# EXHIBIT 1

## EXHIBIT 1 TO THE PRE-TRIAL ORDER

## JOINT STATEMENT OF STIPULATED FACTS

### I.  The Parties

1.     Plaintiff Allergan Sales, LLC is a Delaware corporation having a principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

2.     Plaintiff Forest Laboratories Holdings, Ltd. is an Irish corporation having a principal place of business at Cumberland House, 1 Victoria Street, Hamilton HM11, Bermuda.

3.     Plaintiff Allergan USA, Inc. is a Delaware corporation having a principal place of business at 5 Giralda Farms, Madison, New Jersey 07940 (referred to herein, together with Allergan Sales, LLC and Forest Laboratories Holdings, Ltd. as "Allergan").

4.     Plaintiff Ironwood Pharmaceuticals, Inc. ("Ironwood") is a Delaware corporation having a principal place of business at 100 Summer Street, Suite 2300, Boston, MA 02110.

5.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation having a principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.

6.     Defendant Sandoz Inc. ("Sandoz") is a Colorado corporation having a place of business at 100 College Road West, Princeton, New Jersey 08540.

### II.  The Patents-in-Suit

7.     The Patents-in-Suit are U.S. Patent Nos. 7,304,036 ("the '036 patent"), 7,371,727 ("the '727 patent"), 7,704,947 ("the '947 patent"), 8,080,526 ("the '526 patent"), 8,748,573 ("the '573 patent"), and 8,802,628 ("the '628 patent").

8.     Allergan and Ironwood are the sole owners of the '573 and '628 patents.

9.     Ironwood is the sole owner of the '036, '727, '947, and '526 patents.

10.    Allergan is the exclusive licensee of the '036, '727, '947, and '526 patents.

11.     Pursuant to D.I. 279, the asserted claims of the Patents-in-Suit are set forth in the following table.  Defendants have stipulated to infringement of those claims, to the extent they are valid and enforceable, for each respective ANDA:

| Patents-in-Suit | Teva ANDA 209568 (D.I. 279 at ¶¶ 4-5) | Teva ANDA 211255 (D.I. 279, at ¶¶ 6-7) | Sandoz ANDA 209630 (D.I. 279, at ¶¶ 8-9) |
|---|---|---|---|
| '036 patent | claims 2, 9, 33 37, 39, 43, 44 | claims 2, 9, 39, 43, 44 | claims 2, 9, 33, 37, 39, 43, 44 |
| '727 patent | claims 3, 6 | claims 3, 6 | claims 3, 6 |
| '947 patent | claims 2, 4, 14 | claims 2, 4, 14 | claims 2, 4, 14 |
| '526 patent | claims 1, 2 | claims 1, 2 | claims 1, 2 |
| '573 patent | claims 1, 2, 7, 8 | not asserted | claims 1, 2, 7, 8 |
| '628 patent | claims 1, 16, 17, 20, 21 | not asserted | claims 1, 16, 17, 20, 21 |

Thus, there is no issue of infringement for the parties to try or for the Court to decide at trial.

12.     Defendants have stipulated that the commercial manufacture, use, and sale of Linzess® brand linaclotide capsules (145 μg and 290 μg) is covered by claims 2, 9, 33, 37, 39, 43, and 44 of the '036 patent, claims 3 and 6 of the '727 patent, claims 2, 4, and 14 of the '947 patent, claims 1 and 2 of the '526 patent, claims 1-2 and 7-8 of the '573 patent, and claims 1, 16, 17, 20, and 21 of the '628 patent.  (D.I. 279, at ¶ 10.)

13.     Defendants have stipulated that the commercial manufacture, use, and sale of Linzess® brand linaclotide capsules (72 μg) is covered by claims 2, 9, 39, 43, and 44 of the '036 patent, claims 3 and 6 of the '727 patent, claims 2, 4, and 14 of the '947 patent, and claims 1 and 2 of the '526 patent.  (D.I. 279, at ¶ 11.)

**A.     The '036 Patent**

14.     The '036 patent issued from U.S. Patent Application No. 10/796,719 filed on March 9, 2004.

15.     The '036 patent claims priority to U.S. Utility Patent Application Ser. No. 10/766,735, filed January 28, 2004, U.S. Provisional Patent Application Ser. No. 60/443,098,

filed on Jan. 28, 2003, U.S. Provisional Patent Application Ser. No. 60/471,288, filed on May 15, 2003, and U.S. Provisional Patent Application Ser. No. 60/519,460, filed on Nov. 12, 2003.

16.     The '036 patent, titled "METHODS AND COMPOSITIONS FOR THE TREATMENT OF GASTROINTESTINAL DISORDERS," issued on December 4, 2007.

17.     The named inventors listed on the face of the '036 patent are Mark G. Currie, Shalina Mahajan-Miklos, Thea Norman, and G. Todd Milne.

**B.     The '727 Patent**

18.     The '727 patent issued from U.S. Patent Application No. 10/899,806, filed on July 27, 2004.

19.     The '727 patent claims priority to U.S. Utility Patent Application Ser. No. 10/845,895, filed May 14, 2004, U.S. Utility Patent Application Ser. No. 10/796,719, filed Mar. 9, 2004, U.S. Utility Patent Application Ser. No. 10/766,735, filed Jan. 28, 2004, U.S. Provisional Patent Application Ser. No. 60/443,098, filed on Jan. 28, 2003, U.S. Provisional Patent Application Ser. No. 60/471,288, filed on May 15, 2003, and U.S. Provisional Patent Application Ser. No. 60/519,460, filed on Nov. 12, 2003.

20.     The '727 patent, titled "METHODS AND COMPOSITIONS FOR THE TREATMENT OF GASTROINTESTINAL DISORDERS," issued on May 13, 2008.

21.     The named inventors listed on the face of the '727 patent are Mark G. Currie, Shalina Mahajan-Miklos, Angelika Fretzen, Li Jing Sun, Thea Norman, and G. Todd Milne.

**C.     The '947 Patent**

22.     The '947 patent issued from U.S. Patent Application No. 11/930,696, filed on October 31, 2007.

23.     The '947 patent claims priority to U.S. Patent Application Ser. No. 10/766,735,

filed Jan. 28, 2004, U.S. Provisional Patent Application Ser. No. 60/443,098, filed on Jan. 28, 2003, U.S. Provisional Patent Application Ser. No. 60/471,288, filed on May 15, 2003, and U.S. Provisional Patent Application Ser. No. 60/519,460, filed on Nov. 12, 2003.

24.     The '947 Patent, entitled "METHODS AND COMPOSITIONS FOR THE TREATMENT OF GASTROINTESTINAL DISORDERS," issued on April 27, 2010.

25.     The named inventors listed on the face of the '947 patent are Mark G. Currie, Shalina Mahajan-Miklos, Thea Norman, and G. Todd Milne.

### D.     The '526 Patent

26.     The '526 patent issued from U.S. Patent Application No. 12/754,138, filed on April 5, 2010.

27.     The '526 patent claims priority to U.S. Patent Application Ser. No. 11/930,696, filed Oct. 31, 2007, now U.S. Pat. No. 7,704,947, U.S. Patent Application Ser. No. 10/766,735, filed Jan. 28, 2004, now abandoned, U.S. Provisional Patent Application Ser. No. 60/443,098, filed on Jan. 28, 2003, U.S. Provisional Patent Application Ser. No. 60/471,288, filed on May 15, 2003, and U.S. Provisional Patent Application Ser. No. 60/519,460, filed on Nov. 12, 2003.

28.     The '526 Patent, entitled "METHODS AND COMPOSITIONS FOR THE TREATMENT OF GASTROINTESTINAL DISORDERS," issued on December 20, 2011.

29.     The named inventors listed on the face of the '526 patent are Mark G. Currie, Shalina Mahajan-Miklos, Thea Norman, and G. Todd Milne.

### E.     The '573 Patent

30.     The '573 patent issued from U.S. Patent Application No. 12/851,330, filed on August 5, 2010.

31.     The '573 patent claims priority to U.S. Provisional Patent Application Ser. No.

61/231,725, filed on Aug. 6, 2009.

32.     The '573 Patent, titled "FORMULATIONS COMPRISING LINACLOTIDE," issued on June 10, 2014.

33.     The named inventors listed on the face of the '573 patent are Angelika Fretzen, Steven Witowski, Alfredo Grossi, Hong Zhao, Mahendra Dedhiya, and Yun Mo.

### F.     The '628 Patent

34.     The '628 patent issued from U.S. Patent Application No. 12/541,410, filed on August 14, 2009.

35.     The '628 patent claims priority to U.S. Provisional Patent Application Ser. No. 61/089,422, filed Aug. 15, 2008, U.S. Provisional Patent Application Ser. No. 61/273,332, filed Aug. 3, 2009, and U.S. Provisional Patent Application Ser. No. 61/231,725, filed Aug. 6, 2009.

36.     The '628 Patent, titled "STABLE SOLID FORMULATION OF A GC-C RECEPTOR AGONIST POLYPEPTIDE SUITABLE FOR ORAL ADMINISTRATION," issued on August 12, 2014.

37.     The named inventors listed on the face of the '628 patent are Angelika Fretzen, Steven Witowski, Alfredo Grossi, Hong Zhao, Mahendra Dedhiya, and Yun Mo.

### III.     Plaintiffs' NDA and Linzess®

38.     Allergan holds New Drug Application ("NDA") 202-811 for Linzess® brand linaclotide capsules.

39.     NDA No. 202-811 for Linzess® brand linaclotide capsules was approved by the United States Food and Drug Administration ("FDA") on August 30, 2012.

40.     Plaintiffs listed the '036, '727, '947,'526, '573, and '628 patents in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book") in

connection with NDA No. 202-811.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN SALES, LLC, FOREST LABORATORIES HOLDINGS, LTD., ALLERGAN USA, INC., and IRONWOOD PHARMACEUTICALS, INC. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 16-1114 (RGA) Consolidated |
| v. | ) ) | |
| TEVA PHARMACEUTICALS USA, INC. and SANDOZ INC., | ) ) ) | |
| Defendants. | ) | |

**PRETRIAL ORDER EXHIBIT 2: PLAINTIFFS' STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE LITIGATED**

# TABLE OF CONTENTS

**Page**

I.      BACKGROUND ........................................................................................ 3

II.     PATENTS-IN-SUIT ................................................................................. 5

III.    DEFENDANTS CANNOT PROVE THAT THE ASSERTED CLAIMS OF THE
        '036, '727, '947, AND '526 PATENTS ARE INVALID .................................... 6

        B.      Priority Date ................................................................................. 6

        C.      Level Of Skill In The Art ................................................................ 6

        D.      Defendants Cannot Prove That The Asserted Claims Of The '036, '727,
                '947, And '526 Patents Are Invalid Under 35 U.S.C. § 103 .................. 7

                1.      The '036, '727, '947, And '526 Patents Are Not Obvious ........... 7

                        (a)     A POSA Would Not Have Targeted GC-C To Develop A
                                Treatment For IBS-C And CIC With Any Reasonable
                                Expectation Of Success ................................................... 8

                        (b)     A POSA Would Not Have Selected STcore As A Lead
                                Compound With Any Reasonable Expectation Of Success ......... 10

                        (c)     A POSA Would Not Have Sought To Insert A Proteolytic
                                Cleavage Site Into STcore With Any Reasonable
                                Expectation Of Success ................................................. 13

                        (d)     A POSA Would Not Have Substituted Tyrosine For
                                Leucine At The 9 Position Of STcore With Any
                                Reasonable Expectation Of Success ................................ 14

                        (e)     If One Chose STcore As The Lead Compound, A POSA
                                Would Have Substituted Other Amino Acids At Various
                                Positions Of STcore To Modify Biological Activity ................... 19

                        (f)     A POSA Would Not Have Sought To Treat Pain
                                Associated With IBS-C Using A GC-C Receptor Agonist
                                With Any Reasonable Expectation Of Success ....................... 20

                2.      Objective Indicia Of Non-Obviousness ................................. 22

        E.      Defendants Cannot Prove That Any Of The Asserted Claims Of The '036,
                '727, '947, And '526 Patents Are Invalid Under 35 U.S.C. § 112 .......... 24

          1.     The Asserted Claims Of The '036, '727, And '947 Patents Are Sufficiently Described ............................................................................ 24

          2.     Claims 33, 37, 39, And 43-44 Of The '036 Patent Are Enabled.............. 26

IV.    DEFENDANTS CANNOT PROVE THAT THE ASSERTED CLAIMS OF THE '573 AND '628 PATENTS ARE INVALID .................................................... 27

    B.     Priority Date........................................................................................ 28

    C.     Level Of Skill In The Art..................................................................... 28

    D.     Defendants Cannot Prove That The Asserted Claims Of The '573 And '628 Patents Are Invalid Under 35 U.S.C. § 103 ......................................... 29

          1.     The '573 And '628 Patents Are Not Obvious ........................................... 29

                (a)    Formulating A Shelf-Stable Peptide Is A Complex And Unpredictable Process.................................................. 29

                (b)    Developing A Shelf-Stable Formulation Of Linaclotide Required Undue Experimentation.................................. 32

                (c)    A POSA Would Not Have Selected Leucine To Stabilize Linaclotide With Any Reasonable Expectation Of Success ........ 36

                (d)    A POSA Would Not Have Selected Calcium To Stabilize Linaclotide With Any Reasonable Expectation Of Success ......... 38

                (e)    A POSA Would Not Have Combined Leucine And Calcium To Stabilize Linaclotide With Any Reasonable Expectation Of Success................................................. 39

          2.     Objective Indicia Of Non-Obviousness .................................................... 41

Pursuant to Local Rule 16.3(c)(4), Plaintiffs Allergan Sales, LLC, Forest Laboratories Holdings, Ltd., Allergan USA, Inc., (collectively, "Allergan") and Ironwood Pharmaceuticals, Inc. ("Ironwood") (Allergan and Ironwood, collectively, "Plaintiffs") submit the following Statement of Issues of Fact That Remain to Be Litigated.  Each of the asserted Patents-in-Suit is presumed by statute to be valid (35 U.S.C. § 282) and stipulated by Defendants to be infringed. (D.I. 279.)  Accordingly, Plaintiffs do not have the burden of proving any facts at trial to prevail in this action.  Nonetheless, Plaintiffs intend to dispute the issues of fact identified herein.  This Statement is not intended to be exhaustive and, in addition to what is set forth herein, Plaintiffs reserve the right to prove any facts identified in the pleadings, fact and expert discovery, and any of the accompanying statements of facts and legal issues to be litigated at trial.  Plaintiffs further reserve the right to dispute and rebut any facts asserted by any Defendant at trial.

Plaintiffs expressly incorporate by reference each of the facts and opinions set forth in the following expert reports, and the documents cited within, in their entirety as if fully set forth herein:  Rebuttal Expert Report of Kim E. Barrett, Ph.D., dated January 17, 2019; Rebuttal Expert Report of Lin Chang, M.D., dated January 17, 2019; Rebuttal Expert Report of William DeGrado, Ph.D., dated January 18, 2019; Rebuttal Expert Report of Professor Alexander M. Klibanov, dated January 17, 2019; and, Second Rebuttal Expert Report of Professor Alexander M. Klibanov, dated September 20, 2019.

Plaintiffs' identification of the Issues of Fact That Remain to Be Litigated is based in part on their current understanding of the arguments Defendants Teva Pharmaceuticals USA, Inc. ("Teva") and/or Sandoz Inc. ("Sandoz") (Teva and Sandoz, collectively, "Defendants") are likely to make, based upon the pleadings and discovery in the action to date.  Defendants Statement of

Issues of Fact to Be Litigated (PTO Exhibit 3)[1] includes dozens of pieces of alleged prior art that cannot possibly be presented during the 3-day trial.  Defendants have not indicated which references and prior art combinations Defendants will actually rely upon at trial, or explained any reason to combine with respect to those unidentified combinations.  As Plaintiffs have explained in the meet and confer process, by including so many prior art references in Defendants' PTO sections, Plaintiffs do not believe that Defendants have properly disclosed what defenses they will actually present at trial.   Plaintiffs reserve the right to rebut any facts set forth in Defendants' Statement of Issues of Fact to Be Litigated at trial and in post-trial briefing. Plaintiffs also reserve the right to rebut any facts set forth in the expert reports served by Defendants, facts elicited at trial, and facts presented in any post-trial briefing by Defendants. To the extent Defendants attempt to introduce different or additional facts to meet their burden of proof or to rebut any of Plaintiffs' proofs, Plaintiffs reserve the right to object to and/or contest those facts, and to present any and all arguments in response to those facts.

    If the Court determines that any issue identified in this list as an issue of fact is more properly considered an issue of law, Plaintiffs incorporate such issues by reference into their Statement of Issues of Law That Remain To Be Litigated.  Similarly, if the Court decides that issues that Plaintiffs have designated as issues of law are issues of fact, Plaintiffs incorporate those issues by reference into this Statement of Issues of Fact That Remain to Be Litigated.

---

[1]  Defendants' Statement of Issues of Fact to Be Litigated (PTO Exhibit 3) appears to be a compilation of the Defendants' expert reports served in this case and amounts to over 400 pages. Plaintiffs dispute each of these issues and expressly incorporate by reference Plaintiffs' rebuttal expert reports, and the documents cited within, in their entirety as if fully set forth herein in response to Defendants' Statement.

## I.   BACKGROUND

1.      This is a Hatch-Waxman case regarding six patents protecting Linzess®:  U.S. Patent Nos. 7,304,036 ("the '036 patent"), 7,371,727 ("the '727 patent"), 7,704,947 ("the '947 patent"), 8,080,526 ("the '526 patent"), 8,748,573 ("the '573 patent"), and 8,802,628 ("the '628 patent") (collectively, the "Patents-in-Suit").

2.      Linzess® is a guanylate cyclase-C ("GC-C") agonist that is indicated in adults for treatment of irritable bowel syndrome with constipation ("IBS-C") and chronic idiopathic constipation ("CIC").  Linzess® is the first GC-C agonist to be approved by the U.S. Food and Drug Administration ("FDA") for use as a human therapeutic.

3.      The active ingredient in Linzess® is linaclotide, which is a 14-amino acid peptide with the following amino acid sequence, wherein the three "S-S" indications denote the presence of three disulfide bonds:



4.      Linaclotide is a novel peptide that was first invented by Ironwood scientists and first described in the priority applications leading to the '036, '727, '947, and '526 patents asserted in this case.  No prior art to these patents discloses linaclotide.

5.      After a decade of failures pursuing other approaches, Dr. Currie and his team at Ironwood developed linaclotide by making multiple modifications to an ST peptide.  ST peptides are heat-stable enterotoxins produced by bacteria such as *E. coli* that are well known to induce severe diarrhea, pain, and potential death in humans.  Surprisingly, linaclotide was able to

effectively serve as a human therapeutic without causing these devastating side effects, and in fact was even unexpectedly found to reduce pain.

6.     Functional bowel disorders ("FBDs") such as irritable bowel syndrome ("IBS") and CIC are highly prevalent disorders found worldwide.  IBS and CIC are multifactorial complex conditions that are diagnosed by symptom criteria because there is no objective reliable diagnostic test or marker.  The causes of IBS-C and CIC were unknown at the priority date for the asserted patents and remain unknown today.

7.     IBS is characterized by recurrent abdominal pain associated with defecation or a change in bowel habits, in the absence of structural or biochemical abnormalities in the gastrointestinal tract.  IBS-C is a subtype of IBS in which constipation is the predominant disorder in bowel habits.

8.     CIC is characterized by difficult, infrequent, or incomplete defecation without any known underlying disorder.  Although patients with CIC do not meet the full IBS-C criteria, abdominal pain and/or bloating may be present.

9.     Millions of people are affected by IBS-C and CIC.  Indeed, about 2% of the U.S. population suffer from IBS-C, while anywhere between 2-28% of the U.S. population suffer from CIC.  IBS-C and CIC affect the quality of life and work productivity of these millions of people due to limitations arising from physical problems, bodily pain, mental health, limitations arising from emotional problems, vitality, and social functioning and, as a result, cost the U.S. over $1.5 billion a year.

10.    Prior to its approval, the FDA reviewers for Linzess® recognized that there was an unmet medical need for treatments for patients with IBS-C or CIC.

11.     Linzess® is currently one of only a handful of FDA-approved drugs on the market that treat IBS-C and CIC.  Indeed, at the time it was first approved in 2012, Linzess® was only the second approved drug available on the market to treat IBS-C and CIC and the only approved drug for use in men with these conditions.

## II.     PATENTS-IN-SUIT

12.     Plaintiffs assert the following claims of the Patents-in-Suit against Defendants Teva and Sandoz in this case with respect to their proposed generic 145 µg and 290 µg linaclotide capsules: Claims 2, 9, 33, 37, 39, and 43-44 of the '036 patent, claims 3 and 6 of the '727 patent, claims 2, 4, and 14 of the '947 patent, claims 1-2 of the '526 patent, claims 1-2 and 7-8 of the '573 patent, and claims 1, 16-17, and 20-21 of the '628 patent. Plaintiffs assert the following claims of the Patents-in-Suit against Teva in this case with respect to its proposed generic 72 µg linaclotide capsules: Claims 2, 9, 39, and 43-44 of the '036 patent, claims 3 and 6 of the '727 patent, claims 2, 4, and 14 of the '947 patent, and claims 1-2 of the '526 patent.[2]

13.     The '036, '727, '947, and '526 patents generally describe peptides, including linaclotide, and pharmaceutical compositions comprising peptides, including linaclotide, that activate the GC-C receptor, and methods for treating IBS and other gastrointestinal disorders and conditions using those peptides and pharmaceutical compositions. The asserted claims of the '036, '727, '947, and '526 patents in this case include compound claims, composition claims, method of treatment claims, and method of making claims, all comprising a peptide sequence that includes linaclotide.

14.     The '573 and '628 patents generally describe stable solid oral formulations comprising linaclotide.  The asserted claims of the '573 and '628 patents in this case are generally

---

[2]   Defendants have stipulated to infringement of the asserted claims as set forth in D.I. 279.

directed to room temperature stable, solid oral compositions comprising linaclotide, a calcium

cation, and leucine, and methods of treating chronic constipation or constipation-predominant

IBS using those compositions.

### III. DEFENDANTS CANNOT PROVE THAT THE ASSERTED CLAIMS OF THE '036, '727, '947, AND '526 PATENTS ARE INVALID

15.     The '036, '727, '947, and '526 patents are presumed by statute to be valid.

16.     Many of the references Defendants cite against the '036 patent, the '727 patent, the

'947 patent, and/or the '526 patent were before the U.S. Patent and Trademark Office during

examination of the applications or during reexamination.

### B.     Priority Date

17.     The '036, '727, '947, and '526 patents are entitled to a priority date no later than

January 28, 2003, the filing date of the earliest provisional application to which these patents

claim priority.  At the latest, the '036 patent issued from a utility application filed on March 9,

2004, the '727 patent issued from a utility application filed on July 27, 2004, the '947 patent

issued from a utility application filed on October 31, 2007, and the '526 patent issued from a

utility application filed on April 5, 2010.

### C.     Level Of Skill In The Art

18.     The pertinent art for the '036, '727, '947, and '526 patents is the field of research

and development of peptide drugs for the use in gastrointestinal disorders.

19.     A person of ordinary skill in the art of the '036, '727, '947, and '526 patents as of

the date of invention for each of the asserted claims would have had an M.D. and/or a Ph.D. in

pharmacology, molecular biology, structural biology, biology, biochemistry, medicinal

chemistry, chemistry, chemical engineering, or a related field, along with one to two years of

experience in those areas.  Alternatively, a person of ordinary skill in the art would have had a

Master's Degree in pharmacology, molecular biology, structural biology, biology, biochemistry, medicinal chemistry, chemistry, chemical engineering, or a related field, along with four to five years of experience in those areas.  Alternatively, a person of ordinary skill in the art would have had a Bachelor's Degree in pharmacology, molecular biology, structural biology, biology, biochemistry, medicinal chemistry, chemistry, chemical engineering, or a related field, along with six to seven years of experience in those areas.

> **D.    Defendants Cannot Prove That The Asserted Claims Of The '036, '727, '947, And '526 Patents Are Invalid Under 35 U.S.C. § 103**

> **1.    The '036, '727, '947, And '526 Patents Are Not Obvious**

20.    Plaintiffs expressly incorporate by reference, as if fully set forth herein, each of the facts and opinions set forth in the following expert reports with respect to the nonobviousness of the asserted claims of the '036, '727, '947, or '526 patents:  the Rebuttal Expert Report of Kim E. Barrett, Ph.D., dated January 17, 2019; the Rebuttal Expert Report of Lin Chang, M.D., dated January 17, 2019; and the Rebuttal Expert Report of William DeGrado, Ph.D., dated January 18, 2019.

21.    Defendants cannot prove by clear and convincing evidence that any of the asserted claims of the '036, '727, '947, or '526 patents would have been obvious to a person of ordinary skill in the art ("POSA") under 35 U.S.C. § 103.

22.    References asserted by the Defendants against the '036, '727, '947, or '526 patents do not qualify as (a) analogous art and/or (b) prior art.

23.    None of the prior art relied upon by Defendants, alone or in combination, renders obvious any of the asserted claims of the '036, '727, '947, or '526 patents.

     **(a)**     **A POSA Would Not Have Targeted GC-C To Develop A Treatment For IBS-C And CIC With Any Reasonable Expectation Of Success**

24.     At the time of the inventions of the '036, '727, '947, and '526 patents, drug design, including for gastrointestinal drugs, was a complex and unpredictable art.

25.     The peptides recited in the asserted claims of the '036, '727, '947, and '526 patents, including linaclotide, are GC-C agonists.

26.     When these GC-C agonists bind to the GC-C receptor, they activate the GC-C receptor.  Activation of the GC-C receptor results in an increase in both intracellular and extracellular concentrations of cyclic guanosine monophosphate ("cGMP").

27.     Elevation in intracellular cGMP stimulates secretion of chloride and bicarbonate into the intestinal lumen, mainly through activation of the cystic fibrosis transmembrane conductance regulator ("CFTR") ion channel, resulting in increased intestinal fluid and accelerated transit.

28.     Before the inventions of the '036, '727, '947, and '526 patents, no GC-C agonist had ever been used to make a human therapeutic, much less a gastrointestinal human therapeutic.

29.     A POSA at the time of the invention of the '036, '727, '947, and '526 patents would not have had any reason to target the GC-C receptor to develop a gastrointestinal human therapeutic, including for IBS-C and CIC, with any reasonable expectation of success.

30.     Based on the prior art, a POSA would have looked to the classes of compounds that had already been approved or were already in development for a lead compound for further research.

31.     At the relevant time pharmaceutical companies were researching at least the following types of compounds for treatment of IBS-C:  5-HT3 antagonists; 5-HT4 agonists; 5 lipoxygenase inhibitors; β-3 adrenoreceptor agonists; CCK inhibitors; corticotropin releasing

factor 1 receptor antagonists; lipocortins synthesis agonists; muscarinic antagonists; neurokinin antagonists; opioid agonists; and VL-4 antagonists.  Other targets included the $SST_2$ receptor, NK receptors, NK-1 antagonist, somatostatin receptors, and CRF-1 receptors.  Of these potential targets, the field was primarily focused on the 5HT-4 (serotonin) pathway.

32.     A POSA seeking to develop new therapies for IBS-C or CIC at the relevant time would have been aware that 5-HT4 (serotonin) receptor agonists such as the drug Zelnorm® (tegaserod)—a 5-HT4 receptor partial agonist—were already on the market for these conditions.

33.     The FDA-approved label for Zelnorm® stressed the importance of serotonin, teaching a POSA that: "Serotonin has been shown to be involved in regulating motility, visceral sensitivity and intestinal secretion.  Investigations suggest an important role of serotonin Type-4 (5-HT4) receptors in the maintenance of gastrointestinal functions in humans."

34.     A POSA would have further been aware that at the relevant time, the pharmaceutical industry had been largely focused on small molecule drugs, such as Zelnorm® (tegaserod), and had only a scant history with proteins or peptides as therapeutics.

35.     A POSA at the relevant time would therefore have first sought to improve on known drugs such as Zelnorm® (tegaserod), for example, by maximizing potency and by minimizing any possible off-target activity.  A POSA would not have looked to develop a peptide therapeutic that worked in a completely different pathway by a completely different mechanism.

36.     Indeed, a POSA at the time of the invention of the '036, '727, '947, and '526 patents would not have been attempting to treat constipation by targeting the GC-C receptor with an agonist, or otherwise to modulate secretions.  Instead, a POSA at the relevant time seeking to develop a treatment for constipation would have focused on the only FDA-approved drug,

Zelnorm® (tegaserod), and other targets that affected motility and/or on visceral sensitivity in IBS-C, such as the motilin pathway and opioid receptors.

37.     Researchers who were focused on motility to treat constipation were looking at pro-kinetic agents to speed up the transit of materials through the gastrointestinal tract, primarily in the large intestine.  Such agents included agents that targeted 5-HT (serotonin) receptors and hormones.  Other constipation treatments were also examined with the goal of increasing motility in the gut, for example, motilin pathways and opioid receptors.

38.     Even if a POSA were looking to modulate secretions as a treatment for IBS-C or CIC, such a POSA would not have attempted to do so indirectly by targeting GC-C, but rather would have attempted to do so directly through, for example, CFTR or chloride channels.

39.     For example, a POSA seeking to develop new therapies for IBS-C or CIC at the relevant time would have been aware that the drug Amitiza® (lubiprostone) was under development.  Although Amitiza®'s mechanism of action was not clear at the relevant time, human clinical trials purportedly showed an effect on the CLC chloride channel and modification of secretion.  Based on this preliminary human clinical data, a POSA would have understood that to the extent that Amitiza® modified secretion, it did so by directly acting on the CFTR and/or chloride channels, further suggesting to a POSA that one should investigate compounds that modulate secretions directly rather than indirectly.

40.     Any argument that a POSA would have targeted GC-C to develop a treatment for IBS-C and/or CIC is based on hindsight.

### (b)     A POSA Would Not Have Selected STcore As A Lead Compound With Any Reasonable Expectation Of Success

41.     The GC-C agonist peptides recited in the asserted claims of the '036, '727, '947, and '526 patents, including linaclotide, are analogs of ST peptides.

10

42.     ST peptides are heat-stable enterotoxins produced by bacterial strains such as enterotoxic and enteroaggressive *E. coli*.

43.     ST peptides are often considered "super agonists" of the GC-C receptor because they stimulate it to such an extent that they induce severe diarrhea and cause debilitating pain in many mammalian species, including humans.

44.     Severe diarrhea caused by *E. coli* ST toxins can lead to severe dehydration, which can ultimately lead to death or can make the individual susceptible to infection by other organisms.

45.     Diarrhea caused by agents such as *E. coli* is one of the world's top infectious killers, in particular affecting children in third world countries and causing an estimated 5 million human deaths annually.

46.     The below chart compares the amino acid sequence of STh (i.e., the ST peptide produced by *E. coli* in humans) and linaclotide, using standard single letter amino acid abbreviations:

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STh | N | S | S | N | Y | C | C | E | **L** | C | C | N | P | A | C | T | G | C | Y |
| Linaclotide |  |  |  |  |  | C | C | E | **Y** | C | C | N | P | A | C | T | G | C | Y |

STh(6-19) is known as STcore and is even more toxic than the full length STh.

47.     A POSA at the time of the invention of the '036, '727, '947, and '526 patents would not have been motivated to develop a treatment for IBS-C or CIC based on toxic ST peptides at all, let alone with any reasonable expectation of success, for several reasons.

48.     First, the harmful properties of ST peptides were well-known at the time of the invention.  A POSA would have been very concerned about the toxicity of a drug based on an ST

peptide and would not have chosen an ST peptide as a lead compound, let alone STcore, which a

POSA would have understood to be even more toxic than full length ST.  This is particularly true

because the route of administration of the potential therapeutic based on the toxic ST peptide is

the same route through which the ST toxin causes severe and sometimes lethal diarrhea.  A

POSA at the time would not have wanted to treat one serious gastrointestinal condition—IBS-C

or CIC—by inducing a different one—diarrhea.

49.     Second, a POSA would have doubted that any peptide-based agonist would reach

the site of action without being degraded.  To be effective in treating constipation by stimulating

secretion, a peptide would need to persist into the colon, but there was a significant risk that the

peptide would encounter stability issues in the gut.

50.     Third, a toxin such as an ST peptide would be expected to have a very small

therapeutic window (if any), which would pose a major concern for a POSA.  Threading the

needle between efficacy and safety is extremely problematic when trying to achieve efficacy

with an agent that has potential toxicity *and* a duration of action of less than 24 hours.

51.     If a POSA at the relevant time were attempting to make a treatment based on a

GC-C receptor agonist, a POSA would have begun with guanylin and uroguanylin—endogenous

ligands (i.e., proteins produced naturally in the body) for the GC-C receptor—and modified them

to try to develop a therapeutic.

52.     Guanylin and uroguanylin were known to activate the GC-C receptor and would

not have posed the same toxicity concerns as ST peptides.  These compounds also might have

provided a much larger potential therapeutic window than ST peptides.

53.     Possible modifications to guanylin and uroguanylin for the development of a

human therapeutic could have included:  (1) mutation of the chymotrypsin site in guanylin to

render it resistant to proteolytic cleavage; (2) mutation of uroguanylin to alter its potency and activity at varying pH.  A POSA would have considered almost any modification to the endogenous peptides before considering a toxin.

54.     Any argument that a POSA would have selected STcore as a lead compound is based on hindsight.

> **(c)     A POSA Would Not Have Sought To Insert A Proteolytic Cleavage Site Into STcore With Any Reasonable Expectation Of Success**

55.     Even if a POSA sought to develop a drug based on the toxic STcore peptide, a POSA would not have sought to shorten the lifetime of STcore by introducing a proteolytic cleavage site and would not have had any reasonable expectation of success in doing so.

56.     The onset of action of STcore (STh(6-19)) is about one to two hours, and its duration is approximately 9-10 hours.  Proteolytic cleavage at a substituted site in STcore would decrease the lifetime of the peptide in the system.

57.     There was no evidence at the time of the inventions of the '036, '727, '947, and '526 patents that a drug with a short lifetime would have been effective to treat IBS-C and CIC.

58.     Typically, a POSA would attempt to achieve the ideal of making a drug that has a duration of action sufficient to provide an effect over 24 hours for once a day dosing.  Shortening the duration of action of a drug results in a brief peak of activity followed by a long "trough" in which the drug is no longer active.  The long trough runs the risk of insufficient efficacy and the high peak runs the risk of compromised safety due to target-based toxicity.

59.     Rather than shortening the lifetime of STcore, a POSA seeking to develop a drug based on STcore would have wanted to extend the duration of STcore to about a day to provide once-a-day dosing without large peaks or troughs.

60.     Even if a POSA would have attempted to modify STcore to shorten its lifetime through proteolytic degradation, a POSA would not have chosen to insert a chymotrypsin cleavage site into STcore.

61.     Chymotrypsin is active in the small intestine.  Therefore, if chymotrypsin cleavage actually occurred, the drug might be present at a higher concentration in the upper gut and a low concentration in the lower gut as it progressively encounters chymotrypsin.  A POSA would have understood that such an effect would not be desirable.

62.     Chymotrypsin cleavage is dependent on food intake.  A POSA would not have considered this type of cleavage as a preferred approach for a reliable or desirable method of controlling the toxicity of an ST peptide to make a drug.

63.     A POSA would not have reasonably expected chymotrypsin to cleave STcore before its disulfide bonds were reduced, which reduction would inactivate chymotrypsin as well.

64.     Any argument that a POSA would have sought to insert a proteolytic cleavage site into STcore is based on hindsight.

### (d)     A POSA Would Not Have Substituted Tyrosine For Leucine At The 9 Position Of STcore With Any Reasonable Expectation Of Success

65.     Even if a POSA sought to introduce a chymotrypsin site into STcore to reduce its potency, a POSA would not have substituted a tyrosine (Tyr, Y) for the leucine (Leu, L) at the 9 position of STcore and would have had no reasonable expectation of success in doing so for several reasons.

66.     First, a POSA at the relevant time would not have believed the $Leu^9$ position in the N-terminal region of STcore to be accessible to chymotrypsin cleavage.

67.     The three-dimensional aqueous crystalline structure of the ST peptide is similar to a knotted ball, held tightly together by the three disulfide bonds.  The N-terminal region,

particularly the Leu$^9$ position, is part of a tightly constrained region, involving all three disulfide bonds and two loops, in the middle of this ball.

68.     A POSA would have recognized that for a protease such as chymotrypsin to cleave the peptide at the amide bond between Leu$^9$ and Cys$^{10}$, it would be necessary to disrupt the three-dimensional structure, and extend out the peptide to expose various sites to enzymatic cleavage.  Only if the amide bonds in the ST peptide adopt an extended conformation to fit into the chymotrypsin binding site will cleavage occur at an appreciable rate.  The chain, however, cannot be extended when it is bunched up into a disulfide-bonded tertiary structure.

69.     Without knowing the equilibrium constant for disulfide formation under the conditions of the intestinal lumen, it cannot be predicted whether the disulfides of ST would or would not be reduced to any significant extent.

70.     Moreover, amino acid substitutions to disulfide-rich peptides distant from the disulfide in question were known to have large effects on the equilibrium constant for disulfide formation, which introduces additional uncertainty.  Individual disulfides in disulfide-rich proteins were known to have different reduction potentials, so it could not be predicted which would be reduced most easily.

71.     It is likely that the disulfides in ST peptides were difficult to reduce.  The ST toxin has evolved in enteric bacteria over millions of years to function in the intestinal tract of their hosts.  The biological activity of ST depends on forming the appropriate three-dimensional structure, which in turn, depends critically on the formation of the disulfides.  Thus, a POSA would have reason to believe that the equilibrium constants for disulfide formation in ST are evolutionarily poised to minimize the formation of inactive reduced peptides.

72.     Also, a POSA would not expect to see potent intestinal activity when purified ST analogues were administered orally if the peptide was easily reduced, given the fact that the reduced form is inactive and also because there are many proteases that can act on linear peptides in the gut.

73.     Thus, a POSA would not conclude that the three disulfides of ST would be easily reduced to generate a linear reduced peptide that could be acted on by chymotrypsin, just because a Tyr was introduced into the peptide.

74.     A POSA would have understood that a Tyr for Leu substitution at position 9 would not expose the backbone at that location and therefore would not result in proteolytic cleavage.

75.     Second, a POSA would have been aware that the bacterial toxin EAST1 produced by *E. coli* with homology to ST has a chymotrypsin cleavage site in the region of the Leu in ST and nonetheless is toxic and causes diarrhea in human beings and animals.  A POSA would therefore not have believed that inserting a chymotrypsin cleavage site at that position in STcore would have reduced its toxicity.

76.     Third, a POSA would have preferred the C-terminal region over the N-terminal region of STcore as a location for a putative proteolytic site.

77.     Unlike the N-terminal region, which is constrained by two loops, the C-terminal region is part of only one loop.  The loop in the C-terminal region is larger and hence more accessible to cleavage.

78.     Thr[16] in the C-terminal region would have been a much more likely choice for a POSA as a location for a Tyr substitution than Leu[9].  A POSA would have recognized that in homologous peptides of the ST family, such as *Y. entero* ST and *V. cholera* ST, a potential

chymotrypsin cleavage site, phenylalanine (Phe, F), is already present.  Therefore, a POSA seeking to insert a chymotrypsin site into STcore would have sought to introduce such a site at the Thr[16] position.

79.     Fourth, a POSA at the relevant time would not have understood Tyr to be preferred over other possible chymotrypsin cleavage sites such as Phe or Trp.

80.     A POSA would have understood that chymotrypsin has no preference for Tyr over Phe or Trp.

81.     Moreover, a POSA would have understood that Leu itself is a chymotrypsin cleavage site.  Given that Leu is already present in STcore, and that the peptide is resistant to proteolytic cleavage, a POSA would not have sought to replace Leu with a different chymotrypsin cleavage site such as Tyr, Phe, or Trp.  Instead, a POSA would have understood that the 9 position would not be readily accessible to proteolytic cleavage, given its location within two disulfide bonded rings.

82.     Similarly, substituting Lys for Leu at position 9 yields an ST analog that retains substantial activity, about one-fifth the enterotoxicity of ST.  Given that Lys is the canonical residue for cleavage by trypsin, a POSA would have expected proteolysis (in the gut) if the ring were not so rigid and the 9 position in the peptide were accessible to proteases.

83.     Fifth, a POSA at the relevant time would not have understood Tyr and Leu to have similar hydrophilicity.

84.     Examination of the hydrophilicity and hydrophobicity scales available to a POSA at the relevant time demonstrates that judgments about relative hydrophilicity, hydrophobicity, or substitutability of amino acids were highly dependent on the scale that was used.

85.     A POSA would not have been able to come to any definitive conclusion based on the varying relative values for Leu and Tyr among these different hydrophilicity and hydrophobicity scales.

86.     At the relevant time, there were many hydrophobicity scales available to a POSA. Depending on which scale was chosen, a POSA would come to very different conclusions about the similarity of Leu to Tyr.  In only one scale are Leu and Tyr considered to be similar, while the others indicate that the two residues are quite different in polarity.

87.     Even if a POSA substituted Tyr for the Leu at the 9 position in the N-terminal region of STcore, there was no reasonable expectation of success that this substitution would have produced a useful therapeutic.

88.     For example, there was no reasonable expectation of success that the modified peptide would be able to bind to the GC-C receptor and stimulate intestinal fluid secretion, and do so in a controlled way that was therapeutic, instead of toxic like STcore.  A POSA would not have been able to extrapolate from results in the prior art about binding obtained with a Pap substitution to the effect of a Tyr substitution on binding and activity.

89.     Moreover, a POSA would not have reasonably expected a Tyr substituted at the 9 position to have been accessible to proteolytic cleavage.  A POSA at the relevant time would have understood that this putative cleavage site would be situated within two macrocycles, and also that it would be located in the smallest and most knotted segment of the peptide.

90.     To the extent that a POSA sought to test whether a Tyr substituted at the 9 position would be accessible to chymotrypsin and result in proteolytic cleavage of the peptide, an *in vitro* proteolytic stability assay would have indicated that a Tyr at the 9 position is not in fact accessible and that no such cleavage occurs.

91.     During development of linaclotide, an *in vitro* stability study showed that linaclotide "is resistant to many proteases and conditions found in the gut and intestine."  In this study, linaclotide "was incubated with chymotrypsin, trypsin, pepsin, aminopeptidase, carboxypeptidase A, and simulated gastric fluid (SGF) at pH 1.0."  The results showed that only carboxypeptidase A was able to proteolyze linaclotide, by cleaving off the carboxy-terminal tyrosine—there was no cleavage at the 9 position, and no cleavage by chymotrypsin.

92.     A POSA would therefore not have had a reasonable expectation of success in achieving proteolytic cleavage by chymotrypsin of an ST peptide with a Tyr substituted at the 9 position.

93.     Any argument that a POSA would have substituted tyrosine for leucine at the 9 position of STcore is based on hindsight.

        **(e)     If One Chose STcore As The Lead Compound, A POSA Would Have Substituted Other Amino Acids At Various Positions Of STcore To Modify Biological Activity**

94.     Even if one were to assume a POSA would substitute amino acids of STcore (and a POSA would not have), a POSA would have made changes to the amino acid structure other than with a Tyr substituted at the 9 position to modify the biological activity of the resulting ST analog.

95.     A POSA would have known that one could substitute the amino acid residues in the Asn-Pro-Ala ("NPA") portion of ST core, while maintaining biological activity of the peptide.

96.     For example, guanylin, one of the endogenous agonists of the GC-C receptor, lacks the NPA site, suggesting that this site can be modified without destroying activity.

97.     Similarly, multiple prior art references, including those cited by Defendants, teach a POSA that one can make various substitutions in the NPA region and still retain biological activity similar to STcore.

98.     To the extent a POSA would have considered mutating the N-terminal region, the prior art would direct a POSA to mutate Glu at position 8, rather than Leu at position 9.  For example, the prior art teaches that analogs with Ala substitutions at Glu retain greater biological activity than the same substitution at Leu.  Indeed, the prior art teaches that Leu is one of the three least mutable amino acids, with only Cys and Trp ranking below.

> **(f)     A POSA Would Not Have Sought To Treat Pain Associated With IBS-C Using A GC-C Receptor Agonist With Any Reasonable Expectation Of Success**

99.     Following the invention of linaclotide, studies revealed that Linzess® had unexpectedly proven to be effective in treating the intestinal pain and discomfort associated with patients suffering from IBS-C or CIC.

100.     A POSA at the relevant time would not have expected a GC-C agonist such as Linzess® to have been effective in treating pain, including from IBS-C or CIC.

101.     Abdominal discomfort or pain are part of the diagnostic criteria for IBS-C.  Pain can also be present in patients with CIC.

102.     No prior art cited by Defendants discloses that any GC-C agonist, including an ST peptide, has an effect on pain.

103.     The intestine can be thought of as a tube, with a lining of intestinal epithelial cells.  There are no pain fibers in the intestinal lumen or in the intestinal epithelium.  To reach pain fibers from the intestinal lumen, it is necessary to pass through the intestinal epithelium to the connective tissue outside the intestine.

104.    It is not possible for proteins and peptides (such as Linzess®) to pass through the epithelium to reach the pain fibers outside the intestine.

105.    First, proteins and peptides taken up into epithelial cells are degraded by intracellular proteases.  Therefore, these proteins and peptides cannot readily be absorbed in intact form through the epithelial cells from the lumen to reach the pain fibers outside the intestine.

106.    Second, there are tight junctions made up of proteins that fill the intercellular space between adjacent epithelial cells that line the intestine.  The tight junctions prevent larger molecules such as proteins or peptides from passing from the lumen to the pain fibers outside the intestine.

107.    Therefore, the effect of Linzess® on pain must be the result of some type of signaling pathway that sends a signal from the lumenal side of the intestinal epithelium through the epithelial cells and out to the pain fibers.

108.    A POSA, however, would not have expected cGMP production in the intestinal epithelial cells resulting from activation of the GC-C receptor by Linzess® to signal to pain fibers outside the intestine.  cGMP is not lipid soluble and would be expected to stay within the cell where it is produced.

109.    It was wholly unexpected that activation by Linzess® of the GC-C receptor on the lumenal side of the epithelial cells would lead to secretion of cGMP on the other side of the cells, and that this secretion of cGMP would exert an anti-nociceptive effect (*i.e.*, an effect that blocks the detection of pain and discomfort) on the pain fibers.

110.    The FDA Cross-Discipline Review and the Medical Review concluded that "Linaclotide showed clinical benefit in decreasing abdominal pain," and the Risk Assessment

Review stated that it "may also result in reduced visceral pain secondary to decrease in pain-fiber activity."

111.    Before the pain studies related to Linzess® following the invention of linaclotide, the GC-C pathway was not understood to be involved in gastrointestinal pain pathways.

112.    Moreover, it was surprising that the efficacy data for Linzess® appeared to be superior to those of Zelnorm® (tegaserod), a serotonin 5-HT4 receptor agonist, which was thought to work on pain pathways and would have been expected to treat pain associated with IBS-C.

113.    The effectiveness of Linzess® on pain cannot be explained through effects on bowel habits.  Abdominal pain associated with IBS-C and CIC is only weakly correlated with bowel habits.

114.    The mechanism through which Linzess® appears to treat pain and discomfort was not understood until 2013.  The elucidation of this mechanism of action on pain has led to a new and better understanding of gastrointestinal pain.

115.    Any argument that a POSA would have sought to treat pain associated with IBS-C using a GC-C receptor agonist is based on hindsight.

### 2.    Objective Indicia Of Non-Obviousness

116.    Multiple objective indicia of non-obviousness confirm that the asserted claims of the '036, '727, '947, and '526 patents would not have been obvious in light of the cited prior art references.  Relevant objective indicia of nonobviousness include unexpected results, skepticism, teaching away, long-felt but unsolved need, failure of others, praise, and acquiescence/licensing.

117.    Various properties of linaclotide, compositions containing linaclotide, and the use of linaclotide for treating IBS-C and CIC—as embodied by Linzess®—were unexpected compared to the prior art.  For example, it was unexpected that linaclotide and compositions of

Linzess® would safely and effectively treat IBS-C and CIC, including the intestinal pain and discomfort associated with these disorders, given linaclotide's structural similarity to ST peptides and STcore (the more toxic biological core of ST peptides) expressed by *E. coli*.

118.    Many, including the FDA and experienced scientists in the field, expressed skepticism that linaclotide could safely treat IBS-C and CIC without undue side effects.

119.    The prior art generally and specifically taught away from developing a GC-C agonist, especially an ST peptide, for the treatment of patients suffering from IBS-C or CIC. Instead, at the time of the claimed inventions, pharmaceutical companies and researchers were pursuing development of vastly different compounds and different mechanisms of action.

120.    Prior to the time of the invention, there was a long-felt, but unsolved need for a safe and effective treatment for people suffering from IBS-C and CIC and, in particular, a treatment that also treated the pain associated with these conditions.  The only FDA-approved treatment for IBS-C available at the time of the claimed inventions, Zelnorm® (tegaserod), was approved for "short-term treatment of women" only.  At the time of the FDA approval of Linzess® in 2012, there was only one approved drug on the market to treat IBS-C and CIC—Amitiza® (lubiprostone)—and it was also restricted to use in women for IBS-C.  Over-the-counter ("OTC") treatments for constipation that were available at the time of the invention—such as laxatives, stool softeners, and suppositories—are not satisfactory treatment options for people suffering from IBS-C or CIC. In particular, these OTC products are intended to treat people with periodic episodes of constipation and are not designed to be used chronically. Moreover, OTC laxatives do not help reduce pain and, in fact, can cause pain by causing cramping and other side effects.

121.    Prior to the invention of the asserted claims of the '036, '727, '947, and '526 patents, the pharmaceutical industry had searched for a solution to treat IBS-C and failed to develop a reliable treatment for patients.  Numerous companies had identified drug candidates for potential treatment of IBS-C and embarked on extensive research programs.  Many of those products progressed into Phase I through Phase III clinical trials, but ultimately failed to obtain FDA approval and were never marketed in the United States.

122.    Since its approval Linzess® has been praised by both industry and practitioners. For example, the American Gastroenterological Association (AGA) provided a strong recommendation for using linaclotide in patients with IBS-C based on high-quality evidence.

123.    Allergan exclusively licenses the '036, '727, '947, and '526 patents for the development and marketing of Linzess® in the United States through a Collaboration Agreement between Forest Laboratories, Inc. and Microbia, Inc. (now, Ironwood) dated September 12, 2007.

124.    There is a nexus between this evidence of objective indicia of non-obviousness and the inventions recited in the asserted claims of the '036, '727, '947, and '526 patents. Defendants have stipulated that Linzess® 72 μg, 145 μg, and 290 μg linaclotide capsules are commercial embodiments of, and are coextensive with, the asserted claims of the '036, '727, '947, and '526 patents. (D.I. 279, at ¶¶10-11.)

E.    **Defendants Cannot Prove That Any Of The Asserted Claims Of The '036, '727, '947, And '526 Patents Are Invalid Under 35 U.S.C. § 112**

1.    **The Asserted Claims Of The '036, '727, And '947 Patents Are Sufficiently Described**

125.    Plaintiffs expressly incorporate by reference as if fully set forth herein each of the facts and opinions set forth in the Rebuttal Expert Report of William DeGrado, Ph.D., dated

January 18, 2019, that the asserted claims of the '036, '727, and '947 patents are adequately described.

126.    The asserted claims of the '036, '727, and '947 patents are not invalid for lack of written description.

127.    The specification of the '036, '727, and '947 patents provides the complete amino acid sequence of linaclotide.

128.    The specification of the '036, '727, and '947 patents provides substantial additional description of the claimed peptide, including its disulfide or other internal crosslinks. For example, the specification describes the specific disulfide bonds in the fully folded peptide: "When fully folded, disulfide bonds are present between: $Cys_6$ and $Cys_{11}$; $Cys_7$ and $Cys_{15}$; and $Cys_{10}$ and $Cys_{18}$."  The specification further states:

> The peptides of the invention, like the bacterial ST peptides, have six Cys residues.  These six Cys residues form three disulfide bonds in the mature and active form of the peptide.  If the six Cys residues are identified, from the amino to carboxy terminus of the peptide, as A, B, C, D, E, and F, then the disulfide bonds form as follows:  A-D, B-E, and C-F.  The formation of these bonds is thought to be important for GC-C receptor binding.

Thus, the specification expressly describes peptides with the native disulfide bonds.  In contrast, it does not describe peptides with non-native disulfide bonds.

129.    The specification of the '036, '727, and '947 patents further sets out multiple descriptions and *in vitro* and *in vivo* working examples that demonstrate how to prepare the claimed peptide, elucidate the mode of action of the claimed peptide, and demonstrate the effectiveness and pharmacokinetic properties of the claimed peptide as a therapeutic for conditions such as IBS-C and CIC.

130.    It would have been well known to a POSA at the relevant time that peptides will equilibrate to a native or most stable conformation.

131.    STcore has a stable conformation in nature.

132.    A POSA at the relevant time seeking to develop a therapeutic for conditions such as IBS-C and CIC would have understood that unstable, short-lived isomers of the peptide would not have been suitable therapeutics.  For this reason also, a POSA would have understood the specification of the '036, '727, and '947 patents to be directed to stable isomers of the claimed peptides.

133.    The asserted claims of the '036, '727, and '947 patents are sufficiently described in the specification and meet the written description requirement.

### 2.    Claims 33, 37, 39, And 43-44 Of The '036 Patent Are Enabled

134.    Plaintiffs expressly incorporate by reference as if fully set forth herein each of the facts and opinions set forth in the Rebuttal Expert Report of William DeGrado, Ph.D., dated January 18, 2019, that the claims 33, 37, 39, and 43-44 of the '036 patent are enabled.

135.    Claims 33, 37, 39, and 43-44 of the '036 patent are not invalid for lack of enablement.

136.    A POSA would be able to practice the inventions recited in these claims without undue experimentation given the guidance provided in the '036 patent.

137.    Claims 33, 37, 39, and 43-44 of the '036 patent relate to methods for administering to patients suffering from various conditions an effective amount of a pharmaceutical composition comprising the claimed peptide.

138.    The specification of the '036 patent provides substantial additional description of the claimed peptide, including its disulfide or other internal crosslinks.  For example, the specification describes the specific disulfide bonds in the fully folded peptide:  "When fully folded, disulfide bonds are present between: $Cys_6$ and $Cys_{11}$; $Cys_7$ and $Cys_{15}$; and $Cys_{10}$ and $Cys_{18}$."  The specification further states:

26

> The peptides of the invention, like the bacterial ST peptides, have six Cys residues. These six residues form three disulfide bonds in the mature and active form of the peptide. If the six Cys residues are identified, from the amino to carboxy terminus of the peptide, as A, B, C, D, E, and F, then the disulfide bonds form as follows: A-D, B-E, and C-F. The formation of these bonds is thought to be important for GC-C receptor binding.

Thus, the specification expressly describes peptides with the native disulfide bonds. In contrast, it does not describe peptides with non-native disulfide bonds.

139.    The specification of the '036 patent provides multiple descriptions and *in vitro* and *in vivo* working examples that demonstrate how to prepare the claimed peptide, elucidate the mode of action of the claimed peptide, and demonstrate the effectiveness and pharmacokinetic properties of the claimed peptide as a therapeutic for conditions such as IBS-C and CIC. These descriptions and working examples enable the full scope of the claimed methods of treatment.

140.    It would have been well known to a POSA at the relevant time that peptides will equilibrate to a native or most stable conformation.

141.    STcore has a stable conformation in nature.

142.    A POSA at the relevant time seeking to develop a therapeutic for conditions such as IBS-C and CIC would have understood that unstable, short-lived isomers of the peptide would not have been suitable for use as therapeutics. For this reason also, a POSA would have understood the specification of the '036 patent to be directed to peptides folded into stable isomers.

143.    Claims 33, 37, 39, and 43-44 of the '036 patent are sufficiently enabled by the disclosure in the specification and satisfy the enablement requirement.

## IV.    DEFENDANTS CANNOT PROVE THAT THE ASSERTED CLAIMS OF THE '573 AND '628 PATENTS ARE INVALID

144.    The '573 and '628 patents are presumed by statute to be valid.

145.     Many of the references Defendants cite against the '573 and/or the '628 patent were before the U.S. Patent and Trademark Office during examination of the applications.

**B.     Priority Date**

146.     The '573 patent is entitled to a priority date no later than August 6, 2009, the filing date of the earliest provisional application to which this patent claims priority.  At latest, the '573 patent issued from a utility application filed on August 5, 2010.

147.     The '628 patent is entitled to a priority date no later than August 15, 2008, the filing date of the earliest provisional application to which this patent claims priority.  At latest, the '628 patent issued from a utility application filed on August 14, 2009.

**C.     Level Of Skill In The Art**

148.     The pertinent art for the '573 and '628 patents is the field of drug formulation, development, and/or use of therapeutic agents, including potential treatments for gastrointestinal ("GI") disorders.

149.     A person of ordinary skill in the art of the '573 and '628 patents as of the date of invention for each of the asserted claims would have had (i) an M.D. degree and/or a Ph.D. degree in pharmacology, biology (or a sub-discipline thereof), chemistry (or a subdiscipline thereof), chemical engineering (or a sub-discipline thereof), or a related discipline, along with one to two years of experience in pharmaceutical formulations, or (ii) a Master's degree in the aforementioned disciplines along with four to five years of experience in pharmaceutical formulations, or (iii) a Bachelor's degree in the aforementioned disciplines along with six to seven years of experience in pharmaceutical formulations.

### D. Defendants Cannot Prove That The Asserted Claims Of The '573 And '628 Patents Are Invalid Under 35 U.S.C. § 103

#### 1. The '573 And '628 Patents Are Not Obvious

150.    Plaintiffs expressly incorporate by reference each of the facts and opinions set forth in the Rebuttal Expert Report of Professor Alexander M. Klibanov, dated January 17, 2019, and the Second Rebuttal Expert Report of Professor Alexander M. Klibanov, dated September 20, 2019, including the documents cited within each report, in their entirety as if fully set forth herein with respect to the nonobviousness of the asserted claims of the '573 and '628 patents.

151.    Defendants cannot prove by clear and convincing evidence that any of the asserted claims of the '573 or '628 patents would have been obvious to a POSA under 35 U.S.C. § 103.

152.    References asserted by the Defendants against the '573 or '628 patents do not qualify as (a) analogous art and/or (b) prior art.

153.    None of the prior art relied upon by Defendants, alone or in combination, renders obvious any of the asserted claims of the '573 or '628 patents.

#### (a) Formulating A Shelf-Stable Peptide Is A Complex And Unpredictable Process

154.    At the time of the inventions of the '573 and '628 patents, peptide formulation was a complex and unpredictable art.

155.    One of the major challenges in developing a successful pharmaceutical protein or peptide therapeutic, such as linaclotide, is creating a formulation that is shelf-stable.  Shelf-stability requires that, for a sufficient length of time prior to administration, *i.e.*, during manufacturing, storing, and distributing the drug, the protein or peptide not appreciably undergo deleterious physical or chemical degradation reactions.  A lack of adequate stability can lead to, among other things, drastically diminished efficacy and adverse immune responses in the patient.

29

156.    There was no reasonable expectation that a POSA, at the time of the invention (and even today), when provided with a new therapeutic protein or peptide such as linaclotide, would be able to develop a suitably stable pharmaceutical composition without undue experimentation.

157.    A pharmaceutical formulator, faced with the task of developing a stable pharmaceutical composition containing a protein or peptide such as linaclotide, would need to consider numerous variables and engage in a research project of uncertain outcome.

158.    One of the most important variables is the unique degradation pathways of a given protein or peptide and each pathway's relative level of importance.  Degradation pathways and their relative roles are highly unpredictable because they are specific to, and dependent upon, individual peptides and experimental conditions.  Peptides and proteins often have numerous potential degradation pathways.

159.    Identifying all of a protein or peptide's degradation pathways is difficult and constitutes undue experimentation with no reasonable expectation of success.  It is even more difficult to determine which of a protein or peptide's many degradation pathways are most impactful for instability.

160.    Peptide degradation reactions greatly accelerate as the temperature is raised. Attempting to formulate a peptide to be stable at room temperature is a very different and generally more arduous endeavor than attempting to formulate the same peptide to be stored in a refrigerator.

161.    Once a protein or peptide's degradation pathways are identified, a POSA would have next needed to identify which stabilizing excipients to include in the formulation and the amounts of each one.  A POSA would have also considered numerous formulation variables

30

including, for example, pH, stabilizers, solubilizers, antioxidants, buffers, tonicity modifiers, and bulking agents.

162.    Even with an understanding of a peptide's degradation pathways and their relative roles, developing a shelf-stable peptide formulation is difficult and unpredictable, requiring extensive testing and analysis, with no reasonable expectation of success.

163.    Based on information gathered from examining a peptide of interest and its degradation pathways, a POSA then would have to prepare multiple formulations for testing.

164.    A POSA would not have known what formulation components would have had a stabilizing effect on a particular peptide, let alone in what amounts.

165.    There was a large number of potentially stabilizing excipients and concentrations of those excipients available to a POSA.

166.    In general, the conditions found to be effective for stabilizing one peptide would not necessarily be predictive of how to stabilize another peptide.  For example, excipients found to stabilize a protein such as hGH (comprising 191 amino acid residues) cannot be assumed to stabilize linaclotide (a 14-amino acid peptide).

167.    Moreover, the components and parameters of a pharmaceutical formulation do not work in isolation but instead are interdependent upon one another.  Accordingly, changing one or more of these variables can profoundly affect both the stability of the peptide in the formulation and the overall viability of the formulation as a therapeutically effective composition.  For example, teachings about formulating in aqueous environments are not directly transferable to solid formulations.

168.    Developing a suitable formulation of a therapeutic peptide such as linaclotide would have been (and remains today) a complex balancing act involving the consideration of each parameter in light of the formulation as a whole, rather than in isolation.

169.    The claimed compositions were the result of years of failed efforts and involved using calcium and leucine, two excipients never before used in any peptide formulation in the prior art.

### (b)    Developing A Shelf-Stable Formulation Of Linaclotide Required Undue Experimentation

170.    As of the time of the invention of the '573 and '628 patents, little to no information relating to degradation of linaclotide was publicly available, let alone the crucial knowledge regarding its degradation pathways, their relative roles, and their relevance to formulate linaclotide into a stable solid composition.

171.    As of the time of the invention of the '573 and '628 patents, there also was no publicly available information relating to the potential degradation behavior of ST peptides, including STcore.

172.    To develop a stable solid formulation of linaclotide, a POSA would have needed to engage in extensive characterization of linaclotide, as well as its potential degradants, and conduct thorough pre-formulation studies.

173.    A POSA would have known that there are numerous categories of degradation pathways that may affect peptides, including, for example:  hydrolysis/cleavage of peptide bonds; various oxidation reactions; racemization of amino acid residues; deamidation; beta-elimination of disulfide bonds; covalent aggregation; noncovalent aggregation; adsorption to surfaces; disulfide interchange; photodegradation; glycation and carbamylation; and acetylation products.

174. This extensive experimentation would include determining the relative contributions of these various potential pathways to the degradation of linaclotide.

175. Only after this extensive experimentation could a POSA begin rationally creating test formulations of linaclotide and studying those formulations for stability.

176. Before the invention of the Linzess® formulation as described in the '573 and '628 patents, there was only one other FDA-approved peptide therapeutic orally delivered in a solid form—desmopressin acetate, also known as DDAVP.

177. DDAVP tablets included desmopressin acetate, lactose, potato starch, magnesium stearate, and povidone.

178. To the extent a POSA were to consider cyclosporine soft gelatin capsules a solid, oral dosage form (and one would not), Sandimmmune® brand soft gelatin capsules included cyclosporine, alcohol, corn oil, gelatin, glycerol, polyoxyethalated glycolysed glycerides, and sorbitol. Noral® brand soft gelatin capsules included cyclosporin, alcohol, corn oil-mono-di-triglycerides, polyoxyl 40 hydrogenated castor oil, DL-α-tocopherol, gelatin, glycerol, and propylene glycol.

179. The search for a formulation of linaclotide that was stable at room temperature took several years. In Phase I, IIa, and IIb clinical trials, linaclotide was stored as a frozen solution, or as a frozen lyophilized powder, or as a refrigerated capsule formulation because no room-temperature-stable solid linaclotide formulation had yet been developed.

180. As a result of their extensive work to formulate a room-temperature-stable solid linaclotide formulation for oral administration, the inventors of the '573 and '628 patents discovered and then focused on eliminating three specific degradation pathways occurring in solid linaclotide formulations.

181.    A first identified degradation pathway for linaclotide—commonly referred to as deamidation—involves formation of a hydrolysis product where the Asn7 residue of linaclotide is replaced by Asp7.

182.    Deamidation and the extent of deamidation of linaclotide was unexpected.

183.    Not all asparagine residues in a peptide are prone to deamidation.

184.    The Asn7 residue of linaclotide is followed by a proline (Pro, P) residue, which is a bulky and sterically constraining amino acid residue.  Peptides with this amino acid sequence were known to be resistant to deamidation.

185.    A second degradation pathway of linaclotide involves formation of a degradation product the inventors eventually determined to be an imidazolidinone product called $Cys^1$-IMD.

186.    The formation of $Cys^1$-IMD and the extent of formation of $Cys^1$-IMD was unexpected.

187.    A third degradation pathway of linaclotide involves the formation of an oxidation product through the insertion of an oxygen atom into at least one of the six sulfur atoms present in the three disulfide bridges of linaclotide.

188.    Oxidation and the extent of oxidation of linaclotide was unexpected.

189.    It was a significant and unpredictable discovery that the inventors of the Formulation Patents determined that these three particular degradation pathways played a primary role in the instability of linaclotide.

190.    Many other degradation reactions could have played a significant role in the instability of linaclotide.

191.    There would have been no way to predict in advance that the deamidation, $Cys^1$-IMD, and oxidation degradation pathways would have been the main drivers of linaclotide instability.

192.    Defendants' arguments relating to the expected degradation pathways of linaclotide are incorrect.

193.    A POSA would not have expected any of the following four potential degradation pathways alleged by Defendants to affect linaclotide:  (1) Asn hydrolysis (i.e., deamidation); (2) oxidation of cysteine amino acid side chain(s); (3) covalent or non-covalent aggregation; or (4) N-methyl derivative formation via reaction with formaldehyde.

194.    A POSA seeking to develop a stable solid peptide formulation would have understood that significant experimentation was required to determine which of many degradation pathways were involved in destabilizing linaclotide and which of those pathways were most responsible for the instability.

195.    For example, the inventors of the '573 and '628 patents found that covalent or non-covalent aggregation was not a major degradation pathway in linaclotide.

196.    Following many failed excipient studies, the inventors of the '573 and '628 patents discovered that the salt calcium chloride dihydrate appeared to limit the degree of oxidation of linaclotide and slightly decreased the formation of $Cys^1$-IMD, but had no appreciable effect on deamidation.

197.    The inventors of the '573 and '628 patents further discovered that leucine strongly decreased the formation of $Cys^1$-IMD, but increased deamidation.

198.    In combining calcium chloride dihydrate and leucine, the inventors discovered that this combination surprisingly limited all three degradation products and provided a strong stabilizing effect on linaclotide.

199.    Finally, potential degradation of a peptide resulting in N-methyl derivative formation via reaction with formaldehyde is rare.

200.    Even if a POSA were concerned about potential degradation of linaclotide via reaction with formaldehyde, a POSA would have known to avoid potential sources of formaldehyde and that many pharmaceutically acceptable excipients that did not contain trace amounts of formaldehyde were available.

201.    Real world evidence, including excipient compatibility studies, demonstrated that linaclotide was susceptible to oxidation, formation of a linaclotide-related impurity $Cys^1$-IMD, and deamidation (hydrolysis).

202.    Defendants' arguments relating to the expected degradation pathways of linaclotide are based on hindsight.

> (c)    **A POSA Would Not Have Selected Leucine To Stabilize Linaclotide With Any Reasonable Expectation Of Success**

203.    A POSA would not have had any reason to select leucine to stabilize linaclotide with any reasonable expectation of success.

204.    A POSA would not have considered several of the prior art references cited by Defendants for allegedly disclosing leucine as a stabilizer to be within the scope of the art relevant to preparing a shelf-stable oral formulation of linaclotide.

205.    No prior art reference cited by Defendants teaches that leucine, alone or in combination with any other excipients, would successfully stabilize ST peptides such as STcore.

36

206.    No prior art reference cited by Defendants teaches that leucine, alone or in combination with any other excipients, would successfully stabilize linaclotide.

207.    No prior art reference cited by Defendants teaches that leucine was known to stabilize peptides, let alone specifically linaclotide.

208.    No prior art reference cited by Defendants teaches that leucine addresses the deamidation degradation pathway that plays a significant role in linaclotide's stability.  Indeed, the inventors of the '573 and '628 patents found that leucine increased deamidation of linaclotide.

209.    No prior art reference cited by Defendants teaches that leucine addresses the $Cys^1$-IMD degradation pathway that plays a significant role in linaclotide's stability.

210.    No prior art reference cited by Defendants teaches that leucine addresses the oxidation degradation pathway that plays a significant role in linaclotide's stability.

211.    Even assuming that leucine was known to stabilize peptides, a POSA would have had no reason to select leucine over the many alternative potential stabilizing techniques and/or excipients discussed in the prior art.

212.    A POSA would have considered other types of known stabilizers rather than amino acids.

213.    To the extent that a POSA would have selected an amino acid as a stabilizer for linaclotide, at least tryptophan, norleucine, phenylalanine, and tyrosine are more hydrophobic than leucine.

214.    To the extent that a POSA would have selected an amino acid as a stabilizer for linaclotide, at least arginine or lysine are more hydrophilic that leucine.

215.    Prior art references cited by Defendants teach away from selecting leucine in favor of other amino acids and/or other types of excipients.

216.    Real world evidence, including excipient compatibility studies, showed that leucine alone increased the hydrolysis of linaclotide (conversion of $Asn^7$ to $Asp^7$) and decreased the formation of $Cys^1$-IMD.

217.    Any argument that a POSA would have selected leucine to stabilize linaclotide is based on hindsight.

**(d)    A POSA Would Not Have Selected Calcium To Stabilize Linaclotide With Any Reasonable Expectation Of Success**

218.    A POSA would not have had any reason to select calcium to stabilize linaclotide with any reasonable expectation of success.

219.    No prior art reference cited by Defendants teaches that calcium, alone or in combination with any other excipients, would successfully stabilize ST peptides such as STcore.

220.    No prior art reference cited by Defendants teaches that calcium, alone or in combination with any other excipients, would successfully stabilize linaclotide.

221.    No prior art reference cited by Defendants teaches that calcium addresses the $Cys^1$-IMD degradation pathway that plays a significant role in linaclotide's stability.

222.    No prior art reference cited by Defendants teaches that calcium addresses the oxidation degradation pathway that plays a significant role in linaclotide's stability.

223.    Even assuming that a POSA would have had a reason to select a divalent cation to stabilize peptides, a POSA would have had no reason to select calcium over any other divalent cation, or over the many alternative potential stabilizing techniques discussed in the prior art.

224.    Prior art references cited by Defendants teach away from selecting calcium in favor of other divalent cations and/or other types of excipients.

225. Prior art references cited by Defendants teach away from selecting calcium to stabilize linaclotide because calcium would protect linaclotide administered to patients from degradation by gastrointestinal proteases and would increase absorption of the peptide.

226. Prior art references cited by Defendants teach away from selecting calcium to stabilize linaclotide because calcium causes constipation.

227. Real world evidence, including excipient compatibility studies, showed that calcium alone limited the degree of oxidation of linaclotide, decreased the formation of a $Cys^1$-IMD, and had no effect on deamidation (hydrolysis) of linaclotide.

228. Any argument that a POSA would have selected calcium to stabilize linaclotide is based on hindsight.

**(e)     A POSA Would Not Have Combined Leucine And Calcium To Stabilize Linaclotide With Any Reasonable Expectation Of Success**

229. A POSA would not have had any reason to combine leucine and calcium to stabilize linaclotide with any reasonable expectation of success.

230. No prior art reference cited by Defendants teaches combining leucine and calcium to stabilize any peptide, much less an ST peptide such as STcore.

231. No prior art reference cited by Defendants teaches combining leucine and calcium to stabilize any peptide, let alone specifically linaclotide.

232. Real world evidence, including excipient compatibility studies, showed that leucine alone increased the hydrolysis of linaclotide (conversion of $Asn^7$ to $Asp^7$) and decreased the formation of $Cys^1$-IMD while calcium alone limited the degree of oxidation of linaclotide, decreased the formation of a $Cys^1$-IMD, and had no effect on deamidation (hydrolysis) of linaclotide.  However, the combination of calcium and leucine unexpectedly limited these pathways and degradant formation.

39

233.     Even assuming that leucine and calcium were known to stabilize peptides, a POSA would have had no reason to select this combination of excipients over the many alternative potential stabilizing techniques discussed in the prior art.

234.     There would have been no way for a POSA to reasonably predict what excipients and their combinations and amounts would have worked to stabilize linaclotide, much less would have been optimal, in any given situation.

235.     In addition, potential stabilizing approaches could have been combined with each other in many ways.  Individual excipients could have been employed together at different concentrations and under various environmental conditions.  The overall number of combinations available to a POSA would have been many thousands.

236.     Coupling these many possible options with the unpredictability of the ultimate outcome, undue experimentation would have been required to determine which combination of stabilizing excipients could successfully stabilize linaclotide.

237.     Even if a POSA were to identify a combination of excipients that exhibited suppression of the degradation pathways of linaclotide, there would have been no reasonable expectation that such a combination would have resulted in a sufficiently stable linaclotide formulation to be commercially viable or pharmaceutically useful.

238.     Even if a POSA had a reason to combine leucine and calcium to stabilize linaclotide, undue experimentation would be required to determine the ratios of leucine and calcium that would have been effective in stabilizing linaclotide.

239.     No prior art reference cited by Defendants teaches combining leucine and calcium to stabilize any peptide, let alone linaclotide, at the claimed molar ratios of $Ca^{2+}$, leucine, and linaclotide.

240.    Any argument that a POSA would have selected a combination of leucine and calcium to stabilize linaclotide at the claimed molar ratios is based on hindsight.

241.    No prior art reference cited by Defendants teaches combining leucine and calcium to stabilize any peptide, let alone linaclotide, at the claimed weight percentages of $Ca^{2+}$, leucine, and linaclotide.

242.    Any argument that a POSA would have selected a combination of leucine and calcium to stabilize linaclotide at the claimed weight percentages is based on hindsight.

243.    No prior art reference cited by Defendants teaches combining leucine and calcium to stabilize any peptide, let alone linaclotide, along with a polymer selected from polyvinyl pyrrolidone, polyvinyl alcohol, hydroxylpropyl methyl cellulose, or mixtures thereof at the claimed weight percentages.

244.    Any argument that a POSA would have selected a combination of leucine and calcium to stabilize linaclotide, along with a polymer selected from polyvinyl pyrrolidone, polyvinyl alcohol, hydroxylpropyl methyl cellulose, or mixtures thereof, is based on hindsight.

## 2.    Objective Indicia Of Non-Obviousness

245.    Multiple objective indicia of non-obviousness confirm that the asserted claims of the '573 or '628 patents would not have been obvious in light of the cited prior art references. Relevant objective indicia of nonobviousness unexpected results, failure of others, skepticism, acquiescence/licensing, teaching away[3], and copying.

---

[3]  This secondary consideration is fully supported by the October 17, 2019 testimony of Pardeep K. Gupta, Ph.D and references that he has relied upon. For example, the prior art taught away from choosing excipients that may worsen a disease and taught away from using calcium and leucine in favor of other known excipients. (*See*, *e.g*., 10/17/2019 Depo. Tr. at 49:18-50:17, 55:23-56:22, 65:8-66:20, 67:5-69:14, 76:10-77:3; Gupta Exs. 2-5; Gupta Ex. 6; Gupta Ex. 32; Yanagawa '336.)

246.    The inventors found that the combination of $Ca^{2+}$ and leucine provided unexpected stabilizing effects on all of linaclotide's three main degradation pathways: disulfide oxidation, $Asn^7$ deamidation, and formation of $Cys^1$-IMD. The inventors of the '573 and '628 patents tested, among many other things, the effects of $Ca^{2+}$ on linaclotide, the effects of leucine on linaclotide, and the effects of the combination of $Ca^{2+}$ and leucine on linaclotide.  $Ca^{2+}$ appeared to limit the degree of oxidation of linaclotide and slightly decreased the formation of $Cys^1$-IMD, but had no appreciable effect on deamidation.  Leucine strongly decreased the formation of $Cys^1$-IMD, but increased deamidation.  The combination of $Ca^{2+}$ and leucine, however, limited all three degradation products and provided a strong stabilizing effect on linaclotide.  In view of the fact (i) that $Ca^{2+}$ had no effect on the deamidation of linaclotide when used on its own, and (ii) that leucine increased the deamidation of linaclotide when used on its own, it was unexpected that the combination of $Ca^{2+}$ and leucine decreased the deamidation rate of linaclotide.

247.    The search for a formulation of linaclotide that was stable at room temperature took several years.  During that multi-year search, many people employed or otherwise retained by Ironwood and/or Allergan other than the inventors of the '573 and '628 patents tried to solve the problem of formulating a room temperature stable, solid oral formulation of linaclotide but failed.  Certain generic companies also tried to develop a room temperature, solid oral formulation of linaclotide using excipients other than leucine and calcium but failed.

248.    During the multi-year search for a room temperature stable, solid oral formulation of linaclotide, some expressed skepticism that such a formulation could ever be developed.

249.    Allergan and Ironwood exclusively cross-license the '628 and '573 patents for the development and marketing of Linzess® through a Collaboration Agreement between Forest Laboratories, Inc. and Microbia, Inc. (now, Ironwood) dated September 12, 2007.

250.    

251.    There is a nexus between this evidence of objective indicia of non-obviousness and the inventions recited in the asserted claims of the '573 and '628 patents.  Defendants have stipulated that Linzess® 145 μg and 290 μg linaclotide capsules are commercial embodiments of, and are coextensive with, the asserted claims of the '573 and '628 patents. (D.I. 279, at ¶10.)

EXHIBIT 3

**EXHIBIT 3**

**DEFENDANTS' STATEMENT OF ISSUES OF FACT TO BE LITIGATED**

**PRELIMINARY STATEMENT**

Defendants Teva Pharmaceuticals USA, Inc. ("Teva") and Sandoz, Inc. ("Sandoz") (collectively, "Defendants") submit this Statement of Issues of Fact. To the extent that any issue in Defendants' Statement of Issues of Law is deemed to be an issue of fact, it should be so considered and is incorporated herein by reference. To the extent that any issue presented below is more properly considered an issue of law, it should be so considered and will be incorporated by reference in Defendants' Statement of Issues of Law. Defendants may prove any matter identified in the reports of their expert witnesses and intend to present at trial such additional support contained in their experts' reports regarding the invalidity of the asserted claims that is not expressly set forth herein. Defendants reserve their rights to supplement this Statement of Issues of Fact, as necessary.

**U.S. PATENT NOS. 7,304,036, 7,731,727, 7,704,947, 8,080,526, 8,743,573, 8,802,628 – INVALIDITY**

I.   **INTRODUCTION**

A.  **THE PEPTIDE PATENTS**

1.      The asserted claims of U.S. Patent Nos. 7,304,036 (the "'036 patent") (DTX-001), 7,371,727 (the "'727 patent") (DTX-003), 7,704,947 (the "'947 patent") (DTX-005) and 8,080,526 (the "'526 patent") (DTX-009) are obvious because, in view of the prior art at the time of the invention, a person of ordinary skill in the art ("POSA") would have been motivated to make a derivative of an ST peptide, and pharmaceutical compositions thereof, for use in treating patients with constipation-related disorders, such as IBS-C (irritable bowel syndrome with constipation) and CIC (chronic idiopathic constipation).

2.      More specifically, the prior art taught that guanylate cyclase C ("GC-C") agonists could be used to treat constipation, and a POSA would have selected the ST core (i.e., STh(6–19)) as a lead compound because, among other things, ST peptides were known to be molecular mimics for both guanylin and uroguanylin (i.e., the endogenous hormones that act on the GC-C receptor in the intestine), with pH independent activity and enhanced stability in the gut due to their three disulfide bonds, and the ST core was known to be more heat-stable and resistant to denaturation than the full-length peptide. To reduce the risk of adverse effects, such as diarrhea, a POSA would have been motivated to modify the ST core with a tyrosine residue as a proteolytic cleavage site to facilitate the peptide's inactivation and degradation *in vivo*. A POSA would have been motivated to substitute tyrosine at the position of leucine in the ST core because this analog (i.e., [Tyr$^9$]STh(6–19)) would have been reasonably expected to efficiently bind to and activate the GC-C receptor and the peptide's degradant products would not have been

2

expected to have significant biological activity.

3.      It would have been routine for a POSA to synthesize $[Tyr^9]STh(6-19)$, make a pharmaceutical composition of $[Tyr^9]STh(6-19)$, and determine an effective dose to administer for the treatment of patients with constipation-related disorders. Moreover, no unexpected results or other secondary considerations overcome this clear case of obviousness.

4.      The asserted claims of the '036, '947, and '727 patents lack sufficient written description under 35 U.S.C. § 112 because they do not specify the disulfide pairings that provide the claimed peptides with the molecular conformation critical for biological activity, and the specification does not convey to a POSA that the inventors were in possession of the embodiments of the claimed peptides with alternative disulfide pairings and covalent cross-links. In addition, claims 33, 37, 39, and 43–44 of the '036 patent are not enabled under 35 U.S.C. § 112 because they are directed to administration of an effective amount of a pharmaceutical composition comprising the claimed peptides that do not specify the disulfide pairings critical for biological activity. A POSA would understand that embodiments of the claimed peptides with alternative disulfide pairings and covalent cross-links would have different biological activity, and a POSA would have to engage in undue experimentation to determine an effective amount of the different embodiments to administer for treating constipation-related disorders, such as IBS-C and CIC.

## B. THE FORMULATION PATENTS

5.      The asserted claims of U.S. Patent Nos. 8,802,628 (the "'628 patent") and 8,743,573 (the "'573 patent") are obvious because, in view of the prior art at the time of the invention, a POSA would have been motivated to create a solid oral dosage form of linaclotide comprising leucine and a calcium cation to improve the stability of the drug under long-term and

accelerated storage conditions, and would have had a reasonable expectation of success in doing so.

6.       More specifically, the prior art provided a POSA with rational strategies for developing a suitably stable linaclotide formulation without undue experimentation. These strategies include identifying the causes and mechanisms of protein or peptide instability and identifying methods to manage them.  Based on the prior art teachings, a POSA would have understood that linaclotide is susceptible to certain degradation pathways that would contribute its instability (i.e., deamidation, reaction with formaldehyde, and chemical aggregation). A POSA would have been motivated to minimize linaclotide's degradation by adding leucine and a calcium cation, with a reasonable expectation that these excipients would manage linaclotide's expected degradation and improve overall stability.  A POSA would have reasonably expected that linaclotide, unlike many other therapeutic proteins, was an instrinsically stable peptide, and it would have required only routine experimentation for a POSA to test and confirm the stability of a lincalotide solid dosage form comprising leucine and a calcium cation.

## II.      INVALIDITY OF THE PEPTIDE PATENTS

### A.  PEPTIDE PATENTS IN SUIT

#### 1.  U.S. Patent No. 7,304,036 ("'036 Patent")

##### a.  '036 Patent Claims

7.       The '036 patent, titled "Methods and Compositions for the Treatment of Gastrointestinal Disorders," issued on or about December 4, 2007, from U.S. Application No. 10/796,719 (the "'719 application"), filed March 9, 2004. The '719 application is a continuation-in-part of U.S. Application No. 10/766,735 (the "'735 application"), filed January 28, 2004. The '036 patent purports to claim priority back to three provisional patent applications filed on

January 28, 2003 (No. 60/443,098), May 15, 2003 (No. 60/471,288), and November 12, 2003

(No. 60/519,460). The named inventors of the '036 patent are Mark G. Currie, Shalina Mahajan-

Miklos, Thea Norman, and G. Todd Milne. The '036 patent will expire on August 30, 2026,

according to the Orange Book listing for Linzess®. (*See* Orange Book Listing for Linzess® (DTX-

185, DTX-186, and DTX-187) at 2.)

8.     The earliest possible priority date for the '036 patent is January 28, 2003.

9.     Claims 2, 9, 33, 37, 39, 43, and 44 of the '036 patent are at issue in this case.

The text of those claims are below:

> 2.     A purified peptide consisting of the amino acid sequence:
> Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr
> (SEQ ID NO:31).[1]
>
> 9.     A pharmaceutical composition comprising:
>
>   (a) a purified peptide consisting of the amino acid
>       sequence: Cys Cys Glu Tyr Cys Cys Asn Pro Ala
>       Cys Thr Gly Cys Tyr (SEQ ID NO:31); and
>
>   (b) a pharmaceutically acceptable carrier or excipient.
>
> 33. A method for treating a patient suffering from irritable
> bowel syndrome, the method comprising administering to
> the patient an effective of amount of the pharmaceutical
> composition of claim 9.
>
> 37. The method of any of claims 33-36 wherein the patient
> is suffering from constipation-predominant irritable bowel
> syndrome.
>
> 39. A method for treating constipation in a patient, the
> method comprising administering to the patient an
> effective amount of the pharmaceutical composition of
> claim 9.

---

[1] The sequence of amino acids recited in claims 2 and 9 of the '036 patent (also identified as SEQ ID NO:31) is the same sequence of amino acids for linaclotide, as identified in the drug labeling for Linzess®.

43. The method of any of claims 39-42 wherein the patient is suffering from chronic constipation.

44. The method of any of claims 39-42 wherein the patient is suffering from idiopathtic constipation.

(DTX-001 at 107:48–110:51.)

### b. '036 Patent Specification[2]

10.     The "Summary of the Invention" section in the specification of the '036 patent states:

> The present invention features compositions and related methods for treating IBS and other gastrointestinal disorders and conditions . . . and disorders associated with constipation, e.g., constipation and disorders associated with constipation, e.g., constipation associated with use of opiate pain killers, post-surgical constipation, and constipation associated with neuropathic disorders as well as other conditions and disorders. ***The compositions feature peptides that activate the guanylate cyclase-C (GC-C) receptor***.

(DTX-001 at 2:11–25) (bold emphasis added).) The summary further explains that in the case of IBS and other gastrointestinal disorders, the peptides are useful because: "they can increase gastrointestinal motility" (DTX-001 at 2:29–31); "they can decrease inflammation" (DTX-001 at 2:32–34); and "they can decrease gastrointestinal pain or visceral pain" (DTX-001 at 2:35–38.)

11.     The detailed description of the invention in the specification explains that the GC-C receptor was known as a key regulator of fluid and electrolyte balance in the intestine, and that stimulation of the GC-C receptors leads to increased intestinal motility:

> ***The peptides of the invention bind to the intestinal guanylate cyclase (GC-C) receptor, a key regulator of fluid and electrolyte balance in the intestine. When stimulated, this receptor, which is***

---

[2] These same (or similar) disclosures can be found in the specifications of the '727, '947, and '526 patents.

6

> *located on the apical membrane of the intestinal epithelial surface, causes an increase in intestinal epithelial cyclic GMP (cGMP). This increase in cGMP is believed to cause a decrease in water and sodium absorption and an increase in chloride and potassium ion secretion, leading to changes in intestinal fluid and electrolyte transport and increased intestinal motility.* The intestinal GC-C receptor possesses an extracellular ligand binding region, a transmembrane region, an intracellular protein kinase-like region and a cyclase catalytic domain. Proposed functions for the GC-C receptor are fluid and electrolyte homeostasis, the regulation of epithelial cell proliferation and the induction of apoptosis (Shalubhai 2002 Curr Opin Drug Dis Devel 5:261–268).

(DTX-001 at 22:3–19 (emphasis added).)

12.   The detailed description of the invention further explains that the GC-C receptor was known to be activated by guanylin, uroguanylin and lymphoguanylin, and that ST peptides were known to be 10–100 times more potent than these GC-C agonists:

> In humans, the GC-C receptor is activated by guanylin (Gn) (U.S. Pat. No. 5,96,097), uroguanylin (Ugn) (U.S. Pat. No. 5,140,102) and lymphoguanylin (Forte et al. 1999 *Endocrinology* 140:1800-1806). Interestingly, these agents are 10-100 fold less potent than a class of bacterially derived peptides, termed ST (reviewed in Giannella 1996 J Lab Clin Med 125:173-181). ST peptides are considered superagonists of GC-C and are very resistant to proteolytic degradation.

(DTX-001 at 22:38–46.)

13.   The detailed description of the invention also notes that STs were known to be capable of stimulating the enteric nervous system and may have both analgesic and anti-inflammatory effects:

> ST peptide is capable of stimulating the enteric nervous system (Rolfe et al., 1994, J Physiolo 475: 531-537; Rolfe et al. 1999 Gut 44: 615-619; Nzegwu et al. 1996 Exp Physiol 81: 313-315). Also, cGMP has been reported to have antinociceptive effects in multiple animal models of pain (Lazaro Ibanez et al. 2001 Eur J Pharmacol 426: 39-44; Soares et al. 2001 British J Pharmacol 134: 127-131; Jain et al. 2001 Brain Res 909:170-178; Amarante et al. 2002 Eur J

7

Pharmacol 454:19–23). Thus, GC-C agonists may have both an analgesic as well an anti-inflammatory effect.

(DTX-001 at 22:47–56.)

14.     The detailed description of the invention states that:

The peptides of the invention, like the bacterial ST peptides, have six Cys residues. These six Cys residues form three disulfide bonds in the mature and active form of the peptide. If the six Cys residues are identified, from the amino to carboxy terminus of the peptide, as A, B, C, D, E, and F, then the disulfide bonds form as follows: A-D, B-E, and C-F. The formation of these bonds is thought to be important for GC-C receptor binding. Certain of the peptides of the invention include a potentially functional chymotrypsin cleavage site, e.g., a Trp, Tyr or Phe located between either Cys B and Cys D or between Cys E and Cys F. Cleavage at either chymotrypsin cleavage site reduces or eliminates the ability of the peptide to bind to the GC-C receptor.

(DTX-001 at 24:15–27.)

15.     The detailed description of the invention further states that:

A number of the useful peptides are based on the core sequence: Cys Cys Glu Leu Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr (SEQ ID NO:29). To create a variant having a potentially functional chymotrypsin cleavage site capable of inactivating the peptide, either the Leu (underlined) or the Thr (underlined) can be replaced by Trp, Phe, or Tyr or both the Leu and the Thr can be replaced (independently) Trp, Phe or Tyr. . .. The core sequence can be optionally preceded by Asn Ser Ser Asn Tyr or Asn.

(DTX-001 at 25:4–17.)

16.     The specification explains that the peptides "can be produced either in bacteria including, without limitation, E. Coli, or other existing systems for peptide or protein production . . . or they can be chemically synthesized." (DTX-001 at 28:27–34.) Example 1 in the specification describes the preparation of "Variant ST Peptides and Wild-Type ST Peptide." (*See id.* at 30:13–32:9.)

8

17.    More specifically, Example 1A describes the recombinant preparation of a variant ST Peptide referred to as MD-915 and a wild-type ST peptide referred to as MM-416776. (DTX-001 at 30:18–31:54.) Example 1B identifies the variant ST peptides (MD-915; MD-1100; MD-416774) and wild-type ST peptide (MM-416776) synthesized by a peptide synthesis company. (*Id.* at 31:55–32:3.) The amino acid sequences of these peptides are shown below:

MM-416776: Asn Ser Ser Asn Tyr Cys Cys Glu **Leu** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr
MD-915: Asn Ser Ser Asn Tyr Cys Cys Glu **Tyr** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr
MM-416774: Cys Cys Glu **Leu** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr
MD-1100: Cys Cys Glu **Tyr** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr

(*Id.* at 25:20–24 (SEQ ID NO:26; MM-416776), 25:31–34 (SEQ ID NO:28; MD-915), 25:36–37 (SEQ ID NO:29; MM-416774), and 25:43-44 (SEQ ID NO:31; MD-1100).) Figure 1a purports to depict the results of LCMS analysis of MM-416776 and MD-915, and Figures 1b and 1c purport to depict the results of LCMS analysis of synthetic MD-1100 and the blank. (*Id.* at 21:34–37.)

18.    Example 2 in the specification describes experiments conducted to show the ability of MD-915, MM-416776, and MD-1100 to activate intestinal GC-C. (DTX-001 at 31:10–46.) The experiments were conducted in an assay employing the T84 human colon carcinoma cell line, and cyclic GMP was measured by EIA according to procedures in the Cayman Chemical Cyclic GMP EIA kit. (*Id.* at 31:15–19, 31:37–39.) Figure 2, reproduced below, shows the experimental results:



FIG. 2

(*Id.* at Fig. 2.)

19. Example 3 in the specification describes experiments conducted to determine whether the peptides increase the rate of gastrointestinal transit in a murine gastrointestinal transit assay. (DTX-001 at 32:50–33:39.) Figures 3a and 3b, reproduced below, purport to show the assay results for recombinant MM-416776 and synthetically manufactured MD-1100 in comparison to Zelnorm®:



FIG. 3A

(*Id*. at Fig. 3a; *see also id*. at 33:15–19.)



FIG. 3B

(*Id*. at Fig. 3b; *see also id*. at 33:15–19.) Figure 4a, reproduced below, purports to show that the intestinal transit rate increases with an increasing dose of either recombinantly synthesized MM-416776 or MD-915:

11



FIG. 4A

(*Id.* at Fig. 4a; *see also id.* at 33:20–23.) Figure 4b, reproduced below, purports to show the results

of a study demonstrating both chemically synthesized MD-416776 or MD-1100 increase intestinal

transit rates more than either Tris buffer alone or an equivalent dose of Zelnorm®:



FIG. 4B

(*Id.* at Fig. 4b; *see also id.* at 33:23–27.) Figure 4c, reproduced below, purports to show the results

of a study demonstrating that both chemically synthesized MD-1100 and Zelnorm® are effective

in the assay upon chronic dosing (daily for five days):

12



FIG. 4C

*     $p < 0.01$
**    $p < 0.005$
***   $p < 0.0005$

(*Id*. at Fig. 4c; *see also id*. at 33:35–39.)

20.       Example 4 in the specification describes experiments conducted with MD-915, MD-1100, MM-416776, and Zelnorm® in a suckling mice assay for measuring intestinal secretion. (DTX-001 at 33:40–34:3.) Figures 5a and 5b, reproduced below, purport to show the dose response curves for MM-416776 and MD-1100 in comparison to Zelnorm®, respectively. (*Id*. at 33:55–58.)



FIG. 5A

(*Id*. at Fig. 5a.)

13



FIG. 5B

(*Id*. at Fig. 5b.) Figure 6a, reproduced below, purports to show the dose response curves for

recombinantly generated MM-416776 and MD-915:



FIG. 6A

(*Id*. at Fig. 6a; *see also id*. at 33:63–65.) Figure 6b, reproduced below, purports to show the dose

response curves for chemically synthesized MD-915, MM-1100 and MM-416776 and wild-type

ST:

14



FIG. 6B

(*Id*. at Fig. 6b; *see also id*. at 33:67–34:3.)

21.     The specification of the '036 patent further describes experiments in both inflammatory and non-inflammatory animal models of visceral hyperalgesia to distension to investigate the effects of the peptide on visceral pain in IBS. (DTX-001 at 34:5–11.) More specifically, the specification describes experiments in: (1) a Trinitrobenzenesulphonic Acid (TNBS)-Induced Rectal Allodynia Model; (2) a Stress-Induced Hyperalgesia Model; and (3) a Phenylbenzoquinone-Induced Writhing Model. (*Id*. at 34:5–35:33.)

22.     In the TNBS-Induced Rectal Allodynia Model, electrodes were implanted in the abdomens of male wistar rats and the electrical activity of abdominal striated muscle was recorded by EMG after TNBS was administered to induce rectal inflammation. (DTX-001 at 34:14–30.) The rats were placed in plastic tunnels where their mobility was severely limited for several days before colorectal distension (CRD) was induced. (*Id*. at 34:34–37.) The experimental compounds (i.e., MD-1100 and vehicle) were administered one hour before the CRD was induced

15

step-wise by inflating a balloon in the animal's anus (15 mmHG steps for 5 minutes, from 0 to 60 mmHG). (*Id*. at 34:37–48.) The number of spike bursts corresponding to abdominal contraction were measured per 5-minute period. (*Id*. at 34:49–50.) The results of the experiment are shown in Figure 7 reproduced below:



FIG. 7

(*Id*. at Fig. 7.)

23.     Experiments in a Stress-*Induced* Hyperalgesia Model are described in the specification but no experimental results are reported in the '036 patent. (DTX-001 at 34:62–35:12.)

24.     In the Phenylbenzoquinone-Induced Writhing Model, "one hour after oral dosing with a test compound, e.g., a peptide, morphine or vehicle, 0.02% phenylbenzoquinone (PBQ) solution (12.5 mL/kg) is injected by intraperitoneal route into the mouse." (DTX-001 at 35:19–22.) "The number of stretches and writhings are recorded from the 5th to the 10th minute after PBQ injection, and can also be counted between the 35th and 40th minute and between the 60th and 65th minute to provide a kinetic assessment." (*Id*. at 35:22–26.) Figures 8a and 8b, reproduced below, show the experimental results for MD-915 and MD-1100 in comparison to Indomethacin (a non-steroidal anti-inflammatory drug with known pain control activity):

16



FIG. 8A

(*Id.* at Fig. 8a.)



FIG. 8B

(*Id.* at Fig. 8b.)

25.     Example 5 in the specification describes competitive binding assay experiments performed to determine the affinity of MD-1100 for GC-C receptors found in rat intestinal mucosa. (DTX-001 at 35:48–36:18.) According to the specification, the assay "was performed based on the method of Giannella et al. (*Am. J. Physiol.* 245: G492–G498) between [$^{125}$I] labeled MM-416776 and MD-1100." (*Id.* at 36:1–3.) The results of the experiment are shown in Figure 9 reproduced below:

17



FIG. 9

(*Id*. at Fig. 9.)

26. Example 6 describes experiments performed to study the pharmacokinetics and absorbability of MD-1100 in mice. (DTX-001 at 36:20–37:2.) Figures 10a and 10b, reproduced below, show absorption data for intravenously and orally administered MD-1100 as detected by LCMS and determined by ELISA, respectively:



FIG. 10A

FIG. 10B

## 2.   U.S. Patent No. 7,731,727 ("'727 Patent")

27.     The '727 patent, titled "Methods and Compositions for the Treatment of Gastrointestinal Disorders," issued on or about May 13, 2008, from U.S. Application No. 10/899,806 (the "'806 application") filed July 27, 2004. The '806 application is a continuation-in-part of U.S. Application No. 10/845,895 (the "'895 application"), which is a continuation-in-part of the '719 application, which is a continuation-in-part of the '735 application filed on January 28, 2004. The '727 patent purports to claim priority back to three provisional patent applications filed on January 28, 2003 (No. 60/443,098), May 15, 2003 (No. 60/471,288), and November 12, 2003 (No. 60/519,460). The named inventors of the '727 patent are Mark G. Currie, Shalina Mahajan-Miklos, Angelika Fretzen, Li Jing Sun, Thea Norman, and G. Todd Milne. The '727 patent will expire on January 28, 2024, according to the Orange Book listing for Linzess®. (*See* Orange Book Listing for Linzess® (DTX-185, DTX-186, and DTX-187) at 2.)

28.     The earliest possible priority date for the '727 patent is January 28, 2003.

29.     SEQ ID NO:3 in the '727 patent is: Cys Glu Tyr Cys Asn Pro Ala Cys Thr Gly Cys Tyr. (DTX-003 at Fig. 11-1.)

30.     Claims 3 and 6 of the '727 patent are at issue in this case. The text of those claims are below:

> [*1. A method for preparing a purified peptide comprising SEQ ID NO:3, the method comprising:*
>
> (a) *Chemically synthesizing a peptide comprising the amino acid sequence of SEQ ID NO:3; and*
>
> (b) *purifying the peptide.*][3]
>
> 3. The method of claim 1 wherein the peptide consists of

---

[3] SEQ. ID. NO:3 recited in these claims refers to the same sequence of amino acids for linaclotide, as identified in the drug labeling for Linzess®.

the amino acid sequence of SEQ ID NO:3.

6.  A purified peptide prepared by the method of claim 1.

(DTX-003 at 65:46–66:50.)

### 3.  U.S. Patent No. 7,704,947 ("'947 Patent")

31.     The '947 patent, titled "Methods and Compositions for the Treatment of Gastrointestinal Disorders," issued on or about April 27, 2010, from U.S. Application No. 11/930,696 (the "'696 application") filed October 31, 2007. The '696 application is a divisional of the '735 application. The '947 patent purports to claim priority back to three provisional patent applications filed on January 28, 2003 (No. 60/443,098), May 15, 2003 (No. 60/471,288), and November 12, 2003 (No. 60/519,460). The named inventors of the '947 patent are Mark G. Currie, Shalina Mahajan-Miklos, Thea Norman, and G. Todd Milne. The '947 patent will expire on January 28, 2024, according to the Orange Book listing for Linzess®. (*See* Orange Book Listing for Linzess® (DTX-185, DTX-186, and DTX-187) at 2.)

32.     The earliest possible priority date for the '947 patent is January 28, 2003.

33.     Claims 2, 4, and 14 of the '947 patent are at issue in this case. The text of those claims are below:

> 2. The polypeptide of claim 1 consisting of the amino acid sequence Cys Cys Glu Xaa Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr wherein Xaa is selected from Phe, Trp or Tyr (SEQ ID NO:125).[4]

> 4.   The polypeptide according to claim 2, which is purified.

> 14.   A pharmaceutical composition comprising the polypeptide of claim 2 and a pharmaceutically acceptable

---

[4] The sequence of amino acids recited in these claims (also referred to as SEQ ID NO:125)—with the "Xaa" being Tyr—refers to the same sequence of amino acids for linaclotide, as identified in the drug labeling for Linzess®.

carrier or excipient.

(DTX-005 at 85:16–86:33.)

### 4.  U.S. Patent No. 8,080,526 ("'526 Patent")

34.    The '526 patent, titled "Methods and Compositions for the Treatment of Gastrointestinal Disorders," issued on or about December 20, 2011, from U.S. Application No. 12/754,138 (the "'138 application") filed April 5, 2010. The '138 application is a divisional of the '696 application, which is a divisional application of the '735 application. The '526 patent purports to claim priority back to three provisional patent applications filed on January 28, 2003 (No. 60/443,098), May 15, 2003 (No. 60/471,288), and November 12, 2003 (No. 60/519,460). The named inventors of the '526 patent are Mark Currie, Shalina Mahajan-Miklos, Thea Norman, and G. Todd Milne. The '526 patent will expire on January 28, 2024, according to the Orange Book listing for Linzess®. (*See* Orange Book Listing for Linzess® (DTX-185, DTX-186, and DTX-187) at 2.)

35.    The earliest possible priority date for the '526 patent is January 28, 2003.

36.    Claims 1 and 2 of the '526 patent are at issue in this case. The text of those claims are below:

> 1. A peptide consisting of the amino acid sequence Cys6 Cys7 Glu8 Tyr9 Cys10 Cys11 Asn12 Pro13 Ala14 Cys15 Thr16 Gly17 Cys18 Tyr19 (SEQ ID NO: 31), wherein disulfide bonds are present between Cys6-Cys11, Cys7-Cys15, and Cys10-Cys18.[5]
>
> 2. A pharmaceutical composition comprising the peptide of claim 1 and a pharmaceutically acceptable carrier or excipient.

---

[5] The sequence of amino acids recited in this claim (also referred to as SEQ ID NO:31) refers to the same sequence of amino acids for linaclotide, as identified in the drug labeling for Linzess®.

21

(DTX-009 at 83:20–84:22.)

## B. INVALIDITY PURSUANT TO 35 U.S.C. § 103

### 1. Person of Ordinary Skill in the Art

37.     A POSA during the relevant time period would have a fairly high level of education and skill. Such skilled artisans would be those familiar with the fields, or having access to those familiar with the fields, of peptide or protein chemistry, pharmaceutical formulations comprising polypeptides or proteins, and methods for treating various gastrointestinal ("GI") disorders including constipation, and would include physicians, biochemists, cellular biologists, molecular biologists, microbiologists, medicinal chemists, pharmaceutical chemists, formulation chemists, and peptide or protein chemists involved in research and development of pharmaceutical formulations, including the use of peptides in such formulations, who have a Master's, and/or Ph.D., and/or M.D. degree and several years of experience in the field. The amount of experience in the field would depend upon the level of formal education and particular experience with peptides, proteins, pharmaceutical formulations, and/or treating patients.

38.     A POSA would typically work as part of a multi-disciplinary team and draw upon not only his or her own skills, but also take advantage of certain specialized skills of others in the team to solve a given problem. For example, a peptide chemist, a clinician having experience in treating GI disorders such as constipation and IBS, and a pharmaceutical chemist with experience in the formulation of pharmaceutical compositions, may be part of the team. Therefore, in performing the inquiries of an obviousness determination, the prior art must be viewed from the perspective of such a skilled person at the relevant time, who would easily have understood the prior art references referred to herein and would have the capacity to draw inferences from them.

## 2. Relevant Technical Background

39.     The following background on the underlying technology and terminology assists in the understanding of the pertinent prior art and relevant medical concepts.

### a. Peptide chemistry and the development of peptides as therapeutic treatments

40.     Peptides are short, linear chains of alpha-amino carboxylic acids ("amino acids") linked by amide ("peptide") bonds. In the context of peptide chemistry, the term amino acid is used to refer to alpha-amino carboxylic acids. The peptide bond is a special type of amide bond, formed between the alpha-carbonyl carbon atom of one amino acid and the alpha-amino nitrogen atom of a second amino acid. In a formal sense, such a peptide bond can be formed by reaction of the alpha-carboxyl group of one amino acid and the alpha-amino group of a second amino acid, with the elimination of a molecule of water.

41.     Amino acids are organic compounds having the general formula $NH_2$-CHR-COOH, where R is a side chain chemical moiety specific to each amino acid. The general formula of an amino acid is shown below:



The table below identifies the names of common amino acids found in peptides, as well as the structure of their side chains and one and three letter codes:

| 1 & 3 Letter Codes | | R = | Name |
|---|---|---|---|
| A | Ala | $-CH_3$ | Alanine |
| C | Cys | $-CH_2SH$ | Cysteine |
| D | Asp | $-CH_2COOH$ | Aspartic acid |
| E | Glu | $-CH_2CH_2COOH$ | Glutamic acid |
| F | Phe | $-CH_2-$ | Phenylalanine |
| G | Gly | $-H$ | Glycine |
| H | His | $-CH_2-$ | Histidine |
| I | Ile | $-CH(CH_2CH_3)CH_3$ | Isolecuine |
| K | Lys | $-(CH_2)_4NH_2$ | Lysine |
| L | Leu | $-CH_2CH(CH_3)_2$ | Leucine |
| M | Met | $-(CH_2)_2SCH_3$ | Methionine |
| N | Asn | $-CH_2CONH_2$ | Asparagine |
| P | Pro | | Proline |
| Q | Gln | $(CH_2)_2CONH_2$ | Glutamine |
| R | Arg | $-(CH_2)_3-NH$ | |
| S | Ser | $-CH_2OH$ | Serine |
| T | Thr | $-CH(CH_3)OH$ | Threonine |
| V | Val | $-CH(CH_3)_2$ | Valine |
| W | Trp | $-CH_2-$ | Tryptophan |
| Y | Tyr | $-CH_2-$ $-OH$ | Tyrosine |

The amino acid names, as well as the three-letter and one-letter abbreviations, come from the International Union of Pure and Applied Chemistry ("IUPAC"), the official body that determines the nomenclature of chemical compounds.

  42.  The 20 common amino acids are conveniently grouped as follows: glycine (Gly, R=H) and alanine (Ala, R=CH₃) have small side chains; serine (Ser, R=CH2OH), threonine (Thr, R= CH(CH₃)OH), and cysteine (Cys, R= CH₂SH) have nucleophiles in their side chains; amino acids with hydrophobic (non-aromatic) side chains are valine (Val), leucine (Leu), isoleucine

(Ile), methionine (Met), and proline (Pro). Proline has a secondary alpha-amine in which the side

chain is joined to the alpha-N atom. Aromatic side chain amino acids are pheylalanine (Phe),

tyrosine (Tyr), and tryptophan (Trp). Aspartic acid (Asp) and glutamic acid (Glu) have side chain

acidic carboxyl groups. Asparagine (Asn) and glutamine (Gln) have side chain amide groups.

Amino acids with basic side chains are histidine (His), lysine (Lys), and arginine (Arg).

43.     Nineteen of the twenty amino acids listed above are chiral molecules: that is,

they exist in otherwise identical mirror image forms that are non-superimposable (enantiomers).

An example is shown for alanine (Ala):



L-Alanine
(L-Ala)

D-Alanine
(D-Ala)

In peptide chemistry, the mirror image forms of an amino acid are designated as either the L- or D-

enantiomer, as shown in the case of alanine (above). The amino acid glycine (Gly) is achiral: its

mirror image forms are identical. Peptides derived from ribosomal translation invariably contain

only L-amino acids and glycine (Gly), unless modified post-translationally.

44.     In writing the structure of a peptide, the sequence of amino acids is written from

left-to-right, with the amino terminus (N-terminus) of the peptide on the left and the carboxyl

terminus (C-terminus) on the right. When three-letter codes are used to describe the chemical

structure of a peptide, they are joined by hyphens that represent the peptide bond (e.g., Leu-Ala-

Gly-Val). The presence of an additional hydrogen atom at the N-terminus and the presence of a

hydroxyl group at the C-terminus are implied.

25

45.     Peptides are found in nature and have a diverse range of biological activities, including receptor activation. The peptide binds to the receptor protein in order to activate it. Different peptides are specific to different receptors. Typically, a particular peptide will bind tightly to just one receptor protein in an organism. Such highly selective receptor binding is referred to as "receptor specificity."

46.     Peptide chemists are concerned with the chemistry of peptide molecules, including the chemical (covalent) structure of peptides and how that structure determines the chemical and physical properties of a peptide molecule. Chemical properties include ionization of functional groups at different values of pH (pH is a measure of the acidity of a water solution), and other properties of functional groups present in the peptide molecule. The peptide chain backbone is flexible. Physical properties include the shape that the peptide adopts under different conditions. In order to bind to a receptor protein, a peptide molecule may adopt a special shape ("conformation"), so peptide chemists are concerned with conformational properties of peptides.

47.     Peptide molecules may contain pairs of cysteine (Cys) residues that are linked in disulfide bonds. Disulfide bonds stabilize the folded shape of a peptide molecule and stabilize the peptide, and may contribute to the fold adopted by the peptide.

48.     Peptide molecules have been developed as human therapeutics. In some instances, a peptide that has a natural function in humans is used as a therapeutic agent, e.g., oxytocin. In other examples, a naturally occurring peptide with a known and desirable biological activity was used as a starting point, e.g., captopril. (*See* Pennington, *Peptide Therapeutics from Venom: Current Status and Potential*, 26 BIOORGANIC & MED. CHEM., 2738, 2739 (2018) (DTX-136) ("In the 1970's, the blockbuster angiotensin converting enzyme (ACE) inhibitor captopril (Fig. 3) was developed based on bradykinin-potentiating peptides (BPF) isolated from the venom

of Bothrops jararaca, a pit viper endemic to southeastern South America."); *see also*, Silberstein et al., 40(6) HEADACHE 445, 445 (Abstract) (2000) ("Silberstein") (DTX-055) (disclosing botulinum toxin type A, 25 U, as a safe treatment that significantly reduces migraine frequency, migraine severity, acute medication usage, and associated vomiting).)

49.     Peptide drug development is different in a number of respects from drug discovery for small, non-peptide molecules. Traditional approaches used by medicinal chemists to discover new small molecule drugs include: (1) identification of a small molecule secondary metabolite from natural sources, or from a chemical library of synthetic molecules, by random screening using *in vitro* assays in order to find a lead compound; (2) making changes to a lead compound based on structure-activity relationships to improve its potency; and (3) if the structure of the biological target molecule is known, using computer-aided drug design to develop a small, non-peptide molecule that will bind to that target and elicit the desired response. This last approach is most effective for developing antagonist drug leads.

50.     For peptide drug development, often a natural peptide can serve as a starting point in drug design, particularly for the development of a peptide agonist: a peptide ligand that binds to a cell-surface receptor and that modulates cell function and physiological response(s). The properties of the natural peptide may need to be modified to make it a more effective drug. The modifications may include tuning the peptide's susceptibility to proteolytic degradation and tuning the potency of the peptide. In designing or redesigning a peptide of natural origin to have properties suitable for its intended use as a therapeutic, the peptide chemist considers the following factors:

> a.  the covalent structure of the peptide (i.e., the sequence of amino acids; the presence of covalent modifications such as acetylation of the N-terminus or a C-terminal carboxamide; disulfide bonds, if present);

27

b. side chain functional groups present in the peptide;

c. the conformational properties of the natural peptide molecule;

d. truncation of the natural peptide at one or both ends, while retaining activity;

e. conformational restraints, such as disulfide bonds and/or the presence of proline (Pro) or glycine (Gly) residues, which can affect the backbone conformation of the peptide;

f. assays to determine the activity of the modified peptide, including receptor binding, second messenger, and whole animal assays;

g. the physiological compartment to which the peptide drug is to be delivered for its intended action, and the physiological compartments that the peptide will experience in reaching that site;

h. possible immune reactions to the peptide drug; and

i. the toxicity of the peptide.

51.     Based on published data from the development of a broad range of peptides as therapeutics, the general features of a systematic approach to modifying the properties of a peptide for use as a drug are well established. (*See, e.g.*, Hruby V.J., *Designing Peptide Receptor Agonists and Antagonists*, 1 Nat. Rev. Drug Discovery, 847, 848–49 (2002) ("Hruby") (DTX-123).)

### b.  The human gastrointestinal (GI) tract

52.     The gastrointestinal ("GI") tract refers to the organ system within humans that takes in food, digests it into simple forms, absorbs nutrients into the bloodstream and expels the remains as waste. (*E.g.*, Thomas F. Burks, HUMAN PHARMACOLOGY: MOLECULAR TO CLINICAL 801–14 (2d ed. 1994) ("Burks 1994") (DTX-152).) The human GI tract starts at the mouth and ends at the anus. The component organs of the GI tract include the esophagus, the stomach, the small intestine, and the colon (also known as the large intestine), ending in the rectum. (*E.g.*, *id.* at 802.) Also considered part of the GI tract, although anatomically adjacent to it, are accessory

28

organs, including the salivary glands, liver, gallbladder, and pancreas.

53.     The walls of the GI tract contain layers of circular and longitudinal smooth muscle responsible for intestinal movement. The innermost layer of the GI tract is called the mucosa across which nutrients are absorbed and fluid and electrolytes move. The interior space of the GI tract is referred to as the lumen. The contents of the lumen (or "luminal contents") include ingested food and fluid, natural secretions of the GI tract (such as bicarbonate, pancreatic juices, and bile), and bacteria. (*E.g.*, *id.* at 802–03, 807–08, 810–11.)

54.     A graphical representation of the human GI tract is shown below:



FIGURE 60-1   Overall functions of the gastrointestinal tract. Extrinsic and intrinsic autonomic efferent innervation of the wall of the intestine. The enteric nervous system of the gastrointestinal tract innervates smooth muscle and mucosa. Efferent and afferent neurons are organized in intramural plexuses; the most prominent plexuses are the myenteric plexus between the longitudinal and circular muscle coats and the submucosal plexus between the circular muscle and the muscularis mucosa.

(*Id.* at 802.)

55.     Food enters the mouth where it is masticated and moistened. It travels down the esophagus to the stomach where it is mechanically broken down by churning and mixing. Acid and enzymes are added for further digestion particularly of proteins. The storage capacity of the

29

stomach serves to deliver contents into the small intestine in a regulated gradual manner. In the small intestine, partially digested food is mixed with bile and pancreatic juices so that proteins, fats, and carbohydrates can be further broken down into small enough components to allow absorption into the blood stream. Residual unabsorbed foodstuffs and fluid pass into the colon where excess water is absorbed and the luminal contents are prepared for elimination as feces.

56.     Luminal contents are propelled through the GI tract by a series of synchronized muscular contractions known as peristalsis. The other important type of intestinal muscular movement is segmental contractions. Segmental contractions close and reopen the lumen along short segments of the GI tract to improve mixing of food with digestive enzymes and allow greater contact time with the gut surface epithelium to facilitate absorption.

57.     The normal functioning of the GI tract is partly under the control of the enteric nervous system. The enteric nervous system consists of nerve pathways that innervate and control the smooth muscle and mucosa of the GI tract. (*E.g.*, *id.* at 801, 808.) The enteric nervous system functions outside the consciousness of a person and, as such, is part of the autonomic nervous system.

### i.     The small intestine

58.     In the course of 24 hours, a person will ingest approximately 2.5 liters of fluid and saliva, which passes into the stomach. The stomach produces an additional 1.5 liters in the form of acid, mucous, and pepsin. Gastric contents are delivered through the pyloric sphincter to the small intestine where ultimately another 5 liters of fluid will be added (including bile, pancreatic, and intestinal secretions). Significant absorption of nutrients, fluid, and electrolytes occurs through the mucosa of the small intestine so that only 1.5 liters of fluid enters the large intestine. (*E.g.*, K. Ewe, *Intestinal Transport in Constipation and Diarrhea*, 36: Suppl. 1

30

PHARMACOLOGY 73, 74, Fig. 1 (1988) ("Ewe 1988") (DTX-036).)

59.     Anatomically, the roughly 20-feet-long small intestine connects the stomach and

the colon, and includes the duodenum, jejunum, and ileum. Below is a graphical representation:



(NIH – National Institute of Diabetes and Digestive and Kidney Diseases (DTX-455).)

60.     The duodenum is the first shorter segment of the small intestine, which receives

partially digested food and acid from the stomach. Gastric storage capacity and the regulatory

actions of the pyloric sphincter deliver controlled amounts of contents to the duodenum.

Bicarbonate is secreted to help neutralize gastric acid. The duodenum receives pancreatic enzymes

from the pancreas and bile from the liver and gallbladder, which aid in digestion and absorption.

Pancreatic enzymes such as trypsin, lipase, and amylase break down proteins, fats, and

carbohydrates, respectively, into their smaller components so that they can be absorbed farther

downstream.

61.     Following the duodenum are the jejunum and ileum, which make up most of the

small intestine. These parts of the small intestine are largely responsible for the absorption of fats

and other nutrients. Coordinated propulsive contractions (peristalsis) are the "assembly line"

31

moving the materials downstream. Segmental contractions facilitate mixing of food with digestive enzymes and increase contact time for improved absorption. Absorption is also enhanced by the vast surface area made up of folds and the finger-like villi, and microvilli. The intestinal cells release mucus, which lubricates the intestinal contents, and water, which helps dissolve the digested fragments. After adequate digestion, the nutrients are small enough to pass across individual epithelial cells of the intestinal lining to be absorbed into the blood stream. Most of the fluid previously ingested and secreted into the GI tract is absorbed in the small intestine as well.

### ii.    The large intestine

62.    After passing through the small intestine, the food then enters the 5-feet-long large intestine or colon. The large intestine consists of the cecum and ascending (right) colon, the transverse colon, the descending (left) colon, and the sigmoid colon (which is connected to the rectum):



(Figure adapted from The Merck Manual, *available at https://www.merckmanuals.com.* (DTX-141))

63.    The pouch-like cecum (which includes the appendix) at the beginning of the ascending colon is the point at which the ileum (the last portion of the small intestine) joins the large intestine. Very little nutrient absorption takes place in the colon, but colonic epithelium is

particularly efficient at water and electrolyte absorption. The approximate 1.5 liters that enters the colon each day is reduced to 1/10 of that by the time it reaches the rectum as formed stool. Undigested debris and dietary fiber are extensively fermented by colonic bacteria contributing to gas production (flatus). Bacterial biomass, water, fiber, and undigested foodstuffs make up feces.

64.     By the time stool has reached the sigmoid colon, it is formed. The sigmoid colon collects and stores stool until it is time for expulsion. Filling of the sigmoid colon, with subsequent peristaltic movement into the rectum, leads to defecation. Meal ingestion also sends a signal to the colon, stimulating motility and the urge to defecate (the gastrocolonic reflex). Ideally, stool has form and bulk, allowing rectal and abdominal contractions to propel the feces out through a relaxed anal sphincter during the bear-down maneuver. Stool that is small, dry, or firm is difficult to expel.

### c.   pH gradient in the GI tract

65.     In general, gastric pH is highly acidic (mean pH $1.8 \pm 0.6$). The proximal small intestine, which is located immediately after the stomach, has a slightly acidic pH (mean pH $6.6 \pm 0.5$). The mean pH then gradually increases to a mildly alkaline level (mean pH $7.5 \pm 0.5$), followed by a fall in pH in the cecum (mean pH $6.4 \pm 0.4$). The pH then rises progressively from the right (mean pH $6.3 \pm 0.6$) to the left colon (mean pH $7.1 \pm 0.7$). (*E.g.*, DF Evans et al., *Measurement of Gastrointestinal pH Profiles in Normal Ambulant Human Subjects*, 29 GUT 1035, 1035, 1038–40 (1988) ("Evans 1988") (DTX-140).)

66.     Below is an exemplary figure and study results from the literature, which shows the typical gastrointestinal pH profile measured in a normal human subject:



Fig. 3   *Gastrointestinal pH profile from a normal subject. The position of the capsule in specific areas is labelled accordingly.*

(*Id.* at 1038, 1039.)

### d.  Proteases in the GI tract

67.      Proteases, which are also known as proteinases and peptidases, are enzymes that catalyze the cleavage of proteins through the hydrolysis of peptide bonds. Of all our organ systems, the gastrointestinal tract contains the highest levels of endogenous and exogenous proteases. (*E.g.*, Silvia Amadesi et al., *Protease-Activated Receptors: Protease Signaling in the Gastrointestinal Tract*, 4 CURRENT OPINION IN PHARMACOLOGY 551, 551 (2004) ("Amadesi") (DTX-138).) Proteases in the GI tract are known to "regulate neurotransmission, secretion, motility, epithelial permeability and intestinal inflammation." (*Id.* at 551.)

68.      The proteases that affect the GI tract can be luminal, circulating, secreted, intracellular, intramembrane, or pericellular enzymes. A few representative examples of the many proteases present in the gut are: endogenous lumen proteases (e.g., trypsin, chymotrypsin, elastase, carboxypeptidase); brush-border proteases (e.g., enteropeptidase, dipeptidyl peptidase, aminopeptidases); immune cell proteases (e.g., tryptase, chymase, granzymes, matrix metalloproteinases, plasminogen activators, zonulin); proteases from the circulation (e.g., plasminogen, plasminogen activators, coagulation factors); and intestinal epithelial cell proteases

34

(e.g., zonulin, matriptase, prostasin, matrix metalloproteinases). (*E.g.*, *id.* at 552, 554.)

69.     Protein digestion begins in the stomach where pepsinogen is secreted and then converted by stomach acid into the active enzyme pepsin. Partially digested proteins enter the proximal small bowel where they are further broken down for ultimate absorption into the blood stream. This occurs by a series of steps beginning with secretion of pancreatic protease precursors directly into the duodenal lumen. These are transformed into active proteases by enterokinases secreted from the gut wall. Trypsinogen is converted to trypsin which, in turn, converts other inactive pancreatic enzyme precursors into their active counterparts (i.e., chymotrypsinogen to chymotrypsin). (*E.g.*, *id.* at 553.) These break down the partially digested proteins into component amino acids, which can easily be absorbed across the epithelial surface of the small intestine and into the bloodstream. (*E.g.*, *id.* at 553, 556.)

70.     Intestinal proteases are known to cleave and/or inactivate compounds in the gut. Chymotrypsin is an example of one such protease, which has been shown to cleave and inactivate the intestinal hormone guanylin *in vivo*. (*E.g.*, Richard N. Greenberg et al., *Comparison of Effects of Uroguanylin, Guanylin, and Escherichia coli Heat-Stable Enterotoxin STa in Mouse Intestine and Kidney*, 45:5 J. INVESTIGATIVE MEDICINE 276–84, 279–80 (1997 ("Greenberg 1997") (DTX-043).)

### e.   Regulation of intestinal function by receptors in the gut

71.     Receptors in the gut are membrane surface proteins with unique conformations for specific binding of chemical signal substances capable of triggering changes in the cell's behavior.

72.     Physicians for more than 50 years have been taught in medical school that intestinal toxins produced by gastrointestinal infections (classically cholera) bind to receptors in

the gut, leading to intestinal secretion and the prototypical secretory diarrhea. The general mechanism has been well-studied and understood. The toxin in the GI tract binds to the receptor on the surface of the cell wall, ultimately leading to increased adenylate cyclase activity, increasing the intracellular concentration of cyclic AMP. (*E.g.*, George H. Sack et al., *Gastric Acidity in Cholera and Noncholera Diarrhea*, 47 BULL. WORLD HEALTH ORG. 31–36 (1972) ("Sack 1972") (DTX-144).) This ultimately results in secretion of water and electrolytes into the intestinal lumen, which causes diarrhea ("rice water stool") and potentially severe dehydration. (*E.g.*, DTX-036 at 76; DTX-152 at 807–08.) Laxatives are known to act via this mechanism too. (*E.g.*, DTX-152 at 807, 810.) For example, the stimulant laxative bisacodyl (Dulcolax) acts, in part, by activating adenylate cyclase within the enterocyte (cells lining the intestinal mucosa), which increases intracellular cAMP concentration, leading to active secretion of $Cl^-$ and $HCO3^-$; passive efflux of $Na^+$, $K^+$, and water; and inhibition of $Na^+$ and $Cl^-$ into the enterocyte. (*E.g.*, Ratnaike RN et al., *Mechanisms of Drug-Induced Diarrhea in the Elderly*, 13 DRUG AGING 245–53 (1998) ("Ratnaike 1998") (DTX-142); *see also, e.g.*, DTX-152 at 807, 810.)

73.    In an analogous manner, the bacterial enterotoxin ST of *E. coli* binds and activates the guanylate cyclase-C (GC-C) receptors, leading to intestinal secretion by a similar mechanism. (*E.g.*, Kunwar Shailubhai, *Therapeutic Applications of Guanylate Cyclase-C Receptor Agonists*, 5(2) CURRENT OPINION IN DRUG DISCOVERY & DEVELOPMENT 261–68 (2002) ("Shailubhai 2002") (DTX-057).) The GC-C receptor is located on the apical membrane of the intestinal epithelial surface, and it regulates fluid and electrolyte balance in the intestine. (*E.g.*, *id.* at 263; *see also, e.g.*, DTX-001 at 22:3–19.) Stimulation of GC-C receptors leads to an increase in intestinal epithelial cyclic GMP (cGMP), which is understood to cause a decrease in water and sodium absorption and an increase in chloride and potassium ion secretion, leading to changes in

36

intestinal fluid and electrolyte transport and increased intestinal motility. (*E.g.*, DTX-057 at 262, Fig. 1; *see also, e.g.*, DTX-001 at 22:3–19.)

74.     The ST peptide is a GC-C agonist that has potent effects in both the small and large intestine—it stimulates or induces net secretion in the small intestine, and reduces the absorptive capacity of the colon. For example, Qian explains that "GC-C messenger RNA and STa-binding sites are uniformly expressed throughout the intestine." (Xun Qian et al., *Expression of GC-C, a Receptor- Guanylate Cyclase, and Its Endogenous Ligands Uroguanylin and Guanylin along the Rostrocaudal Axis of the Intestine*, 141:9 Endocrinology 3210, 3210, 3218 Fig. 8 (2000) ("Qian") (DTX-134).) This is illustrated in the figure below:



Fig. 8. Distribution of GC-C mRNA along the rostrocaudal axis of the intestine. The autoradiogram (*top*), ethidium bromide stain (*middle*), and phosphorimager quantitation (*bottom*) were all obtained as described in Fig. 1. The RNA samples were the same as those used in Fig. 1a, but independent aliquots were electrophoresed on a new gel, transferred, and hybridized with a radiolabeled GC-C probe. As before, the RNA obtained from segment 16 was degraded, so this sample has been deleted. *White symbols* give relative magnitudes of the hybridization signals from each tissue segment, aligned with the appropriate lanes of the autoradiogram (n = 1). As in Fig. 1, the *black symbols* (mean ± SEM; n = 7) include additional data obtained from blots performed on a smaller subset of tissue segments isolated from six other animals.

(DTX-134 at 3218.) Qian also explains that "GC-C- mediated cGMP synthesis peaks at the proximal and distal extremes of the intestine (duodenum and colon), but is nearly absent in the middle (ileum)." (*Id.* at 3210.) This is illustrated in the figured below:



(*Id.* at 3220 (Fig. 10(a).) Similarly, Cohen 1988 discusses "the possibility that the human colon may contribute to ST-mediated secretion by demonstrating the existence of ST receptors and ST activation of guanylate cyclase." (Mitchell B. Cohen et al., *Age-Related Differences in Receptors for Escherichia coli Heat-Stable Enterotoxin in the Small and Large Intestine of Children*, 94 GASTROENTEROLOGY 367, 372 (1988) ("Cohen 1988") (DTX-346).) Thus, prior to 2003, the literature suggested that "the colon may significantly contribute to the host's diarrheal response to STa by a decreased absorptive capacity in the face of increased intestinal fluid secretion." (Adam G. Mezoff et al., *Escherichia coli Enterotoxin (STa) Binds to Receptors, Stimulates Guanyl Cyclase, and Impairs Absorption in Rat Colon*, 102 GASTROENTEROLOGY 816, 821 (1992) ("Mezoff 1992") (DTX-347).)

75.     Since before 2003, it was known that the GC-C receptor in humans is activated by the guanylin family of peptides.  For example, Shailubhai 2002 explains that "Uroguanylin, guanylin, lymphoguanylin and bacterial enterotoxin ST are structurally related peptides that activate common guanylate cyclase signaling molecules and, via cyclic GMP (cGMP), regulate water and ion homeostasis in a variety of tissues and organs, including the gastrointestinal (GI) tract, kidneys, lung, prostate, etc."  (*E.g.*, DTX-057 at 261).  This is also acknowledged in the specifications of the Patents in Suit:

> In humans, ***the GC-C receptor is activated by guanylin*** (Gn) (U.S. Pat. No. 5,96,097), ***uroguanylin*** (Ugn) (U.S. Pat. No. 5,140,102) and ***lymphoguanylin*** (Forte et al. 1999 Endocrinology 140:1800-1806). Interestingly, these agents are 10-100 fold less potent than a class of bacterially derived peptides, termed ST (reviewed in Gian[n]ella 1995 J Lab Clin Med 125:173-181). ***ST peptides are considered super agonists of GC-C*** and are very resistant to proteolytic degradation.

(DTX-001 at 22:38–46) (bold emphasis added). Moreover, according to the Patents in Suit, ST peptides were known to be "capable of stimulating the enteric nervous system" and "may have both an analgesic as well as an anti-inflammatory effect." (E.g., Ex. 1, DTX-001 at 22:47–56).

76.     The study of ST peptides and the elucidation of their cGMP-regulating activity led to the discovery of the endogenous hormones guanylin and uroguanylin. For example, Qian disclosed:

> One member of the rGC family, a peptide-sensitive cyclase called GC-C, controls cGMP synthesis in intestinal epithelial cells. GC-C was first recognized because it is pathologically targeted by a bacterially produced peptide toxin, the heat-stable enterotoxin (STa). Binding of STa to an extracellular (intraluminal) domain of GC-C enhances cGMP synthesis in epithelial target cells. The subsequent increase in cGMP levels stimulates electrogenic chloride secretion via the cystic fibrosis transmembrane conductance regulator (CFTR) chloride channel and also inhibits neutral sodium chloride uptake. This leads to the luminal accumulation of sodium chloride and water and thus to a severe form of diarrhea commonly referred to as traveler's diarrhea.
>
> Toxin-induced diarrhea promotes rapid transfer of pathogens from one host to another, thus providing toxigenic bacteria with a reproductive advantage. In contrast, the diarrhea has adverse health and reproductive consequences for the host . . .. Surprisingly, despite this strongly negative selective pressure, GC-C has been evolutionarily conserved in a wide variety of animal species, suggesting that it must play a critical role in some aspect of intestinal physiology. One suggestion consistent with this idea is that GC-C serves not only as a toxin receptor, but also, like other rGCs, as a receptor for one or more endogenous peptide hormones.

(DTX-134 at 3210.)

Below is a depiction of a cross-section of the intestine showing the mode of action of the guanylin family of peptides in the lumen:

39



(DTX-057 at 262 (Fig. 2).)

77.     A more detailed discussion of what was known about ST peptides and the guanylin family of peptides is provided in the subsections below.

### i.     Background on ST peptides

78.     By 1980, *Escherichia coli* (ETEC) was known to produce a heat-labile enterotoxin (LT) and a heat-stable enterotoxin (ST). (*See, e.g.*, R. Sack, *Enterotoxigenic Escherichia coli: Identification and Characterization*, 142(2) J. OF INFECTIOUS DISEASES 279–86, 280 (August 1980) ("Sack 1980") (DTX-116) ("To date only two well-recognized enterotoxins are known to be produced by *E. Coli*, although others are suspected. These two enterotoxins, one heat-labile (LT) and the other heat-stable (ST), have both been highly purified, and their physiologic and biochemical mechanisms of action have been well characterized.").) LT peptides were known to activate adenylate cyclase and produce "prolonged hypersecretion after lag," and ST peptides were known to activate guanylate cyclase and produce "rapid-onset, short-lived hypersecretion." (*Id.* (Table 1).) Diarrhea was reported to be "more severe and of longer duration in persons harboring organisms that produced both LT and ST, as compared with those organisms producing only ST." (*Id.* at 281.)

40

79.     ST peptides were extensively studied after they were discovered. ST strains of porcine origin (STp or STIa) and human origin (STh or STIb) were identified and reported to have 18 and 19 amino acids, respectively. (*See, e.g*., T. Hirayama, *Heat-Stable Enterotoxin of Escherichia coli*, BACTERIAL TOXINS AND VIRULENCE FACTORS IN DISEASE 281–96, 282 (Joel Moss et al. eds., 1995) ("Handbook of Natural Toxins") (DTX-044).) These two strains have been referred to collectively as STa. (*Id*.) The sequence of amino acid residues in these two strains is shown below:



**Fig. 1**   Amino acid sequences and disulfide bond structures of heat-stable enterotoxins STh and STp of enterotoxigenic *Escherichia coli*. Box encloses sequences of 13 amino acids that are very similar in all heat-stabile enterotoxins.

(*Id*. (emphasis added).) STp and STh were known to be highly homologous from the Cys (C) residue near the N-terminal to the Cys (C) residue at the C-terminal, as indicated by the area inside the box of the figure above with the distinct amino acid residues highlighted. This common region contains six Cys residues and three disulfide bonds that provide the molecular conformation.

80.     Aimoto chemically synthesized shorter analogs of STh (STh 6–19) and reported

41

that this peptide had higher heat-stability and more biological activity than the full-length peptide.

(*See* Aimoto et al., *Chemical Synthesis of a Highly Potent and Heat-stable Analog of an Enterotoxin Produced by a Human Strain of Enterotoxigenic Escherichia coli*, 112(1) BIOCHEM. BIOPHY. RES. COMMUN. 320, 326 (1983) ("Aimoto") (DTX-028).) The time course of fluid secretion in suckling mice caused by native STh and synthetic STh (6–19) is shown below:



Fig. 4.  Time courses of fluid accumulation caused by native ST$_h$ (●), synthetic ST$_h$ (△), synthetic ST$_h$(6-19) (▲), and phosphate buffer saline (○) in suckling mice.  3 MU of each ST was administered to suckling mice.  Values are means of six determinations.

(*Id*. at 324 (Figure 4).) Aimoto reported that STh (6–19) was the thermodynamically stable and biologically active site of the toxin. (*Id*. at 326.) Ikemura reported similar findings. (*See* Haruo Ikemura et al., *Heat-Stable Enterotoxin (STh) of Human Enterotoxigenic Escherichia coli (Strain SK-1). Structure-Activity Relationship*, 57 BULL. CHEMICAL SOC'Y JAPAN 2550, 2556 (1984) ("Ikemura") (DTX-046) ("[S]ynthetic ST$_h$(6–19) lacking five N-terminal amino acid residues of ST$_h$ showed higher heat-stability than synthetic or native ST$_h$, as reported in a previous paper. These results suggest that the sequence consisting of 13 amino acid residues from the Cys residue near the N-terminus to the C-terminal Tyr residue is essential for the heat-stability of the toxin.").)

     81.     Yoshimura subsequently prepared a series of STh and STp analogs lacking the

C-terminal Tyr residue to determine the effect of this residue on activity and heat stability. (*See* Shoko Yoshimura et al., *Essential Structure for Full Enterotoxigenic Activity of Heat-Stable Enterotoxin Produced by Enterotoxigenic Escherichia coli*, 181 FEBS LETTERS 138, 139 (1985) ("Yoshimura") (DTX-063) ("To elucidate the minimum structure of ST essential for its full biological activity and to determine the effect of the C-terminal Tyr residue on ST activity and heat stability, we first prepared several analogues of $ST_h$ and $ST_p$ lacking a C-terminal Tyr residue, as shown in table 1.").) The analogs prepared by Yoshimura and their biological activity are shown below in Table 1:

Table 1
Synthetic analogues of ST and their biological properties

| | Synthetic Peptides | Minimum effective dose (ng) | Neutralization by anti-native ST antiserum |
|---|---|---|---|
| | 1        5        10        15 | | |
| $ST_h[1-19]$ | Asn-Ser-Ser-Asn-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-Tyr | 0.8[a)] | + |
| $ST_h[1-18]$ | Asn-Ser-Ser-Asn-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys | 0.4 | + |
| $ST_h[5-19]$ | Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-Tyr | 0.8[a)] | + |
| $ST_h[5-18]$ | Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys | 0.5 | + |
| $ST_h[6-19]$ | Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-Tyr | 0.6[a)] | + |
| $ST_h[6-18]$ | Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys | 0.6 | + |
| | 1        5        10        15 | | |
| $ST_p[1-18]$ | Asn-Thr-Phe-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys-Tyr | 1.0[b)] | + |
| $ST_p[1-17]$ | Asn-Thr-Phe-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys | 1.3 | + |
| $ST_p[4-18]$ | Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys-Tyr | 0.8-1.0[c)] | + |
| $ST_p[4-17]$ | Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys | 1.2 | + |
| $ST_p[5-18]$ | Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys-Tyr | 0.8-1.0[c)] | + |
| $ST_p[5-17]$ | Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys | 0.7 | + |

[a] Cited from [18]
[b] Cited from [14]
[c] Cited from [16]

(*Id*. at 140.) Yoshimura reported that the C-terminal Tyr residue does not affect the biological or immunological properties of STh or STp. (*Id*. ("These results indicate that removal of the C-terminal Tyr residue does not affect the biological or immunological properties of $ST_h$ or $ST_p$ and that the sequences ($ST_h[6-18]$ and $ST_p$ [5-17]) with 13 amino acid residues from the Cys residue near the N-terminus to the Cys residue near the C-terminus have full biological activity.").)

82.     Greenberg 1983 reported that thiol and disulfide compounds reduce the secretory response to ST peptides:

> We examined the effects of disulfide and thiol compounds on Escherichia coli heat-stable enterotoxin (ST) and cyclic GMP-induced secretion. Both cystamine and cystine (disulfide compounds) reduced the secretory responses to submaximal doses of ST in suckling mice (at 0.5 μmol per mouse) and reduced ST activation of guanylate cyclase (by 33 to 73% at 1 mM). In higher doses, cystamine completely eradicated a maximally effective ST dose as well. In addition, the sulfhydryl (thiol) compounds cysteamine, cysteine, and acetylcysteine strikingly reduced the secretory response and the guanylate cyclase response to ST. Neither the disulfide nor the thiol compounds tested reduced cyclic GMP-induced secretion. These studies suggest that disulfide and thiol compounds both block ST-induced secretion before its activation of guanylate cyclase. Taken with the work of others, these findings suggest that disulfide compounds may alter the oxidation reduction state of a cell or act directly on the guanylate cyclase enzyme, whereas thiol compounds may inactivate ST itself by breaking its disulfide bridges, or it may alter guanylate cyclase activation by ST.

(Richard N. Greenberg et al., *Reduction of the Secretory Response to Escherichia coli Heat-Stable Enterotoxin by Thiol and Disulfide Compounds*, 41(1) INFECTION & IMMUNITY 174, 174 (Abstract) (1983) ("Greenberg 1983") (DTX-113).)

83.     Cohen 1986 reported that the small intestine of immature rats was particularly sensitive to ST peptides due in part to an increased number of ST receptors:

> ***In summary, there is an increased sensitivity and response to ST-mediated small intestinal secretion in the developing rat.*** Furthermore, the role of the jejunum in the secretory response appears foremost in the developing rat. Analysis of the kinetics of binding of ST to its enterocyte receptor indicates that there are an increased number of equally avid receptors for ST in the jejunum of the 14-day-old rat compared with the jejunum of the adult rat. There does not appear to be a difference in the degree or sensitivity of guanylate cyclase activation by ST between the developing and adult rat. ***An increased number of ST receptors in the developing intestine may, in part, account for the increased secretory response***

44

> *in the immature animal*. However, further studies are needed to clarify the intracellular events that occur after ST binding to examine the possibility of developmental differences in intracellular response to ST.

(*See* Mitchell B. Cohen et al., *The Immature Rat Small Intestine Exhibits an Increased Sensitivity and Response to Escherichia coli Heat-Stable Enterotoxin*, 20(6) PEDIATRIC RESEARCH 555, 559 (1986) (emphasis added) ("Cohen 1986") (DTX-343).)

84. Cohen 1988 reported that infant children similarly had a greater number of ST receptors, and that this number rapidly decreased with age:

> We examined small and large intestinal specimens from children of various ages for the presence of *E. coli* heat-stable enterotoxin receptors and determined whether the number of receptors or the binding affinity of these receptors was related to the age of the child. We observed specific binding of $^{125}$I-heat-stable enterotoxin to all small intestinal and colonic specimens. However, a greater number of receptors per microgram of membrane protein were present in infants and the number of receptors rapidly decreased with increasing age. We also observed that increased heat-stable enterotoxin stimulation of guanylate cyclase was correlated with increased receptor density. We suggest that a greater number of gastrointestinal receptors for heat-stable enterotoxin, capable of activating more guanylate cyclase, may contribute to the increased severity of diarrhea noted in young children exposed to enterotoxigenic *E. coli*.

(DTX-346 at 367 (Abstract).) Figures 2(A) and 2(B) below show the reported correlation between age and binding capacity of small intestinal and colonic membranes for $^{125}$I-ST:



Figure 2. Correlation between age and the binding capacity of small intestinal (A) and colonic membranes (B) for $^{125}I$-ST. Data were obtained from competitive inhibition of binding experiments as described in Materials and Methods (n = 24 for small intestine, n = 20 for colon). Data are expressed as the number of ST receptors per microgram of intestinal membrane protein. In the final reduced model: ln(receptors/μg protein) = 4.53 − 0.47 ln(age) + 0.08 ln(age)$^2$ − 0.38(urgency of surgery) − 0.68 ln (height), where age is in months, urgency of surgery is represented by 1 = elective and 2 = emergent, and height is in centimeters. For this regression analysis, $R^2 = 69\%$, $p < 0.0001$.

(*Id.* at 370.) Cohen 1988 raised the possibility that the human colon may contribute to ST-mediated secretion "by demonstrating the existence of colonic ST receptors, and ST activation of guanylate cyclase." (*Id.* at 372.)

85.    Cohen and Giannella reported the results of a study conducted to correlate the ST-induced secretory response with the degree of ST inactivation in the adult and 14-day-old rat jejunum. (*See* Mitchell B. Cohen and Ralph A. Giannella, *Jejunal Toxin Inactivation Regulates Susceptibility of the Immature Rat to STa*, 102(2) GASTROENTEROLOGY 1988, 1988 (1992) ("Cohen & Giannella") (DTX-348) ("We have previously observed that over a broad dose range, the immature rat jejunum has an increased sensitivity and responsiveness to $ST_a$ when compared with the jejunum of the adult rat. We have also previously shown that the adult rat jejunum rapidly inactivates $ST_a$. This $ST_a$ inactivation results in cessation of net jejunal secretion . . .. Therefore, we sought to determine whether age-related differences in toxin inactivation account for an increased responsiveness of the immature rat to $ST_a$-induced secretion. Our specific aims were to correlate STa-induced secretory response with the degree of $ST_a$ inactivation in the adult and 14 day-old (immature) rat jejunum.").) The time course of ST-induced secretion in intestinal loops

46

of 14-day-old and adult rats is shown below:



Figure 1. Time course of $ST_a$-induced secretion (mL/g) in in situ intestinal loops of 14-day-old (●) and adult (○) rats. Jejunal ligated loops were inoculated with 5 μmol/L pure $ST_a$ and 250 pmol/L 4-Tyr-$^{125}$I-$ST_a$, and secretion was measured at various time points. Each experimental loop received $ST_a$ diluted in modified Dulbecco's buffer (see Materials and Methods). Also shown is fluid accumulation in control loops [14-day-old (▲) and adult (△)] that received $ST_a$-free modified Dulbecco's buffer. Each point represents the mean ± SE of 9–14 separate determinations.

(*Id*. at 1990.) This figure shows that in the adult rats (open circles) there was a prompt secretory response that peaked at 30 minutes and diminished to virtually zero at 180 minutes. (*Id*.) By comparison, in the 14-day-old rat jejunum (shaded circles) the secretory response was present at 30 minutes but continued to increase until 180 minutes (the last time point tested). (*Id*.) This study suggested that the lack of protective antibodies in human infants may contribute to their increased attack rate of diarrheal disease. (*Id*. at 1995 ("Several factors, including increased exposure to pathogens due to fecal-oral contamination and the lack of protective antibodies, may contribute to this increased attack rate of diarrheal disease in infants. The human infant also has an increased number of receptors for $ST_a$ and an increased $ST_a$-mediated guanylate cyclase response. If our

47

observations in the rat jejunum of age-related differences in host defense against STa (toxin inactivation) are paralleled in the human, they would provide another complementary explanation for the increased sensitivity and response of the human infant to toxigenic diarrhea.").)

86.      Mezoff reported the results of a study conducted to determine the contribution of the colon to ST-mediated diarrheal disease. (DTX-347 at 816.) Mezoff explains that "$ST_a$ has been thought to primarily affect the small bowel; however, we have previously shown the presence of $ST_a$ receptors and $ST_a$-mediated guanyl cyclase activation in human colonic mucosa." (*Id.*) The study reported in Mezoff compared STa binding, STa-induced guanyl cyclase activation, and STa-induced net water flux in the colon and ileum. (*Id.*) The results of the study suggested that the colon may significantly contribute to the host's diarrheal response:

> In summary, we have shown that the colon contains all the necessary components to respond to $ST_a$, including $ST_a$ receptors and $ST_a$-stimulated guanyl cyclase activity. In addition, on the basis of our data we suggest that the colon may significantly contribute to the host's diarrheal response to $ST_a$ by a decreased absorptive capacity in the face of increased small intestinal fluid secretion.

(*Id.* at 821.)

87.      Researchers evaluated numerous ST derivatives to analyze the effects on activity of amino acid substitutions and disulfide bond variations, and to determine the binding region of the peptide. Carpick 1991 reported that derivatives of STh(6-18) were synthesized to "examine the contributions of the individual amino acids in the sequence to the biological activity" of the peptide. (Bruce W. Carpick & Jean Gariépy, *Structural Characterization of Functionally Important Regions of the Escherichia coli Heat-Stable Enterotoxin STIb*, 30 BIOCHEMISTRY 4803, 4803 (1991) ("Carpick 1991") (DTX-031).) Carpick 1991 explains that STh contains six cysteine residues that form three disulfide bridges and reports that the peptide has been modeled

48

as a series of three consecutive reverse turns. (*Id.*) Figure 1 shows the location of the disulfide

bonds and the boundaries of the three turn regions:



FIGURE 1: (A) Amino acid sequence of the *E. coli* heat-stable enterotoxin STIb (ST$_{A-3}$). The toxic domain of STIb, comprising residues 6–18 and abbreviated STIb(6–18), is shown in boldface. The six cysteine residues are involved in three disulfide bridges as indicated. Amino acids are identified by their three-letter codes. (B) Turn regions of STIb(6–18) as derived according to Gariépy et al. (1987). The boundaries of each region are indicated by residue numbers.

(*Id.* at 4804.) Figure 2 shows the amino acid sequences of the ST analogs prepared for the study:



FIGURE 2: Amino acid sequences of all synthetic analogues of STIb(6–18) prepared for this study. The entire sequence of STIb-(6–18) is shown at the top. Solid lines represent regions of each analogue identical in sequence with STIb(6–18). Amino acids are identified by their three-letter codes.

(*Id.*) The biological properties of the synthetic analogs are summarized in Table 1:

49

| analogue | $K_i$ (M) | relative binding affinity (RA) | $ED_{50}$ (mol) | relative enterotoxicity (RE) | RA:RE |
|---|---|---|---|---|---|
| STIb(6–18) | $(4.1 \pm 1.5) \times 10^{-9}$ | 1.0 | $5 \times 10^{-12}$ | 1.0 | 1.0 |
| $A^8$STIb(6–18) | $(1.1 \pm 1.0) \times 10^{-7}$ | 0.04 | $10^{-11}$ | 0.5 | 0.08 |
| $P^9$STIb(6–18) | $(2.2 \pm 1.0) \times 10^{-8}$ | 0.2 | $10^{-11}$ | 0.5 | 0.4 |
| $A^9$STIb(6–18) | $(7.8 \pm 2.0) \times 10^{-8}$ | 0.05 | $2 \times 10^{-11}$ | 0.25 | 0.2 |
| $K^9$STIb(6–18) | $(5.0 \pm 2.0) \times 10^{-8}$ | 0.08 | $3 \times 10^{-11}$ | 0.2 | 0.4 |
| $A^{12}$STIb(6–18) | | 0 | ND | | ND |
| $A^{13}$STIb(6–18) | $(2.1 \pm 1.0) \times 10^{-8}$ | 0.2 | $2 \times 10^{-11}$ | 0.25 | 0.8 |
| $G^{14}$STIb(6–18) | $(1.0 \pm 0.5) \times 10^{-7}$ | 0.04 | $5 \times 10^{-11}$ | 0.1 | 0.4 |
| $dA^{14}$STIb(6–18) | $(3.3 \pm 1.0) \times 10^{-7}$ | 0.01 | $3 \times 10^{-10}$ | 0.02 | 0.5 |
| $A^{17}$STIb(6–18) | $(2.1 \pm 2.0) \times 10^{-8}$ | 0.2 | $5 \times 10^{-12}$ | 1.0 | 0.2 |
| $A^{16}$STIb(6–15) | | 0 | ND | | ND |

Table I: Summary of Biological Properties of STIb(6–18) Analogues[a]

[a] Inhibition constants ($K_i$) were calculated from a Scatchard analysis of data presented in Figure 3. Binding affinity and enterotoxicity are expressed relative to STIb(6–18). $ED_{50}$, analogue dose in infant mice resulting in a half-maximal increase in the gut-to-carcass ratio. RA:RE, ratio of the relative binding affinity (from $K_i$) to the relative toxicity in mice. The analogues $A^{12}$STIb(6–18) and $A^{16}$STIb(6–15) showed no inhibition of binding of $^{125}$I-Y$^4$STIb(4–18) to intestinal cells. ND, not determined.

(*Id.* at 4805.) Carpick 1991 reported that "[t]wo substitutions in the central-turn region . . . [Asn$_{12}$ to Ala, and Ala$_{14}$ to D-Ala] resulted in a large decrease or loss of receptor binding activity . . . pointing out the functional importance of this region," whereas "replacements at other sites showed moderate to slight reductions in biological activity." (*Id.* at 4803 (Abstract).)

88.     The Handbook of Natural Toxins reported that "Yamasaki et al. synthesized analogues of STh[6–19] with single amino acid replacements at positions 12, 13, and 14 and examined their activities" to identify the amino acids that are important for enterotoxic activity. (*See* DTX-044 at 283.) Table 1 shows the biological activity of the analogs with replacements at position 12:

**TABLE 1** Biological Activities of Analogues of STh[6-19] with Amino Acid Replacements at Position 12

| Amino acid sequence | | | | | | | | | | | | | | MED (pmol) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | | | | | | 12 | | | | | | | 19 | |
| C | C | E | L | C | C | N | P | A | C | T | G | C | T | 0.4 |
| – | – | – | – | – | – | V | – | – | – | – | – | – | – | 0.5 |
| – | – | – | – | – | – | A | – | – | – | – | – | – | – | 4.5 |
| – | – | – | – | – | – | F | – | – | – | – | – | – | – | 7.8 |
| – | – | – | – | – | – | S | – | – | – | – | – | – | – | 11 |
| – | – | – | – | – | – | G | – | – | – | – | – | – | – | 32 |
| – | – | – | – | – | – | E | – | – | – | – | – | – | – | 150 |
| – | – | – | – | – | – | R | – | – | – | – | – | – | – | 340 |
| – | – | – | – | – | – | K | – | – | – | – | – | – | – | 1300 |

MED = minimum effective dose.

(*Id.*) All of the derivatives had less biological activity than STh(6–19). Table 2 shows the biological activity of analogs with replacements at position 13:

**TABLE 2** Biological Activities of Analogues of STh[6-19] with Amino Acid Replacements at Position 13

| 6 | | | | | | | 13 | | | | | 19 | | MED (pmol) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C | C | E | L | C | C | N | P | A | C | T | G | C | T | 0.4 |
| – | – | – | – | – | – | – | V | – | – | – | – | – | – | 1.4 |
| – | – | – | – | – | – | – | A | – | – | – | – | – | – | 6.9 |
| – | – | – | – | – | – | – | Q | – | – | – | – | – | – | 13 |
| – | – | – | – | – | – | – | S | – | – | – | – | – | – | 15 |
| – | – | – | – | – | – | – | K | – | – | – | – | – | – | 20 |
| – | – | – | – | – | – | – | R | – | – | – | – | – | – | 20 |
| – | – | – | – | – | – | – | E | – | – | – | – | – | – | 93 |
| – | – | – | – | – | – | – | F | – | – | – | – | – | – | 1200 |

MED=minimum effective dose.

(*Id*. at 284.) All of the derivatives had less biological activity than STh(6–19). Table 3 shows the biological activity of analogs with replacements at position 14:

**TABLE 3** Biological Activities of Analogues of STh[6-19] with Amino Acid Replacements at Position 14

| 6 | | | | | | | | 14 | | | | 19 | | MED (pmol) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C | C | E | L | C | C | N | P | A | C | T | G | C | T | 0.4 |
| – | – | – | – | – | – | – | – | G | – | – | – | – | – | 10 |
| – | – | – | – | – | – | – | – | S | – | – | – | – | – | 14 |
| – | – | – | – | – | – | – | – | D | – | – | – | – | – | 506 |
| – | – | – | – | – | – | – | – | E | – | – | – | – | – | 540 |
| – | – | – | – | – | – | – | – | Q | – | – | – | – | – | 2090 |
| – | – | – | – | – | – | – | – | V | – | – | – | – | – | >6600 |
| – | – | – | – | – | – | – | – | L | – | – | – | – | – | >6600 |
| – | – | – | – | – | – | – | – | F | – | – | – | – | – | >6400 |
| – | – | – | – | – | – | – | – | K | – | – | – | – | – | >6400 |
| – | – | – | – | – | – | – | – | R | – | – | – | – | – | >6500 |

MED=minimum effective dose.

51

(*Id.*) All of the derivatives had less biological activity than STh(6–19). The Handbook of Natural Toxins reported that "[a]ll three amino acids in positions 12, 13, and 14 play an important role in the enterotoxicity of STa." (*Id.* at 285.)

89.     Table 4 of the Handbook of Natural Toxins disclosed the biological activity of ten synthetic analogues of STh with one or two disulfide bonds:



TABLE 4 Synthetic Analogues of STh with One or Two Disulfide Bonds and Their Enterotoxic Activity

| No. | Peptide[a] | MED (pmol) |
|---|---|---|
|  | 6 ... 18 C C E L C C N P A C T G C | 0.4 |
| 1 | A C E L C A N P A C T G C | 380 |
| 2 | C A E L C C N P A A T G C | Inactive |
| 3 | C C E L A C N P A C T G A | 290 |
| 4 | C E L C A N P A C T G C | 150 |
| 5 | C C E L A C N P A C | 110 |
| 6 | C E L A C N P A C T G A | Inactive |
| 7 | C C E L A C N P A C T G A | Inactive |
| 8 | C C E L A C N P A C T G A | Inactive |
| 9 | C A E L C C N P A A T G C | Inactive |
| 10 | C E L A C N P A C T G A | Inactive |

MED-minimum effective dose
[a]C denotes a cysteine residue in which the thiol group is blocked by an acetamidomethyl group.

(DTX-044 at 285–86.) The Handbook of Natural Toxins reported that "the spatial structure of STh with a disulfide bond between Cys-7 and Cys-15 and between Cys-6 and Cys-11 or Cys-10 and Cys-18 is essential for the enterotoxigenic activity of STh." (*Id.* at 285.)

90.     The Handbook of Natural Toxins disclosed the schematic ribbon drawing of the polypeptide backbone of STh(6-18) shown below:



**Fig. 2**   Schematic ribbon drawing of the polypeptide backbone of an STh[6-18].

(DTX-044 at 287; *see also id.* at 285 ("A CPK model and schematic ribbon drawing (Fig. 2) of a short analogue of STh with 13 amino acids was constructed by Yamasaki et al. (1988a) from its three disulfide bonds (Hidaka et al., 1988) and nuclear Overhauser effects (NOE) data obtained by two-dimensional $^1$H-NMR spectroscopy.").) The Handbook of Natural Toxins explains:

> The main chain of the peptide is seemingly folded in a twisted-8 shape, and there are two loop structures consisting of two turns between amino ac ids 9- 11 and 12-15. The three disulfide bonds are located in the hinge region binding these two turns between residues 9-11 and 12-15. These two loops presumably stabilize the spatial structure of STh. From the results shown in Tables l-4, it is assumed that cleavage of the disulfide bond between Cys-6 and Cys-11 or Cys-10 and Cys-18 does not appreciably disrupt the spatial structure necessary for expression of enterotoxic activity, and the twisted-8 structure shown in Figure 2 is still maintained, at least partially. However, cleavage of the disulfide bond between Cys-7 and Cys-15 may completely loosen the spatial conformation of STh, because peptide 2 in Table 4 was completely in active. Cleavage of any two

53

of the disulfide bonds shown in Figure 2 may completely disrupt the structure fixed by the hinge region. Therefore, a twisted-8 structure of the main chain seems important for expression of the enterotoxicity of STh or for stabilization of the spatial structure of the peptide chain from Cys-7 to Cys-15.

(*Id*. at 285.)

91.     Hirayama reported that the "core sequences" of STh(6-18) and STp(5-17) "have the same toxic activities as the entire sequences of STh and STp, respectively, and are more stable to heat treatment than native toxins." (T. Hirayama & A. Wada, Handbook Of Experimental Pharmacology, Bacterial Protein Toxins 577–93, 579 (K. Aktories & I. Just eds., 2000) ("Hirayama") (DTX-114).) Hirayama disclosed that the minimum effective doses of synthetic STh(6-18) and STp(5-17) were 0.4 pmol and 0.5 pmol in the fluid-accumulation test in suckling mice. (*Id*.) The model of STa receptor binding and cell signaling reported in Hirayama is shown below:



**Fig. 1.** Binding and cell signaling of STa on its receptor, STaR

(*Id*. at 580.)

92.     Hasegawa synthesized three ST analogs with a photoreactive amino acid, p-azido-L-phenylalanine (PAP), to determine the region of ST which binds to the receptor protein. (*See* Makoto Hasegawa et al., *Identification of a Binding Region on Escherichia coli Heat-Stable Enterotoxin to Intestinal Guanylyl Cyclase C*, 4 Letters Peptide Sci. 1, 1–2 (1997) ("Hasegawa") (DTX-045).) The positions of the PAP substitutions are shown in the figure below:

| | | 5 | 10 | 15 | |
|---|---|---|---|---|---|
| Ec-STp | : | Asn-Thr-Phe-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys-Tyr | | | |
| Ec-STp(4-17) | : | Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys | | | |
| [Pap⁸]STp(4-17) | : | — — — — Pap⁸ — — — — — — — — — | | | |
| [Pap¹¹]STp(4-17) | : | — — — — Pap¹¹ — — — — — — — | | | |
| [Pap¹⁵]STp(4-17) | : | — — — — — Pap¹⁵ — | | | |
| Ec-STh | : Asn-Ser-Ser-Asn-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys-Tyr | | | | |
| Vm-ST, NAG-ST | : Ile-Asp-Cys-Cys-Glu-Ile-Cys-Cys-Asn-Pro-Ala-Cys-Phe-Gly-Cys-Leu-Asn | | | | |

Fig 1. Primary structures of STp and the synthetic analogs. Ec-STp and Ec-STh are produced by enterotoxigenic *E. coli* of porcine [6] and human [24], respectively. Vm-ST and NAG-ST are elaborated by *Vibrio mimicus* [25] and *Vibrio cholerae* non-O1 [26], respectively.

(*Id*. at 2.) The binding affinity of the ST analogs were evaluated in a competitive binding assay against STp (4-17) and the experimental results are shown in the figure below:

55



Fig. 6. Curves for the inhibition by STp analogs of the binding of $^{125}$I-STp(4–17) to the receptor (values shown represent the mean of duplicate data sets): [Pap$^8$]STp(4–17) (closed triangles), [Pap$^{11}$]STp(4–17) (open triangles), [Pap$^{15}$]STp(4–17) (open circles), and STp(4–17) (closed circles).

(*Id.* at 8.) The order of the binding affinity to the receptor protein was reported to be [Pap$^8$]STp(4-17) (closed triangles in the figure above) ≥ [Pap$^{15}$]STp(4-17) (open circles in the figure above) >> [Pap$^{11}$]STp(4-17) (open triangles in the figure above). (*Id.* at 9.) The figure below shows a CPK model of the structure of STp(5-17) with the PAP residue substitutions:



Fig. 7. CPK model of the structure of STp(5-17), determined by X-ray crystallography and substituted by the Pap residue at positions 8 (in blue), 11 (in red), and 15 (in yellow). The residues in purple, Pro$^{13}$ and Ala$^{14}$, are critical for the toxic activity or the receptor binding [10,11].

(*Id.*) Hasegawa reported that $Pro^{12}$ and $Ala^{13}$ are critical for the toxic activity or receptor binding (*id.* at Fig. 7), and that the data from the study "clearly demonstrate that the region of the ST molecule encompassing the $Asn^{11}$ residue directly interacts with the receptor." (*Id.* at 1 (Abstract).)

93.     Wolfe disclosed a model developed using Comparative Molecular Field Analysis ("COMFA") to predict the primary interactions between GC-C agonists and their receptor. (*See* Henry R. Wolfe & Scott A. Waldman, *A Comparative Molecular Field Analysis (COMFA) of the Structural Determinants of Heat-Stable Enterotoxins Mediating Activation of Guanylyl Cyclase C*, 45 J. MEDICINAL CHEMISTRY 1731, 1731 (2002) ("Wolfe") (DTX-061).) According to Wolfe, the model predicts that:

- "[T]he amino terminus of the toxin is unimpeded by receptor interactions, consistent with the relative tolerance of STa and its analogues to N-terminal modifications, with little loss in potency." (*Id.* at 1732);

- "[T]he backbone of $Cys^5$-$Cys^6$-$Glu^7$-$Leu^8$ adopts a conformation that tightly interacts with a hydrophobic region of GC-C to achieve maximum potency (Figure 3). Within this region, the receptor protein appears to make intimate contact with the peptide backbone and the $\beta$ carbons of $Cys^5$ and $Cys^6$, as well as the alkyl side chains of $Glu^7$ and $Leu^8$. The primary site of electrostatic interactions within this model is derived from residue $Glu^7$ . . . [w]hereas side chain mutations of $Leu^8$ have only minimal effect . . .." (*Id.*);

- "[B]inding and/or agonist activity is mediated [by] the tetrapeptide $Cys^{14}$-$Ala^{15}$-$Gly^{16}$-$Cys^{17}$, which appears to interact with a hydrophobic pocket on the receptor via the side chains of $Cys^{14}$, $Ala^{15}$, and $Gly^{16}$ (Figure 3) . . .. [I]t appears that whereas the C-terminal tetrapeptide (residues 15-18) of STa may play a role in receptor affinity, it is not critical for agonism, since analogues lacking this region still retain agonist activity, albeit at reduced potency." (*Id.* at 1733.)

94.     In sum, by January of 2003, a POSA would have had a great deal of background information on ST peptides and would have understood that:

- ST peptides activate guanylate cyclase and were known to produce

57

rapid-onset, short-lived hypersecretion;

- ST strains of porcine origin were referred to as STp or STIa, and that the 18 amino acid sequence and disulfide pairings of STp were known;

- ST strains of human origin were referred to as STh or STIb, and that the 19 amino acid sequence and disulfide pairings of STh were known;

- STh and STp were referred to collectively as STa;

- There were well-known assays and models for evaluating the binding affinity and activity of ST peptides;

- Thiol and disulfide compounds reduce the secretory response to ST peptides;

- Infant children and immature rats were particularly sensitive to ST peptides because they had an increased number of ST receptors;

- ST peptides have activity in both the small intestine and colon;

- Numerous derivatives of ST peptides had been prepared and the structure activity relationship of ST peptides was relatively well-characterized;

- The N-terminal amino acid residues (i.e., the residues leading up to the first Cys (c) residue) of ST peptides are not essential for biological activity, and removal of these N-terminal residues increases the thermodynamic stability of the peptide;

- The main chain of an ST peptide (i.e., without the N-terminal residues leading to the first Cys-residue) folds into a twisted-8 shape that interacts with the receptor at the Asn(N), Pro (P), and Ala (A) residues in the central region; and

- Amino acid substitutions in the central region of the main chain of an ST peptide (i.e., Asn (N), Pro (P), and Ala (A)) significantly reduces the biological activity of the peptides, whereas substitutions outside of this region result in more moderate reductions in biological activity.

### ii. Background on the guanylin family of peptides

95.     ST peptides were known to be part of a larger guanylin family of peptides that also includes guanylin, uroguanylin, and lymphoguanylin. For example, the guanylin family of

58

peptides is depicted below:



Fig. 3. Subclasses within the guanylin family of biologically active peptides. Guanylin-like peptides are grouped into Class 1 peptides with a single disulfide (i.e. designated as lines connecting cysteine pairs), Class 2 peptides with two disulfides and Class 3 peptides with three intramolecular disulfide bonds. The single letter abbreviation of amino acids is used to denote the primary structures of the biologically active peptides.

(Leonard R. Forte, *Guanylin Regulatory Peptides: Structures, Biological Activities Mediated by Cyclic GMP and Pathobiology*, 81 REGULATORY PEPTIDES 25, 34 (1999) ("Forte 1999") (DTX-112).) The major structural differences that distinguish these peptides from one another are the number of disulfide bonds. Lymphoguanylin has one disulfide bond, uroguanylin and guanylin have two disulfide bonds, and ST peptides have three disulfide bonds.

96.     As previously explained, the study of ST peptides and the elucidation of their cGMP-regulating activity led to the discovery of guanylin and uroguanylin. (*See, e.g.*, DTX-134 at 3210.) An exemplary model of the GC-C signaling pathway provided in the literature for ST peptides, guanylin and uroguanylin is below:

59



(Masamitsu Nakazato, *Guanylin Family: New Intestinal Peptides Regulating Electrolyte and Water Homeostasis*, 36 J. GASTROENTEROL. 219, 222 (2001) ("Nakazato") (DTX-049).)

97.     It was known that uroguanylin and guanylin have complimentary mRNA expression patterns along the rostrocaudal axis of the intestinal tract. For example, Qian reported that uroguanylin's mRNA is predominantly expressed in the small intestine, as illustrated in the figure below:



(*See* DTX-134 at 3212 (Fig. 1(a)).) Guanylin's mRNA is expressed in a complimentary manner in the distal small intestine and colon, as illustrated in the figure below:

60



(*See* DTX-134 at 3213 (Fig. 2(a)).)

98.     It was known that guanylin and uroguanylin cooperatively regulate GC-C activity in a pH dependent fashion, with uroguanylin being more potent at an acidic pH of 5.0 and guanylin being more potent at an alkaline pH of 8.0:

> A wide range of mucosal acidity occurs within the intestinal lumen during digestion. At an acidic mucosal pH of 5.0, uroguanylin was 100-fold more potent than guanylin, but at an alkaline pH of 8.0, guanylin was more potent than uroguanylin in stimulating intracellular cGMP production and transepithelial chloride secretion. Uroguanylin and guanylin appear to cooperatively regulate the guanylyl cyclase activity of a common set of mucosal receptors in a pH-dependent fashion.

(DTX-049 at 222.) The pH dependent activity of guanylin and uroguanylin is illustrated in the figure below:



Fig. 2. Mucosal pH modulates the activation of intestinal Cl⁻ secretion by uroguanylin and guanylin, but not that elicited by *E. coli* ST. T84 cells were grown to monolayers on permeable filters coated with collagen and mounted into modified Ussing chambers for measurement of $I_{sc}$ (short circuit current (taken from Ref. [27]). At the arrows, the indicated concentrations of guanylin (upper panel) or uroguanylin (lower panel) were added to the mucosal reservoirs. After 60 min, 100 nM of *E. coli* ST was added in each experiment to assess the additional $I_{sc}$ responses to this agonist. Mucosal reservoirs of the Ussing chambers were maintained at pH 5.5 or 7.8 as indicated for each panel. The basolateral reservoirs were always maintained at pH 7.4. In this model of the intestine, $I_{sc}$ is equivalent to transcellular secretion of Cl⁻ by T84 cells from the basolateral (serosal) side to the apical (mucosal) side of the epithelium.

(DTX-112 at 32 (caption reproduced on the side of the figure).)

99.     It was known that the pH-dependent activity of guanylin and uroguanylin corresponds to their distribution along the gastrointestinal tract:

> The activity of guanylin and uroguanylin is pH-dependent. In cultured $T_{84}$ cells guanylin is 10-fold more potent in elevating cGMP at pH 8 than at pH 5, whereas uroguanylin is more potent in acidic than in alkaline conditions. In alkaline environment guanylin is more potent than uroguanylin and the opposite is observed in acidic conditions . . .. These relationships correspond with peptides distribution along gastrointestinal tract. Uroguanylin, which is highly expressed in duodenum, is probably the main regulatory peptide in this segment which receives acidic chyme from the stomach, and by stimulating $HCO_3^-$ secretion may contribute to neutralization of luminal fluid. In addition, uroguanylin is resistant to chymotrypsin present in large amounts in duodenum. When one moves distally toward alkaline environment of distal small intestine and colon, guanylin becomes more active.

62

(*See* J. Beltowski, *Guanylin and Related Peptides*, 52(3) J. PHYSIOLOGY & PHARMACOLOGY 351, 362 (2001) ("Beltowski") (DTX-133).) ST peptides, by contrast, were reported to be "slightly more potent in acidic than in alkaline pH," but "more potent than either guanylin or uroguanylin in both acidic and alkaline conditions." (*Id.*)

100.    It was also known that guanylin, unlike ST and uroguanylin, was sensitive to chymotrypsin at its internal tyrosine or phenylalanine residues:

> Uroguanylin and ST have an internal asparagine, whereas guanylin peptides have an aromatic residue at this position. The asparagine makes uroguanylin and ST peptides quite resistant to attack by chymotrypsin, ***while guanylin is readily cleaved and inactivated by hydrolysis of peptide bonds COOH-terminal to the tyrosine or phenylalanine residues of guanylin***. In contrast, prouroguanylin is activated by chymotrypsin cleavage of the precursor in vitro, thus releasing a biologically active uroguanylin peptide. Endoproteases such as chymotrypsin may serve as prouroguanylin converting enzymes for in vivo activation of prouroguanylin in target tissues. However, chymotrypsin-mediated inactivation of guanylin and proguanylin suggests that both active guanylin and its precursor could be functionally inactivated in the small intestine by this pancreatic protease. ***Chymotrypsin is also abundant in the intestinal lumen during digestion revealing that this enzyme could be involved in an inactivation pathway for guanylin after secretion, binding to receptor-GCs and subsequent release and entry of guanylin into the intestinal lumen***.

(*See* DTX-112 at 27 (emphasis added).) Other researchers had observed guanylin's sensitivity to chymotrypsin degradation.

101.    For example, Carpick 1993 reported the results of a study conducted to test the mechanistic association of guanylate cyclase activation with diarrhea by synthesizing guanylin and a guanylin analog ($N^9P^{10}$ guanylin) and comparing their biological activity with synthetic STIb(6-18). (*See* Bruce W. Carpick & Jean Gariépy, *The Escherichia coli Heat-Stable Enterotoxin Is a Long-Lived Superagonist of Guanylin*, 61 INFECTION & IMMUNITY, 4710, 4710

(Abstract) (1993) ("Carpick 1993") (DTX-032).) As shown in Figure 1 below, $N^9P^{10}$ guanylin replaced the Tyr-Ala residues of guanylin at positions 12 and 13 with Asn-Pro (i.e., the amino acid residues at the corresponding positions of ST1b(6-18)):

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ST Ib | Asn | Ser | Ser | Asn | Tyr | Cys | Cys | Glu | Leu | Cys | Cys | Asn | Pro | Ala | Cys | Thr | Gly | Cys | Tyr |
| ST Ib(6-18) |  |  |  |  |  | Cys | Cys | Glu | Leu | Cys | Cys | Asn | Pro | Ala | Cys | Thr | Gly | Cys |  |
| Guanylin |  |  | Pro | Asn | Thr | Cys | Cys | Glu | Ile | Cys | Ala | Tyr | Ala | Ala | Cys | Thr | Gly | Cys |  |
| $N^9P^{10}$guanylin |  |  | Pro | Asn | Thr | Cys | Cys | Glu | Ile | Cys | Ala | Asn | Pro | Ala | Cys | Thr | Gly | Cys |  |

**FIG. 1.** Amino acid sequences of the *E. coli* heat-stable enterotoxin ST Ib (1, 25) and the three peptides prepared for this study: ST Ib(6-18), guanylin, and $N^9P^{10}$ guanylin. The numbering refers to the position of the amino acids in relation to the ST Ib sequence. ST Ib(6-18) corresponds to the biologically active domain of ST Ib (4, 14, 32, 39). Regions of sequence homology are boxed. The substitution Leu-9 → Ile represents a conversed substitution observed in other ST I sequences (35). Amino acids are identified by their three-letter codes. All peptides were synthesized as described in Materials and Methods.

(*Id.* at 4711.) Protease digestion experiments were included as part of the study. (*Id.*) Carpick 1993 reported that "guanylin is rapidly inactivated by chymotrypsin compared with $N^9P^{10}$ guanylin and ST Ib(6-18)" and that "replacement of Tyr-Ala with Asn-Pro in $N^9P^{10}$ guanylin restored both properties of enterotoxicity and protease resistance." (*Id.* at 4713.)

102.    Lymphoguanylin was the most recently discovered member of the guanylin family of peptides. It was identified by cDNA cloning from opossom spleen, and was reported to have potency and efficacy comparable to uroguanylin:

> Recently, the third member of guanylin peptide family has been identified by cDNA cloning from opossum spleen and has been named lymphoguanylin. Complementary DNA encodes 109 aminoacid preprohormone (preprolymphoguanylin) which demonstrates 84% homology with opossum preprourouroguanylin and 40% homology with opossum preproguanylin. This prohormone is predicted to be cleaved to 15-residue active peptide containing only three cysteines (unlike in other peptides lymphoguanylin contains tyrosine at its C-terminus). Therefore it is possible to form only one

> disulfide bridge within this molecule. Synthetic lymphoguanylin
> containing SS bond between 4th and 12th residue is less potent
> agonist than either guanylin or uroguanylin. Lymphoguanylin
> analogue with cysteine to serine substitution at 7th position has been
> synthetized [sic]. This substitution eliminates the possibility of
> alternative SS bond alignments and facilitates the formation of
> single SS bridge and proper folding of the peptide. The potency and
> efficacy of this analogue is comparable to uroguanylin.

(*See, e.g.*, DTX-133 at 353.) Lymphoguanylin was known to be more similar to uroguanylin than to guanylin because it: (1) shares a higher degree of homology with uroguanylin; (2) possesses two acidic glutamate residues near its N-terminus; and (3) contains an internal asparagine at the position occupied by aromatic amino acid in guanylin, which makes it resistant to chymotrypsin digestion. (*Id.*) The highest levels of lymphoguanylin mRNA were reported to be found in opossum heart and renal cortex, followed by renal medulla, spleen, thymus, and testis. (*Id.*)

103.    In sum, by January 2003, a POSA would have understood that:

- ST peptides were known to be part of a larger guanylin family of peptides that includes guanylin, uroguanylin, and lymphoguanylin;

- The study of ST peptides and the elucidation of their cGMP-regulating activity led to the discovery of the endogenous peptides guanylin, uroguanylin, and lymphoguanylin;

- ST peptides were known to have three disulfide bonds, whereas guanylin and uroguanylin were known to have two disulfide bonds, and lymphguanylin was known to have only one disulfide bond;

- Uroguanylin and guanylin were known to have a complimentary pattern of expression, with uroguanylin being more predominantly expressed in the proximal intestine (i.e., jejunum and ileum) and guanylin being more predominantly expressed in the distal intestine (i.e., ileum, cecum, and colon);

- Uroguanylin and guanylin were known to have pH-dependent activity, whereas ST peptides were known to have pH-independent activity;

- Guanylin was known to be sensitive to degradation by proteases such as chymotrypsin, whereas uroguanylin and ST peptides were known to

65

have protease resistance; and

- Lymphoguanylin was the most recently discovered member of the guanylin family of peptides, and lymphoguanylin was reported to be more similar to uroguanylin than guanylin.

### f.   Functional Gastrointestinal Disorders ("FGIDs")

104.    Functional gastrointestinal disorders, or FGIDs, are characterized by a variable combination of chronic or recurrent symptoms attributable to the GI tract (e.g., pain, nausea, vomiting, bloating, diarrhea, constipation) not explained by structural or biochemical abnormalities.

105.    In the mid-1980s, the Multinational Working Teams to Develop Diagnostic Criteria for Functional Gastrointestinal Disorders ("Rome Committees") developed consensus criteria for FGIDs and published them in Gastroenterology International. These documents were eventually updated and compiled into a book as the "Rome Criteria." (D.A. Drossman, *The Functional Gastrointestinal Disorders and the Rome II Process*, 45 (Suppl II) GUT II1–II5, II1 (1999) ("Drossman 1999") (DTX-139).) This first iteration later became known as Rome I, when the second-generation (Rome II) diagnostic criteria for FGIDs was published in 2000. The treatise, "Rome II: The Functional Gastrointestinal Disorders," provides an overview of functional GI disorders, including epidemiology, diagnostic criteria, clinical features, and treatment. (Douglas A. Drossman, ROME II: THE FUNCTIONAL GASTROINTESTINAL DISORDERS: DIAGNOSIS, PATHOPHYSIOLOGY AND TREATMENT: A MULTINATIONAL CONSENSUS (2d ed. 2000) ("Rome II") (DTX-143).)[6] The Rome criteria is a list of symptoms amongst which a specified minimum number allows a diagnosis of a particular FGID. (*Id.* at 654.)

---

[6] This treatise was most recently updated in 2016 as Rome IV.

106.     GI tract problems related to the small intestine and colon (including IBS) may manifest as abnormal or altered bowel habits. Two frequently encountered abnormal bowel habits are diarrhea and constipation, which result from abnormal intestinal motility and fluid balance. (*E.g.*, DTX-036 at Abstract.) The small intestine allows for rapid equilibrium of osmolality (e.g., water and electrolyte balance), while the large intestine preserves water and electrolytes once they have been absorbed. (*Id.*) Constipation and diarrhea are clinical symptoms of abnormalities in stool frequency and consistency due to a variety of causes. Both are caused by abnormalities in intestinal motility and transport of electrolytes and water. (*Id.* at 74.) Small abnormalities in absorption and secretion, especially in the distal intestinal area, can lead to constipation or diarrhea. (*Id.*)

107.     Functional diarrhea involves the frequent recurrent passage of loose or watery stools without abdominal pain or intervening constipation. (*E.g.*, DTX-143 at 644.) Diarrhea may be caused by excessive fluid in the intestinal lumen that cannot be completely reabsorbed before elimination. (*E.g.*, DTX-152 at 807–08 ("Diarrhea results from excessive fluid in the lumen of the intestine; this generates rapid, high-volume flow and overwhelms the absorptive capacity of the colon.").) The intestinal mucosa secretes fluid into the intestinal lumen in response to various stimuli, such as the chemical composition of the luminal contents or motility effects. (*Id.* at 808.) If the amount of fluid in the lumen exceeds the ability of the small intestine and colon to reabsorb it, the stool will be loose and watery, with resultant diarrhea. (*Id.*)

108.     In comparison, functional constipation may be caused by net excessive absorption of water by the colon mucosa from the luminal contents. Excessive absorption of water increases the viscosity of the luminal contents, which in turn slows the flow of the contents through the GI tract, resulting in a hard and dry stool. In addition, "[t]he underproduction of water

67

might result in thick mucus, leading to intestinal blockage or constipation." (*E.g.*, DTX-057 at 262.)

109.     Slow-transit is another general mechanism that may lead to constipation. (*E.g.*, L.R. Schiller, *Review Article: The Therapy of Constipation*, 15 ALIMENT PHARMACOL. THER. 749, 749 (2001) ("Schiller 2001") (DTX-056).) In slow-transit constipation, peristalsis fails to move luminal contents through the colon at a normal rate so stool solids stay in the intestine for a longer time. (*E.g.*, *id.*) As a result, stool solids are extensively degraded by intestinal bacteria and salt and water are further absorbed from the solids, leading to reduced stool weight and stool frequency. (*E.g.*, *id.*) The National Institutes of Health reports that, as of 2000, the overall prevalence of chronic constipation in the general population was approximately 63 million people. (*Digestive Diseases Statistics for the United States – Glossary*, NATIONAL INSTITUTES OF HEALTH at 2, https://www.niddk.nih.gov/health-information/health-statistics/digestive-diseases ("NIH Glossary") (DTX-153).)

110.     Irritable bowel syndrome, or IBS, is the most common FGID. The National Institutes of Health reports that, as of 1998, the overall prevalence of IBS in the general population was approximately 15.3 million people. (*Id.* at 4.) The primary symptoms of IBS are chronic recurrent abdominal pain and alterations in bowel function, which can present as diarrhea or constipation, or can alternate between the two. (*E.g.*, Michael Camilleri et al., *Efficacy and Safety of Alosetron in Women with Irritable Bowel Syndrome: A Randomised, Placebo-Controlled Trial*, 355 THE LANCET 1035, 1035 (Mar. 2000) ("Camilleri 2000") (DTX-030).)

111.     In general, functional constipation refers to a group of functional disorders which present as persistent difficult, infrequent, or seemingly incomplete defecation. (*E.g.*, DTX-143 at 644.) Today, chronic idiopathic constipation ("CIC") generally refers to constipation for which

no cause is identifiable. Constipation-predominant IBS (referred to today as "IBS-C") refers to IBS characterized by constipation symptoms.

112.    The below figure shows the Rome II criteria for the diagnosis of functional bowel disorders as of 2003:



**C. Functional Bowel Disorders**

*The diagnosis of a Functional Bowel Disorder always presumes the absence of a structural or biochemical explanation for the symptoms.*

C1.  Irritable Bowel Syndrome
      At least 12 weeks, which need not be consecutive, in the preceding 12 months of abdominal discomfort or pain that has two out of three features:
1.    Relieved with defecation; *and/or*
2.    Onset associated with a change in frequency of stool; *and/or*
3.    Onset associated with a change in form (appearance) of stool.

*Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome*
      · *Abnormal stool frequency (for research purposes "abnormal" may be defined as greater than 3 bowel movements per day and less than 3 bowel movements per week);*
      · *Abnormal stool form (lumpy/hard or loose/watery stool);*
      · *Abnormal stool passage (straining, urgency, or feeling of incomplete evacuation);*
      · *Passage of mucus;*
      · *Bloating or feeling of abdominal distension.*

C2.  Functional Abdominal Bloating
      At least 12 weeks, which need not be consecutive, in the preceding 12 months of:
1.    Feeling of abdominal fullness, bloating, or visible distension; *and*
2.    Insufficient criteria for a diagnosis of functional dyspepsia, irritable bowel syndrome, or other functional disorder.

C3.  Functional Constipation
      At least 12 weeks, which need not be consecutive, in the preceding 12 months of two or more of:
1.    Straining > ¼ of defecations;
2.    Lumpy or hard stools > ¼ of defecations;

3.    Sensation of incomplete evacuation > ¼ of defecations;
4.    Sensation of anorectal obstruction/blockage > ¼ of defecations;
5.    Manual maneuvers to facilitate > ¼ of defecations (e.g., digital evacuation, support of the pelvic floor); *and/or*
6.    < 3 defecations per week.
Loose stools are not present, and there are insufficient criteria for IBS.

C4.  Functional Diarrhea
      At least 12 weeks, which need not be consecutive, in the preceding 12 months of:
1.    Loose (mushy) or watery stools
2.    Present > ¾ of the time; *and*
3.    No abdominal pain.

C5.  Unspecified Functional Bowel Disorder
      Bowel symptoms in the absence of organic disease that do not fit into the previously defined categories of functional bowel disorders.

**D. Functional Abdominal Pain**

*The diagnosis of Functional Abdominal Pain always presumes the absence of a structural or biochemical explanation for the symptoms.*

D1.  Functional Abdominal Pain Syndrome
      At least 6 months of:
1.    Continuous or nearly continuous abdominal pain; *and*
2.    No or only occasional relationship of pain with physiological events (e.g., eating, defecation, or menses); *and/or*
3.    Some loss of daily functioning; *and*
4.    The pain is not feigned (e.g., malingering), *and*
5.    Insufficient criteria for other functional gastrointestinal disorders that would explain the abdominal pain.

D2.  Unspecified Functional Abdominal Pain
      This is functional abdominal pain that fails to reach criteria for functional abdominal pain syndrome.

(DTX-143, Appendix A: Diagnostic Criteria at 662–63.)

113.    Treatment for constipation should be safe and effective. In general, this should include increasing stool frequency and ease of elimination, avoiding straining, minimizing abdominal discomfort and bloating, and avoiding side effects. Medical therapies for constipation aim at increasing bulk and water content of stool solids and/or increasing intestinal secretion or motility. (*E.g.*, DTX-056 at Abstract.) Treatment with laxatives such as dietary fiber supplements add additional solid material and water to stools, resulting in increased stool weight and softer feces. (*Id.* at 750.)

69

114.     Treatments for constipation include over-the-counter laxatives, particularly osmotic agents (i.e., milk of magnesia and polyethylene glycol) and dietary fiber supplements. These treatments draw fluid into the gut lumen and add water to stools, thereby increasing stool frequency. (*Id.*) Beyond simple fiber supplements, osmotic agents have been the standard first-line treatment in my practice (and in most practices) since well before 2003, and are the most commonly used.

115.     Stimulant laxatives can also be used to treat constipation by stimulating intestinal epithelial nerve or smooth muscle cells, which can inhibit intestinal absorption, promote intestinal secretion, or stimulate motility and reduce transit time. (*Id.*)

### 3.  Scope and Content of the Prior Art

116.     The references identified below are prior art to the '036, '727, '947, and '526 patents, because they published and/or were available to skilled persons before the earliest claimed priority dates of the '036, '727, '947, and '526 patents. Exemplary teachings and disclosures of these prior art references are provided below.[7]

### a.  The '931 Patent

117.     U.S. Patent No. 4,545,931 (the "'931 patent") (DTX-021) issued on October 8, 1985, and is 102(b) prior art to the '036, '727, '947, and '526 patents. The '931 patent was not before the United States Patent and Trademark Office ("Patent Office") during the prosecution of the '036, '727, '947 and '526 patents.

118.     The '931 patent is directed to "a synthetic polypeptide corresponding to heat-stable enterotoxin of *Escherichia coli*. and more particularly to synthetic polypeptides that comprise

---

[7] The Technical Background above, Section II(C), discusses disclosures and teachings of the prior art that are incorporated herein by reference.

principal determinant domains responsible for the immunogenicity of the E. coli heat-stable enterotoxin." (*See* DTX-021 at 1:7–12.) The invention is described in the abstract as follows:

> [t]he synthetic polypeptide includes at least 14 amino acids in the sequence, from amino-terminus to carboxy-terminus, represented by the formula: CysCysGluLeuCysCysTyr(Asn)-ProAlaCysAla(Thr)GlyCysAsn(Tyr) wherein the amino acid in parentheses may replace the immediately preceding amino acid residue, and at least one intramolecular disulfide bond formed between the Cys residues.

(*Id*. at Abstract.) The specification notes that "at least one intramolecular cysteine disulfide bond is required for immunological activity." (*Id*. at 10:29–31.)

119.    The specification explains that the "present invention, relating to synthetically produced ST, has overcome the problem of using ST derived from natural sources in that synthetic ST can be made in large quantitites and in purified form, and has properties similar to those described for pure ST obtained by bacterial growth of a human ETEC strain." (*Id*. at 2:21–26.) The specification further explains that "[i]t is known that naturally occurring, biologic ST contains six Cys residues which form three intramolecular disulfide bonds of cysteine residues" and that others had shown the disulfide bonds to be "necessary for the functioning of naturally occurring ST." (*Id.* at 7:29–34.) According to the specification:

> Two of the six Cys residues of ST may theoretically combine in fifteen different ways to form a disulfide bond of one cysteine residue. Six possible combinations of paired Cys residues remain for the formation of a second disulfide bond, and thereafter only one combination is left for the third disulfide bond. Thus, there are a total of ninety (15x6x1) theoretically possible secondary structural isomers of each primary amino acid residue sequence of ST that contains six Cys residues and two or three disulfide bonds.

(*Id*. at 7:35–44.) However, the specification notes that because of the "practical difficulty" of forming disulfide bonds "between pairs of contiguous Cys residues" there are "considerably fewer

71

than ninety secondary structural isomers containing two or three disulfide bonds." (*Id*. at 7:45–50.)

### b. The '101 Patent

120.    U.S. Patent No. 4,554,101 (the "'101 patent") (DTX-132) issued on November 19, 1985, and is 102(b) prior art to the '036, '727, '947, and '526 patents. The '101 patent was not before the Patent Office during the prosecution of the '036, '727, '947 and '526 patents.

121.    The '101 patent disclosed that leucine, tyrosine, and glutamic acid have hydrophilicity values of -1.8, -2.3, and 3.0±1, respectively, as shown in the chart below:

| Amino Acid | Hydrophilicity Value |
|---|---|
| Arginine | 3.0 |
| Aspartic Acid | 3.0 ± 1 |
| Glutamic Acid | 3.0 ± 1 |
| Lysine | 3.0 |
| Serine | 0.3 |
| Asparagine | 0.2 |
| Glutamine | 0.2 |
| Glycine | 0.0 |
| Proline | −0.5 ± 1 |
| Threonine | −0.4 |
| Alanine | −0.5 |
| Histidine | −0.5 |
| Cysteine | −1.0 |
| Methionine | −1.3 |
| Valine | −1.5 |
| Isoleucine | −1.8 |
| Leucine | −1.8 |
| Tyrosine | −2.3 |
| Phenylalaine | −2.5 |
| Tryptophan | −3.4 |

(*See* DTX-132 at 2:1–20.)

### c. The '670 Patent

122.    U.S. Patent No. 5,489,670 (the "'670 patent") (DTX-022) issued on February 6, 1996, and is 102(b) prior art to the '036, '727, '947, and '526 patents. The '670 patent was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, but it was not cited by the Examiner during prosecution.

123.    The '670 patent disclosed human uroguanylin and taught that uroguanylin may act as a laxative and be useful in patients suffering from constipation due to its ability to elicit chloride

72

secretion and decrease water absorption:

> Human uroguanylin has been further demonstrated to act in an isolated intestinal rat preparation to stimulate an increase in short circuit current. This action is believed to be the physiologic driving force for eliciting chloride secretion and ultimately decreased water absorption. The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation, e.g. cystic fibrosis patients who suffer with severe intestinal complications from constipation.

(DTX-022 at 2:16–25.)

### d. The '888 Patent

124.    U.S. Patent No. 5,518,888 (the "'888 patent") (DTX-023) issued on May 21, 1996, and is 102(b) prior art to the '036, '727, '947 and '526 patents. The '888 patent was not before the Patent Office during the prosecution of the '036, '727, '947 and '526 patents, but it was cited in an Information Disclosure Statement to the Patent Office in the *inter partes* reexamination of the '947 patent.

125.    The '888 patent is directed to "compounds which comprise a moiety that binds to the ST receptor conjugated to a therapeutic or imaging moiety." (DTX-023 at 1:17–19.) According to the specification, "[t]hese conjugated compounds include ST receptor binding moieties which do not bind to cells of normal tissue in the body except cells of the intestinal tract since the cells of other tissues do not possess ST receptors." (*Id*. at 7:5–9.) The '888 patent reports that "Native ST isolated from *E. coli* is 18 or 19 amino acids in length," and "[t]he smallest 'fragment' of ST which retains activity is the 13 amino acid core peptide extending torward the carboxy terminal from cysteine 6 to cysteine 18 (of the 19 amino acid form)." (*Id*. at 8:5–10.)

126.    SEQ ID NO:37 is disclosed as a peptide exhibiting ST activity:

```
( 2 ) INFORMATION FOR SEQ ID NO:37:

        ( i ) SEQUENCE CHARACTERISTICS:
                ( A ) LENGTH: 14 amino acids
                ( B ) TYPE: amino acid
                ( D ) TOPOLOGY: linear

        ( i i ) MOLECULE TYPE: peptide

        ( x i ) SEQUENCE DESCRIPTION: SEQ ID NO:37:

Cys  Cys  Glu  Leu  Cys  Cys  Asn  Pro  Ala  Cys  Thr  Gly  Cys  Tyr
  1                      5                      10
```

(DTX-023 at col. 63; Claim 16.) A POSA would have understood that SEQ ID NO:37 is STh(6–19). The specification of the '888 patent further disclosed that:

> Those having ordinary skill in the art can readily design and produce derivatives having substantially identical amino acid sequences of ST peptides with deletions and/or insertions and/or conservative substitutions of amino acids. For example, following what are referred to as Dayhof's rules for amino acid substitutions (Dayhof, M. D. (1978) *Nat. Biomed Res. Found.*, Washington, D.C. Vol. 5, supp. 3), amino acid residues in a peptide sequence may be substituted with comparable amino acid residues. Such substitutions are well-known and based the upon charge and structural characteristics of each amino acid. Derivatives include fragments of ST receptor binding peptides with deletions and/or insertions and/or conservative substitutions.

(*Id*. at 9:45–57.)

127.    The '888 patent further disclosed that "[t]he present invention provides pharmaceutical compositions that comprise the conjugated compounds of the invention and pharmaceutically acceptable carriers or diluents." (*Id.* at 16:43–45.) The '888 patent further explains that the "pharmaceutical composition of the present invention may be formulated by one having ordinary skill in the art." (*Id.* at 16:46–47.) According to the specification "[s]uitable pharmaceutical carriers are described in *Remington's Pharmaceutical Sciences*, A. Osol, a standard reference text in the field, which is incorporated herein by reference." (*Id.* at 16:48–51.)

74

### e. The '097 Patent

128. U.S. Patent No. 5,969,097 (the "'097 patent") (DTX-109) issued on October 19, 1999, and is 102(b) prior art to the '036, '727, '947, and '526 patents. The '097 patent was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, but it was not cited by the Examiner during prosecution.

129. The '097 patent disclosed human guanylin. (*See* DTX-109 at 1:4–8, Fig. 1.) The '097 patent taught that human guanylin should act as a laxative and be useful in for treating constipation:

> Synthetic human guanylin caused a concentration dependent increase in T84 cell cyclic GMP (FIG. 3*a*). Comparison of the activity of human guanylin with rat guanylin indicated that these two peptides possess a similar relative potency to activate intestinal guanylate cyclase. Both human and rat guanylin were about one order of magnitude less potent than STa. A similar profile of relative potency for displacing [$^{125}$I]-STa specific binding from T84 cells was also observed with STa being most potent and human and rat guanylin equipotent (FIG. 3*b*). Thus, the data indicate that the heat stable enterotoxin is more potent at stimulating intestinal guanylate cyclase than either human or rat guanylin and that all of these peptides share common binding sites.

> \*      \*      \*

> ***The major biological actions of guanylin in the intestine are the stimulation of chloride and water secretion and the inhibition of sodium and water absorption. Thus, guanylin should act as a laxative agent for the treatment of constipation.*** Evidence supporting this proposal is based on the studies cited concerning STa, a structural mimic of guanylin, and data that we have obtained with isolated rat colons.

(*See* DTX-109 at 5:66–6:12, 6:21–34 (emphasis added).)

### f. Shailubhai & Currie

130. International Publication No. WO 01/25266 A1 ("Shailubhai & Currie") (DTX-

75

024) published on April 12, 2001, and is 102(b) prior art to the '036, '727, '947, and '526 patents. Shailubhai & Currie was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, but it was not cited by the Examiner during prosecution.

131.    Shailubhai & Currie disclosed that "[b]inding of uroguanylin or guanylin to the guanylin cyclase receptor stimulates the intracellular production of the cGMP ultimately resulting in the stimulation of salt and water secretion into the intestinal lumen . . .. Uroguanylin has been found to stimulate increases in cyclic GMP levels in a manner similar to another family of heat stable enterotoxins (STs) secreted by pathogenic strains of E. coli . . .." (DTX-024 at 3:13–25.) Shailubhai & Currie further disclosed that "[u]roguanylin is believed to regulate fluid and electrolyte transport in a manner similar to guanylin and the STs in the GI tract. Therefore, as mentioned in previous publications the human uroguanylin may act as a laxative and be useful in patient [sic] suffering from constipation." (*Id*. at 4:3–8.)

132.    Shailubhai & Currie also taught that derivative peptides with similar biological properties can be made by substituting amino acids with similar hydrophilicity:

> Like amino acids can also be substituted on the basis of hydrophilicity. U.S. Patent No. 4,554,101 discloses that the greatest local average hydrophilicity of a protein, as governed by the hydrophilicity of its adjacent amino acids, correlates with a biological property of the protein. The following hydrophilicity values have been assigned to amino acids: arginine/lysine (+3.0); aspartate/glutamate (+3.0 ±1); serine (+0.3); asparagine/glutamine (+0.2); glycine (0); threonine (-0.4); proline (-0.5 ±1); alanine/histidine (-0.5); cysteine (-1.0); methionine (-1.3); valine (-1.5); leucine/isoleucine (-1.8); tyrosine (-2.3); phenylalanine (-2.5); and tryptophan (-3.4). Thus, one amino acid in a peptide, polypeptide, or protein can be substituted by another amino acid having a similar hydrophilicity score and still produce a resultant protein having similar biological activity, i.e., still retaining correct biological function. In making such changes, amino acids having

> hydropathic indices within ±2 are preferably substituted for one another, those within ±1 are more preferred, and those within ±0.5 are most preferred.

(*Id.* at 14:12–31).

### g. Shailubhai '628

133.    U.S. Patent Application Publication No. 2003/0073628 A1 ("Shailubhai '628") (DTX-025) was filed on March 28, 2002, and published on April 17, 2003, and is at least 102(e) prior art to the '036, '727, '947, and '526 patents.[8] Shailubhai '628 was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, but it was not cited by the Examiner during the prosecution.

134.    Shailubhai '628 disclosed that uroguanylin, guanylin, and ST peptides bind to the GC-C receptor and regulate fluid and electrolyte transfer in the GI tract:

> Uroguanylin, guanylin and bacterial ST peptides are structurally related peptides that bind to a guanylate cyclase receptor and stimulate intracellular production of cyclic guanosine monophosphate (cGMP). This results in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), an apical membrane channel for efflux of chloride from enterocytes lining the intestinal tract. Activation of CFTR and the subsequent enhancement of transepithelial secretion of chloride leads to stimulation of sodium and water secretion into the intestinal lumen. Therefore, by serving as paracrine regulators of CFTR activity, cGMP receptor agonists regulate fluid and electrolyte transport in the GI tract.

(DTX-025 at 1 [0003].) Shailubhai '628 further disclosed that uroguanylin-type agonists should be useful in treating inflammatory diseases of the bowel:

> Recent reports have also suggested that the CFTR channel is involved in the transport and maintenance of reduced glutathione, an antioxidant that plays an important role in protecting against

---

[8] Shailubhai '628 would be 102(b) and/or 102(a) prior art to the '036, '727, '947, and '526 patents, if Plaintiffs cannot claim priority to Jan. 28, 2003.

inflammation caused by oxidative stress. Enhancement of intracellular levels of cGMP by way of guanylate cyclase activation or by way of inhibition of cGMP-specific phosphodiesterase would be expected to down-regulate these inflammatory stimuli. Thus, uroguanylin-type agonists should be useful in the prevention and treatment of inflammatory diseases of the lung (e.g., asthma), bowel (e.g., ulcerative colitis and Crohn's disease), pancreas and other organs.

(*Id*. at 1 [0009].)

### h.  Albano

135.    Fabio Albano et al., *Structural and Functional Features of Modified Heat-Stable Toxins Produced by Enteropathogenic Klebsiella Cells*, 48 PEDIATRIC RES. 685 (2000) 685–89 ("Albano") (DTX-026), published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Albano was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement to the Patent Office in the *inter partes* reexamination of the '947 patent.

136.    Albano disclosed the chemical structure and function of the ST fragments that were generated by different proteolytic processing of the original *E. coli* ST1b (i.e., STh). (DTX-026 at 687–88.) Albano taught that ST analogs without the C-terminal residues Thr-Gly-Cys-Tyr would have significant biological activity. (*See* DTX-026 at 688 (Table 1, Toxin A-2) and Figure 3.)

### i.  Appel

137.    Walter Appel, *Chymotrypsin: Molecular and Catalytic Properties*, 19 CLINICAL BIOCHEM. 317–22 (1986) ("Appel") (DTX-027), published in 1986 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Appel was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement to the Patent Office in the *inter partes* reexamination of the '947 patent.

138.     Appel disclosed that chymotrypsin hydrolyses proteins and peptide bonds and has a high selectivity for Tyr, Phe, and Trp:

> Physiologically, chymotrypsin hydrolyses peptide bonds in proteins and polypeptides. The equilibrium is far on the side of hydrolysis. The carboxylic side of amino acids with aromatic side groups like tyrosine, tryptophan and, phenylalanine are predominantly attacked.

(DTX-027 at 318.)

### j.   Aimoto

139.     Saburo Aimoto et al., *Chemical Synthesis of a Highly Potent and Heat-Stable Analog of an Enterotoxin Produced by a Human Strain of Enterotoxigenic Escherichia coli*, 112 BIOCHEMICAL & BIOPHYSICAL RES. COMM. 320–26 (1983) ("Aimoto") (DTX-028), published in 1983 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Aimoto was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited by the Patent Office during the *inter partes* reexamination of the '947 patent.

140.     Aimoto chemically synthesized shorter analogs of STh (i.e., STh 6–19) and reported that this peptide had higher heat-stability and more biological activity than the full-length peptide. (DTX-028 at 326.) The time course of fluid secretion in suckling mice caused by native STh and synthetic STh (6–19) is shown below:



Fig. 4.  Time courses of fluid accumulation caused by native STh (●), synthetic STh (△), synthetic STh(6-19) (▲), and phosphate buffer saline (○) in suckling mice.  3 MU of each ST was administered to suckling mice.  Values are means of six determinations.

(*Id.* at 324 (Figure 4).) Aimoto reported that STh (6–19) was the thermodynamically stable and biologically active site of the toxin. (*Id.* at 326.)

### k.  Aye-Kyaw

141.    Aye-Kyaw et al., *Intracellular Distribution of Radio-labelled Enterotoxigenic Escherichia coli Heat-Stable Toxin (STa) in the Intestine of Suckling Rat*, 13(4) J. DIARRHOEAL DIS. RES. 232–34 (1995) ("Aye-Kyaw") (DTX-115), published in 1995 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Aye-Kyaw was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

142.    Aye-Kyaw conducted a study on the *in vivo* uptake of radio-labelled STa by the different subcellular fractions of the intestine of suckling rats. (DTX-115 at 232–33.) Aye-Kyaw reports that:

> STa could be subjected to intracellular digestion by lysosome. This is supported by the finding that the labelled STa was preferably associated with the mitochondrial-lysosomal fraction (Table II) among other subcellular organelles. The supportive evidence for such a finding has also been reported earlier that STa mainly affects

80

intestinal lysosome during the course of its secretory action. It may be of interest to note that other diarrhoeal toxins, like cholera toxin and *E. coli* heat-labile toxin, did not affect lysosome, which may be the reasons that cholera toxin and *E. coli* heat-labile toxin apparently escape intracellular digestion by lysosome and have prolonged physiological action in contrast to STa, the physiological action of which was reported to be short-lived, possibly as a result of the toxin inactivation by lysosomal enzymes.

(*Id*. at 234 (internal citations omitted).)

### l. Baillie

143.    Thomas A. Baillie, *Drug Metabolites in Safety Testing*, 182 TOXICOLOGY & APPLIED PHARMACOLOGY 188–96 (2002) ("Baillie") (DTX-163), published in 2002 and is at least 102(a) prior art to the '036, '727, '947, and '526 patents. Baillie was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

144.    Baillie disclosed that "[i]n the course of modern drug development, there are four areas in which issues pertaining to drug metabolites need to be addressed, namely (1) drug metabolites as components of (plasma) drug assays, (2) drug metabolites in bioavailablity studies, (3) drug metabolites in bioequiavalence studies, and (4) drug metabolites in safety testing." (*Id*. at 188.) Baillie reports that "[t]his overview focuses on metabolites in preclinical safety assessments" and that the "discussion is restricted to small molecules given by the oral route of administration," but notes that "many of the concepts could be incorporated in the development of biotechnology-derived macromolecules and/or drugs given by nonoral routes." (*Id*. at 188–89.) Baillie taught that "[i]f an important active metabolite circulates in humans, then it should be included as part of the validated bioanalytical assay, at least in some of the safety studies evaluated in each species for toxicity and in an appropriate clinical study at the efficacious clinical dose." (*Id*. at 194.)

### m. Beltowski

145.    J. Beltowski, *Guanylin and Related Peptides*, 52(3) J. PHYSIOLOGY AND PHARMACOLOGY 351–75 (2001) ("Beltowski") (DTX-133), published in 2001 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Beltowski was not before the Patent Office during the prosecution of '036, '727, '947, and '526 patents.

146.    Beltowski disclosed that the activity of guanylin and uroguanylin is pH-dependent.

> The activity of guanylin and uroguanylin is pH-dependent. In cultured $T_{84}$ cells guanylin is 10-fold more potent in elevating cGMP at pH 8 than at pH *5,* whereas uroguanylin is more potent in acidic than in alkaline conditions. In alkaline environment guanylin is more potent than uroguanylin and the opposite is observed in acidic conditions. STa is slightly more potent in acidic than in alkaline pH but the difference is not so striking as in the case of endogenous peptides. STa is, however, more potent than either guanylin or uroguanylin in both acidic and alkaline conditions.

(DTX-133 at 362.) Beltowski further disclosed that lymphoguanylin is a third member of the guanylin peptide family that is more similar to guanylin than to uroguanylin:

> Thus, the family of guanylin-related peptides can be divided into three subfamilies containing three (bacterial enterotoxins), two (guanylin and uroguanylin) or one (lymphoguanylin) disulfide bonds. Lymphoguanylin is, however, more similar to uroguanylin than to guanylin because: 1) aminoacid sequence of its prohormone demonstrates higher degree of homology to the former peptide, 2) possesses two acidic glutamate residues near its N-terminus, 3) contains internal asparagine at the position occupied by aromatic aminoacid in guanylin molecule, which makes lymphoguanylin resistant to chymotrypsin digestion.

(*Id.* at 353–54.)

### n. Burks 1994

147.    Thomas F. Burks, "Gastrointestinal Drugs" in HUMAN PHARMACOLOGY: MOLECULAR TO CLINICAL, 801–14 (2d ed. 1994) ("Burks 1994") (DTX-152), published in 1994

and is 102(b) prior art to the '036, '727, '947, and '526 patents. Burks 1994 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

148.     Burks 1994 disclosed that "secretory laxatives . . . increase secretion of fluid and electrolytes into the lumen of the bowel by the intestinal mucosa, resulting in fluid accumulation and a watery luminal content that flows rapidly through the small and large intestines." (DTX-152 at 810.) Burks 1994 reports that some secretory laxatives increase the flow of chloride, sodium, and water into the intestines, and also that it was "believed that some secretory laxatives directly or indirectly stimulate adenylate cyclase activity, thereby increasing intracellular cAMP concentrations . . .." (DTX-152 at 807.)

### o.  Camilleri 2000

149.     Michael Camilleri et al., *Efficacy and Safety of Alosetron in Women with Irritable Bowel Syndrome: A Randomised, Placebo-Controlled Trial*, 355 LANCET 1035–40 (Mar. 2000) ("Camilleri 2000") (DTX-030), published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Camilleri 2000 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

150.     Camilleri 2000 reports the results of a randomized, placebo controlled trial on the efficacy and safety of alosetron (an antagonist of the 5-HT3 receptor) in women with IBS. (*Id.* at 1035.) Camilleri 2000 disclosed that the primary symptoms of IBS are chronic recurrent abdominal pain and alterations in bowel function, which can present as diarrhea or constipation, or can alternate between the two. (*Id.* at 1035.)

### p.  Camilleri 2001

151.     M. Camilleri, *Review Article: Tegasorod*, 15 ALIMENT PHARMACOL. THER. 277–89 (2001) ("Camilleri 2001") (DTX-164), published in 2001 and is 102(b) prior art to the '036, '727,

'947, and '526 patents. Camilleri 2001 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

152.    Camilleri 2001 is a review article on tegasorod. (*Id*. at 277.) Camilleri 2001 reports that in Phase III clinical studies, tegasorod showed only modest therapeutic gains over placebo and disclosed that "[a]pproximately 12% of tegaserod-treated patients developed diarrhea . . .." (*Id*. at 286–87.)

### q.  Captropil

153.    Captropil is an angiotensin converting enzyme (ACE) inhibitor developed in the 1970s that is 102(b) prior art to the '036, '727, '947, and '526 patents. Captropil was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

154.    Captropil was developed based on bradykinin-potentiating peptides (BPF) isolated from the venom of Bothrops jararaca, a pit viper endemic to southeastern South America. (*See* Pennington, *Peptide Therapeutics from Venom: Current Status and Potential*, 26 BIOORGANIC & MED. CHEM., 2738–58, 2739 (2018) (DTX-136) ("In the 1970's, the blockbuster angiotensin converting enzyme (ACE) inhibitor captopril (Fig. 3) was developed based on bradykinin-potentiating peptides (BPF) isolated from the venom of Bothrops jararaca, a pit viper endemic to southeastern South America.").)

### r.  Carpick 1991

155.    Bruce W. Carpick & Jean Gariépy, *Structural Characterization of Functionally Important Regions of the Escherichia coli Heat-Stable Enterotoxin STIb*, 30 BIOCHEMISTRY 4803–09 (1991) ("Carpick 1991") (DTX-031), published in 1991 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Carpick 1991 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

156.    Carpick 1991 synthesized derivatives of STh(6-18) to "examine the contributions of the individual amino acids in the sequence to the biological activity" of the peptide. (DTX-031 at 4803.) Carpick 1991 explains that STh contains six cysteine residues that form three disulfide bridges and reports that the peptide has been modeled as a series of three consecutive reverse turns. (*Id.*) Figure 1 shows the location of the disulfide bonds and the boundaries of the three turn regions:



FIGURE 1:  (A) Amino acid sequence of the *E. coli* heat-stable enterotoxin STIb (ST$_{A-3}$).  The toxic domain of STIb, comprising residues 6–18 and abbreviated STIb(6–18), is shown in boldface.  The six cysteine residues are involved in three disulfide bridges as indicated. Amino acids are identified by their three-letter codes.  (B) Turn regions of STIb(6–18) as derived according to Gariépy et al. (1987).  The boundaries of each region are indicated by residue numbers.

(*Id*. at 4804.) Figure 2 shows the amino acid sequences of the ST analogs prepared for the study:



FIGURE 2: Amino acid sequences of all synthetic analogues of STIb(6–18) prepared for this study. The entire sequence of STIb-(6–18) is shown at the top. Solid lines represent regions of each analogue identical in sequence with STIb(6–18). Amino acids are identified by their three-letter codes.

(*Id.*) The biological properties of the synthetic analogs are summarized in Table 1:

Table I: Summary of Biological Properties of STIb(6–18) Analogues[a]

| analogue | $K_i$ (M) | relative binding affinity (RA) | $ED_{50}$ (mol) | relative enterotoxicity (RE) | RA:RE |
|---|---|---|---|---|---|
| STIb(6–18) | $(4.1 \pm 1.5) \times 10^{-9}$ | 1.0 | $5 \times 10^{-12}$ | 1.0 | 1.0 |
| A$^8$STIb(6–18) | $(1.1 \bullet 1.0) \times 10^{-7}$ | 0.04 | $10^{-11}$ | 0.5 | 0.08 |
| P$^8$STIb(6–18) | $(2.2 \pm 1.0) \times 10^{-8}$ | 0.2 | $10^{-11}$ | 0.5 | 0.4 |
| A$^9$STIb(6–18) | $(7.8 \pm 2.0) \times 10^{-8}$ | 0.05 | $2 \times 10^{-11}$ | 0.25 | 0.2 |
| K$^9$STIb(6–18) | $(5.0 \pm 2.0) \times 10^{-8}$ | 0.08 | $3 \times 10^{-11}$ | 0.2 | 0.4 |
| A$^{12}$STIb(6–18) | 0 | | ND | ND | |
| A$^{13}$STIb(6–18) | $(2.1 \pm 1.0) \times 10^{-8}$ | 0.2 | $2 \times 10^{-11}$ | 0.25 | 0.8 |
| G$^{14}$STIb(6–18) | $(1.0 \pm 0.5) \times 10^{-7}$ | 0.04 | $5 \times 10^{-11}$ | 0.1 | 0.4 |
| dA$^{14}$STIb(6–18) | $(3.3 \pm 1.0) \times 10^{-7}$ | 0.01 | $3 \times 10^{-10}$ | 0.02 | 0.5 |
| A$^{17}$STIb(6–18) | $(2.1 \pm 2.0) \times 10^{-8}$ | 0.2 | $5 \times 10^{-12}$ | 1.0 | 0.2 |
| A$^{16}$STIb(6–15) | 0 | | ND | ND | |

[a] Inhibition constants ($K_i$) were calculated from a Scatchard analysis of data presented in Figure 3. Binding affinity and enterotoxicity are expressed relative to STIb(6–18). $ED_{50}$, analogue dose in infant mice resulting in a half-maximal increase in the gut-to-carcass ratio. RA:RE, ratio of the relative binding affinity (from $K_i$) to the relative toxicity in mice. The analogues A$^{12}$STIb(6–18) and A$^{16}$STIb(6–15) showed no inhibition of binding of $^{125}$I-Y$^4$STIb(4–18) to intestinal cells. ND, not determined.

(*Id.* at 4805.) Carpick 1991 reports that "[t]wo substitutions in the central-turn region . . . [Asn$_{12}$ to Ala, and Ala$_{14}$ to D-Ala] resulted in a large decrease or loss of receptor binding activity . . . pointing out the functional importance of this region," whereas "replacements at other sites showed moderate to slight reductions in biological activity." (*Id.* at 4803 (Abstract).)

### s.   Carpick 1993

157.   Bruce W. Carpick & Jean Gariépy, *The Escherichia coli Heat-Stable Enterotoxin Is a Long-Lived Superagonist of Guanylin*, 61 INFECTION & IMMUNITY 4710–15 (1993) ("Carpick

1993") (DTX-032), published in 1993 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Carpick 1993 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement in the *inter partes* reexamination of the '947 patent.

158.    Carpick 1993 compared the biological activities of synthetic guanylin, a guanylin analog ($N^9P^{10}$ guanylin), and STh(6-18) to test the mechanistic association of guanylate cyclase activation with diarrhea. (*See* DTX-032 at 4710 (Abstract).) Carpick 1993 reported that:

> [G]uanylin is able to inhibit the binding of a radiolabeled ST I analog to rat intestinal cells but causes diarrhea in infant mice only at doses at least 4 orders of magnitude higher than that of ST Ib(6-18). In contrast, $N^9P^{10}$ guanylin was enterotoxic in mice at much lower doses than guanylin but proved to be a weaker inhibitor of radiolabeled ST I than guanylin in the receptor binding assay. The pattern of guanylate cyclase activation observed for ST Ib(6-18) and the two guanylin analogs parallels the results observed in the receptor binding assay rather than those observed in the diarrheal assay. Treatment of guanylin with chymotrypsin or lumenal fluid derived from newborn mouse intestines results in a rapid loss of binding activity.

(*Id.*) According to Carpick 1993, these "results suggest[ed] that ST I enterotoxins may represent a class of long-lived superagonists of guanylin." (*Id.*)

159.    Moreover, Carpick 1993 taught that guanylin's tyrosine residue is susceptible to protease digestion:

> The tyrosine-alanine segment present in the sequence of guanylin is the only site absent in ST I enterotoxins which represents a segment potentially susceptible to protease digestion (putative chymotryptic site [Fig. 1]). Figure 5A shows that guanylin is rapidly inactivated by chymotrypsin compared with $N^9P^{10}$ guanylin and ST Ib(6-18). Similar results in terms of loss of receptor binding activity were observed when guanylin was exposed to lumenal fluid recovered for small intestines of suckling mice (Fig. 5B) or treated with filtrates of infant mouse intestinal tissues (Fig. 5C). The replacement of Tyr-Ala with Asn-Pro in $N^9P^{10}$ guanylin restored both properties of

87

> enterotoxicity and protease resistance. The long-lived nature of ST
> I enterotoxins may thus be partially responsible for their ability to
> chronically activate the intestinal guanylate cyclase, causing an
> ensuing diarrheal response.

(DTX-032 at 4713.)

### t.   Chang 2002

160.    Chang et al., *Evolving Pathophysiological Model of Functional Gastrointestinal Disorders: Implications for Treatment*, Suppl. 587 EUR. J. SURG. 3–9 (2002) ("Chang 2002") (DTX-366), published in 2002 and is 102(a) prior art to the '036, '727, '947, and '526 patents. Chang 2002 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents. Chang 2002 disclosed that constipation drugs that do not operate through activation of the GC-C receptor were known to reduce pain. (*Id.* at 6 ("Tegaserod [Zelnorm] improves overall GI symptoms, abdominal discomfort or pain, bloating and stool frequency and consistency in female patients with constipation-predominant IBS.").)

### u.   Cohen 1986

161.    Mitchell B. Cohen et al., *The Immature Rat Small Intestine Exhibits an Increased Sensitivity and Response to Escherichia coli Heat-Stable Enterotoxin*, 20(6) PEDIATRIC RESEARCH 555–60 (1986) ("Cohen 1986") (DTX-343), published in 1986 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Cohen 1986 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

162.    Cohen 1986 reported that the small intestine of immature rats was particularly sensitive to ST peptides due in part to an increased number of ST receptors:

> ***In summary, there is an increased sensitivity and response to ST-mediated small intestinal secretion in the developing rat.*** Furthermore, the role of the jejunum in the secretory response appears foremost in the developing rat. Analysis of the kinetics of

binding of ST to its enterocyte receptor indicates that there are an increased number of equally avid receptors for ST in the jejunum of the 14-day-old rat compared with the jejunum of the adult rat. There does not appear to be a difference in the degree or sensitivity of guanylate cyclase activation by ST between the developing and adult rat. ***An increased number of ST receptors in the developing intestine may, in part, account for the increased secretory response in the immature animal***. However, further studies are needed to clarify the intracellular events that occur after ST binding to examine the possibility of developmental differences in intracellular response to ST.

(*See* DTX-343 at 559 (emphasis added).)

### v.  Cohen 1988

163.    Mitchell B. Cohen et al., *Age-Related Differences in Receptors for Escherichia coli Heat-Stable Enterotoxin in the Small and Large Intestine of Children*, 94(2) GASTROENTEROLOGY 367–73 (1988) ("Cohen 1988") (DTX-346), published in 1988 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Cohen 1988 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

164.    Cohen 1988 examined "small and large intestinal specimens from children of various ages for the presence of *E. coli* heat-stable enterotoxin receptors" and observed the "binding of [125]I-heat-stable enterotoxin to all . . . specimens" to determine "whether the number of receptors or the binding affinity of these receptors was related to the age of the child." (DTX-346 at 367 (Abstract).) Cohen 1988 reports that "a greater number of receptors per microgram of membrane bound protein were present in infants and the number of receptors decreased with increasing age." (*Id.*) According to Cohen 1988, "a greater number of gastrointestinal receptors for heat-stable enterotoxin, capable of activating more guanylate cyclase, may contribute to the increased severity of diarrhea noted in young children exposed to enterotoxigenic *E. coli*." (*Id.*) Figure 2 shows the correlation between age and binding capacity of small intestinal and colonic

membranes for ST:



*Figure 2.* Correlation between age and the binding capacity of small intestinal (A) and colonic membranes (B) for $^{125}$I-ST. Data were obtained from competitive inhibition of binding experiments as described in Materials and Methods (n = 24 for small intestine, n = 20 for colon). Data are expressed as the number of ST receptors per microgram of intestinal membrane protein. In the final reduced model: ln(receptors/μg protein) = 4.53 − 0.47 ln(age) + 0.08 ln(age)$^2$ − 0.38(urgency of surgery) − 0.68 ln (height), where age is in months, urgency of surgery is represented by 1 = elective and 2 = emergent, and height is in centimeters. For this regression analysis, $R^2$ = 69%, p < 0.0001.

(*Id.* at 370.)

### w.  Cohen 1989

165.     Mitchell B. Cohen et al., *Differences in jejunal and ileal response to E. coli enterotoxin: possible mechanisms*, 257 (1) AM. J. PHYSIOLOGY-GASTROINTESTINAL AND LIVER PHYSIOLOGY G118–123 (Jul. 1989) ("Cohen 1989") (DTX-345), published in 1989 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Cohen 1989 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

166.     Cohen 1989 reported that the ileum is more sensitive and responsive to ST-mediated secretion than the jejunum. (*See* DTX-345 at G118.) Figure 1 below shows the time course of net ST induced secretion in rat jejunal and ileal ligated loops:



FIG. 1. Time course of net $ST_a$-induced secretion. Secretion was measured in rat jejunal (open circles) and ileal (closed circles) ligated loops during a 3-h incubation with 5 $\mu$M pure $ST_a$ and 250 pM 4-Tyr-$^{125}$I-$ST_a$. Each experimental loop received $ST_a$ diluted in 1 ml of modified Dulbecco's buffer (see MATERIALS AND METHODS). Control loops received 1 ml of $ST_a$-free modified Dulbecco's buffer. Cumulative net secretion represents the difference between an experimental and a control loop. Each point represents the mean ± SE of 5-7 separate determinations.

(*Id*. at G119.) Cohen 1989 suggested that ST may be inactivated or absorbed from the jejunum to a greater extent than in the ileum:

> In summary, there is a strong correlation between differences in the secretory response observed in the jejunum and ileum and the rate and degree of $ST_a$ inactivation and/or absorption at these sites. Because continued receptor occupancy may be required for sustained secretion, greater and more rapid loss of fully active $ST_a$ from the jejunum may result in the more rapid termination of $ST_a$-induced secretion in the jejunum. It is possible that the severity of $ST_a$-induced diarrheal disease is related to the ability of the intestine to inactivate $ST_a$ and terminate secretion.

(*Id*. at G122.) Cohen 1989 notes that others had demonstrated that "in patients with acute undifferentiated diarrhea in the tropics, the magnitude of jejunal secretion was greater than that in the ileum," but that "[n]o similar studies in humans are available to describe the secretory response of jejunum and ileum to $ST_a$." (*Id*.)

### x.   Cohen 1990

167.    Mitchell B. Cohen et al., *E. Coli Heat-stable Enterotoxin (STa) Induced Secretion:*

91

*Differences Between Adult Rat Jejunum and Ileum Correlate with Differences in Metabolic Fate of STa*, ADVANCES IN RES. ON CHOLERA AND RELATED DIARRHEAS, 99–104 (7th ed., 1990) ("Cohen 1990") (DTX-344), published in 1990 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Cohen 1990 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

168.    Cohen 1990 reports that "the $ST_a$-mediated secretory pathways are present in both the ileum and jejunum," and that the "ileum is much more sensitive and responsive to $ST_a$ than is the jejunum." (DTX-344 at 99.) Cohen 1990 conducted a study to "test the hypotheses that $ST_a$ is inactivated or absorbed in the intestine, and that these processes occur to a greater extent in the ileum and jejunum." (*Id*.) Based on the study, the authors concluded that "STa is inactivated and/or absorbed in the intestine, and that these processes occur to a different extent in the ileum and jejunum . . .. [The] greater disappearance of $ST_a$ or alteration of $ST_a$ in the jejunum may result in termination of secretion." (*Id*. at 103.)

### y.   Cohen & Giannella

169.    Mitchell B. Cohen and Ralph A. Giannella, *Jejunal Toxin Inactivation Regulates Susceptibility of the Immature Rat to STa*, 102(2) GASTROENTEROLOGY 1988–96 (1992) ("Cohen & Giannella") (DTX-348), published in 1992 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Cohen & Giannella was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement in the *inter partes* reexamination of the '947 patent.

170.    Cohen & Giannella disclosed that "the immature rat jejunum has an increased sensitivity and responsiveness to $ST_a$" in comparison to adult rat jejunum which "rapidly inactivates STa." (DTX-348 at 1988.) Cohen & Giannella conducted a study to "determine whether

age-related differences in toxin inactivation account for an increased responsiveness of the immature rat to $ST_a$-induced secretion," and to "correlate the $ST_a$-induced secretory response with the degree of $ST_a$ inactivation in the adult and 14-day-old (immature) rat jejunum." (*Id.*) The researchers also "sought to determine whether inactivation of the $ST_a$ occurs in the intestinal lumen, at the BBM, or within the enterocyte." (*Id.*)

171.    Figure 1 disclosed the time course of jejunal secretion induced by 5 μmol/L STa and a control injection of saline in 14-day-old and adult rats.



Figure 1.  Time course of $ST_a$-induced secretion (mL/g) in in situ intestinal loops of 14-day-old (●) and adult (○) rats. Jejunal ligated loops were inoculated with 5 μmol/L pure $ST_a$ and 250 pmol/L 4-Tyr-$^{125}$I-$ST_a$, and secretion was measured at various time points. Each experimental loop received $ST_a$ diluted in modified Dulbecco's buffer (see Materials and Methods). Also shown is fluid accumulation in control loops [14-day-old (▲) and adult (△)] that received $ST_a$-free modified Dulbecco's buffer. Each point represents the mean ± SE of 9–14 separate determinations.

(DTX-348 at 1990.) Figure 1 shows that in adult rats "there was a prompt secretory response that reached maximal intensity at 30 minutes" and "diminished at all subsequent time points" until "the response was virtually zero" at 180 minutes. (*Id.*) Figure 1 also shows that in 14-day-old rats the

"$ST_a$-induced secretion was also present at 30 minutes and then increased until a maximal value was obtained between 90–180 minutes (the last time point tested)." (*Id.*)

172.    In the discussion of results, the authors reported:

> We have shown that in the immature jejunum, there is both persistence of biologically active $ST_a$ and continued $ST_a$-induced secretion. In contrast, in the adult jejunum there is inactivation of $ST_a$ and cessation of secretion. These data are consistent with our hypothesis that the increased sensitivity and response to $ST_a$ in the immature rat jejunum result from the continued presence of biologically active $ST_a$. We also showed that $ST_a$ is partially altered by incubation with luminal fluid or pancreatic fluid. After exposure of $ST_a$ to luminal fluid alone, there is both an alteration of the HPLC profile as well as a decrease in the biological activity of $ST_a$. A change in the HPLC profile but not the binding ability of radiolabeled $ST_a$ occurs after incubation with BBM alone. A completely inactive species is generated only after incubation of $ST_a$ with jejunal organ culture. Thus, while the inactivation process is probably multifactorial, involving the luminal environment and the BBM, it is likely that complete toxin inactivation requires the participation of the enterocyte. It appears that metabolism of $ST_a$ by luminal fluid and by the BBM is similar in the adult and immature rat; however, there appears to be reduced or delayed metabolism of $ST_a$ by the enterocyte in the immature rat.

(DTX-348 at 1994.) The authors further explained:

> Enterotoxigenic *E. coli* cause more frequent and more severe diarrheal illness in the first few months of life. Several factors, including increased exposure to pathogens due to fecal-oral contamination and the lack of protective antibodies, may contribute to this increased attack rate of diarrheal disease in infants. The human infant also has an increased number of receptors for $ST_a$ and an increased $ST_a$-mediated guanylate cyclase response. If our observations in the rat jejunum of age-related differences in host defense against $ST_a$ (toxin inactivation) are paralleled in the human, they would provide another complementary explanation for the increased sensitivity and response of the human infant to toxigenic diarrhea.

(*Id.* at 1995.)

94

### z.   Cuppoletti

173.    Cuppoletti et al., *Recombinant and Native Intestinal Cell ClC-2 Cl- Channels Are Activated by RU-0211*, Suppl. 122:4 GASTROENTEROLOGY A-538 (2002) ("Cuppoletti") (DTX-372), published in 2002 and is at least 102(a) prior art to the '036, '727, '947, and '526 patents. Cuppoletti was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

174.    Cuppoletti taught that RU-0211 "was under development for the treatment of bowel dysfunction." (*Id*. at A-538.) Cuppoletti disclosed that "RU-0211 increases intestinal water secretion and intestinal fluid Cl- concentrations . . .." (*Id*. at A-538.)

### aa. Dahm & Jones

175.    Lawrence J. Dahm and Dean P. Jones, *Rat Jejunum Controls Luminal Thiol-Risulfide Redox*, AM. SOC. FOR NUTRITIONAL SCIENCES 2739–45 (2000) ("Dahm & Jones") (DTX-110), published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Dahm & Jones was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

176.    Dahm & Jones taught that "[d]isulfide reduction may facilitate protein digestion by disrupting disulfide-linked peptides." (DTX-110 at 2744.) Dahm & Jones conducted a study "to determine whether the isolated, vascularly perfused jejunum, free from biliary thiols, could reduce intraluminal glutathione disulfide (GSSG) to glutathione (GSH)." (*Id*.) Dahm & Jones determined that "the rat intestinal epithelium contains a mechanism to reduce a disulfide to maintain luminal thiol-disulfide redox," (*id*. at 2740), and that reduction decreased from proximal to distal jejunum. (*Id*. at 2744.)

### bb. Dayhoff

177.    M.O. Dayhoff et al., *A Model of Evolutionary Change in Proteins*, ATLAS OF PROTEIN SEQUENCE AND STRUCTURE 345–52 (1978) ("Dayhoff") (DTX-351), published in 1978 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Dayhoff was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement in the *inter partes* reexamination of the '947 patent.

178.    Dayhoff examined the amino acid exchanges seen in closely related proteins and derived matrices that describe the amino acid replacement probabilities. (DTX-351 at 345.) Figure 84 is a log odds matrix showing the groups of chemically similar amino acids that tend to replace one another. (*Id*. at 351.) The exchange of tyrosine and leucine has a score of -1 in Figure 84, which indicates that this is a conservative substitution. (*Id*. at 352.)

### cc. Dreyfus

179.    Lawrence A. Dreyfus and Donald C. Robertson, *Solubilization and Partial Characterization of the Intestinal Receptor for Escherichia coli Heat-Stable Enterotoxin*, 46(2) INFECTION AND IMMUNITY 537–43 (Nov. 1984) ("Dreyfus") (DTX-035), published in 1984 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Dreyfus was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

180.    Dreyfus disclosed results of studying binding of $ST_a$ to and activation of guanylate cyclase in rat intestinal epithelial cells and brush border membranes. (DTX-035 at 537 (Abstract).) Dreyfus generally disclosed that "rates of guanylate cyclase activation [by STa] described in this report correlated with binding kinetics." (*Id*. at 541.)

### dd. Drossman 1999

181.    D.A. Drossman, *The Functional Gastrointestinal Disorders and the ROME II*

*Process*, 45 GUT (Suppl II), II1-II5 (1999) ("Drossman 1999") (DTX-139), published in 1999 and

is 102(b) prior art to the '036, '727, '947, and '526 patents. Drossman 1999 was submitted in an

Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727,

'947, and '526 patents, but it was not cited by the Examiner during prosecution.

182.    Drossman 1999 reports that "[t]he Multinational Working Teams to Develop

Diagnostic Criteria for Functional Gastrointestinal Disorders (Rome Committees) began in the

mid-1980s as a series of committees that developed consensus criteria for over 20 FGIDs and

published them in *Gastroenterology International*. These documents were eventually updated and

compiled into a book as the Rome Criteria." (*Id*. at II1.)

### ee. Rome II

183.    Douglas A. Drossman, *Rome II: The Functional Gastrointestinal Disorders:*

*Diagnosis,* Pathophysiology and Treatment: A Multinational Consensus (2d ed. 2000) ("Rome II")

(DTX-143), published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents.

Rome II was not before the Patent Office during the prosecution of the '036, '727, '947, and '526

patents. Rome II disclosed criteria for the diagnosis of functional bowel disorders. (DTX-143,

Appendix A: Diagnostic Criteria at 662–63.)

### ff. Dürr

184.    H.K. Dürr et al., *Fecal Chymotryspin: Study on Some Chracter[i]stics of the Enzyme*,

17 DIGESTION 396–402 (1978) ("Dürr") (DTX-154), published in 1978 and is 102(b) prior art to

the '036, '727, '947, and '526 patents. Dürr was not before the Patent Office during the prosecution

of the '036, '727, '947, and '526 patents.

185.    Dürr disclosed that fecal chymotrypsin has proved to be a valuable tool in the

screening for exorine pancreatic insufficiency. (*Id*. at 396.) Dürr reports that as much as 50% of

the pancreatic chymotrypsin output may be recovered in feces, which "indicates mechanisms stabilizing the enzyme during the intestinal passage." (*Id.* at 401.)

### gg. Eberle

186.    D. Eberle et al., *Rapid Oxidation in Vitro of Endogenous and Exogenous Glutathione in Bile of Rats*, 266(5) J. OF BIOLOGICAL CHEM. 2115–17 (Mar. 10, 1981) 2115–17 ("Eberle") (DTX-111), published in 1981 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Eberle was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

187.    Eberle explains that "[c]ontroversy has existed concerning the relative contribution of oxidized and reduced glutathione to total glutathione efflux from the liver into bile" and reports that "the preponderance of GSSG in bile in the normal state reported by others represents a postexcretory *in vitro* artifact." (DTX-111 at 2115 (Abstract).) Eberle determined "the true contribution of GSH and GSSG to total biliary efflux" by inhibiting the oxidation by acidification of bile during collection. (*Id.*) Table I shows that bile contains GSH in the mM range. (*Id.* at 2116.)

### hh. Evans 1988

188.    D.F. Evans et al., *Measurement of Gastrointestinal pH Profiles in Normal Ambulant Human Subjects*, 29 GUT 1035–41 (1988) ("Evans 1988") (DTX-140), published in 1988 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Evans 1988 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

189.    Evans 1988 disclosed measurements of gastrointestinal pH profiles in normal ambulant human subjects. (*Id.* at 1035.) Figure 3 (reproduced below) shows the gastrointestinal pH profile from a normal subject and Table 2 (reproduced below) disclosed the results and statistics of pH measurements in normal subjects:



Table 2 Results and statistics of pH measurements in normal subjects

| Site | n | Mean pH | Std dev |
|---|---|---|---|
| Jejenum | 55 | 6·63 | 0·53 |
| Mid SB | 52 | 7·41 | 0·36 |
| Ileum | 58 | 7·49 | 0·46 |
| Right colon | 66 | 6·37 | 0·58 |
| Mid colon | 51 | 6·61 | 0·83 |
| Left colon | 50 | 7·04 | 0·67 |
| Whole SB | 51 | 7·30 | 0·34 |
| Whole colon | 48 | 6·63 | 0·67 |

Fig. 3   Gastrointestinal pH profile from a normal subject. The position of the capsule in specific areas is labelled accordingly.

(*Id.* at 1038, 1039.)

### ii. Ewe 1988

190. K. Ewe, *Intestinal Transport in Constipation and Diarrhea*, 36: Suppl. 1 PHARMACOLOGY 73–84 (1988) ("Ewe 1988") (DTX-036), published in 1988 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Ewe was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

191. Ewe 1998 taught that constipation and diarrhea result from abnormal intestinal motility and fluid balance. (DTX-036 at 73 (Abstract).) Ewe 1998 disclosed that the small intestine allows for rapid equilibrium of osmolality (*e.g.*, water and electrolyte balance), while the large intestine preserves water and electrolytes once they have been absorbed. (*Id.*)

192. Ewe 1998 reports that "[f]ormerly, diarrhea and constipation were attributed to disordered motility" and that "[t]his concept changed in the late 1960s and early 1970s when the secretory effect of cholera toxin was recognized and studied in more detail." (*Id.* at 73.) Ewe 1998 explains that constipation and diarrhea are clinical symptoms of abnormalities in stool frequency and consistency due to a variety of causes. (*Id.* at 74.) Both are caused by

99

abnormalities in intestinal motility and transport of electrolytes and water. (*Id.*) Small abnormalities in absorption and secretion, especially in the distal intestinal area, can lead to constipation or diarrhea. (*Id.*)

### jj.  Forte 1999

193.    Leonard R. Forte, *Guanylin Regulatory Peptides: Structures, Biological Activities Mediated by Cyclic GMP and Pathobiology*, 81 REGULATORY PEPTIDES 25–39 (1999) ("Forte 1999") (DTX-112) published in 1999 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Forte 1999 was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, but it was not cited by the Examiner during prosecution.

194.    Forte 1999 disclosed that while STs appear to be "somewhat more potent" than either guanylin or uroguanylin, all three peptides bind to and activate guanylate cyclase receptors in the intestine, leading to increased cGMP synthesis, which in turn increases intestinal fluid and electrolyte secretion. (DTX-112 at 30.) Forte disclosed that STs contain six cysteines, which form three disulfide bonds and appear to be required for the function of the peptide. (*Id.* at 27.) According to Forte 1999, guanylin and uroguanylin contain four cysteines forming two disulfide bonds, which may contribute to the lower potency of guanylin and uroguanylin compared to the STs. (*Id.*)

195.    Forte 1999 further disclosed the sequence for active forms of guanylin, uroguanylin, and *E. coli* ST. (*Id.* at 34 (Fig. 3).) Forte notes that uroguanylin and *E. coli* ST have an internal asparagine, whereas guanylin has an aromatic residue at this position. (*Id.* at 27.) According to Forte 1999, the asparagine makes uroguanylin and ST peptide resistant to attack by chymotrypsin, while guanylin is readily cleaved and inactivated by chymotrypsin-mediated

hydrolysis, suggesting that guanylin could be inactivated in the small intestine by this pancreatic protease. (*Id.*) Forte 1999 also disclosed that chymotrypsin is abundant in the intestinal lumen during digestion, and thus could be involved in inactivating guanylin after entry of guanylin into the intestinal lumen. (*Id.*)

196.    In addition, Forte 1999 disclosed that the guanylate cyclase activation activity of the STs is not affected by pH variations over a wide range (pH 5–8), while the guanylate cyclase activation activity of guanylin and uroguanylin changes under different pH. (DTX-112 at 32.) Forte 1999 reports that the apical face of enterocytes lining the intestinal lumen has variable surface pH microdomains caused by localized differences in $H^+$ and $HCO^-$ concentrations along the crypt to villus axis. (*Id.*) Forte 1999 disclosed that pH variations from 5.0 to 8.0 have no impact on the fluid stimulation activity of the STs. In contrast, the fluid stimulation activity of guanylin and uroguanylin varies under different pH: uroguanylin is active in stimulating fluid secretion under acidic but not basic conditions, while guanylin is active in stimulating fluid secretion under basic but not acidic conditions. (*Id.*)

### kk. Frantz

197.    J. C. Frantz et al., *Binding of Escherichia coli Heat-Stable Enterotoxin to Rat Intestinal Cells and Brush Border Membranes*, 43(2) INFECTION AND IMMUNITY 622–30 (Feb. 1984) ("Frantz") (DTX-038), published in 1984 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Frantz was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

198.    Frantz disclosed the binding properties of $ST_a$ with isolated rat intestinal epithelial cells and brush border membranes. Frantz taught that $ST_a$ binds to a specific high affinity receptor and initiates a transmembrane signal to activate guanylate cyclase. (DTX-038 at 623.) Frantz also

taught that "rates of binding were similar to rates of activation of guanylate cyclase in isolated intestinal epithelial cells and brush border membranes treated with $ST_a$." (*Id.* at 627.)

### ll.  Gariepy I

199.    Jean Gariépy et al.*, Structure of the Toxic Domain of the Escherichia coli Heat-Stable Enterotoxin ST I*, 25 BIOCHEMISTRY 7854–66 (1986) ("Gariepy I") (DTX-039) published in 1986 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Gariepy I was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

200.    Gariepy I disclosed, *inter alia*, the following:

> [a]ctive fragments of the heat-stable enterotoxin ST I of *Escherichia coli* were chemically synthesized with the sequence Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-(Tyr) and studied by proton ([1]H NMR) and carbon-13 ([13]C NMR) nuclear magnetic resonance spectroscopy.

(*See* DTX-039 at 7854 (Abstract); *see also id.* at 7865.) Gariepy I notes that "[t]he mode of action of ST I is linked to its ability to activate particulate guanylate cyclase in the brush border membrane of intestinal epithelial cells." (*Id.* at 7854.) Further, Gariepy I disclosed that two active analogues, abbreviated ST Ib(6-18) and ST Ib(6–19), that had been previously chemically synthesized have similar activity compared to the native ST I. In particular, Gariepy I disclosed that "[t]he secretory activity in suckling mice and the receptor-binding function of these analogues are equipotent with those of native ST I," and "[t]hese analogues therefore contain all the structural information responsible for the toxin's functions." (*Id.*)

### mm.      Gariepy II

201.    Jean Gariépy et al., *Importance of disulfide bridges in the structure and activity of Escherichia coli enterotoxin ST1b*, 84 PROC. NATL. ACAD. SCI. USA 8907–11 (Dec. 1987) ("Gariepy II") (DTX-040), published in 1987 and is 102(b) prior art to the '036, '727, '947, and

'526 patents. Gariepy II was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

202.    Gariepy II disclosed that a 13-amino acid sequence of the *E. coli* STh encodes its receptor-binding and diarrheal functions. (DTX-040 at 8907 (Abstract).) This sequence includes six cysteines involved in three intramolecular disulfide bridges. (*Id.*) Gariepy II disclosed construction of STh analogues that lack two of the six cysteines, and reports disulfide bonds between Cys-7 and Cys-15, Cys-6 and Cys-11, and Cys-10 and Cys-18, the preceding disulfide bonds being ranked in descending order of importance in terms of their respective contribution to the activity of the STh. (*Id.* at 8911.)

### nn. Gariepy & Schoolnik

203.    Jean Gariépy and Gary K. Schoolnik, *Design of a photoreactive analogue of the Escherichia coli heat-stable enterotoxin STIb: Use in identifying its receptor on rat brush border membranes*, 83 PROC. NATL. ACAD. SCI. USA 483–87 (January 1986) ("Gariepy & Schoolnik") (DTX-041), published in 1986 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Gariepy & Schoolnik was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

204.    Gariepy & Schoolnik disclosed the solid-phase peptide synthesis and purification of a 19-amino acid enterotoxic analogue of STI, identified as STIb. (DTX-041 at 483.) Gariepy & Schoolnik further disclose that "the enterotoxic domain [of heat-stable enterotoxins] is confined to a highly conserved C-terminal segment of 13 amino acids." (*Id.*; *see also id.* at 485.)

### oo. Giannella 1995

205.    Ralph A. Giannella, *Escherichia coli heat-stable enterotoxins, guanylins, and their receptors: What are they and what do they do?*, J. LAB CLIN. MED. 125(2):173–81 (Feb. 1995)

103

("Giannella 1995") (DTX-042), published in 1995 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Giannella 1995 was submitted in an Information Disclosure Statement to the Patent Office and cited by the examiner during the prosecution of the '036, '727, '947, and/or '526 patents.

206.    Giannella 1995 disclosed that STh(6–19) activates guanylate cyclase receptors in a fast and reversible manner. The onset of the fluid stimulating activity is rapid, happening within minutes. (DTX-042 at 174.) Giannella 1995 also disclosed the amino acid sequence of STh, STp, guanylin, and uroguanylin. (*Id*. at Fig. 1.)

### pp. Greenberg 1983

207.    Richard N. Greenberg et al., *Reduction of the Secretory Response to Escherichia coli Heat-Stable Enterotoxin by Thiol and Disulfide Compounds*, 41(1) INFECTION AND IMMUNITY 174–80 (July 1983) ("Greenberg 1983") (DTX-113), published in 1983 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Greenberg 1983 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

208.    Greenberg 1983 disclosed the results of experiments conducted to examine "the effects of disulfide and thiol compounds on *Escherichia coli* heat-stable enterotoxin (ST) and cyclic GMP-induced secretion." (DTX-113 at 174 (Abstract).) Greenberg 1983 reports that:

> Both cystamine and cystine (disulfide compounds) reduced the secretory responses to submaximal doses of ST in suckling mice (at 0.5, μmol per mouse) and reduced ST activation of guanylate cyclase (by 33 to 73% at 1 mM). In higher doses, cystamine completely eradicated a maximally effective ST dose as well. In addition, the sulfhydryl (thiol) compounds cysteamine, cysteine, and acetylcysteine strikingly reduced the secretory response and the guanylate cyclase response to ST.

(*Id.*) The authors note that these findings along with the work of others "suggest that disulfide compounds may alter the oxidation reduction state of a cell or act directly on the guanylate cyclase enzyme, whereas thiol compounds may inactivate ST itself by breaking its disulfide bridges, or it may alter guanylate cyclase activation by ST." (*Id.*)

### qq. Greenberg 1997

209.     Richard N. Greenberg et al., *Comparison of Effects of Uroguanylin, Guanylin, and Escherichia coli Heat-Stable Enterotoxin STa in Mouse Intestine and Kidney: Evidence that Uroguanylin Is an Intestinal Natriuretic Hormone*, 45 J. INVESTIGATIVE MED. 276–83 (1997) ("Greenberg 1997") (DTX-043), published in 1997 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Greenberg 1997 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

210.     Greenberg 1997 disclosed results of a study evaluating the effects of STa, guanylin, and uroguanylin in intestinal fluid secretion. It disclosed that orally administered STa and uroguanylin stimulated intestinal fluid secretion in mouse *in vivo*, whereas orally administered guanylin, even at the highest dose used in Greenberg's experiments, did not stimulate intestinal fluid secretion. (DTX-043 at 276 (Abstract).) Greenberg 1997 also disclosed that intestinal proteases, such as chymotrypsin, cleave and inactivate guanylin, thus markedly reduce the *in vivo* potency of guanylin relative to uroguanylin and STs. (*Id*. at 279–80.)

### rr. Hamra 1996

211.     Hamra et al.*, Prouroguanylin and Proguanylin: Purification from Colon, Structure, and Modulation of Bioactivity by Proteases*, 107(1) Endocrinology 257–265 (1996) ("Hamra 1996") (DTX-391) published in 1996 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Hamra 1996 was not before the Patent Office during the prosecution of the '036, '727,

'947, and '526 patents, but it was cited in an Information Disclosure Statement in the *inter partes*

reexamination of the '947 patent.

212.    Hamra 1996 reports that uroguanylin and guanylin have different potency in the

"microclimate at the surface of enterocytes" that ranges "from less than 6.0 to greater than 8.0"

and suggests that both peptides may be required to effectively regulate GC-C activity over this

broad range of luminal pH:

> Our previous work has shown that uroguanylin and guanylin differ
> greatly with respect to their biochemical and pharmacologic
> properties (4). Uroguanylin is a highly potent agonist for GC-C in
> T84 cells when tested at an acidic extracellular pH of 5.5, conditions
> under which guanylin was found to be about 50-fold less potent than
> uroguanylin (4). In contrast, guanylin was more potent than
> uroguanylin at an alkaline extracellular pH of 8.0. ***Because the pH
> of the aqueous microclimate at the surface of enterocytes ranges
> from less than 6.0 to greater than 8.0 (25-27), and uroguanylin
> and guanylin occur together in the same intestinal segments (4),
> these two different peptide agonists may be required to effectively
> regulate GC-C activity and enterocyte transport over this broad
> range of luminal pH***.

(*Id*. at 264 (emphasis added).) Hamra 1996 further disclosed that "[u]roguanylin was found, *in*

*vitro*, to be resistant to inactivation by chymotrypsin, whereas this intestinal protease was shown

to inactivate guanylin by cleavage at its aromatic residue." (*Id*.)

### ss. Hamra 1997

213.    Hamra et al., *Regulation of intestinal uroguanylinyguanylin receptor-mediated*

*responses by mucosal acidity*, 94 PHARMACOLOGY 2705–2710 (1997) ("Hamra 1997") (DTX-378)

published in 1997 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Hamra 1997

was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents,

but it was cited in an Information Disclosure Statement in the *inter partes* reexamination of the

'947 patent.

106

214.   Hamra 1997 explains the effect pH has on the binding affinity of guanylin and uroguanylin:

> ***Mucosal acidity markedly increases the potency of uroguanylin, while rendering guanylin ineffective in the stimulation of cGMP accumulation and transepithelial chloride secretion****. In sharp contrast, a mucosal pH of 8.0 substantially increases the potency of guanylin, while diminishing the potency of uroguanylin*. This striking effect of mucosal pH on agonist potencies was explained by the corresponding shifts in affinities of guanylin and uroguanylin for binding to receptors on T84 cells at the mucosal pH values of 5.0 versus pH 8.0. ***As a result, the affinities of guanylin and uroguanylin for binding to these receptors undergo pH-dependent shifts by as much as 100-fold. Thus, variation in mucosal acidity within the physiological limits observed at the surface of the intestinal mucosa (21–24) influences the activation of receptors by uroguanylin and guanylin****.

(*Id*. at 2709 (emphasis added).)

215.   Hamra 1997 taught that removal of three amino acids at the N-terminus of uroguanylin eliminated its responsiveness to pH changes by reducing its unique potency in acidic conditions:

> Thus, uroguanylin[98–109] did not exhibit an increase in the affinity of this peptide for binding to receptors on T84 cells at acidic versus alkaline pH. This observation is consistent with the similar potencies measured at pH 5.0 compared with pH 8.0 for the cGMP accumulation response to uroguanylin[98–109]. We conclude that the unique acidic amino acids at the N terminus of uroguanylin are required for the increased binding affinities, and accordingly, the enhanced potencies of uroguanylin in the stimulation of target cell responses under the acidic conditions of pH 5.0–5.5 maintained at the mucosal surface of T84 cells in this model epithelium.

(*Id*. at 2708.)

216.   Hamra 1997 explains that "[e]nteric bacteria have evolved a single peptide toxin that serves as a molecular mimic for both of the intestinal hormones, uroguanylin and guanylin. The remarkable potencies of ST peptides compared with the potencies of the enteric hormones is

107

caused by higher affinities for ST binding to the intestinal receptors for uroguanylin and guanylin." (*Id*. at 2710.)

### tt.  Handbook of Natural Toxins

217.    Toshiya Hirayama, *Heat-Stable Enterotoxin of Escherichia coli*, in Bacterial Toxins and Virulence Factors in Disease 281–96 (Joel Moss et al. *eds*., 1995) 281–96 ("Handbook of Natural Toxins") (DTX-044) published in 1995 and is 102(b) prior art to the '036, '727, '947, and '526 patents. The Handbook of Natural Toxins was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

218.    The Handbook of Natural Toxins disclosed that ST1b has also been referred to as STh because it was originally found in *E. coli* isolated from humans. (*See* DTX-044 at 282.) The Handbook of Natural Toxins further disclosed the biological activities of analogs of STh(6–19) with replacements at positions 12, 13, and 14, as well as the biological activities of analogs of STh(6-18) with one or two disulfide bonds. (*See id.* at 283–86 (Tables 1–4).)

### uu. Hasegawa

219.    Makoto Hasegawa et al., *Identification of a Binding Region on Escherichia coli Heat-Stable Enterotoxin to Intestinal Guanylyl Cyclase C*, 4 Letters Peptide Sci. 1–11 (1997) ("Hasegawa") (DTX-045) published in 1997 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Hasegawa was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, and it was cited by the Examiner in the *inter partes* reexamination of the '947 patent.

220.    Hasegawa disclosed that STp region spanning from Cys(5) to Cys(17) is highly homologous among members of the ST family. (DTX-045 at 2.) Hasegawa further disclosed that this region contains three disulfide bonds, between Cys(5) and Cys(10), Cys(6) and Cys(14), and

Cys(9) and Cys(17), which occur in all of the known STs and which are essential for the full activity of ST. (*Id.*) Hasegawa further disclosed that X-ray crystallography of this domain of STp shows that it consists of three structural segments: a $3_{10}$ helix in the N-terminal region (Cys(5)-Cys(9)), a type I β-turn in the central region (Asn(11)-Cys(14)), and a type II β-turn in the C-terminal region (Cys(14)-Cys(17)). (*Id.*) Hasegawa notes that previous studies concluded that the central segment which contains the β-turn structure represents a contact region for the receptor protein. (*Id.*) It also disclosed that the three amino acid residues of the central region, Asn(11)-Pro(12)-Ala(13), are conserved among the ST family, and that the replacement of these three amino acid residues by others dramatically decreases binding activity to the receptor. (*Id.* at 10, Fig. 1.)

221.    Hasegawa synthesized modified STp(4-17) peptides by introducing a photo-chromophore, p-azidophenylalanine (Pap), into three different regions of STp(4-17). (*Id.* at Abstract, Fig. 1.) Hasegawa concludesd that the internal region of the ST peptide encompassing Asn(11) directly interacts with the receptor. (*Id.* at 1 (Abstract).) Hasegawa also taught that the binding affinity of the STp(4-17) analogue in which Leu(8) was replaced with Pap was higher than the analogue in which Ala(15) was replaced with Pap, which itself has a much higher binding affinity compared to the analogue in which Asn(11) was replaced with Pap. (*Id.* at 9.)

### vv. Hirayama

222.    T. Hirayama & A. Wada, *Heat-Stable Enterotoxin of Escherichia Coli*, in 145 Handbook of Exp. Pharmacology, Bacterial Protein Toxins 577–93 (K. Aktories & I. Just eds., 2000) ("Hirayama") (DTX-114) published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Hirayama was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

223.    Hirayama disclosed the full-length amino acid sequence for STh (AsnSerSerAsnTyrCysCysGluLeuCysCysAsnProAlaCysThrGluCysTyr), and notes that the 13 amino acid residues from Cys-6 to Cys-18 "constitute[] the active domain essential for full enterotoxicity." (DTX-114 at 578.) Hirayama goes on to disclose that a truncated peptide, comprising the 13 amino acid residues of STh from Cys-6 to Cys-18, has the same toxic activity as native STh, is more stable to heat treatment than the native peptide, and has the same minimum effective dose (0.4 pmol) as the native STh. (*Id.* at 579–80.)

### ww.    Hruby

224.    Victor J. Hruby, *Designing Peptide Receptor Agonists and Antagonists*, 1(11) NATURE REVIEW DRUG DISCOVERY 847–58 (Nov 2002) ("Hruby") (DTX-123) published in 2002 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Hruby was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

225.    Hruby taught that "a robust strategy has been developed for the design of peptides as drugs, drug candidates and biological tools." (DTX-123 at 847.) Hruby disclosed that the strategies require "careful consideration of both the structural and conformational features of peptides and detailed analyses of their biological activities, including binding, second-messenger, tissue and whole-animal assays." (*Id.* at 848.) Hruby reports that the "strategies have had a great deal of success." (*Id.*)

### xx. Johanson 2002

226.    Johanson et al., *Efficacy and Safety of a Novel Compound, RU-0211, for the Treatment of Constipation*, Suppl. 122:4 GASTROENTEROLOGY, A-315 (2002) ("Johanson 2002") (DTX-365) published in 2002 and is at least 102(a) prior art to the '036, '727, '947, and '526 patents. Johanson 2002 was not before the Patent Office during the prosecution of the '036, '727,

110

'947, and '526 patents.

227.    Johanson 2002 disclosed that RU-0211 is "a chloride channel opener which increases intestinal water secretion" that had been studied in a clinical trial "for the treatment of constipation." (*Id.* at A-315.) Johanson 2002 reported that RU-0211 increased the number of bowel movements per week, decreased constipation-related symptoms, and was well-tolerated in a clinical trial:

> Results: 129 subjects were randomized of which 127 received at least one dose of active drug or placebo. The overwhelming majority of subjects were female and Caucasian. Intent-to-Treat (ITT) analysis demonstrated a statistically significant increase in the average weekly number of spontaneous BMs during weeks 1 and 2 for the 48 and 72 mcg doses when compared with placebo. Furthermore, significantly more subjects receiving the 48 and 72 mcg doses of RU-0211 experienced a BM on the first day of treatment. Statistically significant improvements were also observed in stool consistency, bloating, and global assessment of constipation severity among subjects receiving RU-0211. The most common adverse events (AE) were nausea, headache, diarrhea and bloating. With the exception of nausea, the incidence of AEs was similar among treatment and placebo groups. Although nausea increased in a dose dependant fashion, only 4 subjects withdrew due to nausea and these were equally distributed among the treatment groups. Withdrawals due to lack of efficacy occurred only in the placebo group. Conclusions: The results of this randomized, controlled, clinical trial demonstrate that RU-0211, at doses of 48 and 72 mcg, increases the average number of BMs/wk, decreases constipation related symptoms, and is well tolerated.

(*Id.*)

### yy. Ikemura

228.    Haruo Ikemura et al., *Heat-Stable Enterotoxin (STh) of Human Enterotoxigenic Escherichia coli (Strain SK-1). Structure-Activity Relationship*, 57 BULL. CHEMICAL SOC'Y JAPAN 2550–56 (1984) ("Ikemura") (DTX-046) published in 1984 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Ikemura was not before the Patent Office during the prosecution of

the '036, '727, '947, and '526 patents.

229.    Ikemura disclosed that STh(6–19) lacking five N-terminal amino acid residues of STh has a higher heat-stability than synthetic or native STh. (DTX-046 at 2556.) Ikemura also demonstrates that STh(5-19) lacking four N-terminal amino acid residues of STh has the same heat-stability as that of synthetic or native STh. (*Id.*) Ikemura also disclosed that it is difficult to obtain a large amount of the STh toxin from the culture supernatant of the bacteria and reports a method for chemical synthesis of STh in large quantity. (*Id.* at 2550.) Ikemura further taught that the STh peptides were made in large quantities by solid phase synthesis and were confirmed to be pure by HPLC. (*Id.* at 2552, Fig. 2, 2553.)

### zz. Ladunga

230.    Istvan Ladunga and Randall F. Smith, *Amino Acid Substitutions Preserve Protein Folding by Conserving Steric and Hydrophobicity Properties*, 10(3) PROTEIN ENGINEERING 187–96 (1997) ("Ladunga") (DTX-352) published in 1997 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Ladunga was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement to the Patent Office in the *inter partes* reexamination of the '947 patent.

231.    Ladunga presents "a comprehensive analysis of amino acid substitution patterns . . . and conservation of physiochemical properties in alignments of protein sequences." (DTX-352 at 187.) Ladunga reports that leucine "is involved in 16 of the 80 most frequent multiple-residue" substitution patterns, and disclosed that leucine "easily replaces (or is replaced by) other hydrophobic residues and even hydrophilic ones that have extended side chains (serine, threonine, tyrosine, glutamine, lysine, etc.)." (*Id.* at 194.)

112

### aaa.    Lloyd-Williams

232.    P. Lloyd-Williams et al., *Chemical Approaches to the Synthesis of Peptides and Proteins*, 19-93, 209-36 (1997) ("Lloyd-Williams") (DTX-047) published in 1997 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Lloyd-Williams was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

233.    Lloyd-Williams disclosed that "[t]he advantages of [solid-phase peptide synthesis] over classical synthesis in solution are those of simplicity and speed of execution." (DTX-047 at 219.) Lloyd-Williams further disclosed methods for synthesizing peptides comprising disulfide bridges. (*Id.* at 214–23.) Lloyd-Williams states:

> Disulfide bridges reduce the flexibility of a peptide, making it more rigid and decreasing the number of conformations available to it in solution. Such conformational constraint is often necessary for biological activity, which may be lost if the disulfide is disrupted. Structural stabilization by disulfide bridge formation can also be introduced into nonnatural peptides. This allows the design and preparation of rigid artificial molecules, usually with enhanced thermal stability, that can be used to probe specific aspects of peptide structure or function.

(*Id.* at 209.)

### bbb.    Lu

234.    Wuyuan Lu et al.*, Binding of Amino Acid Side-chains to S1 Cavities of Serine Proteinases*, 266 J. MOL. BIOL. 441–61 (1997) ("Lu") (DTX-126) published in 1997 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Lu was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents. Lu taught that chymotrypsin has a preference for tyrosine over phenylalanine. (DTX-126 at 443 (Table 1).)

### ccc.    Marx

235.    Marx et al., *One Peptide, Two Topologies: Structure and Interconversion*

*Dynamics of Human Uroguanylin Isomers*, 52 J. Pept. Res. 229–40 (1998) ("Marx") (DTX-389)

published in 1998 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Marx was not

before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

236.     Marx reported that guanylin and uroguanylin undergo an isomerization between

two defined topological states that distinguish these peptides from all other known peptide

hormones:

> In conclusion, the fact that uroguanylin and guanylin undergo an isomerization between two defined topological states distinguishes these peptides from all other known peptide hormones. This structural and dynamic characteristic may be a feature of other bioactive multiple disulfide-bridged peptides and proteins.

(*Id.* at 238–39.) Marx reported that the isomers of guanylin and uroguanylin had different

interconversion kinetics:

> A fundamental difference between uroguanylin and guanylin is the velocity of inter-conversion between the respective isomers. Both guanylin isomers are present simultaneously in an equimolar ratiounder any conditions. In contrast, the conversion between uroguanylin isomers follows significantly slower kinetics and is hindered substantially by the carboxy-terminal leucine. Therefore, the two isomers of human uroguanylin may exist physiologically in a nonequimolar ratio.

(*Id.* at 239.) Marx determined that isoform A was bioactive for the GC-C, but noted that isoform

B could also have a distinct functional role:

> From this study, the bioactive isomer concerning the stimulation of GC-C could be assigned unambiguously to isomer A. Although the topological stereoisomerism and the interconversion of uroguanylin isomer B is suitable for isomer B to function as a storage form of isomer A, a distinct functional role of the B-type isomers cannot be excluded.

(*Id.*)

114

### ddd.    McCole 2002

237.    McCole et al., *Transactivation of the Epidermal Growth Factor Receptor in Colonic Epithelial Cells by Carbachol Requires Extracellular Release of Transforming Growth Factor-α*, 277 J. BIOL. CHEM. 42603–42612 (2002) ("McCole 2002") (DTX-330) published in 2002 and is at least 102(a) prior art to the '036, '727, '947, and '526 patents. McCole 2002 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents. McCole 2002 disclosed that insufficient chloride secretion occurs in cystic fibrosis. (*Id.* at 42603.)

### eee.    Mezoff

238.    Adam G. Mezoff et al., *Escherichia coli Enterotoxin (STa) Bind to Receptors, Stimulate Guanyl Cyclase, and Impairs Absorption in Rat Colon*, 102(3) GASTROENTEROLOGY 816–22 (March 1992) ("Mezoff") (DTX-347) published in 1992 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Mezoff was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

239.    Mezoff notes that "the colon has the ability to respond to $ST_a$" and conducted a study to "test the hypothesis that the colon significantly contributes to $ST_a$-mediated diarrheal disease" by "compar[ing] $ST_a$ binding, $ST_a$-induced guanyl cyclase activation, and $ST_a$-induced net water flux in the colon and ileum." (DTX-347 at 816.) Mezoff reports that:

> [T]he colon contains all the necessary components to respond to $ST_a$, including $ST_a$ receptors and $ST_a$-stimulated guanyl cyclase activity. In addition, on the basis of our data we suggest that the colon may significantly contribute to the host's diarrheal response to $ST_a$ by a decreased absorptive capacity in the face of increased small intestinal fluid secretion.

(*Id.* at 821.)

### fff. Nakazato

240.     Masamitsu Nakazato, *Guanylin Family: New Intestinal Peptides Regulating Electrolyte and Water Homeostasis*, 36 J. GASTROENTEROLOGY 219–25 (2001) ("Nakazato") (DTX-049) published in 2001 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Nakazato was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

241.     Nakazato disclosed, *inter alia*, a review of peptides belonging to the guanylin family. Among these are heat-stable enterotoxins which are "produced by pathogenic bacteria [and] have close structural similarities to guanylin and uroguanylin." (DTX-049 at 219.) According to Nakazato, the heat-stable enterotoxins "use this mimicry to act on [guanylyl cyclase-C], causing life-threatening secretory diarrhea." (*Id.*) Nakazato states that "[heat-stable enterotoxins] were shown to bind to intestinal receptor-guanylyl cyclase (GC-C) in the brush border membrane, which subsequently leads to the activation of guanylyl cyclase." (*Id.*) Nakazato also disclosed:

> [a] major structural difference between the guanlyin family peptides and [heat-stable enterotoxins] is the number of cysteines and disulfide bonds: guanylin and uroguanylin have four cysteines and two disulfide bridges compared with STs, with six cysteines and three disulfides. These disulfides are indispensable for optimal peptide potencies in the stimulation of cGMP production in vitro. The potency of the stimulation of guanylyl cyclase activity, in descending order, is [heat-stable enterotoxins], uroguanylin, and guanylin. An additional pair of cysteine residues in [heat-stable enterotoxins] may contribute to their apparently higher potencies.

(*Id.* at 220.)

242.     Nakazato also provides the following model of action:



Fig. 2. A model for the guanylyl cyclase-C (*GC-C*) signaling pathway in intestinal Cl⁻-secreting cells. Luminally secreted guanylin and uroguanylin activate GC-C in nearby cells. These peptides are also secreted into the bloodstream to function in an endocrine fashion. Cl⁻ enters across the basolateral (serosal) membrane. Cyclic guanosine 3',5'-monophosphate (*cGMP*) activates cGMP-dependent protein kinase II (*PKG II*). A key substrate for phosphorylation by PKG II is the apical membrane-localized CFTR protein. CFTR serves as a channel for Cl⁻ and HCO₃⁻ secretion across the apical (mucosal) membrane of epithelial cells. *GTP*, Guanosine 5'-triphosphate

(DTX-049 at 222.)

### ggg.    Niu

243.    Chien-Hua Niu & Yuan-Yuan Chiu, *FDA Perspective on Peptide Formulation and Stability Issues*, 87 J. PHARMACEUTICAL SCI. 1331–34 (1998) ("Niu") (DTX-051) published in 1998 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Niu was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

244.    Niu disclosed that in contrast to conventional synthetic pharmaceuticals, peptides demonstrate more complex chemical modifications and are often more susceptible to denaturation and degradation. (DTX-051 at 1331.) Niu taught generally that the extent of chemical and physical degradation of peptides depends on multiple factors, including temperature. (*Id.* at 1333.)

### hhh.    2002 PDR

245.    The Physicians' Desk Reference 1007 (56th Ed. 2002) ("2002 PDR") (DTX-169) published in 2002 and is at least 102(a) prior art to the '036, '727, '947, and '526 patents. The 2002 PDR was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

117

246.     The 2002 PDR disclosed the prescribing information for the constipation medication Kristalose. (*Id*. at 1007.) The 2002 PDR further disclosed that diarrhea is an adverse event for Kristalose. (*Id*.)

### iii.  Poulopoulou

247.     Cornelia Poulopoulou & Linda M. Nowak, *Extracellular 3',5' Cyclic Guanosine Monophosphate Inhibits Kainate-Activated Responses in Cultured Mouse Cerebellar Neurons*, 286 J. PHARMACOLOGY & EXPERIMENTAL THERAPEUTICS 99–109 (1998) ("Poulopoulou") (DTX-159) published in 1998 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Poulopoulou was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents. Poulopoulou taught "that there are direct inhibitory effects of extracellular cGMP on a large group of excitatory synapses in the CNS—effects that need to be taken into account when investigators utilize membrane-permeable cGMP analogs." (*Id*. at 99 (abstract).)

### jjj. Qian

248.     Xun Qian et al., *Expression of GC-C, A Receptor-Guanylate Cyclase, and Its Endogenous Ligands Uroguanylin and Guanylin along the Rostrocaudal Axis of the Intestine*, 141(9) ENDOCRINOLOGY 3210–3224 (2000) ("Qian") (DTX-134) published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Qian was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

249.     Qian reports that "GC-C, an intestinally expressed rGC, was initially cloned by homology as an orphan receptor," and that "the search for its ligands yielded STa and the endogenous peptides uroguanylin and guanylin." (DTX-134 at 3210.) Qian investigated whether the distribution of the GC-C matches that of its endogenous ligands in the rat intestine and reported the findings below:

118

> We established that 1) uroguanylin is essentially restricted to small bowel; 2) guanylin is very low in proximal small bowel, increasing to prominent levels in distal small bowel and throughout colon; 3) GC-C messenger RNA and STa-binding sites are uniformly expressed throughout the intestine; and 4) GC-C-mediated cGMP synthesis peaks at the proximal and distal extremes of the intestine (duodenum and colon), but is nearly absent in the middle (ileum). These observations suggest that GC-C's activity may be posttranslationally regulated, demonstrate that the distribution of GC-C is appropriate to mediate the actions of both uroguanylin and guanylin, and help to refine current hypotheses about the physiological role(s) of these peptides.

(*Id.*)

### kkk.      Rabenstein

250.      Dallas L. Rabenstein & Pauline L. Yeo, *Kinetics and Equilibria of the Formation and Reduction of the Disulfide Bonds in Arginine-Vasopressin and Oxytocin by Thiol/Disulfide Interchange with Glutathione and Cysteine*, 59 J. ORG. CHEM. 4223–29 (1994) ("Rabenstein") (DTX-160) published in 1994 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Rabenstein was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

251.      Rabenstein reports that "[t]hiol/disulfide interchange reactions provide a mechanism for the reversible formation of disulfide bonds in biological systems." (*Id.* at 4223.) Rabenstein further explains that the "reversible formation of disulfide bonds is [] utilized in biology as a cellular defense system, to regulate metabolism, and to transport reducing equivalents." (*Id.*) Rabenstein disclosed a reaction scheme of "the stepwise kinetics for reduction and formation of the peptide disulfide bonds by thiol/disulfide interchange. . .." (*Id.* at 4227.)

### lll.  Ratnaike 1998

252.      Ratnaike et al., *Mechanisms of Drug-Induced Diarrhea in the Elderly*, 13 DRUG

119

AGING 245–253 (1998) ("Ratnaike 1998") (DTX-142) published in 1998 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Ratnaike 1998 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

253.    Ratnaike 1998 disclosed that secretagogues bisacodyl, misoprostol, and chenodeoxycholic acid "impair fluid absorption by activating adenylate cyclase within the small intestinal enterocyte which increases the level of cyclic AMP. This causes active secretion of $Cl^-$ and $HCO_3^-$, passive efflux of $Na^+$, $K^+$ and water and inhibition of $Na^-$ and $Cl^-$ into the enterocyte." (*Id.* at 246.)

### mmm.    Remington 2000

254.    REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY (Alfonso R. Gennaro ed., 20th ed. 2000) ("Remington 2000") (DTX-052) published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Remington 2000 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

255.    Remington 2000 disclosed components of pharmaceutical compositions, in addition to the active ingredient, that a skilled artisan would routinely use, such as a pharmaceutically acceptable carrier. (DTX-052 at 858.)

### nnn.    Roussel 1992

256.    A.J. Roussel et al., *Myoelectric Activity of the Small Intestine in Enterotoxin-Induced Diarrhea of Calves*, 53:7 AM. J. VET. RES. 1145–1148 (July 1992) ("Roussel 1992") (DTX-053) published in 1992 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Roussel 1992 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

257.    Roussel 1992 conducted a study "to evaluate the effect of STa on jejunal and

120

ileal myoelectric activity in healthy neonatal calves." (*Id*. at 1145.) Roussel 1992 reports that "[s]mall intestinal motility patterns of healthy calves have been carefully studied and are similar to those of non-ruminant species." (*Id*.) The experimental results suggest "that enterotoxin-induced diarrhea of calves is accompanied by increased total spiking activity and minute rhythms in the distal portion of the jejunum and ileum." (*Id*. at 1145 (abstract).)

### ooo.    Sack 1972

258.    George H. Sack et al., *Gastric Acidity in Cholera and Noncholera Diarrhea*, 47 BULL. WORLD HEALTH ORG. 31–36 (1972) ("Sack 1972") (DTX-144) published in 1972 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Sack 1972 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

259.    Sack 1972 disclosed that "cholera enterotoxin alters the function of a variety of tissues and indicate that its effects on water and electrolyte transport by the small bowel are mediated by an alteration in the activity of adenyl cyclase in the mucosal membrane with a resultant change in tissue levels of cyclic 3'5'-adenosine monophosphate (cyclic AMP)." (*Id*. at 31 (internal citations omitted).)

### ppp.    Sack 1980

260.    R. Bradley Sack, *Enterotoxigenic Escherichia coli: Identification and Characterization*, 142(2) J. OF INFECTIOUS DISEASES 279–86 (August 1980) ("Sack 1980") (DTX-116) published in 1980 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Sack 1980 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

261.    Sack 1980 disclosed that the physiological action of ST is characterized by "[r]apid onset, short-lived hypersecretion." (DTX-116 at 280.) Sack 1980 further explains that:

> Strains of ETEC can produce either one or both of the enterotoxins [i.e., LT or ST], depending on the plasmid(s) they carry. It has been shown that the clinical disease caused by strains of ETEC correlated with these types of enterotoxins produced by the isolates. The diarrhea was more severe and of longer duration in persons harboring organisms that produced both LT and ST, as compared with those with organisms producing only ST.

(*Id.* at 281.)

### qqq.    Sato

262.    Takashi Sato et al., *Structural Characteristics for Biological Activity of Heat-Stable Enterotoxin Produced by Enterotoxigenic Escherichia coli: X-ray Crystallography of Weakly Toxic and Nontoxic Analogs*, 33 BIOCHEMISTRY 8641–8650 (1994) ("Sato") (DTX-054) published in 1994 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Sato was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

263.    Sato disclosed that the structure of STp consists of three segments: an N-terminal $3_{10}$ helix, a central type I β-turn, and a C-terminal type II β–turn, which are stabilized by three intramolecular disulfide bond. (DTX-054 at 8641.) The three pairs of disulfide bonds form between amino acid positions 6 and 11, 7 and 15, and 10 and 18. (DTX-054 at 8642.) Sato further disclosed that replacing amino acid residues in the type I β-turn segment located in the central region of the STp, including Asn(11), Pro(12), and Ala(13), results in marked reduction of the biological activity. (*Id.* at 8641–42.) Sato's data strongly suggest that the STp central region consisting of Asn(11), Pro(12), and Ala(13) is part of the interface that binds a pocket on the GC-C receptor. (*Id.* at 8649.) Sato's data further confirm previous findings that Asn(11), Pro(12), and Ala(13) are among the most important residues for STp's activity, and that the activity of STp is less affected by substitutions of Leu(8), because this residue is located on the opposite side of Ala(13). (*Id.*) Further, the disclosed structure by Sato shows that Leu(8) is on the surface of the

122

properly folded ST peptide. (*Id.* at 8646 (Fig. 5a).)

### rrr.  Silberstein

264.     Stephen Silberstein et al., *Botulinum Toxin Type A as a Migraine Preventive Treatment*, 40 HEADACHE 445–50 (2000) ("Silberstein") (DTX-055) published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Silberstein was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

265.     Silberstein disclosed a migraine preventive treatment using botulinum toxin type A, a neurotoxin produced by the bacterium *Clostridium botulinum* and is the most acutely toxic substance known. Silberstein notes that botulinum toxin type A has been used clinically for a number of disorders believed to be due to overactive striated or smooth muscles, such as cervical dystonia, blepharospasm, spasticity, rectal sphincter spasm with fissure, and achalasia. (DTX-055 at 445.) Silberstein reports that pericranial injection of botulinum toxin type A, 25 U, is a safe treatment that significantly reduces migraine frequency, migraine severity, acute medication usage, and associated vomiting. (*Id*. at 445 (Abstract).)

### sss. Schellenberger 1991

266.     Volker Schellenberger et al., *The Specificity of Chymotrypsin, A Statistical Analysis of Hydrolysis Data*, 199 EUR. J. BIOCHEM. 623–36 (1991) ("Schellenberger 1991") (DTX-131) published in 1991 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Schellenberger was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

267.     Schellenberger 1991 aimed to "collect all available quantitative data on the chymotryptic hydrolysis of series of amino acids . . . in order to extract overall information on the specificity of the enzyme." (DTX-131 at 623.) Schellenberger 1991 taught that chymotrypsin

has a preference for tyrosine over phenylalanine. (*Id.* at 635 (Figure 2).)

### ttt. Schellenberger 1994

268.    Volker Schellenberger et al., *Role of the S' Subsites in Serine Protease Catalysis*, 33 BIOCHEMISTRY 4251–57 (1994) ("Schellenberger 1994") (DTX-161) published in 1994 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Schellenberger 1994 was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

269.    Schellenberger 1994 disclosed that chymotrypsin would not cleave the bond between an aromatic amino acid and proline. (*Id.* at 4251.)

### uuu.      Schmidt

270.    R. Schmidt, *Dose-finding Studies in Clinical Drug Development*, 34 EUR. J. CLIN. PHARMACOL. 15-19 (1988) ("Schmidt") (DTX-137) published in 1988 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Schmidt was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

271.    Schmidt disclosed that a "correct dose-finding study is of the utmost importance during clinical development of a new drug." (DTX-137 at 15.) According to Schmidt, the dose-finding study must define the no-effect dose, the mean effective dose, and the maximal effective dose so that "the optimal therapeutic dose range can be selected" when tolerability is taken into account." (*Id.*)

### vvv.      Schiller 2001

272.    L.R. Schiller, *Review Article: The Therapy of Constipation*, 15 ALIMENT PHARMACOL. THER. 749–763 (2001) ("Schiller 2001") (DTX-056) published in 2001 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Schiller 2001 is cited in the specification of the '036, '727, '947, and/or '526 patents.

124

273.     Schiller 2001 disclosed, *inter alia*, that medical therapies for constipation aim at increasing bulk and water content of stool solids and/or increasing intestinal secretion or motility. (*E.g.*, DTX-056 at Abstract.) Schiller 2001 broadly defines laxatives as "agents that ad bulk to intestinal contents, that retain water within the bowel lumen by virtue of osmotic effects, or that stimulate intestinal secretion or motility, thereby increasing the frequency and ease of defecation." (DTX-056 at 749.) Schiller 2001 disclosed that an "increase in intraluminal volume due to the presence of increased solids and obligated water is thought to stimulate motility and accelerate the transit of luminal contents through the colon, thus increasing stool weight." (*Id.* at 751.)

274.     Schiller 2001 reports that three well-known types of laxatives—bulking or hydrophilic agents, osmotic agents, and stimulant laxatives—increase the amount of water in the stool. (DTX-056 at 750.) Specifically, osmotic agents were known to "reduce fluid absorption by the intestine by providing poorly absorbed osmotically active substances that hold additional water intraluminally, thereby increasing the water content of stools." (*Id.*) Schiller 2001 refers to bisacodyl as a "stimulant laxative," which was known to inhibit water absorption in the intestines. (*Id.* at 755.)

### www.     Shailubhai 2002

275.     Kunwar Shailubhai, *Therapeutic Applications of Guanylate Cyclase-C Receptor Agonists*, 5(2) Current Opinion in Drug Discovery & Development 261–268 (2002) ("Shailubhai 2002") (DTX-057) published in 2002 and is at least 102(a) prior art to the '036, '727, '947, and '526 patents. Shailubhai 2002 was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, but it was not cited by the Examiner during the prosecution of these patents.

125

276.     Shailubhai 2002 disclosed that heat-stable enterotoxins "activate common guanylate cyclase signaling molecules and, via cyclic GMP (cGMP), regulate water and ion homeostasis in a variety of tissues and organs, including the gastrointestinal (GI) tract." (DTX-057 at 261.) According to Shailubhai 2002, the endogenous agonists of the guanylate cyclase-C (GC-C) receptor, uroguanylin and guanylin, "stimulate intracellular production of cGMP, which activates CFTR, the chloride channel . . .. [which] leads to activation of ion efflux (Cl⁻ and K⁺) and secretion of water into the intestinal lumen." (*Id*. at 261–62.) Shailubhai 2002 goes on to disclose that "[t]he underproduction of water might result in thick mucus, leading to intestinal blockage or constipation. On the other hand, excessive amount of fluid secretion in the intestine can overwhelm the absorptive capacity of mucus, leading to diarrhea." (*Id.* at 262.)

### xxx.     Shimonishi

277.     Yasutsugu Shimonishi et al., *Mode of Disulfide Bond Formation of a Heat-Stable Enterotoxin (STh) Produced by a Human Strain of Enterotoxigenic Escherichia coli*, 215 FEBS. LETTERS 165–70 (1987) ("Shimonishi") (DTX-058) published in 1987 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Shimonishi was submitted in an Information Disclosure Statement to the Patent Office during the prosecution of the '036, '727, '947, and/or '526 patents, but it was not cited by the Examiner during the prosecution of these patents.

278.     Shimonishi disclosed the three disulfide bonds in the STh peptide, which form between the following cysteine pairs: Cys(6) and Cys(11), Cys(7) and Cys(15), and Cys(10) and Cys(18). (DTX-058 at 165 (Abstract).) STh and STp have the same disulfide bonds. (*Id.* at 170.) Shimonishi further disclosed that reduction of the disulfide bonds in ST peptides results in loss of biological activity, indicating that the tertiary structure formed by the disulfide bonds is necessary for biological activity of ST peptides. (*Id.* at 168.) Moreover, Shimonishi disclosed the

synthesis of STh(6-18). (*Id.* at 165.) Shimonishi reports that synthesis was "performed manually by the solid-phase method," and that the peptides were "purified by HPLC on a reversed-phase column." (*Id.* at 167–68.) In addition, Shimonishi disclosed that STh(6-18), which differs from the native 19 amino acid peptide in that it lacks the N-terminal amino acids AsnSerSerAsnTyr and the C-terminal amino acid Tyr, has the same toxic activities as native STh. (*Id.* at 168.)

### yyy.     Tabb

279.     J.S. Tabb et al., *Characterization of p-Azidophenylalanine as a System L Substrate and a Photoaffinity Probe*, 45 FEDERATION PROC. 1940 (1986) ("Tabb") (DTX-060) published in 1986 and is prior art to the '036, '727, '947, and '526 patents. Tabb was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement in the *inter partes* reexamination of the '947 patent. Tabb disclosed that p-azidophenylalanine "is a photosensitive tyrosine analog." (DTX-060 at 1940.) A POSA would understand that PAP and tyrosine have the molecular structures shown below:



L-Tyrosine (Tyr)          L-para-azido-Phenylalanine (Pap)

### zzz.     White

280.     FMOC SOLID PHASE PEPTIDE SYNTHESIS, A PRACTICAL APPROACH (Weng C. Chan and Peter D. White eds., 2000) 9–114 ("White") (DTX-135) published in 2000 and is 102(b) prior art to the '036, '727, '947, and '526 patents. White was not before the Patent Office during

the prosecution of the '036, '727, '947, and '526 patents.

281.    White disclosed a practical approach to Fmoc solid phase peptide synthesis.

Figure 1 of White, reproduced below, illustrates the principles of solid phase synthesis:



X = Temporary amino protecting group
Y = Permanent side-chain protecting group
A = Carboxy activating group

**Figure 1.** The solid phase peptide synthesis (SPPS) principle.

(DTX-135 at 10.) White explains this approach as follows:

> The C-terminal amino acid residue of the target peptide is attached to an insoluble support via its carboxyl group. Any functional groups in amino acid side chains must be masked with permanent protecting groups that are not affected by the reactions conditions employed during peptide chain assembly. The temporary protecting group masking the α-amino group during the initial resin loading is removed. An excess of the second amino add is introduced, with the carboxy group of this amino acid being activated for amide bond formation through generation of an activated ester or by reaction with a coupling reagent. After coupling, excess reagents are removed by washing and the protecting group removed from the N-terminus of the dipeptide, prior to addition of the third amino acid residue. This process is repeated until the desired peptide sequence is assembled. In a final step, the peptide is released from the support and the side-chain protecting groups are removed. Generally, side-

128

chain protecting groups are removed and the assembled peptide released under the same conditions.

(*Id*. at 9–10.) The Fmoc approach to solid phase peptide synthesis is further illustrated below:



**Figure 3.** Fmoc SPPS.

(*Id*. at 13.) White also illustrates synthetic approaches to the formation of disulfide bonds:

129



**Scheme 1.** Synthetic approaches to the formation of disulphide bridges. The residues to be linked are either on the same (intramolecular reactions; dotted line indicates intervening residues) chain or different (intermolecular reaction; dotted line indicates discontinuity) chains. $X_1$ and $X_2$ designate S-protecting groups that are stable to chain assembly conditions. $X_2$ and $X_2^*$ may or may not be the same, depending on the chemistry chosen for the directed method. Reactions can be carried out either on-resin or in solution; this facet and additional considerations are described more fully in the text.

(*Id.* at 92.) The techniques disclosed in White were well-known in the art by January 2003.

### aaaa.    Wolfe

282.     Henry R. Wolfe & Scott A. Waldman, *A Comparative Molecular Field Analysis (COMFA) of the Structural Determinants of Heat-Stable Enterotoxins Mediating Activation of Guanylyl Cyclase C*, 45 J. MEDICINAL CHEMISTRY 1731–34 (2002) ("Wolfe") (DTX-061) published in 2002 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Wolfe was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement in the inter partes reexamination of the '947 patent.

283.     Wolfe studied the relationship between the structure of heat-stable enterotoxins (STas) and "their measured potencies to induce intestinal secretion." (*See* DTX-061 at 1731.) According to Wolfe:

> The COMFA model predicts that the backbone of $Cys^5$-$Cys^6$-$Glu^7$-$Leu^8$ adopts a conformation that tightly interacts with a hydrophobic region of GC-C to achieve maximum potency (Figure 3). Within this region, the receptor appears to makes [sic] intimate contact with the

130

> peptide backbone and the $\beta$ carbons of $Cys^5$ and $Cys^6$, as well as the alkyl side chains of $Glu^7$ and $Leu^8$. The primary site of electrostatic interactions within the model is derived from residue $Glu^7$, which is typically occupied by polar or charged residues in potent analogues but is intolerant to isomerization. Similarly, neither $Cys^6$ nor $Leu^8$ can tolerate a D-amino acid substitution without a dramatic drop in efficacy. Whereas side chain mutations of $Leu^8$ have only minimal effect, the $Cys^{6-14}$ disulfide cannot be replaced without a complete loss of efficacy, suggesting that it has a key role in maintaining the biologically active structure.

(*Id.* at 1732.)

### bbbb.    Woodworth

284.    Thasia G. Woodworth & Jean C. Nichols, *Recombinant Fusion Toxins – A New Class of Targeted Biologic Therapeutics*, *in* IMMUNOCONJUGATE THERAPY OF HEMATOLOGIC MALIGNANCIES 145–160 (Steven T. Rosen & Timothy M. Kuzel eds., 1993) ("Woodworth") (DTX-062) published in 1993 and is 102(b) prior art to the '036, '727, '947, and '526 patents. Woodworth was not before the Patent Office during the prosecution of the '036, '727, '947, and '526 patents.

285.    Woodworth disclosed that toxins such as diphtheria toxin and *Pseudomonas* exotoxin have been developed as therapeutics and evaluated in patients. For example, Woodworth disclosed that DAB486IL-2, the first fusion toxin to be evaluated in clinical trials, is a single-chain polypeptide composed of sequences for human interleukin-2 (IL-2) and the enzymatic and membrane translocation domains of diphtheria toxin. (DTX-062 at 145.) As another example, Woodworth disclosed Phase I clinical trials that were initiated for two other fusion toxins, each of these based on a Pseudomonas exotoxin template. (*Id.* at 146.)

### cccc.    Yoshimura

286.    Shoko Yoshimura et al., *Essential Structure for Full Enterotoxigenic Activity of*

*Heat-Stable Enterotoxin Produced by Enterotoxigenic Escherichia coli*, 181 FEBS LETTERS 183–

42 (1985) ("Yoshimura") (DTX-063) published in 1985 and is 102(b) prior art to the '036, '727,

'947, and '526 patents. Yoshimura was not before the Patent Office during the prosecution of the

'036, '727, '947, and '526 patents, but it was cited in an Information Disclosure Statement in the

inter partes reexamination of the '947 patent.

287.    Yoshimura disclosed that removal of the last amino acid residue, Tyr, at the C-

terminal end of STh(6–19) does not have much impact on the biological activity or heat stability

of STh(6–19). (DTX-063 at 139–40.) STh(6-18) and STh(6–19) have the same amino acid

sequence except that STh(6-18) does not have the last amino acid residue (Tyr) at the C terminus

of the peptide.

### dddd.    Zelnorm Package Insert

288.    Zelnorm (tegaserod) was approved by the FDA in 2002 and the Zelnorm Package

Insert is at least 102(a) prior art to the '036, '727, '947, and '526 patents. The Zelnorm Package

Insert was not before the Patent Office during the prosecution of the '036, '727, '947, and '526

patents.

289.    Zelnorm was indicated for the short-term treatment of women with irritable bowel

syndrome (IBS) whose primary bowel symptom is constipation. (*See* Zelnorm Package Insert,

DTX-326 at 5, 11.) Zelnorm was known to be a 5-HT4 receptor partial agonist that was reported

to "stimulate[] the peristaltic reflex and intestinal secretion, as well as inhibit[] visceral

sensitivity." (*Id*. at 2.)

### 4. Analysis Applicable to All Asserted Claims of The '036, '727, '947, And '526 Patents

#### a. A POSA would have been motivated to develop a GC-C agonist as a treatment for constipation-related disorders at the time of the invention

290.    As explained in more detail below, a POSA would have been motivated to develop a GC-C agonist as a treatment for constipation-related disorders at the time of the invention because: (a) increasing intestinal secretion was a known way to address constipation (*see, e.g.*, Johanson et al., *Efficacy and Safety of a Novel Compound, RU-0211, for the Treatment of Constipation,* Suppl. 122(4) GASTROENTEROLOGY A-315, A-315 (2002) ("Johanson 2002") (DTX-365)); (b) activating the GC-C receptor was a known way to increase intestinal secretion (*see, e.g.*, DTX-049 at 219, 222 (Figure 2); *see also* DTX-042 at 179, Figure 6; DTX-057 at 261 (abstract); DTX-043 at 276); and (c) the prior art expressly taught that GC-C agonists should act as laxatives and be useful in treating patients suffering from constipation (*see, e.g.*, U.S. Patent No. 5,489,670 ("'670 patent"), DTX-022 at 2:6–24 ("[T]he novel peptide of this invention [human uroguanylin] is an endogenous stimulator of intestinal guanylate cyclase . . . The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation, e.g. cystic fibrosis patients who suffer with severe intestinal complications from constipation."); U.S. Patent No. 5,969,097 ("'097 patent"), DTX-109 at 6:21–34 ("The major biological actions of guanylin in the intestine are the stimulation of chloride and water secretion and the inhibition of sodium and water absorption. Thus, guanylin should act as a laxative agent for the treatment of constipation."); International Publication No. WO 01/25266 A1 ("Shailubhai & Currie"), DTX-024 at 3:13–4:8 ("Uroguanylin is believed to regulate fluid and electrolyte transport in a manner similar to guanylin and the STs in the GI tract. Therefore, as mentioned in previous publications

133

the human uroguanylin may act as a laxative and be useful in patient [sic] suffering from constipation.").)

### i.    Secretion was a known way to address constipation

291.    A POSA would have been motivated to increase secretion to the GI tract in order to treat constipation. As stated above, a POSA would have known that constipation was not solely the result of a motility disorder, but also abnormal fluid balance in the intestines. In fact, according to Ewe 1998, diarrhea and constipation had earlier been thought to be the result of a motility disorder, but in the late 1960s and 1970s, the field began to focus more on secretion. (DTX-036 at 73.) The paper states that "[m]inor changes" in the fluid equilibrium of the GI tract "may cause diarrhea or constipation." (*Id*; *see also id*. at 74 ("It  becomes evident that small derangements of absorption and secretion, especially distally, will lead to functional disturbances called diarrhea or constipation.").)

292.    Ewe 1998 explains that because "the tight epithelium of the colon preserves electrolytes and water once they have been absorbed . . ., small changes of net fluid transport in the colon in either direction will lead to diarrhea or constipation since there is no compensating mechanism behind it." (*Id.* at 73.) Importantly, Ewe 1998 explains that mediators of chloride secretion, like cAMP, are "involved in the regulation of transintestinal electrolyte and water movements . . .." (*Id.*) Ewe 1998 also explains that laxatives regulate water movements and electrolytes through mechanisms like mediating chloride secretion. (*Id.*) Shailubhai 2002 also disclosed that "[t]he underproduction of water might result in thick mucus, leading to intestinal blockage or constipation." (DTX-057 at 262.)

293.    Known therapies for constipation have long aimed at increasing bulk and water content of stools and/or increasing intestinal secretion or motility. Over-the-counter laxatives,

like milk of magnesia, polyethylene glycol, and fiber supplements, were known to increase secretion and add water to stools in order to increase stool frequency. (DTX-056 at 750; DTX-152 at 807.) In fact, Burks 1994 defined an entire category of laxatives as "secretory laxatives" that "increase secretion of fluid and electrolytes into the lumen of the bowel by the intestinal mucosa, resulting in fluid accumulation and a watery luminal content that flows rapidly through the small and large intestines." (DTX-152 at 810.)

294.    A POSA would have known that some laxatives work by increasing secretion and limiting absorption of water in the intestines. Three well-known types of laxatives—bulking or hydrophilic agents, osmotic agents, and stimulant laxatives—increase the amount of water in the stool. (DTX-056 at 750.) Specifically, osmotic agents were known to "reduce fluid absorption by the intestine by providing poorly absorbed osmotically active substances that hold additional water intraluminally, thereby increasing the water content of stools." (*Id.*)

295.    Schiller refers to bisacodyl as a "stimulant laxative," which was known to inhibit water absorption in the intestines. (DTX-056 at 755.) In fact, Burks refers to stimulant laxatives as another name for secretory laxatives and characterizes bisacodyl as a secretory laxative. (*Id.* at 810.)

296.    Ralph Giannella, M.D., who provided a declaration on behalf of the patentee in the inter partes reexamination of the '947 patent, testified at deposition that it was known as of 2003 that "[f]luid intake may help having bowel movements." (Giannella Dep. Tr. (DTX-582) at 25:3–10; 25:19– 26:2.) He also testified that bowel movements result when the colon does not reabsorb all of the fluid that enters it from the small intestine. (*Id.* at 58:23–59:5.)

297.    A POSA would have understood that motility and secretion are closely related and would have been motivated to focus on one or both. In fact, Schiller 2001 broadly defined

135

laxatives as "agents that ad bulk to intestinal contents, that retain water within the bowel lumen by virtue of osmotic effects, or that stimulate intestinal secretion or motility, thereby increasing the frequency and ease of defecation." (DTX-056 at 749.) Slow transit was known to cause over-absorption of salt and water from stool, which reduces stool frequency and weight, making defecation more difficult. (*Id.*) A POSA would have known that an "increase in intraluminal volume due to the presence of increased solids and obligated water is thought to stimulate motility and accelerate the transit of luminal contents through the colon, thus increasing stool weight." (*Id.* at 751.) In order for stool to be properly evacuated from the body, it needs to be of a certain consistency so that the intestinal muscle can move it appropriately. Furthermore, the purpose of modulating intestinal motility is to regulate the amount of fluid in the stools and absorption of fluid by the gut. Slow motility results in small, dry stools, a problem that secretion into the colon can address.

298.     At the time of the invention, it was known that Amitiza, known as RU-0211, increased intestinal secretion and was being developed as a treatment for constipation. In fact, Johanson 2002 taught that "RU-0211, a chloride channel opener which increases intestinal water secretion used for the treatment of constipation," showed a statistically significant increase in average weekly bowel movements. (*Id.* at A-315.) Cuppoletti et al., *Recombinant and Native Intestinal Cell ClC-2 C - Channels Are Activated by RU-0211*, 122(4) (1 Suppl.) GASTROENTEROLOGY A-538 (2002) ("Cuppoletti 2002") (DTX-372) also taught that to treat "bowel dysfunction," "RU-0211 increases intestinal water secretion and intestinal fluid Cl-concentrations . . .." (*Id.* at A-538.) Therefore, a POSA would have understood that the drug shown to be efficacious in treating constipation in these studies operated by increasing secretion. Regardless of whether the exact mechanism by which Amitiza increases secretion was clear, there

136

was no dispute that the drug increased secretion into the GI tract in order to treat constipation.

299.    While the potential for side effects must be taken into consideration, a POSA would not have ruled out treatments for constipation that increased secretion merely out of concern for diarrhea. The potential for a medication to cause side effects is a known risk of almost any treatment. Indeed, a common side effect of treatments for diarrhea that reduce fluid in stools is constipation. A POSA would understand that modifications to drugs or dosage may be necessary to minimize those risks.

300.    For example, the website for Imodium®, a common diarrhea medication, states that the product "slow[s] the movement of fluid through the gut. As a result, there is a greater overall absorption and a decrease in stool volume." (*See Imodium FAQs about Diarrhea Symptoms & Treatment*, JOHNSON & JOHNSON, https://www.imodium.com/faq (DTX-168).) Therefore, some patients will experience constipation as a result of taking Imodium. Despite this risk of constipation, patients still take antidiarrheal medications that thicken stools to treat diarrhea. Similarly, a POSA would understand that treating constipation could result in looser stools and diarrhea, but that would not prevent patients from treating their constipation.



301.    Diarrhea is indeed a side effect of constipation medications. For example, according to the prescribing information for Amitiza, which received FDA approval in 2006, among CIC patients, "[a]pproximately 12% of patients who received Amitiza experienced diarrhea," compared to 1% on placebo. (*See* Amitiza Prescribing Information, DTX-167 at 5.)

137

The prescribing information for the constipation medication Kristalose, which has long been used to treat constipation and chronic constipation, disclosed the following adverse events, including diarrhea:

> **ADVERSE REACTIONS**
> Precise frequency data are not available.
> Initial dosing may produce flatulence and intestinal cramps, which are usually transient. Excessive dosage can lead to diarrhea with potential complications such as loss of fluids, hypokalemia, and hypernatremia.
> Nausea and vomiting have been reported.

(PHYSICIANS' DESK REFERENCE 1007, 1007 (56th Ed. 2002) (DTX-169).)

302.     Zelnorm (tegaserod) was another treatment for constipation known at the time of the invention. Zelnorm (tegaserod) was approved by the FDA in 2002 for the short-term treatment of women with irritable bowel syndrome (IBS) whose primary bowel symptom is constipation. (*See* Zelnorm Package Insert, DTX-326 at 5, 11.) Zelnorm was known to be a 5-HT4 receptor partial agonist that was reported to "stimulate[] the peristaltic reflex and intestinal secretion, as well as inhibit[] visceral sensitivity." (*Id.* at 2.) The Phase III study results reported for tegasorod showed only modest therapeutic gains over placebo and disclosed that "[a]pproximately 12% of tegaserod-treated patients developed diarrhea . . . ." (*See* M. Camilleri, R*eview Article: Tegasorod*, 15 ALIMENT PHARMACOL. THER. 277, 286–287 (2001) ("Camilleri 2001") (DTX-164).)

303.     According to the Linzess® prescribing information, "Diarrhea was the most common adverse reaction of LINZESS-treated patients in the pooled IBS-C and CIC double-blind placebo-controlled trials." (DTX-019 at LINZ_0023420 (§ 5.2 Linzess Prescribing Information).) In fact, the prescribing information reports that in clinical trials of the 290 mcg dose, for example, "20% of LINZESS-treated patients reported diarrhea compared to 3% of

placebo-treated patients." (*Id.* at -421; *see also* Table 1.) The comparable number was 16% for

the 145 mcg dose. (*Id*. at -422.) Therefore, some risk of diarrhea would not discourage a POSA

from pursuing a particular treatment for constipation.

### ii. Activating the GC-C receptor was a known way to increase intestinal secretion

304.     A POSA trying to induce secretion into the GI tract in order to treat constipation

would have been motivated to activate the GC-C receptor.

305.     It was known that other receptor agonists resulted in secretion into the GI tract.

As stated above, it has long been known that certain intestinal toxins, like cholera, bind to

receptors in the GI tract, leading to secretion. Specifically, Ewe 1988 taught that secretagogues

that increase cyclic AMP (cAMP) levels, like cholera and prostaglandins, lead to secretion of

chloride in the GI tract. (DTX-036 at 81.) And while it was known that activation of receptors

increased the level of cAMP and could cause diarrhea, Ratnaike 1998 also taught that this

mechanism of action was used by therapeutic agents. (DTX-142 at 248.) Ratnaike disclosed that

secretagogues bisacodyl, misoprostol, and chenodeoxycholic acid "impair fluid absorption by

activating adenylate cyclase within the small intestinal enterocyte which increases the level of

cyclic AMP." (*Id.* at 246.) Burks 1994 taught that some secretory laxatives increase the flow

of  chloride, sodium, and water into the intestines, and also that it was "believed that some

secretory  laxatives directly or indirectly stimulate adenylate cyclase activity, thereby increasing

intracellular   cAMP concentrations . . .." (DTX-152 at 807; *see also* Ex. 40, Simon et al.,

*Interactions of Laxatives with Enzymes of Cyclic AMP Metabolism from Human  Colonic*

*Mucosa*, 10 Eur. J. Clinical Investigation 231, 233 (1980) ("Simon 1980") (DTX-170)

(teaching that the laxative dioctyl sodium sulfosuccinate, or Ducosate, results in an increase in

cyclic AMP in the GI tract).)

306.     Similarly, Ewe 1988 taught that secretagogues "which increase cGMP such as heat-stable toxins" also stimulate chloride secretion. (DTX-036 at 81 (emphasis added).) Therefore, it was known that activating the GC-C receptor, which would stimulate the production of cGMP, would act like other secretagogues that are cAMP agonists.

307.     Researchers often pursue multiple drugs that use varying pathways to treat a given medical condition. The vast number of over-the-counter laxatives, which have been available for decades, operate through different mechanisms, shows that a POSA would have explored multiple avenues to treat constipation. For example, Amitiza was known as a chloride channel opener that increases intestinal secretion which was being developed as a treatment for constipation. (*See, e.g.*, DTX-365 at A-315; DTX-372 at A-358.)

308.     It was known that Amitiza, known as RU-0211, treated constipation by increasing secretion. In fact, Johanson et al., *Efficacy and Safety of a Novel Compound, RU-0211, for the Treatment of Constipation*, Suppl. 122:4 GASTROENTEROLOGY A-315 (2002) (DTX-365) taught that "RU-0211, a chloride channel opener which increases intestinal water secretion used for the treatment of constipation, showed a statistically significant increase in average weekly bowel movements." Cuppoletti et al., *Recombinant and Native Intestinal Cell ClC-2 C - Channels Are Activated by RU-0211*, l Suppl. 122:4 GASTROENTEROLOGY A-538 (2002) (DTX-372) also taught that to treat "bowel dysfunction," "RU-0211 increases intestinal water secretion and intestinal fluid Cl- concentrations . . .." Therefore, a POSA would have understood that the drug shown to be efficacious in treating constipation in these studies operated by increasing secretion. Regardless of whether the exact mechanism by which Amitiza increases secretion was clear, there was no doubt that the drug increased secretion into the GI tract in order to treat constipation.

140

309.     Mayer et al., *Evolving Pathophysiological Model of Functional Gastrointestinal Disorders: Implications for Treatment*, Suppl. 587 Eur. J. Surg. 3–9 (2002) ("Chang 2002") (DTX-366) would not teach a POSA to ignore the prior art that does teach the activation of the GC-C receptor to treat patients suffering from constipation. (*See, e.g*., DTX-022 at 2:6–24; DTX-109 at 6:21–34; DTX-024 at 3:13–4:8.) Chang 2002 is not directed to constipation but "functional gastrointestinal disorders" more broadly. Chang 2002 does not mention the GC-C receptor and has no bearing on the other references that do disclose that activating the GC-C receptor leads to secretion. The article also does not appear to be exhaustive. In fact, it does not even specifically discuss treatment of CIC.

310.     The AGA Slidesheet similarly discusses other physiological mechanisms, not the GC-C receptor. One of the mechanisms that the slideshow, which discusses IBS generally and not constipation specifically, disclosed to treat IBS is secretion.

311.     The slideshow is titled "Irritable Bowel Syndrome." It is not focused specifically on IBS-C or constipation more generally. (DTX-386 at 1.) Because the slideshow is focused on IBS, not IBS-C or CIC, it is more heavily weighted toward addressing pain than constipation. There is no indication that it is intended to be a comprehensive survey of constipation treatments, as it does not even reference common laxatives like milk of magnesia or Miralax. (*See id.*)

312.     Nevertheless, the document still shows that a POSA would have been motivated to activate the GC-C receptor to treat constipation. The slideshow disclosed physiologic routes that lead to secretion. (*Id.* at 14.) On page 15, the slideshow indicates that "Decreased secretion" can lead to "Constipation potential." In fact, on page 40, the slideshow indicates that serotonin mediates motility, sensation/perception, and secretion in the GI tract. The image shows that a POSA would have been motivated to activate the GC-C receptor in order to treat constipation.

141



(Exhibit 17, AGA Educational Slide Set on IBS at Slide 97.)

313.   The image places motility and secretion as the same target. Second, like the slides above, this slide demonstrates that as of about 2002, Dr. Chang viewed increasing secretion as a viable treatment for IBS, if not constipation. Therefore, these slides show that as of 2002, Dr. Chang was contemplating treatments for IBS generally that mediated secretion in the GI tract.

iii.   **The prior art expressly taught that GC-C agonists should act as laxatives and be useful in treating patients suffering from constipation**

314.   A POSA would have been motivated to develop a GC-C agonist as a treatment for constipation-related disorders at the time of the invention because the prior art expressly taught that GC-C agonists should act as laxatives and be useful in treating patients suffering from constipation. For example, the '670 patent issued in 1996 and taught that human uroguanylin

142

stimulates the GC-C receptor and should act as a laxative and be useful in patients suffering from

constipation:

> *[T]he novel peptide of this invention [human uroguanylin] is an endogenous stimulator of intestinal guanylate cyclase*. It has been found to stimulate increases in cyclic GMP levels in a manner similar to guanylin and the STs. As such regulator, it is useful for the control of intestinal absorption. It has potential to regulate fluid and electrolyte transport. Human uroguanylin also has been found to displace heat stable enterotoxin binding to cultured T84 human colon carcinoma cells. This cell line is known to selectively respond to the toxin in a very sensitive manner with an increase in intracellular cyclic GMP.
>
> Human uroguanylin has been further demonstrated to act in an isolated intestinal rat preparation to stimulate an increase in short circuit current. This action is believed to be the physiologic driving force for eliciting chloride secretion and ultimately decreased water absorption. *The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation*, e.g. cystic fibrosis patients who suffer with severe intestinal complications from constipation.

(*See* DTX-022 at 2:6–24 (emphasis added).) The '097 patent issued in 1999 and similarly taught

that human guanylin stimulated GC-C and should act as a laxative and be useful in patients

suffering from constipation:

> Synthetic human guanylin caused a concentration dependent increase in T84 cell cyclic GMP (FIG. 3*a*). *Comparison of the activity of human guanylin with rat guanylin indicated that these two peptides possess a similar relative potency to activate intestinal guanylate cyclase*. Both human and rat guanylin were about one order of magnitude less potent than STa. A similar profile of relative potency for displacing [$^{125}$I]-STa specific binding from T84 cells was also observed with STa being most potent and human and rat guanylin equipotent (FIG. 3*b*). Thus, the data indicate that the heat stable enterotoxin is more potent at stimulating intestinal guanylate cyclase than either human or rat guanylin and that all of these peptides share common binding sites.

*      *      *

143

> *The major biological actions of guanylin in the intestine are the stimulation of chloride and water secretion and the inhibition of sodium and water absorption. Thus, guanylin should act as a laxative agent for the treatment of constipation.* Evidence supporting this proposal is based on the studies cited concerning STa, a structural mimic of guanylin, and data that we have obtained with isolated rat colons.

(*See* DTX-109 at 5:66–6:12, 6:21–34 (emphasis added).) In addition, Shailubhai & Currie published in 2001 and taught that human uroguanylin binds to the GC-C receptor and should act as a laxative and be useful in treating constipation:

> Binding of uroguanylin or guanylin to the guanylin cyclase receptor stimulates the intracellular production of the cGMP ultimately resulting in the stimulation of salt and water secretion into the intestinal lumen . . .. Uroguanylin is believed to regulate fluid and electrolyte transport in a manner similar to guanylin and the STs in the GI tract. Therefore, as mentioned in previous publications the *human uroguanylin may act as a laxative and be useful in patient* [sic] *suffering from constipation.*

(*See* DTX-024 at 3:13–4:8 (emphasis added).)

315.    A POSA would have understood that ongoing research in the area had made the GC-C receptor a well-defined target in 2003. For example, an early model of the mechanism for inducing secretion by way of the GC-C was published by Ralph Giannella in 1995:



Fig. 6. Current model of ST$_a$ and guanylin action on intestinal mucosa and induced secretion.

(*See* DTX-042 at 179.) This model was subsequently refined to further elucidate chloride secretion through the CFTR, as shown in the figure below published in 2001:



Fig. 2. A model for the guanylyl cyclase-C (*GC-C*) signaling pathway in intestinal Cl⁻-secreting cells. Luminally secreted guanylin and uroguanylin activate GC-C in nearby cells. These peptides are also secreted into the bloodstream to function in an endocrine fashion. Cl⁻ enters across the basolateral (serosal) membrane. Cyclic guanosine 3',5'-monophosphate (*cGMP*) activates cGMP-dependent protein kinase II (*PKG II*). A key substrate for phosphorylation by PKG II is the apical membrane-localized CFTR protein. CFTR serves as a channel for Cl⁻ and HCO₃⁻ secretion across the apical (mucosal) membrane of epithelial cells. *GTP*, Guanosine 5'-triphosphate

(*See* DTX-049 at 222.) Moreover, the location of the drug target was further characterized. For example, the distribution of GC-C mRNA along the axis of the intestine shown below was published by Qian in 2000:



FIG. 8. Distribution of GC-C mRNA along the rostrocaudal axis of the intestine. The autoradiogram (*top*), ethidium bromide stain (*middle*), and phosphorimager quantitation (*bottom*) were all obtained as described in Fig. 1. The RNA samples were the same as those used in Fig. 1a, but independent aliquots were electrophoresed on a new gel, transferred, and hybridized with a radiolabeled GC-C probe. As before, the RNA obtained from segment 16 was degraded, so this sample has been deleted. *White symbols* give relative magnitudes of the hybridization signals from each tissue segment, aligned with the appropriate lanes of the autoradiogram (n = 1). As in Fig. 1, the *black symbols* (mean ± SEM; n = 7) include additional data obtained from blots performed on a smaller subset of tissue segments isolated from six other animals.

(*See* DTX-134 at 3218.) Qian also reported that "GC-C mediated cGMP synthesis peaks at the proximal and distal extremes of the intestine (duodenum and colon), but is nearly absent in the middle (ileum)," (*id*. at 3210), as illustrated in the figure below:

145



(*Id.* at 3220 (Fig. 10(a).) As a result of these studies, a POSA would have understood that the GC-C receptor was a well-defined and promising drug target for treating constipation-related disorders as of 2003.

### b. A POSA would have selected STh(6–19) as a lead compound at the time of the invention

316.     As explained in more detail below, at the time of the invention, a POSA would have understood that a GC-C agonist should have effects all along the gut, including in the colon, in order to mitigate the colon's potent absorptive capacity, and sufficient stability to persist into the colon after oral administration. A POSA would have selected the ST core (i.e., STh(6–19)) as a lead compound at the time of the invention because: (a) ST peptides were known to induce secretion and reduce absorption in the GI tract; (b) ST peptides had been extensively studied and their structure-activity relationship was well-characterized; (c) ST peptides were known to be molecular mimics for both guanylin and uroguanylin, with pH independent activity and enhanced stability in the gut due to their three disulfide bonds; and (d) the ST core was known to have a single defined folded conformation and reported to be more heat-stable and resistant to denaturation than the full-length peptide. A POSA would have understood that a lead compound with high potency like the ST core would present more opportunities for optimization than guanylin or uroguanylin.

146

**i.    ST peptides were known to activate the GC-C receptor, and induce secretion and reduce absorption in the GI tract**

317.    As stated above, the GC-C receptor was known to be a key regulator of intestinal function as of 2003. It was known that ST peptides are part of the guanylin family of peptides and that they induce secretion in the GI tract "via activation of guanylate cyclase and generation of cGMP, which inhibits the coupled influx of $Na^+$ and $Cl^-$ and stimulates $Cl^-$ secretion." (*See, e.g.*, DTX-042 at 174; DTX-049 at 219 ("STs act on GC-C, produce a second messenger, cGMP, and elicit the stimulation of Cl- secretion and the inhibition of Na+ and H2O absorption, thereby causing secretory diarrhea.").) In addition, a POSA would have known that while ST peptides appear to be "somewhat more potent" than either guanylin or uroguanylin, all three peptides bind to and activate GC-C receptors in the intestine, leading to increased cGMP synthesis, which in turn increases intestinal fluid and electrolyte secretion. (*E.g.*, DTX-112 at 30.)

318.    The ST-mediated secretory pathway was known to be present in the ileum and jejunum, with the ileum being more sensitive to ST peptides than the jejunum. (*E.g.*, Mitchell B. Cohen et al., *E. Coli Heat-Stable Enterotoxin (STa) Induced Secretion: Differences Between Adult Rat Jejunum and Ileum Correlate with Differences in Metabolic Fate of STa*, 7 ADVANCES IN RES. ON CHOLERA AND RELATED DIARRHEAS 99, 99 (1990) ("Cohen 1990") (DTX-344).) Further, it was reported in the prior art that the jejunum inactivates the ST peptide to a greater extent than the ileum, resulting in "termination of secretion." (*Id.* at 103.)

319.    ST peptides were known to induce secretion and decrease absorption in the colon. (*E.g.*, DTX-347 at 821.) Mezoff 1992 notes that "the colon has the ability to respond to STa," and the authors conducted a study to "test the hypothesis that the colon significantly contributes to STa-mediated diarrheal disease" by "comparing STa binding, STa-induced guanyl

cyclase activation, and STa-induced net water flux in the colon and ileum." (*Id.* at 816.) Mezoff reports that:

> [T]he colon contains all the necessary components to respond to $ST_a$, including $ST_a$ receptors and $ST_a$-stimulated guanyl cyclase activity. In addition, on the basis of our data ***we suggest that the colon may significantly contribute to the host's diarrheal response to $ST_a$ by a decreased absorptive capacity in the face of increased small intestinal fluid secretion.***

(*Id.* at 821) (bold emphasis added).)

320.     Based on the prior art, a POSA would have understood that ST peptides exhibit short-lived hypersecretion effects in the intestine, with rapid, reversible onset and offset of action. For example, a POSA would have understood from Cohen & Giannella 1992 that secretory responses in adult rats reached maximal intensity at 30 minutes and diminished to virtually zero at 180 minutes. (*See* DTX-348 at 1990 (Fig. 1).) In addition, Giannella 1995 taught that when rat jejunum were perfused *in vivo* with STa, it was observed that "water transport is rapidly inhibited and net secretion results," but once perfusion was ceased, "the transport defect is promptly and totally reversible." (DTX-042 at 174.) According to Giannella 1995, "[b]oth the onset and offset of STa action occurs within minutes." (*Id.* at 174.)

321.     This same effect was observed in Aye-Kyaw 1995, which reported results that "seem to be consistent with the short-lived hyper-secretory action of the toxin." (DTX-115 et al., *Intracellular Distribution of Radio-labelled Enterotoxigenic Escherichia coli Heat-Stable Toxin (STa) in the Intestine of Suckling Rat*, 13(4) J. DIARRHOEAL DIS. RES. 232, 232 (Dec. 1995) ("Aye-Kyaw 1995") (DTX-115).) In addition, Aye-Kyaw 1995 suggested that the physiological action of the ST peptide is short-lived, in part due to deactivation of the ST peptide by lysosomal enzymes:

STa could be subjected to intracellular digestion by lysosome. This is supported by the finding that that labelled STa was preferably associated with the mitochondrial-lysosomal fraction (Table II) among other subcellular organelles. The supportive evidence for such a finding has also been reported earlier that STa mainly affects the intestinal lysosome during the course of its secretory action. It may be of interest to note that other diarrhoeal toxins, like cholera toxin and *E. coli* heat-labile toxin, did not affect lysosome, which may be the reason that cholera toxin and E. coli heat-labile toxin apparently escape intracellular digestion by lysosome and have prolonged physiological action in contrast to STa, the physiological action of which was reported to be short-lived, possibly as a result of toxin inactivation by lysosomal enzymes.

(*Id.* at 234.)

> ### ii.    The extent of intestinal fluid secretion would have been highly relevant to a POSA seeking to develop a treatment for constipation

322.    The extent of intestinal fluid secretion produced by ST peptides would have been highly relevant to a POSA seeking to develop a treatment for constipation. At a basic level, in order for stool to be properly evacuated from the body, it needs to be of a certain consistency so that the intestinal muscle can move it appropriately. Knowing this basic fact, a POSA would have readily recognized the effect that water content and/or intestinal secretion or motility would have on achieving the desired stool consistency, and the import of that effect in seeking to induce a bowel movement in a patient with constipation. (*E.g.*, DTX-056 at 749.) Ewe 1988 taught that "[a]n increase in fluid content may result from increased net secretion or from impaired absorption or both." (DTX-036 at 75.)

323.    A POSA would have understood that the secretory effects discussed above to indicate that ST peptides and guanylin may produce laxative effects. (*See, e.g.*, DTX-109 at 6:23–28 ("guanylin should act as a laxative agent for the treatment of constipation. Evidence supporting

this proposal is based on the studies cited concerning STa, a structural mimic of guanylin, and data that we have obtained with isolated rat colons."); DTX-024 at 4:6–8 ("human uroguanylin may act as a laxative and be useful in patient[s] suffering from constipation."); DTX-022 at 2:20–25 ("The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation."); U.S. Patent Pub. No. 2003/0073628 ¶ [0018] (published 2003) ("Shailubhai '628") (DTX-025) (disclosing *E. coli* ST peptide as a preferred peptide agonist in a method of treating an inflammatory disorder in a mammalian gastrointestinal tract, such as Crohn's disease or ulcerative colitis); DTX-049 at 219 ("Heat-stable enterotoxins produced by pathogenic bacteria have close structural similarities to guanylin and uroguanylin, and they use this mimicry to act on GC-C . . . STs act on GC-C, produce a second messenger, cGMP, and elicit the stimulation of Cl$^-$ secretion and the inhibition of Na$^+$ and H2O absorption . . .."), 222 Fig. 2.) Inducing secretion into the intestines is exactly what laxatives were known to do. (*See* DTX-152 at 807.) U.S. Patent No. 5,969,097 taught that because guanylin stimulates chloride and water secretion and inhibits sodium and water absorption, "guanylin should act as a laxative agent for the treatment of constipation." (DTX-109 at 6:21–25.) The patent based this statement "on the studies cited concerning STa, a structural mimic of guanylin . . . ." (*Id.* at 6:25–26.) Similarly, U.S. Patent No. 5,489,670 taught that uroguanylin was believed to increase chloride secretion and decrease water absorption. (DTX-022 at 2:16–20.) Via this mechanism, "[t]he human uroguyanylin may thus act as a laxative and be useful in patients suffering from constipation, e.g. cystic fibrosis patients who suffer with severe intestinal complications from constipation." (*Id.* at 2:20–24; *see also* DTX-024 at 4:5–8 ("Therefore, as mentioned in previous publications the human uroguyanylin may act as a laxative and be useful in patient [sic] suffering from constipation.").)

150

324.    Barret et al., *Chloride Scretion by the Intestinal Eptithelium*, 62 ANN. REV. PHYSIOLOGY (2000) ("Barrett 2000") (DTX-329), did not suggest that a POSA would not have thought to modulate secretion in order to treat constipation.

325.    First, there was ongoing research that would have motived a POSA to use an ST peptide as a laxative. (*See, e.g.*, DTX-109; DTX-024.)

326.    Second, Barrett 2000 was not an exhaustive survey. The section of the paper titled "Agonists and Antagonists of Chloride Secretion and Their Mechanisms of Action" states, "In this section we do not attempt to provide a comprehensive catalogue of all mediators with reported chloride secretory actions." (DTX-329 at 550.)

327.    Third, Barrett 2000 discloses that regulating chloride secretion has therapeutic benefits.  See, e.g., id. at 536 ("a congenital deficiency in intestinal chloride secretion, occurring in cystic fibrosis, is accompanied by intestinal obstruction and malabsoprtion"), 561 ("The converse of disease that results from excessive chloride secretion, the manifestations of cystic fibrosis are thought to result, at least primarily, from a failure to secrete sufficient amounts of chloride and thus a failure to hydrate mucosal surfaces adequately.") Barrett 2000 discussed secretagogues that operated by activating cAMP, which cholera also activates, and cGMP, which the guanylin family of peptides activate.  *Id.* at 550–54. The paper explains that "[s]ecretory responses to cGMP are reminiscent of those evoked by cAMP in terms of their magnitude and kinetics . . . ." *Id.* at 553.  Therefore, the paper would have informed a POSA that cGMP has a similar secretory effect as cAMP, which was a known route of action for laxative secretagogues (*see, e.g.*, DTX-152 at 807), and would have motivated a POSA to target the GC-C receptor with an ST peptide.

328.    Fourth, Barrett 2000 merely didclosed proposed therapeutic strategies for

regulating chloride secretion, and does not criticize treatment that increased secretion through activation of the GC-C reception.

329.     A POSA would have understood that STs stimulate intestinal fluid secretion after oral administration. For example, Greenberg 1997 disclosed the experimental results of an *in vivo* study that evaluated the effects of STa, guanylin, and uroguanylin on intestinal fluid secretion. (DTX-043 at Abstract.) In particular, based on the *in vivo* study results disclosed in Greenberg 1997, it was shown that orally administered ST peptide and uroguanylin stimulated intestinal fluid secretion in mouse *in vivo*. (*Id.* at Abstract, 276.) In contrast, Greenberg 1997 reports that orally administered guanylin "did ***not*** stimulate intestinal fluid secretion in the suckling mouse, even at the highest dose." (*Id.* at Abstract, 276 (emphasis added).) In addition, a POSA would have further understood from Greenberg 1997 that intestinal proteases, such as chymotrypsin, have been shown to cleave and inactivate guanylin, "thus markedly reducing the in vivo potency of guanylin relative to uroguanylin" and to ST peptide. (*Id.* at 279, 280.) In view of Greenberg 1997's experimental results showing that guanylin did not stimulate intestinal fluid secretion— and knowing the role and effect of intestinal secretion with respect to constipation—a POSA would have been dissuaded from seeking to further develop guanylin as a potential treatment for constipation.

330.     In comparison, a POSA would have understood from several prior-art references that ST peptides had been shown to stimulate fluid secretion and inhibit water absorption in the intestine. (*E.g.*,DTX-109 at 6:8–12, 6:21–30; *see also, e.g.*, DTX-042 at 174.) Further, a POSA would have understood that ST peptides had been shown to affect intestinal motility in the distal portion of the jejunum and ileum when administered to animals. (*E.g.*, A.J. Roussel et al., *Myoelectric Activity of the Small Intestine in Enterotoxin-Induced Diarrhea of Calves*, 53:7 AM.

J. VET. RES. 1145, Abstract (July 1992) ("Roussel 1992") (DTX-053).) Based at least on this information that was known in the prior art, a POSA would have considered the extent of the ST peptide's fluid secretion in the gut, and effect on intestinal motility, to be highly relevant in developing a potential treatment for constipation.

> ### iii.   A POSA would have selected an ST peptide as a lead compound because ST peptides had been extensively studied and the structure activity relationship of this peptide was well-characterized

331.    A POSA would have selected an ST peptide as a lead compound because ST peptides had been extensively studied and the structure activity relationship of this peptide was well-characterized. For example, the amino acid sequences between the N-terminal and C-terminal Cys residues in an ST peptide were known to be thermodynamically stable and the biologically active site of the peptide. (*See, e.g.*, DTX-028 at 326 ("The present finding that the C-terminal 14 amino acid peptide, synthesized in the present work [STh(6–19)], was highly potent and heat-stable suggests that this sequence constitutes the thermodynamically stable and biologically active site of the toxin."); DTX-046 at 2556 ("synthetic STh[6–19] showed higher heat-stability than synthetic or native STh . . ."); DTX-063 at 140 ("These results indicate that removal of the C-terminal Tyr residue does not affect the biological or immunological properties of $ST_h$ or $ST_p$ and that the sequences ($ST_h$[6-18] and $ST_p$[5-17]) with 13 amino acid residues from the Cys residue near the N-terminus to the Cys residue near the C-terminus have full biological activity.").)

332.    As shown below, the active domain of an ST peptide was known to consist of six Cys residues and three disulfide bonds that constrain the molecular conformation:



(*See* DTX-044 at 282 (Figure 1).) The active domain was known to consist of three segments: an N-terminal region (STh Cys(C)[6]-Cys(C)[10]); a central region (STh Asn(N)[12]-Cys(C)[15]); and a C-terminal region (STh Cys(C)[15]-Cys(C)[18]). (*See* DTX-045 at 2.) The active domain was known to fold into the twisted-8 shape shown below:



**Fig. 2**   Schematic ribbon drawing of the polypeptide backbone of an STh[6-18].

(*See* DTX-044 at 287.) The active domain was reported to bind to the GC-C receptor as shown below:

154



**Fig. 1.** Binding and cell signaling of STa on its receptor, STaR

(DTX-114 at 580.)

333.     The asparagine (Asn, N) residue in the central region of the peptide's active domain was known to directly interact with the receptor. (*See* DTX-045 at 1.) STh(6–19) analogs with amino acid replacements at positions 12, 13, and 14 were known to decrease or abolish the biological activity of the peptides. (*See* DTX-044 at 283–84 (Tables 1–3).) STh(6-18) analogs with amino acid replacements at positions outside the central binding region were reported to have moderate to slight reductions in biological activity. (*See* DTX-031 at 4803 (Abstract), 4805 (Table I.).) Thus, the prior art characterizing ST peptides would have provided the POSA with considerable guidance on the properties of potential ST derivatives.

> iv.     **A POSA would have selected an ST peptide as a lead compound because they were known to be molecular mimics for both guanylin and uroguanylin with pH independent activity and enhanced stability in the gut due to their three disulfide bonds**

334.     A fundamental concept within the POSA's general knowledge is the potent

155

ability of the colon to reabsorb excessive fluid generated by the small intestine. Because of this, a POSA would have considered a peptide shown to have effects in the small intestine alone to be insufficient. Ideally, a POSA would have found it beneficial for a constipation treatment to also be active in the colon, in order to mitigate the colon's potent absorptive capacity. Therefore, in seeking to develop a new treatment for constipation, a POSA would have been motivated to identify an active agent that is pH independent, such that it has effects all along the gut.

335.    A POSA seeking to develop a new treatment for constipation would have considered information known in the prior art about the possible effect that pH may have on the biological activity of an agent, such as a peptide, to be highly relevant. For example, Nakazato reports that guanylin and uroguanylin cooperatively regulate GC-C activity in a pH dependent fashion, with uroguanylin being more potent at an acidic pH of 5.0 and guanylin being more potent at an alkaline pH of 8.0. (DTX-049 at 222.) In comparison, a POSA would have known that the biological activity of ST peptides is not affected by pH variations over a wide range. For example, Forte 1999 disclosed that pH variations from approximately 5.0 to 8.0 (the range of pH values across the intestine) have no impact on the biological activity of the STs. (DTX-112 at 32, Fig. 2.)  In contrast, Greenberg 1997 reports that orally administered guanylin "did not stimulate intestinal fluid secretion in the suckling mouse, even at the highest dose."  (Ex. 18, DTX-043, Abstract at 276) (emphasis added).  In addition, a POSA would have further understood from Greenberg 1997 that intestinal proteases, such as chymotrypsin, have been shown to cleave and inactivate guanylin, "thus markedly reducing the in vivo potency of guanylin relative to uroguanylin" and to ST peptide.  (Ex. 18, DTX-043 at 279, 280).  In my opinion, in view of Greenberg 1997's experimental results showing that guanylin did not stimulate intestinal fluid secretion—and knowing the role and effect of intestinal secretion with respect to constipation—

156

a POSA would have been dissuaded from seeking to further develop guanylin as a potential treatment for constipation.

336.    Thus, it would have been well understood that small changes in the GI pH profile may impact dosage form performance, drug dissolution, and/or drug absorption.  Because of this, a POSA would have found it important to know and understand the range of usual values for GI pH and how that pH varies under normal physiological conditions.  Thus, a POSA would have recognized and appreciated that consistent biological activity over a wide pH range, like that shown with the ST peptides, would be a highly desirable property for a constipation treatment.

337.    It was known in the art that the pH-dependent activity of guanylin and uroguanylin corresponds to their distribution along the GI tract:

> The activity of guanylin and uroguanylin is pH-dependent. In cultured $T_{84}$ cells guanylin is 10-fold more potent in elevating cGMP at pH 8 than at pH 5, whereas uroguanylin is more potent in acidic than in alkaline conditions. In alkaline environment guanylin is more potent than uroguanylin and the opposite is observed in acidic conditions. . .. These relationships correspond with peptides distribution along gastrointestinal tract. Uroguanylin, which is highly expressed in duodenum, is probably the main regulatory peptide in this segment which receives acidic chyme from the stomach, and by stimulating $HCO_3^-$ secretion may contribute to neutralization of luminal fluid. In addition, uroguanylin is resistant to chymotrypsin present in large amounts in duodenum. When one moves distally toward alkaline environment of distal small intestine and colon, guanylin becomes more active.

(DTX-133 at 362.)

338.    A POSA would have understood that the biological activity of uroguanylin was optimized for the environment of the small intestine, and that the biological activity of guanylin was optimized for the environment of the distal small intestine and colon. For example, uroguanylin's mRNA is predominantly expressed in the small intestine, as illustrated in the figure

157

below:



(*See* DTX-134 at 3212 (Fig. 1(a)).) Guanylin's mRNA is expressed in a complimentary manner in

the distal small intestine and colon, as illustrated in the figure below:



(*See* DTX-134 at 3213 (Fig. 2(a)).)

339.     A POSA would have selected an ST peptide as a lead compound because ST

peptides were known to serve as a molecular mimic for both guanylin and uroguanylin and have

pH independent activity that would advantageously provide biological activity in both the small

intestine and colon. (*See, e.g.*, Hamra et al., *Regulation of intestinal uroguanyliny/guanylin*

*receptor-mediated responses by mucosal acidity*, 94 PHARMACOLOGY 2705, 2710 (1997)

("Hamra 1997") (DTX-378) ("Enteric bacteria have evolved a single peptide toxin that serves as

158

a molecular mimic for both of the intestinal hormones, uroguanylin and guanylin. The remarkable potencies of ST peptides compared with the potencies of the enteric hormones is caused by higher affinities for ST binding to the intestinal receptors for uroguanylin and guanylin.").) Moreover, a POSA would have understood that ST peptides are more resistant to degradation in the gut than guanylin or uroguanylin because they have an additional disulfide bond, as illustrated in the figure below:



(*See, e.g.*, DTX-112 at 34.) A POSA would have therefore viewed an ST peptide as a preferable lead compound to guanylin or uroguanylin because a derivative of an ST peptide would be more likely to persist into the colon.

340.    A POSA would have understood that an ST peptide is a preferable lead compound to guanylin or uroguanylin because a lead compound with high potency provides more opportunities for optimization than a lead compound with lower potency. A POSA would have understood that a derivative of a more potent lead compound would be more likely to retain *in vivo* activity than a derivative of a less potent lead compound. For example, experiments in the suckling mouse assay showed that STa stimulated intestinal fluid secretion while much higher

159

doses of guanylin had no effect:



**Figure 2.** *Opossum uroguanylin activity in the suckling mouse assay was compared to the activity of STa enterotoxin. There were 4 or 5 mice per point and each point is the mean ± standard error of the mean.*

(*See* DTX-043 at 278.) A POSA in the art would have understood that by selecting a lead compound with high potency, derivatives would be likely to have *in vivo* potency and research efforts could be focused on improving disfavored properties, such as *in vivo* lifetime. By contrast, a POSA would have been uncertain whether a derivative of a low potency lead compound, like guanylin, would have any *in vivo* effect at all.

341.    A POSA would have understood that the biological activity of naturally occurring peptides has been optimized by evolution and that derivatives of naturally occurring peptides would be likely to have reduced binding affinity or potency. Carpick 1993 illustrates this point by showing that proteolytic insensitive analogs of guanylin have reduced binding affinity for the GC-C receptor. As shown below, Carpick 1993 synthesized an analog of guanylin (i.e., $N^9P^{10}$ guanylin) with substitutions to make it proteolytic resistant:



|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ST Ib | Asn | Ser | Asn | Tyr | Cys | Cys | Glu | Leu | Cys | Cys | Asn | Pro | Ala | Cys | Thr | Gly | Cys | Tyr |
| ST Ib(6-18) |  |  |  |  | Cys | Cys | Glu | Leu | Cys | Cys | Asn | Pro | Ala | Cys | Thr | Gly | Cys |  |
| Guanylin |  |  | Pro | Asn | Thr | Cys | Glu | Ile | Cys | Ala | Tyr | Ala | Ala | Cys | Thr | Gly | Cys |  |
| N⁹P¹⁰guanylin |  |  | Pro | Asn | Thr | Cys | Glu | Ile | Cys | Asn | Pro | Ala | Cys | Thr | Gly | Cys |  |

FIG. 1. Amino acid sequences of the *E. coli* heat-stable entero-toxin ST Ib (1, 25) and the three peptides prepared for this study: ST Ib(6-18), guanylin, and $N^9P^{10}$ guanylin. The numbering refers to the position of the amino acids in relation to the ST Ib sequence. ST Ib(6-18) corresponds to the biologically active domain of ST Ib (4, 14, 32, 39). Regions of sequence homology are boxed. The substitution Leu-9 → Ile represents a conversed substitution observed in other ST I sequences (35). Amino acids are identified by their three-letter codes. All peptides were synthesized as described in Materials and Methods.

(DTX-032 at 4711.) Replacing the amino acids of guanylin that make it susceptible to proteolytic degradation with the proteolytic insensitive amino acids of ST peptides significantly reduced the binding affinity of the peptide, as shown in the figure below:

FIG. 2. Displacement curves of the binding of $^{125}$I-Y⁴ST Ib(4-18) to rat villus cells by ST Ib(6-18) (○), guanylin (□), and $N^9P^{10}$ guanylin (△). The relative affinity of each analog for the ST I receptor was determined by its concentration-dependent capacity to inhibit the binding of $^{125}$I-Y⁴ST Ib(4-18) to rat enterocytes. Each datum point represents the average of experiments performed in triplicate.

(*Id.* at 4712.) Table 1 shows that the 50% inhibitory concentration (IC$_{50}$) of $N^9P^{10}$ guanylin was an order of magnitude higher than it was for guanylin:

161

TABLE 1. Biological properties of ST Ib(6-18), guanylin, and $N^9P^{10}$ guanylin

| Peptide | $IC_{50}$ (M)[a] | $ED_{50}$ (mol)[b] | $GC_{50}$ (M)[c] |
|---|---|---|---|
| ST Ib(6-18) | $3.0 \times 10^{-8}$ | $2.5 \times 10^{-12}$ | $10^{-8}$ |
| Guanylin | $10^{-6}$ | $>3.0 \times 10^{-8}$ | $7.0 \times 10^{-7}$ |
| $N^9P^{10}$ guanylin | $6.0 \times 10^{-5}$ | $3.2 \times 10^{-10}$ | $6.3 \times 10^{-6}$ |

[a] $IC_{50}$, 50% inhibitory concentration (peptide concentration required to inhibit 50% of the specific binding of radiolabeled $Y^4ST$ Ib(4-18) to rat villus cells).
[b] $ED_{50}$, 50% effective dose (peptide dose required to cause a half-maximal increase in G:C after oral administration of the analog to infant mice).
[c] $GC_{50}$, 50% guanylate cyclase activation (peptide concentration required to cause a half-maximal activation of intestinal brush-border guanylate cyclase).

(*Id.*)

342.    Hamra 1997 further illustrates this point by showing that pH independent analogs of uroguanylin have reduced potency. Hamra 1997 taught that removal of three amino acids at the N-terminus of uroguanylin eliminates its responsiveness to pH changes by reducing the peptide's unique potency in acidic conditions:

> Thus, uroguanylin$^{98-109}$ did not exhibit an increase in the affinity of this peptide for binding to receptors on T84 cells at acidic versus alkaline pH. This observation is consistent with the similar potencies measured at pH 5.0 compared with pH 8.0 for the cGMP accumulation response to uroguanylin$^{98-109}$. We conclude that the unique acidic amino acids at the N terminus of uroguanylin are required for the increased binding affinities, and accordingly, the enhanced potencies of uroguanylin in the stimulation of target cell responses under the acidic conditions of pH 5.0–5.5 maintained at the mucosal surface of T84 cells in this model epithelium.

(DTX-378 at 2708.) The reduced potency of the pH insensitive analog of uroguanylin is illustrated in Figure 5 below:

162



(*Id*. at 2709 (Figure 5).) Figure 5 shows that concentrations of $10^{-6}$ uroguanylin produced over 200 pmoles of cGMP per well (upper figure) while truncated uroguanylin[98–109] produced only about 20–25 pmoles per well at pH 5.0 (lower figure) at this concentration. Figure 1 shows that the potency of uroguanylin[98–109] is similar to guanylin at pH 5.0:



(*Id*. at 2707.) The amount of cGMP produced by guanylin [$10^{-6}$] at pH 5.0 is about 20–25 pmols.

343.    In addition, a POSA would have understood that guanylin and uroguanylin were

not ideal lead compounds because they were known to have two different isoforms with different biological activity. For example, Marx reported that guanylin and uroguanylin undergo an isomerization between two defined topological states that distinguish these peptides from all other known peptide hormones:

> In conclusion, the fact that uroguanylin and guanylin undergo an isomerization between two defined topological states distinguishes these peptides from all other known peptide hormones. This structural and dynamic characteristic may be a feature of other bioactive multiple disulfide-bridged peptides and proteins.

(*See* Marx et al., *One Peptide, Two Topologies: Structure and Interconversion Dynamics of Human Uroguanylin Isomers*, 52 J. PEPT. RES. 229, 238–39(1998) ("Marx") (DTX-389).) Marx reported that the isomers of guanylin and uroguanylin had different interconversion kinetics:

> A fundamental difference between uroguanylin and guanylin is the velocity of inter-conversion between the respective isomers. Both guanylin isomers are present simultaneously in an equimolar ratio under any conditions. In contrast, the conversion between uroguanylin isomers follows significantly slower kinetics and is hindered substantially by the carboxy-terminal leucine. Therefore, the two isomers of human uroguanylin may exist physiologically in a nonequimolar ratio.

(*Id.* at 239.) Marx determined that isoform A was bioactive for the GC-C, but noted that isoform B could also have a distinct functional role:

> From this study, the bioactive isomer concerning the stimulation of GC-C could be assigned unambiguously to isomer A. Although the topological stereoisomerism and the interconversion of uroguanylin isomer B is suitable for isomer B to function as a storage form of isomer A, a distinct functional role of the B-type isomers cannot be excluded.

(*Id.*) A POSA would prefer a lead compound like the ST core that does not have the isomeric issues presented by guanylin and uroguanylin. (*Id.* at 230 (uroguanylin and guanylin "are characterized by two disulfide bonds . . . which are crucial for biological activity . . .. This

164

structural element leads to the existence of two distinct topological isoforms of each peptide. The enterotoxin ST exhibits an equivalent pattern of disulfides, but has an additional disulfide loop which may enhance its conformational rigidity.") (internal citations omitted).)

344.     Further, a POSA would have expected an ST peptide to have an appropriate therapeutic window.  First, a POSA would have understood that a GC-C agonist does not need to have an extended duration of action to "provide an effect over 24 hours for once a day dosing" to be useful as a treatment for constipation. A POSA would have understood that constipation related disorders could be treated by stimulating net secretion in the intestine and inhibiting reabsorption in the colon to facilitate a bowel movement. A POSA would not be trying to induce constant secretion, merely sufficient secretion to induce more weekly bowel movements. For example, the efficacy of RU-0211 was evaluated as a treatment for constipation by its ability to increase the average number of bowel movements per week and decrease constipation related symptoms. (*See* DTX-365 at A-315 ("This study examined the safety and efficacy of RU-0211, a chloride channel opener which increases intestinal water secretion, for the treatment of constipation. . . . The results of this randomized, controlled, clinical trial demonstrate that RU-0211, as does of 48 and 72 mcg, increases the average number of BMs/week, decreases constipation related symptoms, and is well tolerated."). Thus, a POSA would have understood that a GC-C agonist does not need to be active for 24 hours to stimulate a bowel movement and be useful as a treatment for constipation.

345.     Second, a POSA would have understood that the therapeutic window for an ST peptide would not be defined by plasma concentrations because GC-C agonists act locally and the drug target is concentrated in the proximal small intestine and colon. (See DTX-134 at 3220 (Figure 10(a)).)

346.    Further, a POSA would have expected ST peptides to have a duration in adult humans much shorter than the 9-10 hour duration of action reported in Aimoto for infant mice. Aimoto shows that ST peptides cause fluid accumulation (calculated as the ratio of the weight of the entire intestine to that of the rest of the body) that peaks in 6 hours after 3 mouse units (1 mouse unit is defined as the minimal amount of sample that gives a fluid accumulation ratio of over 0.09) were administered to *suckling* mice. (*See* DTX-028 at 324 and 322). A POSA would have understood that immature animals (*e.g.*, suckling mice) have increased sensitivity to ST peptides due to a greater number of GC-C receptors, and a potential lack of protective antibodies. A person of ordinary skill in the art would have understood that ST peptides have a shorter duration of biological activity in mature animals. For example, Figure 1 of Cohen & Giannella shows that ST peptides have a short-lived bolus of activity in adult rats.  (DTX-348 at 1990.) Based on the prior art, POSA would have expected ST peptides to have an appropriate therapeutic window in adult humans because the magnitude of this short-lived bolus of secretion could be controlled by adjusting the dose of peptide administered. For example, Figure 4 of Gariepy II shows a dose-dependent reduction in guts to carcass weight ratio of suckling mice with reduced concentrations of STh(6-18).  (See DTX-040 at 8909.)

347.    Therefore, a POSA would have been motivated to select an ST peptide as a lead compound for developing a therapeutic agent for treating constipation-based disorders.

### v.    A POSA would have selected STh(6–19) as a lead compound because it was known to be more heat-stable than the full-length peptide

348.    A POSA would have known that peptide drugs should have thermal stability because heat-stable peptides resist denaturation and tend to retain their activity under storage conditions. (*See, e.g.*, Chien-Hua Niu & Yuan-Yuan Chiu, *FDA Perspective on Peptide*

*Formulation and Stability Issues*, 87 J. PHARMACEUTICAL SCI. 1331, 1333 (1998) ("Niu") (DTX-051).) Therefore, a POSA would have looked to minimize the chances of peptide degradation by starting with the most heat-stable ST peptide.

349.    STh(6–19) was known to be more heat-stable than the full-length peptide. (*See* DTX-028 at 326 (teaching that STh(6–19) "constitutes the thermodynamically stable and biologically active site" of the STh peptide); DTX-046 at 2556 (teaching that STh(6–19) has higher heat-stability than synthetic or native STh, while STh(5-19), lacking four N-terminal amino acid residues of STh, showed the same heat-stability as that of the synthetic STh).) A POSA would have selected STh(6–19) as a lead compound for development as a treatment for constipation-related disorders because it would be more resistant to denaturation under storage conditions than the full-length peptide. (*See, e.g.*, DTX-044 at 283–84 (Tables 1–3) (disclosing derivatives of STh(6–19).)

### c.    A POSA would have been motivated to modify STh(6–19) to make [Tyr9]STh(6–19) for use in treating constipation-related disorders at the time of the invention

#### i.    A POSA seeking to develop a treatment for constipation-related disorders would have been motivated to avoid a hyperstimulatory effect

350.    In seeking to develop a treatment for constipation, a POSA would have been motivated to avoid a potential hyperstimulatory effect. In doing so, a POSA would have considered known biological mechanisms.

351.    A POSA would have known that the continuous effect of peptidessecreted by *E. coli* in the intestinal lumen produces a secretory diarrhea. (*E.g.*, DTX-112 at Abstract.) A POSA concerned about causing diarrhea as a side effect of administering an ST peptide would want the drug to have a potent effect that did not continue so long to be dangerous to the patient. Thus, a

POSA would have known that it would be important to moderate those diarrheal effects, and would consider well-known approaches for doing so, such as reducing the dose or reducing the peptide's duration of action.

> ### ii. A POSA would have been motivated to modify STh(6–19) with a tyrosine residue as a proteolytic cleavage site to reduce the peptide's duration of action

352. At the time of the invention, a POSA have would have understood that a peptide agonist of the GC-C receptor only needs to be active for long enough to provide the desired effect (i.e., stimulating net secretion in the small intestine, and reducing absorption in the large intestine). A POSA would have understood that it would not be necessary—or desirable—to induce constant secretion, merely sufficient secretion to induce more weekly bowel movements.

353. At the time of the invention, ST peptides were known to produce "short-lived hypersecretion" in the intestine. (*See, e.g.*, DTX-116 at 280 (Table 1), 281; DTX-115 at 232 (Abstract) ("Results of the study also seem to be consistent with the short-lived hyper-secretory action of the toxin."); DTX-042 at 174 ("The mechanisms of $ST_a$-induced secretion have been extensively studied. When the rat jejunum is perfused *in vivo* with $ST_a$ (Fig. 2), water transport is rapidly inhibited and net secretion results. With cessation of $ST_a$ perfusion, the transport defect is promptly and totally reversible. Both the onset and offset of $ST_a$ action occurs within minutes.").) Figure 1 of Cohen & Giannella, reproduced below, shows the short-lived bolus of activity that ST peptides have in mature animals (open circles):

168



Figure 1. Time course of $ST_a$-induced secretion (mL/g) in in situ intestinal loops of 14-day-old (●) and adult (○) rats. Jejunal ligated loops were inoculated with 5 μmol/L pure $ST_a$ and 250 pmol/L 4-Tyr-$^{125}$I-$ST_a$, and secretion was measured at various time points. Each experimental loop received $ST_a$ diluted in modified Dulbecco's buffer (see Materials and Methods). Also shown is fluid accumulation in control loops [14-day-old (▲) and adult (△)] that received $ST_a$-free modified Dulbecco's buffer. Each point represents the mean ± SE of 9–14 separate determinations.

(DTX-348 at 1990.) A POSA would have understood that the magnitude of this bolus of secretion could be controlled by adjusting the dose of peptide administered. For example, Figure 4 of Gariepy II shows a dose-dependent reduction in guts to carcass weight ratio of suckling mice with reduced concentrations of STh(6-18):



FIG. 4. Diarrheal response curves for the purified peptides $A^{6,11}ST1b(6-18)$ (●), $A^{10,18}ST1b(6-18)$ (○), and ST1b(6–18) (△). A gut/carcass ratio value of 0.09 or above is correlated with a strong episode of diarrhea in all mice tested. Each point represents the average ratio value derived from weight measurements performed on three suckling mice.

169

(*See* Jean Gariépy et al., *Importance of disulfide bridges in the structure and activity of Escherichia coli enterotoxin ST1b*, 84 PROC. NATL. ACAD. SCI. USA 8907, 8909 (Dec. 1987) ("Gariepy II") (DTX-040).) To minimize the risk of adverse events, such as diarrhea, a POSA would have been motivated to modify STh(6–19) to insert a proteolytic cleavage site to control the peptide's duration of action by facilitating the peptide's inactivation and degradation.

354. STh(6–19) contains three disulfide bonds that constrain the conformation of the peptide. Peptides that contain disulfide bonds were known to be resistant to enzymatic digestion. A POSA would have known that the intestinal epithelium releases thiol compounds, such as GSH and cysteine, to the lumen to reduce disulfide bonds, and thus make the peptide more susceptible to digestion by proteolytic enzymes. (*See* Lawrence J. Dahm and Dean P. Jones, *Rat Jejunum Controls Luminal Thiol-Risulfide Redox*, AM. SOC. NUTRITIONAL SCI'S 2739, 2793 (abstract), 2794 (2000) ("Dahm & Jones") (DTX-110) ("Disulfide reduction may facilitate protein digestion by disrupting disulfide-linked peptides"); *see also* D. Eberle et al., *Rapid Oxidation in Vitro of Endogenous and Exogenous Glutathione in Bile of Rats*, 256(5) J. BIOLOGICAL CHEMISTRY 2115, 2116 (Mar. 10, 1981) (DTX-111) (bile contains GSH in the mM range).)

355. A POSA would have known that the redox state of the intestinal lumen in the GI tract is maintained by a redox system involving the reduced and oxidized forms of glutathione and cysteine. Overall a reducing potential is maintained. In such an environment, a peptide containing disulfide bonds, like the ST core, will exist in an equilibrium state that comprises fully oxidized, partially reduced, and reduced forms of the peptide. If the peptide contains a site for proteolytic degradation, that site will be cleaved in the reduced forms of the peptide.

356. At the time of the invention, a POSA would have known that a peptide bond next to the aromatic residues tyrosine (Tyr, Y) and phenylalanine (Phe, F) of guanylin is susceptible

170

to enzymatic digestion by chymotrypsin. (*See, e.g.*, DTX-043 at 281 ("Uroguanylin is more closely related in structure to bacterial STas than is guanylin because of the conserved asparagine (Figure 1). In contrast, guanylin peptides have an aromatic residue, tyrosine or phenylalanine, instead of the asparagine (a polar, uncharged residue). This feature of opossum, rat, mouse, and human forms of guanylin makes these peptides sensitive to cleavage and inactivation by chymotrypsin, because aromatic residues in opossum and rat guanylin are cleavage sites for this protease."); DTX-112 at 27 ("The asparagine makes uroguanylin and ST peptides quite resistant to attack by chymotrypsin, while guanylin is readily cleaved and inactivated by hydrolysis of peptide bonds COOH-terminal to the tyrosine or phenylalanine residues of guanylin.").) A POSA would have known that chymotrypsin has a preference for tyrosine rather than phenylalanine. (*See, e.g.*, Wuyuan Lu et al., *Binding of Amino Acid Side-chains to S1 Cavities of Serine Proteinases*, 266 J. MOL. BIOL. 441, 443 (Table 1) (1997) ("Lu") (DTX-126); Volker Schellenberger et al., *The Specificity of Chymotrypsin, a Statistical Analysis of Hydrolysis Data*, 199 EUR. J. BIOCHEM. 623, 635 (Figure 2) (1991) ("Schellenberger") (DTX-131); *see also* DTX-027 at 318 ("[C]hymotrypsin hydrolyses peptide bonds in proteins and polypeptides. . .. The carboxylic side of amino acids with aromatic side groups like tyrosine, tryptophan and, phenylalanine are predominantly attacked.").) Therefore, a POSA would have been motivated to modify the ST core with a tyrosine residue as a proteolytic cleavage site to facilitate the peptide's inactivation and degradation.

357.    A POSA would have expected that the three disulfide bonds of an ST peptide would be difficult to reduce. A POSA would have reasonably expected that inserting a chymotrypsin cleavage site into the ST core would disrupt the equilibrium state of the peptide in the reducing environment of the intestine. (*See, e.g.*, Dallas L. Rabenstein & Pauline L. Yeo, *Kinetics and*

*Equilibria of the Formation and Reduction of the Disulfide Bonds in Arginine-Vasopressin and Oxytocin by Thiol/Disulfide Interchange with Glutathione and Cysteine*, 59 J. ORG. CHEM. 4223, 4227 (1994) ("Rabenstein") (DTX-160); DTX-043 at 281; H.K. Dürr et al., *Fecal Chymotryspin: Study on Some Chracteristics of the Enzyme*, 17 DIGESTION 396, 401 (1978) ("Dürr") (DTX-154).) Chymotrypsin cleavage of the amino acid backbone of the ST core when the peptide is in its reduced form will cause more of the peptide to be converted from its oxidized active form to its inactive reduced form. The reduced form of the peptide would be degraded by chymotrypsin to result in more peptide conversion and continuing degradation.

358.     A POSA would have understood that the risk of an adverse event being caused by an ST derivative would be reduced by facilitating the inactivation and degradation of the peptide with a chymotrypsin cleavage site. Moreover, a POSA would have understood that a derivative of the ST core with a conservative amino acid substitution outside of the central binding region would likely have reduced potency. (*See* DTX-031 at 4803 (Abstract) ("Two substitutions in the central-turn region of the molecule . . . resulted in a large decrease or less of receptor binding activity as compared to native STIb(6-18), pointing out the functional importance of this region. Analogues containing replacements at other site showed moderate to slight reductions in biological activity.").) Therefore, a POSA would have reasonably expected that a derivative of the ST core with a chymotrypsin cleavage site could be used to treat patients with constipation-related disorders.

> ### iii.     A POSA would have been motivated to modify STh(6–19) to make [Tyr9]STh(6–19) at the time of the invention

359.     A POSA would have been motivated to develop an ST derivative with high receptor binding affinity. At the time of the invention, a POSA would have understood that the asparagine

(Asn, N), proline (Pro, P) and alanine (Ala, A) residues in the central region of the ST core are important to the peptide's ability to bind to the GC-C receptor, as illustrated in the figure below:



Fig. 1. Binding and cell signaling of STa on its receptor, STaR

(DTX-114 at 580.) A POSA would have understood that the best way for achieving an ST derivative with high receptor binding affinity was to avoid the central binding region and to make substitutions in either the N-terminal or C-terminal region of the ST core.

360.    Consistent with what a POSA would have expected, STh(6-19) derivatives with aromatic amino acid residues in the positions of asparagine (Asn, N), proline (Pro, P) and alanine (Ala, A) were known to have reduced biological activity.  The Handbook of Natural Toxins shows that STh(6-19) derivatives with aromatic residues (Phe, F) at the positions of asparagine (Asn, N), proline (Pro, P) and alanine (Ala, A) in the central binding region significantly reduced the biological activity of the peptide.  (See DTX-044 at 284 (Tables 2 and 3).) Thus, the POSA would have known that the aromatic residue tyrosine should not be substituted into the central binding region of STh(6-19).

361.    A POSA would have understood that the tyrosine residue could be inserted into either the N-terminal or C-terminal regions of an ST peptide, as illustrated below:

173



**Fig. 2**   Schematic ribbon drawing of the polypeptide backbone of an STh[6-18].

(DTX-044 at 287 (modified)). A POSA would have reasonably expected that a derivative of STh(6–19) with a conservative tyrosine substitution outside of the central binding region would bind to and activate the GC-C receptor. (*See* DTX-031 at 4803 (Abstract) ("[STh(6-18) [a]nalogues containing replacements at other sites [i.e., outside of the central binding region] showed moderate to slight reductions in biological activity.").)

362.   A POSA would have further understood that degradant products of the derivative of the ST core should not have significant biological activity because these degradant products would need to be characterized during the drug development and approval process. (*See, e.g.*, Thomas A. Baillie, *Drug Metabolites in Safety Testing*, 182 TOXICOLOGY & APPLIED PHARMACOLOGY 188, 189 (2002) ("Baillie") (DTX-163).) It was known in the art that the central disulfide bond in the ST core was necessary for biological activity. (*See, e.g.*, DTX-044 at 285 ("[A] disulfide bond between Cys-7 and Cys-15 *is necessary* for the enterotoxicity of STh and the active center of STh is located in a peptide from Cys-7 to Cys-15 . . .. Therefore, the spatial structure of STh *with a disulfide bond between Cys-7 and Cys-15 and between* Cys-6 and Cys-11 *or* Cys-10 and Cys-18 *is essential for the enterotoxigenic activity or STh*.") (emphasis added).) It was also known in the art that the necessary disulfide bond in the center of the ST core, and at least one of the other two disulfide bonds important to the molecular conformation, were essential for

174

the biological activity of the peptide. (*Id.*) The necessary and important disulfide bonds in the ST core are illustrated in the figure below:



**Fig. 1**   Amino acid sequences and disulfide bond structures of heat-stable enterotoxins STh and STp of enterotoxigenic *Escherichia coli*. Box encloses sequences of 13 amino acids that are very similar in all heat-stable enterotoxins.

(*See id.* at 282 (modified with emphasis added).) A POSA would have been motivated to design the derivative of the ST core so that its degradant products would not be able to form two of the disulfide bonds essential for biological activity.

363.    As illustrated below, cleavage at a position in the N-Terminal region of the ST core would produce a degradant product that cannot form two of the disulfide bonds essential for biological activity:



(*See* DTX-044 at 282 (emphasis added).) By contrast, cleavage in the C-terminal region of the ST core would produce a degradant product that could form two of the disulfide bonds essential for biological activity:



(*See id.* (emphasis added).) Therefore, a POSA would have understood that the proteolytic cleavage site, tyrosine, should be substituted into the N-Terminal region of the STcore.

364.    There are two positions in the N-terminal region of the ST core that the POSA would have considered for the tyrosine substitution, the positions of glutamic acid (Glu, E) and leucine (Leu, L) shown below:

176



(*See id.* (emphasis added).) A POSA would have preferred to substitute tyrosine at the position of

leucine because these residues have more similar hydrophilicity. (*See* U.S. Patent No. 4,554,101

(the "'101 patent"), DTX-132 at 2:1–20 (hydrophilicity values of leucine, tyrosine, and glutamic

acid are -1.8, -2.3, and 3.0±1); DTX-024 at 14 ("Thus, one amino acid in a peptide, polypeptide,

or protein can be substituted by another amino acid having a similar hydrophilicity score and still

produce a resultant protein having similar biological activity, i.e., still retaining correct biological

function. In making such changes, amino acids having hydropathic indices within ±2 are preferably

substituted for one another, those within ±1 are more preferred, and those within ±0.5 are most

preferred."); *see also* DTX-351 at 351–52 (exchange of tyrosine and leucine has a score of -1 in

Figure 84, which indicates that this is a conservative substitution); (Istvan Ladunga and Randall

F. Smith, *Amino Acid Substitutions Preserve Protein Folding By Conserving Steric and

Hydrophobicity Properties*, 10(3) PROTEIN ENG'G 187–96 (1997) ("Ladunga"), DTX-352 at 194

(leucine "easily replaces (or is replaced by) other hydrophobic residues and even hydrophilic ones

that have extended side chains (serine, threonine, tyrosine, glutamine, lysine, etc.)").) Therefore,

177

a POSA would have understood that substituting tyrosine for leucine would result in a derivative that would likely have similar biological activity to the ST core.

365.    In sum, by January 2003, a POSA familiar with the structure activity relationship of ST peptides would have understood that: (a) Tyrosine (Tyr) should not be substituted as a proteolytic cleavage site in the central binding region of the ST core because it would potentially disrupt the peptide's ability to bind to the GC-C receptor and significantly reduce the biological activity of the peptide; (b) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site in the N-terminal region of the ST core because cleavage in the C-terminal region of the ST core would likely produce a degradant product with significant biological activity; and (c) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site at the position of leucine in the N-terminal region of the ST core because leucine and tyrosine have more similar hydrophilicity and this substitution would be expected to produce a peptide with similar biological activity.

366.    As further explained in Section II(B)(5), [Tyr$^9$]STh(6–19) would have been obvious to a POSA at the time of the invention in view of the teachings of Hasegawa, Sato, Carpick 1991, Albano, and/pr Wolfe. Briefly, Hasegawa demonstrates that an aromatic substitution at the position of leucine in an ST derivative (i.e., [Pap$^8$]STp(4-17)) would efficiently bind to the GC-C receptor. Hasegawa synthesized three ST analogs with Pap substitutions at the positions of leucine, asparagine, and alanine shown below:

178



|  |  | 5 | | 10 | | 15 | |
|---|---|---|---|---|---|---|---|
| Ec-STp | : | Asn-Thr-Phe-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys-Tyr |
| Ec-STp(4-17) | : | Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys |
| [Pap⁸]STp(4-17) | : | –  –  –  Pap⁸  –  –  –  –  –  –  –  –  – |
| [Pap¹¹]STp(4-17) | : | –  –  –  –  –  –  Pap¹¹  –  –  –  –  –  – |
| [Pap¹⁵]STp(4-17) | : | –  –  –  –  –  –  –  –  –  –  Pap¹⁵  –  – |
| Ec-STh | : | Asn-Ser-Ser-Asn-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Ala-Gly-Cys-Tyr |
| Vm-ST, NAG-ST | : | Ile-Asp-Cys-Cys-Glu-Ile -Cys-Cys-Asn-Pro-Ala-Cys-Phe-Gly-Cys-Leu-Asn |

Fig 1. Primary structures of STp and the synthetic analogs. Ec-STp and Ec-STh are produced by enterotoxigenic *E. coli* of porcine [6] and human [24], respectively. Vm-ST and NAG-ST are elaborated by *Vibrio mimicus* [25] and *Vibrio cholerae* non-O1 [26], respectively.

(DTX-045 at 2.) Pap is an analog of tyrosine with a similar aromatic side chain, as shown below:

L-Tyrosine (Tyr)          L-para-azido-Phenylalanine (Pap)

(*See* DTX-060 at 1940 ("p-Azidophenylalanine (azphe) is a photosensitive tyrosine analog that produces a highly reactive nitrene upon UV irradiation.").) The binding affinity of the ST analogs were evaluated in a competitive binding assay against STp(4-17) and the experimental results are shown in the figure below:



Fig. 6. Curves for the inhibition by STp analogs of the binding of $^{125}$I-STp(4–17) to the receptor (values shown represent the mean of duplicate data sets): [Pap$^8$]STp(4–17) (closed triangles), [Pap$^{11}$]STp(4–17) (open triangles), [Pap$^{15}$]STp(4–17) (open circles), and STp(4–17) (closed circles).

(DTX-045 at 8.) The order of the binding affinity to the receptor protein was reported to be [Pap$^8$]STp(4-17) (closed triangles in the figure above) $\geq$ [Pap$^{15}$]STp(4-17) (open circles in the figure above) $>>$ [Pap$^{11}$]STp(4-17) (open triangles in the figure above). (*Id.* at 9.) In view of the disclosures of Hasegawa, a POSA would have been motivated to substitute tyrosine at the position of leucine in the ST core because this analog (i.e., [Tyr$^9$]STh(6–19)) would have been reasonably expected to efficiently bind to and activate the GC-C receptor without producing degradant products that have significant biological activity.

367.    Sato taught that the amino acids in the central binding region of an ST peptide (i.e., the N(Asn)-P(Pro)-A(Ala) amino acid residues) are the most important residues for the peptide's activity, and that substitutions outside of this region have less of an impact on activity. Sato synthesized weakly toxic and nontoxic analogs of STp to evaluate the structural characteristics important for biological activity using X-ray crystallography. (*See* DTX-054 at 8641 (Abstract).) Sato reported that the structure of STp consists of three segments, an N-terminal $3_{10}$ helix, a central type I β-turn, and a C-terminal type II β–turn, which are stabilized by three intramolecular disulfide bonds. *Id.* Sato disclosed that:

> The receptor binding region of the toxin estimated from the spatial arrangement of the atoms is mainly constituted from the side chain and main chain of $Asn^{11}$ and $Pro^{12}$ in addition to $Ala^{13}$, compatible with previous findings that $Asn^{11}$, $Pro^{12}$, and $Ala^{11}$ are the most important residues for the activity (Takeda et al., 1991) and that the toxicity of STp is less affected by substitution of $Glu^7$, $Leu^8$, and $Gly^{16}$, which are located on the opposite side of $Ala^{13}$ (DTX-063 et al., 1986; Carpick & Gariepy, 1991).

(*Id*. at 8649.) Moreover, Sato taught that:

> The disulfide linkage not found in guanylin corresponds to the bridge in the N-terminal segment of ST that is important for making a rigid pillar, it is considered that the rigidity of the N-terminal segment is important for ST to maintain its enterotoxicity under the severe physiological conditions in intestinal organs of the host animal. This idea is supported by the fact that guanylin is rapidly degraded by components in the intestinal tract of infant mice, whereas ST is strongly resistant to digestion by them."

(*Id*. at 8650 (internal citations omitted).) In view of the disclosures of Sato, a POSA would have been motivated to substitute tyrosine at the position of leucine in the ST core because this analog (i.e., $[Tyr^9]STh(6–19)$) would have been reasonably expected to efficiently bind to and activate the GC-C receptor without producing degradant products that have significant biological activity.

368.    Carpick 1991 similarly taught that the amino acids in the central binding region of an ST peptide (i.e., the N(Asn)-P(Pro)-A(Ala) amino acid residues) are the most important residues for the peptide's activity, and that substitutions outside of this region have less of an impact on activity. Carpick 1991 synthesized analogs of STh(6-18) with amino acid substitutions at positions 8, 9, 10, 12, 13, 14, 17 and 18, and evaluated the biological properties of the analogs. (*See* DTX-031 at 4804 (Figure 2) and 4805 (Table 1).) Carpick 1991 reported that substitutions in the central turn region of ST(6-18) (i.e., Asn12 to Cys15) "resulted in a large decrease or loss of receptor binding activity" whereas "replacements at other sites showed moderate to slight reductions in biological activity." (*Id*. at 4803 (Abstract).) In view of the disclosures of Carpick 1991, a POSA

181

would have been motivated to substitute tyrosine at the position of leucine in the ST core because this analog (i.e., [Tyr$^9$]STh(6–19)) would have been reasonably expected to efficiently bind to and activate the GC-C receptor without producing degradant products that have significant biological activity.

369.    Albano disclosed that a closely related homologue of STh without the C-terminal residues (i.e., Thr-Gly-Cys-Tyr), referred to as Toxin A-2, has significant biological activity. The amino acid sequence of Toxin A-2 is shown in Table 1 below:

**Table 1.** *Amino acid sequence of the three new toxins derived from engineered* Klebsiella pneumonia *AL55 strain*

|  | 1 | 5 | 10 | 15 |
|---|---|---|---|---|
| ST1b | Asn-Ser-Ser-Asn-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-Tyr |
| Toxin A-1 | Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-Tyr |
| Toxin B | Ser-Ser-Asn-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-Tyr |
| Toxin A-2 | Ser-Ser-Asn-Tyr-Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys |

(*See* DTX-026 at 688.) The biological activity of Toxin A-2 is shown in the figure below:



**Figure 3.** Dose-dependent activation of guanylate cyclase by *E. coli* ST1b and by *Klebsiella* toxins A-1, A-2, and B. The kinetics of guanylate cyclase activation in response to *E. coli* ST1b and to *Klebsiella* toxins A-1, A-2, and B were similar, indicating similar biologic effects of the toxin isoforms. All toxin isoforms induced a significant increase in cGMP concentrations. However, *E. coli* ST1b was slightly but significantly more potent than *Klebsiella* toxins. Data are mean ± SE of four separate experiments.

(*See* DTX-026 at 688.) In view of the disclosures of Albano, a POSA would have been motivated to substitute tyrosine in the N-terminal region of the ST core at the position of leucine because this

analog (i.e., [Tyr$^9$]STh(6–19)) would have been reasonably expected to efficiently bind to and activate the GC-C receptor without producing degradant products that have significant biological activity.

370.     Wolfe developed a COMFA model to predict the primary interactions between GC-C agonists and their receptor and confirms that leucine would have been the preferred region in the N-terminal region of STh(6–19) for substitution of tyrosine as a proteolytic cleavage site. (*See* DTX-061 at 1732 (the model predicts "that the backbone of Cys$^5$-Cys$^6$-Glu$^7$-Leu$^8$ adopts a conformation that tightly interacts with a hydrophobic region of GC-C to achieve maximum potency."; "[t]he primary site of electrostatic interaction within the model is derived from residue Glu$^7$," whereas "side chain mutations of Leu$^8$ have only minimal effect.").) In view of the disclosures of Wolfe, a POSA would have been motivated to substitute tyrosine at the position of leucine in the ST core because this analog (i.e., [Tyr$^9$]STh(6–19)) would have been reasonably expected to efficiently bind to and activate the GC-C receptor without producing degradant products that have significant biological activity.

### iv.     It would have been routine for a POSA to prepare [Tyr9]STh(6–19)

371.     Preparing [Tyr$^9$]STh(6–19) would have been routine for a POSA. For example, Aimoto synthesized and purified STh and STh(6–19) in the early 1980s. (*See* DTX-028 at 320 ("[W]e synthesized STh . . . and confirmed the synthetic peptide had the same biological and physio-chemical properties as those of the native ST."), 321 ("We report the chemical synthesis of a shorter analog of STh, which has the same sequence as that of the 14 amino acid residue from the C-terminal end of STh . . .."), 323 ("A shorter synthetic analog of STh, STh(6–19), was purified by chromatography on DEAE-Sephadex A-25 under similar conditions to those for synthetic

183

STh.").) Aimoto disclosed a method of synthesizing STh(6–19). (*Id.* at 322.)

372.    It would have been routine for a POSA to synthesize and purify an analog of STh(6–19) with a Tyr substitution at position 9. For example, Carpick 1991 synthesized analogs of STh(6-18) with amino acid substitutions at positions 8, 9, 10, 12, 13, 14, 17 and 18. (*See* DTX-031 at 4804 (Figure 2).) Carpick 1991 disclosed that the analogs were synthesized using solid-phase methods and purified. (*Id.* at 4803–04.) Hasegawa synthesized and purified a derivative of ST with the tyrosine analog Pap at the position of Leu[8] (i.e., [Pap[8]]STp(4-17)). (*See* DTX-045 at 2 (Figure 1).) Hasegawa disclosed a synthetic scheme for preparing a representative derivative (i.e., [Pap[11]]STp(4-17). (*Id.* at 3, 4, 6.)

373.    Thus, there were well-known methods for synthesizing and purifying STh(6–19) and analogs of ST peptides with amino acid substitutions, including analogues with side chain aromatic amino substitutions at the position of Leu. It would have been routine for a POSA to synthesize and purify [Tyr[9]]STh(6–19) and a POSA would have had more than a reasonable expectation of success. (*See, e.g.*, FMOC SOLID PHASE PEPTIDE SYNTHESIS, A PRACTICAL APPROACH 9-114, 9-13 (Weng C. Chan & Peter D. White eds., 2000) ("White") (DTX-135) (disclosing principles of Fmoc solid phase peptide synthesis), 91–92 (disclosing synthetic approaches to the formation of disulfide bridges); Paul Lloyd-Williams et al., CHEMICAL APPROACHES TO THE SYNTHESIS OF PEPTIDES AND PROTEINS 19-93, 209-36 (1997) ("Lloyd-Williams") (DTX-047) at 19 ("[T]he advantages of [solid-phase peptide synthesis] over classical synthesis in solution are those of simplicity and speed of execution."), 209 and 214–23 (disclosing methods for synthesizing peptides with disulfide bridges).)

### v. It would have been routine for a POSA to evaluate [Tyr9]STh(6–19) in receptor binding and activation assays and in animal models

374.   It would have been routine for a POSA to evaluate the efficacy and safety of [Tyr$^9$]STh(6–19) at the time of the invention. In general terms the process consists of evaluating the peptide: in receptor binding assays; receptor activation (second messenger) assays; and animal models of increasing relevance to the desired physiological effect. In parallel with these assays, toxicity studies in animals would be carried out. (*See, e.g.*, DTX-123 at 848 ("In any case, robust strategies for the design of peptide ligands ('ligand-based drug design') have been developed that require careful consideration of both the structural and conformational features of peptides and detailed analyses of their biological activities, including binding, second-messenger, tissue and whole-animal assays. Such strategies have had a great deal of success.").) The different components of this process could be contracted out to organizations that specialize in such assays, models, and toxicity studies.

375.   There were well-known GC-C receptor binding assays. (*See, e.g.*, DTX-022 at 2:57–64 ("Fig. 3(b) Displacement of $^{125}$I-STa specific binding from T84 cells by human uroguanylin, human guanylin and STa. . .. Specific binding (%) was determined by dividing the specifically bound $^{125}$I-STa at each ligand concentration by the specifically bound $^{125}$I-STa in the absence of ligands."); DTX-109 at 2:18–21 (Fig. 3(b) "Competition inhibition of [$^{125}$I]-STa binding. Unlabeled STa (E), human guanylin (J), or rat guanylin (H) were added in increasing concentrations using [$^{125}$I]-STa as described in Methods.").) There were also well-known receptor activation assays for measuring stimulation of the secondary messenger cGMP. (*See, e.g.*, DTX-022 at 2:53–55 ("FIG. 3(a) Concentration-response effect of synthetic human uroguanylin, human guanylin and E. coli ST5-18 (STa) on cyclic GMP levels in T84 cells."); DTX-109 at 2:15-17 (Fig.

185

3(a) "Activity in the T84 cell bioassay. As determined by analysis of the effects of the peptides on intracellular cyclic GMP levels.").) It would have been routine for a POSA to evaluate [Tyr[9]]STh(6–19) in these assays to determine that it binds to and activates the GC-C receptor.

376.    In addition, animal models relevant to the desired physiological effect of induced net secretion had been established. (*See, e.g.*, DTX-063 at 139 ("Enterotoxigenic activity was assayed by measuring the amount of sample required to cause fluid accumulation in the intestine of 2-4-day-old suckling mice 4 h after its administration, as in [6]. The fluid accumulation ratio of each animal was calculated as the ratio of the weight of the entire intestine to that of the rest of the body. . ..") and 140 (Table 1) (minimum effective dose of STh(6–19) was 0.6 ng); DTX-031 at 4805 (Figure 4) ("Dose-response curves for the administration of STIb(6-18) analogue dilutions to newborn suckling mice. A quantitative assessment of the diarrheal response in mice is reported in terms of the gut-to-carcass ration (G:C), which was calculated as described under Experimental Procedures."); DTX-044 at 283 ("Shimonishi and coworkers chemically synthesized STh, STp, and their analogues and examined their biological and immunological properties. . .. Activity of synthetic STa and its analogues in the fluid accumulation assay in suckling mice showed that the core sequences (STh[6-18] and STp[5-17]) have the same toxicity as the holotoxins and are more stable to heat. The minimum effective doses (MED) of the synthetic peptides were 0.4 pmol for STh[6-18] and 0.5 pmol for STp[5-17], which corresponded to those of native STh and STp."); Greenberg at 278 (Figure 2) (guts-to-carcass ratio per ng peptide (i.e., STa, uroguanylin, guanylin) administered per mouse).) It would have been routine for a POSA to evaluate [Tyr[9]]STh(6–19) in these animal models to determine the net secretion induced by the amount of administered peptide.

377.    A POSA would have used the data from the assays and animal models to guide the clinical development of [Tyr[9]]STh(6–19) for the treatment of patients with constipation-related

disorders.

> **vi.    A POSA would have been motivated to make a pharmaceutical composition of [Tyr9]STh(6–19) and would have had a reasonable expectation of success in doing so**

378.    A POSA would have understood that [Tyr$^9$]STh(6–19) would need to be formulated into a pharmaceutical composition for use in treating patients. Pharmaceutical compositions facilitate the storage, distribution, and administration of active pharmaceutical ingredients. Therefore, a POSA would have been motivated to combine [Tyr$^9$]STh(6–19) with one or more pharmaceutically acceptable carriers or excipients in a pharmaceutical composition. (*See, e.g.*, DTX-023 at 16:43–51 ("[T]he present invention provides pharmaceutical compositions that comprise the conjugated compounds of the invention [i.e., a peptide moiety that binds to the ST receptor conjugated to a therapeutic or imaging moiety] and pharmaceutically acceptable carriers or diluents. The pharmaceutical composition of the present invention may be formulated by one having ordinary skill in the art. Suitable pharmaceutical carriers are described in Remington's Pharmaceutical Sciences, A. Osol, a standard reference text in the field., which is incorporated herein by reference."); *see also* DTX-052 at 858–63 (disclosing pharmaceutical excipients and carriers routinely used by POSA for preparing oral solid dosage forms).)

379.    A POSA would understand that a pharmaceutical composition would generally include an amount of the active pharmaceutical ingredient that when properly administered would constitute an effective dose. A POSA would understand that the effective dose of the active pharmaceutical ingredient is evaluated as part of a "dose-finding study." (*See* R. Schmidt, *Dose-finding studies in clinical drug development*, 34 EUR. J. CLIN PHARMACOL. 15, 15 (1988) ("Schmidt") (DTX-137).) The objective of a dose-finding study is to "satisfy the requirement that

patients be exposed only to the quantity of drug that they really need." (*Id.*) Determining an effective dose is thus a matter of routine experimentation.

380.    A POSA would have been motivated to find an effective amount of a therapeutic agent, and would have been able to do so by routine experimentation. A POSA would have routinely included one or more pharmaceutically acceptable excipients in a pharmaceutical formulation, in addition to a therapeutically effective amount of the active ingredient. Therefore, a POSA would have routinely formulated a pharmaceutical composition containing an effective amount of [Tyr$^9$]STh(6–19) with one or more pharmaceutically acceptable carriers or excipients, and a POSA would have had a reasonable expectation of success in doing so.

> **vii.    A POSA would have had a reasonable expectation of success in making [Tyr9]STh(6–19), formulating compositions of this peptide, and using these compositions to treat patients with conditions such as IBS, IBS-C, chronic constipation, and idiopathic constipation.**

381.    A POSA would have reasonably expected that [Tyr$^9$]STh(6–19), and pharmaceutical compositions thereof, could be made and used to treat patients with constipation-related disorders.

382.    A POSA would have reasonably expected that [Tyr$^9$]STh(6–19) would bind to and activate the GC-C receptor because the prior art demonstrated that an ST derivative with an aromatic substitution at the position of leucine has high receptor binding affinity. (*See, e.g.*, DTX-045 at 2 and 8.) A POSA would have reasonably expected that [Tyr$^9$]STh(6–19) would have sufficient stability in the gut to persist into the colon because it is stabilized by three disulfide bonds. (*See, e.g.*, DTX-112 at 34.)

383.    A POSA would have reasonably expected [Tyr$^9$]STh(6–19) to produce a short-lived

bolus of intestinal secretion in adult humans. (*See, e.g.*, DTX-348 at 1990, Figure 1.) A POSA would have reasonably expected that $[Tyr^9]STh(6-19)$ could be used to treat patients with constipation-related disorders because the magnitude of the bolus of activity could be controlled by adjusting the dose, and the duration of the bolus of activity would be controlled by the chymotrypsin cleavage site. (*See, e.g.*, DTX-040 at 8909 (Figure 4); DTX-043 at 281 ("guanylin peptides have an aromatic residue, tyrosine or phenylalanine, instead of the asparagine (a polar, uncharged residue). This feature of opossum, rat, mouse, and human forms of guanylin makes these peptides sensitive to cleavage and inactivation by chymotrypsin, because aromatic residues in opossum and rat guanylin are cleavage sites for this protease."); DTX-112 at 27 ("The asparagine makes uroguanylin and ST peptides quite resistant to attack by chymotrypsin, while guanylin is readily cleaved and inactivated by hydrolysis of peptide bonds COOH-terminal to the tyrosine or phenylalanine residues of guanylin.").)

384.     Therefore, a POSA would have reasonably expected that pharmaceutical compositions of $[Tyr^9]STh(6-19)$ could be made and used to treat patients with constipation-related disorders.

### 5.   The Asserted Claims of the '036 Patent Would Have Been Obvious

#### a.   Claim 2 of the '036 Patent

385.     Claim 2 of the '036 patent recites:

> 2.       A purified peptide consisting of the amino acid sequence: Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr (SEQ ID NO:31).

As shown below, the amino acid sequence recited in claim 2 is a derivative of STh(6–19) with a tyrosine (Y) residue at the position of leucine (L):

| STh(6–19) | **C C E L C C N P A C T G C Y** |
|-----------|--------------------------------|
| SEQ ID NO:31 | **C C E *Y* C C N P A C T G C Y** |

189

Claim 2 of the '036 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment references described below and one or more of the [Tyr$^9$]STh(6–19) references described below.

386.    At the time of the invention, a POSA would have been motivated to develop a GC-C agonist as a treatment for constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation, idiopathic constipation) based on the teachings of the '097 patent, Nakazato, Shailubhai, Shailubhai & Currie, Shailubhai '628, the '670 patent, Greenberg, Ewe 1988, Sack 1980, Beltowski, and/or Giannella (collectively, the "Method of Treatment References"). The teachings of these references are briefly summarized below:

- **'097 Patent:** "The major biological actions of guanylin in the intestine are the stimulation of chloride and water secretion and the inhibition of sodium and water absorption. Thus, guanylin should act as a laxative agent for the treatment of constipation. Evidence supporting this proposal is based on the studies cited concerning STa, a structural mimic of guanylin, and data that we have obtained with isolated rat colons." (*See* DTX-109 at 6:21–34.)

- **Nakazato:** "The regulation of intestinal salt and water transport is critical to the maintenance of fluid volume. Control of this life-sustaining activity is mediated by the concerted actions of hormones, neurotransmitters, and locally acting factors. Guanylin and uroguanylin are novel peptides that were first isolated from rat jejunum and opossum urine, respectively. They bind to and activate guanylyl cyclase-C (GC-C) receptors to regulate intestinal and renal fluid and electrolyte transport through the second messenger, cyclic guanosine 3',5'-monophosphate (GMP). Heat-stable enterotoxins [i.e., ST peptides] produced by pathogenic bacteria have close structural similarities to guanylin and uroguanylin, and they use this mimicry to act on GC-C . . .." (*See* DTX-049 at 219.)

- **Shailubhai:** "Binding of these peptide hormones [i.e., uroguanylin, guanylin, lymphoguanylin and bacterial enterotoxin ST] to the GC-C receptor stimulates intracellular production of cyclic guanosine monophosphate (cGMP), resulting in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), the apical membrane channel for efflux of chloride from enterocytes lining the gastrointestinal (GI) tract. Activation of CFTR chloride channel, and the subsequent enhancement of transepithelial efflux of Cl$^-$ and K$^+$ ions leads to secretion of water into the intestinal lumen." (*See* DTX-

190

057 at 261.) "Water secretion into the lumen of intestine is essential for normal coating of mucin, which protects gastric mucosa from mechanical damage and the harmful effects of acidity in the GI tract . . .. The underproduction of water might result in thick mucus, leading to intestinal blockage or constipation." (*Id*. at 262.)

- **Shailubhai & Currie:** "Binding of uroguanylin or guanylin to the guanylin cyclase receptor stimulates the intracellular production of the cGMP ultimately resulting in the stimulation of salt and water secretion into the intestinal lumen . . .. Uroguanylin has been found to stimulate increases in cyclic GMP levels in a manner similar to another family of heat stable enterotoxins (STs) secreted by pathogenic strains of E. coli. . .." (*See* DTX-024 at 3:13–25.) "Uroguanylin is believed to regulate fluid and electrolyte transport in a manner similar to guanylin and the STs in the GI tract. Therefore, as mentioned in previous publications the human uroguanylin may act as a laxative and be useful in patient [sic] suffering from constipation." (*Id*. at 4:3–8.)

- **Shailubhai '628:** "Uroguanylin, guanylin and bacterial ST peptides are structurally related peptides that bind to a guanylate cyclase receptor and stimulate intracellular production of cyclic guanosine monophosphate (cGMP). This results in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), an apical membrane channel for efflux of chloride from enterocytes lining the intestinal tract. Activation of CFTR and the subsequent enhancement of transepithelial secretion of chloride leads to stimulation of sodium and water secretion into the intestinal lumen. Therefore, by serving as paracrine regulators of CFTR activity, cGMP receptor agonists regulate fluid and electrolyte transport in the GI tract." (DTX-025 at 1 [0003]). "Recent reports have also suggested that the CFTR channel is involved in the transport and maintenance of reduced glutathione, an antioxidant that plays an important role in protecting against inflammation caused by oxidative stress. Enhancement of intracellular levels of cGMP by way of guanylate cyclase activation or by way of inhibition of cGMP-specific phosphodiesterase would be expected to down-regulate these inflammatory stimuli. Thus, uroguanylin-type agonists should be useful in the prevention and treatment of inflammatory diseases of the lung (e.g., asthma), bowel (e.g., ulcerative colitis and Crohn's disease), pancreas and other organs." (*Id*. at 1 [0009].)

- **'670 patent:** "[Human uroguanylin] has been found to stimulate increases in cyclic GMP levels in a manner similar to guanylin and the STs. As such regulator, it is useful for the control of intestinal absorption. It has potential to regulate fluid and electrolyte transport . . .. Human uroguanylin has been further demonstrated to act in an isolated intestinal rat preparation to stimulate an increase in short circuit current. This action is believed to be the physiologic driving force for eliciting chloride secretion and ultimately decreased water absorption. The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation, e.g. cystic fibrosis patients who suffer with severe intestinal complications from constipation." (*See* DTX-022 at 2:8–12, 16–25.)

- **Greenberg 1997:** "Uroguanylin and guanylin are intestinal peptides that activate a

191

receptor-guanylate cyclase [i.e., GC-C], which is also a receptor for *Escherichia coli* heat-stable enterotoxin (STa). These peptides may have a role in the body's regulation of fluid and electrolytes." (DTX-043 at 276.) "The results of our studies demonstrate that STa exerts its diarrheal effects in the intestine by molecular mimicry, serving as a bacteria-derived member of the peptide family that also contains the intestinal peptides, uroguanylin and guanylin. In addition, the reduced potency of guanylin compared to uroguanylin is caused by its susceptibility to proteases such as chymotrypsin." (*Id*. at 280.)

- **Ewe 1988**: Ewe 1998 taught that constipation and diarrhea result from abnormal intestinal motility and fluid balance. (DTX-036 at 73 (Abstract).) Ewe 1998 disclosed that the small intestine allows for rapid equilibrium of osmolality (*e.g*., water and electrolyte balance), while the large intestine preserves water and electrolytes once they have been absorbed. (*Id*.) Ewe 1998 reports that "[f]ormerly, diarrhea and constipation were attributed to disordered motility" and that "[t]his concept changed in the late 1960s and early 1970s when the secretory effect of cholera toxin was recognized and studied in more detail." (*Id*. at 73.) Ewe 1998 explains that constipation and diarrhea are clinical symptoms of abnormalities in stool frequency and consistency due to a variety of causes. (*Id*. at 74.) Both are caused by abnormalities in intestinal motility and transport of electrolytes and water. (*Id*.) Small abnormalities in absorption and secretion, especially in the distal intestinal area, can lead to constipation or diarrhea. (*Id*.)

- **Sack 1980**: Sack 1980 disclosed that the physiological action of ST is characterized by "[r]apid onset, short-lived hypersecretion." (DTX-116 at 280.) Sack 1980 further explains that: "Strains of ETEC can produce either one or both of the enterotoxins [i.e., LT or ST], depending on the plasmid(s) they carry. It has been shown that the clinical disease caused by strains of ETEC correlated with these types of enterotoxins produced by the isolates. The diarrhea was more severe and of longer duration in persons harboring organisms that produced both LT and ST, as compared with those with organisms producing only ST." (*Id*. at 281.)

- **Beltowski**: "Guanylin and uroguanylin are short peptides homologous to heat-stable enterotoxins of Escherichia coli and other coterie bacteria. Guanylin and uroguanylin are synthetized from the respective preproeptides mainly in gastrointestinal mucosa and are secreted both into intestinal lumen and into the blood. Luminally secreted peptides stimulate chloride and bicarbonate secretion in the intestine through the mechanism involving guanylate cyclase C receptor, cyclic GMP, protein kinase G and cystic fibrosis transmembrane conductance regulator (CFTR) chloride channel." (DTX-133 at Abstract.) Beltowski disclosed that the activity of guanylin and uroguanylin is pH-dependent: "The activity of guanylin and uroguanylin is pH-dependent. In cultured $T_{84}$ cells guanylin is 10-fold more potent in elevating cGMP at pH 8 than at pH *5,* whereas uroguanylin is more potent in acidic than in alkaline conditions. In alkaline environment guanylin is more potent than uroguanylin and the opposite is observed in acidic conditions. STa is slightly more potent in acidic than in alkaline pH but the difference is not so striking as in the case of endogenous peptides. STa is, however, more potent than either guanylin or uroguanylin in both acidic and alkaline conditions." (DTX-133 at 362.)

- **Giannella 1995:** "The mechanisms of $ST_a$-induced fluid secretion have been extensively studied. When the rat jejunum is perfused in vivo with $ST_a$ (Fig. 2), water transport is rapidly inhibited and net secretion results. With cessation of $ST_a$ perfusion, the transport defect is promptly and totally reversible. Both the onset and offset of $ST_a$ action occurs within minutes . . .. $ST_a$-induced secretion occurs via activation of guanylate cyclase and generation of cGMP, which inhibits the coupled influx of Na+ and Cl- and stimulates Cl- secretion. Others have noted the rapid onset of action of $ST_a$, its effects on the colon, and the possible involvement of serotonin and the enteric nervous system." (*See* DTX-042 at 174.) "Recently an endogenous ligand called guanylin has been extracted from mammalian intestine and shown to bind to the $ST_a$ receptor. A similar peptide, called uroguanylin, has been found in human and animal urine. It is likely that guanylin and uroguanylin are indeed endogenous ligands for the $ST_a$ receptor and may be modulators of Cl- secretion in the intestine, kidney, and perhaps in other organs." (*Id*. at 179.)

387.   A POSA would have been familiar with the background art on ST peptides, guanylin, uroguanylin, and lymphoguanylin described above. As explained in detail in Section II(B)(2), a POSA familiar with this background art would have been motivated to select STh(6–19) as a lead compound for development as a treatment for constipation-related disorders for the reasons summarized below:

- ST peptides were known to induce secretion and reduce absorption in the GI tract;

- ST peptides had been extensively studied and the characterization of their structure activity relationship would have provided a POSA with considerable guidance on the properties of potential ST derivatives;

- ST peptides were known to be molecular mimics for both guanylin and uroguanylin, with pH independent activity and enhanced stability in the gut due to their three disulfide bonds; and

- the ST core was known to have a single defined folded conformation and reported to be more heat-stable and resistant to denaturation than the full-length peptide.

388.   A POSA familiar with the background art on ST peptides, guanylin, uroguanylin, and lymphoguanylin would have been motivated to modify STh(6–19) with a tyrosine residue as a proteolytic cleavage site for the reasons explained in Section II(B)(4). As previously explained in Section II(B)(4), a POSA would have reasonably expected that modifying STh(6–19) with a

193

proteolytic cleavage site, preferably tyrosine, would tune the peptide's activity and facilitate the peptide's inactivation and degradation by proteolytic enzymes to reduce the risk of adverse effects, such as diarrhea.

389.    As previously explained, a POSA familiar with the background art on the structure activity relationship of ST peptides would have understood that: (a) Tyrosine (Tyr) should not be substituted as a proteolytic cleavage site in the central binding region of the ST core because it would potentially disrupt the peptide's ability to bind to the GC-C receptor and significantly reduce the biological activity of the peptide; (b) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site in the N-terminal region of the ST core because cleavage in the C-terminal region of the ST core would likely produce a degradant product with significant biological activity; and (c) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site at the position of leucine in the N-terminal region of the ST core because leucine and tyrosine have similar hydrophilicity and this substitution would be expected to produce a peptide with similar biological activity.

390.    As previously explained, a POSA would have been motivated to substitute tyrosine at the position of leucine in STh(6–19) based on the teachings of Handbook of Natural Toxins, Lu, Hasegawa, Sato, Carpick 1991, Albano, and/or Wolfe (collectively, the "[Tyr[9]]STh(6–19) References"). The teachings of these references are briefly summarized below:

- **<u>Handbook of Natural Toxins</u>**: The Handbook of Natural Toxins disclosed that ST1b has also been referred to as STh because it was originally found in *E. coli* isolated from humans. (*See* DTX-044 at 282.) The Handbook of Natural Toxins further disclosed the biological activities of analogs of STh(6–19) with replacements at positions 12, 13, and 14, as well as the biological activities of analogs of STh(6-18) with one or two disulfide bonds. (*See id.* at 283–86 (Tables 1–4).)

- **<u>Lu</u>**: Lu taught that chymotrypsin has a preference for tyrosine over phenylalanine. (DTX-126 at 443 (Table 1).)

194

- **Hasegawa:** Hasegawa taught an ST derivate with a Pap substitution at the position of leucine will efficiently bind with the GC-C receptor. (*See* DTX-045 at 4 (Figure 2), at 8 (Figure 6) and 9 ("The order of the binding affinity to the receptor protein was reported to be $[Pap^8]STp(4\text{-}17) \geq [Pap^{15}]STp(4\text{-}17) >> [Pap^{11}]STp(4\text{-}17).$").) A POSA would have understood that Pap is an analog of tyrosine, and that an ST derivative with tyrosine at the position of leucine would efficiently bind to the GC-C receptor. While Hasegawa shows that an aromatic substitution at the position of alanine in the C-terminal region of an ST derivative would also efficiently bind to the GC-C receptor, a POSA would have understood that the proteolytic cleavage site should not be in the C-terminal region because the degradant product(s) would likely have significant biological activity. Moreover, Hasegawa demonstrates that a POSA would have viewed leucine as the preferable position in the N-terminal region of an ST peptide for an aromatic amino acid substitution. (*See* DTX-045 at 2 (Figure 2).) Thus, a POSA would have been motivated to prepare $[Tyr^9]STh(6\text{–}19)$ based on the teachings of Hasegawa.

- **Sato:** Sato taught that the "receptor binding region" of ST peptides "estimated from the spatial arrangement of the atoms is mainly constituted from the side chain and main chain of $Asn^{11}$ and $Pro^{12}$ in addition to $Ala^{13}$, compatible with previous findings that $Asn^{11}$, $Pro^{12}$, and $Ala^{11}$ are the most important residues for the activity and that the toxicity of STp is less affected by substitution of $Glu^7$, $Leu^8$, and $Gly^{16}$, which are located on the opposite side of $Ala^{13}$." (*See* DTX-054 at 8649 (internal citations omitted).) Sato taught further that "the disulfide linkage not found in guanylin corresponds to the bridge in the N-terminal segment of ST that is important for making a rigid pillar, it is considered that the rigidity of the N-terminal segment is important for ST to maintain its enterotoxicity under the severe physiological conditions in intestinal organs of the host animal" because "guanylin is rapidly degraded by components in the intestinal tract of infant mice, whereas ST is strongly resistant to digestion by them." (*Id.* at 8650 (internal citations omitted).) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare $[Tyr^9]STh(6\text{–}19)$ based on the teachings of Sato.

- **Carpick 1991:** Carpick 1991 taught that substitutions in the central turn region of ST(6-18) (i.e., Asn12 to Cys15) "resulted in a large decrease or loss of receptor binding activity" whereas "replacements at other sites showed moderate to slight reductions in biological activity." (*See* DTX-031 at 4803, 4804 (Figure 2), and 4805 (Table 1).) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare $[Tyr^9]STh(6\text{–}19)$ based on the teachings of Carpick 1991.

195

- **Albano:** Albano taught that ST analogs without the C-terminal residues Thr-Gly-Cys-Tyr would have significant biological activity. (*See* DTX-026 at 688 (Table 1, Toxin A-2) and Figure 3.) Thus, a POSA would have understood that the proteolytic cleavage site tyrosine should be substituted outside of the central binding region of STh(6–19) and at a position in the N-terminal region to minimize the possibility of a degradant product with significant biological activity. A POSA would have understood that the tyrosine substitution in the N-terminal region of STh(6–19) should be at the position of leucine because tyrosine and leucine have more similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Albano.

- **Wolfe:** Wolfe taught that a COMFA model of ST peptides predicts that "the amide backbone of Cys$^5$-Cys$^6$-Glu$^7$-Leu$^8$, the $\beta$ carbon atoms of Cys$^5$-Cys$^6$, and the sized chains of Pro$^{12}$, Ala$^{13}$, and Ala$^{15}$ comprise the primary interactions of GC-C agonists with the receptor surface." (DTX-061 at 1731.) Wolfe also taught "that the backbone of Cys$^5$-Cys$^6$-Glu$^7$-Leu$^8$ adopts a conformation that tightly interacts with a hydrophobic region of GC-C to achieve maximum potency," and that "[t]he primary site of electrostatic interaction within the model is derived from residue Glu$^7$," whereas "side chain mutations of Leu$^8$ have only minimal effect." (DTX-061 at 1732.) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Wolfe.

391.    Claim 2 of the '036 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

392.    As shown below, combining the knowledge of a POSA with one or more of the teachings of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide having the amino acid sequence recited in claim 2 of the '036

patent:

| | |
|---|---|
| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr[9]]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:31 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr[9]]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claim 2 of the '036 patent would have been obvious to a POSA at the time of the invention.

***

393.     Claim 2 of the '036 patent would have been obvious to a POSA ***in further view*** of Aimoto, Gariepy I, and/or Ikemura (collectively, the "STh(6–19) References"). As previously explained, a POSA would have been motivated to select STh(6–19) as a lead compound. The teachings of the STh(6–19) References described below would have motivated a person or ordinary skill in the art to select STh(6–19) as a lead compound:

**Aimoto:** Aimoto disclosed the amino acid sequence of $ST_h$ and $ST_p$, and that $ST_h$(6–19) comprises the heat-stable and biologically active domain of $ST_h$. (DTX-028 at 321, 326.) Aimoto further taught that $ST_h$(6–19) is resistant to proteinase digestion and is more heat-stable than the full-length peptide. (*Id.* at 324–25.)

**Gariepy I:** Gariepy I disclosed that "[a]ctive fragments of the heat-stable enterotoxin ST I of *Escherichia coli* were chemically synthesized with the sequence Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-(Tyr) and studied by proton ($^1$H NMR) and carbon-13 ($^{13}$C NMR) nuclear magnetic resonance spectroscopy." (*See* DTX-039 at 7854 (Abstract); *see also id.* at 7865.) Gariepy I further disclosed that STh(6-18) and STh(6–19) were chemically synthesized and that "[t]hese analogues contain all the structural information responsible for the toxin's functions." (*Id*. at 7854.)

**Ikemura:** Ikemura disclosed that "[s]ynthetic $ST_h$[5-19] . . . showed the same heat-stability as that of synthetic $ST_h$," but the "toxicity of $ST_h$[5-19] was found to decrease with the duration of heat-treatment." (DTX-046 at 2556.) Ikemura further disclosed that "synthetic STh[6–19] . . . showed higher heat-stability than synthetic or native $ST_h$." (*Id.*) Ikemura reports that the "enhanced structural stability of $ST_h$[6–19] may be due to

197

decreased perturbation of the molecule on heating as a result of loss of the five N-terminal amino acid residues." (*Id*.)

394. Claim 2 of the '036 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

395. As shown below, combining the background knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide having the amino acid sequence recited in asserted claim 2 of the '036 patent:

| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:31 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claim 2 of the '036 patent would have been obvious to a POSA at the time of the invention.

\*\*\*

396. Claim 2 of the '036 patent would have been obvious to a POSA *in further view* of Carpick 1993, Forte and/or Greenberg 1997 (collectively, the "Proteolytic Cleavage Site

198

References"). As previously explained, each of these references disclosed that ST peptides are not sensitive to proteolytic digestion like guanylin and would have motivated a POSA to modify STh(6–19) to insert a proteolytic cleavage site to facilitate the inactivation and degradation of the peptide. The teachings of these references are briefly summarized below:

**Carpick 1993:** Carpick 1993 disclosed that "guanylin is able to inhibit the binding of a radiolabeled ST I analog to rat intestinal cells but causes diarrhea in infant mice only at doses at least 4 orders of magnitude higher than that of ST Ib(6-18)," and that "[t]reatment of guanylin with chymotrypsin or lumenal fluid derived from newborn mouse intestines resulted in a rapid loss of binding activity." (DTX-032 at 4710 (Abstract).) Carpick 1993 reports that "these results suggest that ST I enterotoxins may represent a class of long-lived superagonists of guanylin." (*Id*.) Carpick 1993 further disclosed that guanylin is susceptible to protease digestion at the tyrosine residue. (*Id*. at 4713 ("The tyrosine-alanine segment present in the sequence of guanylin is the only site absent in ST I enterotoxins which represents a segment potentially susceptible to protease digestion (putative chymotryptic site [Fig. 1]). Figure 5A shows that guanylin is rapidly inactivated by chymotrypsin compared with N9P10 guanylin and ST Ib(6-18). Similar results in terms of loss of receptor binding activity were observed . . .. The replacement of Tyr-Ala with Asn-Pro in N9P10 guanylin restored both properties of enterotoxicity and protease resistance.").)

**Greenberg 1997:** Greenberg 1997 disclosed that "guanylin is an ineffective agonist in vivo relative to uroguanylin or STa when these peptides are administered orally to suckling mice because of proteolytic cleavage and inactivation of guanylin by chymotrypsin and possibly by other proteases in the GI tract." (DTX-043 at 280.) Greenberg 1997 taught that: "[u]roguanylin is more closely related in structure to bacterial STas than is guanylin because of the conserved asparagine (Figure 1). In contrast, guanylin peptides have an aromatic residue, tyrosine or phenylalanine, instead of the asparagine (a polar, uncharged residue). This feature of opossum, rat, mouse, and human forms of guanylin makes these peptides sensitive to cleavage and inactivation by chymotrypsin, because aromatic residues in opossum and rat guanylin are cleavage sites for this protease." (*Id*. at 281.)

**Forte:** Forte disclosed that "[t]he asparagine makes uroguanylin and ST peptides quite resistant to attack by chymotrypsin, while guanylin is readily cleaved and inactivated by hydrolysis of peptide bonds COOH-terminal to the tyrosine or phenylalanine residues of guanylin." (DTX-112 at 2.)

397.    Claim 2 of the '036 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of

199

the Proteolytic Cleavage Site References, and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

398.    As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of the Proteolytic Cleavage Site References, and one or more of the [Tyr$^9$]STh(6–19) References results in the amino acid sequence recited in claim 2 of the '036 patent:

| STh(6–19) | **C C E L C C N P A C T G C Y** |
|---|---|
| [Tyr$^9$]STh(6–19) | **C C E _Y_ C C N P A C T G C Y** |
| SEQ ID NO:31 | **C C E _Y_ C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claim 2 of the '036 patent would have been obvious to a POSA at the time of the invention.

### b. Claim 9 of the '036 Patent

399.    Claim 9 of the '036 patent recites:

9.    A pharmaceutical composition comprising: (a) a purified peptide consisting of the amino acid sequence: Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr (SEQ ID NO:31); and (b) a pharmaceutically acceptable carrier or excipient.

200

Claim 9 would have been obvious to a POSA at the time of the invention because it is directed to pharmaceutical compositions of the peptides recited in claim 2.

400.     As previously explained for claim 2 of the '036 patent, the peptides recited in claim 9 of the '036 patent would have been obvious to a POSA at the time of the invention. A POSA would have been motivated to synthesize and purify $[Tyr^9]STh(6–19)$ for use in treating patients with constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation, idiopathic constipation) and would have had more than a reasonable expectation of success in doing so. As explained in Section II(B)(4)(c), a POSA would have been motivated to make a pharmaceutical composition containing an effective amount of $[Tyr^9]STh(6–19)$ and would have had a reasonable expectation of success in doing so.

401.     Therefore, claim 9 of the '036 patent would have been obvious to a POSA at the time of the invention.

### c.   Claims 33, 37, 39, 43, and 44 of the '036 Patent

402.     Claims 33, 37, 39, 43, and 44 of the '036 patent recite:

33.     A method for treating a patient suffering from irritable bowel syndrome, the method comprising administering to the patient an effective of amount of the pharmaceutical composition of claim 9.

37.     The method of any of claims 33-36 wherein the patient is suffering from constipation-predominant irritable bowel syndrome.

39.     A method for treating constipation in a patient, the method comprising administering to the patient an effective amount of the pharmaceutical composition of claim 9.

43.     The method of any of claims 39-42 wherein the patient is suffering from chronic constipation.

44.     The method of any of claims 39-42 wherein the patient is suffering from idiopathic constipation.

201

Claims 33, 37, 39, 43, and 44 would have been obvious to a POSA at the time of the invention because they are directed to methods of treating patients suffering from IBS, C-IBS, constipation, chronic constipation, and idiopathic constipation with an effective amount of the pharmaceutical compositions recited in claim 9.

403.    As previously explained for claim 9 of the '036 patent, a POSA would have been motivated to make a pharmaceutical composition containing an effective amount of [Tyr$^9$]STh(6–19) and would have had a reasonable expectation of success in doing so. As previously explained in Section II(B)(4)(c), a POSA would have reasonably expected that a pharmaceutical composition of [Tyr$^9$]STh(6–19) would be useful in treating patients with constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation,  idiopathtic constipation).

404.    Therefore, claims 33, 37, 39, 43, and 44 of the '036 patent would have been obvious to a POSA at the time of the invention.

### 6.  The Asserted Claims of the '727 Patent Would Have Been Obvious

405.    The asserted claims of the '727 patent are recited below:

> 3.    The method of claim 1 wherein the peptide consists of the amino acid sequence of SEQ ID NO:3.

> 6.     A purified peptide prepared by the method of claim 1.

Claims 3 and 6 of the '727 patent depend from unasserted claim 1 recited below:

> 1.    A method for preparing a purified peptide comprising SEQ ID NO:3, the method comprising:

>> (a) chemically synthesizing a peptide comprising the amino acid sequence of SEQ ID NO:3; and (b) purifying the peptide.

SEQ ID NO:3 in the '727 patent is Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr.

(*See* DTX-003 at Figure 11-1.)

202

406.    As shown below, SEQ ID NO:3 claimed in claims 1, 3, and 6 of the '727 patent is a derivative of STh(6–19) with a tyrosine (Y) residue at the position of leucine (L):

| STh(6–19) | **C C E L C C N P A C T G C Y** |
| SEQ ID NO:3 | **C C E *Y* C C N P A C T G C Y** |

Claims 1, 3, and 6 of the '727 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19) previously described for the reasons explained below.

407.    A POSA at the time of the invention would have been motivated to develop a GC-C agonist as a treatment for patients with constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation, idiopathic constipation) based on the teachings of one or more of the Method of Treatment References. The teachings of these references are briefly summarized below:

- **'097 Patent:** "The major biological actions of guanylin in the intestine are the stimulation of chloride and water secretion and the inhibition of sodium and water absorption. Thus, guanylin should act as a laxative agent for the treatment of constipation. Evidence supporting this proposal is based on the studies cited concerning STa, a structural mimic of guanylin, and data that we have obtained with isolated rat colons." (*See* DTX-109 at 6:21–34.)

- **Nakazato:** "The regulation of intestinal salt and water transport is critical to the maintenance of fluid volume. Control of this life-sustaining activity is mediated by the concerted actions of hormones, neurotransmitters, and locally acting factors. Guanylin and uroguanylin are novel peptides that were first isolated from rat jejunum and opossum urine, respectively. They bind to and activate guanylyl cyclase-C (GC-C) receptors to regulate intestinal and renal fluid and electrolyte transport through the second messenger, cyclic guanosine 3',5'-monophosphate (GMP). Heat-stable enterotoxins [i.e., ST peptides] produced by pathogenic bacteria have close structural similarities to guanylin and uroguanylin, and they use this mimicry to act on GC-C . . ." (*See* DTX-049 at 219.)

- **Shailubhai:** "Binding of these peptide hormones [i.e., uroguanylin, guanylin, lymphoguanylin and bacterial enterotoxin ST] to the GC-C receptor stimulates intracellular production of cyclic guanosine monophosphate (cGMP), resulting in the activation of the

203

cystic fibrosis transmembrane conductance regulator (CFTR), the apical membrane channel for efflux of chloride from enterocytes lining the gastrointestinal (GI) tract. Activation of CFTR chloride channel, and the subsequent enhancement of transepithelial efflux of Cl$^-$ and K$^+$ ions leads to secretion of water into the intestinal lumen." (*See* DTX-057 at 261.) "Water secretion into the lumen of intestine is essential for normal coating of mucin, which protects gastric mucosa from mechanical damage and the harmful effects of acidity in the GI tract . . .. The underproduction of water might result in thick mucus, leading to intestinal blockage or constipation." (*Id*. at 262.)

- **<u>Shailubhai & Currie:</u>** "Binding of uroguanylin or guanylin to the guanylin cyclase receptor stimulates the intracellular production of the cGMP ultimately resulting in the stimulation of salt and water secretion into the intestinal lumen . . .. Uroguanylin has been found to stimulate increases in cyclic GMP levels in a manner similar to another family of heat stable enterotoxins (STs) secreted by pathogenic strains of E. coli . . ." (*See* DTX-024 at 3:13–25.) "Uroguanylin is believed to regulate fluid and electrolyte transport in a manner similar to guanylin and the STs in the GI tract. Therefore, as mentioned in previous publications the human uroguanylin may act as a laxative and be useful in patient [sic] suffering from constipation." (*Id*. at 4:3–8.)

- **<u>Shailubhai '628:</u>** "Uroguanylin, guanylin and bacterial ST peptides are structurally related peptides that bind to a guanylate cyclase receptor and stimulate intracellular production of cyclic guanosine monophosphate (cGMP). This results in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), an apical membrane channel for efflux of chloride from enterocytes lining the intestinal tract. Activation of CFTR and the subsequent enhancement of transepithelial secretion of chloride leads to stimulation of sodium and water secretion into the intestinal lumen. Therefore, by serving as paracrine regulators of CFTR activity, cGMP receptor agonists regulate fluid and electrolyte transport in the GI tract." (DTX-025 at 1 [0003].) "Recent reports have also suggested that the CFTR channel is involved in the transport and maintenance of reduced glutathione, an antioxidant that plays an important role in protecting against inflammation caused by oxidative stress. Enhancement of intracellular levels of cGMP by way of guanylate cyclase activation or by way of inhibition of cGMP-specific phosphodiesterase would be expected to down-regulate these inflammatory stimuli. Thus, uroguanylin-type agonists should be useful in the prevention and treatment of inflammatory diseases of the lung (e.g., asthma), bowel (e.g., ulcerative colitis and Crohn's disease), pancreas and other organs." (*Id*. at 1 [0009].)

- **<u>'670 patent:</u>** "[Human uroguanylin] has been found to stimulate increases in cyclic GMP levels in a manner similar to guanylin and the STs. As such regulator, it is useful for the control of intestinal absorption. It has potential to regulate fluid and electrolyte transport . . .. Human uroguanylin has been further demonstrated to act in an isolated intestinal rat preparation to stimulate an increase in short circuit current. This action is believed to be the physiologic driving force for eliciting chloride secretion and ultimately decreased water absorption. The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation, e.g. cystic fibrosis patients who suffer with severe intestinal

complications from constipation." (*See* DTX-022 at 2:8–12, 16–25.)

- **Greenberg 1997:** "Uroguanylin and guanylin are intestinal peptides that activate a receptor-guanylate cyclase [i.e., GC-C], which is also a receptor for *Escherichia coli* heat-stable enterotoxin (STa). These peptides may have a role in the body's regulation of fluid and electrolytes." (DTX-043 at 276.) "The results of our studies demonstrate that STa exerts its diarrheal effects in the intestine by molecular mimicry, serving as a bacteria-derived member of the peptide family that also contains the intestinal peptides, uroguanylin and guanylin. In addition, the reduced potency of guanylin compared to uroguanylin is caused by its susceptibility to proteases such as chymotrypsin." (*Id*. at 280.)

- **Ewe 1988**: Ewe 1998 taught that constipation and diarrhea result from abnormal intestinal motility and fluid balance. (DTX-036 at 73 (Abstract).) Ewe 1998 disclosed that the small intestine allows for rapid equilibrium of osmolality (*e.g*., water and electrolyte balance), while the large intestine preserves water and electrolytes once they have been absorbed. (*Id*.) Ewe 1998 reports that "[f]ormerly, diarrhea and constipation were attributed to disordered motility" and that "[t]his concept changed in the late 1960s and early 1970s when the secretory effect of cholera toxin was recognized and studied in more detail." (*Id*. at 73.) Ewe 1998 explains that constipation and diarrhea are clinical symptoms of abnormalities in stool frequency and consistency due to a variety of causes. (*Id*. at 74.) Both are caused by abnormalities in intestinal motility and transport of electrolytes and water. (*Id*.) Small abnormalities in absorption and secretion, especially in the distal intestinal area, can lead to constipation or diarrhea. (*Id*.)

- **Sack 1980**: Sack 1980 disclosed that the physiological action of ST is characterized by "[r]apid onset, short-lived hypersecretion." (DTX-116 at 280.) Sack 1980 further explains that: "Strains of ETEC can produce either one or both of the enterotoxins [i.e., LT or ST], depending on the plasmid(s) they carry. It has been shown that the clinical disease caused by strains of ETEC correlated with these types of enterotoxins produced by the isolates. The diarrhea was more severe and of longer duration in persons harboring organisms that produced both LT and ST, as compared with those with organisms producing only ST." (*Id*. at 281.)

- **Beltowski**: "Guanylin and uroguanylin are short peptides homologous to heat-stable enterotoxins of Escherichia coli and other coterie bacteria. Guanylin and uroguanylin are synthetized from the respective preproeptides mainly in gastrointestinal mucosa and are secreted both into intestinal lumen and into the blood. Luminally secreted peptides stimulate chloride and bicarbonate secretion in the intestine through the mechanism involving guanylate cyclase C receptor, cyclic GMP, protein kinase G and cystic fibrosis transmembrane conductance regulator (CFTR) chloride channel." (DTX-133 at Abstract.) Beltowski disclosed that the activity of guanylin and uroguanylin is pH-dependent: "The activity of guanylin and uroguanylin is pH-dependent. In cultured $T_{84}$ cells guanylin is 10-fold more potent in elevating cGMP at pH 8 than at pH *5,* whereas uroguanylin is more potent in acidic than in alkaline conditions. In alkaline environment guanylin is more potent than uroguanylin and the opposite is observed in acidic conditions. STa is slightly more

potent in acidic than in alkaline pH but the difference is not so striking as in the case of endogenous peptides. STa is, however, more potent than either guanylin or uroguanylin in both acidic and alkaline conditions." (DTX-133 at 362.)

- **Giannella 1995:** "The mechanisms of $ST_a$-induced fluid secretion have been extensively studied. When the rat jejunum is perfused in vivo with $ST_a$ (Fig. 2), water transport is rapidly inhibited and net secretion results. With cessation of $ST_a$ perfusion, the transport defect is promptly and totally reversible. Both the onset and offset of $ST_a$ action occurs within minutes . . .. STa-induced secretion occurs via activation of guanylate cyclase and generation of cGMP, which inhibits the coupled influx of Na+ and Cl- and stimulates Cl-secretion. Others have noted the rapid onset of action of $ST_a$, its effects on the colon, and the possible involvement of serotonin and the enteric nervous system." (*See* DTX-042 at 174.) "Recently an endogenous ligand called guanylin has been extracted from mammalian intestine and shown to bind to the $ST_a$ receptor. A similar peptide, called uroguanylin, has been found in human and animal urine. It is likely that guanylin and uroguanylin are indeed endogenous ligands for the $ST_a$ receptor and may be modulators of Cl$^-$ secretion in the intestine, kidney, and perhaps in other organs." (*Id*. at 179.)

408.    A POSA would have been familiar with the background art on ST peptides, guanylin, uroguanylin, and lymphoguanylin described above. As explained in detail in Section II(B)(2), a POSA familiar with this background art would have been motivated to select STh(6–19) as a lead compound for development as a treatment for patients with constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation, idiopathic constipation) for the reasons summarized below:

- ST peptides were known to induce secretion and reduce absorption in the GI tract;

- ST peptides had been extensively studied and the characterization of their structure activity relationship would have provided a POSA with considerable guidance on the properties of potential ST derivatives;

- ST peptides were known to be molecular mimics for both guanylin and uroguanylin, with pH independent activity and enhanced stability in the gut due to their three disulfide bonds; and

- the ST core was known to have a single defined folded conformation and reported to be more heat-stable and resistant to denaturation than the full-length peptide.

409.    A POSA familiar with the background art on ST peptides, guanylin, uroguanylin,

206

and lymphoguanylin would have been motivated to modify STh(6–19) with a tyrosine residue as a proteolytic cleavage site for the reasons explained in Section II(B)(4). As explained in Section II(B)(4), a POSA would have reasonably expected that modifying STh(6–19) with a proteolytic cleavage site, preferably tyrosine, would tune the peptide's activity and facilitate the peptide's inactivation and degradation by proteolytic enzymes to reduce the risk of adverse effects, such as diarrhea.

410.   As previously explained, a POSA familiar with the background art on the structure activity relationship of ST peptides would have understood that: (a) Tyrosine (Tyr) should not be substituted as a proteolytic cleavage site in the central binding region of the ST core because it would potentially disrupt the peptide's ability to bind to the GC-C receptor and significantly reduce the biological activity of the peptide; (b) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site in the N-terminal region of the ST core because cleavage in the C-terminal region of the ST core would likely produce a degradant product with significant biological activity; and (c) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site at the position of leucine in the N-terminal region of the ST core because leucine and tyrosine have similar hydrophilicity and this substitution would be expected to produce a peptide with similar biological activity.

411.   As previously explained, a POSA would have been motivated to substitute tyrosine at the position of leucine in STh(6–19) based on the teachings of Hasegawa, Sato, Carpick 1991, Albano, and/or Wolfe (collectively, the "[$Tyr^9$]STh(6–19) References"). The teachings of these references are briefly summarized below:

- **Handbook of Natural Toxins**: The Handbook of Natural Toxins disclosed that ST1b has also been referred to as STh because it was originally found in *E. coli* isolated from humans. (*See* DTX-044 at 282.) The Handbook of Natural Toxins further disclosed the biological

207

activities of analogs of STh(6–19) with replacements at positions 12, 13, and 14, as well as the biological activities of analogs of STh(6-18) with one or two disulfide bonds. (*See id.* at 283–86 (Tables 1–4).)

- **Lu**: Lu taught that chymotrypsin has a preference for tyrosine over phenylalanine. (DTX-126 at 443 (Table 1).)

- **Hasegawa:** Hasegawa taught an ST derivate with a Pap substitution at the position of leucine will efficiently bind with the GC-C receptor. (*See* DTX-045 at 4 (Figure 2), at 8 (Figure 6) and 9 ("The order of the binding affinity to the receptor protein was reported to be [Pap$^8$]STp(4-17) $\geq$ [Pap$^{15}$]STp(4-17) >> [Pap$^{11}$]STp(4-17).").) A POSA would have understood that Pap is an analog of tyrosine, and that an ST derivative with tyrosine at the position of leucine would efficiently bind to the GC-C receptor. While Hasegawa shows that an aromatic substitution at the position of alanine in the C-terminal region of an ST derivative would also efficiently bind to the GC-C receptor, a POSA would have understood that the proteolytic cleavage site should not be in the C-terminal region because the degradant product(s) would likely have significant biological activity. Moreover, Hasegawa demonstrates that a POSA would have viewed leucine as the preferable position in the N-terminal region of an ST peptide for an aromatic amino acid substitution. (*See* DTX-045 at 2 (Figure 2).) Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Hasegawa.

- **Sato:** Sato taught that the "receptor binding region" of ST peptides "estimated from the spatial arrangement of the atoms is mainly constituted from the side chain and main chain of Asn$^{11}$ and Pro$^{12}$ in addition to Ala$^{13}$, compatible with previous findings that Asn$^{11}$, Pro$^{12}$, and Ala$^{11}$ are the most important residues for the activity and that the toxicity of STp is less affected by substitution of Glu$^7$, Leu$^8$, and Gly$^{16}$, which are located on the opposite side of Ala$^{13}$." (*See* DTX-054 at 8649 (internal citations omitted).) Sato taught further that "the disulfide linkage not found in guanylin corresponds to the bridge in the N-terminal segment of ST that is important for making a rigid pillar, it is considered that the rigidity of the N-terminal segment is important for ST to maintain its enterotoxicity under the severe physiological conditions in intestinal organs of the host animal" because "guanylin is rapidly degraded by components in the intestinal tract of infant mice, whereas ST is strongly resistant to digestion by them." (*Id*. at 8650 (internal citations omitted).) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Sato.

- **Carpick 1991:** Carpick 1991 taught that substitutions in the central turn region of ST(6-18) (i.e., Asn12 to Cys15) "resulted in a large decrease or loss of receptor binding activity" whereas "replacements at other sites showed moderate to slight reductions in biological activity." (*See* DTX-031 at 4803, 4804 (Figure 2), and 4805 (Table 1).) Therefore, a POSA

208

would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Carpick 1991.

- **Albano:** Albano taught that ST analogs without the C-terminal residues Thr-Gly-Cys-Tyr would have significant biological activity. (*See* DTX-026 at 688 (Table 1, Toxin A-2) and Figure 3.) Thus, a POSA would have understood that the proteolytic cleavage site tyrosine should be substituted outside of the central binding region of STh(6–19) and at a position in the N-terminal region to minimize the possibility of a degradant product with significant biological activity. A POSA would have understood that the tyrosine substitution in the N-terminal region of STh(6–19) should be at the position of leucine because tyrosine and leucine have more similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Albano.

- **Wolfe:** Wolfe taught that a COMFA model of ST peptides predicts that "the amide backbone of Cys$^5$-Cys$^6$-Glu$^7$-Leu$^8$, the $\beta$ carbon atoms of Cys$^5$-Cys$^6$, and the sized chains of Pro$^{12}$, Ala$^{13}$, and Ala$^{15}$ comprise the primary interactions of GC-C agonists with the receptor surface." (DTX-061 at 1731.) Wolfe also taught "that the backbone of Cys$^5$-Cys$^6$-Glu$^7$-Leu$^8$ adopts a conformation that tightly interacts with a hydrophobic region of GC-C to achieve maximum potency," and that "[t]he primary site of electrostatic interaction within the model is derived from residue Glu$^7$," whereas "side chain mutations of Leu$^8$ have only minimal effect." (DTX-061 at 1732.) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Wolfe.

412.   Claims 3 and 6 of the '727 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

413.    As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide with SEQ ID NO:3 claimed in claims 3 and 6 of the '727 patent:

| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr$^9$]STh(6–19) | **C C E _Y_ C C N P A C T G C Y** |
| SEQ ID NO:3 | **C C E _Y_ C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to chemically synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claims 3 and 6 of the '727 patent would have been obvious to a POSA at the time of the invention.

***

414.    Claims 3 and 6 of the '727 patent would have been obvious to a POSA **_in further view_** of the STh(6–19) References. As previously explained, a POSA would have been motivated to select STh(6–19) as a lead compound. The teachings of the STh(6–19) References described below would have motivated a person or ordinary skill in the art to select STh(6–19) as a lead compound:

- **Aimoto:** Aimoto disclosed the amino acid sequence of $ST_h$ and $ST_p$, and that $ST_h$(6–19) comprises the heat-stable and biologically active domain of $ST_h$. (DTX-028 at 321, 326.) Aimoto further taught that $ST_h$(6–19) is resistant to proteinase digestion and is more heat-stable than the full-length peptide. (_Id._ at 324–25.)

- **Gariepy I:** Gariepy I disclosed that "[a]ctive fragments of the heat-stable enterotoxin ST I of _Escherichia coli_ were chemically synthesized with the sequence Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-(Tyr) and studied by proton ($^1$H NMR) and carbon-13 ($^{13}$C NMR) nuclear magnetic resonance spectroscopy." (_See_ DTX-039 at 7854 (Abstract); _see also id._ at 7865.) Gariepy I further disclosed that STh(6-18) and STh(6–19) were chemically synthesized and that "[t]hese analogues contain all the structural information responsible for the toxin's functions." (_Id_. at 7854.)

- **Ikemura:** Ikemura disclosed that "[s]ynthetic $ST_h$[5-19] . . . showed the same heat-stability as that of synthetic $ST_h$," but the "toxicity of $ST_h$[5-19] was found to decrease with

the duration of heat-treatment." (DTX-046 at 2556.) Ikemura further disclosed that "synthetic STh[6–19] . . . showed higher heat-stability than synthetic or native ST$_h$." *Id.* Ikemura reports that the "enhanced structural stability of ST$_h$[6–19] may be due to decreased perturbation of the molecule on heating as a result of loss of the five N-terminal amino acid residues." (*Id.*)

415.    Claims 3 and 6 of the '727 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

416.    As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide with SEQ ID NO:3 claimed in claims 3 and 6 of the '727 patent:

| STh(6–19) | **C C E L C C N P A C T G C Y** |
|---|---|
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:3 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claims 3 and 6 of the '727 patent would have been obvious to a POSA at the time of the invention.

***

417.    Claims 3 and 6 of the '727 patent would have been obvious to a POSA ***in further***

211

*view* of the Proteolytic Cleavage Site References. As explained, each of these references disclosed that ST peptides are not sensitive to proteolytic digestion like guanylin and would have motivated a POSA to modify STh(6–19) to insert a proteolytic cleavage site to facilitate the inactivation and degradation of the peptide. The teachings of these references are briefly summarized below:

- **Carpick 1993:** Carpick 1993 disclosed that "guanylin is able to inhibit the binding of a radiolabeled ST I analog to rat intestinal cells but causes diarrhea in infant mice only at doses at least 4 orders of magnitude higher than that of ST Ib(6-18)," and that "[t]reatment of guanylin with chymotrypsin or lumenal fluid derived from newborn mouse intestines resulted in a rapid loss of binding activity." (DTX-032 at 4710 (Abstract).) Carpick 1993 reports that "these results suggest that ST I enterotoxins may represent a class of long-lived superagonists of guanylin." (*Id.*) Carpick 1993 further disclosed that guanylin is susceptible to protease digestion at the tyrosine residue. (*Id.* at 4713 ("The tyrosine-alanine segment present in the sequence of guanylin is the only site absent in ST I enterotoxins which represents a segment potentially susceptible to protease digestion (putative chymotryptic site [Fig. 1])[.] Figure 5A shows that guanylin is rapidly inactivated by chymotrypsin compared with N9P10 guanylin and ST Ib(6-18). Similar results in terms of loss of receptor binding activity were observed . . .. The replacement of Tyr-Ala with Asn-Pro in N9P10 guanylin restored both properties of enterotoxicity and protease resistance.").)

- **Greenberg 1997:** Greenberg 1997 disclosed that "guanylin is an ineffective agonist in vivo relative to uroguanylin or STa when these peptides are administered orally to suckling mice because of proteolytic cleavage and inactivation of guanylin by chymotrypsin and possibly by other proteases in the GI tract." (DTX-043 at 280.) Greenberg 1997 taught that: "[u]roguanylin is more closely related in structure to bacterial STas than is guanylin because of the conserved asparagine (Figure 1). In contrast, guanylin peptides have an aromatic residue, tyrosine or phenylalanine, instead of the asparagine (a polar, uncharged residue). This feature of opossum, rat, mouse, and human forms of guanylin makes these peptides sensitive to cleavage and inactivation by chymotrypsin, because aromatic residues in opossum and rat guanylin are cleavage sites for this protease." (*Id.* at 281.)

- **Forte:** Forte disclosed that "[t]he asparagine makes uroguanylin and ST peptides quite resistant to attack by chymotrypsin, while guanylin is readily cleaved and inactivated by hydrolysis of peptide bonds COOH-terminal to the tyrosine or phenylalanine residues of guanylin." (DTX-112 at 2.)

418.    Claims 3 and 6 of the '727 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of

212

the Proteolytic Cleavage Site References, and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

419.    As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of the Proteolytic Cleavage Site References, and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide with SEQ ID NO:3 claimed in claims 3 and 6 of the '727 patent:

| | |
|---|---|
| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:3 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to chemically synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claims 3 and 6 of the '727 patent would have been obvious to POSA at the time of the invention.

### 7.   The Asserted Claims of the '947 Patent Would Have Been Obvious

#### a.   Claims 2 and 4 of the '947 Patent

420.    Asserted claims 2 and 4 of the '947 patent are recited below:

2.    The polypeptide of claim 1 consisting of the amino acid sequence Cys Cys Glu Xaa Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr wherein Xaa is selected from Phe, Trp or Tyr (SEQ ID NO:125).

4.    The polypeptide according to claim 2, which is purified.

(*See* DTX-005 at 85:16–86:33.) As shown below, the amino acid sequence recited in claim 2 encompass derivatives of STh(6–19) with phenylalanine (Phe, F), tryptophan (TRP, W) or tyrosine (Tyr, Y) residues at the position of leucine (L):

| | |
|---|---|
| STh(6–19) | **C C E L C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *F* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *W* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *Y* C C N P A C T G C Y** |

Claims 2 and 4 of the '947 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References and one or more of the [Tyr[9]]STh(6–19) References previously described for the reasons explained below.

421.    At the time of the invention, a POSA would have been motivated to develop a GC-C agonist as a treatment for treatment for patients with constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation, idiopathic constipation) based on the teachings of the Method of Treatment References. The teachings of these references are briefly summarized below:

- **'097 Patent:** "The major biological actions of guanylin in the intestine are the stimulation of chloride and water secretion and the inhibition of sodium and water absorption. Thus, guanylin should act as a laxative agent for the treatment of constipation. Evidence supporting this proposal is based on the studies cited concerning STa, a structural mimic of guanylin, and data that we have obtained with isolated rat colons." (*See* DTX-109 at 6:21–34.)

- **Nakazato:** "The regulation of intestinal salt and water transport is critical to the maintenance of fluid volume. Control of this life-sustaining activity is mediated by the concerted actions of hormones, neurotransmitters, and locally acting factors. Guanylin and uroguanylin are novel peptides that were first isolated from rat jejunum and opossum urine, respectively. They bind to and activate guanylyl cyclase-C (GC-C) receptors to regulate intestinal and renal fluid and electrolyte transport through the second messenger, cyclic guanosine 3',5'-monophosphate (GMP). Heat-stable enterotoxins [i.e., ST peptides] produced by pathogenic bacteria have close structural similarities to guanylin and uroguanylin, and they use this mimicry to act on GC-C . . ." (*See* DTX-049 at 219.)

- **Shailubhai:** "Binding of these peptide hormones [i.e., uroguanylin, guanylin,

214

lymphoguanylin and bacterial enterotoxin ST] to the GC-C receptor stimulates intracellular production of cyclic guanosine monophosphate (cGMP), resulting in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), the apical membrane channel for efflux of chloride from enterocytes lining the gastrointestinal (GI) tract. Activation of CFTR chloride channel, and the subsequent enhancement of transepithelial efflux of $Cl^-$ and $K^+$ ions leads to secretion of water into the intestinal lumen." (*See* DTX-057 at 261.) "Water secretion into the lumen of intestine is essential for normal coating of mucin, which protects gastric mucosa from mechanical damage and the harmful effects of acidity in the GI tract . . .. The underproduction of water might result in thick mucus, leading to intestinal blockage or constipation." (*Id*. at 262.)

- **Shailubhai & Currie:** "Binding of uroguanylin or guanylin to the guanylin cyclase receptor stimulates the intracellular production of the cGMP ultimately resulting in the stimulation of salt and water secretion into the intestinal lumen . . .. Uroguanylin has been found to stimulate increases in cyclic GMP levels in a manner similar to another family of heat stable enterotoxins (STs) secreted by pathogenic strains of E. coli . . ." (*See* DTX-024 at 3:13–25.) "Uroguanylin is believed to regulate fluid and electrolyte transport in a manner similar to guanylin and the STs in the GI tract. Therefore, as mentioned in previous publications the human uroguanylin may act as a laxative and be useful in patient [sic] suffering from constipation." (*Id*. at 4:3–8.)

- **Shailubhai '628:** "Uroguanylin, guanylin and bacterial ST peptides are structurally related peptides that bind to a guanylate cyclase receptor and stimulate intracellular production of cyclic guanosine monophosphate (cGMP). This results in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), an apical membrane channel for efflux of chloride from enterocytes lining the intestinal tract. Activation of CFTR and the subsequent enhancement of transepithelial secretion of chloride leads to stimulation of sodium and water secretion into the intestinal lumen. Therefore, by serving as paracrine regulators of CFTR activity, cGMP receptor agonists regulate fluid and electrolyte transport in the GI tract." (DTX-025 at 1 [0003]). "Recent reports have also suggested that the CFTR channel is involved in the transport and maintenance of reduced glutathione, an antioxidant that plays an important role in protecting against inflammation caused by oxidative stress. Enhancement of intracellular levels of cGMP by way of guanylate cyclase activation or by way of inhibition of cGMP-specific phosphodiesterase would be expected to down-regulate these inflammatory stimuli. Thus, uroguanylin-type agonists should be useful in the prevention and treatment of inflammatory diseases of the lung (e.g., asthma), bowel (e.g., ulcerative colitis and Crohn's disease), pancreas and other organs." (*Id*. at 1 [0009].)

- **'670 patent:** "[Human uroguanylin] has been found to stimulate increases in cyclic GMP levels in a manner similar to guanylin and the STs. As such regulator, it is useful for the control of intestinal absorption. It has potential to regulate fluid and electrolyte transport . . .. Human uroguanylin has been further demonstrated to act in an isolated intestinal rat preparation to stimulate an increase in short circuit current. This action is believed to be the physiologic driving force for eliciting chloride secretion and ultimately decreased water

absorption. The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation, e.g. cystic fibrosis patients who suffer with severe intestinal complications from constipation." (*See* DTX-022 at 2:8–12, 16–25.)

- **Greenberg 1997:** "Uroguanylin and guanylin are intestinal peptides that activate a receptor-guanylate cyclase [i.e., GC-C], which is also a receptor for *Escherichia coli* heat-stable enterotoxin (STa). These peptides may have a role in the body's regulation of fluid and electrolytes." (DTX-043 at 276.) "The results of our studies demonstrate that STa exerts its diarrheal effects in the intestine by molecular mimicry, serving as a bacteria-derived member of the peptide family that also contains the intestinal peptides, uroguanylin and guanylin. In addition, the reduced potency of guanylin compared to uroguanylin is caused by its susceptibility to proteases such as chymotrypsin." (*Id.* at 280.)

- **Ewe 1988**: Ewe 1998 taught that constipation and diarrhea result from abnormal intestinal motility and fluid balance. (DTX-036 at 73 (Abstract).) Ewe 1998 disclosed that the small intestine allows for rapid equilibrium of osmolality (*e.g.*, water and electrolyte balance), while the large intestine preserves water and electrolytes once they have been absorbed. (*Id.*) Ewe 1998 reports that "[f]ormerly, diarrhea and constipation were attributed to disordered motility" and that "[t]his concept changed in the late 1960s and early 1970s when the secretory effect of cholera toxin was recognized and studied in more detail." (*Id.* at 73.) Ewe 1998 explains that constipation and diarrhea are clinical symptoms of abnormalities in stool frequency and consistency due to a variety of causes. (*Id.* at 74.) Both are caused by abnormalities in intestinal motility and transport of electrolytes and water. (*Id.*) Small abnormalities in absorption and secretion, especially in the distal intestinal area, can lead to constipation or diarrhea. (*Id.*)

- **Sack 1980**: Sack 1980 disclosed that the physiological action of ST is characterized by "[r]apid onset, short-lived hypersecretion." (DTX-116 at 280.) Sack 1980 further explains that: "Strains of ETEC can produce either one or both of the enterotoxins [i.e., LT or ST], depending on the plasmid(s) they carry. It has been shown that the clinical disease caused by strains of ETEC correlated with these types of enterotoxins produced by the isolates. The diarrhea was more severe and of longer duration in persons harboring organisms that produced both LT and ST, as compared with those with organisms producing only ST." (*Id.* at 281.)

- **Beltowski**: "Guanylin and uroguanylin are short peptides homologous to heat-stable enterotoxins of Escherichia coli and other coterie bacteria. Guanylin and uroguanylin are synthetized from the respective preproeptides mainly in gastrointestinal mucosa and are secreted both into intestinal lumen and into the blood. Luminally secreted peptides stimulate chloride and bicarbonate secretion in the intestine through the mechanism involving guanylate cyclase C receptor, cyclic GMP, protein kinase G and cystic fibrosis transmembrane conductance regulator (CFTR) chloride channel." (DTX-133 at Abstract.) Beltowski disclosed that the activity of guanylin and uroguanylin is pH-dependent: "The activity of guanylin and uroguanylin is pH-dependent. In cultured $T_{84}$ cells guanylin is 10-fold more potent in elevating cGMP at pH 8 than at pH 5, whereas uroguanylin is more

potent in acidic than in alkaline conditions. In alkaline environment guanylin is more potent than uroguanylin and the opposite is observed in acidic conditions. STa is slightly more potent in acidic than in alkaline pH but the difference is not so striking as in the case of endogenous peptides. STa is, however, more potent than either guanylin or uroguanylin in both acidic and alkaline conditions." (DTX-133 at 362.)

- **Giannella 1995:** "The mechanisms of $ST_a$-induced fluid secretion have been extensively studied. When the rat jejunum is perfused in vivo with $ST_a$ (Fig. 2), water transport is rapidly inhibited and net secretion results. With cessation of $ST_a$ perfusion, the transport defect is promptly and totally reversible. Both the onset and offset of $ST_a$ action occurs within minutes . . .. STa-induced secretion occurs via activation of guanylate cyclase and generation of cGMP, which inhibits the coupled influx of Na+ and Cl- and stimulates Cl- secretion. Others have noted the rapid onset of action of $ST_a$, its effects on the colon, and the possible involvement of serotonin and the enteric nervous system." (*See* DTX-042 at 174.) "Recently an endogenous ligand called guanylin has been extracted from mammalian intestine and shown to bind to the $ST_a$ receptor. A similar peptide, called uroguanylin, has been found in human and animal urine. It is likely that guanylin and uroguanylin are indeed endogenous ligands for the $ST_a$ receptor and may be modulators of Cl$^-$ secretion in the intestine, kidney, and perhaps in other organs." (*Id*. at 179.)

422.   A POSA would have been familiar with the background art on ST peptides, guanylin, uroguanylin, and lymphoguanylin described above. As explained in detail in Section II(B)(2), a POSA familiar with this background art would have been motivated to select STh(6–19) as a lead compound for development as a treatment for IBS-C and chronic constipation for the reasons summarized below:

- ST peptides were known to induce secretion and reduce absorption in the GI tract;

- ST peptides had been extensively studied and the characterization of their structure activity relationship would have provided a POSA with considerable guidance on the properties of potential ST derivatives;

- ST peptides were known to be molecular mimics for both guanylin and uroguanylin, with pH independent activity and enhanced stability in the gut due to their three disulfide bonds; and

- the ST core was known to have a single defined folded conformation and reported to be more heat-stable and resistant to denaturation than the full-length peptide.

423.   A POSA familiar with the background art on ST peptides, guanylin, uroguanylin,

217

and lymphoguanylin would have been motivated to modify STh(6–19) with a tyrosine residue as a proteolytic cleavage site for the reasons explained in Section II(B)(4). As previously explained in Section II(B)(4), a POSA would have reasonably expected that modifying STh(6–19) with a proteolytic cleavage site, preferably tyrosine, would tune the peptide's activity and facilitate the peptide's inactivation and degradation by proteolytic enzymes to reduce the risk of adverse effects, such as diarrhea.

424.    As previously explained, a POSA familiar with the background art on the structure activity relationship of ST peptides would have understood that: (a) Tyrosine (Tyr) should not be substituted as a proteolytic cleavage site in the central binding region of ST core because it would potentially disrupt the peptide's ability to bind to the GC-C receptor and significantly reduce the biological activity of the peptide; (b) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site in the N-terminal region of ST core because cleavage in the C-terminal region of the ST core would likely produce a degradant product with significant biological activity; and (c) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site at the position of leucine in the N-terminal region of ST core because leucine and tyrosine have similar hydrophilicity and this substitution would be expected to produce a peptide with similar biological activity.

425.    As previously explained, a POSA would have been motivated to substitute tyrosine at the position of leucine in STh(6–19) based on the teachings of Hasegawa, Sato, Carpick 1991, Albano, and/or Wolfe (collectively, the "[Tyr$^9$]STh(6–19) References"). The teachings of these references are briefly summarized below:

- **Handbook of Natural Toxins**: The Handbook of Natural Toxins disclosed that ST1b has also been referred to as STh because it was originally found in *E. coli* isolated from humans. (*See* DTX-044 at 282.) The Handbook of Natural Toxins further disclosed the biological

218

activities of analogs of STh(6–19) with replacements at positions 12, 13, and 14, as well as the biological activities of analogs of STh(6-18) with one or two disulfide bonds. (*See id.* at 283–86 (Tables 1–4).)

- **Lu**: Lu taught that chymotrypsin has a preference for tyrosine over phenylalanine. (DTX-126 at 443 (Table 1).)

- **Hasegawa:** Hasegawa taught an ST derivate with a Pap substitution at the position of leucine will efficiently bind with the GC-C receptor. (*See* DTX-045 at 4 (Figure 2), 8 (Figure 6), and 9 ("The order of the binding affinity to the receptor protein was reported to be [Pap$^8$]STp(4-17) ≥ [Pap$^{15}$]STp(4-17) >> [Pap$^{11}$]STp(4-17).").) A POSA would have understood that Pap is an analog of tyrosine, and that an ST derivative with tyrosine at the position of leucine would efficiently bind to the GC-C receptor. While Hasegawa shows that an aromatic substitution at the position of alanine in the C-terminal region of an ST derivative would also efficiently bind to the GC-C receptor, a POSA would have understood that the proteolytic cleavage site should not be in the C-terminal region because the degradant product(s) would likely have significant biological activity. Moreover, Hasegawa demonstrates that a POSA would have viewed leucine as the preferable position in the N-terminal region of an ST peptide for an aromatic amino acid substitution. (*See* DTX-045 at 2 (Figure 2).) Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Hasegawa.

- **Sato:** Sato taught that the "receptor binding region" of ST peptides "estimated from the spatial arrangement of the atoms is mainly constituted from the side chain and main chain of Asn$^{11}$ and Pro$^{12}$ in addition to Ala$^{13}$, compatible with previous findings that Asn$^{11}$, Pro$^{12}$, and Ala$^{11}$ are the most important residues for the activity and that the toxicity of STp is less affected by substitution of Glu$^7$, Leu$^8$, and Gly$^{16}$, which are located on the opposite side of Ala$^{13}$." (*See* DTX-054 at 8649 (internal citations omitted).) Sato taught further that "the disulfide linkage not found in guanylin corresponds to the bridge in the N-terminal segment of ST that is important for making a rigid pillar, it is considered that the rigidity of the N-terminal segment is important for ST to maintain its enterotoxicity under the severe physiological conditions in intestinal organs of the host animal" because "guanylin is rapidly degraded by components in the intestinal tract of infant mice, whereas ST is strongly resistant to digestion by them." (*Id.* at 8650 (internal citations omitted).) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Sato.

- **Carpick 1991:** Carpick 1991 taught that substitutions in the central turn region of ST(6-18) (i.e., Asn12 to Cys15) "resulted in a large decrease or loss of receptor binding activity" whereas "replacements at other sites showed moderate to slight reductions in biological activity." (*See* DTX-031 at 4803, 4804 (Figure 2), and 4805 (Table 1).) Therefore, a POSA

219

would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Carpick 1991.

- **Albano:** Albano taught that ST analogs without the C-terminal residues Thr-Gly-Cys-Tyr would have significant biological activity. (*See* DTX-026 at 688 (Table 1, Toxin A-2) and Figure 3.) Thus, a POSA would have understood that the proteolytic cleavage site tyrosine should be substituted outside of the central binding region of STh(6–19) and at a position in the N-terminal region to minimize the possibility of a degradant product with significant biological activity. A POSA would have understood that the tyrosine substitution in the N-terminal region of STh(6–19) should be at the position of leucine because tyrosine and leucine have more similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Albano.

- **Wolfe:** Wolfe taught that a COMFA model of ST peptides predicts that "the amide backbone of Cys$^5$-Cys$^6$-Glu$^7$-Leu$^8$, the $\beta$ carbon atoms of Cys$^5$-Cys$^6$, and the sized chains of Pro$^{12}$, Ala$^{13}$, and Ala$^{15}$ comprise the primary interactions of GC-C agonists with the receptor surface." (DTX-061 at 1731.) Wolfe also taught "that the backbone of Cys$^5$-Cys$^6$-Glu$^7$-Leu$^8$ adopts a conformation that tightly interacts with a hydrophobic region of GC-C to achieve maximum potency," and that "[t]he primary site of electrostatic interaction within the model is derived from residue Glu$^7$," whereas "side chain mutations of Leu$^8$ have only minimal effect." (DTX-061 at 1732.) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine. Thus, a POSA would have been motivated to prepare [Tyr$^9$]STh(6–19) based on the teachings of Wolfe.

426.     Claims 2 and 4 of the '947 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19) References. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

427.     As shown below, combining the knowledge of a POSA with the teachings of one

or more of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19)

References results in a peptide having an amino acid sequence claimed in asserted claims 2 and 4

of the '947 patent:

| | |
|---|---|
| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *F* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *W* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *Y* C C N P A C T G C Y** |

As explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19)

and a POSA would have had more than a reasonable expectation of success in doing so. Thus,

claims 2 and 4 of the '947 patent would have been obvious to a POSA at the time of the invention.

\*\*\*

428.    Claims 2 and 4 of the '947 patent would have been obvious to a POSA *in further*

*view* of the STh(6–19) References. As previously explained, a POSA would have been motivated

to select STh(6–19) as a lead compound. The teachings of the STh(6–19) References described

below would have motivated a person or ordinary skill in the art to select STh(6–19) as a lead

compound:

- **Aimoto:** Aimoto disclosed the amino acid sequence of ST$_h$ and ST$_p$, and that ST$_h$(6–19) comprises the heat-stable and biologically active domain of ST$_h$. (DTX-028 at 321, 326.) Aimoto further taught that ST$_h$(6–19) is resistant to proteinase digestion and is more heat-stable than the full-length peptide. (*Id.* at 324–25.)

- **Gariepy I:** Gariepy I disclosed that "[a]ctive fragments of the heat-stable enterotoxin ST I of *Escherichia coli* were chemically synthesized with the sequence Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-(Tyr) and studied by proton ($^1$H NMR) and carbon-13 ($^{13}$C NMR) nuclear magnetic resonance spectroscopy." (*See* DTX-039 at 7854 (Abstract); *see also id.* at 7865.) Gariepy I further disclosed that STh(6-18) and STh(6–19) were chemically synthesized and that "[t]hese analogues contain all the structural information responsible for the toxin's functions." (*Id.* at 7854.)

- **Ikemura:** Ikemura disclosed that "[s]ynthetic ST$_h$[5-19] . . . showed the same heat-stability as that of synthetic ST$_h$," but the "toxicity of ST$_h$[5-19] was found to decrease with

221

the duration of heat-treatment." (DTX-046 at 2556.) Ikemura further disclosed that "synthetic STh[6–19] . . . showed higher heat-stability than synthetic or native $ST_h$." (*Id.*) Ikemura reports that the "enhanced structural stability of $ST_h[6–19]$ may be due to decreased perturbation of the molecule on heating as a result of loss of the five N-terminal amino acid residues." (*Id.*)

429.    Claims 2 and 4 of the '947 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

430.    As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide having one of the amino acid sequences claimed in asserted claims 2 and 4 of the '947 patent:

| | |
|---|---|
| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *F* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *W* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claims 2 and 4 of the '947 patent would have been obvious to a POSA at the time of the invention.

***

222

431.    Claims 2 and 4 of the '947 patent would have been obvious to a POSA *in further view* of the Proteolytic Cleavage Site References. As previously explained, each of these references disclosed that ST peptides are not sensitive to proteolytic digestion like guanylin and would have motivated a POSA to modify STh(6–19) to insert a proteolytic cleavage site to facilitate the inactivation and degradation of the peptide. The teachings of these references are briefly summarized below:

- **Aimoto:** Aimoto disclosed the amino acid sequence of $ST_h$ and $ST_p$, and that $ST_h(6–19)$ comprises the heat-stable and biologically active domain of $ST_h$. (DTX-028 at 321, 326.) Aimoto further taught that $ST_h(6–19)$ is resistant to proteinase digestion and is more heat-stable than the full-length peptide. (*Id.* at 324–25.)

- **Gariepy I:** Gariepy I disclosed that "[a]ctive fragments of the heat-stable enterotoxin ST I of *Escherichia coli* were chemically synthesized with the sequence Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-(Tyr) and studied by proton ($^1$H NMR) and carbon-13 ($^{13}$C NMR) nuclear magnetic resonance spectroscopy." (*See* DTX-039 at 7854 (Abstract); *see also id.* at 7865.) Gariepy I further disclosed that STh(6-18) and STh(6–19) were chemically synthesized and that "[t]hese analogues contain all the structural information responsible for the toxin's functions." (*Id.* at 7854.)

- **Ikemura:** Ikemura disclosed that "[s]ynthetic $ST_h[5-19]$ . . . showed the same heat-stability as that of synthetic $ST_h$," but the "toxicity of $ST_h[5-19]$ was found to decrease with the duration of heat-treatment." (DTX-046 at 2556.) Ikemura further disclosed that "synthetic STh[6–19] . . . showed higher heat-stability than synthetic or native $ST_h$." (*Id.*) Ikemura reports that the "enhanced structural stability of $ST_h[6–19]$ may be due to decreased perturbation of the molecule on heating as a result of loss of the five N-terminal amino acid residues." (*Id.*)

432.    Claims 2 and 4 of the '947 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of the Proteolytic Cleavage Site References, and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been

motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

433.    As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of the Proteolytic Cleavage Site References, and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide having one of the amino acid sequences claimed in asserted claims 2 and 4 of the '947 patent:

| STh(6–19) | **C C E L C C N P A C T G C Y** |
|---|---|
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *F* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *W* C C N P A C T G C Y** |
| SEQ ID NO:125 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claims 2 and 4 of the '947 patent would have been obvious to a POSA at the time of the invention.

**b.  Claim 14 of the '947 Patent**

434.    Asserted claim 14 of the '947 patent is recited below:

14.    A pharmaceutical composition comprising the polypeptide of claim 2 and a pharmaceutically acceptable carrier or excipient.

(*See* DTX-005 at 86:31–33.) Claim 14 would have been obvious to a POSA at the time of the invention because it is directed to pharmaceutical compositions of the peptides recited in claim 2.

435.    As previously explained for claim 2 of the '947 patent, at least one of the peptides claimed in claim 2 of the '947 patent (i.e., [Tyr$^9$]STh(6–19)) would have been obvious to a POSA

at the time of the invention. A POSA would have been motivated to synthesize and purify [Tyr$^9$]STh(6–19) for use in treating patients with constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation, idiopathic constipation). A POSA would have been motivated to make a pharmaceutical composition of [Tyr$^9$]STh(6–19) because the peptide would need to be packaged, shipped, stored, and administered to be useful in treating patients with constipation-related disorders, such as chronic constipation and IBS-C. As previously explained, a POSA would have been motivated to make a pharmaceutical composition containing an effective amount of [Tyr$^9$]STh(6–19) and would have had a reasonable expectation of success in doing so.

436.    Therefore, claim 14 of the '947 patent would have been obvious to a POSA at the time of the invention.

### 8. The Asserted Claims of the '526 Patent Would Have Been Obvious

#### a. Claim 1 of the '526 Patent

437.    Asserted claim 1 of the '526 patent recites:

> 1.    A peptide consisting of the amino acid sequence Cys$_6$ Cys$_7$ Glu$_8$ Tyr$_9$ Cys$_{10}$Cys$_{11}$ Asn$_{12}$ Pro$_{13}$ Ala$_{14}$ Cys$_{15}$ Thr$_{16}$ Gly$_{17}$Cys$_{18}$ Tyr$_{19}$ (SEQ ID NO: 31), wherein disulfide bonds are present between Cys$_6$-Cys$_{11}$, Cys$_7$-Cys$_{15}$, and Cys$_{10}$-Cys$_{18}$.

(*See* DTX-009 at 83:20–25.) As shown below, the amino acid sequence recited in claim 1 is a derivative of STh(6–19) with a tyrosine (Y) residue at the position of leucine (L):

> STh(6–19)          **C C E L C C N P A C T G C Y**
> SEQ ID NO:31    **C C E *Y* C C N P A C T G C Y**

The disulfide bonds recited in claim 1 are in the same relative positions as the disulfide bonds in STh(6–19). (*See* DTX-044 at 282.) Claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with

225

one or more of the Method of Treatment References and one or more of the [Tyr$^9$]STh(6–19)

References previously described for the reasons explained below.

438.   A POSA at the time of the invention would have been motivated to develop a GC-C agonist as a treatment for patients with constipation-related disorders (e.g., IBS, IBS-C, constipation, chronic constipation, idiopathic constipation) based on the teachings of the Method of Treatment References. The teachings of these references are briefly summarized below:

- **'097 Patent:** "The major biological actions of guanylin in the intestine are the stimulation of chloride and water secretion and the inhibition of sodium and water absorption. Thus, guanylin should act as a laxative agent for the treatment of constipation. Evidence supporting this proposal is based on the studies cited concerning STa, a structural mimic of guanylin, and data that we have obtained with isolated rat colons." (*See* DTX-109 at 6:21–34.)

- **Nakazato:** "The regulation of intestinal salt and water transport is critical to the maintenance of fluid volume. Control of this life-sustaining activity is mediated by the concerted actions of hormones, neurotransmitters, and locally acting factors. Guanylin and uroguanylin are novel peptides that were first isolated from rat jejunum and opossum urine, respectively. They bind to and activate guanylyl cyclase-C (GC-C) receptors to regulate intestinal and renal fluid and electrolyte transport through the second messenger, cyclic guanosine 3',5'-monophosphate (GMP). Heat-stable enterotoxins [i.e., ST peptides] produced by pathogenic bacteria have close structural similarities to guanylin and uroguanylin, and they use this mimicry to act on GC-C . . ." (*See* DTX-049 at 219.)

- **Shailubhai:** "Binding of these peptide hormones [i.e., uroguanylin, guanylin, lymphoguanylin and bacterial enterotoxin ST] to the GC-C receptor stimulates intracellular production of cyclic guanosine monophosphate (cGMP), resulting in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), the apical membrane channel for efflux of chloride from enterocytes lining the gastrointestinal (GI) tract. Activation of CFTR chloride channel, and the subsequent enhancement of transepithelial efflux of Cl$^-$ and K$^+$ ions leads to secretion of water into the intestinal lumen." (*See* DTX-057 at 261.) "Water secretion into the lumen of intestine is essential for normal coating of mucin, which protects gastric mucosa from mechanical damage and the harmful effects of acidity in the GI tract . . .. The underproduction of water might result in thick mucus, leading to intestinal blockage or constipation." (*Id*. at 262.)

- **Shailubhai & Currie:** "Binding of uroguanylin or guanylin to the guanylin cyclase receptor stimulates the intracellular production of the cGMP ultimately resulting in the stimulation of salt and water secretion into the intestinal lumen . . .. Uroguanylin has been found to stimulate increases in cyclic GMP levels in a manner similar to another family of

226

heat stable enterotoxins (STs) secreted by pathogenic strains of E. coli . . ." (*See* DTX-024 at 3:13–25.) "Uroguanylin is believed to regulate fluid and electrolyte transport in a manner similar to guanylin and the STs in the GI tract. Therefore, as mentioned in previous publications the human uroguanylin may act as a laxative and be useful in patient [sic] suffering from constipation." (*Id*. at 4:3–8.)

- **Shailubhai '628:** "Uroguanylin, guanylin and bacterial ST peptides are structurally related peptides that bind to a guanylate cyclase receptor and stimulate intracellular production of cyclic guanosine monophosphate (cGMP). This results in the activation of the cystic fibrosis transmembrane conductance regulator (CFTR), an apical membrane channel for efflux of chloride from enterocytes lining the intestinal tract. Activation of CFTR and the subsequent enhancement of transepithelial secretion of chloride leads to stimulation of sodium and water secretion into the intestinal lumen. Therefore, by serving as paracrine regulators of CFTR activity, cGMP receptor agonists regulate fluid and electrolyte transport in the GI tract." (DTX-025 at 1 [0003]). "Recent reports have also suggested that the CFTR channel is involved in the transport and maintenance of reduced glutathione, an antioxidant that plays an important role in protecting against inflammation caused by oxidative stress. Enhancement of intracellular levels of cGMP by way of guanylate cyclase activation or by way of inhibition of cGMP-specific phosphodiesterase would be expected to down-regulate these inflammatory stimuli. Thus, uroguanylin-type agonists should be useful in the prevention and treatment of inflammatory diseases of the lung (e.g., asthma), bowel (e.g., ulcerative colitis and Crohn's disease), pancreas and other organs." (*Id*. at 1 [0009].)

- **'670 patent:** "[Human uroguanylin] has been found to stimulate increases in cyclic GMP levels in a manner similar to guanylin and the STs. As such regulator, it is useful for the control of intestinal absorption. It has potential to regulate fluid and electrolyte transport . . .. Human uroguanylin has been further demonstrated to act in an isolated intestinal rat preparation to stimulate an increase in short circuit current. This action is believed to be the physiologic driving force for eliciting chloride secretion and ultimately decreased water absorption. The human uroguanylin may thus act as a laxative and be useful in patients suffering from constipation, e.g. cystic fibrosis patients who suffer with severe intestinal complications from constipation." (*See* DTX-022 at 2:8–12, 16–25.)

- **Greenberg 1997:** "Uroguanylin and guanylin are intestinal peptides that activate a receptor-guanylate cyclase [i.e., GC-C], which is also a receptor for *Escherichia coli* heat-stable enterotoxin (STa). These peptides may have a role in the body's regulation of fluid and electrolytes." (DTX-043 at 276.) "The results of our studies demonstrate that STa exerts its diarrheal effects in the intestine by molecular mimicry, serving as a bacteria-derived member of the peptide family that also contains the intestinal peptides, uroguanylin and guanylin. In addition, the reduced potency of guanylin compared to uroguanylin is caused by its susceptibility to proteases such as chymotrypsin." (*Id*. at 280.)

- **Ewe 1988**: Ewe 1998 taught that constipation and diarrhea result from abnormal intestinal motility and fluid balance. (DTX-036 at 73 (Abstract).) Ewe 1998 disclosed that the small

intestine allows for rapid equilibrium of osmolality (*e.g.*, water and electrolyte balance), while the large intestine preserves water and electrolytes once they have been absorbed. (*Id.*)  Ewe 1998 reports that "[f]ormerly, diarrhea and constipation were attributed to disordered motility" and that "[t]his concept changed in the late 1960s and early 1970s when the secretory effect of cholera toxin was recognized and studied in more detail." (*Id.* at 73.) Ewe 1998 explains that constipation and diarrhea are clinical symptoms of abnormalities in stool frequency and consistency due to a variety of causes. (*Id.* at 74.) Both are caused by abnormalities in intestinal motility and transport of electrolytes and water. (*Id.*) Small abnormalities in absorption and secretion, especially in the distal intestinal area, can lead to constipation or diarrhea. (*Id.*)

- **Sack 1980**: Sack 1980 disclosed that the physiological action of ST is characterized by "[r]apid onset, short-lived hypersecretion." (DTX-116 at 280.) Sack 1980 further explains that: "Strains of ETEC can produce either one or both of the enterotoxins [i.e., LT or ST], depending on the plasmid(s) they carry. It has been shown that the clinical disease caused by strains of ETEC correlated with these types of enterotoxins produced by the isolates. The diarrhea was more severe and of longer duration in persons harboring organisms that produced both LT and ST, as compared with those with organisms producing only ST." (*Id.* at 281.)

- **Beltowski**: "Guanylin and uroguanylin are short peptides homologous to heat-stable enterotoxins of Escherichia coli and other coterie bacteria. Guanylin and uroguanylin are synthetized from the respective preproeptides mainly in gastrointestinal mucosa and are secreted both into intestinal lumen and into the blood. Luminally secreted peptides stimulate chloride and bicarbonate secretion in the intestine through the mechanism involving guanylate cyclase C receptor, cyclic GMP, protein kinase G and cystic fibrosis transmembrane conductance regulator (CFTR) chloride channel." (DTX-133 at Abstract.) Beltowski disclosed that the activity of guanylin and uroguanylin is pH-dependent: "The activity of guanylin and uroguanylin is pH-dependent. In cultured $T_{84}$ cells guanylin is 10-fold more potent in elevating cGMP at pH 8 than at pH *5*, whereas uroguanylin is more potent in acidic than in alkaline conditions. In alkaline environment guanylin is more potent than uroguanylin and the opposite is observed in acidic conditions. STa is slightly more potent in acidic than in alkaline pH but the difference is not so striking as in the case of endogenous peptides. STa is, however, more potent than either guanylin or uroguanylin in both acidic and alkaline conditions." (DTX-133 at 362.)

- **Giannella 1995:** "The mechanisms of $ST_a$-induced fluid secretion have been extensively studied. When the rat jejunum is perfused in vivo with $ST_a$ (Fig. 2), water transport is rapidly inhibited and net secretion results. With cessation of $ST_a$ perfusion, the transport defect is promptly and totally reversible. Both the onset and offset of $ST_a$ action occurs within minutes . . .. $ST_a$-induced secretion occurs via activation of guanylate cyclase and generation of cGMP, which inhibits the coupled influx of Na+ and Cl- and stimulates Cl-secretion. Others have noted the rapid onset of action of $ST_a$, its effects on the colon, and the possible involvement of serotonin and the enteric nervous system." (*See* DTX-042 at 174.) "Recently an endogenous ligand called guanylin has been extracted from mammalian

intestine and shown to bind to the $ST_a$ receptor. A similar peptide, called uroguanylin, has been found in human and animal urine. It is likely that guanylin and uroguanylin are indeed endogenous ligands for the $ST_a$ receptor and may be modulators of $Cl^-$ secretion in the intestine, kidney, and perhaps in other organs." (*Id*. at 179.)

439.    A POSA would have been familiar with the background art on ST peptides, guanylin, uroguanylin, and lymphoguanylin described above. As explained in detail in Section II(B)(2), a POSA familiar with this background art would have been motivated to select STh(6–19) as a lead compound for development as a treatment for constipation-related disorders for the reasons summarized below:

- ST peptides were known to induce secretion and reduce absorption in the GI tract;

- ST peptides had been extensively studied and the characterization of their structure activity relationship would have provided a POSA with considerable guidance on the properties of potential ST derivatives;

- ST peptides were known to be molecular mimics for both guanylin and uroguanylin, with pH independent activity and enhanced stability in the gut due to their three disulfide bonds; and

- the ST core was known to have a single defined folded conformation and reported to be more heat-stable and resistant to denaturation than the full-length peptide.

440.    A POSA familiar with the background art on ST peptides, guanylin, uroguanylin, and lymphoguanylin would have been motivated to modify STh(6–19) with a tyrosine residue as a proteolytic cleavage site for the reasons explained in Section II(B)(4). As previously explained in Section II(B)(4), a POSA would have reasonably expected that modifying STh(6–19) with a proteolytic cleavage site, preferably tyrosine, would tune the peptide's activity and facilitate the peptide's inactivation and degradation by proteolytic enzymes to reduce the risk of adverse effects, such as diarrhea.

441.    As previously explained, POSA familiar with the background art on the structure activity relationship of ST peptides would have understood that: (a) Tyrosine (Tyr) should not be

229

substituted as a proteolytic cleavage site in the central binding region of ST core because it would potentially disrupt the peptide's ability to bind to the GC-C receptor and significantly reduce the biological activity of the peptide; (b) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site in the N-terminal region of ST core because cleavage in the C-terminal region of the ST core would likely produce a degradant product with significant biological activity; and (c) Tyrosine (Tyr) should preferably be substituted as a proteolytic cleavage site at the position of leucine in the N-terminal region of ST core because leucine and tyrosine have similar hydrophilicity and this substitution would be expected to produce a peptide with similar biological activity.

442.    As previously explained, a POSA would have been motivated to substitute tyrosine at the position of leucine in STh(6–19) based on the teachings of Hasegawa, Sato, Carpick 1991, Albano, and/or Wolfe (collectively, the "[Tyr$^9$]STh(6–19) References"). The teachings of these references are briefly summarized below:

- **<u>Handbook of Natural Toxins</u>**: The Handbook of Natural Toxins disclosed that ST1b has also been referred to as STh because it was originally found in *E. coli* isolated from humans. (*See* DTX-044 at 282.) The Handbook of Natural Toxins further disclosed the biological activities of analogs of STh(6–19) with replacements at positions 12, 13, and 14, as well as the biological activities of analogs of STh(6-18) with one or two disulfide bonds. (*See id.* at 283–86 (Tables 1–4).)

- **<u>Lu</u>**: Lu taught that chymotrypsin has a preference for tyrosine over phenylalanine. (DTX-126 at 443 (Table 1).)

- **<u>Hasegawa:</u>** Hasegawa taught an ST derivate with a Pap substitution at the position of leucine will efficiently bind with the GC-C receptor. (*See* DTX-045 at 4 (Figure 2), at 8 (Figure 6) and 9 ("The order of the binding affinity to the receptor protein was reported to be [Pap$^8$]STp(4-17) ≥ [Pap$^{15}$]STp(4-17) >> [Pap$^{11}$]STp(4-17).").) A POSA would have understood that Pap is an analog of tyrosine, and that an ST derivative with tyrosine at the position of leucine would efficiently bind to the GC-C receptor. While Hasegawa shows that an aromatic substitution at the position of alanine in the C-terminal region of an ST derivative would also efficiently bind to the GC-C receptor, a POSA would have understood that the proteolytic cleavage site should not be in the C-terminal region because

the degradant product(s) would likely have significant biological activity. Moreover, Hasegawa demonstrates that a POSA would have viewed leucine as the preferable position in the N-terminal region of an ST peptide for an aromatic amino acid substitution. (*See* DTX-045 at 2 (Figure 2).) Thus, a POSA would have been motivated to prepare [Tyr[9]]STh(6–19) based on the teachings of Hasegawa.

- **Sato:** Sato taught that the "receptor binding region" of ST peptides "estimated from the spatial arrangement of the atoms is mainly constituted from the side chain and main chain of Asn[11] and Pro[12] in addition to Ala[13], compatible with previous findings that Asn[11], Pro[12], and Ala[11] are the most important residues for the activity and that the toxicity of STp is less affected by substitution of Glu[7], Leu[8], and Gly[16], which are located on the opposite side of Ala[13]." (*See* DTX-054 at 8649 (internal citations omitted).) Sato taught further that "the disulfide linkage not found in guanylin corresponds to the bridge in the N-terminal segment of ST that is important for making a rigid pillar, it is considered that the rigidity of the N-terminal segment is important for ST to maintain its enterotoxicity under the severe physiological conditions in intestinal organs of the host animal" because "guanylin is rapidly degraded by components in the intestinal tract of infant mice, whereas ST is strongly resistant to digestion by them." (*Id*. at 8650 (internal citations omitted).) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr[9]]STh(6–19) based on the teachings of Sato.

- **Carpick 1991:** Carpick 1991 taught that substitutions in the central turn region of ST(6–18) (i.e., Asn12 to Cys15) "resulted in a large decrease or loss of receptor binding activity" whereas "replacements at other sites showed moderate to slight reductions in biological activity." (*See* DTX-031 at 4803, 4804 (Figure 2), and 4805 (Table 1).) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine because tyrosine and leucine have similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr[9]]STh(6–19) based on the teachings of Carpick 1991.

- **Albano:** Albano taught that ST analogs without the C-terminal residues Thr-Gly-Cys-Tyr would have significant biological activity. (*See* DTX-026 at 688 (Table 1, Toxin A-2) and Figure 3.) Thus, a POSA would have understood that the proteolytic cleavage site tyrosine should be substituted outside of the central binding region of STh(6–19) and at a position in the N-terminal region to minimize the possibility of a degradant product with significant biological activity. A POSA would have understood that the tyrosine substitution in the N-terminal region of STh(6–19) should be at the position of leucine because tyrosine and leucine have more similar hyrophilicity. Thus, a POSA would have been motivated to prepare [Tyr[9]]STh(6–19) based on the teachings of Albano.

231

- **Wolfe:** Wolfe taught that a COMFA model of ST peptides predicts that "the amide backbone of $Cys^5$-$Cys^6$-$Glu^7$-$Leu^8$, the $\beta$ carbon atoms of $Cys^5$-$Cys^6$, and the sized chains of $Pro^{12}$, $Ala^{13}$, and $Ala^{15}$ comprise the primary interactions of GC-C agonists with the receptor surface." (DTX-061 at 1731.) Wolfe also taught "that the backbone of $Cys^5$-$Cys^6$-$Glu^7$-$Leu^8$ adopts a conformation that tightly interacts with a hydrophobic region of GC-C to achieve maximum potency," and that "[t]he primary site of electrostatic interaction within the model is derived from residue $Glu^7$," whereas "side chain mutations of $Leu^8$ have only minimal effect." (DTX-061 at 1732.) Therefore, a POSA would have understood that the tyrosine substitution should be made outside of the central binding region of STh(6–19), in the N-terminal region of STh(6–19) to minimize the possibility of a degradant product with significant biological activity, and at the position of leucine. Thus, a POSA would have been motivated to prepare $[Tyr^9]$STh(6–19) based on the teachings of Wolfe.

443.   Claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References and one or more of the $[Tyr^9]$STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

444.   As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References with the teachings of one or more of the $[Tyr^9]$STh(6–19) References results in a peptide having the amino acid sequence recited in asserted claim 1 of the '526 patent:

| STh(6–19) | **C C E L C C N P A C T G C Y** |
| $[Tyr^9]$STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:31 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, a POSA would have chemically synthesized $[Tyr^9]$STh(6–19) with the same disulfide bond pairings of STh(6–19). As previously explained, it would have been routine

for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention.

***

445.     Claim 1 of the '526 patent would have been obvious to a POSA *in further view* of the STh(6–19) References. As previously explained, a POSA would have been motivated to select STh(6–19) as a lead compound. The teachings of the STh(6–19) References described below would have motivated a person or ordinary skill in the art to select STh(6–19) as a lead compound:

- **Aimoto:** Aimoto disclosed the amino acid sequence of $ST_h$ and $ST_p$, and that $ST_h$(6–19) comprises the heat-stable and biologically active domain of $ST_h$. (DTX-028 at 321, 326.) Aimoto further taught that $ST_h$(6–19) is resistant to proteinase digestion and is more heat-stable than the full-length peptide. (*Id.* at 324–25.)

- **Gariepy I:** Gariepy I disclosed that "[a]ctive fragments of the heat-stable enterotoxin ST I of *Escherichia* coli were chemically synthesized with the sequence Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-(Tyr) and studied by proton ($^1$H NMR) and carbon-13 ($^{13}$C NMR) nuclear magnetic resonance spectroscopy." (*See* DTX-039 at 7854 (Abstract); *see also id.* at 7865.) Gariepy I further disclosed that STh(6-18) and STh(6–19) were chemically synthesized and that "[t]hese analogues contain all the structural information responsible for the toxin's functions." (*Id.* at 7854.)

- **Ikemura:** Ikemura disclosed that "[s]ynthetic $ST_h$[5-19] . . . showed the same heat-stability as that of synthetic $ST_h$," but the "toxicity of $ST_h$[5-19] was found to decrease with the duration of heat-treatment." (DTX-046 at 2556.) Ikemura further disclosed that "synthetic STh[6–19] . . . showed higher heat-stability than synthetic or native $ST_h$." (*Id.*) Ikemura reports that the "enhanced structural stability of $ST_h$[6–19] may be due to decreased perturbation of the molecule on heating as a result of loss of the five N-terminal amino acid residues." (*Id.*)

446.     Claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References described above. All of these references would have been

233

known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

447.    As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, and one or more of the [Tyr$^9$]STh(6–19) References results in a peptide having the amino acid sequence recited in asserted claim 1 of the '526 patent:

| | |
|---|---|
| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:31 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, a POSA would have prepared [Tyr$^9$]STh(6–19) with the same disulfide bond pairings of STh(6–19). As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had a reasonable expectation of success in doing so. Thus, claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention.

***

448.    Claim 1 of the '526 patent would have been obvious to a POSA ***in further view*** of the Proteolytic Cleavage Site References. As previously explained, each of these references disclosed that ST peptides are not sensitive to proteolytic digestion like guanylin and would have motivated a POSA to modify STh(6–19) to insert a proteolytic cleavage site to facilitate the inactivation and degradation of the peptide. The teachings of these references are briefly summarized below:

- **Aimoto:** Aimoto disclosed the amino acid sequence of ST$_h$ and ST$_p$, and that ST$_h$(6–19)

234

comprises the heat-stable and biologically active domain of $ST_h$. (DTX-028 at 321, 326.) Aimoto further taught that $ST_h(6–19)$ is resistant to proteinase digestion and is more heat-stable than the full-length peptide. (*Id.* at 324–25.)

- **Gariepy I:** Gariepy I disclosed that "[a]ctive fragments of the heat-stable enterotoxin ST I of *Escherichia coli* were chemically synthesized with the sequence Cys-Cys-Glu-Leu-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-(Tyr) and studied by proton ([1]H NMR) and carbon-13 ([13]C NMR) nuclear magnetic resonance spectroscopy." (*See* DTX-039 at 7854 (Abstract); *see also id.* at 7865.) Gariepy I further disclosed that STh(6-18) and STh(6–19) were chemically synthesized and that "[t]hese analogues contain all the structural information responsible for the toxin's functions." (*Id.* at 7854.)

- **Ikemura:** Ikemura disclosed that "[s]ynthetic $ST_h[5-19]$ . . . showed the same heat-stability as that of synthetic $ST_h$," but the "toxicity of $ST_h[5-19]$ was found to decrease with the duration of heat-treatment." (DTX-046 at 2556.) Ikemura further disclosed that "synthetic $STh[6–19]$ . . . showed higher heat-stability than synthetic or native $ST_h$." (*Id.*) Ikemura reports that the "enhanced structural stability of $ST_h[6–19]$ may be due to decreased perturbation of the molecule on heating as a result of loss of the five N-terminal amino acid residues." (*Id.*)

449.   Claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention in view of the background knowledge of a POSA in combination with one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of the Proteolytic Cleavage Site References, and one or more of the [Tyr[9]]STh(6–19) References described above. All of these references would have been known to a POSA at the time of the invention because they relate to the GC-C receptor and GC-C agonists. A POSA would have been motivated to combine the teachings of these references because they are in a common field of art and teach a POSA how to optimize the characteristics of a well-known peptide for therapeutic utility.

450.   As shown below, combining the knowledge of a POSA with the teachings of one or more of the Method of Treatment References, one or more of the STh(6–19) References, one or more of the Proteolytic Cleavage Site References, and one or more of the [Tyr[9]]STh(6–19) References results in a peptide having the amino acid sequence recited in asserted claim 1 of the

235

'526:

| STh(6–19) | **C C E L C C N P A C T G C Y** |
| [Tyr$^9$]STh(6–19) | **C C E *Y* C C N P A C T G C Y** |
| SEQ ID NO:31 | **C C E *Y* C C N P A C T G C Y** |

As previously explained, a POSA would have prepared [Tyr$^9$]STh(6–19) with the same disulfide bond pairings of STh(6–19). As previously explained, it would have been routine for a POSA to synthesize and purify [Tyr$^9$]STh(6–19) and a POSA would have had more than a reasonable expectation of success in doing so. Thus, claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention.

### b.  Claim 2 of the '526 Patent

451.    Asserted claim 2 of the '526 patent recites:

>  2.    A pharmaceutical composition comprising the peptide of claim 1 and a pharmaceutically acceptable carrier or excipient.

(*See* DTX-009 at 84:20–22.) Claim 2 would have been obvious to a POSA at the time of the invention because it is directed to pharmaceutical compositions of the peptides recited in claim 1.

452.    As previously explained for claim 1 of the '526 patent, the peptide recited in claim 1 of the '526 patent would have been obvious to a POSA at the time of the invention. As previously explained, a POSA would have been motivated to synthesize and purify [Tyr$^9$]STh(6–19) for use in treating patients with constipation-related disorders and would have had more than a reasonable expectation of success in doing so. As previously explained, a POSA would have been motivated to make a pharmaceutical composition of [Tyr$^9$]STh(6–19) and would have had a reasonable expectation of success in doing so. Therefore, claim 2 of the '526 patent would have been obvious to a POSA at the time of the invention.

236

### 9.   There Is No Compelling Evidence of Secondary Considerations

#### a.   Teaching away

453.    In order to teach away from a solution, a reference must criticize or discredit that solution; merely expressing a general preference for an alternative is not sufficient to teach away. The fact that prior art disclosed other potential solutions to constipation therefore does not qualify as teaching away.

454.    As stated above, the prior art—and numerous constipation treatments—taught increasing secretion to treat constipation. The prior art also taught the use of GC-C agonists, and ST peptides specifically, to treat constipation.

455.    Interest in motility drugs, along the lines of Zelnorm, does not constitute a teaching away from the subject matter of the asserted claims of the '036, '727, '947, and '526 patents.  At the time of the invention, a POSA would have understood that prokinetic agents that target serotonin receptors were known to have limited efficacy and potentially serious side effects.  For example, Zelnorm (tegasorod) was a prokinetic agent launched in 2002 that targets the 5-HT4 receptor which was only moderately effective.  The Phase III study results reported in 2001 for tegasorod showed only modest therapeutic gains over placebo:

| Study | 4 mg/day | | 12 mg/day | | Placebo | |
|---|---|---|---|---|---|---|
| | Both genders | females | Both genders | females | Both genders | females |
| **B301** | | | | | | |
| Response rate (%) | 38.8 | 38 | 38.4 | 39 | 30.2 | 28 |
| Therapeutic gain (%) | 9.1 | 10.2 | 8.3 | 11.3 | | |
| Adjusted $P$-value | 0.018 | 0.013 | 0.033 | 0.012 | | |
| **B307 (dose titration) (4–12 mg/day)** | | | | | | |
| Response rate (%) | 38.3 | 39 | 42.2 | 43 | 37 | 38 |
| Therapeutic gain (%) | 0.8 | 1.5 | 6 | 5.2 | | |
| Adjusted $P$-value | 0.8 | N.S. | 0.14 | N.S. | | |
| **B351** | | | | | | |
| Response rate (%) | 38.9 | 41 | 45.7 | 46.9 | 33.3 | 32 |
| Therapeutic gain (%) | 6 | 8.8 | 12.4 | 14.8 | | |
| Adjusted $P$-value | 0.16 | 0.062 | 0.016 | 0.004 | | |

Table 3. Summaries of the response rates and therapeutic gains

237

(*See* DTX-164 at 286.)  In addition, a POSA would have known that cisapride was a serotonin 5-HT4 receptor agonist which was withdrawn from the market in 2000 because it produced severe cardiac side effects.

456.    The limited efficacy and potentially serious side effects associated with pro-kinetic 5-HT4 agonists would have motivated a POSA to pursue alternative drug targets with different mechanisms of action for treating constipation at the time of the invention.  For example, it was known by 2002 that RU-0211 was "a chloride channel opener which increases intestinal water secretion" that had been studied in a clinical trial "for the treatment of constipation." (*See* DTX-365 at A-315.)  The clinical study results reported for RU-0211 (*see id.*) would have motivated a POSA to develop other treatments for constipation-related disorders that increase intestinal secretion.

457.    As previously explained, a POSA would have looked to the prior art and found express teachings to target the GC-C receptor for treating constipation. (*See, e.g.*, DTX-022 at 2:6-24; DTX-109 at 6:21-34; DTX-024 at 3:13-4:8.)  A POSA would have selected the ST core as a lead compound because it serves as a molecular mimic for both guanylin and uroguanylin and presents more opportunities for optimization. (*See* DTX-378 at 2710) ("Enteric bacteria have evolved a single peptide toxin that serves as a molecular mimic for both of the intestinal hormones, uroguanylin and guanylin. The remarkable potencies of ST peptides compared with the potencies of the enteric hormones is caused by higher affinities for ST binding to the intestinal receptors for uroguanylin and guanylin.").)  A POSA would have understood that the biological activity of the ST core could be optimized by inserting a chymotrypsin cleavage site to tune the peptide's activity and facilitate the peptide's inactivation and degradation by proteolytic enzymes.  As previously explained, a POSA would have reasonably expected that [Tyr$^9$]STh(6-19) could be used to treat

238

constipation-related disorders because the magnitude of the bolus of activity expected from this peptide could be controlled by adjusting the dose and the duration of the bolus of activity would be controlled by the chymotrypsin cleavage site.

458.    No prior art references have been identified that expressly teach away from using an ST derivative for the treatment of constipation related disorders.

### b.  Long-felt need and failure of others

459.    The vast majority of patients with IBS-C and CIC respond well to agents that were already on the market before Linzess. These medications include Miralax, milk of magnesia, fiber, and Amitiza, which received FDA approval in 2006, before Linzess.

460.    One review by three physicians at the Mayo Clinic said that "evidence to support the use of these newer agents [including linaclotide] for [chronic constipation and IBS-C] is rated as moderate . . .." (*See* Bharucha et al., *American Gastroenterological Association Technical Review on Constipation*, 144(1) GASTROENTEROLOGY (2013) (DTX-173).) The study summarized the evidence supporting the use of lubiprostone (Amitiza), linaclotide, and prucalopride (Motegrity), which received approval in 2018. (*Id.*) According to the authors, the reduced risk of chronic constipation compared to placebo is 12% for Motegrity, 20% for Amitiza, and 13% for Linzess. (*Id.*)

461.    No reference showing that Linzess is superior to any other over-the-counter or prescription treatment in terms of either its efficacy or side-effect profile has been raised. Plaintiffs' witness, Linda Kunka, the global regulatory lead for the Linzess product, testified that she was not aware of any head-to-head clinical studies comparing the efficacy of Linzess to other prescription or over-the-counter drugs. (Kunka Dep. Tr. (DTX-584) at 165:18–166:17.) Allergan also advises its sales representatives that there are no head-to-head clinical trials comparing the

239

safety or efficacy of Linzess to any other product.  (*Id.* at 169:7–12.)

462.    Therefore, to the extent Linzess satisfied any long-felt need, it would have been limited, particularly because previous treatments were already addressing that need.

463.    The withdrawal of alosetron from the market as a result of safety issues is not evidence that a POSA would not have pursued a treatment for constipation via GC-C activation. Alosetron, which treated diarrhea-predominant IBS, is a "selective antagonist of the serotonin 5-HT3 receptor type." (Lotronex Prescribing Information, DTX-171 at 13.) The withdrawal of alosetron as a treatment for diarrhea says little about the risks of increasing secretion to treat constipation, but would suggest that treatment of IBS via the serotonin receptors could be dangerous.

464.    Alosetron and cisapride, which also modulated motility, were withdrawn from the market in 2000. The withdrawal of these two motility modulators that used the serotonin receptors would have encouraged a POSA to develop a drug that operated through different mechanisms. Similarly, tegaserod, which also operated through serotonin receptors, would have taught a POSA not to pursue drugs that operated through the serotonin receptors, and would have motivated a POSA to pursue a treatment for constipation that increased secretion to the intestines.

465.    No treatment that has been taken off the market because it was overstimulating the secretory mechanism and causing diarrhea has been identified. Alosetron was withdrawn from the market because of reports of ischemic colitis, an inflammation of the large intestine. (*IBS Drug Withdrawn After Less Than a Year on the Market*, WEBMD HEALTH NEWS, https://www.webmd.com/ibs/news/20001128/ibs-drugwithdrawn-            after-less-than-year-on-market#1 (November 28, 2000) (DTX-172).) Cisapride and tegaserod were both removed from the market because of cardiovascular side effects.

240

466.    Over- the-counter medications were efficacious and could be given to patients long term.

467.    Over-the-counter laxatives can cause cramping when patients start taking them, but that is because they are inducing a bowel movement. For example, a patient should not take Dulcolax long-term and Dulcolax may cause pain as it induces a bowel movement, but that does not mean other laxatives like Miralax and milk of magnesia cannot be used long-term or that they cause pain.

468.    Plaintiffs have overstated the societal costs of IBS-C and have not performed any analysis of the impact of Linzess on thos costs.  Plaintiffs' arguments are based on information about IBS broadly, and are not specific or limited to the conditions for which Linzess is approved to treat. As a result, any claims that Linzess has reduced these "costs to society" are unsupported and overstated.

469.    Linzess® is only approved to treat irritable bowel syndrome with constipation and chronic idiopathic constipation. (Linzess® Label, 1/2017, DTX-020 at 1.) IBS-C is the least prevalent category within IBS. For example, a systematic review of nine studies relating to IBS found the prevalence of IBS-C to be only 22% of all IBS instances. (Lovell et al., *Global Prevalence of and Risk Factors for Irritable Bowel Syndrome: A Meta-analysis*, 2012 (10) CLINICAL GASTROENTEROLOGY & HEPATOLOGY 712, 715 (DTX-195) (the prevalence of additional categorizations was found to be 23.4% for IBS with diarrhea, 24.0% for mixed IBS, and 22.2% for unclassifiable IBS).) Indeed, the study referenced by Plaintiff describing the costs of IBS does not include a single reference to "constipation" or "IBS-C," despite mentioning "diarrhea" 16 times. (Sandler et al., *The Burden of Selected Digestive Diseases in the United States*, 2002(122) GASTROENTEROLOGY 1500–1511 (2002) (DTX-

200).) Furthermore, there are multiple available treatments for IBS-C, including other prescription medications and OTC laxatives, as well as non-medicinal treatments. As an example, one analyst report noted that OTC laxatives make up more than 65% of sales for IBS-C and CIC. (Credit Suisse, "Ironwood Pharmaceuticals." (Nov. 27, 2017) (DTX-175) at 20 ($7.5B OTC laxative sales / ($7.5B OTC laxative sales + $4.0B Rx laxative sales) = 65.2%).) There is no reliable economic evidence of long-felt need or any other secondary consideration pertaining to the patents-in-suit.

### c. Unexpected results/skepticism

470.   There is little evidence that Linzess relieves pain beyond the pain reduction that a POSA would expect after inducing a bowel movement. The only document—in fact, the only page—raised to show that Linzess has an impact on pain through its mechanism of activating the GC-C receptor is a portion of the prescribing information that discusses animal, but not human, studies: "In animal models, linaclotide has been shown to both accelerate GI transit and reduce intestinal pain. The linaclotide induced reduction in visceral pain in animals is thought to be mediated by increased extracellular cGMP, which was shown to decrease the activity of pain-sensing nerves." (DTX-019 at LINZ_0023425.) In fact, Plaintiffs' own advertisements state that the "relevance to humans" of the pain- reducing mechanism is "not known."  (Kurtz Dep. Tr. (DTX-580) at 163:3 – 11.)

471.   As stated above, there is no evidence that any pain reduction associated with a 290 mcg dose of Linzess is the result of a mechanism other than the relief a patient experiences from having a bowel movement. And as stated above, no studies comparing the safety and efficacy of Linzess to any other product have been raised; therefore, no study showing that Linzess causes a greater reduction in pain than other treatments for constipation has been raised.

472.     A POSA would have understood that many patients who experience constipation also have pain or discomfort as a result. A patient who does not have a bowel movement for a few days will be bloated and uncomfortable. A POSA would expect that treating constipation and inducing a bowel movement would relieve some of that discomfort. In fact, other constipation drugs that did not operate through activation of the GC-C receptor were known to reduce pain, showing that inducing a bowel movement is likely responsible for much of the improvement in pain. (*See* Mayer 2002 at 6 ("Tegaserod [Zelnorm] improves overall GI symptoms, abdominal discomfort or pain, bloating and stool frequency and consistency in female patients with constipation-predominant IBS."), ("Alosetron and cilansetron are effective in improving symptoms in patients with IBS such as abdominal pain and discomfort . . ..").)

473.     A POSA would have been motivated to use an ST peptide to treat constipation. The prior art taught the use of the guanylin family of peptides for therapeutic purposes, including to treat constipation. A POSA would have been able to modify the peptide or decrease the dose in order to have a therapeutic effect that did not "cause intractable diarrhea."

474.     Ralph Giannella, M.D., who submitted a declaration in the reexamination, testified that toxins had previously been used as the starting point for therapeutic purposes. For example, he testified that some vaccines are modified toxins. (Giannella Dep. Tr. (DTX-582) at 111:7–18.) He also testified that he was involved with testing of a modified strain of cholera to determine if the strain would work as a vaccine. (*Id.* at 115:9–12.) He testified that the results of the study he conducted of the cholera strain were successful. (*Id.* at 117:20–118:8.) Because the art disclosed previous attempts to use the cAMP mechanism therapeutically, a POSA would not have avoided activation of the GC-C receptor to treat constipation out of a fear that such a treatment could cause diarrhea.

243

> **i.    A POSA would have understood that the skepticism of Plaintiffs' experts was unfounded at the time of the invention**

475.    The declarations of Drs. Falkow and Giannella submitted as part of the *ex parte* reexamination of the '947 patent purport to show that "two of the premier experts in the field . . . expressed skepticism at the relevant time that a therapeutic based on the ST peptide would be safe or effective."  (*See* Falkow Declaration to '947 Patent Reexam ("Falkow Decl.") (DTX-305 at LINZ_0020793-808); Giannella Declaration to '947 Patent Reexam ("Giannella Decl.") (DTX-306 at LINZ_0020809-830)).)  A POSA at the time of the invention would have understood that the purported skepticism of Plaintiffs' experts was unfounded.

476.    Specifically, a POSA would have understood that Plaintiffs' experts are assuming that administration of an ST derivative would produce the effects of a bacterial infection by *E. Coli*.  (*See, e.g.*, DTX-305 at ¶ 8 (stating that "ST peptides are bacterial toxins" that are a "frequent cause of travelers' diarrhea in adults" and the symptoms included "watery diarrhea, as well as dehydration, abdominal cramping, and pain."), ¶¶ 7 and 9 (stating his belief that Dr. Currie's proposal to use ST as a therapeutic "might be dangerous, or at least more harmful than helpful" and that it would fail); DTX-306 at ¶ 13 (stated that he did not believe Dr. Currie's effort to base a therapy on the ST peptide would be successful, at least because he believed that ST analogs "might just induce diarrhea and would therefore be unsafe.").)  This assumption is misplaced and a POSA would have understood that a bacterial infection is different in fundamental ways from administering a controlled dose of an ST derivative.

477.    A POSA would have understood that *E. coli* produce multiple toxins that cause travelers' diarrhea.  For example, in 1980, Sack reported that *E. coli* were known to produce both heat-labile and heat-stable peptides:

> To date only two well-recognized enterotoxins are known to be produced by *E. coli*, although others are suspected. These two enterotoxins, one heat-labile (LT) and the other heat-stable (ST), have both been highly purified [10-15], and their physiologic and biochemical mechanisms of action have been well characterized.

(DTX-116 at 280.) Sack specifically teaches that diarrhea is less severe and of shorter duration in strains of ETEC that produce only ST peptides:

> Strains of ETEC can produce either one or both of the enterotoxins, depending on the plasmid(s) they carry. It has been shown that the clinical disease caused by strains of ETEC correlated with the types of enterotoxins produced by the isolates. The diarrhea was more severe and of longer duration in persons harboring organisms that produced both LT and ST, as compared with those with organisms producing only ST.

(*Id*. at 281).) Moreover, a POSA would have understood that the diarrheal response to an *E. coli* infection depends upon the extent of bacterial colonization of the intestine and the amount of peptides secreted.

478.    A POSA would not expect a controlled dose of an ST derivative to produce the diarrheal response of a bacterial *E. coli* infection. To the contrary, a POSA would have reasonably expected that the magnitude of the short-lived bolus of intestinal secretion produced by ST peptides in mature animals could be controlled by adjusting the dose of the peptide administered. (*See* DTX-348 at 1990 (Figure 1); DTX-040 at 8909 (Figure 4).) A POSA would have further understood that introducing a chymotrypsin cleavage site into the ST core would minimize the risk of an adverse event by moderating the duration of this bolus of secretion. As previously explained, a POSA would have reasonably expected that $[Tyr^9]STh(6-19)$ could be used to treat constipation-related disorders in adults.

479.    Moreover, a POSA would not have been skeptical that a derivative of an ST peptide would be degraded before reaching the colon. A POSA would have understood that the structure

245

of an ST peptide is stabilized by three disulfide bonds.  (*See, e.g.*, DTX-112 at 34.)  The three

disulfide bonds of an ST peptide would have been expected to be difficult to reduce.  Thus, a

POSA at the time of the invention would not have been concerned that a derivative of an ST peptide

would be fully degraded before it reached the colon.

> **ii.    Linaclotide's purportedly novel mechanism of action on pain-sensing nerves does not support the non-obviousness of the asserted claims of the '036, '727, '947, and '526 patents**

480.    Linaclotide's purportedly novel mechanism of action on pain-sensing nerves does

not support the non-obviousness of the asserted claims of the '036, '727, '947, and '526 patents.

A POSA would understand that linaclotide's action on pain-sensing nerves has never been

established in humans and is therefore of little weight.  The Linzess® label explains that linaclotide

has only been shown to decrease the activity of pain-sensing nerves in animal models:

> **12.1 Mechanism of Action**
> Linaclotide is structurally related to human guanylin and uroguanylin and functions as a guanylate cyclase-C (GC-C) agonist.  Both linaclotide and its active metabolite bind to GC-C and act locally on the luminal surface of the intestinal epithelium. Activation of GC-C results in an increase in both intracellular and extracellular concentrations of cyclic guanosine monophosphate (cGMP).  Elevation in intracellular cGMP stimulates secretion of chloride and bicarbonate into the intestinal lumen, mainly through activation of the cystic fibrosis transmembrane conductance regulator (CFTR) ion channel, resulting in increased intestinal fluid and accelerated transit.  ***In animal models, linaclotide has been shown to both accelerate GI transit and reduce intestinal pain.***
>
> ***In an animal model of visceral pain, linaclotide reduced abdominal muscle contraction and decreased the activity of pain-sensing nerves by increasing extracellular cGMP.***

(Linzess® Label (Revised 01/2017) (DTX-020) at LINZ_0023536–37 (emphasis added).)

Plaintiffs' own marketing materials, which are required to be consistent with the label by the FDA,

show that the animal studies purporting to establish linaclotide's efficacy on calming pain-sensing nerves is of unknown relevance to humans:



*This was seen in animal studies and the relevance to humans is unknown.

(*See, e.g.*, Deposition Transcript of Caroline Kurtz ("Kurtz Tr.") (DTX-580) at 1; *see also id.* at 160:5-167:23 (FDA requires marketing materials to be consistent with the label).)

481.    A POSA would not attribute clinical study results to linaclotide's purported effect on calming pain-sensing nerves because the mechanism of action is insufficiently characterized. The figure below illustrates linaclotide's purportedly novel mechanism on calming pain-sensing nerves:



(*See* Castro et al., *Linaclotide Inhibits Colonic Nociceptors and Relieves Abdominal Pain via Guanylate Cyclase-C and Extracellular Cyclic Guanosine 30,50-Monophosphate*, 145 GASTROENTEROLOGY 1334, 1344, Fig. 7 (2013) ("Castro 2013") (DTX-367).)  A POSA would understand that this model does not show how cGMP is being released to where it can act on pain fibers.  This model simply refers to the mechanism of cGMP release as a "transporter dependent mechanism."  (*See* DTX-367 at 1344 (Figure 7(b) caption) ("***cGMP is also released, via a transporter dependent mechanism, through the basolateral membrane of intestinal epithelial cells***.  This extracellular, non-cell permeant cGMP can then act on high-threshold colonic nociceptors, which are located on blood vessels, to inhibit their mechanosensitivity and lead to reduced nociception and reduced abdominal pain.") (emphasis added).)  A POSA would not attribute clinical results to this purported mechanism of action without further characterization of the rate and extent to which cGMP is released through the basolateral membrane of humans to where it can act on pain fibers.

482.    This model also does not teach a POSA what the molecular target is for the extracellular cGMP which is purported to produce an effect on colonic pain fibers.  For example,

Castro 2013 explains that additional studies were being conducted to elucidate the molecular target for extracellular cGMP:

> cGMP is then actively transported across the basolateral epithelial cell membrane into the submucosal space, where it exerts its action on nociceptors located on blood vessels to inhibit their function (Figure 7B). Although active mechanisms for transport of cGMP out of cells have been described, cGMP is poorly diffused across cell membranes passively and is not actively transported back into cells. Therefore, we believe the effects of cGMP on colonic nociceptors are acting through an extracellular or membrane target. We believe this report is the first to show that extracellular cGMP alters intestinal nociceptor function and mediates peripheral analgesia. This pathway is independent of the NO/soluble guanylate cyclase mechanism and the resulting effects of increasing neuronal intracellular cGMP that have been reported previously using different pharmacological agents, including membrane permeable cGMP (8-bromo-cHMP or CPT-cGMP). ***Additional studies to elucidate the molecular target for extracellular cGMP are ongoing.***

(*Id*. at 1342-43 (emphasis added).) A POSA would not attribute clinical results to this purported mechanism of action without further characterization of the molecular target for extracellular cGMP.

483.   A POSA would have been uncertain whether oral administration of Linzess® (290 µg, 145 µg, and 72 µg) ever produces the concentrations of linaclotide in the colon that were used in the animal studies that purport to establish linaclotide's novel mechanism of action. For example, Castro 2013 states that "[w]e have calculated that oral treatment of linaclotide (290 *µ*g) in humans equates approximately to the highest dose of linaclotide we used in the preclinical studies (Supplementary Figure 1)." (DTX-367 at 1346.e1.) Supplementary Figure 1, reproduced below, does not show this calculation:



**Supplementary Figure 1.** Primary structures of linaclotide, human uroguanylin, and human guanylin. Identical amino acids are shaded by boxes. In this study, human uroguanylin was applied to colonic nociceptors during in vitro recordings.

(*Id*. at 1346.e7.)   A POSA would not attribute clinical study results to the animal studies that purportedly establish linaclotide's novel mechanism of action without a better understanding of how the doses used in the animal studies translate to humans.

484.    Castro 2013 reports the results of a cGMP efflux study in human intestinal Caco-2 cells to establish that linaclotide produces extracellular cGMP.   (*See* DTX-367 at 1335.)   Figure 4(c) shows that a 1000 nM concentration of linaclotide produces 15 pmol of cGMP:



(*See* DTX-367 at 1341.)   A POSA would have been uncertain whether oral administration of linaclotide (290 µg, 145 µg, and 72 µg) ever produces linaclotide concentrations of 1000 nM in the colon.

485.    A POSA would understand that doses of 290 µg, 145 µg, and 72 µg of linaclotide correspond to 189 nMoles, 94 nMoles, and 47 nMoles of linaclotide, respectively, as shown in the table below:

| Linzess® dose (mcg) | Grams linaclotide administered (dose x 1g/1,000,000 mcg) | nMoles linaclotide (grams linaclotide x 1 mol/1,526.74 grams x $10^{-9}$ nM/mol) |
|---|---|---|
| 290 | 0.00029 grams linaclotide | 189 nMoles |
| 145 | 0.000145 grams linaclotide | 94 nMoles |
| 72 | 0.000072 grams linaclotide | 47 nMoles |

A POSA would further understand that linaclotide is degraded in the intestinal tract.  (*See, e.g.,* Linzess® Label (Revised 01/2017) (DTX-020) at Linz_0023537 ("Active peptide recovery in the stool samples of fed and fasted health subjects following administration of LINZESS 290 mcg once daily for seven days averaged about 5% (fasted) and about 3% (fed) and all of it as the active metabolite.").)  A POSA would be unable to evaluate whether linaclotide concentrations of 1000 nM are ever achieved in the human colon without additional information about the rate of linaclotide degradation and the volume of fluid in the intestinal tract after oral administration of 290 µg, 145 µg, and 72 µg of Linzess®.

486.    A POSA would have been uncertain whether oral administration of Linzess® (290 µg, 145 µg, and 72 µg) would produce sufficient quantities of cGMP to have a calming effect on pain-sensing nerves in the colon of an adult human.   For example, Figure 4(c) shows that linaclotide concentrations of 1000 nM (i.e., $10^{-6}$ M) produce 15 pmols of cGMP (i.e., $10^{-12}$ mols) in Human Caco-2 cells.  (*See* DTX-367 at 1341 (Figure 4(c)).)  A POSA would have understood that concentrations of cGMP much higher than 15 pmols did not produce an effect on the colonic nociceptors of mice.  For example, Figures 5(a) and 5(b) show that concentrations of less than 1 µM (i.e., $10^{-6}$ M) cGMP did not produce a significant effect on the colonic nociceptors of mice:



(DTX-367 at 1342.)  Since Figure 4(c) shows that 1000 nM of linaclotide produces only 15 pmols of cGMP and Figures 5(a) and 5(b) show that cGMP concentrations six orders of magnitude higher had no signicant effect on the pain sensors of mice, a POSA would be uncertain whether oral administration of Linzess® (290 µg, 145 µg, and 72 µg) produces sufficient amounts of extracellular cGMP to have a significant effect on the pain-sensing nerves of adult humans.

487.    A POSA would not have been surprised that extracellular cGMP would have an effect on pain-sensors.  For example, it was reported in 1998 that cGMP produces direct inhibitory effects on excitatory synapses in the central nervous system.  (*See, e.g*., Cornelia Poulopoulou & Linda M. Nowak, *Extracellular 3',5' Cyclic Guanosine Monophosphate Inhibits Kainate-Activated Responses in Cultured Mouse Cerebellar Neurons*, 286 J. PHARMACOLOGY & EXPERIMENTAL THERAPEUTICS 99, 99 (1998) (DTX-159) ("Overall, these data indicate that there are direct inhibitory effects of extracellular cGMP on a large group of excitatory synapses in the CNS—effects that need to be taken into account when investigators utilize membrane-permeable cGMP analogs.").)  It was also known that ST peptides produce extracellular cGMP.  (*See, e.g*., DTX-134 at 3220 (Figure 10(c)).)  A POSA would not be surprised that extracellular cGMP can be released through the basolateral membrane of intestinal epithelial cells to where it can act on colonic nociceptors.

488.    Linaclotide's purportedly surprising effect on pain lacks a sufficient nexus to the asserted claims of the '036, '727, '947, and '526 patents to support their validity.  A POSA would understand that whether or not linaclotide could have an effect on pain would depend on the dose of linaclotide administered.  For example, certain doses of linaclotide could potentially produce enough extracellular cGMP to inhibit the pain-sensing nerves of humans while others doses of linaclotide do not.  Since the asserted claims of the '036, '727, '947, and '526 patents are not limited to any particular dose of linaclotide, a POSA would understand that this purportedly unexpected result lacks a sufficient nexus to the claims to support their validity

### d.  Praise by others

489.    Evidence to show that others praised the claimed invention include articles, awards, and other public statements. Linaclotide has not been praised by others.

### e.  Acquiesence/Licensing

490.    Plaintiffs have not demonstrated that a nexus exists between the claimed features of the patents-in-suit and the licenses they identified taken out by their competitors.

## C.  INVALIDITY PURSUANT TO 35 U.S.C. § 112

### 1.  The asserted claims of the '036 patent are invalid under 35 U.S.C. § 112 for lack of written description

491.    The specification of the '036 patent does not convey to a POSA that the inventors were in possession of the inventions recited in the asserted claims.

### a.  Asserted Claim 2 of the '036 patent lacks written description

492.    Claim 2 covers purified peptides "consisting of" amino acid SEQ ID NO:31:

> 2.    A purified peptide consisting of the amino acid sequence: Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr (SEQ ID NO:31).

(*See* DTX-001 at 107:49–51.) In my opinion, claim 2 lacks written description because it does not specify the disulfide pairings that provide the peptide with its molecular conformation.

493.    The specification of the '036 patent discloses an embodiment of claim 2 with three disulfide bonds between the Cys residues:

> The peptides of the invention, like the bacterial ST peptides, have six Cys residues. These six Cys residues form three disulfide bonds in the mature and active form of the peptide. If the six Cys residues are identified, from the amino to carboxy terminus of the peptide, as A, B, C, D, E, and F, then the disulfide bonds form as follows: A-D, B-E, and C-F. The formation of these bonds is thought to be important for GC-C receptor binding.

(*See id.* at 24:15–22.) However, a POSA would understand that the claims are not limited to peptides with only these three disulfide pairings, because the disulfide bonds are not claimed, and the specification discloses alternative embodiments of the invention. For example, the specification teaches that "[i]n certain embodiments the disulfide bonds are replaced by other covalent cross-links . . ." (*See, e.g.*, *id.* at 3:47–48.) The specification of the '036 patent further explains:

> In addition, one or more disulfide bonds can be replaced by alternative covalent cross-links, e.g., an amide bond, an ester linkage, an alkyl linkage, a thio ester linkage, a lactam bridge, a carbamoyl linkage, a urea linkage, a thiourea linkage, a phosphonate ester linkage, an alkyl linkage, and alkenyl linkage, an ether, a thioether linkage, or an amino linkage.

(*Id.* at 7:33–39.) Thus, a POSA would understand that claim 2 encompasses peptides having three disulfide bonds, two disulfide bonds, one disulfide bond, no disulfide bonds, and variations having alternative covalent cross-links.

494.    A POSA would understand that claim 2 encompasses a large number of peptides that are neither described nor disclosed in the specification of the '036 patent. For example, the six

254

cysteine residues in SEQ ID NO:31 have the same relative positions as the six cysteine residues in

STh(6-18). It was known in the art that the six cysteine residues in STh(6-18) could form at least

fifteen possible three-disulfide pairing patterns:



FIG. 1.   Possible disulfide pairing patterns of ST1b(6–18). The six cysteines of ST1b(6–18), at positions 6, 7, 10, 11, 15, and 18, can adopt 15 possible disulfide arrangements. Amino acids are identified by the single-letter code.

(*See* Gariepy 1987 at 8908.) A POSA would have understood that the amino acid sequence of

STh(6-18) could form an even larger number of peptides with one or two disulfide bonds. (*See*

DTX-021 at 7:35–44 ("[T]here are a total of ninety (15x6x1) theoretically possible secondary

structural isomers of each primary amino acid residue sequence of ST that contains six Cys

residues and two or three disulfide bonds.").) A POSA would have understood that the amino acid

sequence of STh(6-18) could also be prepared with numerous alternative covalent cross-links.

495.    The specification of the '036 patent does not convey to a POSA that the inventors

were in possession of all of the embodiments of the invention encompassed by claim 2 of the '036

patent, including all of the variations with three disulfide bonds, two disulfide bonds, one disulfide

bond, and variations where the disulfide bonds are replaced by other covalent cross-links. (*See, e.g.*, DTX-001 at 3:47–48; *id.* at 7:33–39.) Therefore, claim 2 of the '036 patent is invalid for lack of written description.

### b. Asserted claim 9 of the '036 patent lacks a written description

496.    Claim 9 of the '036 patent recites:

> 9.    A pharmaceutical composition comprising: (a) a purified peptide consisting of the amino acid sequence: Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr (SEQ ID NO:31); and (b) a pharmaceutically acceptable carrier or excipient.

Claim 9 lacks written description because it does not specify the disulfide pairings of the peptide in the pharmaceutical composition.

497.    As explained for claim 2, the specification of the '036 patent does not convey to a POSA that the inventors were in possession of all of the embodiments of a peptide having amino acid SEQ ID NO:31, including all of the variations with three disulfide pairings, two disulfide pairings, one disulfide pairing, and variations where the disulfide bonds are replaced by other covalent cross-links. (*See, e.g.*, DTX-001 at 3:47–48; *id.* at 7:33–39.) Correspondingly, the specification of the '036 patent does not convey to a POSA that the inventors were in possession of all of the potential pharmaceutical compositions comprising these peptides. Therefore, claim 9 of the '036 patent is invalid for lack of written description.

### c. Asserted claims 33, 37, 39, 43, and 44 of the '036 patent lack a written description

498.    Claims 33, 37, 39, 43, and 44 of the '036 patent recite:

> 33.    A method for treating a patient suffering from irritable bowel syndrome, the method comprising administering to the patient an effective of amount of the pharmaceutical composition of claim 9.

256

37.     The method of any of claims 33-36 wherein the patient is suffering from constipation-predominant irritable bowel syndrome.

39.     A method for treating constipation in a patient, the method comprising administering to the patient an effective amount of the pharmaceutical composition of claim 9.

43.     The method of any of claims 39-42 wherein the patient is suffering from chronic constipation.

44.     The method of any of claims 39-42 wherein the patient is suffering from idiopathic constipation.

These claims are dependent upon claim 9 and claim 2, and lack written description because the disulfide pairings are not specified for the peptide in the pharmaceutical compositions, and the specification does not disclose an effective amount of the pharmaceutical compositions to administer for treating patients with IBS, IBS-C, chronic constipation, and idiopathic constipation.

499.     As explained for claim 2, the specification of the '036 patent does not convey to a POSA that the inventors were in possession of all of the embodiments of a peptide having amino acid SEQ ID NO:31, including all of the variations with three disulfide bonds, two disulfide bonds, one disulfide bond, and variations where the disulfide bonds are replaced by other covalent cross-links. (*See, e.g.*, DTX-001 at 3:47–48; *id.* at 7:33–39.) Correspondingly, the specification of the '036 patent does not convey to a POSA that the inventors were in possession of all of the pharmaceutical compositions encompassed by claim 9.

500.     Furthermore, a POSA would have understood that there would be numerous peptides having the amino acid sequence of SEQ ID NO:31 which would not have significant biological activity. For example, a peptide having the amino acid sequence of SEQ ID NO:31 which was improperly folded would be unlikely to bind to the GC-C receptor to provide the desired therapeutic effect. Moreover, a POSA would be uncertain whether peptides having the amino acid

257

sequence of SEQ ID NO:31 and alternative covalent cross-links would bind to the GC-C receptor to provide the desired therapeutic effect. Thus, a POSA would have been uncertain whether an effective amount of these peptides could ever be administered in pharmaceutical compositions to treat patients with irritable bowel syndrome, chronic constipation, and IBS-C.

501.     Therefore, claims 33, 37, 39, 43, and 44 of the '036 patent are invalid for lack of written description.

## 2. The asserted claims of the '727 patent are invalid under 35 U.S.C. § 112 for lack of written description

502.     The specification of the '727 patent does not convey to a POSA that the inventors were in possession of the inventions recited in the asserted claims.

503.     The asserted claims of the '727 patent are recited below:

> 3.     The method of claim 1 wherein the peptide consists of the amino acid sequence of SEQ ID NO:3.

> 6.      A purified peptide prepared by the method of claim 1.

(*See* DTX-003 at 65:53–66:50.) Claims 3 and 6 of the '727 patent depend from unasserted claim 1 recited below:

> 1.     A method for preparing a purified peptide comprising SEQ ID NO:3, the method comprising:
> (a) chemically synthesizing a peptide comprising the amino acid sequence of SEQ ID NO:3; and (b) purifying the peptide.

(*Id.* at 65:46–50.) SEQ ID NO:3 in the '727 patent is Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr. (*See id.* at Figure 11-1.) Claims 1, 3, and 6 lack written description because they do not specify the disulfide pairings that provide the peptide with its molecular conformation.

504.     The specification of the '727 patent discloses an embodiment of claims 1, 3, and 6 with three disulfide bonds between the Cys residues:

258

> The peptides of the invention, like the bacterial ST peptides, have six Cys residues. These six residues form three disulfide bonds in the mature and active form of the peptide. If the six Cys residues are identified, from the amino to carboxy terminus of the peptide, as A, B, C, D, E, and F, then the disulfide bonds form as follows: A-D, B-E, and C-F. The formation of these bonds is thought to be important for GC-C receptor binding.

(*See* DTX-003 at 43:29–36.) However, a POSA would understand that the claims are not limited to peptides with these three disulfide pairings because the specific disulfide bonds are not claimed, and the specification discloses alternative embodiments of the invention. For example, the specification teaches that:

> The invention includes methods for treating various gastrointestinal disorders by administering a peptide that acts as a partial or complete agonist of the GC-C receptor. The peptide includes at least six cysteines that can form [sic] three disulfide bonds. In certain embodiments the disulfide bonds are replaced by other covalent cross-links . . .

(*See* DTX-003 at 4:4–8; *see also id.* at 10:48–59 ("In addition, one or more disulfide bonds can be replaced by alternative covalent cross-links . . ..").) Thus, a POSA would understand that claims 3 and 6 encompass peptides having three disulfide bonds, two disulfide bonds, one disulfide bond, no disulfide bonds, and variations having alternative covalent cross-links.

505.    A POSA would understand that claims 1, 3, and 6 encompass a large number of peptides that are neither described nor disclosed in the specification of the '727 patent. For example, the six cysteine residues in SEQ ID NO:3 have the same relative positions as the six cysteine residues in STh(6-18). It was known in the art that the six cysteine residues STh(6-18) could form at least fifteen possible three-disulfide pairing patterns. (*See* Gariepy 1987 at 8908.) A POSA would have understood that the amino acid sequence of STh(6-18) could form an even larger number of peptides with one or two disulfide bonds. (*See* DTX-021 at 7:35–44 ("[T]here

259

are a total of ninety (15x6x1) theoretically possible secondary structural isomers of each primary amino acid residue sequence of ST that contains six Cys residues and two or three disulfide bonds.").) A POSA would have understood that the amino acid sequence of STh(6-18) could also be prepared with numerous alternative covalent cross-links.

506.    The specification of the '727 patent does not convey to a POSA that the inventors were in possession of all of the embodiments of the invention encompassed by claims 1, 3, and 6 of the '727 patent, including all of the variations with three disulfide pairings, two disulfide pairings, one disulfide pairing, and other covalent cross-links. (*See* DTX-003 at 4:4–8; *see also id.* at 10:48–59).) Therefore, claim 1, 3, and 6 of the '727 patent are invalid for lack of written description.

### 3.   The asserted claims of the '947 patent are invalid under 35 U.S.C. § 112 for lack of written description

507.    The specification of the '947 patent does not convey to a POSA that the inventors were in possession of the inventions recited in the asserted claims of the '947 patent.

508.    Asserted claims 2 and 4 of the '947 patent recite:

> 2.    The polypeptide of claim 1 consisting of the amino acid sequence Cys Cys Glu Xaa Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr wherein Xaa is selected from Phe, Trp or Tyr (SEQ ID NO:125).
>
> 4.    The polypeptide according to claim 2, which is purified.

(*See* DTX-005 at 85:20:25).) Claims 2 and 4 lack written description because they do not specify the disulfide pairings that provide the peptide with its molecular conformation.

509.    The specification of the '947 patent discloses an embodiment of claims 2 and 4 with three disulfide bonds between the Cys residues:

> The peptides of the invention, like the bacterial ST peptides, have six Cys residues. These six Cys residues form three disulfide bonds

260

> in the mature and active form of the peptide. If the six Cys residues
> are identified, from the amino to carboxy terminus of the peptide, as
> A, B, C, D, E, and F, then the disulfide bonds form as follows: A-D,
> B-E, and C-F. The formation of these bonds is thought to be
> important for GC-C receptor binding.

(*See* DTX-005 at 20:42–49.) However, a POSA would understand that the claims are not limited

to peptides with these three disulfide pairings because they are not claimed, and the specification

discloses alternative embodiments. For example, the specification teaches that:

> The invention includes methods for treating various gastrointestinal
> disorders by administering a peptide that acts as a partial or complete
> agonist of the GC-C receptor. The peptide includes at least six
> cysteines that can form three disulfide bonds. In certain
> embodiments the disulfide bonds are replaced by other covalent
> cross-links . . .

(*See* DTX-005 at 3:18–23; *see also id*. at 5:52–64 ("In addition, one or more disulfide bonds can

be replaced by alternative covalent cross-links . . .").) Thus, a POSA would understand that claims

2 and 4 encompass peptides having three disulfide bonds, two disulfide bonds, one disulfide bond,

no disulfide bonds, and alternative covalent cross-links.

510.    A POSA would understand that claims 2 and 4 encompass a large number of

peptides that are neither described nor disclosed in the specification of the '947 patent. For

example, the six cysteine residues in SEQ ID NO:125 have the same relative positions as the six

cysteine residues in STh(6-18). It was known in the art that the six cysteine residues STh(6-18)

could form at least fifteen possible three-disulfide pairing patterns. (*See* Gariepy 1987 at 8908.) A

POSA would have understood that the amino acid sequence of STh(6-18) could form an even

larger number of peptides with one or two disulfide bonds. (*See* DTX-021 at 7:35–44 ("[T]here

are a total of ninety (15x6x1) theoretically possible secondary structural isomers of each primary

amino acid residue sequence of ST that contains six Cys residues and two or three disulfide

261

bonds.") (DTX-021 at DEFS-LINA-00000014).) A POSA would have understood that the amino acid sequence of STh(6-18) could also be prepared with numerous alternative covalent cross-links.

511.    The specification of the '947 patent does not convey to a POSA that the inventors were in possession of all of the embodiments of the invention encompassed by claims 2 and 4 of the '947 patent, including all of the variations with three disulfide pairings, two disulfide pairings, one disulfide pairing, and other covalent cross-links. (*See, e.g.*, DTX-005 at 3:18–23; *see also id*. at 5:52–64.) Therefore, asserted claims 2 and 4 of the '947 patent are invalid for lack of written description.

512.    Asserted claim 14 of the '947 patent recites a pharmaceutical composition comprising the polypeptide of claim 2:

> 14.    A pharmaceutical composition comprising the polypeptide of claim 2 and a pharmaceutically acceptable carrier or excipient.

(*See* DTX-005 at 86:31–33.) Claim 14 lacks written description because the disulfide pairings of the peptide in the pharmaceutical composition are not specified.

513.    As explained for claim 2, the specification of the '947 patent does not convey to a POSA that the inventors were in possession of all of the embodiments of a peptide having amino acid SEQ ID NO:125, including all of the variations with three disulfide pairings, two disulfide pairings, one disulfide pairing, and variations where the disulfide bonds are replaced by other covalent cross-links. (*See* DTX-005 at 3:18–23; *see also id*. at 5:52–64.) Correspondingly, the specification of the '947 patent does not convey to a POSA that the inventors were in possession of all of the potential pharmaceutical compositions comprising these peptides. Therefore, claim 14 of the '947 patent is invalid for lack of written description.

### 4. Claims 33, 37, 39, 43, and 44 of the '036 patent are invalid under 35 U.S.C. § 112 for lack of enablement

514. Claims 33, 37, 39, 43, and 44 of the '036 patent, reproduced below, are directed to methods of treating patients suffering from IBS, IBS-C, chronic constipation, and idiopathic constipation by administration of an effective amount of the pharmaceutical composition of claim 9:

> 33. A method for treating a patient suffering from irritable bowel syndrome, the method comprising administering to the patient an effective of amount of the pharmaceutical composition of claim 9.

> 37. The method of any of claims 33-36 wherein the patient is suffering from constipation-predominant irritable bowel syndrome.

> 39. A method for treating constipation in a patient, the method comprising administering to the patient an effective amount of the pharmaceutical composition of claim 9.

> 43. The method of any of claims 39-42 wherein the patient is suffering from chronic constipation.

> 44. The method of any of claims 39-42 wherein the patient is suffering from idiopathic constipation.

(*See* DTX-001 at 107:42–110:51.) The pharmaceutical composition recited in claim 9 is reproduced below:

> 9. A pharmaceutical composition comprising: (a) a purified peptide consisting of the amino acid sequence: Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr (SEQ ID NO:31); and (b) a pharmaceutically acceptable carrier or excipient.

The specification of the '036 patent does not teach a POSA how to use the full scope of the invention of claims 33, 37, 39, 43, and 44 of the '036 patent without undue experimentation.

515. The following *Wand* factors are considered in evaluating whether practicing the full scope of a claimed invention requires undue experimentation: (1) the quantity of

experimentation necessary; (2) the amount of direction or guidance presented in the specification; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims. These factors are discussed below.

516.   **Factor 1: Quantity of Experimentation:** Factor 1 weighs in favor of claims 33, 37, 39, 43, and 44 of the '036 patent being invalid for lack of enablement. As previously explained, a POSA would have determined the effective amount of [Tyr$^9$]STh(6–19) to administer in a pharmaceutical composition for treating patients with IBS, IBS-C, chronic constipation, and idiopathic constipation as a matter of routine experimentation. However, claims 33, 37, 39, 43, and 44 of the '036 patent are not limited to this specific peptide, or any specific pharmaceutical formulation of this peptide, and as explained in more detail below, it would require significant experimentation for a POSA to practice the full scope of these method of treatment claims.

517.   **Factor 2: Amount of Guidance in the Specification:** The amount of guidance in the specification concerning administration of an "effective amount" of the pharmaceutical compositions of claim 9 in the claimed methods of treatment weighs in favor of claims 33, 37, 39, 43, and 44 being invalid for lack of enablement.

518.   The specification of the '036 patent discloses experimental data for certain peptides in receptor binding and activation assays, in mouse models of gastrointestinal transit and intestinal secretion, in pain models, and in mouse absorption models. More specifically, Examples 1a and 1b in the specification describe the recombinant and chemical synthesis of peptides with the amino acid sequences shown below:

MM416776: Asn Ser Ser Asn Tyr Cys Cys Glu **Leu** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr
MD915: Asn Ser Ser Asn Tyr Cys Cys Glu **Tyr** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr
MM416774: Cys Cys Glu **Leu** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr

MD1100: Cys Cys Glu **Tyr** Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr

(*See* DTX-001 at 25:20–24 (SEQ ID NO:26; MM-416776), 25:31–34 (SEQ ID NO:28; MD-915), 25:36–37 (SEQ ID NO:29; MM-416774), and 25:43–44 (SEQ ID NO:31; MD-1100).) A POSA would have understood that MM-416776 has the amino acid sequence of STh, that MM-416774 has the amino acid sequence of STh(6–19), that MD-915 has the amino acid sequence of [Tyr$^9$]STh(1-19) and that MD-1100 has the amino acid sequence of [Tyr$^9$]STh(6–19).

519. Figure 2 in the '036 patent specification shows experimental results for MM-416776 (i.e., STh(1-19)), MD-915 (i.e., [Tyr$^9$]STh(1-19)), and MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in receptor activation assays for measuring stimulation of the secondary messenger cGMP. Figure 3A in the '036 patent specification purports to show experimental results for MM-416776 (i.e., STh(1-19)) and Zelnorm in an acute mouse gastrointestinal transit model. Figure 3B in the '036 patent specification purports to show experimental results for MD-1100 (i.e., [Tyr$^9$]STh(6–19)) and Zelnorm in an acute mouse gastrointestinal transit model.

520. Figure 4A in the '036 patent specification purports to show experimental results for SEQ ID NO:4 (i.e., STp(1-18)) and SEQ ID NO:3 (i.e., [Tyr$^{11}$]STp(1-18)) in a gastrointestinal transit model. Figure 4B in the '036 patent specification purports to show experimental results for Zelnorm, MM-416776 (i.e., STh(1-19)) and MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in a gastrointestinal transit model. Figure 4C in the '036 patent specification purports to show experimental results for Zelnorm and MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in a gastrointestinal transit assay.

521. Figure 5A in the '036 patent specification purports to show experimental results for Zelnorm and MM-416776 (i.e., STh(1-19)) in a mouse intestinal secretion model. Figure 5B in the '036 patent specification purports to show experimental results for Zelnorm and MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in a mouse intestinal secretion model.

522. Figure 6A in the '036 patent specification purports to show experimental results for MD-915 (i.e., [Tyr$^9$]STh(1-19)) and MM-416776 (i.e., STh(1-19)) in a mouse intestinal secretion model. Figure 6B in the '036 patent specification purports to show experimental results for MD-915 (i.e., [Tyr$^9$]STh(1-19)), MM-416776 (i.e., STh(1-19)), and MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in a mouse intestinal secretion model.

523. Figure 7 purports to show the effect of MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in a rat TNBS colorectal distension assay. Figure 8A purports to show the effect of MD-915 (i.e., [Tyr$^9$]STh(1-19)) in a mouse writhing assay. Figure 8B purports to show the effect of MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in a mouse writhing assay.

524. Figure 9 purports to show the results of MD-1100 (i.e., [Tyr$^9$]STh(6–19)) in a competitive binding assay. Figures 10a and 10b purport to show absorption data for MD-1100 (i.e., [Tyr$^9$]STh(6–19)) administered orally and intravenously as detected by LCMS and ELISA.

525. The specification does not specifically disclose what an "effective amount" of MD-1100 (i.e., [Tyr$^9$]STh(6–19)) is for the treatment of humans with IBS, IBS-C, chronic constipation, and idiopathic constipation.

526. In fact, the term "effective" is used only three times in the part of the '036 patent specification preceding the claims. Excerpts of the specification's references to the term "effective" are reproduced below:

> The identical experiment was performed to determine if MD-1100 is ***effective*** in a chronic dosing treatment regimen. Briefly, 8 week old CD1 female mice are dosed orally once a day for 5 days with either MD-1100 (0.06 mg/kg or 0.25 mg/kg in 20 mM Tris pH 7.5) or vehicle alone (20 mM Tris pH 7.5). On the 5th day, a GIT assay is performed identical to that above except 200 μl of a 10% charcoal solution is administered. FIG. 4c shows the results of a study demonstrating both chemically synthesized MD-1100 or Zelnorm® are ***effective*** in a mouse gastrointestinal motility assay upon chronic

266

> dosing (daily for 5 days). The results are shown side by side with acute dosing (1 day).

(*See* DTX-001 at 33:28–39 (emphasis added).)

> Also suitable in the invention are dry powder formulations comprising a therapeutically ***effective*** amount of active compound blended with an appropriate carrier and adapted for use in connection with a dry-powder inhaler.

(*See* DTX-001 at 40:65–41:2 (emphasis added).)

527.    The specification does not disclose what an "effective amount" of any peptide having SEQ ID NO:31 is, or any pharmaceutical composition thereof, for treating humans with IBS, IBS-C, chronic constipation, and idiopathic constipation.

528.    While it would be routine for a POSA to determine the effective amount of fully oxidized [Tyr$^9$]STh(6–19) (i.e., with disulfide bonds present between Cys$^6$-Cys$^{11}$, Cys$^7$-Cys$^{15}$, and Cys$^{10}$-Cys$^{18}$) to administer in a pharmaceutical composition to patients for treating IBS, IBS-C, chronic constipation, and idiopathtic constipation, the pharmaceutical formulations of claim 9 do not recite fully oxidized [Tyr$^9$]STh(6–19) with disulfide bonds present between Cys$^6$-Cys$^{11}$, Cys$^7$-Cys$^{15}$, and Cys$^{10}$-Cys$^{18}$. Claim 9 recites pharmaceutical compositions comprising a peptide having amino acid SEQ ID NO:31 and a pharmaceutically acceptable carrier or excipient.

529.    As explained for factor 8 below, a POSA would understand that claim 9 encompasses peptides having amino acid SEQ ID NO:31 with no disulfide bonds, one disfulfide bond, two disulfide bonds, three disulfide bonds, and alternative covalent cross-links. A POSA would reasonably expect that numerous peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds and alternative covalent cross-links could bind to and activate the GC-C receptor.

530.    As explained for factor 8 below, a POSA would further understand that peptides

267

having amino acid SEQ ID NO:31 with one or two disulfide bonds or alternative covalent cross-links, would likely need to be administered in different amounts to be effective for treating IBS, IBS-C, chronic constipation, and idiopathic constipation.

531.    The amount of guidance in the specification does not enable a POSA to practice the full scope of claims 33, 37, 39, 43, and 44 without undue experimentation. To practice the full scope of claims 33, 37, 39, 43, and 44, a POSA would have to evaluate:

- Numerous peptides having amino acid SEQ ID NO:31 with one, two or three disulfide bonds or alternative covalent cross-links in GC-C receptor binding assays, in GC-C activation assays, and in animal models;

- Numerous peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links in dose-finding studies to determine the effective dose for each peptide in a pharmaceutical composition; and

- Numerous pharmaceutical compositions of peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links for suitability in a method for treating patients having IBS, IBS-C, chronic constipation, and idiopathic constipation.

Therefore, factor 2 weighs in favor of claims 33, 37, 39, 43, and 44 being invalid for lack of enablement.

532.    **Factor 3: Presence or Absence of Working Examples:** The absence of a working example of a "pharmaceutical composition" comprising a peptide having SEQ ID NO:31 in the specification weighs in favor of claims 33, 37, 39, 43, and 44 being invalid for lack of enablement.

533.    The specification of the '036 patent does not disclose a specific example of a "pharmaceutical formulation" containing an effective amount of a peptide having SEQ ID NO:31 for use in treating IBS, IBS-C, chronic constipation, and idiopathic constipation.

534.    The terms "pharmaceutical" or "pharmaceutically" are used only twelve times in the part of the specification of the '036 patent preceding the claims. Excerpts of the specification's

268

references to the terms "pharmaceutical" or "pharmaceutically" are reproduced below:

> The invention features ***pharmaceutical*** compositions comprising certain peptides that are capable of activating the guanylate-cyclase C (GC-C) receptor. Also within the invention are pharmaceutical compositions comprising a peptide of the invention as well as combination compositions comprising a peptide of the invention and a second therapeutic agent . . .

(*See* DTX-001 at 2:39–45 (emphasis added).)

> In addition, the ***pharmaceutical*** compositions can include an (OK) agent selected from the group consisting of Ca channel blockers (e.g., ziconotide), 5HT receptor antagonists . . .

(*Id*. at 3:12–16 (emphasis added).)

> In a thirteenth aspect, the invention features a ***pharmaceutical*** composition comprising a polypeptide described herein.

(*Id*. at 14:5–7 (emphasis added).)

> The agents, alone or in combination, can be combined with any ***pharmaceutically*** acceptable carrier or medium.

(*Id*. at 37:65–67 (emphasis added).)

> Examples of excipients for use as the ***pharmaceutically*** acceptable carriers and the ***pharmaceutically*** acceptable inert carriers and the aforementioned additional ingredients include, but are not limited to binders, fillers, disintegrants, lubricants, anti-mircobial agents, and coating agents such as: . . .

(*Id*. at 38:23–27 (emphasis added).)

> COATING AGENTS: sodium carboxymethyl cellulose, cellulose acetate phthalate, ethylcellulose, gelatin, ***pharmaceutical*** glaze . . .

(*Id*. at 39:8–10 (emphasis added).)

> The ***pharmaceutical*** forms suitable for injection can include sterile aqueous or organic solutions or dispersions which include, e.g., water, an alcohol, an organic solvent, and oil or other solvent or dispersant . . .. ***Pharmaceutical*** agents can be sterilized by filter sterilization or by other suitable means.

269

(*Id*. at 41:45–49, 55–57 (emphasis added).)

> Suitable *pharmaceutical* compositions in accordance with the invention will generally include an amount of the active compound(s) with an acceptable *pharmaceutical* diluent or excipient, such as a sterile aqueous solution, to give a range of final concentrations, depending on the intended use. The techniques of preparation are generally well known in the art, as exemplified by Remington's *Pharmaceutical* Sciences (18th Edition, Mack Publishing Company, 1995).

(*Id*. at 42:9–16 (emphasis added).)

535.    The specification of the '036 patent does not disclose an actual working example of a "pharmaceutical" formulation containing an effective amount of any peptide having SEQ ID NO:31 for use in treating IBS, IBS-C, chronic constipation, and idiopathic constipation.

536.    While it would be routine for a POSA to prepare a pharmaceutical composition of an effective amount of fully oxidized $[Tyr^9]STh(6–19)$ (i.e., with disulfide bonds present between $Cys^6$-$Cys^{11}$, $Cys^7$-$Cys^{15}$, and $Cys^{10}$-$Cys^{18}$) for administration in a pharmaceutical formulation for treating IBS, IBS-C, chronic constipation, and idiopathtic constipation, claim 9 is not limited to a pharmaceutical formulation comprising fully oxidized $[Tyr^9]STh(6–19)$ with disulfide bonds present between $Cys^6$-$Cys^{11}$, $Cys^7$-$Cys^{15}$, and $Cys^{10}$-$Cys^{18}$ and a pharmaceutically acceptable carrier or excipient. Claim 9 recites pharmaceutical compositions comprising a peptide having amino acid SEQ ID NO:31 and a pharmaceutically acceptable carrier or excipient.

537.    As explained for factor 8 below, a POSA would understand that claim 9 encompasses peptides having amino acid SEQ ID NO:31 with one disulfide bond, two disulfide bonds, three disulfide bonds, and other alternative covalent cross-links. A POSA would reasonably expect that numerous peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds and alternative covalent cross-links could bind to and activate the GC-C receptor. A POSA would

270

further understand that peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds or alternative covalent cross-links would likely need to be formulated in different ways, and administered in different amounts to be effective for treating IBS, IBS-C, chronic constipation, and idiopathic constipation.

538.    To practice the full scope of claims 33, 37, 39, 43, and 44, a POSA would have to evaluate:

- Numerous peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links in GC-C receptor binding assays, in GC-C activation assays, and in animal models;

- Numerous peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links in dose-finding studies to determine the effective dose for each peptide in a pharmaceutical composition; and

- Numerous pharmaceutical compositions of peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links for suitability in a method for treating patients having IBS, IBS-C, chronic constipation, and idiopathic constipation.

The absence of a working example of a "pharmaceutical composition" containing an effective amount of a peptide having amino acid SEQ ID NO:31 in the specification leaves a POSA without a meaningful starting point for practicing the full scope of the claimed invention. Therefore, factor 3 weighs in favor of claims 33, 37, 39, 43, and 44 being invalid for lack of enablement.

539.    **Factors 4 and 5: Nature of the Invention and State of the Prior Art:** Factors 4 and 5 weigh in favor of claims 33, 37, 39, 43, and 44 of the '036 patent being invalid for lack of enablement.

540.    According to the '036 patent specification, the "present invention features compositions and related methods for treating IBS and other gastrointestinal disorders and conditions . . ., and disorders and conditions associated with constipation . . . as well as other

271

conditions and disorders using peptides and other agents that activate the guanylate cyclase C (GC-C) receptor." (*See* DTX-001 at Abstract.) A POSA would have understood that claims 33, 37, 39, 43, and 44 of the '036 patent are directed to methods of treating patients having IBS, IBS-C, chronic constipation, and idiopathic constipation by administration of an effective amount of pharmaceutical compositions of derivatives of STh(6–19).

541.    As previously explained, a POSA would have known that GC-C agonists should act as laxatives to be useful for treating patients suffering from constipation. As also previously explained, the structure activity relationship of ST peptides was relatively well-characterized, and the prior art would have provided the POSA with considerable guidance on the properties of potential ST derivatives. As also previously explained, a POSA would have reasonably expected that $[Tyr^9]STh(6–19)$ would bind to and activate the GC-C receptor and have utility in treating patients with IBS, IBS-C, chronic constipation, and idiopathic constipation.

542.    While it would be routine for a POSA to prepare a pharmaceutical composition of an effective amount of fully oxidized $[Tyr^9]STh(6–19)$ (i.e., with disulfide bonds present between $Cys^6-Cys^{11}$, $Cys^7-Cys^{15}$, and $Cys^{10}-Cys^{18}$) for administration in a pharmaceutical formulation for treating IBS, IBS-C, chronic constipation, and idiopathtic constipation, claim 9 is not limited to a pharmaceutical formulation comprising fully oxidized $[Tyr^9]STh(6–19)$ with disulfide bonds present between $Cys^6-Cys^{11}$, $Cys^7-Cys^{15}$, and $Cys^{10}-Cys^{18}$ and a pharmaceutically acceptable carrier or excipient. Claim 9 recites pharmaceutical compositions comprising a peptide having amino acid SEQ ID NO:31 and a pharmaceutically acceptable carrier or excipient.

543.    As explained for factor 8 below, a POSA would understand that claim 9 encompasses peptides having amino acid SEQ ID NO:31 with one disulfide bond, two disulfide bonds, three disulfide bonds, and other alternative covalent cross-links. A POSA would reasonably

expect that numerous peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds and alternative covalent cross-links could bind to and activate the GC-C receptor. A POSA would further understand that peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds or alternative covalent cross-links would likely need to be formulated in different ways, and administered in different amounts to be effective for treating IBS, IBS-C, chronic constipation, and idiopathic constipation.

544.   To practice the full scope of claims 33, 37, 39, 43, and 44, a POSA would have to evaluate:

- Numerous peptides having amino acid SEQ ID NO:31 with one, two or three disulfide bonds or alternative covalent cross-links in GC-C receptor binding assays, in GC-C activation assays, and in animal models;

- Numerous peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links in dose-finding studies to determine the effective dose for each peptide in a pharmaceutical composition; and

- Numerous pharmaceutical compositions of peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links for suitability in a method for treating patients having IBS, IBS-C, chronic constipation, and idiopathic constipation.

The state of the prior art does not teach a POSA to practice the full scope of claims 33, 37, 39, 43, and 44 without undue experimentation.

545.   **Factors 6 and 7: Relative Skill of Those in the Art and Predictability or Unpredictability of the Art:** Factors 6 and 7 weigh in the favor of claims 33, 37, 39, 43, and 44 of the '036 patent being invalid for lack of enablement.

546.   As previously explained, a POSA during the relevant time period would have a fairly high level of education and skill, including experience in the fields of peptide or protein chemistry, pharmaceutical formulations comprising polypeptides or proteins, and methods for

treating various GI disorders including constipation. A POSA would typically work as part of a multi-disciplinary team to take advantage of each team member's specialized skill to solve problems.

547.    A POSA would have the knowledge and skill to develop derivatives of ST peptides with improved properties that would have therapeutic utility. It would have been routine for a POSA to chemically synthesize and purify ST derivatives, prepare pharmaceutical compositions of the ST derivatives, and to determine the effective amount of the pharmaceutical compositions to administer to patients with IBS, IBS-C, chronic constipation, and idiopathic constipation.

548.    While it would be routine for a POSA to prepare a pharmaceutical composition of an effective amount of fully oxidized [$Tyr^9$]STh(6–19) (i.e., with disulfide bonds present between $Cys^6$-$Cys^{11}$, $Cys^7$-$Cys^{15}$, and $Cys^{10}$-$Cys^{18}$) for administration in a pharmaceutical formulation for treating IBS, IBS-C, chronic constipation, and idiopathtic constipation, claim 9 is not limited to a pharmaceutical formulation comprising fully oxidized [$Tyr^9$]STh(6–19) with disulfide bonds present between $Cys^6$-$Cys^{11}$, $Cys^7$-$Cys^{15}$, and $Cys^{10}$-$Cys^{18}$ and a pharmaceutically acceptable carrier or excipient. Claim 9 recites pharmaceutical compositions comprising a peptide having amino acid SEQ ID NO:31 and a pharmaceutically acceptable carrier or excipient.

549.    As explained for factor 8 below, a POSA would understand that claim 9 encompasses peptides having amino acid SEQ ID NO:31 with one disulfide bond, two disulfide bonds, three disulfide bonds, and other alternative covalent cross-links. A POSA would reasonably expect that numerous peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds and alternative covalent cross-links could bind to and activate the GC-C receptor. A POSA would further understand that peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds or alternative covalent cross-links would likely need to be formulated in different ways, and

274

administered in different amounts to be effective for treating IBS, IBS-C, chronic constipation, and idiopathic constipation.

550.    To practice the full scope of claims 33, 37, 39, 43, and 44, a POSA would have to evaluate:

- Numerous peptides having amino acid SEQ ID NO:31 with one, two or three disulfide bonds or alternative covalent cross-links in GC-C receptor binding assays, in GC-C activation assays, and in animal models;

- Numerous peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links in dose-finding studies to determine the effective dose for each peptide in a pharmaceutical composition; and

- Numerous pharmaceutical compositions of peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links for suitability in a method for treating patients having IBS, IBS-C, chronic constipation, and idiopathic constipation.

While a POSA would have had the training and skill to perform this experimentation, it would nonetheless take substantial time and effort for a POSA to perform this analysis and practice the full scope of claims 33, 37, 39, 43, and 44.

551.    **Factor 8: Breadth of the Claims:** The breadth of the claims weighs in the favor of claims 33, 37, 39, 43, and 44 of the '036 patent being invalid for lack of enablement.

552.    As previously explained, claim 9 is not limited to a pharmaceutical formulation comprising fully oxidized [Tyr$^9$]STh(6–19) with disulfide bonds present between Cys$^6$-Cys$^{11}$, Cys$^7$-Cys$^{15}$, and Cys$^{10}$-Cys$^{18}$ and a pharmaceutically acceptable carrier or excipient. Claim 9 recites pharmaceutical compositions comprising a peptide having amino acid SEQ ID NO:31 and a pharmaceutically acceptable carrier or excipient.

553.    A POSA would understand that claim 9 does not specify the disulfide bonds that provide the peptide having amino acid SEQ ID NO:31 with its conformation. A POSA would

275

further understand that the conformation of a peptide having amino acid SEQ ID NO:31 is important for binding to and activating the GC-C receptor.

554.    The specification of the '036 patent discloses an embodiment of a peptide encompassed by claim 9 with three disulfide bonds between the Cys residues:

> The peptides of the invention, like the bacterial ST peptides, have six Cys residues. These six Cys residues form three disulfide bonds in the mature and active form of the peptide. If the six Cys residues are identified, from the amino to carboxy terminus of the peptide, as A, B, C, D, E, and F, then the disulfide bonds form as follows: A-D, B-E, and C-F. The formation of these bonds is thought to be important for GC-C receptor binding.

(*See* DTX-001 at 24:15–22.) However, a POSA would understand that the claims are not limited to this peptide, because the specific disulfide bonds are not claimed, and the specification discloses alternative embodiments of the invention. For example, the specification teaches that "[i]n certain embodiments the disulfide bonds are replaced by other covalent cross-links." (DTX-001 at 3:47–48.) The specification of the '036 patent further explains:

> In addition, one or more disulfide bonds can be replaced by alternative covalent cross-links, e.g., an amide bond, an ester linkage, an alkyl linkage, a thioester linkage, a lactam bridge, a carbamoyl linkage, a urea linkage, a thiourea linkage, a phosphonate ester linkage, an alkyl linkage, and alkenyl linkage, an ether, a thioether linkage, or an amino linkage."

(*Id.* at 7:33–39.) Thus, a POSA would understand that the peptides encompassed by claim 9 include peptides having no disulfide bonds, one disulfide bond, two disulfide bonds, three disulfide bonds, and alternative covalent cross-links.

555.    A POSA would understand that claim 9 encompasses a large number of peptides that are neither described nor disclosed in the specification of the '036 patent. For example, the six cysteine residues in SEQ ID NO:31 have the same relative positions as the six cysteine residues in

276

STh(6-18). It was known in the art that the six cysteine residues in STh(6-18) could form fifteen possible three-disulfide pairing patterns. (*See* Gariepy 1987 at 8908.) A POSA would have understood that the amino acid sequence of STh(6-18) could form an even larger number of peptides with one or two disulfide bonds. (*See* DTX-021 at 7:35–44 ("[T]here are a total of ninety (15x6x1) theoretically possible secondary structural isomers of each primary amino acid residue sequence of ST that contains six Cys residues and two or three disulfide bonds.").) A POSA would have also understood that the amino acid sequence of STh(6-18) could be prepared to form a large number of peptides with alternative covalent cross-links.

556.    Thus, a POSA would have understood that a large number of peptides having the amino acid sequence of SEQ ID NO:31 are encompassed by the pharmaceutical compositions recited in claim 9. A POSA would have reasonably expected that numerous peptides having amino acid SEQ ID NO:31 with one or two disulfide bonds and alternative covalent cross-links could bind to and activate the GC-C receptor. (*See* DTX-021 at 10:29–31 ("at least one intramolecular cysteine disulfide bond is required for immunological activity").) For example, analogs of STh(6-18) with two disulfide bonds were known in the art to have biological activity, as shown below:

277

TABLE 4 Synthetic Analogues of STh with One or Two
Disulfide Bonds and Their Enterotoxic Activity

| No. | Peptide[a] | MED (pmol) |
|---|---|---|
| | C C E L C C N P A C T G C | 0.4 |
| 1 | A C E L C A N P A C T G C | 380 |
| 2 | C A E L C C N P A A T G C | Inactive |
| 3 | C C E L A C N P A C T G A | 290 |
| 4 | C E L C A N P A C T G C | 150 |
| 5 | C C E L A C N P A C | 110 |
| 6 | C E L A C N P A C T G A | Inactive |
| 7 | C C E L A C N P A C T G A | Inactive |
| 8 | C C E L A C N P A C T G A | Inactive |
| 9 | C A E L C C N P A A T G C | Inactive |
| 10 | C E L A C N P A C T G A | Inactive |

MED-minimum effective dose
[a]C denotes a cysteine residue in which the thiol group is blocked by an
acetamidomethyl group.

(*See* DTX-044 at 286.)

557.   The specification of the '036 patent does not teach a POSA which peptides having

amino acid SEQ ID NO:31 and alternative disulfide pairings or cross covalent cross-links have

biological activity. Correspondingly, the specification of the '036 patent does not teach a POSA

what an effective amount of these alternative peptides would be to administer to patients with IBS,

IBS-C, chronic constipation, and idiopathic constipation. Moreover, the specification of the '036

patent does not disclose a working example of any pharmaceutical compositions containing an

effective amount of a peptide having amino acid SEQ ID NO:31 for treating patients with IBS,

IBS-C, chronic constipation, and idiopathic constipation.

278

558.    Therefore, to practice the full scope of claims 33, 37, 39, 43, and 44, a POSA would have to evaluate:

- Numerous peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links in GC-C receptor binding assays, in GC-C activation assays, and in animal models;

- Numerous peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links in dose-finding studies to determine the effective dose for each peptide in a pharmaceutical composition; and

- Numerous pharmaceutical compositions of peptides having amino acid SEQ ID NO:31 with one, two, or three disulfide bonds or alternative covalent cross-links for suitability in a method for treating patients having IBS, IBS-C, chronic constipation, and idiopathic constipation.

Accordingly, factor 8 weighs in favor of claims 33, 37, 39, 43, and 44 being invalid for lack of enablement because practicing the full scope of these claims would require undue experimentation.

## III.    OBVIOUSNESS OF THE FORMULATION PATENTS

559.    As described in further detail below, the asserted claims of the '573 patent and '628 patent ("the Formulation Patents") are invalid as obvious under 35 U.SC. § 103.

560.    Linaclotide was a known therapeutic peptide prior to the priority dates for the Formulation Patents. For example, the prior art disclosed the amino acid sequence of linaclotide (e.g., linaclotide's primary structure and disulfide bonds), effective dosages of linaclotide for the treatment of IBS-C and CIC, and that linaclotide was administered as a solid oral dosage form. A POSA accordingly would have been motivated to prepare to a solid linaclotide formulation for oral administration.

561.    The prior art further disclosed the three-dimensional shapes of peptides closely related to linaclotide, including STh peptides from which linaclotide is derived. A POSA would expect linaclotide to have a similar three-dimensional shape, in particular due to the presence of

279

the peptides' nearly identical three disulfide bonds. Accordingly, a POSA would look to prior art discussion of these related peptides when formulating a solid linaclotide formulation for oral administration.

562.    A POSA would have further reasonably expected that linaclotide could be stabilized in a solid oral dosage form by addressing certain potential degradation pathways based on the prior art and on the known structure of linaclotide and the structure of related peptides described in the prior art. For example, a POSA would have sought to stabilize a linaclotide formulation by addressing deamidation via linaclotide's exposed asparagine residue, formaldehyde-mediated degradation, in particular given the low efficacious doses of linaclotide, and other degradation pathways such as aggregation. A POSA would also have been aware that is it not necessary to address every possible degradation pathway in order to formulate a solid linaclotide formulation for oral administration.

563.    The prior art taught methods of stabilizing these degradation pathways, including the common use of a finite number of versatile excipients capable of stabilizing multiple degradation pathways. A POSA would have looked to these disclosures for guidance formulating a solid linaclotide formulation for oral administration. For example, metal cations, and in particular divalent calcium ions, were taught by the prior art to stabilize a peptide with an exposed asparagine and to further reduce aggregation. Leucine was taught by the prior art to decrease aggregation, formaldehyde-mediated degradation, and deamidation.

564.    A POSA would have been motivated to combine the use of calcium and leucine to address different degradation pathways based on the teachings of the prior art, and would have done a reasonable expectation of success in doing so.  It would have required only routine experimentation to arrive at the optimal concentrations of each excipient that would stabilize a

solid linaclotide formulation

## A. FORMULATION PATENTS IN SUIT

### 1. U.S. Patent No. 8,748,573 ("the '573 patent")

565.    The '573 Patent, titled "FORMULATIONS COMPRISING LINACLOTIDE," issued on June 10, 2014. The named inventors listed on the face of the '573 patent are Angelika Fretzen, Steven Witowski, Alfredo Grossi, Hong Zhao, Mahendra Dedhiya, and Yun Mo.

566.    U.S. Patent Application No. 12/851,330, the application that ultimately issued as the '573 patent, was filed on August 5, 2010. The cover of the '573 patent claims priority to U.S. Provisional Patent Application Ser. No. 61/231,725, filed on Aug. 6, 2009. The earliest possible priority date for the '573 patent is August 6, 2009.

567.    The asserted claims of the '573 patent are generally directed to a method of treating chronic constipation or constipation-predominant irritable bowel syndrome by administering to a patient an oral, solid pharmaceutical dosage form comprising linaclotide, leucine, and Ca2+. More particularly, the asserted claims recite:

> 1. A method of treating chronic constipation or constipation-predominant irritable bowel syndrome in a patient in need thereof, comprising administering to the patient an oral, solid pharmaceutical dosage form comprising:
>
> between 100 μg and 300 μg of a peptide consisting of the amino acid sequence $Cys_1$ $Cys_2$ $Glu_3$ $Tyr_4$ $Cys_5$ $Cys_6$ $Asn_7$ $Pro_8$ $Ala_9$ $Cys_{10}$ $Thr_{11}$ $Gly_{12}$ $Cys_{13}$ $Tyr_{14}$ (SEQ ID NO:1) or a pharmaceutically acceptable salt thereof, wherein the peptide includes disulfide bonds between $Cys_1$ and $Cys_6$, $Cys_2$ and $Cys_{10}$, and $Cys_5$ and $Cys_{13}$;
>
> leucine in a molar ratio of leucine to the peptide between 40:1 and 20:1; and
>
> $Ca^{2+}$ or a salt thereof in a molar ratio of $Ca^{2+}$ [to] the peptide between 70:1 and 50:1.
>
> 2. The method of claim 1, wherein the oral, solid pharmaceutical dosage

281

form further comprises a polymer selected from polyvinyl pyrrolidone, polyvinyl alcohol, hydroxylpropyl methyl cellulose and mixtures thereof in an amount between 0.01 wt. % and 2 wt. % relative to the total weight of the oral dosage form.

3. [not asserted] A method of treating chronic constipation or constipation-predominant irritable bowel syndrome in a patient in need thereof, comprising administering to the patient an oral, solid pharmaceutical dosage form comprising a peptide consisting of the amino acid sequence $Cys_1 Cys_2 Glu_3 Tyr_4 Cys_5 Cys_6 Asn_7 Pro_8 Ala_9 Cys_{10} Thr_{11} Gly_{12} Cys_{13} Tyr_{14}$ (SEQ ID NO:1) or a pharmaceutically acceptable salt thereof, wherein the and $Cys_5$ and $Cys_{13}$ in an amount between 0.2% by weight and 0.4% by weight, leucine in an amount between 0.5% by weight and 0.8% by weight, and a $Ca^{2+}$ salt in an amount between 1.4% by weight and 1.65% by weight relative to the total weight of the oral dosage form.

***

7. The method of claim 3, wherein the oral, solid pharmaceutical dosage form further comprises a polymer selected from polyvinyl pyrrolidone, polyvinyl alcohol, hydroxylpropyl methyl cellulose and mixtures thereof in an amount between 0.01 and 2 wt. % relative to the total weight of the oral dosage form.

8. 8.  The method of claim 1, wherein the Ca2+ or salt thereof and leucine are present in a molar ratio of at least 1.5:1.

### 2.  U.S. Patent No. 8,802,628 ("the '628 patent")

568.  The '628 Patent, titled "STABLE SOLID FORMULATION OF A GC-C RECEPTOR AGONIST POLYPEPTIDE SUITABLE FOR ORAL ADMINISTRATION," issued on August 12, 2014. The named inventors listed on the face of the '628 patent are Angelika Fretzen, Steven Witowski, Alfredo Grossi, Hong Zhao, Mahendra Dedhiya, and Yun Mo.

569.  U.S. Patent Application No. 12/541,410, the application that ultimately issued as the '628 patent, was filed on August 14, 2009. The cover of the '628 patent claims priority to U.S. Application Ser. No. 61/089,422, filed Aug. 15, 2008, U.S. Application Ser. No. 61/273,332, filed Aug. 3, 2009, and U.S. Application Ser. No. 61/231,725, filed Aug. 6, 2009. The earliest possible

priority date for the '628 patent is August 15, 2008.

570.    The asserted claims of the '628 patent are generally directed to a solid oral pharmaceutical composition for oral administration comprising a pharmaceutically acceptable carrier, linaclotide, a $Ca^{2+}$ cation, and leucine. More particularly, the asserted claims recite:

> 1. A solid pharmaceutical composition for oral administration comprising a pharmaceutically acceptable carrier, linaclotide, a $Ca^{2+}$ cation and leucine, wherein linaclotide has the amino acid sequence Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr (SEQ ID NO:1) and activates the guanylate cyclase C (GC-C) receptor.

> 2. [not asserted] The solid pharmaceutical composition of claim 1, wherein said Ca2+ is provided as calcium chloride, calcium phosphate, or calcium sulfate.

> \*\*\*

> 16. The solid pharmaceutical composition according to claim 1, wherein an assay value for linaclotide in a unit dosage form determined on a weight/weight basis decreases by less than 10%, after (a) 18 months of storage of the pharmaceutical composition at 25° C. at 60% relative humidity in a sealed container containing a desiccant or (b) 6 months of storage of the pharmaceutical composition at 40° C. at 75% relative humidity in a sealed container containing a desiccant.

> 17. The solid pharmaceutical composition according to claim 16, wherein the assay value for the linaclotide decreases by less than 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2% or 1% after (a) 18 months of storage of the pharmaceutical composition at 25° C. at 60% relative humidity in a sealed container containing a desiccant or (b) 6 months of storage of the pharmaceutical composition at 40° C. at 75% relative humidity in a sealed container containing a desiccant.

> \*\*\*

> 20. The solid pharmaceutical composition of claim 2, wherein said $Ca^{2+}$ cation is provided as calcium chloride.

> 21. The solid pharmaceutical composition of claim 1, wherein the molar ratio of $Ca^{2+}$ cation:leucine:linaclotide is 40-100:20-50:1.

571.    The parties did not identify any claim terms or phrases for construction by the Court, and the Court has not construed any of the asserted claims. These facts are therefore based

on the ordinary and customary meaning of the language in the asserted claims as it would have been understood by a POSA at the time of the invention in light of the specification.

### B.  PERSON OF ORDINARY SKILL IN THE ART

572.    A POSA during the relevant time period would have a fairly high level of education and skill. Such POSAs would be those familiar with the fields, or have access to those familiar with the fields, of peptide or protein chemistry, pharmaceutical formulations comprising polypeptides or proteins, and methods for treating various GI disorders including constipation, and would include physicians, biochemists, cellular biologists, molecular biologists, microbiologists, medicinal chemists, pharmaceutical chemists, formulation chemists, or protein chemists involved in research and development of pharmaceutical formulations, including the use of peptides in such formulations, who have a Master's, and/or Ph.D., and/or M.D. degree and several years of experience in the field. The amount of experience in the field would depend upon the level of formal education and particular experience with peptides, proteins, pharmaceutical formulations, and/or treating patients.

573.    The POSA would typically work as part of a multi-disciplinary team and draw upon not only his or her own skills, but also take advantage of certain specialized skills of others on the team to solve a given problem. For example, a clinician having experience in treating GI disorders such as constipation and irritable bowel syndrome ("IBS") and a peptide chemist may be part of the team. Therefore, in performing the inquiries of an obviousness determination, the prior art must be viewed from the perspective of such a skilled person, who would easily have understood the prior art references referred to herein and would have the capacity to draw inferences from them.

## C.  RELEVANT TECHNICAL BACKGROUND

574.    Prior art may be in the form of, among other things, a patent or patent application, a publication, an invention, a public statement, or a product. The relevant "critical date" for purposes of this analysis for the '628 patent is August 15, 2008, and for the '573 patent is August 6, 2009. The following analysis represents what a POSA would have known as of these dates.

### 1.  Pharmaceutical Formulation

575.    Pharmaceutical formulation is the process in which different chemical substances, including the active drug (i.e., the pharmaceutically active agent), are combined to produce a final pharmaceutical product. Pharmaceutical formulation may also refer to the pharmaceutical dosage form prepared via such process.

576.    By at least January 28, 2003, it was known that pharmaceutical formulations, such as solid oral dosage forms, routinely contain other materials in addition to a therapeutically effective amount of one or more active ingredients. (*See, e.g.*, REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY 858 (Alfonso Gennaro, ed., 20th ed., 2000) ("Remington 2000") (DTX-052).) These additional materials are called "excipients."

577.    This section briefly analyzes how a POSA would have chosen a therapeutically effective amount of an active ingredient before January 28, 2003. (*See* Section III(C)(1)(a).) The next section includes an analysis of several reasons for including a pharmaceutically acceptable excipient in a pharmaceutical formulation. (*See* Section (IIII)(C)(1)(b).)

### a.  Therapeutically effective amount of an active ingredient

578.    By at least January 28, 2003, a POSA would have identified a therapeutically effective amount of an active ingredient by routine experimentation.

579.    As early as 1988, it was known that a "dose-finding study" is a critical

component of a clinical development of a new drug. (R. Schmidt, *Dose-finding studies in clinical drug development*, 34 Eur. J. Clinical Pharmacology 15, Summary (1988) ("Schmidt 1988") (DTX-137).)

580.    As Schmidt 1988 taught:

> The clinical development of a new drug is usually divided into three phases. Phase I is devoted to tolerability testing and pharmacokinetic evaluation. Trials in late Phase I or early Phase II are aimed at elucidating clinical efficacy in the intended patient population and to define the dosage and dosage schedule. Controlled trials are performed subsequently to compare the new drug with the standard medications. In Phase III, large scale trials are performed to confirm the efficacy and safety of the new drug in the target population.

(*Id.* at 15.)

581.    Schmidt 1988 disclosed that the objective of a dose-finding study is to "satisfy the requirement that patients be exposed only to the quantity of drug that they really need," i.e., an "effective amount" of the drug. (*Id.*)

582.    By January 28, 2003, it was known that the minimum effective dose is "the smallest dose with a discernible useful effect," which is the smallest dose producing a clinical response that can be declared statistically significantly different from the placebo response. (*See id.* at 17; F. Bretz et al., *Practical Considerations for Optimal Designs in Clinical Dose Finding Studies*, 00 Statistics in Med. 1, 2  (2000) ("Bretz 2000") (DTX-145).) Several methods were known for estimating the minimum effective dose, such as modeling approaches or multiple test strategies. (DTX-145 at 2.)

583.    Further, it was known that the maximum useful dose, which is a dose "beyond which no further beneficial effects is seen," could similarly be estimated using multiple test strategies or modeling approaches. (*Id.*)

286

584.    Schmidt 1988 disclosed the following figure depicting the relationship between efficacy and tolerability in a dose-finding study. (*See* DTX-137 at 17, Fig. 1.)



**Fig. 1.** Interrelation between efficacy (Eff) and tolerability (Tol) in a dose-finding study. d = dose

585.    Further, dose-response studies were well known in the art. For example, in 1994, the International Council on Harmonization of Technical Requirements for the Registration of Pharmaceuticals for Human Use ("ICH-E4") published the "Guidelines for industry: Dose-response information to support drug registration." ("Industry Guidelines 1994") (DTX-147).

586.    Industry Guidelines 1994 taught that information obtained from a dose-response study "can help identify an appropriate starting dose, the best way to adjust dosage to the needs of a particular patient, and a dose beyond which increases would be unlikely to provide added benefit or would produce unacceptable side effects." (*Id.* at 1.)

587.    Industry Guidelines 1994 taught that "[a]ssessment of dose-response should be an integral component of drug development with studies designed to assess dose-response an inherent part of establishing the safety and effectiveness of the drug." (*Id.* at 5.)

287

588.    Industry Guidelines 1994 taught four specific study designs to assess dose response: parallel dose response, cross-over dose response, forced titration, and optional titration. (*Id.* at 9.)

589.    Industry Guidelines 1994 taught that "[a] widely used, successful, and acceptable design" for "obtaining population average dose-response data, is the randomized parallel, dose-response study with three or more dosage levels, one of which may be zero (placebo)." (*Id.* at 14.)

590.    Additionally, Bretz 2000 taught efficient designs for estimating target doses of interest.

591.    Therefore, by January 28, 2003, a POSA would have been motivated to find an effective amount of a therapeutic agent, such as a therapeutic peptide, and would have been able to do so by routine experimentation.

### b.  Excipients

592.    A pharmaceutical formulation typically contains one or more excipients in addition to the pharmaceutically active ingredient.

593.    By at least January 28, 2003, it was known that excipients may be added to the pharmaceutical formulation to facilitate handling and manufacturing, enhance the physical appearance, improve stability, and aid in the delivery of the drug to the body. (*See, e.g.*, DTX-052 at 858, 885.)

594.    For example, a solid oral dosage formulation—such as a tablet or capsule—may contain one or more of the following types of excipients: diluents, binders, glidants, and/or lubricants (excipients that facilitate processing of a formulation); stabilizers (excipients that improve a formulation's stability); coloring agents and coating (excipients associated with a

formulation's physical appearance); flavoring agents and sweeteners (excipients that enhance a formulation's taste); and modified-release agents (excipients that help modify or control the rate of release of the drug). (*See, e.g.*, *id.* at 860–63, 885–92.)

595.     A POSA would have carefully evaluated different pharmaceutically acceptable excipients and would have selected one or more excipients to achieve the desired drug delivery goals and to maintain the therapeutic efficacy of the active ingredient in the pharmaceutical formulation. (*Id.* at 858.)

596.     Therefore, by January 28, 2003, a POSA would have routinely included one or more pharmaceutically acceptable excipients in a pharmaceutical formulation, in addition to a therapeutically effective amount of the active ingredient.

597.     In sum, by January 28, 2003, a POSA would have routinely prepared a pharmaceutical formulation containing an effective amount of a therapeutic peptide, including a derivative of an ST peptide such as linaclotide,[9] and a pharmaceutically acceptable excipient, and would have had a reasonable expectation of success in doing so. As the '036 patent provides, the techniques of preparing such a formulation were "generally well known in the art, as exemplified by Remington's Pharmaceutical Sciences (18th ed. 1995)." (*See also* DTX-001 at 42:9–16.). (*See also* DTX-001 at 42:9–16.)

---

[9] *See, e.g.*, Aimoto et al., *Chemical Synthesis of a Highly Potent and Heat-stable Analog of an Enterotoxin Produced by a Human Strain of Enterotoxigenic Escherichia coli*, 112(1) BIOCHEM. BIOPHY. RES. COMMUN. 320, 326 (1983) (DTX-028) (disclosing that STh(6-19) has higher heat stability and more biological activity than STh); Carpick et al., "\*Structural Characterization of Functionally Important Regions of the Escherichia coli Heat-Stable Enterotoxin STIb*, 30 BIOCHEMISTRY 4803, 4805 Table 1 (1991) (DTX-031) (disclosing the biological activity of various derivatives of STh(6-18)); HANDBOOK OF NATURAL TOXINS: BACTERIAL TOXINS AND VIRULENCE FACTORS IN DISEASE 283–84, Tables 1-3 (Moss J. et al. eds., vol. 8 1995) (DTX-044) (disclosing the biological activity of various derivatives of STh(6-19).)

289

### 2.   Linaclotide Was a Known Therapeutic Peptide

598.    This section first discusses what was known about peptide and protein structure before the relevant critical dates for the the '628 patent and the '573 patent. (*See* Section (III)(C)(2)(a).)

599.    This section then discusses that linaclotide was a known therapeutic peptide before the relevant critical dates for the the '628 patent and the '573 patent. (*See* Section (III)(C)(2)(b).)

### a.   Protein and peptide structure

600.    Amino acids are the basic structural units of proteins and peptides. An amino acid unit in a protein or peptide is called a residue.

601.    An amino acid consists of an amino group, a carboxyl group, a hydrogen atom, and a distinctive R group bonded to a carbon atom.



602.    Twenty different R groups varying in size, shape, charge, and chemical reactivity are commonly found in natural proteins and peptides. Indeed, all proteins in all species, from bacteria to human, are made from the same set of twenty amino acids.

603.    The structure of the amino acids asparagine, aspartic acid, and cysteine are shown below.

290

asparagine        aspartic acid        cysteine

604.    Amino acids are often designated by either a three-letter abbreviation or a one-letter abbreviation, as shown in the below table. (*See* L. Stryer, BIOCHEMISTRY 21 (1988) ("Stryer 1988") (DTX-149).)

**Table 2-2**
Abbreviations for amino acids

| Amino acid | Three-letter abbreviation | One-letter symbol |
|---|---|---|
| Alanine | Ala | A |
| Arginine | Arg | R |
| Asparagine | Asn | N |
| Aspartic acid | Asp | D |
| Asparagine or aspartic acid | Asx | B |
| Cysteine | Cys | C |
| Glutamine | Gln | Q |
| Glutamic acid | Glu | E |
| Glutamine or glutamic acid | Glx | Z |
| Glycine | Gly | G |
| Histidine | His | H |
| Isoleucine | Ile | I |
| Leucine | Leu | L |
| Lysine | Lys | K |
| Methionine | Met | M |
| Phenylalanine | Phe | F |
| Proline | Pro | P |
| Serine | Ser | S |
| Threonine | Thr | T |
| Tryptophan | Trp | W |
| Tyrosine | Tyr | Y |
| Valine | Val | V |

605.    Some proteins and peptides contain disulfide bonds. These cross-links between

291

different chains (i.e., inter-molecular disulfide bond) or between parts of a chain (i.e., intra-molecular disulfide bond) are formed by the oxidation of cysteine residues. The resulting disulfide is often called "cystine." (*Id.* at 23.)



606.    Many amino acids, usually more than 50, are joined by peptide bonds to form a "polypeptide" (i.e., a protein) linear chain. Peptides, on the other hand, are shorter, linear chains of amino acids linked by peptide bonds.

607.    A protein or a peptide chain is understood to have a "direction," because its building blocks (i.e., amino acids) have different ends—the amino end and the carboxyl end. By convention, the amino end is taken to be the beginning of the polypeptide, and thus, the sequence of amino acids in a polypeptide is written starting with the amino-terminal residue (i.e., the N-terminal) and ending with the carboxyl-terminal residue (i.e., the C-terminal).

### b. Linaclotide was known to treat certain gastrointestinal disorders

608.    It was known that linaclotide (i.e., MD-1100) is a 14-amino acid peptide with the following amino acid sequence and three disulfide bonds between cysteines 1 and 6, 2 and 10, and 5 and 13. (U.S. Patent Application Publication No. 2005/0020811 A1 ¶¶ [0025], [0110] ("Currie '811 publication") (DTX-066); *see also* Andresen et al., *Linaclotide Acetate*, 33(7) DRUGS OF THE FUTURE 570, 580 (2008) ("Andresen 2008") (DTX-073); Harris et al., *Drug Evaluation: Linaclotide, a New Direction in the Treatment of Irritable Bowel Syndrome and Chronic Constipation*, 9(4) CURRENT OPINION MOLECULAR THERAPEUTICS 403, 403 (2007) ("Harris 2007") (DTX-079).)



609.    Further, it was known that linaclotide acts as an agonist of the intestinal GC-C receptor, "a key regulator of fluid and electrolyte balance in the intestine," "expressed in the intestine by gastrointestinal epithelial cells," and thus increases intestinal transit rates and intestinal secretion. (*See* DTX-066 ¶¶ [0097], [0098], [0135], [0138]–[0140]; *id.* at Figs. 2, 3b, 5b, 6b.)

610.    Linaclotide was used for the treatment of patients with chronic constipation or constipation-predominant irritable bowel syndrome (c-IBS) in clinical studies. (*See* Andresen et al., *Effect of 5 Days Linaclotide on Transit and Bowel Function in Females with Constipation-Predominant Irritable Bowel Syndrome*, 133(3) GASTROENTEROLOGY 761–68 (2007) ("Andresen 2007") (DTX-328); DTX-073 at 570, 572, 574.)

611.     The preferred route of administration for linaclotide was the oral route (*see generally* DTX-328; DTX-073), for example, by administering a capsule formulation. (DTX-066 ¶ [0159].)

612.     Linaclotide was administered orally and was well-tolerated across a daily dose range of 100–1000 µg in a Phase IIA study. (DTX-073 at 572; *see also* DTX-079 at 406; Brian E. Lacy, *ACG 2006 – Evaluation and Treatment of IBS and Chronic Constipation*, MEDSCAPE GASTROENTEROLOGY 3 (2006) (available at www.medscape.com) ("Lacy 2006") (DTX-082; Press Release, Microbia, "Microbia Announces Positive Phase 2 Results for its Investigational Compound Linaclotide" (May 21, 2007) ("Microbia Press Release 2007") (DTX-086).)

613.     A daily dose of 75, 150, 300, and 600 µg of linaclotide was used to treat patients with chronic constipation or c-IBS in a Phase IIB study. (DTX-073 at 573; *see also* Press Release, Microbia, "Microbia and Forest Laboratories Announce Preliminary Results of Linaclotide Phase 2B Studies" (Mar. 4, 2008) ("Microbia Press Release 2008") (DTX-087).)

### 3.  Known Methods for Preparing Stable Protein and Peptide Formulations

614.     The preparation of proteins and peptides as medicinal agents has long been an integral part of the pharmaceutical industry. (*See, e.g.*, Manning  et al., *Stability of Protein Pharmaceuticals*, 6(11) PHARMACEUTICAL RES. 903–18, 909 (1989) ("Manning 1989") (DTX-048).)

615.     The prior art taught rational strategies for developing a stable peptide or protein formulation. (*See, e.g.*, DTX-048 at 903; Volkin et al., *Degradative Covalent Reactions Important to Protein Stability*, 8 MOLECULAR BIOTECH. 105, 106 (1997) ("Volkin 1997") (DTX-094).)

616.    It was well-known that understanding a protein or peptide's stability at a molecular level was important for preparing stable protein or peptide formulations. (*See, e.g.*, DTX-048 at 903; DTX-094 at 106.)

617.    Protein or peptide instability may result from structural modifications via chemical bond formation or cleavage, creating a new chemical entity. (*See, e.g.*, DTX-048 at 903.) These structural modifications are often called "degradation." (*Id.*)

618.    Examining the amino acid sequence of a protein or a peptide was known to be "extremely useful" in understanding, and minimizing, the causes and mechanisms of a protein or a peptide's instability. (DTX-094 at 119.)

### a.    Common known protein or peptide degradation pathways

619.    Several structural modifications or degradations were known to commonly affect proteins and peptides, including therapeutic proteins and peptides. A POSA, knowing a protein or peptide's structure, could determine from that structure likely degradation pathways. These common degradation pathways include:

- Hydrolysis, for example, deamidation of the asparagine amino acid side chain to form aspartic acid (*see, e.g.*, DTX-048 at 903; DTX-094 at 106);

- Oxidation of, for example, the cysteine amino acid side chain (*see, e.g.*, DTX-048 at 905);

- Covalent or non-covalent aggregation (*see, e.g.*, DTX-048 at 603, 906);

- N-methyl derivative formation, for example, via reaction with formaldehyde (*see, e.g.*, del Barrio et al., *Simultaneous Determination of Formic Acid and Formaldehyde in Pharmaceutical Excipients Using Headspace GC/MS*, 41 J. PHARMACEUTICAL & BIOMEDICAL ANALYSIS 738, 738 (2006) ("del Barrio

295

2006") (DTX-100); Li et al., *Detection and Quantification of Low-Molecular-Weight Aldehydes in Pharmaceutical Excipients by Headspace Gas Chromatography*, A 1104 J. CHROMATOGRAPHY 1, 1 (2006) ("Li 2006") (DTX-084)).

620.     *Hydrolysis/deamidation*—the side chain of a glutamine or asparagine amino acid residue in a peptide or protein is hydrolyzed/deamidated to form a side chain with a carboxylic acid group, i.e., glutamic acid or aspartic acid side chain, respectively. This structural modification for an asparagine side chain is shown below (*see, e.g.*, DTX-094 at 107):



621.     This spontaneous degradation reaction, observed under a variety of conditions, was known as "one of the most commonly encountered chemical modifications of proteins." (*See* DTX-094 at 106; *see also* DTX-048 at 903.)

622.     One well-characterized example of deamidation involving a therapeutic agent is deamidation of the human growth hormone ("rhGH"). (DTX-094 at 108.)

623.     *Oxidation*—the side chains of histidine, methionine, cysteine, tryptophan, and tyrosine residues in a protein or peptide are potential oxidation sites. (DTX-048 at 905.)

624.     It was known in the art that cysteine may be oxidized to form a cystine, i.e., two cysteine residues that are linked by a disulfide bond. (Cleland et al., *The Development of Stable Protein Formulations: A Close Look at Protein Aggregation, Deamidation, and Oxidation*, 10(4) CRITICAL REV. THERAPEUTIC DRUG CARRIER SYSTEMS 307, 345 (1993) ("Cleland 1993") (DTX-

034).) Additionally, it was known that "[o]nce the cystine disulfide is formed, it is much less susceptible to reaction with mild oxidants" than cysteine, and "so is often found as the stable end product in an oxidative reaction." (*Id.*)

625.     Covalent or non-covalent aggregation is another major degradation pathway for proteins or peptides. (*See, e.g.*, *id.* at 354.)

626.     *Covalent aggregation* occurs when covalent bonds between two or more peptide molecules are formed. For example, in proteins or peptides with intra-molecular disulfide bonds, inter-molecular disulfide bonds may form, linking two or more peptide or protein chains together, which may lead to protein or peptide aggregation. (DTX-048 at 906.)

627.     It was known that even freeze-dried proteins, such as bovine serum albumin, could undergo aggregation as a result of moisture-induced inter-molecular disulfide bond formation. (DTX-094 at 113.)

628.     Non-covalent aggregation is another cause of protein or peptide instability. (DTX-048 at 903, 910.)

629.     *N-methyl derivative formation via reaction with formaldehyde*—it was known that formaldehyde, a common residual impurity present in excipients, could degrade various drug products by forming adducts with the drug products' primary and/or secondary amine groups. (*See, e.g.*, DTX-084 at 1; DTX-100 at 738.)

630.     Further, it was known that formaldehyde is present in many materials, including components of packaging, and that parts per million levels might cause significant degradation because of its low molecular weight. (*See, e.g.*, P.J. Crowley, *Excipients as Stabilizers*, 2(6) PSIT 237, 238 (1999) ("Crowley 1999") (DTX-076); DTX-100 at 743.)

631.     Additionally, it was known that formaldehyde reacts with the amino group of the

297

N-terminal amino acid residue and the side-chains of, among others, cysteine, to form an imine, a Schiff-base. (DTX-100 at 739; Metz et al., *Identification of Formaldehyde-Induced Modifications in Proteins: Reactions with Model Peptides*, 279 J. BIOLOGICAL CHEMistry 6235, 6238 (2004) ("Metz 2004") (DTX-105).) This reaction is shown below:



### b.  Known methods for minimizing common protein or peptide degradation pathways

632.    The prior art taught several methods for minimizing common protein or peptide degradation pathways by using well-known pharmaceutically acceptable excipients.

633.    For example, it was known that amino acids act as formaldehyde scavengers in pharmaceutical compositions, and thus stabilize the therapeutic peptide or protein by adsorbing formaldehyde. (*See* U.S. Patent No. 5,874,106 at 3:34–37 ("Adesunloye '106 patent") (DTX-151); EP 1559433 A1 at Abstract ("Iwata '433 publication") (DTX-146).)

634.    Additionally, it was known that adding amino acids, such as leucine, to a pharmaceutical composition comprising growth hormone reduces deamidation of human growth hormone by 25–30% compared to the use of phosphate buffer. (U.S. Patent No. 5,654,278 at 6:39–44 ("Sørensen '278 patent") (DTX-064).)

635.    In general, divalent metal ions were known as peptide stabilizers, and as useful carriers for oral administration of physiologically active peptides. (International Publication No. WO 02/26248 A1 at 2:31–3:5 ("Marra '248 publication") (DTX-069); EP 0943336 A1 ¶¶ [0024],

[0026] ("Yanagawa '336 publication") (DTX-065).)

636.     Divalent cations, such as $Ca^{2+}$,[10] were known to improve the stability of a formulation containing a therapeutic polypeptide by reducing the deamidation rate (U.S. Patent Application Publication No. 2008/0124326 A1 ¶¶ [0033], [0035] ("Rehder '326 publication") (DTX-070); U.S. Patent No. 6,022,858 at 4:47–51 ("Sørensen '858 patent") (DTX-071)) or the dimerization/aggregation rate (International Publication No. WO 04/039392 A2 ¶ [0028] ("Bentz '392 publication") (DTX-276); Chen et al., *Influence of Calcium Ions on the Structure and Stability of Recombinant Human Deoxyribonuclease I in the Aqueous Lyophilized States*, 88(4) J. PHARMAC. SCI., 477, 481 (1999) ("Chen 1999") (DTX-075)).

637.     Further, it was known that various moisture-related degradation pathways (such as aggregation or hydrolysis) could be reduced by adding a divalent cation carrier, such as calcium chloride anhydrous, to the protein or peptide formulation due to its hygroscopic effect. (DTX-076 at 238.)

638.     Thus, it was known that the addition of a divalent cation and an amino acid could stabilize a peptide formulation by reducing different, though overlapping, degradation pathways:

- Divalent cations were known to reduce hydrolysis/deamidation and dimerization/aggregation;

- Amino acids were known to reduce hydrolysis/deamidation, and formaldehyde-mediated degradation.

---

[10] Additionally, calcium ions were known to stabilize the structure of thermolysin and Bacillus subtilis var. amylosacchuriticus neutral protease, whereas zinc was shown not to contribute to heat stability of these proteins. (*See generally* M. Tajima et al., Role of Calcium Ions in the Thermostability of Thermolysin and Bacillus subtilis var. amylosacchariticus Neutral Protease, 64 EUR. J. BIOCHEM. 243–47 (1976) ("Tajima 1976") (DTX-150).)

639.     Moreover, amino acids such as leucine and several divalent cation compounds—including $Ca^{2+}$-based compounds—are well-known pharmaceutically acceptable, water-soluble excipients.

640.     A POSA would have also routinely tested the stabilizing effects of various excipients and combinations thereof. For example, several high-throughput screening techniques were known to characterize the stability and activity of protein and peptide formulations and to identify the optimal combination of excipients. (*See generally* Martinus et al., *High throughput screening of protein formulation stability: Practical considerations*, 65 EUR. J. PHARMACEUTICS & BIOPHARMACEUTICS 131–48 (2006) ("Martinus 2006") (DTX-148).)

641.     Further, the prior art taught a stable peptide formulation containing both a divalent cation (such as $Ca^{2+}$) and an amino acid (such as leucine). (*See* U.S. Patent No. 5,130,298 at 1:9–11, 3:51–4:8, 6:9–31 ("Cini '298 patent") (DTX-068); DTX-070   ¶¶ [0061], [0070], [0082].)

642.     Thus, a POSA would have reasonably expected that combining a divalent cation carrier, such as a $Ca^{2+}$-based compound, and an amino acid known to reduce peptide hydrolysis/deamidation and formaldehyde-mediated degradation, such as leucine, would lead to further stabilization of the formulation.

### D.  SCOPE AND CONTENT OF THE PRIOR ART

643.     Each of the asserted claims of the '628 patent and the '573 patent are invalid as obvious in view of the prior art. The relevant "critical date" is August 15, 2008, for the '628 patent, and August 6, 2009, for the '573 patent. The following, along with the analysis in Section III(E) and (F), represent what a POSA would have known as of these dates.

### 1.  Adesunloye '106 Patent

644.    U.S. Patent No. 5,874,106, to A. T. Adesunloye and P. E. Stach, was issued on February 23, 1999 ("Adesunloye '106 patent") (DTX-151).

645.    Adesunloye '106 patent taught a method of reducing crosslinking in gelatin capsules by scavenging materials that react with the polypeptide chains of the gelatin shell, such as aldehydes, and in particular, formaldehyde. (*See* DTX-151 at 1:50–53; 2:22–34.)

646.    Adesunloye '106 patent taught that amino acids function "as [a] carbonyl scavenger, especially a formaldehyde scavenger" in pharmaceutical compositions. (*See id.* at 3:34–37.) Adesunloye '106 patent taught that amino acids that are the building blocks of proteins, such as leucine, are especially useful. (*Id.* at 3:48–56; 4:58–64.)

647.    The Adesunloye '106 patent was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 2.  Aimoto 1983

648.    Saburo Aimoto et al., *Chemical Synthesis of a Highly Potent and Heat-stable Analog of Enterotoxin Produced by a Human Strain of Enterotoxigenic Escherichia Coli*, 112 BIOCHEMICAL & BIOPHYSICAL RES. COMM. 320 (1983) ("Aimoto 1983") (DTX-028), was published in 1983.

649.    Aimoto 1983 taught that the reason STh was called a "heat stable" peptide was because of the observation that the biological activity of the peptide was detectable after heating the peptide "in boiling water for 30 min." (*Id.* at 324.) Aimoto 1983 taught that STh(6–19) was more heat-stable than STh and retained its function even after heat treatment at 120°C for 30 min. (*Id.* at summary.) Aimoto 1983 disclosed that the HPLC peak area for STh(6–19) was only reduced to 75% after heating at 100°C for 30 min.; and only reduced to 66% (i.e., two-thirds)

after heating at 100°C for 60 min., or at 120°C for 10 min. (*Id.* at 324–25.) Aimoto 1983 taught that "[t]he enhanced structural stability of [STh(6–19)] may be due to decreased perturbation of the molecule on heating as a result of the absence of the N-terminal sequence." (*Id.* at 325–26.) Aimoto 1983 concluded that STh(6–19) is "the thermodynamically stable and biologically active site" of STh. (*Id.* at 326.)

650.    Aimoto 1983 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 3.  Andresen 2007

651.    Viola Andresen et al., *Effect of 5 Days Linaclotide on Transit and Bowel Function in Females with Constipation-Predominant Irritable Bowel Syndrome*, 133(3) GASTROENTEROLOGY 761–68 (2007) ("Andresen 2007") (DTX-328), was published in 2007.

652.    Andresen 2007 disclosed the results of a "randomized, double-blind, placebo-controlled study [of] the effects of oral linaclotide [MD-1100], 100 and 1000 μg once daily, in 36 women with constipation-predominant irritable bowel syndrome." (DTX-328 at Abstract.)

653.    Andresen 2007 further disclosed that "[i]n women with constipation-predominant irritable bowel syndrome, linaclotide 1000 μg once daily significantly accelerated ascending colonic transit." (*Id.*) Linaclotide also improved "stool consistency, stool frequency, ease of passage and time to first bowel movement." (*Id.*)

654.    Andresen 2007 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 4.  Andresen 2008

655.    Viola Andresen et al., *Linaclotide Acetate*, 33(7) DRUGS OF THE FUTURE 570–76 (July 2008) ("Andresen 2008") (DTX-073), was published in 2008.

656.     Andresen 2008 disclosed that linaclotide was used for the treatment of patients with chronic constipation or constipation-predominant irritable bowel syndrome in clinical studies. (DTX-073 at 570, 572, 574.)

657.     Andresen 2008 reports that linaclotide was administered orally and was well-tolerated across a daily dose range of 100–1000 µg in a Phase IIA study. (*Id.* at 572.)

658.     Andresen 2008 also disclosed that a daily dose of 75, 150, 300, or 600 µg of linaclotide was used to treat patients with chronic constipation or IBS-C in a Phase IIB study. (*Id.* at 573.)

659.     Andresen 2008 disclosed the peptide sequence of linaclotide, which includes the disulfide bonds formed between cysteines 1 and 6, 2 and 10, and 5 and 13. (*Id.* at 571.)

660.     Andresen 2008 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 5.  Bentz '392 Publication

661.     International Publication No. WO 04/039392 A2, by J. Bentz and L. L. Kang ("Bentz '392 publication") (DTX-276), was published on May 13, 2004.

662.     Bentz '392 publication disclosed solid-state polypeptide formulations that are stabilized against degradation at temperatures that approximate or exceed physiological conditions. (*See* DTX-276 at Abstract; ¶ [0006].)

663.     Bentz '392 publication disclosed that "the term 'polypeptide' includes oligopeptides and proteins and encompass[es] any natural or synthetic compound containing two or more amino acids linked by the carboxyl group of one amino acid to the amino group of another." (*Id.* ¶ [0006].)

664.     Bentz '392 publication taught that the peptide formulation may be stabilized by

303

adding metal ions, preferably a divalent metal salt, such as $CaCl_2$, $MgCl_2$ of $ZnCl_2$, to the solid formulation. (*Id.* ¶ [0028].)

665.    Table 8 disclosed the results of a study conducted to evaluate the stability of PACAP, a synthetic peptide of 31-amino acid length, achieved by formulating solid-state PACAP particles at varying pH with $CaCl_2$, with Histidine, and with both $CaCl_2$ and Histidine. (*Id.* ¶¶ [0026], [0041]; *see also* ¶ [0065] (Example 7).)

666.    Bentz '392 publication taught that "$CaCl_2$ further improved the stability of PACAP particles at both pH 2 and 6 (Table 8)." (*Id.* ¶ [0065].)

**TABLE 8:** *The Stabilization and Additive Stabilization Effects of $CaCl_2$ and Histidine, at pH2 and 6 for PACAP Particle Stored @ 60° for 2 months*

| Additives | %Aggregate | %Initial PACAP |
|---|---|---|
| pH2 with no Additive | 1.1 | 92 |
| pH2 with $CaCl_2$ | 0.8 | 95 |
| pH6 with Histidine | 4.2 | 87 |
| pH6 with $CaCl_2$ and Histidine | 1.6 | 92 |

*\* Histidine concentration of CaCl2 and Histidine were 10 mM*

667.    The Bentz '392 publication was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 6.   Capelle 2007

668.    Martinus A.H. Capelle, *High Throughput Screening of Protein Formulation Stability*, 65 EUR. J. PHARMACEUTICS & BIOPHARMACEUTICS 131 (2007) ("Capelle 2007") (DTX-148), was published in 2007.

669.    Capelle 2007 taught that deamidation is one of "the most common chemical degradation pathways" affecting therapeutic proteins in pharmaceutical formulations. (*Id.* at 132.)

670.    Capelle 2007 disclosed that "[t]he development of high throughput screening equipment and assays has increased over the last 10 years" (*id.* at 134), and further taught that "many high throughput techniques are available for the preparation and analysis of protein formulations." (*Id.* at 144.)

671.    Capelle 2007 does not list peptide bond cleavage or hydrolysis. (*Id.* at 132.) Capelle 2007 only mentions "hydrolysis" without specifying the type of hydrolysis. (*Id.*) Further, it explicitly taught that "deamidation and oxidation" are "[t]he most common chemical degradation pathways." (*Id.*)

672.    Capelle 2007 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 7.  Carpenter 2002

673.    RATIONAL DESIGN OF STABLE PROTEIN FORMULATIONS (John F. Carpenter et al. eds., 2002) ("Carpenter 2002") (DTX-293), was published in 2002.

674.    Carpenter 2002 taught that "a great deal of research regarding protein stability has been conducted and this information is readily available in the literature." (*Id.* at 1.) Carpenter 2002 identifies another source of information guiding protein formulation development is regulatory guidelines, which "provide information about how to conduct studies and obtain useful results for evaluating formulations." (*Id.* at 2.)

675.    Carpenter 2002 disclosed common analytical methods and techniques that help a formulator assess the stability of formulation in high throughput manner, and stability protocols used in high throughput protein and peptide formulation development. (*Id.* at 191–94; *see also id.* at 15 (teaching a typical study protocol for formulation optimization).) Carpenter 2002 taught a POSA to use "literature studies on similar proteins, even if [] anecdotal" while developing a

305

protein formulation." (*Id.* at 186.)

676.     Carpenter 2002 taught that dried or solid formulations "have less stability-related issues and have a much greater potential tolerance for room-temperature storage," and were successfully used to overcome protein stability problems. (*Id.* at 11.) Carpenter 2002 taught that this is in part because liquid formulations were known to be more susceptible to certain degradation pathways and less stable at room temperature compared to solid formulations. (*Id.* at 10-11.) For example, Carpenter 2002 taught that "[c]ertainly, chemical degradation is typically slower in the solid state than in liquate state, due to reduced mobility of the protein and limited exposure to water." (*Id.* at 100; *see also id.* at 110.)

677.     Carpenter 2002 taught that bulky residues at the C-terminal side of an Asn residue are predicted to reduce the deamidation rate of Asn in a peptide at neutral or alkaline pH. (*Id.* at 88–89.) Carpenter 2002 also taught that deamidation of the asparagine residue of pharmaceutical proteins and peptides was "extensively studied" before the critical dates of the asserted claims. (*Id.* at 86.)

678.     Carpenter 2002 taught that "[a] large number of possible chemical reactions have been identified as leading to decomposition of peptides (Manning et al. 1989). However, a select few are of primary concern to pharmaceutical scientists." (*Id.* at 85.) Carpenter 2002 taught that the oxidation reactions that "are of primary concern" to pharmaceutical scientists, i.e., a POSA, are oxidation "at cysteine residues (to form disulfide bond linkages), at methionine (to form sulfoxides), or at heterocyclic aromatic side chains of tryptophan and histidine (to form N-oxides)." (*Id.*)

679.     Carpenter 2002 taught that "[c]ertainly, chemical degradation is typically slower in the solid state than in liquate state, due to reduced mobility of the protein and limited exposure

306

to water." (*Id.* at 100; *see also id.* at 110.)

680.    Carpenter 2002 was cited by the Examiner during prosecution of the '573 or '628

patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 8.  Chan '788 Patent

681.    U.S. Patent No. 6,383,788 B1, to H. K. Chan et al., was issued on May 7, 2002

("Chan '788 patent") (DTX-067).

682.    Chan '788 patent taught liquid solutions, suitable for pharmaceutical

administration, comprising deoxyribonuclease (DNase) in substantially non-deamidated form

that are stable at pHs of less than neutral. (DTX-067 at 2:16–21.)

683.    According to Chan '788 patent, "[t]he major route of degradation for rhDNase is

deamidation . . . . The rate of deamidation was also found to be highly dependent on the pH of

the formulation." (*Id.* at 9:52–56.)

684.    Chan '788 patent disclosed:

> [M]ethods for the preparation of liquid solutions comprising DNase
> as active principle which comprising [sic] using in said solutions . . .
> an amount of calcium ion that 2) stabilizes said solutions that are at
> a pH of less than neutral from precipitation resulting in said
> solutions being clear and thus in a form suitable for storage and
> pharmaceutical administration. In the later [sic], deamidation of the
> DNase is inhibited, a consequence of the lowered pH (from neutral).

(*Id.* at 3:31–42.)

685.    The Chan '788 patent further disclosed that the calcium ion source can be any

calcium salt, such as calcium chloride. (*Id.* at 4:18–20.)

686.    The Chan '788 patent was not before the Patent Office during the prosecution of

the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 9.  Chen 1999

687.     Bei Chen et al., *Influence of Calcium Ions on the Structure and Stability of Recombinant Human Deoxyribonuclease I in the Aqueous Lyophilized States*, 88(4) J. PHARMACEUTICAL SCI. 477 (1999) ("Chen 1999") (DTX-075), was published in 1999.

688.     Chen 1999 studied the "effect of calcium ions on the structure and stability of recombinant human DNase I ('rhDNase') and aqueous and solid (lyophilized) states." (DTX-075 at 477.)

689.     Chen 1999 disclosed that "[t]he primary degradation route for the aqueous protein was deamidation," and that for lyophilized protein treated with EGTA to remove calcium ions "there was some loss in enzymatic activity upon reconstitution." (*Id.*)

690.     Chen 1999 concluded that "the removal of calcium ions by EGTA-treatment decreased the stability of rhDNase in both the aqueous and solid states even though no large overall calcium-induced structural changes could be observed by the techniques used in this study." (*Id.*)

691.     Chen 1999 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 10.  Cini '298 patent

692.     U.S. Patent No. 5,130,298, to J. K. Cini and A. L. Finkenaur ("Cini '298 patent") (DTX-068), was issued on July 14, 1992.

693.     Cini '298 patent disclosed "pharmaceutical compositions [comprising epidermal growth factor ('EGF')] having increased stability as a result of being combined with a metal cation." (DTX-068 at 1:9–11.)

694.     According to Cini '298 patent, EGF is susceptible to degradation, which causes

loss of biological activity, thus making long-term storage of aqueous preparations of EGF impractical. (*Id.* at 1:48–52.)

695.    Cini '298 patent further states:

> Degradation of EGF refers to the natural aging process whereby the molecular structure of the EGF molecule that is used as a starting material (e.g., the 53 amino acid form or a variant thereof) is either: (a) chemically modified to form an EGF variant as a result of a naturally occurring or environmentally induced chemical reaction such as isomerization, oxidation or deamidation; or (b) broken down or decomposed into smaller molecules.

(*Id.* at 2:62–3:2.)

696.    Cini '298 patent notes that proteins "in which amino acid residues within the protein structure act to stabilize a degradation product, such as an isomerized intermediate" can be stabilized by the inclusion of metal cations. (*Id.* at 3:20–25.)

697.    Cini '298 patent states that "[a]lthough the present invention is exemplified by the use of the zinc divalent cation, it is contemplated that other suitable cations may achieve the same effect. . . . Other cations which may be suitable are those of magnesium, calcium, cadmium, nickel, tin, potassium and lithium." (*Id.* at 3:51–4:8.)

698.    Cini '298 patent further disclosed:

> The structural stability of EGF as a result of metal binding is a function of the stoichiometry of metal to EGF, pH and ionic strength of the medium. Another important variable in the metal-protein complex formation is the dielectric constant (DIE) and the water activity on the surface of the protein. Neutral compounds have been shown to affect the water structure and the DIE in the medium. A decrease in the DIE should cause an increase in ionic interaction (e.g., metal-EGF complex), thereby enhancing the binding of the metal to EGF and increasing the stability. A secondary effect of decreasing the DIE would be to increase intramolecular hydrogen bonding, which would also contribute to the EGF stability. Thus, it is believed that factors which decrease the DIE will have a stabilizing effect on the EGF protein by changing the polarity of the

309

water, altering the hydration envelope around the protein and in some cases interacting directly with the surface of the protein. Examples of neutral compounds which are capable of reducing the DIE are as follows: . . . polyhydroxylic compounds, such as . . . povidone, hydroxymethyl (ethyl or propyl) cellulose, . . . and the like . . .; amino acids, such as glycine, leucine, polyamino acids, and the like; and other compounds such as gelatin or hydrolyzed gelatin and dextran. Such compounds are all FDA approved and water soluble. It is believed that addition of any of these neutral charged pharmaceutical compounds to the compositions of the present invention may further increase the stabilization of the EGF.

(*Id.* at 5:64–6:30.)

699.    The Cini '298 patent was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 11. Cleland 1993

700.    Cleland J.L. et al., *The Development of Stable Protein Formulations: A Close Look at Protein Aggregation, Deamidation, and Oxidation*, 10(4) CRITICAL REV. THERAPEUTIC DRUG CARRIER SYSTEMS 307–77 (1993) ("Cleland 1993") (DTX-034), was published in 1993.

701.    Cleland 1993 disclosed an overview of the three most common protein degradation pathways, which are protein aggregation, deamidation, and oxidation. (DTX-034 at 307.)

702.    Because these degradation processes occur during formulation of protein drugs, a major goal in designing a suitable formulation is to provide a compatible formulation that ensures the maximum stability of the protein drugs. (*Id.* at 308.) Cleland 1993 taught that "[t]his stability needs to be supported for a time period measured in years, in order to provide an adequate shelf life for the drug." (*Id.*)

703.    Cleland 1993 taught that "degradation rates can be minimized either by formulating under conditions where the individual reactions are the slowest, or by adding

excipients that retard selected reaction pathways." (*Id.* at 354.)

704.     Cleland 1993 taught that excipients can be added to formulations to increase the stability of the therapeutic agent (such as a protein), for example, by retarding or inhibiting aggregation. (*Id.* at 317.) Cleland 1993 taught several criteria that excipients must meet, and further taught that because many excipients with approved pharmaceutical applications do not meet all of these criteria when used alone, "a combination of excipients is often used to take advantage of the characteristics of each excipient." (*Id.*)

705.     Cleland 1993 taught that non-enzymatic deamidation of asparagine and glutamine residues can occur in proteins and peptides, which is a hydrolysis reaction requiring water. (*Id.* at 326.) Cleland 1993 taught that "it is prudent to minimize the deamidation reaction as much as possible in the protein formulation," and provides several strategies to do so. (*Id.* at 337.)

706.     Cleland 1993 noted that "[a]s early as 1942, researchers observed that deamidation was markedly dependent on buffer anion," and much faster rates were observed when, for example, a phosphate buffer was used. (*Id.* at 338–39.)

707.     Cleland 1993 further taught that because deamidation is a hydrolysis reaction that requires water, "an obvious strategy to decrease deamidation is to eliminate water." (*Id.* at 340.) Cleland 1993 notes that "residual water" in solid formulation allows degradation via deamidation, which "can be controlled by proper choice of excipients." (*Id.*)

708.     Cleland 1993 taught that oxidation is another major degradation pathway both in solution and solid formulations. (*Id.* at 341.) Cleland 1993 taught that cysteine is one of the amino acids in proteins and peptides that is "easily oxidized." (*Id.* at 345.)

709.     Cleland 1993 taught that cysteine may be oxidized to form a cystine, i.e., two

311

cysteine residues that are linked by a disulfide bond. (*Id.* at 345.) Cleland 1993 further taught that "[o]nce the cystine disulfide is formed, it is much less susceptible to reaction with mild oxidants" than cysteine, and "so is often found as the stable end product in an oxidative reaction." (*Id.*)

710.     Cleland 1993 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 12. Crowley 1999

711.     P.J. Crowley, *Excipients as Stabilizers*, 2(6) PSIT 237 (1999) ("Crowley 1999") (DTX-076), was published in 1999.

712.     Crowley 1999 taught that to reduce moisture-related degradation, an excipient "having a greater affinity for water compared with the drug" could be used so "that moisture in the product is sequestrated by the excipient." (DTX-076 at 238.)

713.     Further, Crowley 1999 taught "[f]ormaldehyde has the capability to participate in most of the known reactions of aldehydes and is present in many materials, including components of packaging. Parts per million levels might cause significant degradation because of its low molecular weight." (*Id.* at 238.) Crowley 1999 also taught that formaldehyde "can be sequestrated by an excipient." (*Id.*)

714.     Crowley 1999 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 13. Currie '811 Publication

715.     U.S. Patent Application Publication No. 2005/0020811 A1 ("Currie '811 publication") (DTX-066)—which is the publication for U.S. Application No. 10/796,719 that ultimately issued as the '036 patent—was published on January 27, 2005.

716.     Currie '811 publication disclosed compositions of peptides that activate the

guanylate cyclase C ("GC-C") receptor and related methods for treating IBS and other gastrointestinal disorders. (DTX-066 ¶¶ [0006], [0097].)

717.     Currie '811 publication disclosed linaclotide (MD-1100, with the amino acid sequence Cys Cys Glu Tyr Cys Cys Asn Pro Ala Cys Thr Gly Cys Tyr) (*id.* ¶ [0110]), data demonstrating its activity in a GC-C receptor activity assay and demonstrating its ability to increase intestinal transit rates and intestinal secretion in mice (*id.* ¶¶ [0135], [0138]–[0140]; *id.* at Figs. 2, 3b, 5b, 6b), and data describing its pharmacokinetic properties (*id.* ¶¶ [0153]–[0157]; *id.* at Figs. 10a, 10b).

718.     Currie '811 publication disclosed that the peptides "are preferably administered orally, e.g., as a . . . capsule." (*Id.* ¶ [0159]; *see also id.* ¶¶ [0013], [0041], [0057], [0058], [0174], Examples 3, 4, and 6, Figs. 10a, 10b.) Additionally, the '811 publication disclosed:

> The agents, alone or in combination, can be combined with any pharmaceutically acceptable carrier or medium. Thus, they can be combined with materials that do not produce an adverse, allergic or otherwise unwanted reaction when administered to a patient. The carriers or mediums used can include solvents, dispersants, coatings, absorption promoting agents, controlled release agents, and one or more inert excipients (which include starches, polyols, granulating agents, microcrystalline cellulose, diluents, lubricants, binders, disintegrating agents, and the like), etc. If desired, tablet dosages of the disclosed compositions may be coated by standard aqueous or nonaqueous techniques.

(*Id.* ¶ [0163].)

719.     Currie '811 publication disclosed:

> The composition may contain other additives as needed, including for example lactose, glucose, fructose, galactose, trehalose, sucrose, maltose, raffinose, maltitol, melezitose, stachyose, lactitol, palatinite, starch, xylitol, mannitol, myoinositol, and the like, and hydrates thereof, and amino acids, for example alanine, glycine and betaine, and peptides and proteins, for example albumen [sic].

313

(*Id.* ¶ [0164].)

720.    Further, Currie '811 publication identifies the following excipients as suitable

binders and fillers:

> BINDERS: corn starch, potato starch, other starches, gelatin, natural
> and synthetic gums such as acacia, sodium alginate, alginic acid,
> other alginates, powdered tragacanth, guar gum, cellulose and its
> derivatives (e.g., ethyl cellulose, cellulose acetate, carboxymethyl
> cellulose calcium, sodium carboxymethyl cellulose), polyvinyl
> pyrrolidone, methyl cellulose, pre-gelatinized starch (e.g., STARCH
> 1500® and STARCH 1500 LM®, sold by Colorcon, Ltd.),
> hydroxypropyl methyl cellulose, microcrystalline cellulose (e.g.
> AVICEL™, such as, AVICEL-PH-101™, -103™ and -105™, sold
> by FMC Corporation, Marcus Hook, Pa., USA), or mixtures thereof,
>
> FILLERS: talc, calcium carbonate (e.g., granules or powder),
> dibasic calcium phosphate, tribasic calcium phosphate, calcium
> sulfate (e.g., granules or powder), microcrystalline cellulose,
> powdered cellulose, dextrates, kaolin, mannitol, silicic acid,
> sorbitol, starch, pre-gelatinized starch, or mixtures thereof . . .

(*Id.* ¶¶ [0166]–[0167].)

721.    Currie '811 publication further disclosed that "[m]ethods to increase chemical

and/or physical stability of the agents . . . described herein are found in," among others, WO

02/26248 (*see* DTX-069). (*Id.* ¶ [0181].)

722.    The Currie '811 publication was cited by the Examiner during prosecution of the

'573 and '628 patents. (DTX-013 at p. 1; DTX-015 at p. 1.)

### 14. Daugherty 2006

723.    Ann L. Daugherty et al., *Formulation and Delivery Issues for Monoclonal

Antibody Therapeutics*, 58 J. ADVANCED DRUG DELIVERY REV. 686 (2006) ("Daugherty 2006")

(DTX-294), was published in 2006.

724.    Daugherty 2006 taught that the reason for the variability in antibody stability

314

requirements is "the fact that the small differences between these antibodies are focused on surface-exposed amino acid differences that stipulate antigen specificity." (*Id.* at 690.)

725.     Daugherty 2006 taught frequently observed antibody degradation pathways, such as oxidation of methionine and cysteine residues, deamidation of glutamine and asparagine residues, aggregation, and fragmentation. (*Id.* at 690–94.) Daugherty 2006 taught amino acid sequences predicted to deamidate and those that are less prone to deamidation. (*Id.* at 692.)

726.     Despite this variability, Daugherty 2006 also taught strategies to stabilize antibody formulations. Daugherty 2006 taught that antibody therapeutics are typically formulated in liquid formulations for injection in part because liquid formulations are less expensive, faster to develop, generally easier to prepare for administration, and facilitate delivery of the antibody to the cite of action. (*Id.* at 690, 696.) However, as Daugherty 2006 taught, liquid formulations are prone to "oxidation, deamidation, aggregation and fragmentation," and that "water is the common culprit" in each of these degradation events. (*Id.* at 694.) Daugherty 2006 taught that one strategy for stabilizing antibody-based drugs is preparing solid formulations, such as lyophilized formulations, or spray-dried formulations that can be added to a polymer matrix and made into microspheres. (*Id*. at 694–95.) Daugherty 2006 further taught that using protective excipients can reduce antibody aggregation during lyophilization or spray-drying processes. (*Id.* at 701.)

727.     Daugherty 2006 taught that "[a]ntibodies, because of their endogenous nature, have built-in features that may pose problems for stability as biotherapeutics agents, that function in the normal clearance of these proteins from the body []. Thus, despite our best efforts to prepare stable antibody-based drug formulations, the ultimate stability of these products may be limited to inherent mechanisms of degradation pre-designed for the rate of clearance optimal for their

315

function and turnover in the body." (*Id.* at 701.)

728.     Daugherty 2006 was not before the Patent Office during the prosecution of the

'573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 15. del Barrio 2006

729.     Mary-Anne del Barrio et al., *Simultaneous Determination of Formic Acid and*

*Formaldehyde in Pharmaceutical Excipients Using Headspace GC/MS*, 41 J. PHARMACEUTICAL

& BIOMEDICAL ANALYSIS 738 (2006) ("del Barrio 2006") (DTX-100), was published in 2006.

730.     del Barrio 2006 disclosed that "[f]ormaldehyde is a common residual impurity in

many excipients such as polysorbate, povidone and polyethylene glycol 300" and that "[t]he

presence of this impurity can potentially decrease the stability of drug substances by reacting with

the amino group to form the N-methyl derivative." (DTX-100 at 738.)

731.     More specifically, del Barrio 2006 taught that "almost all excipients contained

varying levels of . . . formaldehyde." (*Id.* at 743.)

732.     For example, del Barrio 2006 disclosed that hydroxypropyl methylcellulose was

determined to have 11.1–15.7 ppm formaldehyde; magnesium stearate was found to have 1.1

ppm formaldehyde; and formaldehyde levels in Povidone ranged between less than 0.2 and 0.4

ppm. (*Id.* at 742, Table 2.)

733.     del Barrio 2006 was not before the Patent Office during the prosecution of the

'573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 16. DiFeo 2003

734.     Thomas J. DiFeo, *Drug Product Development: A Technical Review of Chemistry,*

*Manufacturing, and Controls Information for the Support of Pharmaceutical Compound*

*Licensing Activities*, 29(9) DRUG DEV. & INDUS. PHARMACY 939 (2003) ("DiFeo 2003") (DTX-

165), was published in 2003.

735.    DiFeo 2003 taught that testing drug and excipient compatibility is a routine part of any pre-formulation process. (*Id.* at 942–43, Table 1.)

736.    DiFeo 2003 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 17. FDA Guidance 1994

737.    *Guidance for Industry for the Submission of Chemistry, Manufacturing, and Controls Information for Synthetic Peptide Substances*, FOOD & DRUG ADMINISTRATION (1994) ("FDA Guidance 1994") (DTX-077), was published in 1994.

738.    FDA Guidance 1994 disclosed the purification strategy for synthetic peptide substances. (DTX-077 at 7.) Specifically, FDA Guidance 1994 requires the removal of any contaminating materials and lists a number of contaminants, including deamidation products. (*Id.*)

739.    FDA Guidance 1994 stated that an appropriate purification process should be developed to separate the desired peptide from any contaminating materials. (*Id.*)

740.    FDA Guidance 1994 further disclosed that when a peptide is kept "in solution or under high humidity," degradation will occur more rapidly than when the peptide is kept dry. (*Id.* at 12.)

741.    FDA Guidance 1994 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 18. Glinski 1999

742.    Jacek Glinski et al., *Surface Properties of Aqueous Solutions of L-Leucine*, 84 CHEMISTRY 99 (2000) ("Glinski 1999") (DTX-446).

317

743.    Glinski 1999 showed that leucine causes a change in properties of water and decreases the surface tension of solution in a concentration and pH dependent manner, thereby acting as a surfactant. (*Id.* at Abstract.)

744.    Glinski was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 19. Handbook of Natural Toxins

745.    The HANDBOOK OF NATURAL TOXINS 285 (Joel Moss et al. eds., 1995) ("Handbook of Natural Toxins") (DTX-044), was published in 1995.

746.    The Handbook of Natural Toxins taught that the secondary structure of STh and STh(6–19) was essential for these peptides' biological activity. (*Id.*) The Handbook of Natural Toxins also taught the secondary structure of STh(6-18), which is a peptide with the same amino acid as STh(6–19) without the last tyrosine residue. (*Id.* at 287; *see also id.* at 285.)

747.    The Handbook of Natural Toxins was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 20. Harris 2007

748.    Lucinda A. Harris et al., *Drug Evaluation: Linaclotide, a New Direction in the Treatment of Irritable Bowel Syndrome and Chronic Constipation*, 9(4) CURRENT OPINION MOLECULAR THERAPEUTICS 403 (2007) ("Harris 2007") (DTX-079), was published in 2007.

749.    Harris 2007 describes and summarizes the results of a clinical study performed with linaclotide for the treatment of irritable bowel syndrome and chronic constipation.

750.    Harris 2007 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 21. HPE 2006

751.     HANDBOOK OF PHARMACEUTICAL EXCIPIENTS (Rowe, R.C. et al. eds., 5th ed. 2006) ("HPE 2006") (DTX-078) was published in 2006.

752.     HPE 2006 disclosed that:

> Calcium stearate is primarily used in pharmaceutical formulations as a lubricant in tablet and capsule manufacture at concentrations up to 1.0% w/w. Although it has good antiadherent and lubricant properties, calcium stearate has poor glidant properties.

> Calcium stearate is also employed as an emulsifier, stabilizing agent, and suspending agent, and is also used in cosmetics and food products.

(DTX-078 at 102.)

753.     Moreover, "the amount of hydroxylpropyl methyl cellulose as a binder in a dosage form is typically in the range of 2% to 5% by weight." (*Id.* at 346.)

754.     HPE 2006 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 22. Hu 2001

755.     Hu et al., *β-Sheet Structure Formation of Proteins in Solid State as Revealed by Circular Dichroism Spectroscopy*, 62(1) BIOPOLYMERS 15 (2001) ("Hu 2001") (DTX-215) was published in 2001.

756.     In Hu 2001, the authors studied the solid-state secondary structure of a few proteins and peptides and showed that insulin, lysozyme, DsbA protein, luciferase, and ovalbumin showed "no or slight structural rearrangement from solution to solid state." (*Id.* at Abstract; *see also id.* at 20.) Hu 2001 taught that "insulin, lysozyme, and oxidized DsbA are small proteins with three, four, and one disulfide [bonds], respectively. The structures are thought to be

319

extremely rigid and stable and the disulfide might impede structural rearrangement." (*Id.* at 20.) Based on the teachings of Hu 2001, it would have been evident to a POSA that the structure of linaclotide would be even more rigid than other proteins and peptides containing disulfide bonds because the ratio of disulfide bonds to the number of amino acids is much higher in linaclotide.

757.    Hu 2001 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 23. Iwata '433 Publication

758.    EP 1559433 A1, by M. Iwata et al. ("Iwata '433 publication") (DTX-146), was published on August 3, 2005.

759.    Iwata '433 publication disclosed a composition for use in the field of, *inter alia*, medicament, containing an active ingredient, aldehyde-like substances that destabilize the active ingredient, and a stabilizer having an amine structure and capable of adsorbing aldehydes. (*See* DTX-146 at Abstract.)

760.    Iwata '433 publication taught that an example of such stabilizer is an amino acid. (*Id*; *see also id.* ¶ [0021].)

761.    Iwata '433 publication taught that "compounds having a primary amine or a secondary amine within the structure thereof may easily react with formaldehyde or a compound having an aldehyde group to form an imine or enamine." (*Id.* ¶ [0003].)

762.    Iwata '433 publication also taught that "it has been known that a solid pharmaceutical composition or various additives to be contained therein may slightly contain formaldehyde or other aldehyde-like substances." (*Id.* ¶ [0004].)

763.    Iwata '433 publication disclosed a prior Japanese reference that taught using, *inter alia*, amino acids to stabilize "a lyophilized pharmaceutical composition of a high-molecular

weight substance." (*Id.* ¶ [0006].)

764.    In particular, Iwata '433 publication provides:

> [I]t has been found that a composition containing a low-molecular weight active substance the stability of which is impaired by effects of aldehyde has a defect that said active substance is decomposed by a substance being capable of supplying aldehyde-like substances to be added to said composition, for example, by a substance such as an aldehyde group-containing excipient, etc. during the production process of said composition or in the storage thereof so that the activity of said active substance is decreased. They have intensively studied in order to find a method for preventing such decrease in activity, and found that the decrease in activity of said active substance may effectively be suppressed by adding a compound having an amine structure and being capable of absorbing aldehydes as a stabilizer.

(*Id.* ¶ [0009].)

765.    Iwata '433 publication taught that the method disclosed could be used for preparing solid pharmaceutical compositions, such as capsules and tablets. (*Id.* ¶ [0010].)

766.    The Iwata '433 publication was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 24. Lacy 2006

767.    Brian E. Lacy, *ACG 2006 – Evaluation and Treatment of IBS and Chronic Constipation*, MEDSCAPE GASTROENTEROLOGY (2006) (available at www.medscape.com) ("Lacy 2006") (DTX-082) was published in 2006.

768.    Lacy 2006 disclosed the results of "a double-blind, randomized, placebo-controlled study to assess the efficacy of [linaclotide] in patients with chronic constipation." (*Id.* at 3.)

769.    According to Lacy 2006, patients in the study "were randomized to placebo or 1 of 3 daily doses of linaclotide (100, 300, or 1000 micrograms [mcg]) for 2 weeks." (*Id.*) Lacy

2006 further disclosed that the patients reported no significant adverse events, and "that linaclotide increased stool frequency, improved stool consistency, and improved ease of evacuation compared with placebo." (*Id.*)

770.     Lacy 2006 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 25. Learoyd 2008

771.     Tristan P. Learoyd, *Chitosan-Based Spray-Dried Respirable Powders for Sustained Delivery of Terbutaline Sulfate*, 68 EUR. J. PHARMACEUTICS & BIOPHARMACEUTICS 224 (2008) ("Learoyd 2008") (DTX-447) was published in 2008.

772.     Because of its surfactant-like properties, leucine was shown to improve the dispersion efficiency of spray-dried powder formulations. (*Id.* at 230.) Learoyd 2008 taught that "[l]eucine is a particularly hydrophobic amino acid, and its surfactant-like properties may result in the capacity for leucine to migrate to the droplet surface during the rapid drying phase in spray-drying, and hence influence the surface characteristics of the resultant particle[.]" (*Id.*) Therefore, a POSA would have expected leucine to create a layer on the surface of powder particles that in addition to improving the dispersion efficiency of spray-dried powder formulations would also protect the particles from moisture.

773.     Learoyd 2008 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 26. Li 2006

774.     Z. Li et al., *Detection and Quantification of Low-Molecular-Weight Aldehydes in Pharmaceutical Excipients by Headspace Gas Chromatography*, A 1104 J. CHROMATOGRAPHY 1–10 (2006) ("Li 2006") (DTX-084) was published in 2006.

775.    Li disclosed that the "adverse effect of reactive chemical residues on the quality of drug products has necessitated the determination of low-molecular-weight aldehydes in pharmaceutical excipients." (DTX-084 at Abstract.)

776.    Li 2006 also disclosed that the "most abundant aldehydes found in the samples were formaldehyde and acetaldehyde." (*Id.*)

777.    Li 2006 taught that "[f]ormaldehyde present in excipients has been implicated in the degradation of several drug products where it can form adducts with primary and/or secondary amine groups." (*Id.* at 1.)

778.    Li 2006 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 27. Manning 1989

779.    Manning M.C. et al., *Stability of Protein Pharmaceuticals*, 6(11) PHARM. RES. 903–918 (1989) ("Manning 1989") (DTX-048) was published in 1989.

780.    Manning 1989 disclosed that chemical reactions known to affect proteins and peptides include hydrolysis (such as deamidation of asparagine side chain) and oxidation (such as oxidation of Cys, which can lead to disulfide bond formation and/or exchange). (DTX-048 at 903.)

781.    Manning 1989 taught that deamidation of specific asparagine residues has been linked to changes in protein function for a number of proteins, and therefore is a major concern in the preparation of protein pharmaceuticals. (*Id.* at 905.)

782.    Further, Manning 1989 taught that deamidation has been observed to occur in vitro for a number of proteins, including bovine growth hormone, human growth hormone, insulin, and adrenocorticotropic hormone, indicating that deamidation is a common phenomenon.

(*Id.* at 903.)

783.     Manning 1989 disclosed that in a deamidation reaction, the side chain amide linkage of an asparagine or glutamine residue in a peptide or protein is hydrolyzed to form a free carboxylic acid. (*Id.* at 903.)

784.     Deamidation proceeds through a five-membered cyclic imide intermediate, which spontaneously hydrolyzes to give a mixture of peptides in which the polypeptide backbone is attached via an α-carboxyl linkage (Asp) or a β-carboxyl linkage (iso-Asp). (*Id.* at 904.)

785.     Manning 1989 taught that another common degradation pathway for proteins and peptides is oxidation. The side chains of histidine, methionine, or cysteine are potential oxidation sites. (*Id.* at 905.)

786.     Manning 1989 taught that cysteine may be oxidized spontaneously, in the absence of oxidizing agents, by reacting with the oxygen from the air. (*Id.* at 906.) The rate of this spontaneous oxidation is faster in presence of catalytic quantities of iron and copper ions. (*Id.*)

787.     Manning 1989 also taught that another category of protein or peptide instability other than chemical bond formation includes aggregation. (*Id.* at 903.)

788.     Manning 1989 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 28. Marra '248 Publication

789.     International Publication No. WO 02/26248 A1, by M. T. Marra et al. ("Marra '248 publication") (DTX-069), was published on April 4, 2002.

790.     Marra '248 publication disclosed, *inter alia*, that the "conantokins are a family of peptides that contain 10-30 amino acids" and disclosed the following exemplary sequences:

324

ConG:     GEγγLQγNQγLIRγKSN (SEQ ID NO:1);

ConT:     GEγγYQKMLγNLRγAEVKKNA (SEQ ID NO:2);

ConR:     GEγγVAKMAAγLARγNIAKGCKVNCYP (SEQ ID NO:3);

ConL:     GEγγVAKMAAγLARγDAVN (SEQ ID NO:4);

ConOc:    GEγγYRKAMAγLEAKKAQγALKA (SEQ ID NO:5);

ConSI:    GDγγYSKFIγRERγAGRLDLSKFP (SEQ ID NO:6);

(DTX-069 at 2:4; 3:25–30.)

791.    Marra '248 publication further disclosed a conantokin peptide formulation with improved stability, comprising a divalent ion such as $Zn^{2+}$, $Mg^{2+}$, or $Ca^{2+}$, which is capable of stabilizing the peptide, and thus reducing the rate of conantokin degradation:

> Thus, the present invention provides a stable conantokin formulation. In one embodiment, the formulation includes, in addition to a conantokin, a divalent metal ion capable of stabilizing the structure of the conantokin and thereby reducing the rate of conantokin degradation in solution. In one aspect of this embodiment, the divalent metal ion is any physiologically acceptable divalent metal ion, preferably $Zn^{2+}$, $Mg^{2+}$, $Ca^{2+}$ or mixtures thereof. In a second aspect of this embodiment, the divalent metal ion is present in the formulation from a physiologically acceptable salt, preferably a halide salt.

(*Id.* at 2:31–3:5.) Additionally, Marra '248 publication disclosed that chloride is the preferred halide salt. (*Id.* at 7:31–8:1.)

792.    The Marra '248 publication was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 29. Matubayasi 2002

793.    Norihiro Matubayasi et al., *Thermodynamic Quantities of Surface Formation of Aqueous Electrolyte Solutions*, 250 J. COLLOID & INTERFACE SCI. 431 (2002) ("Matubayasi 2002") (DTX-448) was published in 2002.

794.    Matubayasi 2002 showed that leucine molecules can form a film at the surface

325

and have the property of decreasing the surface tension in proportion to their concentration in the system. (*Id.* at Abstract.) Their study also showed that this effect from leucine is higher than from the other aliphatic amino acids with hydrophobic side chains such as valine, alanine, and glycine. (*Id.* at Fig. 12.)

795.     Matubayasi 2002 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 30. Metz 2004

796.     M. Metz et al., *Identification of Formaldehyde-Induced Modifications in Proteins: Reactions with Model Peptides*, 279 J. BIOLOGICAL CHEMistry 6235 (2004) ("Metz 2004") (DTX-105) was published in 2004.

797.     Metz 2004 disclosed that formaldehyde is a well-known cross-linking agent that can inactivate or immobilize protein. (DTX-105 at Abstract.) Metz 2004 studies the chemical modifications occurring on each natural amino acid residue caused by formaldehyde. (*Id.*)

798.     Formaldehyde reacts with the amino group of the N-terminal amino acid residue and the side-chains of, among others, cysteine, to form an imine, a Schiff-base. (*Id.* at 6238.) This reaction is shown below:



799.     Metz 2004 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

326

### 31. Microbia Press Release 2006

800.    "Linaclotide Shown to Improve Symptoms of Chronic Constipation in Phase 2A Study" was a press release by Microbia, published on Oct. 24, 2006. (Press Release, Microbia, Linaclotide Shown to Improve Symptoms of Chronic Constipation in Phase 2A Study (Oct. 24, 2006) ("Microbia Press Release 2006(DTX-085)

801.    Microbia Press Release 2006 presents data from a Phase 2a study of the use of linaclotide to treat patients with chronic constipation. (DTX-085 at 1.) According to Microbia Press Release 2006, "[f]orty-two patients were enrolled and dosed with placebo or linaclotide once-daily at doses of 100 mcg, 300 mcg or 1,000 mcg for 14 days." (*Id.*)

802.    The Microbia Press Release 2006 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 32. Microbia Press Release 2007

803.    "Microbia Announces Positive Phase 2 Results for its Investigational Compound Linaclotide" was a press release by Microbia, published on May 21, 2007. (Press Release, Microbia, Microbia Announces Positive Phase 2 Results for its Investigational Compound Linaclotide (May 21, 2007) ("Microbia Press Release 2007"). (DTX-086))

804.    Microbia Press Release 2007 disclosed the presentation of data obtained from a Phase 2 clinical trial of the use of linaclotide to treat patients with constipation-predominant irritable bowel syndrome ("IBS-C"). (DTX-086 at 1.) According to Microbia Press Release 2007, "[t]hirty-six women suffering from IBS-C were evaluated in a double-blind, placebo-controlled study, which consisted of a five-day baseline and a five-day treatment period." (*Id.*)

805.    The Microbia Press Release 2007 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 33. Microbia Press Release 2008

806.     "Microbia and Forest Laboratories Announce Preliminary Results of Linaclotide

Phase 2B Studies" was a press release by Microbia, published on March 4, 2008. (Press Release,

Microbia, Microbia and Forest Laboratories Announce Preliminary Results of Linaclotide Phase

2B Studies (March 4, 2008) ("Microbia Press Release 2008"). (DTX-087))

807.     Microbia Press Release 2008 disclosed the presentation of data from two Phase

2b studies of the use of linaclotide to treat patients with chronic constipation ("CC") and IBS-C.

(DTX-087 at 1.)

808.     According to Microbia Press Release 2008, for the CC study, "[310 patients]

were randomized to receive placebo or linaclotide once-daily in the morning at doses of 75 mcg,

150 mcg, 300 mcg, or 600 mcg for 28 days," and for the IBS-C study, "[420 patients] were

randomized to receive placebo or linaclotide once-daily in the morning at doses of 75 mcg, 150

mcg, 300 mcg, or 600 mcg for 12 weeks." (*Id.* at pp. 1–2.)

809.     The Microbia Press Release 2008 was not before the Patent Office during the

prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 34. Motheram 2007

810.     Rajeshwar Motheram, *Behavior of Recombinant Human Growth Hormone at

Solid / Liquid Interfaces, University of the Sciences in Philadelphia* (Mar. 2007) (Dissertation)

("Motheram 2007") (DTX-451) was published in 2007.

811.     Motheram 2007 taught that phosphate buffer did not affect the chemical stability

of hGH. (*Id.*)

812.     Motheram 2007 was not before the Patent Office during the prosecution of the

'573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

328

### 35. Ozaki 1991

813.     Ozaki et al., *Molecular Structure of the Toxic Domain of Heat-stable Enterotoxin Produced by a Pathogenic Strain of Excherichia Coli*, 266(9) J. BIOLOGICAL CHEMISTRY 5934 (1991) ("Ozaki 1991") (DTX-606) was published in 1991 and has been produced in the case by Plaintiffs. (*See* LINZ_0107080–087.)

814.     In Ozaki 1991, researchers from Osaka University in Japan published the 3D structure of a fully functional analogue of STp, Mpr5-STp(5-17), which consists of 13 amino acid residues from Cys(5) to Cys(17) and where Mpr is β-mercaptopropionic acid. (*See* DTX-606 at Abstract, *see also id.* at Figs. 3, 4, and 6.) This structure was obtained using X-ray crystallography of the peptide crystalized from water. (*See, e.g., id.* at Abstract.) Ozaki 1991 reports three β-turns along a spiral peptide backbone fixed tightly by three intramolecular disulfide bonds. (*Id.*; *see also id.* at 5937.) This information taught a POSA that the STp(5-17) and STh(6-18) peptides with the same disulfide bonds are very similar in their structure and stability.

815.     Ozaki 1991 taught that all the side chains of the peptide's amino acids "are oriented to the outside of the molecule," and that "[t]he side chains from Asn11 to Ala13 form a particularly prominent, isolated cluster projecting from the surface of the molecule to the outside." (*Id.* at 5937.) Ozaki 1991 further taught that crystals of the peptide were "hydrated by 13 water molecules per peptide molecule." (*Id.* at 5939.) A space-filling display of the Mpr5-STp(5-17) and water molecules as shown in Fig. 6 of Ozaki is reproduced below:

329



816.    Ozaki 1991 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 36. Raula 2007

817.    Janne Raula et al., *Study of the Dispersion Behaviour of L-Leucine Containing Microparticles Synthesized with an Aerosol Flow Reactor Metho*, 177 POWDER TECH. 125 (2007) ("Raula 2007") (DTX-449) was published in 2007.

818.    Because of its surfactant-like properties, leucine was shown to improve the dispersion efficiency of spray-dried powder formulations. (*Id.* at 125.) Raula 2007 taught that "L-

leucine molecules show surface-active properties in aqueous solutions and are likely to accumulate at an air–water interface. L-leucine molecules form a layer on the surface of droplets that inhibits the penetration of water vapour through it." (*Id.* at 128; *see also id.* at 126.) Raula 2007 also taught that "L-leucine, being a surface-active material in water, became concentrated at the outer surface of the precursor droplets and subsequently in the resulting dry powders." (*Id.* at 131.)

819.    Raula 2007 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 37. Rehder '326 Publication

820.    U.S. Patent Application Publication No. 2008/0124326 A1, by Rehder et al. ("Rehder '326 publication") (DTX-070), was published on May 29, 2008.

821.    Rehder '326 publication states that polypeptides are susceptible to chemical degradation via reactions such as hydrolysis. (DTX-070 ¶ [0008].)

822.    Rehder '326 publication disclosed a method for stabilizing aqueous and other liquid polypeptide solutions, as well as lyophilized formulations, which comprises contacting a therapeutic polypeptide with a divalent cation. (*Id.* ¶¶ [0014], [0033].) In particular, Rehder '326 publication disclosed:

> The invention is directed to a formulation that can stabilize aqueous and other liquid polypeptide solutions as well as lyophilized formulations. The formulation of the invention is useful with polypeptides susceptible to aspartic acid (Asp or D) or asparagine (Asn or N) isomerization because it prevents or reduces the rate or extend [sic] of isoaspatic [sic] acid formation. Susceptible polypeptides include those having solvent-exposed Asp or Asn because they tend to form succinimide intermediates via hydrolysis or deamination reactions prompted by solvent and form destabilizing isoaspartyl residues. Reduction in the rate or extent of isoaspartic acid formation is accomplished by inclusion of one or

331

> more divalent cations, or a salt thereof, together with the polypeptide
> and/or other formulation components.

(*Id.* ¶ [0033].)

823.    According to Rehder '326 publication, polypeptides that are particularly susceptible to aspartic acid or asparagine isomerization are those comprising 1 or more aspartic acid (Asp) or asparagine (Asn) residues in close proximity (i.e., within 1, 2, 3 or 4 amino acids) of another charged or polar amino acid side chain, such as glutamic acid (Glu) or threonine (Thr). (*Id.* ¶¶ [0079], [0081].)

824.    Rehder '326 publication also disclosed that "the divalent cation formulations of the invention can be used with polypeptides having, for example, 10, 20 . . . or 1000 or more amino acid residues. All sizes of polypeptides in between these exemplary numbers also are for use in the divalent cation-containing formulations of the invention." (*Id.* ¶ [0080].)

825.    Divalent cations are defined by Rehder '326 publication as including $Ca^{2+}$ and salts thereof, such as $CaCl_2$. (*Id.* ¶ [0057].)

826.    Rehder '326 publication further disclosed that additional excipients may be included in the formulation, including polymers and amino acids. (*Id.* ¶ [0061].)

827.    The Rehder '326 publication was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 38. Remington 2000

828.    REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY (Alfonso Gennaro ed., 20th ed. 2000) ("Remington 2000") (DTX-052) was published in 2000.

829.    Remington 2000 disclosed that drug substances most frequently are administered orally by means of solid dosage forms such as tablets and capsules. (DTX-052 at 858.)

830.    Remington 2000 disclosed components of pharmaceutical compositions, in addition to the active ingredient, that a skilled artisan would routinely use, such as a pharmaceutically acceptable carrier. (*Id.*)

831.    Remington 2000 also taught that additives may be added to the formulation, for example, to improve stability. (*Id.*)

832.    Remington 2000 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 39. Remington 2006

833.    REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY (Troy, D. B. et al. wds., 21st ed. 2006) ("Remington 2006") (DTX-088) was published in 2006.

834.    Remington 2006 disclosed that stability testing is a routine procedure performed on drug substances and products to ensure that drug products retain their activity for their anticipated shelf lives. (DTX-088 at 1025.)

835.    Remington 2006 disclosed that stability may be defined as the capability of a particular formulation, in a specific container/closure system, to remain within its physical, chemical, microbiological, therapeutic, and toxicological specifications. (*Id.*)

836.    Remington 2006 disclosed that during the preformulation stage, the stability and compatibility of a drug substance with various solvents, buffered solutions, and excipients considered for the drug formulation are tested, to optimize the drug formulation. (*Id.*)

837.    Remington 2006 disclosed that the USP guidelines for the minimum time period of testing and the storage conditions for pharmaceutical products are as follows:

**Table 52-1. Stability Protocols**

| CONDITIONS | MINIMUM TIME PERIOD AT SUBMISSION |
|---|---|
| Long-term testing 25°C ± 2°C/60% ± 5% RH | 12 mo |
| Accelerated testing 40°C ± 2°C/75% ± 5% RH | 6 mo |
| Alternate testing[a] 30°C ± 2°C/65% ± 5% RH | 12 mo |

[a]Required if *significant change* occurs during 6-mo storage under conditions of accelerated testing.

(*Id.* at 1026.)

838.    Remington 2006 disclosed that many factors affect the stability of a pharmaceutical product, including the stability of the active ingredient(s), the interaction between the active and inactive ingredients, the dosage form, the container-liner-closure system, and environmental conditions during storage. (*Id.* at 1027.)

839.    Remington 2006 also disclosed that stability evaluations include both chemical and physical studies of pharmaceutical formulations. (*Id.*) Remington 2006 further disclosed that physical factors, such as heat, light, and moisture, may initiate or accelerate chemical reactions. (*Id.*)

840.    Remington 2006 disclosed that the dosage form of the pharmaceutical product presents unique stability problems. (*Id.*)

841.    Remington 2006 disclosed that hard gelatin capsules are used by pharmaceutical manufacturers in the production of the majority of capsule products. (*Id.*)

842.    Remington 2006 disclosed that gelatin is stable in air when dry, but is subject to microbial decomposition when moist or maintained in an aqueous solution. (*Id.*) Remington 2006 disclosed that if gelatin capsules are stored in a high-humidity environment, they may soften, stick together, or become distorted; however, if gelatin capsules are stored in an environment of

334

extreme dryness, they may harden and crack. (*Id.*) Remington 2006 disclosed that encapsulated

dosage forms must be packaged properly and states:

> Because moisture may be absorbed or released by gelatin capsules depending on the environmental conditions, capsules offer little physical protection to hydroscopic or deliquescent materials enclosed within a capsule when stored in an area of high humidity. It is not uncommon to find capsules packaged in containers along with a packet of desiccant material as a precautionary measure.

(*Id.* at 1028.)

843.     Remington 2006 was not before the Patent Office during the prosecution of the

'573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 40. Sato 1994

844.     Takashi Sato et al., *Structural Characteristics for Biological Activity of Heat Stable Enterotoxin Produced by Enterotoxigenic Escherichia coli*, 33(29) BIOCHEMISTRY 8641 (1994) ("Sato 1994") (DTX-054) was published in 1994.

845.     Sato 1994 disclosed the 3D structure of two additional analogs of STp(5-17) determined using X-ray crystallography. (*Id.* at Abstract.) Sato 1994 taught that the C-terminal region of all three STp analogs were "strikingly similar" to "peptides known to be ionophores which bind a metal ion with their 3 (or 4, 6, or 8) carbonyls or hydroxyls or amides," suggesting that "the C-terminal region binds a metal ion such as Na+, K+, or Ca2+" and that "ST may function as a cation binding peptide." (*Id.* at 8647–48.) Sato 1994 also notes previous studies that provide evidence that ST may act as a Ca2+ binding peptide. (*Id.* at 8648.)

846.     Figure 8 of Sato 1994, which shows a space-filling model of Mpr5-STp(5-17) and bulk arrangement of the atoms around Ala13, is reproduced below:

335



FIGURE 8: Space-filling model of [Mpr⁵]STp(5–17) without hydrogen atoms depicting the bulk arrangement of the atoms around Ala¹³, which is strongly suggested to be part of the binding interface. The methyl carbon atom of Ala¹³ and the atoms of Asn¹¹, Pro¹², and Ala¹³ are shaded heavily and lightly, respectively. These atoms form the main portion of the hydrophobic core of the ST molecule, judging from the manner of hydration in the crystals (see the text).

847.   Sato 1994 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

**41. Senderoff 1994**

848.   Richard I. Senderoff et al., *Aqueous Stability of Human Epidermal Growth Factor 1-48*, 11(12) PHARMACEUTICAL RES. 1712 (1994) was published in 1994 ("Senderoff 1994") (DTX-089).

849.   Senderoff 1994 disclosed the isolation and characterization of degradation products of human epidermal growth factor ("hEGF") 1-48. (DTX-089 at 1712.) According to

336

Senderoff 1994, deamidation of the asparagine residue at position 1 of the hEGF 1-48 peptide contributes to the degradation of the peptide. (*Id.*)

850.     Senderoff 1994 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 42. Shaheen 2007

851.     Shaheen et al., Best of DDW 2007, *Highlights from Digestive Disease Week and the 108th Annual Meeting of the American Gastroenterological Association Institute, May 19-24, 2007, Washington D.C.*, 3(8) GASTROENTEROLOGY & HEPATOLOGY 620 (2007) ("Shaheen 2007") (DTX-090) was published in 2007.

852.     Shaheen 2007 reports that "Andresen and colleagues from the Mayo Clinic . . . and Microbia . . . announced data from a randomized, double-blind, placebo-controlled study evaluating the effects of oral linaclotide . . . for the treatment of constipation-predominant IBS (IBS-C)." (DTX-090 at 631.) Shaheen 2007 notes, *inter alia*, that the study "findings do provide justification for proceeding to larger trials in patients with IBS-C and chronic constipation." (*Id.* at 632.)

853.     Shaheen 2007 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 43. Sørensen '278 Patent

854.     U.S. Patent No. 5,654,278, to H. H. Sørensen ("Sørensen '278 patent") (DTX-064) was issued on August 5, 1997.

855.     Sørensen '278 patent disclosed "a formulation of human growth hormone comprising leucine as additive [which] shows a very high stability against deamidation and oxidation." (*See* DTX-064 at 4:25–28.) The stabilized product "allows for the storing and

337

shipment thereof in a lyophilized state or in the form of a dissolved or re-dissolved formulation."
(*Id.* at 4:28–30.)

856.    Sørensen '278 patent further disclosed that the pharmaceutical formulations may be formulated for oral administration. (*Id.* at 4:42–45.)

857.    Sørensen '278 patent disclosed that the predominant degradation reactions of human growth hormone (hGH) are deamidation by direct hydrolysis or via a cyclic succinimide intermediate. (*Id.* at 1:47–50.)

858.    According to Sørensen '278 patent, the addition of leucine to a composition comprising human growth hormone reduces deamidation of human growth hormone by 25%-30% compared to the use of phosphate buffer. (*Id.* at 6:39–44.)

859.    Sørensen '278 patent disclosed that leucine to be used in accordance with the present invention is preferably a naturally occurring alpha leucine. The amino acid(s) may be L or D amino acid(s) or a mixture thereof. (*Id.* at 5:64–67.)

860.    Sørensen '278 patent disclosed, in the Example, that the rate of deamidation was examined in formulations comprising 4 mg/ml of hGH and 5 mM L-leucine or D-leucine (i.e., the molar ratio of hGH to leucine in the Example is 28:1). (*Id.* at 6:15–17.) The Example shows that the rate of deamidation is reduced in solutions containing L- or D-leucine. (*Id.* at 6:46–47.)

861.    Sørensen '278 patent disclosed that the pharmaceutical formulation of the invention may furthermore comprise salts for adjusting the tonicity and/or an excipient to facilitate the processing thereof. (*Id.* at 4:63–65.)

862.    Sørensen '278 patent disclosed that a preferred embodiment of the invention is in the form of a pharmaceutical formulation of human growth hormone comprising a carrier in the form of a buffered aqueous solution of growth hormone. (*Id.* at 4:56–59.)

338

863.    The Sørensen '278 patent was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 44. Sørensen '858 Patent

864.    U.S. Patent No. 6,022,858 to H. H. Sørensen et al. was issued on February 8, 2000 ("Sørensen '858 patent") (DTX-071).

865.    Sørensen '858 patent disclosed pharmaceutical formulations comprising "human growth hormone pretreated with zinc and optionally lysine or calcium ions . . . [which] shows a very high stability against deamidation in aqueous solution." (DTX-071 at 4:47–51.)

866.    Sørensen '858 patent further disclosed that the pharmaceutical formulations may be formulated for oral administration. (*Id.* at 4:56–58.)

867.    According to Sørensen '858 patent, "[c]alcium ions when present are preferably added in the form of a physiologically acceptable soluble salt such as the chloride." (*Id.* at 5:25–27.)

868.    The Sørensen '858 patent was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 45. Stryer 1988

869.    Lubert Stryer, BIOCHEMISTRY (3d ed. 1988) ("Stryer 1988") (DTX-149) was published in 1988.

870.    Stryer 1988 taught that physiologically active proteins and peptides spontaneously fold—that is, they form a three-dimensional structure in which the hydrophobic side chains of their amino acids are buried inside the three-dimensional structure and the polar and charged side chains of their amino acid are on the surface of the three-dimensional structure. (*Id.* at 30.)

339

871.     Stryer 1998 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 46. Szenczi 2006

872.     Árápad Szenczi et al., *The Effect of Solvent Environment on the Conformation and Stability of Human Polyclonal IgG in Solution*, 34 BIOLOGICALS 5 (2006) ("Szenczi 2006") (DTX-450) was published in 2006.

873.     Szenczi 2006 taught the stabilizing effect of leucine in protein antibody preparations. (*Id.* at Abstract.) Their study showed that leucine decreases the aggregation tendency and is included in the list of standard stabilizers for proteins. This stabilizing effect is believed to be due to surfactant properties of leucine.

874.     Szenczi 2006 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 47. USP 23

875.     UNITED STATES PHARMACOPEIA (USP 23): NATIONAL FORMULARY (NF18) (1995) was published in 1995 ("USP 23") (DTX-092).

876.     USP 23 disclosed that capsules are solid dosage forms in which the drug is enclosed within a hard or soft soluble container or shell. (DTX-092 at 1942.)

877.     USP 23 disclosed that hard-shell capsules are filled with powder, beads, or granules. (*Id.* at 1943.) USP 23 also disclosed that inert sugar beads (nonpareils) may be coated with active ingredients and coating compositions and then placed into the capsules. (*Id.*)

878.     USP 23 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

**48. Volkin 1997**

879.    David B. Volkin et al., *Degradative Covalent Reactions Important to Protein Stability*, 8 MOLECULAR BIOTECH. 105 (1997) was published in 1997 ("Volkin 1997") (DTX-094).

880.    Volkin 1997 states that "[t]he purification and formulation of [therapeutic peptides and proteins] requires an understanding of the causes and mechanisms of inactivation in order to develop rational strategies for their stabilization." (DTX-094 at 106.)

881.    According to Volkin 1997, "[t]he spontaneous, nonenzymatic deamidation of asparagine residues is one of the most commonly encountered chemical modifications of proteins" and can occur during the isolation and/or storage of proteins. (*Id.*)

882.    Volkin 1997 suggests carefully examining the amino acid sequence of a protein or a peptide in order to utilize strategies to minimize modification or degradation reactions. (*Id.* at 119.)

883.    Volkin 1997 concluded that "the careful selection of experimental and storage solution conditions (including temperature, pH, and additives), based on the particular properties of the specific protein molecule under consideration, often can minimize successfully or even eliminate the occurrence of [protein modification reactions]." (*Id.* at 120.)

884.    Volkin 1997 was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

**49. Wahren '418 Publication**

885.    WO 2006/088418 ("Wahren '418 publication") (DTX-166) was published in 2006.

886.    Wahren '418 publication taught that leucine was a water-soluble excipient used

341

in pharmaceutical formulations, for example, as a lubricant in solid formulations. (*Id.* at 8 ("Examples of useful water soluble lubricants include sodium benzoate, polyethylene glycol, *L-leucine*, adipic acid, and combinations thereof.") (emphasis added).)

887.    The Wahren '418 publication was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

### 50. Yanagawa '336 Publication

888.    EP 0943336 A1, by A. Yanagawa ("Yanagawa '336 publication") (DTX-065), was published on September 22, 1999.

889.    Yanagawa '336 publication disclosed a pharmaceutical composition for oral administration containing a physiologically active peptide, such as peptide hormones, "with excellent stability and enhanced absorption via the oral route." (*See* DTX-065 at Abstract.)

890.    Yanagawa '336 publication disclosed that the peptide is dispersed in a physiologically acceptable porous powdery or crystalline polyvalent metal compound carrier with a mean particle diameter of 500 μm or less, i.e., a divalent or higher-valency metal compound such as calcium. (*Id.* at Abstract; *see also id.* ¶¶ [0023]–[0024], [0026].)

891.    Yanagawa '336 publication explained that "polyvalent metal compounds," including calcium carbonate and calcium chloride, "are highly useful as a carrier for oral administration of physiologically active peptides, especially as enteric coated preparations, because these compounds protect the physiologically active peptides from degradation by gastrointestinal proteases and increases absorption of said peptides," (*id.* ¶¶ [0024], [0026]) and that the enteric coated preparation is preferably prepared by filling the peptide-containing composition in enteric coated capsules or by making tablets with enteric coating (*id.* ¶ [0050]).

892.    Yanagawa '336 publication taught that the effective content of the

342

physiologically active peptide in the composition for oral administration may be, for example, "0.005 to 30%, preferably 0.01 to 20%, and more preferably 0.1 to 5.0%, per 100% total weight of a powder preparation." (*Id.* ¶ [0044].)

893.    Yanagawa '336 publication provideed examples of peptide hormones, such as luteinizing hormone-releasing hormone ("LH-RH") (e.g., buserelin). (*Id.* ¶ [0016].)

894.    Yanagawa '336 publication also disclosed that "favorable oral absorption is obtained when the content of the polyvalent metal compound as the carrier, e.g. . . ., calcium carbonate, calcium lactate . . ., and the like, is 70 to 99.995%, preferably 80 to 99.99%, and more preferably 95 to 99.9%, per 100% total weight of the composition." (*Id.* ¶ [0046].)

895.    The Yanagawa '336 publication also disclosed that the composition may also contain conventional excipients, stabilizers, fillers, binders, dispersants, disintegrators, lubricants, adsorbents, and the like. (*Id.* ¶ [0051].)

896.    The Yanagawa '336 publication was not before the Patent Office during the prosecution of the '573 or '628 patents. (DTX-013 at pp. 1–2; DTX-015 at pp. 1–2.)

## E.  RATIONAL STRATEGIES FOR DEVELOPING A STABLE PEPTIDE OR PROTEIN FORMULATION WERE KNOWN

897.    The prior art taught rational strategies for developing a stable peptide or protein formulation. (DTX-048 at 903; DTX-094 at 106.) These rational strategies include identifying the causes and mechanisms of protein or peptide instability and methods to manage them.

898.    Linaclotide is neither a large nor structurally complex protein. Indeed, linaclotide is a simple peptide with a three-dimensional shape that was reasonably expected to be highly similar to the known three-dimensional shape of STh peptides from which linaclotide was derived. For example:

343



1. **Prior art would have guided a POSA in developing a suitably stable protein or peptide formulation**

899.     Carpenter 2002 taught that "a great deal of research regarding protein stability has been conducted and this information is readily available in the literature." (DTX-293 at 1.) Carpenter 2002 identified another source of information guiding protein formulation development is regulatory guidelines, which "provide information about how to conduct studies and obtain useful results for evaluating formulations." (*Id.* at 2.)

900.     Carpenter 2002 taught a POSA to use "literature studies on similar proteins, even if [] anecdotal" while developing a protein formulation. (*Id.* at 186.) A POSA would not have ignored this teaching.

901.     Further, many of the prior art references that discuss the instability of protein and peptide formulations concerned liquid formulations, which were preferred due to convenience of manufacturing processes or constraints imposed by the required delivery methods. (*See, e.g.*, *id.* at 10, 109 (discussing that although liquid formulations are preferred for various reasons, many protein drugs are not stable enough to be handled as a liquid formulation).) The prior art taught that dried or solid formulations "have less stability-related issues and have a much greater potential tolerance for room-temperature storage," and were successfully used to overcome protein stability problems. (*Id.* at 11.) This is in part because liquid formulations were known to be more susceptible to certain degradation pathways and less stable at room temperature compared to solid formulations. (*Id.* at 10–11.)

902.     For example, Carpenter 2002 taught that "[c]ertainly, chemical degradation is typically slower in the solid state than in liquate state, due to reduced mobility of the protein and limited exposure to water." (*Id.* at 100; *see also id.* at 110.) Therefore, a POSA would have understood that any instability caused by water would be less pronounced in solid formulations than in liquid formulations because a POSA would have understood that a solid formulation contains limited amounts of water. Further, a POSA would have expected reduced protein and peptide degradation rates in a solid formulation due to reduced mobility of the protein or peptide.

903.     A POSA would have been motivated to prepare a solid linaclotide formulation for oral administration. Based on the teachings of prior art stated above, a POSA would have reasonably expected that a solid linaclotide formulation would be more stable at room temperature than a liquid linaclotide formulation.

904.     Unlike antibodies, linaclotide is a simple peptide whose three-dimensional shape was reasonably expected to be highly similar to the known three-dimensional shape of STh

345

peptides from which it was derived. Daugherty 2006 explained that the reason for the variability in antibody stability requirements is "the fact that the small differences between these antibodies are focused on surface-exposed amino acid differences that stipulate antigen specificity." (DTX-294 at 690.) Therefore, a stable antibody formulation accounts for the variability in the "hyper variable region" of the antibody, which determines the antibody's specificity to its antigen. And linaclotide, as a small and structurally less complicated peptide, has no such "hyper variable region" to account for.

905.    And even despite the variability in antibody stability requirements, Daugherty 2006 taught frequently observed antibody degradation pathways, such as oxidation of methionine and cysteine residues, deamidation of glutamine and asparagine residues, aggregation, and fragmentation. (*Id.* at 690–94.) Indeed, Daugherty 2006 taught amino acid sequences predicted to deamidate and those that are less prone to deamidation. (*Id.* at 692.)

906.    Despite this variability, Daugherty 2006 also taught strategies to stabilize antibody formulations. Daugherty 2006 taught that antibody therapeutics are typically formulated in liquid formulations for injection in part because liquid formulations are less expensive, faster to develop, generally easier to prepare for administration, and facilitate delivery of the antibody to the site of action. (*Id.* at 690, 696.) However, as Daugherty 2006 taught, liquid formulations are prone to "oxidation, deamidation, aggregation and fragmentation," and "water is the common culprit" in each of these degradation events. (*Id.* at 694.) Daugherty 2006 taught one strategy for stabilizing antibody-based drugs is preparing solid formulations, such as lyophilized formulations, or spray-dried formulations that can be added to a polymer matrix and made into microspheres. (*Id.* at 694–95.) Daugherty 2006 further taught that using protective excipients can reduce antibody aggregation during lyophilization or spray-drying processes. (*Id.* at 701.)

907.    Thus, despite the fact that different formulations may be used to stabilize different antibodies, the prior art taught common degradation pathways that may contribute to antibody degradation, and strategies to manage those pathways.

908.    Further, a POSA would not have expected to encounter certain instability issues related to antibody formulations when preparing stable formulations of other proteins and peptides such as linaclotide. Daugherty 2006 taught that "[a]ntibodies, because of their endogenous nature, have built-in features that may pose problems for stability as biotherapeutics agents, that function in the normal clearance of these proteins from the body. Thus, despite our best efforts to prepare stable antibody-based drug formulations, the ultimate stability of these products may be limited to inherent mechanisms of degradation pre-designed for the rate of clearance optimal for their function and turnover in the body." (*Id.* at 701 (internal citation omitted).) Thus, a POSA would not have reasonably expected to encounter such stability issues when preparing a suitably stable, solid formulation of linaclotide, which is not an antibody. Rather, a POSA would have reasonably expected linaclotide to be an intrinsically stable peptide.

## 2. A POSA would have reasonably expected linaclotide, unlike many other therapeutic proteins, would be an intrinsically stable peptide

909.    A POSA would have understood that unlike many known therapeutic proteins and peptides, linaclotide was reasonably expected to be an intrinsically stable peptide.

910.    A POSA would have expected linaclotide to have similar 3D structure and intrinsic stability in solid state compared to the precursor peptides from which it was derived.

911.    In particular, Currie '811 taught that linaclotide is a variant of STh(6–19), a peptide derived from an E. coli heat-stable peptide called STh. (DTX-066 ¶ [0109].) The only difference between linaclotide and STh(6–19) is that leucine, i.e., the fourth amino acid in STh(6–

19), is substituted with tyrosine in linaclotide. Currie '811 also taught a variant of STh in which the same leucine residue is substituted with tyrosine. The known primary structure of linaclotide, STh(6–19), STh, and STh(Leu → Tyr) are shown below:



912.     Aimoto 1983 taught that the reason STh was called a "heat stable" peptide was because of the observation that the biological activity of the peptide was detectable after heating the peptide "in boiling water for 30 min." (DTX-028 at 324.) Aimoto 1983 taught that STh(6–19) was more heat-stable than STh and retained its function even after heat treatment at 120°C for 30 min. (*Id.* at summary.) Aimoto 1983 disclosed that the HPLC peak area for STh(6–19) was only reduced to 75% after heating at 100 °C for 30 min; and only reduced to 66% (i.e., two-thirds) after heating at 100°C for 60 min, or at 120°C for 10 min. (*Id.* at 324–25.) Aimoto 1983 taught that "[t]he enhanced structural stability of [STh(6–19)] may be due to decreased perturbation of the molecule on heating as a result of the absence of the N-terminal sequence." (*Id.* at 325–26.)

348

Aimoto 1983 concluded that STh(6–19) is "the thermodynamically stable and biologically active site" of STh. (*Id.* at 326.)

913.     Further, it was known that the secondary structure of STh and STh(6–19) was essential for these peptides' biological activity. (DTX-044 at 285.) The prior art taught the secondary structure of STh(6-18), a peptide with the same amino acid as STh(6–19) without the last tyrosine residue. (*Id.* at 287; *see also id.* at 285.)



**Fig. 2**   Schematic ribbon drawing of the polypeptide backbone of an STh[6-18].

914.     Currie '811 taught that linaclotide, STh, and STh(Leu → Tyr) have a similar function: they similarly increase intestinal transit rate in an acute murine gastrointestinal model tested. (*See* DTX-066, Figs. 4A, 4B; *id.* ¶ [0088].) Given the known similarity in primary structure and function, a POSA would have reasonably expected that linaclotide, STh(6–19), STh, and STh(Leu → Tyr) would have similar secondary structure, and thus, similar intrinsic stability.

915.     Therefore, a POSA would have reasonably expected that linaclotide would be an intrinsically stable peptide that, similar to STh(6–19), would retain its secondary structure and function even at temperatures as high as 100°C. In contrast, many proteins, including pharmaceutical proteins such as antibodies, would have been reasonably expected to denature

349

(i.e., lose their tertiary or secondary structure) when exposed to such high temperatures.

916.    Furthermore, Hu 2001 studied the solid-state secondary structures of certain proteins and peptides and reported that insulin, lysozyme, DsbA protein, luciferase, and ovalbumin showed "no or slight structural rearrangement from solution to solid state." (DTX-215 at Abstract; *see also id*. at 20.) Hu 2001 explained that "insulin, lysozyme, and oxidized DsbA are small proteins with three, four, and one disulfide [bonds], respectively. The structures are thought to be extremely rigid and stable and the disulfide might impede structural rearrangement." (*Id*. at 20.) Based on the teachings of Hu 2001, it would have been evident to a POSA that the structure of linaclotide would be even more rigid than other proteins and peptides containing disulfide bonds because the ratio of disulfide bonds to the number of amino acids is much higher in linaclotide.

### 3. Prior art teachings about other proteins and peptides would have guided a POSA in developing a suitably stable, solid linaclotide formulation

917.    The prior art taught rational strategies for developing a stable peptide or protein formulation. Gaining an understanding of the causes and mechanisms of protein and peptide degradation is an important step in preparing a stable pharmaceutical formulation. To that end, prior art teachings regarding different proteins and peptides would have been helpful to a POSA in preparing a suitably stable, solid linaclotide formulation.

918.    It was known that all proteins and peptides are made of the same building blocks: amino acids (such as asparagine). Although two different proteins or peptides with different primary sequences may have different higher order structures, a POSA would have reasonably expected that they both would be prone to the same type of degradation if, for example, they both have exposed asparagine residues.

919.    Similarly, a protein or peptide's size is not determinative of its chemical degaradation.  A POSA would have been able to learn and extrapolate about the chemical degaradation of a peptide or protein of interest from other references explaining chemical degaradation of other proteins with similar structural characteristics and amino acid residues, and would not dismiss them simply because of differences in size.   In other words, chemical degaradation is generally the same across the board irrespective of size of peptides or proteins. Accordingly, a POSA would have understood that information concerning a larger protein may be relevant to a smaller peptide's chemical degradation.

920.    The three-dimensional shape of linaclotide was reasonably expected to be highly similar to the known three-dimensional shape of STh peptides from which it was derived. In particular, it was known that linaclotide was derived from STh, STh(6-19), STp, and MPr[5]-STp(5-17) (*see, e.g.*, Currie '811 at ¶ [0109]), which can be considered "linaclotide's precursor peptides."  The primary amino acid sequences of linacloide and its precursor peptides are shown below—shaded in grey are the sequences that were known to constitute the functional part of these peptides:



921.    Additional information about the 3D structure of linaclotide's precursor peptides were known in the art.  For example, in Ozaki 1991, researchers from Osaka University in Japan published the 3D structure of a fully functional analogue of STp, Mpr5-STp(5-17), which consists of 13 amino acid residues from Cys(5) to Cys(17) and where Mpr is β-mercaptopropionic acid. (*See* DTX-606 at Abstract, *see also id.* at Figs. 3, 4, and 6.) This structure was obtained using X-ray crystallography of the peptide crystalized from water. (*See, e.g., id.* at Abstract.) Ozaki 1991 reports three β-turns along a spiral peptide backbone fixed tightly by three intramolecular disulfide bonds. (*Id.*; *see also id.* at 5937.) This information taught a POSA that the STp(5-17) and STh(6-18) peptides with the same disulfide bonds are very similar in their structure and stability.

922.    Ozaki 1991 taught that all the side chains of the peptide's amino acids "are oriented to the outside of the molecule," and that "[t]he side chains from Asn11 to Ala13 form a particularly prominent, isolated cluster projecting from the surface of the molecule to the

outside." (*Id*. at 5937.) Ozaki 1991 further taught that crystals of the peptide were "hydrated by 13 water molecules per peptide molecule." (*Id*. at 5939.)

923.     Sato 1994 disclosed the 3D structure of two additional analogs of STp(5-17) determined using X-ray crystallography. (DTX-054 at Abstract.) Sato 1994 taught that the C-terminal region of all three STp analogs were "strikingly similar" to "peptides known to be ionophores which bind a metal ion with their 3 (or 4, 6, or 8) carbonyls or hydroxyls or amides," suggesting that "the C-terminal region binds a metal ion such as $Na^+$, $K^+$, or $Ca^{2+}$" and that "ST may function as a cation binding peptide."  (*Id.* at 8647-48.)  Sato 1994 also noted previous studies that provide evidence that ST may act as a $Ca^{2+}$ binding peptide. (*Id.* at 8648.)

924.     Thus a POSA would have reasonably expected that linaclotide would be susceptible to degradation via asparagine deamidation. This logical expectation is supported by the reasonably expected secondary structure of linaclotide, which would have reasonably suggested to a POSA that the asparagine residue is exposed, thus it would be susceptible to deamidation in presence of residual water in a solid formulation.

925.     The prior art provided a POSA with methods for addressing the problem of degradation by deamidation.  For example, the prior art taught stabilized liquid and lyophilized protein formulation in which calcium chloride was used to reduce asparagine deamidation. For example, Sørensen '858 taught that human growth hormone (hGH) has two asparagine residues that are susceptible to deamidation. (DTX-071 at 2:4–5.) As another example, Rehder '326 taught that polypeptides with exposed asparagine residues, such as antibodies with asparagine residues located at the variable regions or the Complementarity Determining Regions (CDRs), are susceptible to degradation via asparagine deamidation. (DTX-070 ¶¶ [0033]–[0034].) These two references teach stabilizing two different proteins: one concerns stabilizing formulations of hGH

353

and the other concerns stabilizing formulations of a different class of proteins (i.e., antibodies). Yet, they both teach stabilizing proteins by minimizing the same degradation pathway (i.e., deamidation of susceptible of asparagine residues), by using the same excipient—calcium chloride. (*See, e.g.*, DTX-071 at Example, cols. 7–8; DTX-070 ¶ [0034].)

926.    Based on the teachings of Sørensen '858 and Rehder '326, a POSA would have known that two different proteins (with different primary sequence and three-dimensional shape) could be degraded via the same pathway, i.e., deamidation of susceptible asparagine residues. Further, based on the teachings of Sørensen '858 and Rehder '326, a POSA would have known that the deamidation of susceptible asparagine residues in these two different proteins was reduced by using the same excipient (calcium chloride). Therefore, a POSA would have reasonably expected that a formulation containing a peptide with an asparagine residue, such as linaclotide, would be susceptible to deamidation and could be stabilized by using calcium chloride.

927.    A POSA would have expected linaclotide to be particularly susceptible to asparagine deamidation. The prior art taught that including an amino acid such as leucine as an additive in a solid or solution protein formulation would decrease the rate of asparagine hydrolysis. (*See* DTX-064 at Abstract.)

928.    In particular, Sørensen '278 patent discloses "a formulation of human growth hormone [hGH] comprising leucine as additive [which] shows a very high stability against deamidation, oxidation and cleavage of peptide bonds." (*See id.*; *see also id.* at 4:25–28.) The stabilized product "allows for the storing and shipment thereof in a lyophilized state or in the form of a dissolved or re-dissolved formulation." (*Id.* at 4:28–30.)

929.    Sørensen '278 patent taught that pharmaceutical formulation of growth hormone

"tend to be unstable." (*Id.* at 1:44–45.) In particular, the major degradation product of hGH in lyophilized state (i.e., solid formulation), as well as in solution, is deaminated hGH. (*Id.* at 1:65–2:1.) Sørensen '278 patent taught that hGH has two Asn residues that are susceptible to and undergo deamidation.  (*See id.* at 2:1–3.)

930.    According to Sørensen '278 patent, the addition of leucine to a composition comprising human growth hormone reduces deamidation of human growth hormone by 25%–30% compared to the use of phosphate buffer. (*Id.* at 6:39–44.) Sørensen '278 patent disclosed that the leucine to be used in accordance with the present invention is preferably a naturally occurring alpha leucine.  The amino acid(s) may be L or D amino acid(s) or a mixture thereof. (*Id.* at 5:64–67.)

931.    Sørensen '278 patent disclosed, in the Example, that the rate of deamidation was examined in formulations comprising 4 mg/ml of hGH and 5 mM L-leucine or D-leucine (e.g., the molar ratio of hGH to leucine in the Example is 28:1). (*Id.* at 6:15–17.) The Example showed that the rate of deamidation is reduced in solutions containing L- or D-leucine. (*Id.* at 6:46–47.)

932.    Sørensen '278 patent further disclosed that the pharmaceutical formulations may be in the form of a lyophilized powder or aqueous solution, formulated for oral or parenteral administration. (*Id.* at 4:42–45, 4:50–59.)

933.    Based on the teachings of Sørensen '278 patent, a POSA would have been motivated, with a reasonable expectation of success, to add an amino acid such as leucine to a solid formulation of linaclotide to prepare a stable solid oral formulation.

934.    Formaldehyde was known to be present in many pharmaceutical materials, including components of packaging, and further, it was known that parts-per-million levels of formaldehyde in pharmaceutical formulations of proteins and peptides might cause significant

355

degradation because of its low molecular weight. (DTX-076 at 238; DTX-100 at 743.) Further, it was known that formaldehyde reacts with the primary amino group of the N-terminal amino acid residue of a peptide to form an imine, a Schiff-base. (DTX-100 at 739; DTX-105 at 6238.)

935.    A POSA would have known that linaclotide's N-terminal residue contains a primary amine group that was known to be susceptible to reacting with formaldehyde, and thus a POSA would have reasonably expected residual formaldehyde present in excipients, packaging components, and other materials that come into contact with linaclotide during the manufacturing process would react with linaclotide's N-terminal residue to form a Cys-1-imide derivative of linaclotide.

936.    A POSA would have been able to use known techniques and equipment to prepare and test formulations at various temperatures. Thus, a POSA would have tested excipients that are reasonably expected to manage linaclotide's expected degradation pathways at the appropriate temperature to confirm the expected effect of those excipients.

937.    A POSA would have reasonably expected that two excipients, leucine and calcium cation, would reduce degradation pathways reasonably expected to contribute to linaclotide instability. Further, the prior art taught concentrations at which leucine and calcium cation can be added to a formulation. (*See* DTX-065; International Publication No. WO 02/26248 A1 ("Mara '248') (DTX-069); DTX-064.) A POSA, as a matter of routine experimentation, would have been able to optimize the amount of each of these two excipients in a linaclotide solid formulation. (*See, e.g.*, DTX-293 at 15 (teaching a typical study protocol for formulation optimization).)

938.    Testing drug and excipient compatibility is a routine part of any pre-formulation process. A POSA would have been able to conduct these studies using known techniques. (*See*

DTX-165 at 942–943, Table 1.) Thus, a POSA working on preparing a suitably stable linaclotide formulation would have routinely tested the compatibility of linaclotide and other excipients used in the formulation with leucine and calcium cation compounds, excipients that the POSA would have reasonably expected would manage linaclotide degradation. Indeed, as of the relevant critical dates, it was common practice to screen many formulations with the excipients known or expected to increase stability of a peptide drug included in the formulation. Further, a POSA would have reasonably expected that leucine and calcium cation would be compatible with linaclotide based on the prior art that taught using these two excipients as stabilizers in other protein and peptide formulations, and would have been able to confirm this through routine testing.

939.     Therefore, a POSA would have followed the rational strategy taught by the prior art for preparing a suitably stable linaclotide formulation – (1) identifying pathways that were reasonably expected to contribute to linaclotide instability, and (2) finding excipients that were reasonably expected to manage those pathways – and that a POSA would have been able to confirm these reasonable expectations using routine experimentation.

### F.  THE DIFFERENCES BETWEEN THE PRIOR ART AND THE SUBJECT MATTER CLAIMED IN THE '573 PATENT AND THE '628 PATENT WOULD HAVE BEEN OBVIOUS

940.     There are numerous different combinations of prior art references and many exemplary references that disclose the limitations of the asserted claims. As explained in more detail below, the following combinations would have rendered the asserted claims obvious:

- Any or all of Currie '811 publication, Lacy 2006, Microbia Press Release 2006, Andresen 2007, Harris 2007, Microbia Press Release 2007, Shaheen 2007, Andresen 2008, or Microbia Press

357

Release 2008 (the "Linaclotide References"), alone or in combination; and

- Any or all of Sørensen '278 patent, Adensunloye '106 patent, or Iwata '433 publication (the "Leucine References"), alone or in combination; and

- Any or all of Rehder '326 publication, Sørensen '858 patent, Cleland 1993, Bentz '393 publication, Chan '788 patent, Chen 1999, Marra '248 publication, Yanagawa '336 publication, or Cini '298 patent (the "Ca$^{2+}$ References"), alone or in combination; and/or

- Any or all of Manning 1989, Cleland 1993, Senderoff 1994, Volkin 1997, Crowley 1999, Metz 2004, del Barrio 2006, Li 2006, FDA Guidance 1994, USP 23, Remington 2000, and Remington 2006 (the "Formulation References"), alone or in combination.

941.    A POSA would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references.

942.    A POSA would not have had to combine all of these references; many of them are cumulative in certain respects, and are included simply for completeness; or to the extent Plaintiffs dispute that one or more references could or should apply.  The fact that these strategies were used repeatedly, however, confirms the reasonable expectation one of ordinary skill in the art would have as to their ability to work in a linaclotide formulation; and/or would have been one of a limited number of options available for the person of ordinary skill in the art to try in

358

developing a linaclotide formulation.

943.    The asserted claims of the '573 patent and the '628 patent are generally directed to a stable solid formulation comprising linaclotide, $Ca^{2+}$, and leucine. A POSA would have been motivated, with a reasonable expectation of success, to add $Ca^{2+}$ and leucine to a solid linaclotide formulation. A POSA would have arrived at the claimed formulation with routine experimentation.

944.    For example, based on the known structure of linaclotide and the teachings of the prior art, a POSA would have reasonably expected linaclotide to be susceptible to degradation via the following pathways:

- Hydrolysis (i.e., deamidation) of the asparagine residue to aspartic acid;

- Dimerization, or polymerization, via inter-molecular disulfide bond formation between cysteine residues of two or more linaclotide molecules (covalent aggregation) or non-covalent aggregation; and

- Formation of linaclotide imide derivatives due to linaclotide's reaction with formaldehyde.

945.    The prior art taught that an amino acid, such as leucine, and a divalent cation, such as $Ca^{2+}$, would reduce the rate of one or more of the expected linaclotide's degradation pathways. Thus, a POSA would have reasonably expected that adding an amino acid, such as leucine, and/or a divalent cation, such as $Ca^{2+}$, would improve the stability of a solid linaclotide formulation.

946.    It was expected that an amino acid, such as leucine, and a divalent cation, such

359

as $Ca^{2+}$, would improve linaclotide's stability by reducing different degradation pathways. Thus, a POSA would have been motivated to add both leucine and $Ca^{2+}$ to the linaclotide formulation, and would have reasonably expected that combining these two additives would further improve the formulation's stability compared to adding only one of these additives.

947.    As stated in more detail below, the limitations of the asserted claims are not new or inventive.

### 1. A POSA would have been motivated to prepare a stable solid dosage form of linaclotide

948.    As stated above, the prior art disclosed the structure of linaclotide, and that linaclotide is effective in treating chronic constipation and constipation predominant IBS when administered orally.

949.    A POSA would have been motivated to prepare a stable solid oral dosage form for linaclotide.

950.    Drug substances most frequently are administered orally by means of solid dosage forms such as tablets and capsules. (DTX-052 at 858.) Indeed, the prior art taught that linaclotide may be "administered orally, e.g., as a tablet or cachet containing a predetermined amount of the active ingredient, gel, pellet, paste, syrup, bolus, electuary, slurry, capsule, powder, granules, . . ." (*See* DTX-066 ¶ [0174].)

951.    A POSA would have well understood that from an oral delivery standpoint, linaclotide is unique because it is designed for local activity in the intestines only and is not designed for systemic delivery.  Thus, linaclotide was known to be a locally active durg that had to be delivered to the intestine to treat constipation.  Enteric coatings and capsules were commonly used to protect an active ingredient, such as linaclotide, from the acidic environment

of the stomach en route to the intestine.  Therefore, solid oral administration was expected to be an appropriate and convenient route of administration for linaclotide.

952.    Further, the prior art taught that a stable formulation "would provide an effective means of delivering an efficacious and safe amount" of the pharmaceutically active ingredient, and "would lower the production and treatment costs." (DTX-070 ¶ [0012].)

## 2. A POSA would have been motivated to minimize linaclotide's degradation

953.    To prepare a stable solid oral formulation for linaclotide, a POSA would have sought to minimize linaclotide's degradation during storage.

954.    Stability of an active pharmaceutical agent, such as a peptide, at the molecular level is defined as the capability of a particular formulation, in a specific container/closure system, to remain within its, *inter alia*, chemical specifications. (*See* DTX-088 at 1025.)

955.    Before the priority dates of the '628 and '573 patents, it was well known that understanding a peptide's stability at a molecular level was important for preparing stable peptide formulations. (*See, e.g.*, DTX-048 at 903; DTX-094 at 106; *see* DTX-088 at 1029.)

956.    It was known that peptide instability may result from structural modifications via chemical bond formation or cleavage, creating a new chemical entity. (*See, e.g.*, DTX-048 at 903.) These structural modifications are often called "degradation." (*Id.*)

957.    Further, before the priority dates of the '628 and '573 patents, the FDA required the removal of any contaminating materials when purifying therapeutic peptides and provided a list of contaminants including deamidation products. (DTX-077 at 7.) Degradation of the peptide during storage would lead to formation of compounds similar to those removed during the purification process. (*Id.* at 12.)

### 3. A POSA would have reasonably expected linaclotide to be susceptible to certain degradation pathways.

958.    Based on the teachings of prior art and linaclotide's known primary structure, i.e., the amino acid sequence, and its reasonably expected three-dimensional structure, a POSA would have reasonably expected the following three degradation pathways would contribute to linaclotide's instability in a solid formulation, and thus a POSA would have been motivated to manage linaclotide's degradation via these degradation pathways:

- Deamidation of the asparagine amino acid side chain to form aspartic acid;

- Formaldehyde-mediated degradation; and

- Covalent or non-covalent aggregation.

959.    Based on the teachings of the prior art, a POSA would have reasonably expected that these three degradation pathways would contribute to linaclotide's instability, and thus would have been motivated to manage these during storage. A POSA would have reasonably arrived at the claimed formulation. It is not necessary for a POSA to know with certainty that an expected result will actually occur; a reasonable expectation is enough.

960.    Based on the teachings of the prior art, a POSA would have been motivated to add leucine and calcium cation to a linaclotide solid formulation, with a reasonable expectation that they would stabilize the formulation, which was confirmed by real-world data. Additionally, linaclotide's actual degradation pathways, or the actual mechanisms by which they are managed, are not elements of any of the asserted claims. The asserted claims are generally directed to a solid linaclotide formulation comprising leucine and calcium cation.

961.    Further, the prior art taught leucine and calcium cation would manage these

362

degradation pathways. Thus, a POSA would have been motivated to use leucine and calcium cation in a linaclotide solid formulation.

### a. A POSA would have reasonably expected that formaldehyde would contribute to linaclotide instability

962.     Formaldehyde was known to be present in in many pharmaceutical materials, including components of packaging, and further, it was known that parts-per-million levels of formaldehyde in pharmaceutical formulations of proteins and peptides might cause significant degradation because of its low molecular weight. (DTX-076 at 238; DTX-100 at 743.) Further, it was known that formaldehyde reacts with the primary amino group of the N-terminal amino acid residue of a peptide to form an imine, a Schiff-base. (DTX-100 at 739; DTX-105 at 6238.)

963.     A POSA would have known that linaclotide's N-terminal residue contains a primary amine group that was known to be susceptible to reacting with formaldehyde, and thus a POSA would have reasonably expected residual formaldehyde present in excipients, packaging components, and other materials that come into contact with linaclotide during the manufacturing process would react with linaclotide's N-terminal residue to form a Cys-1-imide derivative of linaclotide.

964.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ (DTX-336 at LINZ_NDA0001828 (3.2.P.2.1 Components of the Drug Product).)[11]

965.    There are several post-1997 references that discuss formaldehyde-mediated degradation. (DTX-076 at 238; DTX-105 at 6238; DTX-100 at 743; DTX-084 at 1.)

966.    For example, Crowley 1999 taught "[f]ormaldehyde has the capability to participate in most of the known reactions of aldehydes and is present in many materials, including components of packaging. Parts per million levels might cause significant degradation because of its low molecular weight." (DTX-076 at 238.)

967.    A POSA would have understood that presence of trace amounts of formaldehyde would cause significant linaclotide degradation given the low doses of linaclotide (75–600 μg of linaclotide) that were used to treat patients with chronic constipation or c-IBS in a Phase IIB study. Thus, a POSA would have understood that a solid linaclotide formulation would contain $4.9 \times 10\text{-}8 – 3.9 \times 10\text{-}7$ moles of linaclotide.[12] Because molecular weight of formaldehyde is 30.031 g/mol, 1.47 – 11.71 μg of formaldehyde in the formulation could react with 100% of linaclotide in the formulation. A POSA would have understood that 1 ppm = 1 μg/g. Therefore, a POSA would have understood that as little as 1.47 – 11.71 ppm formaldehyde in the formulation could react with 100% of linaclotide in the formulation. Therefore, a POSA would have reasonably expected that trace amounts of formaldehyde would cause significant linaclotide degradation.

968.    Metz 2004 explained that the nature of all possible chemical modifications in

---

[11] ████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████

[12] Based on the known sequence of linaclotide, a POSA would have understood that the linaclotide's chemical formula is $C_{59}H_{79}N_{15}O_{21}S_6$, and thus its molecular weight is 1,526.74 g/mol.

proteins caused by formaldehyde was not elucidated before they started their studies, in part because of the low resolution of the available analytical methods. (DTX-105 at 6235.) Metz 2004 then explained that the availability of tandem high-performance liquid chromatography-mass spectrometry when they started their studies provided the tools necessary to learn about the chemistry of formaldehyde-protein reactions. (*Id.*) Metz 2004 then taught an overview of the major degradation products resulting from reactions between model peptides and formaldehyde, and taught that their data can be used to predict and identify reactive sites in proteins and peptides exposed to formaldehyde. (*Id.* at 6236.)

969.    Li 2006 and del Barrio 2006 taught analytical methods for detecting trace amounts of formaldehyde in pharmaceutical excipients. del Barrio 2006 taught that "almost all excipients contained varying levels of formic acid and formaldehyde." (DTX-100 at 743.) Although these teachings might not have been available to the authors of Manning 1989, Cleland 1993, and Volkin 1997, Li 2006 and del Barrio 2006 were published, and thus would have been available to a POSA before the purported invention claimed in the asserted claims.

970.    Prior art teachings discussed trace amounts of formaldehyde, which are sufficient to cause significant linaclotide degradation, in particular due to the very low efficacious dosages of linaclotide disclosed by the prior art, are present in many commonly used excipients and pharmaceutical packaging materials without being deliberately added.

971.    Thus, a POSA would have reasonably expected that formaldehyde-degradation would contribute to linaclotide instability in a solid formulation.

### b.  A POSA would have reasonably expected that deamidation and aggregation would contribute to linaclotide instability

972.    Deamidation and covalent and non-covalent aggregation are common pathways

365

that contribute to instability of pharmaceutical formulations of proteins and peptides.

973.     For example, the prior art taught that deamidation is one of "the most common chemical degradation pathways" affecting therapeutic proteins in pharmaceutical formulations. (DTX-148 at 132.) Indeed, deamidation of the asparagine residue of pharmaceutical proteins and peptides was "extensively studied" before the critical dates of the asserted claims. (DTX-293 at 86.) As another example, Volkin 1997 listed deamidation and disulfide destruction and interchange (which could lead to covalent aggregation) as "[c]ommonly observed modifications that occur in proteins during in vitro purification, storage and handling." (DTX-094 at Abstract; *see also id.* at 106.) Similarly, Cleland 1993 taught that the most common protein degradation pathways include deamidation and aggregation. (DTX-034 at Abstract.)

974.     A POSA would have reasonably expected these two common degradation pathways would contribute to linaclotide's instability in a solid formulation.

975.     A POSA's reasonable expectation of linaclotide's deamidation in a solid formulation is further supported by the prior art teachings about the 3D structure of linaclotide's precursor peptide in solid state obtained using X-ray crystallography. (*See* generally DTX-606 and DTX-054.)

976.     Ozaki 1991 disclosed the 3D structure of a fully functional analogue of STp, Mpr5-STp(5-17), which consists of 13 amino acid residues from Cys(5) to Cys(17) and where Mpr is β-mercaptopropionic acid. (*See* DTX-606 at Abstract; *see also id.* at Figs. 3, 4 and 6.) This structure was obtained using X-ray crystallography of the peptide crystalized from water. (*See, e.g., id.* at Abstract.) Ozaki 1991 teaches that all of the side chains of the peptide's amino acids "are oriented to the outside of the molecule," and that "[t]he side chains from Asn11 to Ala13 form a particularly prominent, isolated cluster projecting from the surface of the molecule to the

outside." (*Id*. at 5937.)

977.    Similarly, Sato 1994 disclosed a space-filling model of the same precursor peptide in solid state obtained based on X-ray crystallography, which shows the side chain of the Asn residue is exposed on the surface of the peptide. (*See* DTX-054 at Fig. 8.)

978.    A POSA would have understood that the three-dimensional shape of a protein or a peptide as a whole largely determines its stability to degradative processes, such as oxidation and deamidation.  Given the known similarity in primary structure and function, a POSA would have reasonably expected linaclotide's structure to be similar to the structure of linaclotide's precursor peptide.

979.    Thus, based on the 3D structure of linaclotide's precursor peptide in solid state disclosed in Ozaki 1991 and Sato 1994, a POSA would have reasonably expected that the side chain of the Asn residue in linaclotide in a solid formulation would be exposed on the surface of the peptide.

980.    The Rehder '326 publication taught that polypeptides with exposed asparagine residues, such as antibodies with asparagine residues located at the variable regions or the Complementarity Determining Regions (CDRs) are susceptible to degradation via asparagine deamidation." (*See* DTX-070 ¶¶ [0033]-[0035]).)   The teachings of Rehder '326 publication encompass solid formulations of proteins and peptides with an exposed Asn residue.  Therefore, a POSA would have reasonably expected that Asn deamidation would contribute to instability of a solid formulation of linaclotide.

### c.    A POSA would have reasonably expected that oxidation would not contribute to linaclotide's instability

981.    Oxidation of side chains of certain amino acid residues such as cysteine is another

common degradation pathway observed in many therapeutic proteins and peptides. It was known that a cysteine residue in a peptide may be oxidized to form a cystine, i.e., two cysteine residues that are linked by a disulfide bond. (DTX-034 at 345.)

982.     Indeed, prior art references support that oxidation of the cysteine amino acid side chain is one of the most common degradation pathways for therapeutic peptides and proteins. (*See, e.g.*, DTX-293 at 85 (teaching that oxidation is one of the two most common source of chemical instability of pharmaceutical proteins and peptides, which can occur at cysteine, methionine, histidine and tryptophan residues)[13]; DTX-034 at Abstract, 343–345 (teaching that the three most protein degradation pathways are aggregation, deamidation, and oxidation, such as oxidation at the cysteine, methionine, histidine, and tryptophan residues).) Thus, a POSA would have reasonably expected a cysteine residue in a peptide or protein would be susceptible to oxidation.

983.     The prior art taught that "[o]nce the cystine disulfide is formed, it is much less susceptible to reaction with mild oxidants" than cysteine, and "so is often found as the stable end product in an oxidative reaction." (DTX-034 at 345.)

984.     As shown below, it was known that linaclotide has three disulfide bonds between cysteines 1 and 6, 2 and 10, and 5 and 13. (DTX-066 ¶¶ [0025], [0110]; *see also* DTX-079 at 403, 404; DTX-073 at 570.)

---

[13] It was known that linaclotide does not contain any of the following amino acid residues: methionine, histidine, and tryptophan. (*See, e.g.*, Block Opening Report (DTX-555) ¶ 83 (*see also* Gupta Report (DTX-573) at ¶ 32); Klibanov Report (DTX-571) ¶¶ 61–62.)



Cys-Cys-Glu-Tyr-Cys-Cys-Asn-Pro-Ala-Cys-Thr-Gly-Cys-Tyr

985.    Because the cysteine residues in linaclotide are linked by cystine disulfide bonds, i.e., "the stable end product in an oxidative reaction," a POSA would have reasonably expected linaclotide to be less susceptible to oxidation. (DTX-034 at 345.)

986.    Cleland 1993 taught that a cystine disulfide bond is "'much less susceptible to reaction with mild oxidants (such as H2O2) than either methionine or cysteine, and so is often found as the stable end product in an oxidative reaction.'" Cleland also writes:

> Once cystine disulfide is formed, much less susceptible to reaction with mild oxidants (such as $H_2O_2$) than either methionine or cysteine, and so is often found as the stable end product in an oxidative reaction, Exceptions to this have been reported. ***Certain organic acids react with $H_2O_2$ to form the more reactive acylperoxides and peracids,*** which are known to oxidize cystines.

(DTX-034 at 345 (emphasis added).)

987.    Based on these teachings, a POSA would have reasonably expected linaclotide's cystine disulfide bonds would be susceptible to oxidation in the presence of $H_2O_2$ and certain organic acids that form the more reactive acylperoxides and peracids. A POSA would not have reasonably expected that a linaclotide formulation would contain the organic acids and $H_2O_2$ that form the more reactive acylperoxides and peracids, which would then oxidize cystine disulfide bonds in linaclotide.

988.    A POSA would not have reasonably expected Tyr oxidation to contribute to linaclotide instability.

989.    It was known in the art that Tyr oxidizes "by visible light in the presence of dyes,

369

i.e., via photooxidation." (DTX-048 at 907.) A POSA would not have reasonably expected this oxidation mechanism to destabilize linaclotide when the formulation was not expected to contain any dyes and/or was not expected to be exposed to light during storage.

990.    Further, Carpenter 2002 taught that "[a] large number of possible chemical reactions have been identified as leading to decomposition of peptides (Manning et al. 1989.) ***However, a select few are of primary concern to pharmaceutical scientists***."[14] (DTX-293 at 85 (emphasis added).) Carpenter 2002 taught that the oxidation reactions that "are of primary concern" to pharmaceutical scientists, i.e., a POSA, are oxidation "at cysteine residues (to form disulfide bond linkages), at methionine (to form sulfoxides), or at heterocyclic aromatic side chains of tryptophan and histidine (to form N-oxides)." (*Id.*) Therefore, tyrosine oxidation would not have been of primary concern to a POSA.

991.    Similarly, Cleland 1993 taught that "several reactive amino acids may undergo oxidation: methionine, cysteine, histidine, tryptophan, and tyrosine, each with its own chemistry. Because the focus of this review is protein formulation stability, only the pertinent amino acids are discussed below." (DTX-034 at 343 (emphasis added).) Cleland 1993 then discusses oxidation at methionine, cysteine, histidine, and tryptophan residues, but does not discuss tyrosine oxidation. (*Id.* at 343–46.) Cleland 1993 refers the readers interested in "alternate protein oxidation mechanisms, including oxidation induced by high energy radiation, photooxidation reactions, metal ion catalysis, and enzymatic oxidation by oxidases" to literature outside the formulation art. (*Id.* at 343.)

---

[14] After reading this statement from Carpenter 2002, a POSA would have understood that not all degradation mechanisms discussed in Manning 1989 (including photooxidation of tyrosine residues) would have been of primary concern to a POSA.

992.     The data disclosed in the '628 patent does not show that oxidation plays a primary role or a significant role in the instability of linaclotide.  In particular, the data reported in Tables 7 and 17 is highly variable, and fails to provide sufficient information to allow a POSA to perform a mass balance analysis, thus rendering it inconclusive.  For example, Table 7 of the '628 patent, reproduced below, reports the amount of oxidized linaclotide (measured in "Area % by HPLC") and the amount o flinaclotide for 15 formulations stored at 40°C/75% RH for six months.  (*See* '628 patent at 22:60-67.)  The data related to linaclotide formulation examples prepared without a cation are highlighted below.  The '628 patent states that a cation selected from the group comprising $Mg^{2+}$, $Ca^{2+}$, and $Zn^{2+}$ "is useful for suppressing the formation of an oxidation product of the linaclotide during storage." (*Id.* at 6:56-59.)  The data reported in Table 7 do not show that linaclotide's oxidation played a primary or significant role in the instability of linaclotide.  Rather, the data shows that even in the absence of calcium ions, in three out of four examles, the maximum extent of oxidation reaction is less than 0.5% of initial amount of linaclotide when the formulation is stored at 40°C/75% RH for six months.  According to the FDA guidelines on stability and shelf-life expectations, the degree of oxidation in all four cases would be considered acceptable.

TABLE 7

| Exam-ple | Assay [w/w] % of Initial | Area % by HPLC | | | |
|---|---|---|---|---|---|
| | | Linaclotide (% of Initial) | Oxidation | Hydrolysis | Formaldehyde Imine |
| 1 | 107.56 | 96.88 (99.13) | 0.11 | 0.24 | 0.19 |
| 3 | 98.87 | 97.36 (99.42) | 0.07 | 0.52 | 0.15 |
| 4 | 95.67 | 95.61 (97.83) | 0.10 | 0.16 | 0.24 |
| 5 | 103.41 | 95.87 (98.68) | 0.07 | 0.25 | 0.24 |
| 6 | 99.46 | 93.64 (95.51) | 0.14 | 0.70 | 0.55 |
| 7 | 98.64 | 93.44 (95.36) | 0.45 | 1.45 | 0.63 |
| 8 | 92.81 | 88.20 (94.90) | 0.37 | 1.85 | 0.49 |
| 9 | 93.53 | 93.81 (96.55) | 0.2 | 0.41 | 1.06 |
| 10 | 77.12 | 84.85 (87.77) | 0.37 | 0.29 | 4.45 |
| 11 | 85.73 | 89.09 (91.63) | 1.18 | 0.49 | 1.38 |
| 12 | 33.60 | 41.98 (43.15) | ND | ND | ND |
| 13 | 87.69 | 91.91 (94.01) | 1.98 | 0.74 | 0.86 |
| 14 | 86.94 | 90.59 (92.70) | 0.25 | 0.54 | 1.23 |
| 15 | 87.71 | 87.54 (93.24) | 0.24 | 0.66 | 1.67 |
| 17 | 98.94 | 93.65 (95.16) | ND | 0.32 | 0.73 |

993.     As another reexample, Table 17 of the '628 patent (copied below) reports the amount of oxidized linaclotide (measured in "Area% by HPLC") and the amount of linaclotide for 15 formulations stored at 25°C/60% RH for 24 months. (*See id.* at 30:45-57.) The data related to linaclotide formulation examples prepared without a cation are highlighted below. Assuming that any conclusion can be drawn from the data reported in Table 17, the data do not demonstrate that linaclotide's oxidation played a primary or significant role in the instability of linaclotide.

TABLE 17

| Example | Assay [w/w] % of Initial | Area % by HPLC | | | |
|---|---|---|---|---|---|
| | | Linaclotide (% of Initial) | Oxidation | Hydrolysis | Formaldehyde Imine |
| 8 | 94.36 | 94.58 (101.7) | 0.21 | 1.26 | 0.53 |

TABLE 17-continued

| Example | Assay [w/w] % of Initial | Area % by HPLC | | | |
|---|---|---|---|---|---|
| | | Linaclotide (% of Initial) | Oxidation | Hydrolysis | Formaldehyde Imine |
| 9 | 94.08 | 95.09 (97.86) | 0.14 | 0.36 | 0.93 |
| 10 | 80.80 | 87.82 (90.84) | 0.38 | 0.26 | 3.77 |
| 10a[1] | 89.29 | 91.55 (94.95) | 0.50 | 0.39 | 1.60 |
| 10b[2] | 88.41 | 91.19 (95.02) | 0.44 | 0.34 | 1.61 |
| 10c[3] | 72.35 | 72.36 (75.76) | 0.30 | 0.26 | 19.13 |
| 11 | 87.50 | 90.25 (92.82) | 1.03 | 0.42 | 1.94 |
| 12 | 62.82 | 66.77 (68.62) | 2.20 | 1.24 | 2.11 |
| 13 | 90.59 | 93.79 (95.93) | 1.21 | 0.65 | 0.77 |
| 14 | 91.41 | 94.88 (97.09) | 0.18 | 0.47 | 0.65 |
| 15 | 90.91 | 90.31 (96.18) | 0.17 | 0.56 | 1.64 |
| 17 | 91.45 | 92.92 (96.81) | 0.71 | 0.56 | 0.73 |

[1] As for Example 10 with additional protective coating of Aquacoat (Aquacoat Ethylcellulose Aqueous Dispersion, 15% w/w, FMC Biopolymer, ECD-30).
[2] As for Example 10 with additional protective coating of Opadry (Opadry AMB dispersion, 20% w/w, Colorcon).
[3] As for Example 10 with additional protective coating of Eudragit (Eudragit E PO, Degussa, Roehm Pharma Polymers; SLS, Stearic Acid)

994.    This data is consistent with a POSA's reasonable expectation that oxidation would not substantially contribute to linaclotide's instability.

### d.  A POSA would not have expected other degradation pathways would contribute to linaclotide's instability

995.    A POSA would not have reasonably expected other degradation pathways would destabilize linaclotide.

996.    *Hydrolysis/cleavage of peptide bonds*—The prior art taught that the peptide bonds of an aspartic acid residue (Asp) are susceptible to cleavage at a rate at least 100 times faster than other peptide bonds, and that the Asp peptide bonds may be cleaved in dilute acid by

373

heating at 110°C for 5–18 h. (DTX-048 at 907; *see also* DTX-094 at 109 (teaching that when a series of proteins were heated in 0.03 N HCl (pH = 2.0) at 105°C for up to 20 hours, it was found that Asp is preferentially is cleaved at a rate at least 100 times higher than any other amino acids).) For example, irreversible thermal inactivation of lysozyme and ribonuclease A at 90–100°C, at pH = 4, was found to be due to peptide bond cleavage at Asp-X bonds. (DTX-048 at 907; DTX-094 at 110.) Another reported protein degradation due to peptide bond cleavage at Asp residue related to long-term storage of human epidermal growth factor in an aqueous solution at 45°C, pH = 3. (DTX-094 at 110.)

997.     It was known that linaclotide does not have an Asp residue. Further, the cleavage at Asp peptide bonds have been reported at temperatures much higher than room temperature, the temperature at which linaclotide formulation was designed to be stored. Therefore, a POSA would not have reasonably considered that hydrolysis/cleavage of peptide bonds would contribute to linaclotide instability.[15]

998.     Additionally, peptide bonds may be cleaved if the protein formulation contains protease contaminants, which usually occurs when the protein or peptide of interest is prepared in a host cell, as opposed to when they are prepared by chemical synthesis. (DTX-094 at 110.) Thus, a POSA would have been able to avoid this mode of peptide bond cleavage by preparing linaclotide via chemical synthesis, which was known in the art. (DTX-066 ¶ [0131].)

999.     *Racemization of amino acid residues*—This protein degradation pathway was

---

[15] Capelle 2007 does not list peptide bond cleavage or hydrolysis. (DTX-148 at 132.) It only mentions "hydrolysis" without specifying the type of hydrolysis. (*Id.*) Further, it explicitly taught that "deamidation and oxidation" are "[t]he most common chemical degradation pathways." (*Id.*) Cleland 1993 does not discuss peptide bond cleavage at any other part of the article. (*See generally* DTX-034.)

studied at pH = 7.5 at 123°C, showing that Asp residue in peptides undergo racemization 100,000-fold faster than the free amino acid, whereas other amino acids showed only a 2-4-fold increase. (DTX-048 at 908.) Racemization of Asp in a model peptide (Asp-Cys-Thr-His) at pH = 7.4 and 37°C was shown to have a half-life of 19.5 h. (*Id.* at 908–09.) Because linaclotide does not have an Asp residue, and other amino acids were known to undergo racemization at much slower rates, a POSA would not have reasonably expected that racemization would contribute to linaclotide instability at room temperature.

1000.     *Beta-elimination of disulfide bonds*—It was known that beta-elimination of proteins at high temperatures (e.g., 100°C), or at lower temperatures and high pH, contributes to their inactivation. (DTX-048 at 909.) Manning 1989, however, taught that it was not known whether this is a degradation pathway that affects protein pharmaceuticals. (*Id.*) Similarly, Volkin 1997 taught that beta-elimination occurs at alkaline pH = 12-13, or at neutral pH = 6-8 at high temperatures of 90–100°C. (DTX-094 at 111.) Another example of beta-elimination was shown for insulin analogs stored at pH = 7.4 at 30–50°C, which was shown to be dependent on the conformational stability of insulin. (*Id.*)

1001.     A POSA would not have reasonably expected beta-elimination would contribute to linaclotide's instability because: (i) a POSA would have reasonably expected linaclotide to have a stable conformation; (ii) the reported beta-elimination occurred at temperatures much higher than room temperature, the temperature at which linaclotide formulation was designed to be stored; and (iii) Manning 1989 taught that beta-elimination was not known as a degradation pathway that affects protein pharmaceuticals.

1002.     *Adsorption to surfaces*—the prior art taught that while protein adsorption to surfaces was a well-known phenomenon in the field of biomaterials because of its importance in

375

designing artificial limbs, organs, or contact lenses, reported studies in the pharmaceutical formulations were limited. (DTX-048 at 910.) The only well-studied example was insulin, because it was expected to be used with various delivery devices (e.g., syringes, pumps, implants). (*Id.*) A POSA would have understood that adsorption to surfaces is not a primary concern for stability of solid formulations during storage. Therefore, a POSA would not have reasonably expected that adsorption to surfaces would contribute to linaclotide instability during storage of the solid formulation.

1003.    *Photodegradation*—It was known that radiation (such as X-rays, gamma-rays, electrons, and alpha particles) could inactivate proteins via photodegradation, which the prior art taught would have been a concern if radiation is used as a sterilization technique, for example, as used in the food industry, or when UV, visible, and fluorescence spectroscopy are used for analytical methods of protein detection. (DTX-094 at 115–16.) Because none of the above are expected to occur during storage of linaclotide formulation, a POSA would not have expected that photodegradation would contribute to linaclotide's instability during storage.

1004.    *Glycation and carbamylation*—The prior art taught that these degradation pathways were expected to occur when reducing sugars, e.g., glucose, are used as stabilizers of proteins during storage (for glycation) or in presence of urea (for carbamylation). (DTX-094 at 117.) Therefore, in the absence of reducing sugars or urea, a POSA would not have reasonably expected that glycation and carbamylation would contribute to linaclotide's instability during storage.

1005.    Therefore, a POSA would not have reasonably expected that any of the degradation pathways discussed above would contribute to linaclotide's instability.

### 4. The prior art taught how to minimize linaclotide's expected degradation pathways

1006.    The prior art taught that certain excipients or additives can minimize or delay one or more of the expected linaclotide degradation pathways.

1007.    A POSA would have reasonably expected that the prior art additives stated below would improve the stability of a linaclotide solid formulation.

1008.    Further, a POSA would have been able to test the effect of the prior art additives discussed below on the stability of a linaclotide solid formulation via routine experimentation.

### a. The prior art taught how to minimize linaclotide's expected hydrolysis/deamidation

1009.    As stated above, a POSA would have expected linaclotide to be particularly susceptible to asparagine deamidation. The prior art taught that including an amino acid such as leucine as an additive in a solid or solution protein formulation would decrease the rate of asparagine hydrolysis. (*See* DTX-064 at Abstract.)

1010.    In particular, Sørensen '278 patent disclosed "a formulation of human growth hormone [hGH] comprising leucine as additive [which] shows a very high stability against deamidation, oxidation and cleavage of peptide bonds." (*See* DTX-064 at Abstract, *see also id.* 4:25–28.) The stabilized product "allows for the storing and shipment thereof in a lyophilized state or in the form of a dissolved or re-dissolved formulation." (*Id.* at 4:28–30.)

1011.    Sørensen '278 patent taught that pharmaceutical formulations of growth hormone "tend to be unstable." (*Id.* at 1:44–45.) In particular, the major degradation product of hGH in lyophilized state (i.e., solid formulation), as well as in solution, is deaminated hGH. (*Id.* at 1:65–2:1.)

1012.    According to Sørensen '278 patent, the addition of leucine to a composition

377

comprising human growth hormone reduces deamidation of human growth hormone by 25%–30% compared to the use of phosphate buffer. (*Id.* at 6:39–44.)

1013.    Sørensen '278 patent disclosed that leucine to be used in accordance with the present invention is preferably a naturally occurring alpha leucine. The amino acid(s) may be L or D amino acid(s) or a mixture thereof. (*Id.* at 5:64–67.)

1014.    Sørensen '278 patent disclosed, in the Example, that the rate of deamidation was examined in formulations comprising 4 mg/ml of hGH and 5 mM L-leucine or D-leucine (i.e., the molar ratio of hGH to leucine in the Example is 28:1). (*Id.* at 6:15–17.) The Example shows that the rate of deamidation is reduced in solutions containing L- or D-leucine. (*Id.* at 6:46–47.)

1015.    Sørensen '278 patent further disclosed that the pharmaceutical formulations may be in the form of a lyophilized powder or aqueous solution, formulated for oral or parenteral administration. (*Id.* at 4:42–45, 4:50–59.)

1016.    Based on the teachings of Sørensen '278 patent, a POSA would have been motivated, with a reasonable expectation of success, to add an amino acid such as leucine to a solid formulation of linaclotide to prepare a stable solid oral formulation.

1017.    Several other references teach that divalent cations, such as $Ca^{2+}$, can reduce the rate of a therapeutic peptide's deamidation at the asparagine residues.

1018.    For example, Rehder '326 publication taught that the rate of asparagine deamidation can be reduced by adding one or more divalent cations to a formulation containing a polypeptide that is susceptible to asparagine deamidation. (DTX-070 ¶ [0033].) As stated above, a POSA would have expected linaclotide to be particularly susceptible to asparagine deamidation.

1019.    Rehder '326 publication taught adding one or more divalent cations to a therapeutic polypeptide formulation "can stabilize aqueous and other liquid polypeptide solutions

378

as well as lyophilized formulations" by reducing the rate of asparagine hydrolysis. (*Id.*) For example, Rehder '326 publication taught adding 10–150 mM $CaCl_2$ to a formulation containing a therapeutic polypeptide to improve the stability of the polypeptide. (*Id.* ¶ [0035]; *see also id.* ¶ [0057].)

1020.    Rehder '326 publication also disclosed that "the divalent cation formulations of the invention can be used with polypeptides having, for example, 10, 20 . . . or 1000 or more amino acid residues. All sizes of polypeptides in between these exemplary numbers also are for use in the divalent cation-containing formulations of the invention." (*Id.* ¶ [0080].)

1021.    As another example, Sørensen '858 patent disclosed pharmaceutical formulations comprising "human growth hormone pretreated with zinc and optionally lysine or calcium ions . . . [which] shows a very high stability against deamidation in aqueous solution." (DTX-071 at 4:47–51.)

1022.    Sørensen '858 patent taught that the stability of the disclosed formulations "allows for the storing and shipment thereof in a lyophilized state or in the form of a dissolved or re-dissolved formulation at ambient temperature." (*Id.* at Abstract.)

1023.    Sørensen '858 patent taught that "[c]alcium ions when present are preferably added in the form of a physiologically acceptable soluble salt such as the chloride." (*Id.* at 5:25–27.)

1024.    Sørensen '858 patent further disclosed that the pharmaceutical formulations may be formulated for oral administration. (*Id.* at 4:56–58.)

1025.    A POSA would have been motivated to apply the teachings of Rehder '326 publication and Sørensen '858 patent (which disclose using calcium compounds to stabilize

aqueous solutions of proteins and peptides) to a solid formulation of linaclotide.[16] This is because a POSA would have understood that a solid formulation contains residual moisture, i.e., water. Therefore, solid formulations may raise similar problems (such as hydrolysis), which may be addressed by similar solutions used for aqueous formulations.

1026.    Additionally, it was well known that deamidation is a hydrolysis reaction that requires water. Therefore, a POSA would have known that "an obvious strategy to decrease deamidation is to eliminate water." (DTX-034 at 340.) Cleland 1993 notes that "residual water" in solid formulation allows degradation via deamidation, which "can be controlled by proper choice of excipients." (*Id.*)

1027.    Thus, the prior art taught and a POSA would have been motivated to reduce the rate of linaclotide hydrolysis by adding a hygroscopic excipient, such as calcium chloride.[17] The prior art taught that an excipient with higher affinity for moisture, such as calcium chloride, can be used to reduce moisture-related degradation, such as linaclotide hydrolysis. (*See* DTX-076 at 238 ("Thus, formulation with a substance having a greater affinity for water compared with the drug could mean that moisture in the product is sequestrated by the excipient.").)

1028.    Therefore, a POSA would have been motivated, with a reasonable expectation of success, to add $Ca^{2+}$ to a solid linaclotide formulation to reduce the rate of linaclotide deamidation/hydrolysis.

---

[16] This is consistent with Dr. Fretzen's lab notebook (*see* DTX-223 at IW_LINZ_00000268) and related testimony, which show that Ironwood, too, considered prior art teachings related to IV formulation of peptides and proteins relevant to linaclotide formulation. (*See* Fretzen Dep. Tr. (DTX-578) at 161:7–14.)

[17] Dr. Fretzen admitted that calcium chloride was known as a desiccant and thus was useful in reducing moisture-related degradation. (*See* Fretzen Dep. Tr. (DTX-578) at 162:4:12; 162:22-–163:3.)

### b. The prior art taught how to minimize linaclotide's expected reaction with formaldehyde

1029.    As stated above, formaldehyde was a well-known cross-linking agent that was known to inactivate, or immobilize protein. (DTX-105 at Abstract.) In particular, it was known that formaldehyde reacts with the amino group of the N-terminal amino acid residue to form an imine, a Schiff-base. (*Id.* at 6238.)[18] This reaction is shown below:



1030.    Further, it was known that "[f]ormaldehyde is a common residual impurity in many excipients such as polysorbate, povidone and polyethylene glycol 300" and that "[t]he presence of this impurity can potentially decrease the stability of drug substances by reacting with the amino group to form the N-methyl derivative." (DTX-100 at 738; *see also* DTX-084 at 1; DTX-146 ¶ [0004].)

1031.    The prior art also taught that an amino acid used as an additive can act as a formaldehyde scavenger in a pharmaceutical formulation.[19] (*See, e.g.*, DTX-151 at 3:34–37; DTX-146 at Abstract.)

---

[18] ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████ (*See* DTX-336 at LINZ_NDA0001828; Fretzen Dep. Tr. (DTX-578) at 232:7–233:16.)

[19] Amino acids have long been known as formaldehyde scavengers in the field of chemistry, in general. (*See, e.g.*, U.S. Patent No. 5,705,537, issued Jan. 6, 1998, DTX-072 at Abstract (teaching that amino acids, such as leucine, reduce emission of free formaldehyde from a foamed resin).)

1032.    In particular, Iwata '433 publication disclosed a composition for use in the field of, *inter alia*, medicament, containing an active ingredient, aldehyde-like substances that destabilize the active ingredient, and a stabilizer having an amine structure and capable of adsorbing aldehydes. (*See* DTX-146 at Abstract; *see also id.* ¶ [0009].)

1033.    Iwata '433 publication taught that an example of such stabilizer is an amino acid. (*Id.* at Abstract; *see also id.* ¶ [0021].)

1034.    Therefore, a POSA would have been motivated, with a reasonable expectation, to add an amino acid, such as leucine, to a linaclotide solid formulation as a formaldehyde scavenger to reduce linaclotide's reaction with formaldehyde.

### c.    The prior art taught how to minimize linaclotide's expected aggregation

1035.    The prior art taught how to minimize a peptide or a protein dimerization/aggregation in a pharmaceutical formulation.

1036.    For example, Bentz '392 publication taught that "[t]he addition of metal ions [such as, $Ca^{2+}$, $Mg^{2+}$, $Zn^{2+}$] to the solid-state polypeptide particles of the present invention reduces the amount of polypeptide dimerization over time." (DTX-276 at ¶ [0028].)[20]

1037.    Bentz '392 publication disclosed solid-state polypeptide formulations that are stabilized against degradation at temperatures that approximate or exceed physiological conditions. (*See id.* at Abstract; ¶ [0006].) "[T]he term 'polypeptide' includes oligopeptides and proteins and encompass[es] any natural or synthetic compound containing two or more amino acids linked by the carboxyl group of one amino acid to the amino group of another." (*Id.* at ¶

---

[20] In fact, Dr. Fretzen testified that Ironwood decided to test the stabilizing effect of calcium, magnesium, and zinc on linaclotide, in part, based on the teachings of this paper. (*See* Fretzen Dep. Tr. (DTX-578) at 225:15–21; Ex. 19.)

[0006].)

1038.   Bentz '392 publication taught that the peptide formulation may be stabilized by adding metal ions, preferably a divalent metal salt, such as $CaCl_2$, $MgCl_2$ of $ZnCl_2$, to the solid formulation. (*Id.* ¶ [0028].)

1039.   Table 8 disclosed the results of a study conducted to evaluate the stability of PACAP, a synthetic peptide of 31-amino acid length, achieved by formulating solid-state PACAP particles at varying pH with $CaCl_2$, with histidine, and with both $CaCl_2$ and histidine. (*Id.* ¶¶ [0026], [0041]; *see also* ¶ [0065] (Example 7).) Bentz '392 publication taught that "$CaCl_2$ further improved the stability of PACAP particles at both pH 2 and 6 (Table 8)." (*Id.* ¶ [0065].)

**TABLE 8:** *The Stabilization and Additive Stabilization Effects of $CaCl_2$ and Histidine, at pH2 and 6 for PACAP Particle Stored @ 60° for 2 months*

| Additives | %Aggregate | %Initial PACAP |
|---|---|---|
| pH2 with no Additive | 1.1 | 92 |
| pH2 with $CaCl_2$ | 0.8 | 95 |
| pH6 with Histidine | 4.2 | 87 |
| pH6 with $CaCl_2$ and Histidine | 1.6 | 92 |

*\* Histidine concentration of CaCl2 and Histidine were 10 mM*

1040.   As another example, the prior art taught that calcium ions protect DNase from aggregation both in solutions and in solid formulations.

1041.   Chan '788 patent taught that adding calcium ions protected solutions of DNase from precipitation without the need for refrigeration. (DTX-067 at 3:1–5.) Chan '788 patent explains that the aggregates formed from DNase were non-covalent aggregates (*id.* at 7:66–67), and that calcium ions prevented aggregation by specifically binding to the DNase (*id.* at 7:57:60; *see also* DTX-048 at 911 (teaching that binding of ions to proteins increases thermal stability as

383

shown for several proteins)).

1042.    Similarly, Chen 1999 disclosed that aggregation of recombinant human DNase I in solid-state in the absence of calcium was much more pronounced compared to aggregation in the presence of calcium. (DTX-075 at 481.)

1043.    Therefore, a POSA would have been motivated, with a reasonable expectation of success, to add a calcium compound to the solid linaclotide formulation to reduce the expected linaclotide dimerization/aggregation.[21]

### 5. A POSA would have reasonably expected that the prior art additives known to manage linaclotide's expected degradation pathways would improve the stability of a linaclotide solid formulation

1044.    A POSA would have been motivated, with a reasonable expectation of success, to manage degradation pathways reasonably expected to contribute to linaclotide's instability because prior art taught how to manage the rate of such degradation pathways in pharmaceutical formulations. (Block Opening Report (DTX-555)  ¶¶ 354–400; *see also* Gupta Report (DTX-573) ¶ 58.)

1045.    A POSA would have been motivated to select leucine with a reasonable expectation that it would stabilize a linaclotide solid formulation.

### 6. A POSA would have been motivated to select calcium cation with a reasonable expectation that it would stabilize a linaclotide solid formulation

1046.    A POSA would have been motivated to add a divalent metal compound, such as calcium, to a linaclotide oral solid formulation to protect linaclotide from asparagine deamidation and aggregation.

---

[21] Dr. Fretzen admitted that prior art literature taught that calcium chloride prevents dimer formation. (*See* DTX-223 at IW_LINZ_00000272; Fretzen Dep. Tr. (DTX-578) at 165:20–23.)

1047.    First, the prior art taught divalent cations (such as calcium cation) would reduce the rate of deamidation of a protein in a pharmaceutical formulation and aggregation. For example, Marra '248 publication taught a conantokin peptide formulation with improved stability, comprising a divalent ion such as $Zn^{2+}$, $Mg^{2+}$, or $Ca^{2+}$, which is capable of stabilizing the peptide by reducing the rate of conantokin degradation. (DTX-069 at 2:31–3:5.) Marra '248 publication taught that conantokins are a family of peptides that contain 10–30 amino acids. (*Id.* at 2:4.)

1048.    Thus, the prior art provides successful examples of using divalent cations, such as calcium, to stabilize protein and peptide formulations. Marra '248 does not describe the details of the mechanism by which divalent cations stabilized the peptide, but it provides another real-world point of evidence that divalent cations can be used as stabilizers in peptide formulations.[22]

1049.    Further, as stated below, calcium cation is the only cation that the prior art taught would reduce the rate of both deamidation and aggregation of a protein in a pharmaceutical formulation. Therefore, a POSA would have been motivated to add calcium cation to a linaclotide solid formulation to manage deamidation and aggregation of linaclotide.

1050.    Further, a POSA would have reasonably expected that calcium cation would increase stability of linaclotide in a solid formulation because the prior art taught that calcium cation, when added to protein and peptide formulations, reduced the same protein and peptide degradation pathways that were reasonably expected to destabilize linaclotide.

1051.    Second, prior art taught that di- or travilent metal cations (such as $Al^{3+}$, $Mg^{2+}$,

---

[22] As stated below, a POSA would have reasonably expected that a divalent cation stabilizes a peptide's structure by binding to amino acid residues on the peptide's surface. This mechanism was shown to stabilize proteins and peptides against covalent and non-covalent aggregation.

$Zn^{2+}$, and $Ca^{2+}$) protect therapeutic proteins and peptides from degradation during storage, and from degradation after oral administration by GI proteases. Yanagawa '336 taught di- or trivalent metal compounds, such as calcium chloride, calcium phosphate, or calcium sulfate are highly useful as a carrier for oral administration of physiologically active peptides, especially as enteric coated preparations, because these compounds protect the peptides from degradation by GI proteases and increases absorption of said peptides. (*See* DTX-065 ¶¶ [0023], [0024], [0026]; claim 7.)

1052.    The teachings of Yanagawa '336 are not limited to any specific peptide—rather, Yanagawa '336 explicitly taught that their method of preparing a pharmaceutical composition can be used for "physiologically active peptides." (DTX-065 ¶ [0015].) Because linaclotide is a physiologically active peptide, a POSA would have understood that a linaclotide formulation can be prepared according to the teachings of Yanagawa '336.

1053.    Thus, Yanagawa '336 provides another motivation to a POSA, in addition to reducing the rate of reasonably expected linaclotide degradations via deamidation and aggregation, to add a calcium salt to a linaclotide formulation: a POSA would have reasonably expected that a calcium salt in a linaclotide formulation would also protect linaclotide from degradation by GI proteases after oral administration, in addition to reducing linaclotide's reasonably expected degradation via deamidation and aggregation during storage.

### a. A POSA would have reasonably expected that calcium cation would reduce linaclotide's deamidation rate in a solid formulation

1054.    A POSA would have reasonably expected that asparagine deamidation would contribute to linaclotide's instability in a solid formulation, and thus a POSA would have been motivated to reduce the rate of linaclotide's deamidation.

1055.    The prior art taught that adding a divalent cation to pharmaceutical formulations would reduce the deamidation rate of therapeutic proteins in the pharmaceutical formulations.

1056.    In particular, Rehder '326 taught that stable aqueous and solid (e.g., lyophilized) formulations of polypeptides that are susceptible to asparagine deamidation, such as those with solvent exposed asparagine residues, can be prepared by adding $CaCl_2$ to the formulation which reduces the rate of deamidation of the solvent exposed asparagine residues. (*See* DTX-070 ¶¶ [0033]–[0035].) As stated above, a POSA would have reasonably expected that linaclotide would have a solvent exposed asparagine residue. Therefore, and based on the teachings of Rehder '326, a POSA would have reasonably expected that adding $CaCl_2$ to a solid linaclotide formulation would increase stability of linaclotide by reducing the rate of deamidation of the solvent exposed asparagine residue.

1057.    It is true that Rehder '326 defines the term "divalent cation" as including metal ions such as $Ca^{2+}$, $Zn^{2+}$, $Mn^{2+}$, $Mg^{2+}$, $Fe^{2+}$, $Co^{2+}$, $Ni^{2+}$, $Cu^{2+}$, $Sc^{2+}$, $Ti^{2+}$, $V^{2+}$, $Cr^{2+}$, $Ga^{2+}$, $Ge^{2+}$, and $Se^{2+}$ and lists several of these as cations that can be used in a protein formulation. (DTX-070 ¶¶ [0057], [0084].) However, Rehder '326 singles out calcium cation (in the form of the chloride salt, i.e., $CaCl_2$) to stabilize a therapeutic protein or peptide in a formulation to describe a specific embodiment of the stabilized therapeutic protein or peptide formulations. (*Id.* ¶¶ [0034]–[0035].) Further, Rehder '326 provides data supporting that $CaCl_2$ would stabilize a peptide or protein formulation. (*See, e.g.*, *id.* at Figs. 15, 17.) Therefore, a POSA would have been motivated to add $CaCl_2$ to a solid formulation of linaclotide to reduce the rate of linaclotide deamidation with a reasonable expectation of success.

1058.    The teachings of Sørensen '858 would have further motivated a POSA to select calcium cation over other divalent cations to stabilize a therapeutic protein or peptide in a

pharmaceutical formulation by reducing the rate of asparagine deamidation. Sørensen '858 taught reducing the rate of asparagine deamidation in liquid and lyophilized formulations containing a growth hormone by adding calcium cation to the formulation. (*See, e.g.*, DTX-071 at Abstract; col. 7, Example.) In particular, Sørensen '858 taught that adding $CaCl_2$ to a preparation of human growth hormone lowered the amount of deamidated human growth hormone more than when $CaCl_2$ was not added to the preparation. (*Id.* at col. 7, Example.) Sørensen '858 explicitly taught that the formulation they disclosed may be prepared "in the form of a lyophilized powder to be reconstituted later . . . or in the form of a solution comprising human growth hormone." (*Id.* at 4:64–5:1.)

1059.   Sørensen '858 taught that human growth hormone (hGH) has two asparagine residues that are susceptible to deamidation: asparagine in position 149 and, to a lesser extent, asparagine in position 152. (*Id.* at 2:4–5.) As stated above, a POSA would have reasonably expected that linaclotide, too, would have an asparagine residue susceptible to deamidation. Thus, a POSA would have been motivated to add $CaCl_2$ to a solid formulation of linaclotide to reduce the rate of linaclotide deamidation with a reasonable expectation of success.

1060.   Cleland 1993's teaching would have been a starting point for a POSA motivated to reduce linaclotide's deamidation rate. But, a POSA would have also been familiar with the teachings of Rehder '326 and Sørensen '858. Based on Rehder '326 or Sørensen '858, a POSA would have been able to narrow down Cleland 1993's broad teachings to $CaCl_2$.

1061.   All proteins and peptides are made of the same building blocks: amino acids (such as asparagine). Although two different proteins or peptides with different primary sequences may have different higher order structures, they would be prone to the same type of degradation if, for example, they both have solvent exposed asparagine residues.

388

1062.    The three-dimensional shape of linaclotide was reasonably expected to be highly similar to the known three-dimensional shape of STh peptides from which it was derived, based on the sequence similarity and presence of the same intramolecular disulfide bonds. A POSA would have reasonably expected that linaclotide would be susceptible to degradation via asparagine deamidation based on linaclotide's known primary and reasonably expected secondary structure, which would have reasonably suggested to a POSA that the asparagine residue in linaclotide is accessible, thus susceptible, to deamidation in presence of residual water in a solid formulation.

1063.    As stated above, based on the teachings of Sørensen '858 and Rehder '326, a POSA would have reasonably expected that a formulation containing linaclotide with an asparagine residue susceptible to deamidation could be stabilized by using calcium chloride.

1064.    A POSA would have reasonably expected that leucine and a calcium salt would reduce different, though overlapping, degradation pathways, and thus, a POSA would have been motivated to add both, with a reasonable expectation that adding both leucine and a calcium salt would further stabilize the linaclotide formulation.

1065.    A POSA would have been motivated to add $CaCl_2$ to a solid formulation of linaclotide to reduce the rate of linaclotide deamidation with a reasonable expectation of success.

### b.  A POSA would have reasonably expected that calcium cation would reduce linaclotide's aggregation in a solid formulation

1066.    A POSA would have reasonably expected that covalent and non-covalent aggregation would contribute to linaclotide's instability in a solid formulation, and thus a POSA would have been motivated to reduce linaclotide's aggregation.

1067.    The prior art taught that adding a divalent cation to pharmaceutical formulations

389

would reduce aggregation of proteins and peptides in the formulations.

1068. In particular, Bentz '392 taught that adding metal cations (such as $Ca^{2+}$, $Mg^{2+}$, $Zn^{2+}$) to a solid formulation containing therapeutic peptides reduces the amount of polypeptide dimerization, which is a form of covalent aggregation. (DTX-276 ¶ [0028]) Further, Bentz '392 taught that metal cations reduce peptide dimerization by forming ionic linkages or salt bridges with the peptide molecule, which in turn limit the interaction between peptide molecules, and thus reduce peptide dimerization. (*Id.*)

1069. A POSA would have expected this mechanism of action to work for proteins and peptides that have solvent exposed residues capable of interacting with cations. It is well-known that physiologically active proteins and peptides spontaneously fold, that is, they form a three-dimensional structure in which the hydrophobic side chains of their amino acids are buried inside the three-dimensional structure and the polar and charged side chains of their amino acid are on the surface of the three-dimensional structure. (*See, e.g.*, DTX-149 at 30.) Therefore, a POSA would have reasonably expected that folded proteins or peptides would have polar and/or charged amino acids on their surfaces, which may form ionic linkages or salt bridges with metal cations. Linaclotide, in particular, was reasonably expected to have a negatively charged amino acid (i.e., Glu) that could interact with metal cations to form ionic linkages or salt bridges.

1070. Therefore, a POSA would have reasonably expected that the method used in Bentz '392 for reducing peptide aggregation in a solid formulation would similarly work in a linaclotide solid formulation.

1071. Further, Bentz '392 taught that adding $CaCl_2$ to a formulation improved the stability of a synthetic therapeutic peptide of 31-amino acid length at both pH 2 and 6. (DTX-276 ¶¶ [0026], [0041], Example 7, Table 8.) Based on these experimental results, a POSA would have

390

been motivated to select calcium cation to add to a linaclotide solid formulation to reduce linaclotide's reasonably expected covalent aggregation via dimerization.

1072.    Chan '788 and Chen 1999 support a POSA's expectation regarding the protective effect of calcium cation by teaching that adding calcium cations protected DNase from non-covalent aggregation in both solid and liquid formulations, by binding to the protein thus preventing aggregation. (DTX-067 at 3:31–42; DTX-075 at 477.)

1073.    As another example, Cini '298 taught using divalent cations, such as zinc, magnesium, and calcium, which increase the stability of a formulation comprising epidermal growth factor, and further taught that other proteins may similarly be stabilized as a result of the binding of a divalent cation (such as zinc) to the active amino acid residues. (DTX-068 at 1:9–11, 3:20–23, 3:51–4:8.) This further supports a POSA's understanding that divalent cations can stabilize proteins and peptides by binding to proteins and peptides.

1074.    In addition, Sato 1994 disclosed a 3D structure of a linclotide precursor peptide in a solid state obtained based on X-ray crystallography.  In particular, Sato 1994 disclosed a space-filling model of the linaclotide precursor peptide in solid state, which shows the side chain of the Glu residue is exposed on the surface of the peptide.  (*See, e.g.*, DTX-054 at Fig. 8.) Similarly, Ozaki 1991 taught that "[a]ll the side chains of constituent amino acids are oriented to the outside of the molecule."  (DTX-606 at 5937.)

1075.    Further, Sato 1994 taught that the C-terminal region of all linaclotide's precursor peptide was "strikingly similar" to "peptides known to be ionophores which bind a metal ion with their 3 (or 4, 6, or 8) carbonyls or hydroxyls or amides," suggesting that "the C-terminal region binds a metal ion such as Na+, K+, or Ca2+" and that linaclotide's precursor peptide "may

function as a cation binding peptide." (DTX-054 at 8647–48.)  Sato 1994 also noted previous studies that provide evidence that ST may act as a Ca2+ binding peptide. (*Id.* at 8648.)

1076.   As explained above, a POSA would have reasonably expected linaclotide's structure to be similar to the structure of linaclotide's precursor peptide. (*See* Block Reply Report ¶ 43.) Thus, based on the 3D structure of linaclotide's precursor peptide in solid state disclosed in Ozaki 1991 and Sato 1994, a POSA would have reasonably expected that the side chain of the Glu residue in linaclotide in a solid formulation would be exposed on the surface of the peptide, which would allow calcium cations to form "ionic linkages or salt bridges with the peptide molecule, which in turn limit the interaction between peptide molecules, and thus reduce peptide dimerization."

1077.   Additionally, based on the teachings of Sato 1994, a POSA would have reasonably expected that linaclotide would act as a Ca2+ binding peptide. The prior art teaches that divalent cations (such as Ca2+) protected proteins and peptides from aggregation in both solid and liquid formulations by binding to the protein or peptide thus preventing aggregation.

1078.   Based on the above teachings, a POSA would have been motivated to add calcium ion to improve the stability of a solid linaclotide formulation with a reasonable expectation of success.

1079.   None of the asserted claims require that calcium cations reduce aggregation, or any other specific degradation pathway for that matter. As stated above, based on the teachings of the prior art, a POSA would have been motivated to use calcium cations to increase the stability of a linaclotide solid formulation. That a POSA could not have predicted with 100% accuracy the exact *mechanism* by which calcium cations stabilize linaclotide does not mean that it was not obvious that calcium cations *would* stabilize linaclotide.

392

1080.   A POSA would have been motivated to add calcium cations to a solid formulation of linaclotide to increase linaclotide's stability.

### c. The prior art would have guided a POSA to select calcium cation

**Rehder '326**

1081.   Rehder '326 taught that stable aqueous and solid (e.g., lyophilized) formulations of polypeptides that are susceptible to asparagine deamidation, such as those with solvent exposed asparagine residues, can be prepared by adding $CaCl_2$ to the formulation which reduces the rate of deamidation of the solvent exposed asparagine residues. (DTX-070 at ¶¶ [0014], [0033]) As stated above, a POSA would have reasonably expected that linaclotide would have a solvent exposed asparagine residue.

1082.   Therefore, and based on the teachings of Rehder '326, a POSA would have reasonably expected that adding $CaCl_2$ to a solid linaclotide formulation would increase stability of linaclotide by reducing the rate of deamidation of the solvent exposed asparagine residue.

1083.   Rehder '326's techniques were not limited to the stabilization of peptides in aqueous environments, and would have given a POSA a reasonable expectation of success in developing a stable, solid formulation of linaclotide.

1084.   Rehder '326 explicitly taught that a formulation containing divalent cations, such as calcium, is useful for stabilizing peptides and proteins susceptible to asparagine deamidation, because it reduces the rate of this degradation pathway, and that susceptible proteins and peptides include those having solvent-exposed asparagine. (DTX-070 ¶ [0033].) Further, Rehder '326 lists a few examples of commercially available therapeutic protein formulations that can be formulated according to Rehder '326's teachings, including different kinds of proteins such as

393

fusion proteins, receptors, interferons, antibodies, and stem cell factors. (*Id.* ¶ [0119]–[0120].) Thus, a POSA would have understood that the teachings of Rehder '326 are not limited to any specific protein or peptide; rather, they are applicable to any protein or peptide having solvent-exposed asparagine (such as linaclotide).

1085.   It is true that Rehder '326 defines the term "divalent cation" as including metal ions such as $Ca^{2+}$, $Zn^{2+}$, $Mn^{2+}$, $Mg^{2+}$, $Fe^{2+}$, $Co^{2+}$, $Ni^{2+}$, $Cu^{2+}$, $Sc^{2+}$, $Ti^{2+}$, $V^{2+}$, $Cr^{2+}$, $Ga^{2+}$, $Ge^{2+}$, and $Se^{2+}$ and lists several of these as cations that can be used in a protein formulation. (*Id.* ¶¶ [0057], [0084].) However, Rehder '326 singles out $Ca^{2+}$ (in the form of the chloride salt, i.e., $CaCl_2$) to stabilize a therapeutic protein or peptide in a formulation to describe a specific embodiment of the stabilized therapeutic protein or peptide formulations. (*Id.* ¶¶ [0034]–[0035].) Further, Rehder '326 provides data supporting that $CaCl_2$ would stabilize a peptide or protein formulation. (*See, e.g.*, *id.* at Figs. 15, 17.) Therefore, a POSA would have been motivated to add $CaCl_2$ to a solid formulation of linaclotide to reduce the rate of linaclotide deamidation with a reasonable expectation of success.

1086.   Carpenter 2002 taught that "[c]ertainly, chemical degradation is typically slower in the solid state than in liquate state, due to reduced mobility of the protein and limited exposure to water." (DTX-293 at 100 (internal citations omitted); *see also id.* at 110.) Therefore, a POSA would have understood that any instability caused by water would be less pronounced in solid formulations than in liquid aqueous formulations because a POSA would have understood that a solid formulation contains limited amount of water. Further, a POSA would have expected lower protein and peptide degradation rates in a solid formulation due to reduced mobility of the protein or peptide. Consistent with these understandings, the prior art taught that dried or solid formulations "have less stability-related issues and have a much greater potential tolerance for

room-temperature storage," and were successfully used to overcome protein stability problems. (*Id.* at 11; *see also id.* at 10.) Therefore, a POSA would have understood that in general, a solid formulation would be more stable compared to a liquid formulation, and that such stability could be further extended by using excipients and stabilizers that reduce expected degradation pathways. Further, as stated above, a POSA would have reasonably expected that linaclotide would be an intrinsically stable peptide.

1087.   Based on the teachings of Rehder '326, a POSA would have reasonably expected that adding $CaCl_2$ to a solid linaclotide formulation would increase stability of linaclotide by reducing the rate of deamidation of the solvent exposed asparagine residue.

### Sørensen '858

1088.   Sørensen '858 taught reducing the rate of asparagine deamidation in liquid and lyophilized formulations containing a growth hormone by adding calcium cation to the formulation. In particular, Sørensen '858 taught that adding $CaCl_2$ to a preparation of human growth hormone lowered the amount of deamidated human growth hormone more than when $CaCl_2$ was not added to the preparation. (DTX-071 at col. 7, Example.) Sørensen '858 explicitly taught that the formulation they disclosed may be prepared "in the form of a lyophilized powder to be reconstituted later . . . or in the form of a solution comprising human growth hormone." (*Id.* at 4:64–5:1.)

1089.   Sørensen '858 taught that human growth hormone (hGH) has two asparagine residues that are susceptible to deamidation: asparagine in position 149 and, to a lesser extent, asparagine in position 152. (*Id.* at 2:4–5.) As stated above, a POSA would have reasonably expected that linaclotide, too, would have an asparagine residue susceptible to deamidation. Thus, a POSA would have had a reasonable expectation that Sorensen '858's approaches for stabilizing

395

hGH would be useful in developing a stable linaclotide formulation.

1090.    The temperature of 37°C used in the example in Sørensen '858 was much higher than room temperature, and Sørensen '858 taught that the formulation containing hGH in a solid formulation should be stable for about one month. However, peptide degradation reactions greatly accelerate as the temperature is raised. Thus, a POSA would have understood that the formulation tested in Sørensen '858 would be more stable at room temperature than at 37°C. Sørensen '858 also taught that by using its methods it would be possible to extend the stability of a lyophilized formulation, which was previously required to be kept at 4°C, to one month at room temperature. Further, as stated above, a POSA would have reasonably expected that linaclotide would be a thermodynamically stable peptide. Therefore, the fact that Sørensen '858 taught that a hGH protein solid formulation was expected to be stable for about one month would not have dissuaded a POSA from preparing a suitably stable linaclotide formulation based on the teachings of Sørensen '858, with a reasonable expectation that the solid linaclotide formulation would have improved stability at room temperature.

1091.    Based on the teachings of Sørensen '858, a POSA would have been motivated to add $CaCl_2$ to a solid formulation of linaclotide to reduce the rate of linaclotide deamidation with a reasonable expectation of success.

### Cleland 1993

1092.    Cleland 1993 taught that one strategy to decrease deamidation is to "eliminate water." (DTX-034 at 338–39.) Cleland 1993 notes that "residual water" in solid formulation allows degradation via deamidation, which "can be controlled by proper choice of excipients." (*Id.* at 340)

1093.    It was known in the art that $CaCl_2$ is a desiccant, as admitted by Dr. Fretzen. (*See*

396

Fretzen Dep. Tr. (DTX-578) at 162:11–12 ("Calcium chloride is a desiccant, and we knew that at the time.").) A POSA would have known that preparing a formulation with a substance having a greater affinity for water (such as $CaCl_2$), compared with the drug could sequester residual moisture in the product.

1094.    A POSA would have been motivated to add $CaCl_2$ to a solid linaclotide formulation to sequester residual moisture, which a POSA would have reasonably expected would reduce the rate of linaclotide deamidation.

### Bentz '392

1095.    Bentz '392 taught that adding metal cations (such as $Ca^{2+}$, $Mg^{2+}$, $Zn^{2+}$) to a solid formulation containing therapeutic peptides reduces the amount of polypeptide dimerization, which is a form of covalent aggregation. (DTX-276 at Abstract, ¶ [0006].) Further, Bentz '392 taught that metal cations reduce peptide dimerization or aggregation by forming ionic linkages or salt bridges with the peptide molecule, which in turn limit the interaction between peptide molecules, and thus reduce peptide dimerization or aggregation. (DTX-276 ¶ [0028].)

1096.    As stated above, based on the known primary and reasonably expected secondary structure of linaclotide, a POSA would have reasonably expected that a divalent cation (such as $Ca^{2+}$) would be able to bind to linaclotide to form ionic linkages or salt bridges discussed in Bentz '392. Therefore, a POSA would have reasonably expected that the method used in Bentz '392 for reducing peptide aggregation in a solid formulation would similarly work in a linaclotide solid formulation.

1097.    Based on the teachings of Benz '392, a POSA would have been motivated to add $CaCl_2$ to a linaclotide solid formulation with a reasonable expectation that $CaCl_2$ would improve linaclotide's stability.

397

**Marra '248**

1098.    Marra '248 taught a conantokin peptide formulation with improved stability, comprising a divalent cation, such as $Zn^{2+}$, $Mg^{2+}$, or $Ca^{2+}$, which is capable of stabilizing the peptide.

1099.    Although Marra '248 does not describe the details of the mechanism by which divalent cations stabilized the peptide, it provides another point of real-world evidence of divalent cations' role as stabilizers in peptide formulations. Further, as stated above, a POSA would have reasonably expected that a divalent cation stabilizes a peptide's structure by binding to amino acid residues on the peptide's surface. This mechanism was shown to stabilize proteins and peptides against covalent and non-covalent aggregation.

1100.    A POSA would have had a reasonable expectation that a divalent metal cation would bind to, or stabilize the structure of, linaclotide in a similar manner. As stated above, Bentz '392 taught that metal cations reduce peptide dimerization or aggregation by forming ionic linkages or salt bridges with the peptide molecule, which in turn limit the interaction between peptide molecules, and thus reduce peptide dimerization or aggregation. (DTX-276 ¶ [0028].) A POSA would have reasonably expected that linaclotide could form such ionic linkages or salt bridges with metal cations. Therefore, a POSA would have reasonably expected that a divalent metal cation would bind to, and stabilize the structure of, linaclotide in a similar manner.

1101.    A POSA would have understood that a solid formulation contains residual moisture, i.e., water, and thus may raise similar problems, which may be addressed by similar solutions used for aqueous formulations. Indeed, the prior art taught that methods used to stabilize a protein in an aqueous solution is transferable to a solid formulation.

1102.    A POSA would have reasonably expected that a shelf life longer than 51 days

398

could be achieved for linaclotide when using calcium cation as a stabilizer based on the results of stability experiments performed on aqueous formulation at 37°C in Mara '248. First, peptide degradation reactions greatly accelerate as the temperature is raised. Thus, a POSA would have understood that the formulation tested in Mara '248 would be more stable at room temperature compared to the formulation stored at 37°C. Second, as stated above, a POSA would have understood that in general, a solid formulation would be more stable compared to a liquid formulation, and that such stability could be further extended by using excipients and stabilizers that reduce expected degradation pathways. Further, as stated above, a POSA would have reasonably expected that linaclotide would be an intrinsically stable peptide.

1103.   Marra '248 taught peptide formulations with improved stability, comprising a divalent ion such as $Zn^{2+}$, $Mg^{2+}$, or $Ca^{2+}$, and provides another real-world point of evidence that divalent cations can be used as stabilizers in a peptide formulation.

### Chan '788 and Chen 1999

1104.   Chan '788 taught that adding calcium cation protects solutions of DNase from non-covalent aggregation without the need for refrigeration by specifically binding to the protein and thus preventing aggregation. (DTX-067 at 3:31–42.)

1105.   Chen 1999 taught that the aggregation of recombinant human DNase in solid-state in the absence of calcium cation was much more pronounced compared to aggregation in the presence of calcium cation, which Chen 1999 explains is due to calcium cations binding to the DNase molecules. (DTX-075 at 477.)

1106.   Chen 1999 further confirms a POSA's understanding that the stabilizing effect of calcium cation (by preventing aggregation) would work in solid formulations. (*See, e.g.*, DTX-075 at Abstract (teaching the stabilizing effect of calcium ions on DNase in both the aqueous and

solid formulations)).)

## Yanagawa '336

1107.    Yanagawa '336 taught that di- or trivalent metal compounds, such as calcium chloride, calcium phosphate, or calcium sulfate are highly useful as a carrier for oral administration of physiologically active peptides, especially as enteric coated preparations, because these compounds protect the peptides from degradation by GI proteases and increases absorption of said peptides. (DTX-065 ¶¶ [0024], [0026], [0050].)

1108.    Yanagawa '336 provides another motivation to a POSA, in addition to reducing the rate of reasonably expected linaclotide degradation via deamidation and aggregation, to add a calcium salt to a linaclotide formulation: a POSA would have reasonably expected that a calcium salt in a linaclotide formulation would also protect linaclotide from degradation by GI proteases after oral administration, in addition to minimizing linaclotide's reasonably expected degradation via deamidation and aggregation during storage.

1109.    The teachings of Yanagawa '336 are not limited to any specific peptide or set of peptides. Yanagawa '336 explicitly taught that their method of preparing a pharmaceutical composition can be used for "physiologically active peptides." (DTX-065 ¶ [0015].) Because linaclotide is a physiologically active peptide, a POSA would have understood that a linaclotide formulation can be prepared according to the teachings of Yanagawa '336.

1110.    Yanagawa '336 provides another motivation to a POSA to add a calcium salt to a linaclotide formulation.

## Cini '298

1111.    Cini '298 taught using divalent cations, such as zinc, magnesium, and calcium, to increase the stability of a formulation comprising epidermal growth factor, and further taught

that other proteins may similarly be stabilized as a result of the binding of a divalent cation (such as zinc) to the active amino acid residues. (DTX-068 at. 1:9–11, 3:51–4:8, 3:20–23).) Therefore, Cini '298 taught divalent cations, such as zinc, magnesium, and calcium, increase the stability of a protein in a formulation by binding to the active amino acid residues.

1112.   As stated above, a POSA would have expected that divalent cations would bind to the glutamic acid residue in linaclotide. Therefore, a POSA would have reasonably expected that divalent cations would stabilize linaclotide in a manner similar to the one described in Cini '298.

1113.   Cini '298 would have motivated a POSA to add a divalent cation to a solid linaclotide formulation, with a reasonable expectation that the divalent cation would improve linaclotide's stability.

### 7.   A POSA would have been motivated to select leucine with a reasonable expectation that it would stabilize a linaclotide solid formulation

1114.   A POSA would have reasonably expected that asparagine deamidation and formaldehyde-mediated degradation would contribute to linaclotide's instability.

1115.   Further, prior art taught that leucine would reduce deamidation of a protein in a pharmaceutical formulation, and that amino acids (such as leucine) would reduce formaldehyde-mediated degradation of proteins. Therefore, a POSA would have been motivated to add leucine to a linaclotide solid formulation to manage deamidation and formaldehyde-mediated degradation with a reasonable expectation of success.

### a.   A POSA would have reasonably expected that leucine would manage asparagine deamidation

1116.   Based on the teachings of Sørensen '278, a POSA would have been motivated to add leucine to a linaclotide solid formulation with a reasonable expectation that leucine would

stabilize linaclotide by managing linaclotide's deamidation.

1117.   In particular, Sørensen '278 taught that "[i]t has now surprisingly been found that a formulation of human growth hormone comprising leucine as additive shows a very high stability against deamidation and oxidation. The stability of the product allows for the storing and shipment thereof in a lyophilized state or in the form of a dissolved or re-dissolved formulation." (DTX-064 at 4:25–30.)

1118.   A POSA would not have ignored this teaching. Rather, based on this teaching, a POSA would have been motivated to use the same excipient (i.e., leucine) to manage the same degradation pathway (i.e., deamidation), and thus would have reasonably expected to achieve the same result (preparing a suitably stable, solid formulation).

1119.   Based on the teachings of Sørensen '278, a POSA would have reasonably expected that leucine would manage deamidation of a protein or peptide susceptible to deamidation in both solid and liquid formulations. (*See* DTX-064 at 4:25–30.)

1120.   That Sørensen '278 does not explicitly teach the mechanism by which leucine reduced deamidation rates does not detract from its explicit teachings that leucine reduced deamidation rates.

1121.   It is not necessary for a POSA to know with certainty that a desired result will occur; a reasonable expectation of success is enough. Additionally, none of the asserted claims require that leucine reduces Asn degradation. Based on the teachings of the prior art, a POSA would have reasonably expected that leucine would stabilize linaclotide in a solid formulation by managing deamidation and/or formaldehyde degradation, with a reasonable expectation of success. That a POSA could not have predicted the exact mechanism by which leucine stabilizes linaclotide with 100% accuracy does not mean that it was not obvious that leucine would stabilize

402

linaclotide.

### b. A POSA would have reasonably expected that amino acids (such as leucine) would reduce formaldehyde-mediated degradation of linaclotide

1122.    A POSA would have had another motivation to add leucine to a solid linaclotide formulation. A POSA would have reasonably expected that linaclotide's reaction with trace amounts of formaldehyde, known to be present in excipients, packaging, and other materials that come into contact with linaclotide during manufacturing, would contribute to linaclotide's instability, and thus would have been motivated to add leucine, which would act as a formaldehyde scavenger, to the formulation.

1123.    Further, based on the teachings of the prior art, including the known presence of trace amounts of formaldehyde in commonly used excipients and packaging materials, a POSA would have reasonably expected that it would be difficult to identify and eliminate all sources of formaldehyde that come into contact with linaclotide during the manufacturing process. The prior art indeed contemplated the difficulty of eliminating all sources of formaldehyde and taught that formaldehyde can be instead scavenged by an excipient. (DTX-076 at 238.)

1124.    The prior art taught that an amino acid used as an additive can act as a formaldehyde scavenger in a pharmaceutical formulation, and thus would stabilize proteins and peptides against formaldehyde-mediated degradation. Therefore, a POSA would have been motivated to add an amino acid, such as leucine, to a solid linaclotide formulation, with a reasonable expectation that the amino acid would manage formaldehyde-mediated degradation of linaclotide.

### c. The prior art taught using leucine as an excipient in pharmaceutical formulations, including formulations containing therapeutic proteins

1125.    Leucine was a known water-soluble excipient used in pharmaceutical formulations; for example, as a lubricant in solid formulations. (*See, e.g.*, WO 2006/088418 ("Wahren '418") (DTX-166) at 8 ("Examples of useful water soluble lubricants include sodium benzoate, polyethylene glycol, *L-leucine*, adipic acid, and combinations thereof.") (emphasis added).) The prior art also taught using leucine in a capsule dosage form. (*See, e.g.*, DTX-151 at 3:50–55.)

1126.    It is well-known that gelatin is a protein-based compound. Further, it was known that formaldehyde reacts with proteins by, *inter alia*, forming methylene bridges (thus cross-linking proteins) and forming an imine adduct. (*See* DTX-105 at Abstract.) Thus, a POSA would have reasonably expected the same excipients that reduced crosslinking in gelatin shell by scavenging formaldehyde (*see* DTX-151 at 3:34–37) would also reduce linaclotide's formaldehyde-mediated degradation by the very same mechanism, i.e., scavenging formaldehyde.

1127.    Further, the prior art taught using leucine in a protein formulation. For example, Sørensen '278 taught using leucine in a protein formulation to reduce deamidation rates. The explicit teachings of Sørensen '278 would have motivated a POSA to use leucine to increase stability of formulated linaclotide.

1128.    Leucine had been shown to be a general stabilizer for protein before the priority date.  For example, Szenczi 2006 taught the stabilizing effect of leucine in protein antibody preparations.  (DTX-450 at Abstract.)  Their study showed that leucine decreases the aggregation tendency and is included in the list of standard stabilizers for proteins.  This stabilizing effect is

404

believed to be due to surfactant properties of leucine.

1129.    Further, a POSA would have been motivated to select leucine with a reasonable expectation of success for the additional reason that it would act as a surfactant in a linaclotide solid formulation.  Matubayasi 2002 showed that leucine molecules can form a film at the surface and have the property of decreasing the surface tension in proportion to their concentration in the system.  (DTX-448 at Abstract.)  Their study also showed that this effect from leucine is higher than from the other aliphatic amino acids with hydrophobic side chains such as valine, alanine, and glycine.  (*Id.* at Fig. 12.)  Glinkski 1999 showed that leucine causes a change in properties of water and decreases the surface tension of solution in a concentration and pH dependent manner, thereby acting as a surfactant.  (DTX-446 at Abstract.)

1130.    Because of its surfactant-like properties, leucine was shown to improve the dispersion efficacy of spray dried powder formulations.  (*See, e.g.*, DTX-449 at 125; DTX-447 at 230.)   In particular, Raula 2007 taught that "L-leucine molecules show surface-active porperties in aqueous solutions and are likely to accumulate at an air–water interface. L-leucine molecules form a layer on the surface of droplets that inhibits the penetration of water vapour through it." (DTX-449 at 128; *see also id.* at 126.) Raula 2007 also teaches that "L-leucine, being a surface-active material in water, became concentrated at the outer surface of the precursor droplets and subsequently in the resulting dry powders." (*Id.* at 131.) Similarly, DTX-447 teaches that "[l]eucine is a particularly hydrophobic amino acid, and its surfactant-like properties may result in the capacity for leucine to migrate to the droplet surface during the rapid drying phase in spray-drying, and hence influence the surface characteristics of the resultant particle[.]" (DTX-447 at 230.) Therefore, a POSA would have expected leucine to create a layer on the surface of

405

powder particles that in addition to improving the dispersion efficiency of spray dried powder formulations would also protect the particles from moisture.

1131. The teachings of Raula 2007 and Learoyd 2008 would have further motivated a POSA to use leucine as an excipient in a solid formulation of linaclotide. A POSA would have known that a solid oral linaclotide formulation would contain small amount, i.e., between 75 to 600 μg, of the linaclotide. A POSA would have been aware that certain techniques used for manufacturing solid formulations, such as blending or granulation, could not ensure content uniformity in the solid dosage form when the dosage form contains very low amount of the active ingredient. Thus, given the relatively small amount of linaclotide in the formulation, a POSA would have considered using other techniques to ensure homogenous distribution of the drug during the relevant time period.

1132. A common technique used to ensure content uniformity in solid dosage forms containing small amount of active ingredients was preparing capsules filled with spray coated beads. A POSA would have understood that the teachings of Raula 2007 and Learoyd 2008 regarding spray dried formulations of solid formulations (i.e. dry powders) are applicable to preparing capsules filled with spray coated beads.[23] Therefore, the surfactant-like properties of leucine would have further motivated a POSA to use leucine in a solid oral formulation of linaclotide.

---

[23] A POSA would not have been deterred by Raula 2007 and Learoyd 2008 because the final solid form is administered in a different manner than the expected route of administration of linaclotide (i.e. inhalation versus oral administration). The method of administration does not change the stability of the formulation, which was improved by the addition of leucine, as discussed in these references.

### d. A POSA would have been motivated to select leucine based on a reasonable expectation that leucine would manage two degradation pathways reasonably expected to contribute to linaclotide instability

1133.    Based on the teachings of Sørensen '278, a POSA would have been motivated to add leucine to a linaclotide solid formulation with a reasonable expectation that leucine would stabilize linaclotide by reducing linaclotide's deamidation.

1134.    Additionally, a POSA would have been motivated to add an amino acid, such as leucine, to a solid linaclotide formulation, with a reasonable expectation that the amino acid would reduce formaldehyde-mediated degradation of linaclotide.

1135.    A POSA would have been motivated to add leucine to a linaclotide formulation to reduce the reasonably expected deamidation of linaclotide. (*See* DTX-064 at 4:25–30.)

1136.    A POSA would additionally have been motivated to select an excipient that may reasonably be expected to reduce more than one degradation pathway.

1137.    The prior art taught two excipients that would reduce both deamidation and formaldehyde-mediated degradation of peptides: leucine and histidine. (*Compare* DTX-151 at 3:50–55 *with* DTX-064 at col. 6, Table.)

1138.    In light of these teachings, a POSA would have been motivated to select leucine to stabilize a linaclotide solid formulation because a POSA would have reasonably expected that leucine would reduce the rates of both deamidation and formaldehyde-mediated degradation pathways. Contrary to assertions otherwise, numerous alternatives were not available to a POSA to reduce the deamidation and formaldehyde-mediated degradation pathways.

### e. The prior art would have guided a POSA to select leucine

#### Sørensen '278

1139.    Sørensen '278 would have motivated a POSA to use leucine to manage the deamidation reaction that a POSA would have reasonably expected would contribute to linaclotide's instability, with a reasonable expectation that leucine would increase linaclotide's stability in a solid formulation.

1140.    Sørensen '278 explicitly taught that "[t]he major degradation product of hGH in lyophilized state as well as in solution is deamidated hGH." (DTX-064 at 1:66–2:1.) Based on this teaching, a POSA would have reasonably expected that the asparagine deamidation would contribute to linaclotide instability.

1141.    hGH and linaclotide have very similar structural characterisitcs.  It was well known as of the priority date that both hGH and linaclotide have compact structures—hGH is a compact, constrained protein with a well-defined structure, and linaclotide also has a compact structure.  In addition, both hGH and linaclotide are single chain polypeptides, which are also highly constrained by intrachain disulfide bonds locking the sturcutres in place.  In particular, hGH has two intrachain disulfide bonds and linaclotide has three intrachain disulfide bonds.  Lastly, hGH and linaclotide contain side chains exposed to the solvent, including side chains of asparagine residues.

1142.    A POSA therefore, would have considered the teachings of Sørensen '278 to be particularly relevant to preparing pharmaceutical formulations of linaclotide.  Sørensen '278 taught that adding leucine to a pharmaceutical composition comprising hGH reduces deamidation of hGH by 25%– 30% compared to the use of a phosphate buffer.   (*Id.* at 6:39–44.) It was well known as of the relevant priority date that phosphate buffer did not affect the chemical stability

408

of hGH.  (*See* DTX-451.)

1143.    Sørensen '278 would explicitly taught a POSA to use the same excipient (i.e., leucine) to manage the same degradation pathway (i.e., deamidation), and thus would have reasonably expected to achieve the same result (preparing a suitably stable, solid formulation). Knowing the mechanism by which leucine would reduce asparagine degradation is not relevant to the appropriate assessment.

1144.    Sørensen '278's teachings are not limited to hGH stabilization in an aqueous solution. Indeed, Sørensen '278 explicitly taught that "a formulation of human growth hormone comprising leucine as additive shows a very high stability against deamidation and oxidation [which] allows for the storing and shipment thereof in a lyophilized state [i.e., a solid formulation] or in the form of a dissolved or re-dissolved formulation." (DTX-064 at 4:25–30.) Similarly, Sørensen '278 explicitly taught that "the formulation of the invention may be in the form of a lyophilized powder to be reconstituted later . . . or in the form of a solution comprising growth hormone." (*Id.* at 4:50–54.) Therefore, Sørensen '278 explicitly taught that leucine can stabilize human growth hormone in both a solid and liquid formulation.

1145.    Further, a POSA would have understood that water-mediated degradations do not solely occur in aqueous formulations. Indeed, Sørensen '278 explicitly taught that deamidation is "[t]he major degradation product of hGH in *lyophilized state* as well as in solution is deamidated hGH." (DTX-064 at 1:66–2:1 (emphasis added).) A POSA would have understood that a lyophilized formulation is a form of solid formulation. As stated above, Sørensen '278 explicitly taught that the method used to stabilize the human growth hormone in an aqueous solution is indeed transferable to a solid formulation.

1146.    Given the explicit teachings of Sørensen '278 that leucine, when used in both

409

solid and aqueous formulations, can reduce the deamidation of human growth hormone, a protein that was susceptible to degradation by deamidation, a POSA would have reasonably expected that leucine, when used in a solid formulation, would manage the same degradation pathway that was reasonably expected to contribute to linaclotide's instability.

1147.    None of the asserted claims require that leucine reduces Asn degradation. As stated, based on the teachings of the prior art, a POSA would have reasonably expected that leucine would stabilize linaclotide in a solid formulation with a reasonable expectation of success. That a POSA could not have predicted the exact mechanism by which leucine stabilizes linaclotide with 100% accuracy does not mean that it was not obvious that leucine would stabilize linaclotide.

1148.    Therefore, Sørensen '278 would have motivated a POSA to use leucine to manage the deamidation reaction that a POSA would have reasonably expected would contribute to linaclotide's instability, with a reasonable expectation that leucine would increase linaclotide's stability in a solid formulation.

**Metz 2004**

1149.    Metz 2004 disclosed that formaldehyde is a well-known cross-linking agent that can inactivate or immobilize proteins.[24] (DTX-105 at Abstract).) Metz 2004 taught that formaldehyde reacts with the amino group of the N-terminal amino acid residue in proteins and peptides. (*Id.* at 6238.)

---

[24] A POSA would have understood that protein cross-linking is an undesired reaction in a protein pharmaceutical formulation, and would have been motivated to reduce it, because it was known that cross-linking could deactivate or interfere with the biological function of the protein. A POSA would have understood that stabilization by cross-linking is in fact a degradation pathway that would contribute to a pharmaceutical formulation's instability.

1150.   Metz 2004 explicitly taught that formaldehyde reacts with the amino group of the N-terminal amino acid residue of a protein or peptide. (*Id.*) Further, a POSA would have known that linaclotide has an N-terminal amino acid and would have reasonably expected that the amino group of this N-terminal amino acid would be susceptible to reacting with formaldehyde. Therefore, a POSA would have reasonably expected that the reaction explicitly taught by Metz 2004 would happen between formaldehyde and the amino group of the N-terminal amino acid of linaclotide, as shown below:



1151.   Further, a POSA would have known that formaldehyde is present in many commonly used pharmaceutical materials, including components of packaging, and that trace amount of formaldehyde (e.g., at parts-per-million levels) could cause significant linaclotide degradation in a linaclotide formulation. (Block Opening Report (DTX-555)  ¶ 336; *see also* Gupta Report (DTX-573) ¶ 58.)

1152.   Therefore, based on the teachings of Metz 2004, a POSA would have reasonably expected that formaldehyde-mediated degradation would contribute to linaclotide instability in a solid formulation that contains trace amounts of formaldehyde.

### del Barrio 2006

1153.   del Barrio 2006 taught that almost all excipients contain varying levels of formaldehyde, and that the presence of this impurity can decrease the stability of drug substances by reacting with the amino group to form the N-methyl derivative. (DTX-100 at 738.)

1154.    Based on the teachings of the prior art, a POSA would have reasonably expected that it would be difficult to identify and eliminate all sources of formaldehyde that come into contact with linaclotide during the manufacturing process. The prior art indeed contemplated the difficulty of eliminating all sources of formaldehyde and taught that formaldehyde can be instead scavenged by an excipient. (DTX-076 at 238.)

1155.    Based on the teachings of del Barrio 2006, a POSA would have reasonably expected that a linaclotide formulation would contain trace amounts of formaldehyde that would decrease the stability of linaclotide by reacting with the amino group to form the N-methyl derivative, and thus would have been motivated to scavenge the trace amount of formaldehyde in the linaclotide formulation.

## Li 2006

1156.    Li 2006 disclosed that one of the most abundant aldehydes found in pharmaceutical excipients is formaldehyde, and that formaldehyde present in excipients has been implicated in the degradation of several drug products where it can form adducts with primary and/or secondary amine groups. (*Id*. at 1.)

## Adesunloye '106

1157.    Adesunloye '106 taught a method of stabilizing the gelatin shell of capsules by scavenging materials that react with the polypeptide chains of the gelatin shell, such as aldehydes, and in particular, formaldehyde, which can be scavenged by using amino acids, such as leucine, which act a formaldehyde scavenger. (DTX-151 at 1:50–53, 2:22–34, 3:34–37, 3:48–56, 4:58–64.)

1158.    A POSA would have understood that the teachings of Adesunloye '106 would be applicable to reducing formaldehyde reaction with other proteins and peptides in pharmaceutical

412

formulations.

1159.    It is well-known that gelatin is a protein-based compound. Further, it was known that formaldehyde reacts with proteins by, *inter alia*, forming methylene bridges (thus cross-linking proteins) and forming an imine adduct. (*See* DTX-105 at Abstract.) Thus, a POSA would have reasonably expected the same excipients that reduced cross-linking in a gelatin shell by scavenging formaldehyde (*see* DTX-151 at 3L34–37) would also reduce linaclotide's formaldehyde-mediated degradation by the same mechanism, i.e., scavenging formaldehyde.

1160.    A POSA would have considered the teachings of Adesunloye '106 in preparing a formulation of linaclotide, even though Adesunloye '106 discusses APIs that are different from linaclotide. This is because Adesunloye '106 taught the stabilization of a component of a pharmaceutical composition (i.e., the gelatin capsule shell) that, similar to linaclotide, reacts with formaldehyde during storage.

1161.    No teachings in Adesunloye '106 would have dissuaded a POSA from using leucine as a formaldehyde scavenger. Further, as stated above, a POSA would have been motivated to use leucine to prepare a suitably stable, solid linaclotide formulation because the prior art taught that leucine also reduced deamidation of a therapeutic protein in a solid formulation. Therefore, a POSA would have been motivated to select leucine over glycine, with a reasonable expectation that leucine would reduce the rates of both the deamidation and formaldehyde-mediated degradation pathways.

1162.    Based on the teachings of Adesunloye '106, a POSA would have been motivated, with a reasonable expectation of success, to add an amino acid (such as leucine) to a solid linaclotide formulation to manage linaclotide's degradation.

413

## Iwata '433

1163.    Iwata '433 taught that "compounds having a primary amine or a secondary amine within the structure thereof may easily react with formaldehyde or a compound having an aldehyde group." (DTX-146 at ¶ [0003].) A POSA would have understood that linaclotide contains both primary and secondary amines within its structure, and thus would be susceptible to reaction with formaldehyde.

1164.    Further, Iwata '433 taught that "it has been known that a solid pharmaceutical composition or various additives to be contained therein may slightly contain formaldehyde or other aldehyde-like substances," and that "adding a compound having an amine structure [such as an amino acid] and being capable of absorbing aldehydes as a stabilizer" could reduce the formaldehyde-mediated degradation in solid pharmaceutical compositions, such as capsules and tablets. (*Id.* ¶¶ [0004], [0009].)

1165.    Therefore, a POSA would have been motivated to add an amino acid (such as leucine) to a solid linaclotide formulation to stabilize linaclotide against formaldehyde.

1166.    Iwata '433 taught that "it has been known that a solid pharmaceutical composition or various additives to be contained therein may slightly contain formaldehyde or other aldehyde-like substances." (DTX-146 at [0004].)

1167.    The fact that Iwata '433 relates to low-molecular weight active substances would not have dissuaded a POSA from applying the teachings of Iwata '433 to linaclotide.

1168.    A POSA would have understood that compounds with different molecular weight (e.g., low molecular weight, or high molecular weight, such as linaclotide) would be susceptible to reacting with formaldehyde if they have "a primary amine or a secondary amine within the structure thereof." (*Id.* ¶ [0003].) As stated above, linaclotide has such primary and secondary

414

amines. Additionally, a POSA would have reasonably expected that an excipient, such as an amino acid, that scavenges formaldehyde in a formulation comprising a low-molecular weight compound would scavenge formaldehyde in a formulation comprising a high-molecular weight compound, because the scavenging reaction between the excipient and formaldehyde is the same reaction in both formulations.

1169.    A POSA would have understood that the same amount (in weight) of a high molecular weight compound (such as linaclotide) is more susceptible to trace amounts of formaldehyde compared to the same amount of a low-molecular weight active substance in presence of the same amount of formaldehyde. This is because the molar ratio of formaldehyde to active substance would be higher for a high molecular weight compound (such as linaclotide) compared to a low-molecular weight active substance. Thus, a POSA would have understood that it is more important to scavenge trace amount of formaldehyde present in a formulation comprising a high molecular weight compound (such as linaclotide) compared to a low-molecular weight active substance.

1170.    A POSA would have been motivated to use leucine to prepare a suitably stable, solid linaclotide formulation because the prior art taught that leucine also reduced deamidation of a therapeutic protein in a solid formulation. No prior art that taught any other amine disclosed in Iwata '433 (other than histidine disclosed in Sørensen '278) has been raised that also reduces deamidation of a therapeutic protein in a solid formulation. Therefore, a POSA would have been motivated to select leucine, with a reasonable expectation that leucine would reduce the rates of both the deamidation and formaldehyde-mediated degradation pathways.

1171.    Based on the teachings of Iwata '433, a POSA would have been motivated to add an amino acid (such as leucine) to a solid linaclotide formulation to stabilize linaclotide (a high

415

molecular weight substance) against formaldehyde.

**8. A POSA would have reasonably expected that adding a divalent cation, such as Ca2+, and an amino acid, such as leucine, to a linaclotide solid oral formulation would improve the stability of the linaclotide solid oral formulation**

1172.    Based on the teachings of prior art, a POSA would have been motivated, with a reasonable expectation of success, to add any one of the following additives to a linaclotide solid formulation to improve the stability of the formulation:

- An amino acid (such as leucine)

    a. To reduce the rate of linaclotide deamidation; and/or

    b. As a formaldehyde scavenger, to reduce linaclotide degradation via reaction with formaldehyde.

- A divalent cation (such as $Ca^{2+}$)

    a. To reduce the rate of linaclotide deamidation;

    b. To reduce linaclotide aggregation; and/or

    c. To reduce linaclotide degradation during storage, and after oral administration.

1173.    As shown above, a POSA would have expected that an amino acid (such as leucine) and a divalent cation (such as $Ca^{2+}$) to improve the stability of a solid linaclotide formulation by decreasing different linaclotide degradation pathways.

1174.    Therefore, a POSA would have expected that combining an amino acid such as leucine and a divalent cation such as $Ca^{2+}$ would further improve the stability of a solid linaclotide

formulation compared to using each individually.[25]

1175.   A POSA would have been able to confirm the stabilizing effect of an amino acid (such as leucine) and/or a divalent cation (such as $Ca^{2+}$) in a solid linaclotide formulation via routine experimentation.[26]

1176.   Further, the prior art disclosed stable peptide or protein formulations containing both a divalent metal cation (such as $Ca^{2+}$) and an amino acid (such as leucine).

1177.   For example, Cini '298 patent disclosed "pharmaceutical compositions [comprising epidermal growth factor ("EGF")] having increased stability as a result of being combined with a metal cation." (DTX-068 at 1:9–11.) Cini '298 patent taught that the metal cation can be selected from a group comprising zinc, magnesium, and calcium. (*Id.* at 3:51–4:8.)

1178.   Cini '298 patent also taught that neutral compounds that decrease the dielectric constant, such as glycine, leucine, and poly-amino acids, may further increase the stability of the EGF. (*Id.* at 6:9–31.)

1179.   As another example, Rehder '326 publication publication taught that divalent cations, such as $Ca^{2+}$ and $Mg^{2+}$, can be used in a liquid formulation or lyophilized formulation of a peptide as a stabilizer to protect the peptide against deamidation of the asparagine residue. (*See*

---

[25] Consistent with this expectation, Dr. Fretzen testified that Ironwood decided to add both calcium and leucine to a linaclotide solid formulation because it expected to see "further improve[ment in] the stability by addressing different degradation pathways." (Fretzen Dep. Tr. (DTX-578) at 249:5–22; DTX-285 at IW_LINZ_00819390.)

[26] In fact, Dr. Fretzen testified that Ironwood hired PharmAssist, an outside contractor, to perform routine stability testing on linaclotide formulations. (*See* Fretzen Dep. Tr. (DTX-578) at 69:13–70:2.) Additionally, Dr. Fretzen testified that Design of Experiment ("DOE") is a commonly used method to test the effect of several excipients on the stability of a formulation, and optimize the ratios of different excipients in the formulation, by performing a minimum number of tests. (*See* Fretzen Dep. Tr. (DTX-578) at 193:7–19; *see also* DTX-223 at IW_LINZ_00000296.)

DTX-070 publication ¶¶ [0070], [0082].) In particular, Rehder '326 publication publication taught adding 10–150 mM $CaCl_2$ to a formulation containing a therapeutic polypeptide to improve the stability of the polypeptide. (*Id.* ¶ [0035].)

1180.    Rehder '326 publication publication also taught that additional excipients may be included in the formulation, including polymers and amino acids. (*Id.* ¶ [0061].)

1181.    Because it was known that an amino acid, such as leucine, and a divalent cation compound, such as a $Ca^{2+}$ compound, are water-soluble well-known excipients routinely used in pharmaceutical formulations, and both would have been expected to contribute to the stabilization of linaclotide in different ways, a POSA would have had a reasonable expectation of success in preparing a stable solid formulation comprising linaclotide, leucine, and a $Ca^{2+}$ compound.

### a. A POSA would have reasonably expected that adding calcium cation and leucine to a linaclotide solid oral formulation would improve the stability of the linaclotide solid oral formulation

1182.    A POSA would have expected an amino acid (such as leucine) and a divalent cation (such as calcium cation) would improve the stability of a solid linaclotide formulation by reducing the rates of different, though overlapping, linaclotide degradation pathways, and therefore, a POSA would have expected that combining leucine and calcium cation would further improve the stability of a solid linaclotide formulation compared to using each individually. Thus, a POSA would have been motivated to combine leucine and calcium cation with a reasonable expectation that the combination would further improve linaclotide's stability.  A POSA would have been able to confirm the stabilizing effect of an amino acid (such as leucine) and/or a divalent cation (such as Ca2+) in a solid linaclotide formulation via routine experimentation.

1183.    This is supported by the Ironwood statements in documents submitted to the

FDA, in which Ironwood stated its expectation prior to the purported invention that combinations of excipients that address different degradation pathways would further improve linaclotide's stability. (*See* DTX-285; *see also* Fretzen Dep. Tr. (DTX-578) at 245:12–22.)

1184.    A POSA would have reasonably expected that the following degradation pathways were reasonably expected to contribute to linaclotide's instability would be reduced by leucine or calcium cation, not both:

- Formaldehyde-mediated degradation: reasonably expected to be reduced by leucine

- Aggregation: reasonably expected to be reduced by calcium cation

1185.    A POSA would have added any number of excipients deemed necessary to the formulation. Therefore, a POSA would have been motivated to use both leucine and calcium cation, as a POSA would have reasonably expected both leucine and calcium cation to be necessary to improve linaclotide's stability in a solid formulation.

1186.    The fact that leucine and calcium cation were also reasonably expected to reduce deamidation would not have dissuaded a POSA from using both, because the POSA would have been motivated to reduce linaclotide's degradation by two other pathways that were reasonably expected to contribute to linaclotide's instability: formaldehyde-mediated degradation and aggregation.

1187.    The motivation to combine these two excipients comes from the prior art that taught their reasonably expected effects on linaclotide's stability. Indeed, the prior art disclosed pharmaceutical formulations of therapeutic proteins and peptides comprising both calcium cation and leucine. (*See* DTX-068 and DTX-070.)

1188.    For example, Cini '298 patent disclosed "pharmaceutical compositions

419

[comprising epidermal growth factor ("EGF")] having increased stability as a result of being combined with a metal cation." (DTX-068 at 1:9–11.) Cini '298 patent taught that the metal cation can be selected from a group comprising zinc, magnesium, and calcium. (*Id.* at 3:51–4:8.)

1189.    Cini '298 patent also taught that neutral compounds that decrease the dielectric constant, such as glycine, leucine, and poly-amino acids, may further increase the stability of the EGF. (*Id.* at 6:9–31.)

1190.    As another example, Rehder '326 publication taught that divalent cations, such as $Ca^{2+}$ and $Mg^{2+}$, can be used in a liquid formulation or lyophilized formulation of a peptide as a stabilizer to protect the peptide against deamidation of the asparagine residue. (*See* DTX-070 ¶¶ [0070], [0082].) In particular, Rehder '326 publication taught adding 10–150 mM $CaCl_2$ to a formulation containing a therapeutic polypeptide to improve the stability of the polypeptide. (*Id.* ¶ [0035].)

1191.    Rehder '326 publication also taught that additional excipients may be included in the formulation, including polymers and amino acids. (*Id.* ¶ [0061].)

1192.    A POSA would have reasonably understood that the teachings related to stabilizing an aqueous formulation could be transferred to a solid dosage form. Due to its rigid structure, linaclotide would have been expected to exist in a very similar 3D structure in solution and solid form.  For example, Hu 2001 taught that "insulin, lysozyme, and oxidized DsbA are small proteins with three, four, and one disulfide [bonds], respectively.  The structures are thought to be extremely rigid and stable and the disulfide might impede structural rearrangement." (DTX-215 at 20.)  Based on the teachings of Hu 2001, it would have been evident to a POSA that the structure of linaclotide would be even more rigid than other proteins and peptides containing disulfide bonds because of the ratio of disulfide bonds to the number of amino acids is much

420

higher in linaclotide.

1193.    Because it was known that an amino acid, such as leucine, and a divalent cation compound, such as a $Ca^{2+}$ compound, are water-soluble well-known excipients routinely used in pharmaceutical formulations, and both would have been expected to contribute to the stabilization of linaclotide in different ways, a POSA would have had a reasonable expectation of success in preparing a stable solid formulation comprising linaclotide, leucine, and a $Ca^{2+}$ compound.

1194.    Thus, a POSA would have been motivated to combine leucine and calcium cation with a reasonable expectation that the combination would further improve linaclotide's stability.

### 9.    The claimed ratios of linaclotide, calcium cation, and leucine would have been obvious

1195.    The prior art disclosed the claimed ratios of linaclotide, calcium cation, and leucine, which a POSA would have routinely optimized in preparing a suitably stable, solid linaclotide formulation. (Yanagawa '336, Mara '248, and Sørensen '278.)

1196.    Given that a POSA would have been motivated to use these two excipients with a reasonable expectation that they would stabilize a linaclotide solid formulation, a POSA would have been able to optimize the ratios of linaclotide, leucine, and calcium cation by using the ratios disclosed in the prior art and routine experimentation,[27] even without resorting to the high-throughput techniques taught in the art. Thus, a POSA would not have needed to test a large

---

[27] One routine method for performing statistical analysis was Design of Experiments ("DoE"), which was routinely used to analyze and interpret controlled tests to evaluate the ratios of linaclotide, leucine and calcium cation that affect the stability of a linaclotide formulation. It is known that DoE allows for multiple input factors (concentrations of multiple components of the formylation) to be manipulated, determining their effect on a desired output (stability of the formulation). A POSA would have been motivated to add leucine and calcium cation to a linaclotide solid formulation with a reasonable expectation that they would increase the stability of the formulation.

number of combinations and permutations of stabilizing excipients.

1197.   Additionally, a POSA could have used high-throughput techniques to speed up the process of routine optimization of the ratios of linaclotide, leucine, and calcium cation. High throughput screening techniques are not aspirational, rather they existed and were used before the priority dates of the '573 patent and the '628 patent. For example, Capelle 2007 disclosed that "[t]he development of high throughput screening equipment and assays has increased over the last 10 years" (DTX-148 at 134), and further taught that "many high throughput techniques are available for the preparation and analysis of protein formulations." (*Id.* at 144.)

1198.   A POSA would not have tested all known common excipients to see which one, or which combinations thereof, would stabilize linaclotide. The prior art taught a rational strategy for stabilizing protein formulation, including identifying the degradation mechanism and methods to manage those degradation mechanisms. Further, as stated above, based on the information available to a POSA, a POSA would have reasonably expected that leucine and calcium cation would stabilize linaclotide.

1199.   Additionally, no evidence or data raised suggests that the molar ratios claimed in the '573 patent and '628 patent are unexpected and/or anything but the result of routine optimization. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████   (*See* DTX-337 (3.2.P.2.2 Drug Product (Linaclotide Capsules, (145 µg)) at LINZ_NDA0001864.)██████████████████████████████████

████████████████████████████   The absence of any unexpected results supports the obviousness of the claimed molar ratio ranges.

### 10. The limitations of the asserted claims would have been obvious

#### a.   Asserted Claims of the '628 Patent

##### i.   Claim 1 of the '628 patent

1200.   Claim 1 encompasses a solid pharmaceutical composition, such as a capsule, for oral administration, whereby the composition comprises a pharmaceutically acceptable carrier, linaclotide, a $Ca^{2+}$ cation such as a calcium salt, and an amino acid such as leucine.

1201.   First, before the critical date for the '628 patent, a POSA would have been motivated to develop a pharmaceutical formulation containing linaclotide because linaclotide had been shown to be safe and well-tolerated after oral administration in clinical studies. (*See* DTX-090 at 632; DTX-073 at 572; DTX-087 at 1; DTX-086 at 1; DTX-085 at 1; DTX-082 at 3.)

1202.   A POSA would have been further motivated to formulate linaclotide (i.e., MD-1100) in a solid oral dosage form such as a capsule because Currie '811 publication disclosed that "the peptides and agonists of the invention" are preferably administered orally for treating intestinal motility disorders such as constipation. (*See* DTX-066 ¶ [0159].) Additionally, Currie '811 publication disclosed that linaclotide was orally administered in animal studies (*id.* ¶¶ [0137], [0151]), and that linaclotide binds to the GC-C receptors located in the intestine and activates the receptors after oral administration (*id.* ¶¶ [0133]–[0135], [0153]–[0154]; Examples 2, 5).

1203.   Further, claim 1 also requires that the oral dosage form contains a pharmaceutically acceptable carrier. Currie '811 publication disclosed that linaclotide compositions for oral administration contain pharmaceutically acceptable carriers. (*Id.* ¶ [0165].)

1204.   Finally, claim 1 also requires that the oral dosage form contains a $Ca^{2+}$ cation, such as a calcium salt, and an amino acid such as leucine. As stated above, a POSA would have

been motivated, with a reasonable expectation of success, to prepare a solid pharmaceutical composition for oral administration, comprising linaclotide, a $Ca^{2+}$ cation such as a calcium salt, and an amino acid such as leucine.

1205.    Therefore, claim 1 of the '628 patent is obvious over the prior art.

### ii.    Claims 20–21 of the '628 Patent

1206.    Claim 20 depends from independent claim 1 and claim 2.  Claim 2 depends from claim 1 and requires that $Ca^{2+}$ is provided as calcium chloride, calcium phosphate, or calcium sulfate.  Claim 20 further specificies that the $Ca^{2+}$ is provided as calcium chloride.

1207.    Claim 21 depends from claim 1, and further requires that the molar ratio of $Ca^{2+}$ cation:leucine:linaclotide is 40–100:20–50:1.

1208.    As stated above, claim 1 is obvious over the prior art.  Moreover, before the critical date for the '628 patent, a POSA would have routinely used salts such as calcium chloride to stabilize the peptide oral composition. For example, Yanagawa '336 publication discloses that common calcium salts such as calcium chloride can be used in the peptide oral composition to increase stabilization. (DTX-065, at ¶¶ [0023-0024], [0026]; *see also* DTX-069, at 2:31-3:5, 4:31-8:1.)  A POSA would have been motivated, with a reasonable expectation of success, to prepare a solid pharmaceutical composition for oral administration, comprising linaclotide, a $Ca^{2+}$ cation such as calcium chloride, and an amino acid such as leucine.  Therefore, claim 20 of the '628 patent is obvious over the prior art

1209.    Moreover, Sørensen '278 patent disclosed using leucine to inhibit deamidation of hGH. Sørensen '278 patent taught that deamidation of hGH in a formulation containing 4 mg/ml hGH is reduced by 25%–30% in the presence of 5 mM leucine compared to the absence of leucine. (*See* DTX-064 at 6:15–18.) A POSA would have known that the molar ratio of leucine

424

to the protein in this formulation is 28:1.[28]

1210.    Sørensen '278 patent also taught that the amount of leucine used in a solid pharmaceutical formulation containing hGH is up to 100 mM and preferably in the range of 1–10 mM. (*See* DTX-064 at 5:8–11.) Thus, Sørensen '278 patent disclosed that adding leucine to a formulation containing a protein containing an asparagine residue at a molar ratio in the range of 5.6:1 to 56:1[29] inhibits deamidation at the asparagine residue.

1211.    As stated above, like hGH, linaclotide contains an asparagine residue and is susceptible to deamidation. Thus, a POSA would have been motivated to use a similar amount of leucine such that the molar ratio of leucine to linaclotide is in the range of 5.6–56:1 to reduce deamidation of linaclotide.

1212.    The leucine to linaclotide molar ratio of 5.6–56:1 disclosed in Sørensen '278 patent overlaps with the claimed ranges of molar ratio in claim 21 of the '628 patent.

1213.    In addition, a POSA would have routinely optimized the molar ratio of leucine to linaclotide to prepare a stable solid formulation.

1214.    Further, as stated above, Yanagawa '336 publication disclosed that various proteins, including peptide hormones, physiologically active proteins, and enzyme proteins, can be formulated into a composition containing a $Ca^{2+}$ cation to protect the peptides and proteins

---

[28] The MW of hGH is 22,126 Da, which is 22,126 g/mole. (*See* Hepner et al., *Mass Spectrometrical Analysis of Recombinant Human Growth Hormone (Genotropin®) Reveals Amino Acid Substitutions in 2% of the Expressed Protein*, 3(1) PROTEOME SCIENCE 1, 2 (2005) (DTX-080).) The amount of hGH in the formulation is 4 g/L/22,126 g/mol = 0.18 mM. Thus, the molar ratio of leucine to the protein is 5.0/0.18=28:1.

[29] The amount of hGH in the formulation is 0.18 mM. Thus, if 1 mM leucine is used, the molar ratio of leucine/protein is 1/0.18=5.6; and if 10 mM of leucine is used, the molar ratio of leucine/protein is 10/0.18=56.

from degradation by GI proteases, and thus increase the stability of the proteins and peptides. (DTX-065 ¶ [0015]; *see also* DTX-069 at 2:31–3:5; DTX-094 at 106, 119–20.)

1215.    Yanagawa '336 publication exemplifies buserelin as such a protein. (DTX-065 ¶¶ [0016], [0053]–[0054].) Yanagawa '336 publication further disclosed that the amount of the protein in the dosage form is preferably in the range of "0.005 to 30%" and the amount of the calcium compound in the dosage form is preferably "70 to 99.995%." (*Id.* ¶¶ [0044], [0046].)

1216.    Yanagawa '336 publication disclosed a capsule that contains buserelin and calcium carbonate. (*Id.* ¶¶ [0053]–[0054].)

1217.    For an oral dosage form that contains a protein such as buserelin at an amount of 30% and a calcium compound such as calcium carbonate at an amount of 70%, the molar ratio of $Ca^{2+}$ to the protein (buserelin) is 30.4:1.[30] On the other hand, for an oral dosage form that contains buserelin at an amount of 0.005% and calcium carbonate at an amount of 99.995%, the molar ratio of $Ca^{2+}$ to the protein (buserelin) is $2.6 \times 105$:1.[31]

1218.    Thus, Yanagawa '336 publication disclosed the use of $Ca^{2+}$ at a molar ratio of $Ca^{2+}$ to a protein of between 30.4:1 to $2.6 \times 105$:1 to increase the stability of the protein.

1219.    Thus, a POSA would have been motivated to use a $Ca^{2+}$ to linaclotide molar ratio within the range disclosed in Yanagawa '336 publication.

1220.    The $Ca^{2+}$ to peptide molar ratio range disclosed in Yanagawa '336 publication

---

[30] The MW of buserelin is 1299.48 g/mole and the MW of CaCO3 (calcium carbonate) is 100 g/mol. Thus, the molar amount of buserelin is 30/1299.48=0.023, and the molar amount of $Ca^{2+}$ is 70/100=0.7. Therefore, the molar ratio of $Ca^{2+}$ to protein is 0.7/0.015=53.3:1.

[31] In this scenario, the molar amount of buserelin is $0.005/1299.48=3.8 \times 10$-6 and the molar amount of Ca2+ is 99.995/100=0.99995. Therefore, the molar ratio of $Ca^{2+}$ to protein is $0.99995/3.8 \times 10$-6=$2.6 \times 105$.

overlaps with the molar ratio ranges claimed in claim 21 of the '628 patent.

1221.    As another example, Marra '248 publication disclosed conantokin peptide formulations with improved stability, comprising a divalent ion such as $Zn^{2+}$, $Mg^{2+}$, or $Ca^{2+}$, which is capable of stabilizing the peptide, and thus reducing the rate of conantokin degradation. In particular, Marra '248 publication disclosed testing the stability of several conantokin peptide formulations containing 0.1 mM Canontokin-G ("GCX-1007")[32] and from 0.25 to 10 mM $Ca^{2+}$. (*See* DTX-069 Table 7.)

1222.    Therefore, Marra '248 publication taught preparing stable peptide formulations in which the molar ratio of $Ca^{2+}$ to the peptide is between 2.5:1 to 100:1.

1223.    Thus, a POSA would have been motivated to use a $Ca^{2+}$ to linaclotide molar ratio within the range disclosed in Marra '248 publication.

1224.    The molar ratio range disclosed in Marra '248 publication (with ratio of $Ca^{2+}$ to the peptide between 2.5:1 to 100:1) overlaps with the molar ratio range claimed in claim 21 of the '628 patent.

1225.    Further, a POSA would have routinely optimized the molar ratio of $Ca^{2+}$ to linaclotide to prepare a stable solid formulation.

1226.    Thus, at least based on Sørensen '278 patent, Yanagawa '336 publication, and Marra '248 publication, the molar ratio range recited in claim 21 of the '628 patent is obvious over the prior art.

### iii.    Claims 16–17 of the '628 Patent

---

[32] In Table 7, Marra '248 publication disclosed formulations containing 225 μg/mL of GCX-1007. The molecular weight of CGX-1007 is disclosed as 2,265 g/mol. (*See id.* at Table 16.) Therefore, the GCX-1007 molar content of the Table 7 formulations containing 225 μg/mL is 0.1 mM.

1227.    Claim 16 depends from claim 1, and claim 17 depends from claim 16. Claims 16 and 17 specify that an assay value for linaclotide in a unit dosage form determined on a weight/weight basis decreases by less than 10% (claim 16) or less than 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, or 1% (claim 17) after (a) 18 months of storage of the pharmaceutical composition at 25°C at 60% relative humidity in a sealed container containing a desiccant or (b) 6 months of storage of the pharmaceutical composition at 40°C at 75% relative humidity in a sealed container containing a desiccant.

1228.    As stated above, claim 1 of the '628 patent is obvious over the prior art.

1229.    A POSA would have understood "assay value" to mean, for example, the amount of linaclotide in a sample by comparing to a linaclotide reference standard as determined by a method such as HPLC. (*See* DTX-015 at 5:46–49.)

1230.    As stated above, a POSA would have expected linaclotide to be susceptible to certain degradation pathways, such as hydrolysis of the asparagine residue number 7, dimerization or aggregation, and formaldehyde-mediated imine formation.

1231.    Further, it was known that that during storage, the presence of water may accelerate the deamidation, and/or aggregation reactions. For example, Remington 2006 disclosed that factors affecting the stability of a pharmaceutical product during storage include moisture because it may initiate or accelerate chemical reactions. (DTX-088 at 1027.)

1232.    Hard gelatin capsules were a commonly used dosage form by pharmaceutical manufacturers. (DTX-088 at 1027.) It was known, however, that gelatin capsules present unique storage stability problems. (*Id.*) For example, it was known that gelatin is stable in air when dry but is subject to microbial decomposition when moist or maintained in an aqueous solution. (DTX-088 at 1027.) Additionally, it was known that if gelatin capsules are stored in a high-

428

humidity environment, they may soften, stick together, or become distorted; however, if gelatin capsules are stored in an environment of extreme dryness, they may become brittle and crack. (*Id.*)

1233.    Thus, it was routine to use proper packaging for solid dosage forms, such as capsules, including packaging the dosage forms in sealed containers containing a desiccant and/or an oxygen scavenger to avoid exposure to moisture and oxygen in the air. (DTX-088 at 1028.)

1234.    The prior art taught that the stability of a pharmaceutically active agent, such as linaclotide, may be defined as the time from the date of the manufacture and packaging of the formulation until its chemical activity is not less than a predetermined level of labeled potency. (DTX-088 at 1025.) The prior art taught that "90% of labeled potency generally is recognized as the minimum acceptable potency level." (*Id.*)

1235.    Therefore, a POSA would have been motivated to optimize the linaclotide solid formulation containing leucine and $Ca^{2+}$, via routine experimentation, so that linaclotide's potency decreases by less than 10% (i.e., linaclotide retains more than 90% of its potency) during storage, as commonly measured by chromatographic purity or assay value.

1236.    Further, storage conditions recited in each of claims 16-17 correspond to the temperature, humidity, and duration conditions of the long-term testing (a minimum of 12 months' storage) or the accelerated testing (a minimum of six months' storage), routinely used by formulators, as specified in the USP guidelines, Chapter <1049>. (DTX-088 at 1026.)

**Table 52-1. Stability Protocols**

| CONDITIONS | MINIMUM TIME PERIOD AT SUBMISSION |
|---|---|
| Long-term testing 25°C ± 2°C/60% ± 5% RH | 12 mo |
| Accelerated testing 40°C ± 2°C/75% ± 5% RH | 6 mo |
| Alternate testing[a] 30°C ± 2°C/65% ± 5% RH | 12 mo |

[a]Required if *significant change* occurs during 6-mo storage under conditions of accelerated testing.

1237.   Therefore, for at least the above reasons, each of claims 16 and 17 of the '628 patent is obvious over the prior art.

### b.  Asserted Claims of the '573 Patent

### i.   Claim 1 of the '573 Patent

1238.   Claim 1 is directed to a method of treating chronic constipation or constipation-predominant irritable bowel syndrome in a patient by orally administering to the patient a composition that contains: between 100 µg and 300 µg of linaclotide (or a pharmaceutically acceptable salt thereof), leucine in a molar ratio of leucine to linaclotide between 40:1 and 20:1; and $Ca^{2+}$ or a salt thereof in a molar ratio of $Ca^{2+}$ to linaclotide between 70:1 and 50:1.

1239.   The solid, oral pharmaceutical dosage form recited in claim 1 of the '573 patent is similar to the solid, oral pharmaceutical composition recited in claim 1 of the '628 patent. Both compositions contain linaclotide, leucine, and $Ca^{2+}$. The dosage form recited in claim 1 of the '573 patent additionally requires that the dosage form contains (1) between 100 µg and 300 µg linaclotide, (2) the molar ratio of leucine to linaclotide is between 40:1 and 20:1, and (3) the molar ratio of $Ca^{2+}$ to linaclotide is between 70:1 and 50:1.

1240.   As stated above, a POSA would have been motivated to prepare a stable solid dosage form of linaclotide, such as a capsule, that contains leucine and $Ca^{2+}$.

1241.   *Between 100 µg and 300 µg of linaclotide.* A POSA would have been motivated

430

to include between 100 µg and 300 µg of linaclotide in an oral dosage form.

1242.    First, the prior art disclosed linaclotide as an orally administered agent for the treatment of chronic constipation or constipation-predominant irritable bowel syndrome (IBS-C) in a patient. (*See, e.g.*, DTX-090 at 631; DTX-073 at 570, 574; DTX-328; DTX-087 at 1; DTX-082 at 3; DTX-066 ¶¶ [0057]–[0058], [0136]–[0142] (Examples 3 & 4).)

1243.    Linaclotide was shown to be safe and well-tolerated after oral administration in clinical studies. (DTX-090 at 632; DTX-073 at 572; *see also* DTX-087 at 1; DTX-086 at 1; DTX-085 at 1; DTX-082 at 3.)

1244.    Microbia Press Release 2006 disclosed that, in a phase IIA study, a daily dose of 100, 300, or 1,000 µg linaclotide was used to treat patients with chronic constipation, which was well-tolerated with no severe adverse events, and was effective in improving bowel function. (DTX-085 at 1.)

1245.    Andresen 2008 disclosed that, in a phase IIB study, a daily dose of 75, 150, 300, and 600 µg linaclotide was used to treat patients with IBS-C or chronic constipation. (DTX-073 at 573; *see also* DTX-087 at 1; DTX-082.)

1246.    Thus, a POSA would have been motivated to prepare an oral formulation containing between 100 µg and 300 µg of linaclotide, and would have reasonably expected the formulation to be effective in treating chronic constipation or constipation-predominant irritable bowel syndrome.

1247.    *Molar ratio of leucine to linaclotide between 40:1 and 20:1.* As stated above, a POSA would have been motivated, with a reasonable expectation of success, to add leucine to a solid formulation of linaclotide to minimize linaclotide's deamidation and/or formaldehyde-mediated degradation.

431

1248.   Sørensen '278 patent disclosed that the amount of leucine used in a solid pharmaceutical formulation containing hGH was up to 100 mM and preferably in the range of 1– 10 mM. (DTX-064 at 5:8–11.) The '278 patent also reports that compared to the absence of leucine, the presence of 5 mM leucine reduces deamidation of hGH by 25%–30% in a formulation containing 4 mg/ml hGH. (*Id.* at 6:15–18.) The molar ratio of leucine to the protein is 28:1.

1249.   Like hGH, linaclotide contains an asparagine residue that is susceptible to deamidation. Thus, a POSA would have been motivated to use a similar amount of leucine such that the molar ratio of leucine to linaclotide is 28:1 to inhibit deamidation of linaclotide.

1250.   The leucine to linaclotide ratio of 28:1 taught by the Sørensen '278 patent falls within the range of between 40:1 and 20:1 recited in claim 1.

1251.   Sørensen '278 patent also taught that the amount of leucine used in a solid pharmaceutical formulation containing hGH is up to 100 mM and preferably in the range of 1– 10 mM. (*See* DTX-064 at 5:8–11.) Thus, Sørensen '278 patent disclosed that adding leucine to a formulation containing a protein containing an asparagine residue at a molar ratio in the range of 5.6:1 to 56:1[33] inhibits deamidation at the asparagine residue.

1252.   As stated above, like hGH, linaclotide contains an asparagine residue and is susceptible to deamidation. Thus, a POSA would have been motivated to use a similar amount of leucine such that the molar ratio of leucine to linaclotide is in the range of 5.6–56:1 to reduce deamidation of linaclotide.

1253.   The leucine to linaclotide ratio in the range of 5.6:1 to 56:1 taught by Sørensen

---

[33] The amount of hGH in the formulation is 0.18 mM. Thus, if 1 mM leucine is used, the molar ratio of leucine/protein is 1/0.18=5.6; and if 10 mM of leucine is used, the molar ratio of leucine/protein is 10/0.18=56.

432

'278 patent overlaps with the range of between 40:1 and 20:1 recited in claim 1.

1254.    In addition, a POSA would have routinely optimized the molar ratio of leucine to linaclotide to prepare a stable solid formulation.[34]

1255.    *$Ca^{2+}$ in a molar ratio of $Ca^{2+}$ to linaclotide between 50:1 and 70:1*. As stated above, a POSA would have been motivated, with a reasonable expectation of success, to add $Ca^{2+}$ to a solid formulation of linaclotide to improve the stability of a solid oral linaclotide formulation, for example, by minimizing linaclotide's deamidation, dimerization, and/or aggregation.

1256.    Marra '248 publication disclosed conantokin peptide formulations with improved stability, comprising a divalent ion such as $Zn^{2+}$, $Mg^{2+}$, or $Ca^{2+}$, which is capable of stabilizing the peptide, and thus reducing the rate of conantokin degradation. In particular, Marra '248 publication disclosed testing the stability of several conantokin peptide formulations containing 0.1 mM Canontokin-G ("GCX-1007")[35] and from 0.25 to 10 mM $Ca^{2+}$. (*See* DTX-069 Table 7.)

1257.    Therefore, Marra '248 publication taught preparing stable formulations in which the molar ratio of $Ca^{2+}$ to the peptide is between 2.5:1 to 100:1.

1258.    The molar ratio range disclosed in Marra '248 publication (with ratio of $Ca^{2+}$ to the peptide between 2.5:1 to 100:1) overlaps with the molar ratio range of between 50:1 and 70:1

---

[34] Additionally, Dr. Fretzen testified that DOE is, for example, a commonly used method to test the effect of several excipients on the stability of a formulation, and optimize the ratios of different excipients in the formulation, by performing a minimum number of tests. (*See* Fretzen Dep. Tr. (DTX-578) at 193:7–19; *see also* DTX-223 at IW_LINZ_00000296.) Moreover, no evidence or data has been raised to suggest that the molar ratios claimed in the '573 patent are unexpected and/or anything but the result of routine optimization.

[35] In Table 7, Marra '248 publication disclosed formulations containing 225 µg/mL of GCX-1007. The molecular weight of CGX-1007 is disclosed as 2,265 g/mol. (*See id.* at Table 16.) Therefore, the GCX-1007 molar content of the Table 7 formulations containing 225 µg/mL is 0.1 mM.

recited in claim 1 of the '573 patent.

1259.    As another example, Yanagawa '336 publication disclosed that various proteins, including peptide hormones, physiologically active proteins, and enzyme proteins, can be formulated into a composition together with a $Ca^{2+}$ cation to protect the proteins from degradation by GI proteases, and thus increase the stability of the proteins or peptides. (DTX-065 ¶ [0015].)

1260.    Yanagawa '336 publication further disclosed that the amount of the protein in the dosage form is preferably in the range of "0.005 to 30%" and the amount of the calcium compound in the dosage form is preferably "70 to 99.995%." (*Id.* ¶¶ [0044], [0046].)

1261.    Yanagawa '336 publication disclosed a capsule that contains buserelin and calcium carbonate. (*Id.* ¶¶ [0053]–[0054].)

1262.    For an oral dosage form that contains a protein such as buserelin at an amount of 30% and a calcium compound such as calcium carbonate at an amount of 70% (i.e., a dosage form with the highest amount of the protein), the molar ratio of $Ca^{2+}$ to the protein (buserelin) is 30.4:1. On the other hand, for an oral dosage form that contains the same protein at an amount of 0.005% and calcium carbonate at an amount of 99.995%, the molar ratio of $Ca^{2+}$ to the protein (buserelin) is $2.6 \times 105:1$.

1263.    Thus, Yanagawa '336 publication disclosed the use of $Ca^{2+}$ at a molar ratio of $Ca^{2+}$ to a protein of between 30.4:1 to $2.6 \times 105:1$ to increase the stability of the protein. The molar ratio range disclosed in Yanagawa '336 publication overlaps with the molar ratio range of between 50:1 and 70:1 recited in claim 1 of the '573 patent.

1264.    In addition, a POSA would have routinely optimized the molar ratio of $Ca^{2+}$ to

434

linaclotide to prepare a stable solid formulation.[36]

1265.    Therefore, for at least the above reasons, claim 1 of the '573 patent is obvious over the prior art.

### ii.    Claim 3 of the '573 Patent

1266.    Claim 3 is directed to a method of treating chronic constipation or constipation-predominant irritable bowel syndrome in a patient by orally administering to the patient a composition that contains: between 0.2% and 0.4% by weight of linaclotide; between 0.5% and 0.8% by weight of leucine; and between 1.4% and 1.65% by weight of a $Ca^{2+}$ salt.

1267.    As stated above for claim 1, the prior art disclosed that an oral dosage form of linaclotide can be used for the treatment of chronic constipation or IBS. (*See, e.g.,* DTX-066 ¶¶ [0057]–[0058], [0136]–[0142] (Examples 3 and 4); DTX-073 at 570, 574; DTX-328; DTX-087 at 1; DTX-086 at 1; DTX-085 at 1; DTX-090 at 631; DTX-082 at 3.)

1268.    Thus, a POSA would have been motivated, with a reasonable expectation of success, to administer an oral solid pharmaceutical dosage form that contains linaclotide for the treatment of chronic constipation or constipation-predominant irritable bowel syndrome.

1269.    Further, as stated above, Yanagawa '336 publication taught that various proteins including "peptide hormones . . . physiologically active proteins and enzyme proteins" can be formulated into a composition together with $Ca^{2+}$ carrier compound to protect peptides from degradation. (DTX-065 ¶ [0015].)

---

[36] Additionally, Dr. Fretzen testified that DOE is, for example, a commonly used method to test the effect of several excipients on the stability of a formulation, and optimize the ratios of different excipients in the formulation, by performing a minimum number of tests. (*See* Fretzen Dep. Tr. (DTX-578) at 193:7–19; *see also* DTX-223 at IW_LINZ_00000296.) Moreover, no evidence or data has been raised to suggest that the molar ratios claimed in the '573 patent are unexpected and/or anything but the result of routine optimization.

1270.    Yanagawa '336 publication further disclosed that the amount of the protein in the dosage form is in the range of "0.005 to 30%" by weight. (DTX-065 ¶ [0044].)

1271.    Marra '248 publication disclosed that the pharmaceutical compositions preferably contain from about 0.01% to 10% of the active ingredient by weight of the total composition. (DTX-069 at 7:19–11.)

1272.    The range of 0.005% to 30% and 0.01% to 10% by weight for the therapeutic peptide or protein disclosed in Yanagawa '336 publication and Marra '248 publication, respectively, overlap with the range of between 0.2% to 0.4% by weight for linaclotide recited in claim 3.

1273.    Additionally, as stated above, the prior art disclosed molar ratios of leucine and $Ca^{2+}$ to the pharmaceutically active peptide or protein that would stabilize the formulation containing the pharmaceutically active peptide or protein.

1274.    In particular, Sørensen '278 patent disclosed that in a stable formulation, the molar ratio of leucine to the protein was 28:1. To achieve this molar ratio for a linaclotide formulation that contains 0.01% to 10% by weight of linaclotide, a POSA would add between 0.024% to 24% by weight of leucine to the formulation.

1275.    Additionally, Adesunloye '106 patent disclosed using an amino acid as a formaldehyde scavenger in a gelatin capsule formulation. (*See* DTX-151 at 3:3–37.) Adesunloye '106 patent taught that the capsule filling "preferably comprises from about 0.1 to about 25 percent" of an amino acid, such as leucine. (*Id.* at 3:26–27; 4:58–63.)

1276.    The ranges disclosed in prior art overlap with the range required in claim 3 (i.e., between 0.5% and 0.8% by weight of leucine).

1277.    Additionally, as stated above, Marra '248 publication disclosed peptide

436

formulations containing $Ca^{2+}$ and a therapeutic peptide, in which the molar ratio of $Ca^{2+}$ to the peptide is between 2.5:1 to 100:1. To achieve this molar ratio range for a linaclotide formulation that contains 0.01% to 10% by weight of linaclotide, a POSA would add to the formulation between 0.0018% to 0.072% by weight of $CaCl_2$ (for a formulation that contains 0.01% linaclotide) and between 1.81% and 72% by weight of $CaCl_2$ (for a formulation that contains 10% linaclotide). This range overlaps with the range required in claim 3 (i.e., between 1.4% and 1.65% by weight of $Ca^2$).

1278.   Further, a POSA would have optimized the amount of leucine and $Ca^{2+}$ that would stabilize a linaclotide solid oral formulation, using routine experimentation.[37]

1279.   Therefore, for at least the above reasons, claim 3 of the '573 patent is obvious over the prior art.

### iii.   Claims 2 and 7 of the '573 Patent

1280.   Claim 2 depends from claim 1, and claim 7 depends from claim 3.

1281.   As stated above, claims 1 and 3 are obvious over the prior art.

1282.   Claims 2 and 7 require that the oral, solid pharmaceutical dosage form further comprises a polymer selected from polyvinyl pyrrolidone, polyvinyl alcohol, hydroxylpropyl methyl cellulose, and mixtures thereof in an amount between 0.01 wt. % and 2 wt. % relative to the total weight of the oral dosage form.

---

[37] Additionally, Dr. Fretzen testified that Design of Experiment (DOE) is, for example, a commonly used method to test the effect of several excipients on the stability of a formulation, and optimize the ratios of different excipients in the formulation, by performing a minimum number of tests. (*See* Fretzen Dep. Tr. (DTX-578) at 193:7–19; *see also* DTX-223 at IW_LINZ_00000296.) Moreover, no evidence or data has been raised to suggest that the molar ratios claimed in the '573 patent are unexpected and/or anything but the result of routine optimization.

1283.    Before the critical date for the '573 patent, a POSA would have routinely included commonly used binders, such as polyvinyl pyrrolidone and cellulose derivatives, in the peptide oral composition. For example, Currie '811 publication disclosed that binders such as hydroxylpropyl methyl cellulose can be used in an oral solid pharmaceutical dosage form containing linaclotide. (*See* DTX-066 ¶ [0166].)

1284.    Further, it was known in the art that the amount of hydroxylpropyl methyl cellulose as a binder in a dosage form is typically in the range of 2% to 5% by weight. (*See, e.g.*, DTX-078 at 346.)

1285.    The range of 2% to 5% by weight overlaps the range of 0.01 wt. % and 2 wt. % recited in claim 2.

1286.    In addition, a POSA would have routinely optimized the amount of a binder in a pharmaceutical dosage form.

1287.    Therefore, for at least the above reasons, claims 2 and 7 of the '573 patent are obvious over the prior art.

### iv.    Claim 8 of the '573 Patent

1288.    Claim 8 depends from claim 1, and further requires that the $Ca^{2+}$ or salt thereof and leucine are present in a molar ratio of at least 1.5:1.

1289.    As stated above, claim 1 is obvious over the prior art.

1290.    As stated above for claim 1, based on the teachings of Sørensen '278 patent, a POSA would have been motivated to use an amount of leucine such that the molar ratio of leucine to linaclotide is 28:1.

1291.    As also stated above, Yanagawa '336 publication taught the use of $Ca^{2+}$ at a molar ratio of $Ca^{2+}$ to a protein of between 30.4:1 to $2.6 \times 105$:1 to increase the stability of the protein.

438

And, Marra '248 publication taught preparing stable formulations in which the molar ratio of $Ca^{2+}$ to the peptide is between 2.5:1 to 100:1. (*See* DTX-069, Table 7.) Marra '248 publication disclosed that, the optimal formulation contained 10 mM $Ca^{2+}$ and 0.1 mM GCX-1007. (*Id.* at 35:30–36:4.)

1292.    Based on the above ratios of $Ca^{2+}$ disclosed in Yanagawa '336 publication and the optimal formulation of Marra '248 publication, the molar ratio of $Ca^{2+}$ to leucine (taught in Sørensen '278 patent) is 1.09:1 to $9.3 \times 10^3$:1, and 3.5:1, respectively. These molar ratios overlap with the molar ratio of at least 1.5:1 recited in claim 8.

1293.    In addition, a POSA would have routinely optimized the amount of $Ca^{2+}$ and leucine in the dosage form.

1294.    Therefore, for at least the above reasons, claim 8 of the '573 patent is obvious over the prior art.

## G. NO OBJECTIVE INDICIA OF NONOBVIOUSNESS

1295.    There is no evidence of any "objective indicia" or "secondary considerations" of nonobviousness of the '573 and '628 patents.   In particular, there is no evidence of any "unexpected results," "acquiescence/licensing," "copying," "failure of others," "skepticism," "long-felt but unsolved need," "teaching away," or "praise" that supports non-obviousness of the asserted claims of the '573 patent and the '628 patent.[38]

---

[38] Defendants do not concede that evidence of secondary considerations is appropriate, relevant and/or admissible in view of Plaintiffs' failure to disclose their purported evidence of "objective indicia" of nonobviousness during fact and expert discovery, and as set forth in but not limited to Defendants' Motion In Limine to Limit Plaintiffs' Assertion of Secondary Considerations of Nonobviousness and in Defendants' objections to Plaintiffs' list of exhibits they intend to offer at trial.

### 1.  Unexpected Results

1296.    As stated above, and based on the teachings of the prior art, a POSA would have reasonably expected that leucine and calcium cation would improve the stability of a solid linaclotide formulation and that their combination would further improve the stability of a solid linaclotide formulation compared to using each individually.

1297.    To the extent Plaintiffs argue that it was unexpected that the combination of leucine and calcium cation decreased deamidation of linaclotide, none of the asserted claims are directed to formulations containing leucine (but not calcium cation) or calcium cation (but not leucine). Additionally, the asserted claims do not specify the exact mechanism by which leucine and calcium cation stabilize linaclotide in a solid formulation.

1298.    Moreover, it would not have been surprising that a linaclotide solid formulation containing leucine and calcium would show decreased linaclotide deamidation because the prior art taught that both leucine and calcium cation would reduce asparagine deamidation.

1299.    It would not have been surprising to a POSA that a combination of leucine and calcium cation stabilized a linaclotide solid formulation.

1300.    Moreover, the '573 patent does not provide any data supporting unexpected results.  In particular, the '573 patent does not disclose any stability data for linaclotide formulations that only contain $Ca^{2+}$ as stabilizer, or only include leucine as stabilizer. (*See* DTX-013, Tables 2–15.)

1301.    The data disclosed in the '628 patent also do not support any unexpected results for at least the following reasons. First, no conclusions from the data reported in Tables 7 and 17 of the '628 patent can be drawn to a reasonable degree of scientific certainty. Second, even if a POSA could draw draw any conclusions from the data disclosed in the '628 patent, the data do

440

not show that there is any synergisitic effect from combining leucine and calcium cation in a solid linaclotide formulation.

1302.    The '628 patent discloses stability data for several linaclotide solid formulations containing different cations, amines, binders and other additive, with varying amounts of linaclotide, and different molar ratios of cation:linaclotide and amine:linaclotide. (*See* DTX-015 at Table 1 (disclosing different linaclotide solid formulations of Examples 1–15), Table 14 (disclosing different linaclotide solid formulations of Examples 27–53), Table 7 (disclosing stability data for Examples 1 and 3–15), Tables 16A and 16B (disclosing stability data for Examples 27–53), and Table 17 (disclosing stability data for Examples 8–15).)

1303.    The '628 patent, however, notes that "[c]hromatographic purity values for Examples 27-53 at the six-month time point appear atypically low," which the '628 patent explains "are likely due to an insufficient desiccant capacity at six months for these particular storage conditions." (*Id.* at 30:27–40.) Therefore, for this additional reason, the data presented for Examples 27–53 do not appear to be reliable for drawing any conclusion to support unexpected results.

1304.    From the remaining Examples for which the '628 patent discloses stability data, only Examples 1 and 3–5 (containing both leucine and calcium chloride), 8 (containing only leucine), 9 (containing only calcium chloride), and 10–11 (which do not contain either calcium chloride or leucine) are potentially be relevant to support unexpected results.  (*See id.* at Table 1.) However, several of these examples do not lend themselves to a scientifically sound comparison for the additional reason that more than one element changes from one example to another.

1305.    A comparison of the stability data for Examples 10 and 11 shows that the

441

amount of linaclotide in the formulation may impact the stability of the formulation. (*See id.* at Tables 7 and 17.)  None of the samples that contain both calcium chloride and leucine (Examples 1 and 3–5) have the same amount of linaclotide as the samples that do not contain either stabilizers (Examples 10 and 11). The amount of linaclotide in the formulation of Example 8 (which only contains leucine) is not the same as any of Examples 1, 3–5, or 10–11.

1306.    And the molar ratio of calcium chloride to linaclotide in the formulation of Example 9 is different from the molar ratio of calcium chloride to linaclotide in the formulation of Examples 1 and 3-5. A scientifically sound conclusion cannot be drawn from the data disclosed in Tables 7 and 17 regarding the effect of calcium chloride or leucine, when used alone, or when used together because more than one element changes going from examples that do not contain calcium chloride or leucine, to those examples that contain only one of these, to the examples that contain both.

1307.    Examples 9 and 11 are the only example pair in which only one element changes between the two examples—the addition of calcium chloride. (*See* DTX-015 at Table 1.) The reported data for the amount of hydrolysis product reported for these two examples shows that addition of calcium chloride decreased the amount of linaclotide hydrolysis. (*See id.* at Table 7 (0.49 and. 0.41) and Table 17 (0.42 and 0.36) for Examples 9 and 11, respectively.) Therefore, on their face, these data do not support unexpected results.  They are rather in line with a POSA's reasonable expectations based on the teachings of prior art.

### 2.   Acquiesence/Licensing

1308.    Claims regarding acquiescence/licensing would not apply to the '573 and '628 patents since applications for those patents had not been filed at the time of the license agreement between Ironwood (then Microbia) and Forest in 2007. Plaintiffs have not

demonstrated that a nexus exists between the claimed features of the '573 and '628 patents and the licenses taken out by their competitors.

### 3. Copying

1309.    To the extent that Plaintiffs argue that generic ANDA filers, by "copying" a brand name pharmaceutical, including the formulation itself, provide evidence of copying or non-obviousness, this reasoning is economically incorrect due to economic differences in development incentives between branded drugs and generic drugs, as well as the FDA approval pathway for generics.  The mere existence of suppliers developing generic products does not provide evidence of secondary considerations or incentives for other companies to have developed the original product or claimed inventions. Branded drug companies incur substantial research, regulatory, and approval costs that are not incurred by generic suppliers. For example, Reiffen et al., *Generic Drug Industry Dynamics*, 87(1) THE REVIEW OF ECONOMICS AND STATISTICS 37, 38 (2005) ("Reiffen 2005") (DTX-199) notes that average new drugs in the 1990s required $800 million in development and testing expenditures over eight years, compared to ANDA expenditures of $603,000 and a time to generic entry of only two to three years. (DTX-199 at 38). The FDA has stated that bioequivalence expedites the availability of less costly generic drugs by "permit[ting] FDA to approve applications to market generic versions of brand-name drugs without repeating costly and duplicative clinical trials." (FDA Website, *Abbreviated New Drug Application (ANDA): Generics*, http://www.fda.gov/Drugs/DevelopmentApprovalProcess/How-DrugsareDevelopedandApproved/ApprovalApplications/AbbreviatedNewDrugApplicationANDAGenerics/.) (DTX-181) The Federal Circuit has confirmed that potential generic suppliers

443

do not provide evidence of secondary considerations like commercial success[39], and similar economic reasoning applies to other secondary considerations as well.

1310. Generic filers additionally do not show the kind of "copying" that might suggest that a patented invention is not obvious, since they are merely seeking bioequivalence in accordance with FDA regulations. Economically, the question of copying is whether others in the market, here pharmaceutical companies developing new drug products, have copied the claimed inventions instead of pursuing independent treatments, compositions, and other areas. No such evidence of copying exists. To the contrary, at least one branded non-linaclotide IBS-C treatment has launched since Linzess®'s approval in 2012, and additional medications to treat IBS-C are being investigated. *See* Press Release, "Synergy Pharmaceuticals Reports Fourth Quarter and Full Year 2017 Financial Results and Business Update," SYNERGY PHARMACEUTICALS (Mar 21, 2018) https://ir.synergypharma.com/press-releases/detail/1864/synergy-pharmaceuticalsreports-fourth-quarter-and-full) (DTX-201); HealthLine, "IBS-C: New Treatments Deliver Promising Management," (Mar. 13, 2017) https://www.healthline.com/health/ibs-c/new-treatments#1 (describing the possible use of bile acid modulators, probiotics, targeted bacterial treatments, and fecal transplants in treating IBS-C) (DTX-190).

---

[39] *Galderma Laboratories, L. P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) ("The mere fact that generic pharmaceutical companies seek approval to market a generic version of a drug, without more, is not evidence of commercial success that speaks to the non-obviousness of patent claims. Plainly, Tolmar believes that it can make a profit selling a generic version of the claimed invention. This is likely true in all Hatch-Waxman cases, if not all patent cases generally. However, that fact tells us very little about the level of commercial success of the patented invention relative to the prior art or the extent to which the commercial success of the branded drug is 'due to the merits of the claimed invention beyond what was readily available in the prior art.' *J.T. Eaton*, 106 F.3d at 1571. As such, it does not support a finding of non-obviousness.").

1311.    ████████████████████████████

██████████████████████████  ████████████

██████████████████████████████████████

██████████████████████████████████

1312.    From an economic perspective, there is no evidence of copying that is relevant to obviousness. The Federal Circuit has confirmed that generic suppliers do not provide relevant evidence of copying.[40]

### 4.  Failure of Others

1313.    Plaintiffs have not demonstrated that skilled workers have tried and failed in the past to practice the inventions claimed by the '573 and '628 patents. Plaintiffs have not demonstrated that any of the ostensible failures they have identified failed because they lacked the claimed features of the '573 and '628 patents.

### 5.  Teaching Away

1314.    As stated above, and based on the teachings of the prior art, a POSA would not have been discouraged from following the path set out in the '573 and '628 patents and would not have been led in a direction divergent from the path that was taken by the named inventors of the '573 and '628 patents.

### 6.  Blocking patents

1315.    Secondary considerations may be used to support arguments of nonobviousness

---

[40] *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.,* 713 F.3d 1369, 1377 (Fed. Cir. 2013) ("Lastly, we reject Bayer's contention that copying of its COC preparations by the Defendants and other generic manufacturers supports its validity position. Such evidence of copying in the ANDA context is not probative of nonobviousness because a showing of bioequivalence is required for FDA approval. *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 377 Fed.Appx. 978, 983 (Fed.Cir.2010).").

of a claimed invention, but that secondary considerations may not be relevant for obviousness in the presence of "blocking patents." (*Acorda Therapeutics, Inc. v. Roxane Labs. Inc.*, 903 F.3d 1310, 1337 (Fed. Cir. 2018).) The Federal Circuit has explained that blocking patents can exist where "practice of a later invention would infringe the earlier patent," and that the presence of blocking patents can deter others from investing, developing, and commercializing a product due to the "risk of infringement liability and associated monetary or injunctive remedies." (*Id.* at 1337.) The Federal Circuit has stated that blocking patents may be "relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent." (*Id.*)

1316.    The '036 patent family and market exclusivity for Linzess® would have economically disincentivized and blocked others from making, developing, and marketing the alleged inventions claimed in the '573 and '628 patents, based on the following considerations: (1) timing, (2) scope, (3) FDA Orange Book, (4) licensing exclusivity, (5) enforcement, (6) other linaclotide products, and (7) Safe Harbor provisions. From an economic perspective, blocking patents reduce the relevance of any secondary considerations that are based on arguments or evidence about others not pursuing the alleged inventions, including at least commercial success, long-felt need, skepticism, and failure of others.

### a.   Timing

1317.    All of the patents in the '036 patent family have the same or similar priority dates, in or around January 2003. The application which later became the '036 patent was published in January 2005, the '727 patent in November 2006, the '947 patent in January 2009, and the '526 patent in May 2011. The '036 patent issued in December 2007, the '727 patent in May 2008, the '947 patent in April 2010, and the '526 patent in December 2011. Expected

expiration dates for the '036 patent family last until at least 2024–2026, well past the priority dates of the '573 and '628 patents, such that blocking disincentives have been in effect and will remain in effect for some time. By comparison, the'628 patent claims priority back to August 2008 and the '573 patent claims priority back to August 2009, well after the priority dates of all of the blocking patents, after the publication date of the applications that would become the '036 patent and '727 patent, and after the issuance of the '036 patent and '727 patent. Accordingly, leading up to and around the time of the alleged inventions claimed in the '573 and '628 patents, other patents were already filed and/or issued and thus economically disincentivized the development of the purported inventions of the '573 and '628 patents by others. Patents need not be issued to act as economic deterrents, since merely the anticipation of possible issuance can be enough to deter development of later patents. Here, both filed (including published applications) and already issued patents contributed to economic disincentives for developing the alleged inventions of the '573 and '628 patents. Similarly, the FDA exclusivity period following Linzess®'s FDA approval in December 2012 provided further disincentives for development.

### b. Scope

1318.    Economically, the '036 patent family provided disincentives for developing later inventions for products that fall within the scope and/or involve the use of those patents. The '573 and '628 patents involve the use of linaclotide and treatment of gastrointestinal disorders—e.g., a method of treating constipation-predominant irritable bowel syndrome with a formulation including linaclotide as described in the '573 patent, and a solid pharmaceutical composition containing linaclotide and an amino acid sequence as described in the '628 patent. (DTX-015 cols. 35–37; DTX-013 at cols 111–12.) The alleged inventions of the '573 and '628

patents could not be claimed without use of the linaclotide compound and/or related methods of treatment. The role of the '036 patent family as blocking patents is consistent with statements made by Ironwood to the SEC and investors on the patent protection provided by the '036 patent family. (Ironwood, Form 10-K, 2009, DTX-191 at 3.) For example, in a 2009 SEC Annual Report, Ironwood stated: "In addition to five years of exclusivity under the Drug Price Competition and Patent Term Restoration Act of 1984, or the Hatch-Waxman Act, that would be granted if linaclotide is approved by the FDA, linaclotide is covered by a U.S. composition of matter patent that expires in 2025, subject to possible patent term extension." (*Id.*) As another example, in a 2010-Q2 earnings call, Ironwood stated to investors: "We're developing a convenient, once-daily capsule, and we've issued Composition of Matter patents that cover Linaclotide until 2025." (Ironwood, Earnings Call Transcript, 2010-Q2, 8/5/2010, DTX-192 at 3.) Accordingly, the scope of the '036 patent family and the '573 and '628 patents support the economic disincentives created by the blocking patents in this case.

### c.  FDA Orange Book

1319.     The '036 patent family has been listed by Plaintiffs in the FDA Orange Book for Linzess®. *See* FDA Orange Book Websites, Patent and Exclusivity for: N202811, Products 001, 002, and 003, https://www.accessdata.fda.gov, accessed 2/11/2019 _(DTX-185, DTX-186, DTX-187).  The FDA Orange Book is a publication that allows pharmaceutical companies to identify patents that are alleged to cover specific pharmaceutical products. By listing the '036 patent family in the FDA Orange Book, Plaintiffs have deterred competition by making others aware of patents that may cover Linzess® and block commercialization efforts within their scope. Accordingly, the '036 patent family being listed in the FDA Orange Book further supports the economic disincentives created by the blocking patents in this case.

448

#### d.  Licensing Exclusivity

1320.    Ironwood (while formerly named Microbia) granted a co-exclusive right and license (i.e., an exclusive license subject only to rights reserved needed to perform its obligations under the agreement) to Forest in 2007 to commercialize a branded linaclotide product in North America, including the United States, ██████████████████████ ████████████████████████████████████████████ ███████████ ██ █████████████████████████████ ██████████████████████████ Accordingly, the exclusive licensing arrangement shows that others could not pursue development of the alleged inventions without a license to existing patents and that at least the '036 patent family was needed to develop, use, and offer for sale linaclotide, which further confirms the blocking disincentives provided by the '036 patent family for any entity besides the patent holder and exclusive licensees.

#### e.  Enforcement

1321.    Plaintiffs have asserted the '036 patent family against Defendants in this case. This shows that Plaintiffs have actively sought to "block" competition by means of the '036 patent family. This threat of legal action and enforcement further supports the blocking disincentives provided by the '036 patent family, since companies pursuing linaclotide



products may face enforcement efforts by Plaintiffs.

### f.   Other Linaclotide Products

1322.    Plaintiffs have not put forth any evidence that others were pursuing significant research, development, or commercialization efforts relating to linaclotide (other than Forest who was granted a co-exclusive license to develop the product in coordination with Ironwood). (*See, e.g.*, Collaboration Agreement by and between Microbia and Forest, 9/12/2007, DTX-420 at LINZ_0093885, -93890, -93892, -93894, -93896, -93897, -93898, -94070 ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Additionally, the FDA database of approved drug products and the FDA Orange Book do not contain any evidence of other products using the linaclotide compound, either for treatment of gastrointestinal disorders or otherwise. (*See FDA Drug Details Website, Search Results for "Linaclotide,"* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process, accessed Feb. 14, 2019 (DTX-182) ; FDA Orange Book, 2018, DTX-180 at 3-257.) Similarly, a database of registered clinical trials that is maintained by the National Library of Medicine shows no pharmaceutical companies having sponsored trials relating to linaclotide in the United States, apart from Ironwood and Forest. (*See ClinicalTrials.gov, Search for "linaclotide,"* https://clinicaltrials.gov/ct2/results?cond=&term=linaclotide&cntry=&state=&city=&dist=, accessed Feb. 11, 2019 (DTX-179) (Of 40 registered trials, 22 were sponsored by Forest and/or Ironwood, and 13 were conducted outside of the United States. The remaining 5 trials were sponsored by the University of Virginia, the Mayo Clinic and National Cancer Institute, the

US Department of Defense and Thomas Jefferson University, Texas Tech, and TriHealth Inc., and do not appear to be for developing new linaclotide products).) The lack of other linaclotide products further confirms the blocking disincentives provided by the '036 patent family.

### g. "Safe Harbor" Provisions

1323.    U.S. patent law provides certain "Safe Harbor" provisions that allow for research and development activities directed towards seeking regulatory approval, without risk of infringement of issued patents. (35 U.S.C. § 271(e)(1) ("It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drags or veterinary biological products.").) While certain research and development activities are protected from infringement claims, commercialization is not protected. Accordingly, blocking patents provide disincentives for development since future sales are subject to claims of infringement, even if the development itself is not.

### h. Economic Relevance of Secondary Considerations

1324.    In the presence of blocking patents and market exclusivity, secondary indicia may provide limited information, if any, on whether a claimed technology is obvious. This makes sense, economically, because other entities lack incentives to develop products that they would be blocked from commercializing. From an economic perspective, blocking patents reduce the relevance of any secondary considerations that are based on arguments or evidence about others not pursuing the alleged inventions, including at least commercial success, long-felt need, skepticism, and failure of others. To the extent that Plaintiffs' secondary considerations for the '573 and '628 patents are based on such arguments or evidence, those

451

secondary considerations are inconsistent with the economic disincentives created by the blocking patents discussed herein, and thus do not support a finding of non-obviousness. Said another way, those secondary considerations would have no economic relevance to obviousness since there is an alternative explanation (i.e., the blocking patents and market exclusivity for Linzess®) for why others did not pursue the alleged inventions.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN SALES, LLC, FOREST LABORATORIES HOLDINGS, LTD., ALLERGAN USA, INC., and IRONWOOD PHARMACEUTICALS, INC. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 16-1114 (RGA) Consolidated |
| v. | ) ) | |
| TEVA PHARMACEUTICALS USA, INC. and SANDOZ INC. | ) ) ) | |
| Defendants. | ) ) | |

**PRETRIAL ORDER EXHIBIT 4:
PLAINTIFFS' STATEMENT OF ISSUES OF LAW
THAT REMAIN TO BE LITIGATED**

## TABLE OF CONTENTS

II. VALIDITY ............................................................................................................3

    A. Presumption of Validity....................................................................................3

    B. Obviousness .....................................................................................................4

        1. General Principles of the Obviousness Analysis ........................................4

            a. Motivation to Combine ...................................................................6

            b. Reasonable Expectation of Success ...............................................10

        2. The Obviousness Analysis for New Chemical Compounds.....................11

        3. The Obviousness Analysis for New Compositions ..................................16

        4. The Obviousness Analysis Involving Ranges...........................................18

        5. Objective Indicia of Nonobviousness ......................................................18

            a. Skepticism......................................................................................20

            b. Unexpected Results........................................................................21

            c. Long-Felt but Unsolved Need........................................................22

            d. Failure of Others ............................................................................22

            e. Acquiescence/Licensing ................................................................23

            f. Copying...........................................................................................23

            g. Teaching Away ...............................................................................24

            h. Praise/Industry Recognition...........................................................25

    C. Written Description...........................................................................................26

    D. Enablement ......................................................................................................28

III. REMEDIES..............................................................................................................30

IV. EXCEPTIONAL CASE............................................................................................31

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Alcon Research Ltd. v. Barr Labs., Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014)........................................................................ 26, 27, 28, 30

*Alcon Research, Ltd. v. Watson Labs., Inc.*,
   No. 15-1159-GMS, 2018 WL 1115090 (D. Del. Mar. 1, 2018) .............................. 20, 21, 22

*Allergan, Inc. v. Sandoz Inc.*,
   796 F.3d 1293 (Fed. Cir. 2015)..................................................................................... *passim*

*Amerigen Pharms. Ltd. v. UCB Pharma GmbH*,
   913 F.3d 1076 (Fed. Cir. 2019)............................................................................... 11, 12, 14

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
   580 F.3d 1340 (Fed. Cir. 2009)............................................................................................ 11

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)............................................................................................ 26

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
   119 F.3d 953 (Fed. Cir. 1997).............................................................................................. 23

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
   750 F.2d 1569 (Fed. Cir. 1984)............................................................................................ 30

*Bayer Pharma AG v. Watson Labs., Inc.*,
   183 F. Supp. 3d 538 (D. Del. 2016)
   *rev'd on other grounds*, 874 F.3d 1316 (Fed. Cir. 2017) ....................................................... 24

*Capon v. Eshhar*,
   418 F.3d 1349 (Fed. Cir. 2005)............................................................................................ 27

*Cephalon, Inc. v. Watson Pharms., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013)..................................................................................... 28, 29

*Circuit Check Inc. v. QXQ Inc.*,
   795 F.3d 1331 (Fed. Cir. 2015).............................................................................................. 5

*Cordis Corp. v. Medtronic AVE, Inc.*,
   339 F.3d 1352 (Fed. Cir. 2003)..................................................................................... 26, 28

*Creative Compounds, LLC v. Starmark Labs.*,
   651 F.3d 1303 (Fed. Cir. 2011).............................................................................................. 3

*Daiichi Sankyo Co., Ltd. v. Matrix Labs., Ltd.*,
   619 F.3d 1346 (Fed. Cir. 2010)............................................................................... 12, 14, 24

*DeGeorge v. Bernier*,
   768 F.2d 1318 (Fed. Cir. 1985)............................................................................................ 29

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ........................................................................ 10

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
  227 F.3d 1361 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 974 (2001) .................. 24

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
  533 F.3d 1353 (Fed. Cir. 2008) ................................................................ 11, 13, 14

*Eli Lilly v. Zenith Goldline Pharms.*,
  471 F.3d 1369 (Fed. Cir. 2006) .................................................................... 12, 16

*Endo Pharms. Solutions Inc. v. Custopharm, Inc.*,
  234 F. Supp. 3d 587 (D. Del. 2017) ................................................................ 3, 6

*Endo Pharms. Solutions, Inc. v. Custopharm Inc.*,
  894 F.3d 1374 (Fed. Cir. 2018) ...................................................................... 6, 9

*Falko-Gunter Falkner v. Inglis*,
  448 F.3d 1357 (Fed. Cir. 2006) ............................................................ 23, 27, 29

*Forest Labs. LLC v. Sigmapharm Labs., LLC*,
  918 F.3d 928 (Fed. Cir. 2019) .................................................................... 4, 6, 8

*Genetics Inst., LLC v. Novartis Vaccines and Diagnostics, Inc.*,
  655 F.3d 1291 (Fed. Cir. 2011) .................................................................... 18, 19

*Genzyme Corp. v. Dr. Reddy's Labs., Ltd.*,
  716 F. App'x 1006, 1010 (Fed. Cir. 2017) ......................................................... 15

*Genzyme Corp. v. Dr. Reddy's Labs., Ltd.*,
  No. 13-1506-GMS, 2016 WL 2757689 (D. Del. May 11, 2016)
  *aff'd by*, 716 F. App'x 1006 (Fed. Cir. 2017) ........................................... 6, 21, 25

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966) ...................................................................................... 5, 20

*Grunenthal GmbH v. Alkem Labs. Ltd.*,
  919 F.3d 1333 (Fed. Cir. 2019) ......................................................................... 9

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
  940 F.3d 680 (Fed. Cir. 2019) ......................................................................... 10

*Impax Labs. Inc. v. Lannett Holdings Inc.*,
  893 F.3d 1372 (Fed. Cir. 2018) .................................................................... 5, 23

*In re Armodafinil Patent Litig. Inc. ('722 Patent Litig.)*,
  939 F. Supp. 2d 456 (D. Del. 2013) .................................................................... 7

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012) ................................................................. *passim*

*In re Dow Chemical Co.*,
  837 F.2d 469 (Fed. Cir. 1988) ......................................................................... 21

*In re Hedges*,
　783 F.2d 1038 (Fed. Cir. 1986)............................................................................. 5

*In re Klein*,
　647 F.3d 1343 (Fed. Cir. 2011)......................................................................... 5, 6

*In re Rosuvastatin Calcium Patent Litig.*,
　703 F.3d 511 (Fed. Cir. 2012)........................................................................ 12, 14

*In re Rosuvastatin Calcium Patent Litig.*,
　719 F. Supp. 2d 388 (D. Del. 2010), *aff'd*, 703 F.3d 511 (Fed. Cir. 2012)........................... 21

*In re Sullivan*,
　498 F.3d 1345 (Fed. Cir. 2007)............................................................................ 24

*In re Wands*,
　858 F.2d 731 (Fed. Cir. 1988)............................................................................. 29

*Innogenetics, N.V. v. Abbott Labs.*,
　512 F.3d 1363 (Fed. Cir. 2008)............................................................................. 7

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
　821 F.3d 1359 (Fed. Cir. 2016)........................................................................ 7, 10

*Karsten Mfg. Corp. v. Cleveland Golf Co.*,
　242 F.3d 1376 (Fed. Cir. 2001)........................................................................... 10

*KSR Int'l Co. v. Teleflex Inc.*,
　550 U.S. 398 (2007)........................................................................................ 4

*Kubota v. Shibuya*,
　999 F.2d 517 (Fed. Cir. 1993)............................................................................ 29

*Lampi Corp. v. Am. Power Prods, Inc.*,
　228 F.3d 1365 (Fed. Cir. 2000)........................................................................... 26

*Leo Pharm. Prods., Ltd. v. Rea*,
　726 F.3d 1346 (Fed. Cir. 2013)................................................................ 8, 10, 17, 19, 21

*Life Techs., Inc. v. Clontech Labs., Inc.*,
　224 F.3d 1320 (Fed. Cir. 2000)........................................................................... 11

*Lochner Techs., LLC v. Vizio, Inc.*,
　567 F. App'x 931 (Fed. Cir. 2014)....................................................................... 27

*Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*,
　711 F. App'x 633 (Fed. Cir. 2017)......................................................................... 6

*Merck Sharp & Dohme Corp. v. Hospira Inc.*,
　No. 14-915-RGA, 2016 WL 5872620 (D. Del. July 10, 2016) ........................................... 24

*Merck Sharp & Dohme Pharm., SRL v. Teva Pharms. USA, Inc.*,
　No. CIV 07-1596 GEB DEA, 2009 WL 3153316 (D.N.J. Aug. 19, 2009) .................... 21, 24

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011) ............................................................................................................ 3

*Millennium Pharms. Inc. v. Sandoz Inc.*,
  862 F.3d 1356 (Fed. Cir. 2017) ............................................................ 6, 14, 19, 21, 22

*Minn. Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
  976 F.2d 1559 (Fed. Cir. 1992) ...................................................................................... 23

*Mintz v. Dietz & Watson, Inc.*,
  679 F.3d 1372 (Fed. Cir. 2012) ...................................................................................... 19

*Novartis Pharms. Corp. v. Noven Pharms., Inc.*,
  125 F. Supp. 3d 474 (D. Del. 2015),
  *appeal dismissed*, Nos. 15-2051 (Fed. Cir. Nov. 13, 2015) ......................................... 8, 9, 17

*Novartis Pharms. Corp. v. Par Pharms., Inc.*,
  48 F. Supp. 3d 733 (D. Del. 2014) ........................................................ 4, 5, 7, 9, 17

*Novartis Pharms. Corp. v. Watson Labs., Inc.*,
  611 F. App'x 988 (Fed. Cir. 2015) ................................................... 3, 4, 5, 7, 8, 9, 17

*Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd*,
  287 F. Supp. 3d 505 (D. Del. 2017), *aff'd* 923 F.3d 1051 (Fed. Cir. 2019) .............. 19, 22, 23

*Novartis Pharms Corp. v. West-Ward Pharm. Int'l Ltd.*,
  923 F.3d 1051, 1060 (Fed. Cir. 2019) ............................................................................ 16

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) .......................................................................................................... 31

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008) ................................................................................ 5, 15

*OSI Pharms, LLC v. Apotex Inc.*,
  939 F.3d. 1375 (Fed. Cir. 2019) ..................................................................................... 10

*Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*,
  678 F.3d 1280 (Fed. Cir. 2012) ............................................................................... *passim*

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
  555 F. App'x 961 (Fed. Cir. 2014) ...................................................................... 11, 12, 14

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
  566 F.3d 989, 997 (Fed. Cir. 2009) ................................................................................ 15

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*,
  748 F.3d 1354 (Fed. Cir. 2014) ...................................................................................... 20

*Sanofi-Aventis U.S., LLC v. Dr. Reddy's Labs., Inc.*,
  933 F.3d 1367 (Fed. Cir. 2019) ........................................................................ 11, 14, 23

*SRI Intern., Inc. v. Advanced Technology Laboratories, Inc.*,
  45 F.3d 443, 1994 WL 712487 (Fed. Cir. 1994) ........................................................... 3

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983)............................................................................ 18, 19, 20

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007)............................................................................ 11, 13, 15

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
   459 F. Supp. 2d 227 (S.D.N.Y. 2006)...................................................................... 32, 33

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
   549 F.3d 1381 (Fed. Cir. 2008).............................................................................. 32, 33

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   723 F.3d 1363 (Fed. Cir. 2013),
   *aff'd in-part on other grounds, rev'd in part on other grounds*, 135 S. Ct. 831 (2015)......... 20

*Tokai Corp. v. Easton Enters., Inc.*,
   632 F.3d 1358 (Fed. Cir. 2011)................................................................................... 3

*Transmatic, Inc. v. Gulton Indus., Inc.*,
   53 F.3d 1270 (Fed. Cir. 1995).................................................................................... 4

*UCB, Inc. v. Accord Healthcare, Inc.*,
   201 F. Supp. 3d 491 (D. Del. 2016), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).................. *passim*

*Unigene Labs., Inc. v. Apotex, Inc.*,
   655 F.3d 1352 (Fed. Cir. 2011)
   *cert. denied*, 565 U.S. 1261 (2012)..................................................................... 5, 6, 16, 17

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*,
   418 F.3d 1326 (Fed. Cir. 2005)................................................................................. 29

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
   782 F.2d 995 (Fed. Cir. 1986).................................................................................. 23

*Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*,
   231 F.3d 1339 (Fed. Cir. 2000)......................................................................... 13, 31, 32

## STATUTORY AUTHORITIES

35 U.S.C. § 103(a)........................................................................................................ 4, 11

35 U.S.C. § 271(e)(4) ............................................................................................. 30, 31, 32

35 U.S.C. § 271(e)(4)(A) ............................................................................................... 30

35 U.S.C. § 271(e)(4)(B) ............................................................................................... 30

35 U.S.C. § 282 ............................................................................................................. 3

Pursuant to Local Rule 16.3(c)(5), Plaintiffs Allergan Sales, LLC, Forest Laboratories

Holdings, Ltd., Allergan USA, Inc., (collectively, "Allergan") and Ironwood Pharmaceuticals,

Inc. ("Ironwood") (Allergan and Ironwood, collectively, "Plaintiffs") submit the following

Statement of Issues of Law That Remain to Be Litigated.  Each of the asserted Patents-in-Suit is

presumed by statute to be valid (35 U.S.C. § 282) and stipulated by Defendants to be infringed.

(D.I. 279.)  Accordingly, Plaintiffs do not have the burden of proving any issues of law at trial to

prevail in this action.  Nonetheless, Plaintiffs intend to rely on the issues of law identified herein.

This Statement is not intended to be exhaustive and, in addition to what is set forth herein,

Plaintiffs reserve the right to prove any matters identified in the pleadings, fact and expert

discovery, and any of the accompanying statements of facts and legal issues to be litigated at

trial.  Plaintiffs further reserve the right to dispute and rebut any issues of law asserted by any

Defendant at trial.

Plaintiffs' identification of the Issues of Law That Remain to Be Litigated is based in part

on their current understanding of the arguments Defendants Teva Pharmaceuticals USA, Inc.

("Teva") and/or Sandoz Inc. ("Sandoz") (Teva and Sandoz, collectively, "Defendants") are likely

to make, based upon the pleadings and discovery in the action to date.  To the extent Defendants

attempt to introduce different or additional legal issues to meet their burden of proof or to rebut

Plaintiffs' burden of proof, Plaintiffs reserve the right to object to and/or contest those issues, and

to present any and all arguments in response to those legal issues.

If the Court determines that any issue identified in this list as an issue of law is more

properly considered an issue of fact, Plaintiffs incorporate such issues by reference into their

Statement of Issues of Fact That Remain To Be Litigated.  Similarly, if the Court decides that

1

issues that Plaintiffs have designated as issues of fact are issues of law, Plaintiffs incorporate those issues by reference into this Statement of Issues of Law That Remain to Be Litigated.

1.      The effective filing date for each of the Patents-in-Suit is before March 16, 2013.

Therefore, pre-America Invents Act United States patent law governs the action.

## II.      <u>VALIDITY</u>

### A.      Presumption of Validity

2.      An issued patent is presumed to be valid.  35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011); *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1303 (Fed. Cir. 2015); *Novartis Pharms. Corp. v. Watson Labs., Inc*., 611 F. App'x 988, 994 (Fed. Cir. 2015).

3.      The presumption that an issued patent claim is valid can be overturned only with clear and convincing evidence of invalidity.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011); *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1303 (Fed. Cir. 2015).

4.      "Although the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the [PTO]."  *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1313 (Fed. Cir. 2011) (quoting *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011)); *see also Endo Pharms. Solutions Inc. v. Custopharm, Inc.*, 234 F. Supp. 3d 587, 592 (D. Del. 2017).

5.      Similarly, although the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered by the PTO during reexamination.  *SRI Intern., Inc. v. Advanced Technology Laboratories, Inc*., 45 F.3d 443, 1994 WL 712487, *3 (Fed. Cir. 1994) (validity upheld where Defendants' prior art had already been considered during reexamination).  Where a reexamination certificate has been issued "deference is due the Patent Office decision to issue the patent with respect to evidence bearing on validity which it considered."  *SRI Intern., Inc. v. Advanced Technology Laboratories, Inc*., 45 F.3d 443, 1994

WL 712487, *3 (Fed. Cir. 1994) (citation omitted); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53

F.3d 1270, 1275 (Fed. Cir. 1995) (affirming validity and noting that the claims had previously

survived reexamination).

### B.   Obviousness

6.   Whether Defendants have proven by clear and convincing evidence that one or

more of the asserted claims of the Patents-in-Suit are invalid as obvious.  The applicable law is

set forth as follows:

### 1.   General Principles of the Obviousness Analysis

7.   Section 103 provides that:  "A patent may not be obtained though the invention is

not identically disclosed or described as set forth in section 102, if the differences between the

subject matter sought to be patented and the prior art are such that the subject matter as a whole

would have been obvious at the time the invention was made to a person having ordinary skill in

the art to which said subject matter pertains.  Patentability shall not be negatived by the manner

in which the invention was made."  35 U.S.C. § 103(a); *see also Novartis Pharms. Corp. v. Par*

*Pharms., Inc.*, 48 F. Supp. 3d 733, 752 (D. Del. 2014), *aff'd sub nom*, *Novartis Pharm. Corp. v.*

*Watson Labs., Inc.*, 611 F. App'x 988 (Fed. Cir. 2015).

8.   Obviousness is a question of law based on underlying issues of fact.  *KSR Int'l*

*Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007); *Forest Labs. LLC v. Sigmapharm Labs., LLC*, 918

F.3d 928, 934 (Fed. Cir. 2019).

9.   This Court has summarized the obviousness inquiry as follows:

Obviousness is a question of law that depends on the following factual inquiries: (1) the
scope and content of the prior art; (2) the differences between the claims and the prior art;
(3) the level of ordinary skill in the relevant art; and (4) any objective considerations such
as commercial success, long felt but unsolved need, and the failure of others.

*Novartis Pharm. Corp. v. Par Pharm., Inc.*, 48 F. Supp 3d 733, 752 (D. Del. 2014), *aff'd sub nom*, *Novartis Pharm. Corp. v. Watson Labs., Inc.*, 611 F. App'x 988 (Fed. Cir. 2015); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

10.     Whether a claim is invalid for obviousness is determined from the perspective of a person of ordinary skill in the art ("POSA" or "PHOSITA").  *See, e.g.*, *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011) ("A person of ordinary skill at the time of the invention interprets the prior art using common sense and appropriate perspective."); *Novartis Pharms. Corp. v. Par Pharms., Inc.*, 48 F. Supp. 3d 733, 752 (D. Del. 2014) ("The obviousness inquiry must be conducted from the PHOSITA's point of view."), *aff'd sub nom*, *Novartis Pharm. Corp. v. Watson Labs., Inc.*, 611 F. App'x 988 (Fed. Cir. 2015).

11.     In determining the scope and content of the prior art, the prior art must be considered "as a whole." *Impax Labs. Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372, 1379-80 (Fed. Cir. 2018); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).  "It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art." *In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986) (citation omitted).

12.     "A reference qualifies as prior art for an obviousness determination under § 103 only when it is analogous to the claimed invention." *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011) (reversible error where Board relied upon nonanalogous art).  "Whether a reference is analogous art is a question of fact." *Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1335 (Fed. Cir. 2015) (reversing JMOL because jury had correctly determined that prior art was not analogous).  Prior art is analogous if it is from the same field of endeavor or if it is reasonably

pertinent to the particular problem the inventor is trying to solve. *In re Klein*, 617 F.3d 1343, 1348 (Fed. Cir. 2011); *Genzyme Corp. v. Dr. Reddy's Labs*., No. 13-1506-GMS, 2016 WL 2757689, *10 (D. Del. May 11, 2016), *aff'd by*, 716 F. App'x 1006 (Fed. Cir. 2017).

13.     "An invention is not obvious simply because all of the claimed limitations were known in the prior art at the time of the invention." *Forest Labs. LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 934 (Fed. Cir. 2019); *Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*, 711 F. App'x 633, 636 (Fed. Cir. 2017) ("it is improper to combine references 'like separate pieces of a simple jigsaw puzzle'") (citation omitted); *Unigene Labs., Inc. v. Apotex, Inc*., 655 F.3d 1352, 1360 (Fed. Cir. 2011) (obviousness "requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination"); *Endo Pharms. Solutions Inc. v. Custopharm, Inc.*, 234 F. Supp. 3d 587, 591 (D. Del. 2017) ("A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.") (citation omitted).

14.     Where the prior art does not disclose or teach each of the claim limitations, the claim is not obvious. *See*, *e.g.*, *Endo Pharms. Solutions, Inc. v. Custopharm Inc*., 894 F.3d 1374, 1379-81 (Fed. Cir. 2018) (prior art did not disclose claim element requiring 750 mg testosterone undecanoate); *Millennium Pharms., Inc. v. Sandoz Inc*., 862 F.3d 1356, 1365-66 (Fed. Cir. 2017) (reversing obviousness finding because the prior art did not disclose lyophilization of bortezomib or use of mannitol as a bulking agent for bortezomib).

### a.     Motivation to Combine

15.     The burden falls on the challenger of the patent to show that a POSA (1) would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and (2) that the skilled artisan would have had a reasonable expectation of success in doing so. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig*., 676

F.3d 1063, 1068-69 (Fed. Cir. 2012); *Novartis Pharms. Corp. v. Par Pharm., Inc.*, 48

F. Supp. 3d 733, 752 (D. Del. 2014) (a party seeking to invalidate a patent claim "must show that

a PHOSITA would be motivated to combine the claimed combinations with a reasonable

expectation of success."), *aff'd sub nom*, *Novartis Pharm. Corp. v. Watson Labs., Inc.*, 611

F. App'x 988 (Fed. Cir. 2015). This motivation to combine must be demonstrated by clear and

convincing evidence. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent

Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012).

16. "The presence or absence of a motivation to combine references in an

obviousness determination is a pure question of fact." *Intelligent Bio-Systems, Inc. v. Illumina

Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016) (citation omitted).

17. For an accused infringer "to establish obviousness, it is insufficient to allege a

general motivation to discover an undefined solution that could take many possible forms." *In re

Armodafinil Patent Litig. Inc. ('722 Patent Litig.)*, 939 F. Supp. 2d 456, 500 (D. Del. 2013). This

is because "knowledge of a problem and motivation to solve it are entirely different from

motivation to combine particular references to reach the particular claimed method." *Id.*

(quoting *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008)).

18. Indeed:

[T]he Federal Circuit has clarified that "obvious to try" is also not obvious when a
skilled artisan would have to: (1) "vary all parameters or try each of numerous
possible choices until one possibly arrived at a successful result, where the prior
art gave either no indication of which parameters were critical or no direction as
to which of many possible choices is likely to be successful"; or (2) "explore new
technology or general approach that seemed to be a promising field of
experimentation, where the prior art gave only general guidance as to the
particular form of the claimed invention or how to achieve it."

*In re Armodafinil Patent Litig. Inc. ('722 Patent Litig.)*, 939 F. Supp. 2d 456, 502 (D. Del. 2013)

(citations omitted).

19.     Obviousness requires a demonstration that a person of ordinary skill in the art would have had knowledge and a motivation to address the problem identified by the invention. *Novartis Pharm. Corp. v. Watson Labs., Inc.*, 611 F. App'x 988, 996 (Fed. Cir. 2015) ("Watson failed to prove that a rivastigmine formulation was known to be susceptible to oxidative degradation. … Without the knowledge of the problem, one of skill in the art would not have been motivated to modify GB '040 with antioxidants as purportedly disclosed in the [prior art]"); *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013) ("The inventors of the '013 patent recognized and solved a problem with the storage stability of certain formulations—a problem that the prior art did not recognize and a problem that was not solved for over a decade."); *Novartis Pharms. Corp. v. Noven Pharms., Inc.*, 125 F. Supp. 3d 474, 486 (D. Del. 2015) ("a PHOSITA would not have known that rivastigmine was susceptible to oxidative degradation based on the prior art"), *appeal dismissed*, Nos. 15-2051, 15-2053 (Fed. Cir. Nov. 13, 2015).

20.     "Even an obvious solution … does not render an invention obvious if the problem solved was previously unknown." *Novartis Pharm. Corp. v. Watson Labs., Inc.*, 611 F. App'x 988, 995 (Fed. Cir. 2015).  Indeed, "an invention can often be the recognition of a problem itself." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013).

21.     If "the problem was not known, the possible approaches to solving the problem were not known or finite, and the solution was not predictable, it would not have been obvious for a person of ordinary skill to make the claimed invention." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013); *Forest Labs. LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 935 (Fed. Cir. 2019) ("We have recognized that where a problem was not known in the art,

the solution to that problem may not be obvious, because 'ordinary artisans would not have

thought to try at all because they would not have recognized the problem.'") (citation omitted).

22.     Moreover, "[a] conclusion of obviousness does not follow from merely 'varying

all the parameters or trying each of numerous possible choices until one possibly arrived at a

successful result, where the prior art gave either no indication of which parameters were critical

or no direction as to which of many possible choices is likely to be successful.'" *Grunenthal*

*GmbH v. Alkem Labs. Ltd*., 919 F.3d 1333, 1345 (Fed. Cir. 2019) (citation omitted); *Endo*

*Pharms. Solutions, Inc. v. Custopharm Inc*., 894 F.3d 1374, 1382, 1384 (Fed. Cir. 2018) (no

motivation to combine when prior art provided "large number of possible co-solvents").

23.     "Evidence of obviousness, especially when that evidence is proffered in support

of an 'obvious-to-try' theory, is insufficient unless it indicates that the possible options skilled

artisans would have encountered were 'finite', 'small', or 'easily traversed', and that skilled

artisans would have had a reason to select the route that produced the claimed invention." *See In*

*re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1072

(Fed. Cir. 2012); *Novartis Pharms. Corp. v. Par Pharms., Inc*., 48 F. Supp. 3d 733, 752-53

(D. Del. 2014), *aff'd sub nom.*, *Novartis Pharm. Corp. v. Watson Labs., Inc.*, 611 F. App'x 988

(Fed. Cir. 2015); *Novartis Pharms. Corp. v. Noven Pharms., Inc*., 125 F. Supp. 3d 474, 478

(D. Del. 2015).

24.     "A reference may be said to teach away when a person of ordinary skill, upon

reading the reference, would be discouraged from following the path set out in the reference, or

would be led in a direction divergent from the path that was taken by the applicant." *Allergan,*

*Inc. v. Sandoz*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) (citation omitted).  "Whether the prior art

teaches away from the claimed invention is a question of fact." *Id.* (citation omitted).

25.     When two references provide conflicting teachings, "[s]uch conflicting teachings cannot reasonably be viewed as suggesting their combination." *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1385 (Fed. Cir. 2001).  Similarly, an "inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements." *Allergan, Inc. v. Sandoz*, 796 F.3d 1293, 1306 (Fed. Cir. 2015) (quoting *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009)).

### b.     Reasonable Expectation of Success

26.     "[E]ven if it was obvious to experiment with [certain] options," it still was not obvious to try if "there is nothing to indicate that a skilled artisan would have had a reasonable expectation that such an experiment would succeed. … Without a reasonable expectation of success or clues pointing to the most promising combinations, an artisan could have spent years experimenting without success." *Leo Pharm. Prods. Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013) (citation omitted); *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 703-704 (Fed. Cir. 2019) (no reasonable expectation of success where "a POSITA would be challenged to predict relative ratios" of excipients because "components…interact in an unpredictable or unexpected way"); *OSI Pharms, LLC v. Apotex Inc.*, 939 F.3d. 1375, 1385 (Fed. Cir. 2019) (considering the failure rate of new drug compounds to gain FDA approval; prior art references "provide no more than a hope—and hope that a potentially promising drug will treat a particular [condition] is not enough to create a reasonable expectation of success in a highly unpredictable art.").

27.     "The presence or absence of a reasonable expectation of success is also a question of fact." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016) (citation omitted).

28.     Whether a POSA would have had a reasonable expectation of success is measured at the date of the invention described in the asserted patent claim.  *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009).

29.     "The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.  What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art."  *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012) (citing 35 U.S.C. § 103(a) ("Patentability shall not be negatived by the manner in which the invention was made.")); *Cf. Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000) ("That the inventors were ultimately successful is irrelevant to whether one of ordinary skill in the art, at the time the invention was made, would have reasonably expected success.").

### 2.     The Obviousness Analysis for New Chemical Compounds

30.     Whether a new chemical compound would have been *prima facie* obvious over a prior art compound follows a two-part inquiry referred to as a "lead compound analysis."  *See Sanofi-Aventis U.S., LLC v. Dr. Reddy's Labs., Inc.*, 933 F.3d 1367, 1375 (Fed. Cir. 2019); *Amerigen Pharms. Ltd. v. UCB Pharma GmbH*, 913 F.3d 1076, 1080, 1086-89 (Fed. Cir. 2019); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x 961, 969 (Fed. Cir. 2014); *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1291 (Fed. Cir. 2012); *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 541 (D. Del. 2016), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

31.     "First, the court determines whether a chemist of ordinary skill in the art would have selected the asserted prior art compound as a lead compound, or starting point, for further development."  *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x 961, 969 (citing *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.,* 533 F.3d 1353, 1359 (Fed. Cir. 2008)); *see also Otsuka Pharm.*

*Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1291 (Fed. Cir. 2012); *Daiichi Sankyo Co., Ltd. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1353-1354 (Fed. Cir. 2010); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 541-42 (D. Del. 2016), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

32.     Without a specific reason found within the prior art, "[m]ere structural similarity between a prior art compound and the claimed compound does not inform the lead compound selection." *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x 961, 969-970 (Fed. Cir. 2014) (citing *Otsuka Pharm. Co., Ltd. v. Sandoz Inc.,* 678 F.3d 1280, 1292 (Fed. Cir. 2012)); *Daiichi Sankyo Co. v. Matrix Labs., Ltd.,* 619 F.3d 1346, 1354 (Fed. Cir. 2010) ("proving a reason to select a compound as a lead compound depends on more than just structural similarity, but also knowledge in the art of the functional properties and limitations of the prior art compounds").

33.     In determining whether a chemist would have selected a prior art compound as a lead for pharmaceutical development, the analysis is guided by evidence of the prior art compound's pertinent properties, including positive attributes (such as activity, efficacy, and potency), adverse effects (such as toxicity and unwanted side effects), and other relevant information (such as FDA approval).  *See, e.g., Amerigen Pharms. Ltd. v. UCB Pharma GmbH*, 913 F.3d 1076, 1080-81, 1086-87 (Fed. Cir. 2019) (considering bioavailability of prior art compounds); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x 961, 969 (Fed. Cir. 2014) ("The selection analysis may be guided by evidence of the compound's pertinent properties, such as chemical activity or potency"); *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1291-93 (Fed. Cir. 2012) (considering antipsychotic activity, potency, and unwanted side effects of prior art compounds); *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 517 (Fed. Cir. 2012) (considering toxicity and potency of prior art compound); *Eli Lilly & Co. v. Zenith*

*Goldline Pharms., Inc.*, 471 F.3d 1369, 1379 (Fed. Cir. 2006) (considering activity of prior art compounds); *Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.,* 231 F.3d 1339, 1345 (Fed. Cir. 2000) (considering activity of prior art compounds); *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1358 (Fed. Cir. 2007) (considering the toxicity and activity of prior art compounds); *Eisai Co. v. Dr. Reddy's Labs., Ltd.,* 533 F.3d 1353, 1358 (Fed. Cir. 2008) (considering a prior art compound's lipophilicity and low molecular weight); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 542 (D. Del. 2016) (rejecting an asserted lead compound because "a POSA seeking to develop an AED would have started by looking at FDA-approved drugs or at compounds with demonstrated clinical efficacy"), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

34.     The second part of the lead compound analysis requires the factfinder to determine "whether the prior art would have supplied one of ordinary skill in the art with a reason or motivation to modify a lead compound to make the claimed compound with a reasonable expectation of success." *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1292 (Fed. Cir. 2012); *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007) ("[I]n cases involving new chemical compounds, it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound."); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 541 (D. Del. 2016) ("the Court must next consider whether it would have been obvious to move from the prior art compound to the patented compound"), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

35.     If the alleged infringer fails to provide clear and convincing evidence that the prior art would have directed a POSA to make each of the various modifications to the lead

compound to arrive at the claimed compound with a reasonable expectation of success, then the

claimed compound is not obvious. *See, e.g., Sanofi-Aventis U.S., LLC v. Dr. Reddy's Labs., Inc.*,

933 F.3d 1367, 1377 (Fed. Cir. 2019) ("[I]t would not have been obvious to make simultaneous

methoxy substitutions at the C7 and C10 of docetaxel."); *Amerigen Pharms. Ltd. v. UCB Pharma*

*GmbH*, 913 F.3d 1076, 1080-81, 1086-87 (Fed. Cir. 2019) ("Amerigen did not otherwise meet its

burden to prove that the specific claimed modifications to 5-HMT would have been obvious.");

*Millennium Pharms., Inc. v. Sandoz Inc*., 862 F.3d 1356, 1364 (Fed. Cir. 2017) ("The district

court clearly erred in its obviousness analysis.  There is no teaching or suggestion in the

references to produce the claimed mannitol ester."); *Pfizer Inc. v. Teva Pharms. USA, Inc*., 555

F. App'x 961, 971 (Fed. Cir. 2014) ("Appellants failed to set forth evidence identifying the

necessary teachings for a skilled artisan to modify alkyl groups at GABA's 3–position to improve

anticonvulsant activity."); *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc*., 678 F.3d 1280, 1296 (Fed.

Cir. 2012) ("Defendants failed to prove that the prior art would have directed one to make the

various modifications necessary to convert OPC-4392 into aripiprazole."); *In re Rosuvastatin*

*Calcium Patent Litig*., 703 F.3d 511, 518 (Fed. Cir. 2012) ("Defendants did not demonstrate the

required motivation for selecting Sandoz Compound 1b as a lead compound, or for making this

specific sulfonyl change in the Compound 1b molecule."); *Daiichi Sankyo Co., Ltd. v. Matrix*

*Laboratories, Ltd*., 619 F.3d 1346 (Fed. Cir. 2010) ("[O]ne of skill in the art would not have

been motivated to modify the ARBs disclosed in the '902 patent to obtain olmesartan

medoxomil."); *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd*., 533 F.3d 1353, 1358 (Fed. Cir. 2008)

("The record … shows no discernible reason for a skilled artisan to begin with lansoprazole only

to drop the very feature, the fluorinated substituent, that gave this advantageous property.");

*UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 543 (D. Del. 2016) ("Defendants

have failed to prove that such a person would have been motivated to change the $NHOC_3$ of compound 31 to the $CH_2OCH_3$ of lacosamide.  The record does not establish that a POSA contemplating such a change would have had a reasonable expectation that such a substitution would yield a promising result."), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

36.     Where proposed modifications of a prior art compound will have unpredictable effects, there is no reasonable expectation of success.  *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1360 (Fed. Cir. 2007) (no reasonable expectation of success where biological activities of various modifications to prior art were "unpredictable"); *Procter & Gamble Co. v. Teva Pharms. USA, Inc*., 566 F.3d 989, 996-997 (Fed. Cir. 2009) (properties of biphosphonates could not be anticipated based on their structure; test results confirmed unpredictability of biphosphates); *see also Genzyme Corp. v. Dr. Reddy's Labs., Ltd*., 716 F. App'x 1006, 1010 (Fed. Cir. 2017) ("The district court's finding that stem cell mobilization was highly unpredictable at the time of the invention also runs counter to an expectation of success.")

37.     If a new chemical compound is not obvious, then claims to compositions containing that new compound and methods of using that new and nonobvious compound within the same patent are also not obvious.  *See*, *e.g*., *Procter & Gamble Co. v. Teva Pharms. USA, Inc*., 566 F.3d 989, 992, 997 (Fed. Cir. 2009) (claim 4 (compound claim), claim 16 (pharmaceutical composition) and claim 23 (method of use) all held not invalid under the lead compound analysis); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc*., 520 F.3d 1358, 1365 (Fed. Cir. 2008) (holding method of use claims directed to nonobvious compound are not invalid based on lead compound analysis); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 514-15, 541-44 (D. Del. 2016) (claim 9 (compound claim), claim 10 (therapeutic composition) and claim

15

13 (method of use) all held not invalid under the lead compound analysis), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018). *Cf. Novartis Pharms. Corp. v. West-Ward Pharm. Int'l Ltd.*, 923 F.3d 1051, 1060 (Fed. Cir. 2019) (affirming finding of nonobviousness; no reversible error where the district court applied the lead compound analysis to a method patent that did not also include new compound claims because there was no motivation to modify the prior art).

### 3.   The Obviousness Analysis for New Compositions

38.     In the context of a patent claiming a new or improved pharmaceutical composition of an FDA-approved drug, the obviousness inquiry starts with the identification of a prior art "reference composition" rather than a lead compound. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1362 (Fed. Cir. 2011) ("In this case, Miacalcin® serves as the 'reference composition' for … development of the claimed composition."), *cert. denied*, 565 U.S. 1261 (2012); *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1292 (Fed. Cir. 2012) ("[T]he term 'reference composition' is more appropriate than 'lead compound' when considering obviousness for a chemical composition.") (quoting *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1362 (Fed. Cir. 2011)).

39.     A claim to "a new composition or formulation to deliver an FDA-approved active ingredient … is not obvious if a person of ordinary skill would not select and combine the prior art references to reach the claimed composition or formulation." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011) (citing *Eli Lilly v. Zenith Goldline Pharms.*, 471 F.3d 1369, 1380 (Fed. Cir. 2006).

40.     As the Federal Circuit has explained in the context of analyzing new compositions:

> Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. Rather, ***obviousness requires the***

16

> ***additional showing that a person of ordinary skill at the time of
> the invention would have selected and combined those prior art
> elements in the normal course of research and development*** to
> yield the claimed invention.

*Unigene Labs., Inc. v. Apotex, Inc*., 655 F.3d 1352, 1360 (Fed. Cir. 2011) (emphasis added;

internal citation omitted).

41.     If the alleged infringer fails to provide clear and convincing evidence that the

prior art would have directed a POSA to make each of the various modifications to the reference

composition to arrive at the claimed formulation with a reasonable expectation of success, then

the claimed formulation is not obvious.  *Unigene Labs., Inc. v. Apotex, Inc*., 655 F.3d 1352, 1362

(Fed. Cir. 2011) (POSA would not have been motivated to include 20 mM citric acid as a

substitute for benzalkonium chloride in prior art formulation); *Novartis Pharms. Corp. v. Watson

Labs., Inc*., 611 F. App'x 988, 996 (Fed. Cir. 2015) (Trial court properly "credited evidence that

one of skill in the art would not have been motivated to risk incompatibility by including an

antioxidant in a formulation without evidence of its necessity.").

42.     In addition, there is no proper motivation to combine prior art references with a

reasonable expectation of success if the prior art fails to disclose the actual problem to be solved

by the claimed composition.  *See*, *e.g.*, *Leo Pharm. Prods, Ltd. v. Rea*, 726 F.3d 1346, 1355 (Fed.

Cir. 2013) (no motivation to combine references when the prior art did not recognize storage

stability problem of prior art formulations); *Novartis Pharms. Corp. v. Par Pharms., Inc*., 48

F. Supp. 3d 733, 754 (D. Del. 2014) (A POSA "would not have been motivated to include an

antioxidant in any formulation unless there was evidence of oxidative degradation."), *aff'd sub

nom*, *Novartis Pharm. Corp. v. Watson Labs., Inc.*, 611 F. App'x 988 (Fed. Cir. 2015); *Novartis

Pharms. Corp. v. Noven Pharms., Inc*., 125 F. Supp. 3d 474, 484-86 (D. Del. 2015) (no

motivation to combine references where the prior art does not disclose rivastigmine's

susceptibility to oxidative degradation), *appeal dismissed*, Nos. 15-2051, 15-2053 (Fed. Cir. Nov. 13, 2015).

### 4.   The Obviousness Analysis Involving Ranges

43.   A claimed invention is not obvious simply because it includes a limitation with ranges that may be disclosed in the prior art or that overlaps with ranges disclosed in the prior art. *See*, *e.g.*, *Genetics Inst., LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1306-1307 (Fed. Cir. 2011) (rejecting argument "that a broad range necessarily renders obvious a narrower range falling within that broad range").

44.   Disclosure of very broad ranges in the prior art may not invite the routine optimization that would be necessary to prove obviousness. *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1306 (Fed. Cir. 2011) (holding that ordinary motivation to optimize did not apply where disclosure was 68,000 protein variants including 2,332 amino acids).

45.   Even if a claimed invention falls within a range disclosed by the prior art, obviousness may negated by showing that (1) the prior art taught away for the claimed inventions or (2) that there are unexpected results. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, fn.7 (Fed. Cir. 2012).

### 5.   Objective Indicia of Nonobviousness

46.   An obviousness determination requires contemporaneous consideration of objective indicia of nonobviousness (or secondary considerations) such as failure of others, unexpected results, acquiescence, copying, skepticism, and long-felt but unsolved need. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (error to "defer examination of the objective considerations until after the factfinder makes an obviousness finding"); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530,

1538-39 (Fed. Cir. 1983) (secondary considerations are "to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.").

47.     These objective indicia "may often be the most probative and cogent evidence of nonobviousness in the record," and "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Mintz v. Dietz & Watson, Inc*., 679 F.3d 1372, 1378 (Fed. Cir. 2012) (internal citations omitted); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983) (citations omitted); *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013) ("Objective indicia 'can be the most probative evidence of nonobviousness in the record, and enables the court to avert the trap of hindsight.'") (citation omitted); *In re Cyclobenzaprine*, 676 F.3d at 1079 ("The objective considerations, when considered with the balance of the obviousness evidence in the record, guard as a check against hindsight bias."); *Millennium Pharms., Inc. v. Sandoz Inc*., 862 F.3d 1356, 1368 (Fed. Cir. 2017) ("Evidence of objective indicia 'can be the most probative evidence of nonobviousness in the record,' and objective indicia enable 'the court to avert the trap of hindsight.'") (citation omitted); *Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd*., 287 F. Supp. 3d 505, 510 (D. Del. 2017) ("Secondary considerations of nonobviousness are important because they 'serve as insurance against the insidious attraction of the siren hindsight.'") (citation omitted), *aff'd* 923 F.3d 1051 (Fed. Cir. 2019).  Objective indicia of nonobviousness thus "help turn back the clock and place the claims in the context that led to their invention." *Mintz v. Dietz & Watson, Inc*., 679 F.3d 1372, 1378 (Fed. Cir. 2012).

48.     Evidence of objective indicia of nonobviousness may include information obtained after the filing date of an asserted patent.  *Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc*., 655 F.3d 1291, 1307 (Fed. Cir. 2011) ("every property of a claimed

compound need not be fully recognized as of the filing date of the patent application to be

relevant to nonobviousness"); *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc.,*

*USA*, 748 F.3d 1354, 1360 (Fed. Cir. 2014) ("patentability may consider all of the characteristics

possessed by the claimed invention, whenever those characteristics become manifest").

49.     Where a commercial embodiment is coextensive with the asserted claims, then a

nexus is presumed between the objective indicia of nonobviouness based on that embodiment

and the claimed invention.  *See*, *e.g.*, *Teva Pharms. USA, Inc. v. Sandoz, Inc*., 723 F.3d 1363,

1372-73 (Fed. Cir. 2013) (defendants did not rebut the presumption of nexus), *aff'd in-part on*

*other grounds, rev'd in part on other grounds*, 135 S.Ct. 831 (2015); *Alcon Research, Ltd. v.*

*Watson Labs., Inc*., No. 15-1159-GMS, 2018 WL 1115090, at \*23, \*25 (D. Del. Mar. 1, 2018)

("If the marketed product embodies the claimed features, and is coextensive with them, then a

nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to

rebut the presumed nexus.") (citation omitted).

50.     "The objective considerations, when considered with the balance of the

obviousness evidence in the record, guard as a check against hindsight bias."  *In re*

*Cyclobenzaprine*, 676 F.3d 1063, 1079 (Fed. Cir. 2012) (citing *Graham v. John Deere Co. of*

*Kansas City*, 383 U.S. 1, 36 (1966)).  Thus, when the patentee comes forward with evidence of

objective indicia, the defendant must demonstrate that the claims were obvious in light of all the

evidence by clear and convincing evidence.  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530,

1538-39 (Fed. Cir. 1983).

### a.     Skepticism

51.     Skepticism with respect to the claimed invention is a significant consideration

because it serves to discourage researchers from pursuing that line of investigation and

development.  "The skepticism of an expert, expressed before these inventors proved him wrong,

is entitled to fair evidentiary weight." *In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir.

1988); *see also In re Rosuvastatin Calcium Patent Litig.*, 719 F. Supp. 2d 388, 407 (D. Del.

2010) ("The evidence demonstrates that there was much skepticism in the industry concerning

the safety of rosuvastatin."), *aff'd*, 703 F.3d 511 (Fed. Cir. 2012); *Genzyme Corp. v. Dr. Reddy's

Labs., Ltd.*, No. 13-1506-GMS, 2016 WL 257689, at *15 (D. Del. May 11, 2016) (crediting

inventor testimony that he encountered skepticism from colleagues), *aff'd by*, 716 F. App'x 1006

(Fed. Cir. 2017); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 537-38, 543

(D. Del. 2016) (skepticism supported nonobviousness where "[c]ompanies rejected FAAs

because the compounds had not yet 'demonstrate[d] a lack of toxicity,' did 'not appear that

potent,' and did not have a clear mechanism of action."), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

### b.    Unexpected Results

52.    The existence of unexpected results is additional objective evidence of

nonobviousness.  *See Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013)

(tests showed "combination of known elements yields more than just predictable results"); *UCB,

Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 538, 543 (D. Del. 2016) ("It was

unexpected … that lacosamide turned out to demonstrate substantial anticonvulsant activity

without high toxicity values."), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018); *Millennium Pharms. v.

Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir. 2017) (district court erred in discounting

"unexpectedly superior stability, solubility, and dissolution"); *Alcon Research, Ltd. v. Watson

Labs., Inc.*, No. 15-1159-GMS, 2018 WL 1115090, at *24 (D. Del. Mar. 1, 2018) ("The POSA

would find the further reduction of redness caused by 0.7% olopatadine to be surprising and

unexpected.").  "In order to demonstrate 'unexpected results,' a patentee must show that the 'the

claimed invention exhibits some superior property or advantage that a person of ordinary skill in

the relevant art would have found surprising or unexpected.'"  *Merck Sharp & Dohme Pharm.,*

*SRL v. Teva Pharms. USA, Inc.*, No. CIV 07-1596 GEB DEA, 2009 WL 3153316, *52 (D.N.J.

Aug. 19, 2009) (citations omitted); *Alcon Research, Ltd. v. Watson Labs., Inc.*, No. 15-1159-

GMS, 2018 WL 1115090, at *24 (D. Del. Mar. 1, 2018) (same).

### c.   Long-Felt but Unsolved Need

53.    The existence of a long-felt but unsolved need that is met by the claimed

invention is further objective evidence of nonobviousness.  *See*, *e.g.*, *In re Cyclobenzaprine*, 676

F.3d at 1081-83 (long-felt need for a therapeutically effective, extended-release cyclobenzaprine

formulation); *Millennium Pharms. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017) (long-

felt need for a product to treat multiple myeloma); *Novartis Pharms. Corp. v. West-Ward

Pharms. Int'l Ltd*, 287 F. Supp. 3d 505, 531 (D. Del. 2017) ("long-felt need for new therapies for

the treatment of advanced PNETs after the failure of cytotoxic chemotherapy"), *aff'd* 923 F.3d

1051 (Fed. Cir. 2019); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 538, 543

(D. Del. 2016) ("While the record clearly shows that Vimpat® did not solve the problem for all

people with epilepsy, and, thus, did not fully satisfy the unmet need, it has proven effective at

controlling seizures in a segment of the population who had previously gone without relief from

other available AEDs."), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).  "Evidence of long-felt need is

'particularly probative of obviousness when it demonstrates both that a demand existed for the

patented invention, and that others tried but failed to satisfy that demand'."  *Millennium Pharms.

v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017) (citation omitted).

### d.   Failure of Others

54.    A claimed invention would not have been obvious where evidence demonstrates

the failure of others to provide a feasible solution to a longstanding problem.  *In re

Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1082-

83 (Fed. Cir. 2012) ("ALZA's failure to develop an extended-release formulation strongly

supports a nonobviousness finding"); *Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd*, 287 F. Supp. 3d 505, 531 (D. Del. 2017) (nonobviousness supported by "the failure of others to develop a treatment for advanced PNETs after the failure of cytotoxic chemotherapy"), *aff'd* 923 F.3d 1051 (Fed. Cir. 2019); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 538, 543 (D. Del. 2016) (failure of others to develop a safe and effective antiepileptic drugs supported finding of nonobviousness), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018). "Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081 (Fed. Cir. 2012). "This is particularly true when the evidence indicates that others found development of the claimed invention difficult and failed to achieve any success." *Id.; Sanofi-Aventis U.S., LLC v. Dr. Reddy's Labs., Inc.*, 933 F.3d 1367, 1380 (Fed. Cir. 2019) (affirming that "multiple groups around the world tried unsuccessfully to develop taxanes into effective therapies" "warrants significant weight in the ultimate obviousness analysis").

### e. Acquiescence/Licensing

55. Another objective indicia of nonobviousness is the acquiescence of others in the industry, generally shown through licensing the patented invention. *Impax Labs. Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372, 1381 (Fed. Cir. 2018) (crediting license that was as "at least in part attributable to the patents-in-suit"); *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed. Cir. 1997) (licenses supported nonobviousness of the invention); *Minn. Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1575 (Fed. Cir. 1992) (company's decision to take a license was "real world" evidence of nonobviousness).

### f. Copying

56. Copying by others is probative of the nonobviousness of the claimed invention. *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed. Cir. 1986) ("[C]opying the

claimed invention, rather than one within the public domain, is indicative of non-obviousness.");

*Merck Sharp & Dohme Corp. v. Hospira Inc.*, No. 14-915-RGA, 2016 WL 5872620, *10

(D. Del. July 10, 2016) ("The generic is not, however, required to copy inactive ingredients or

the methods used in a manufacturing process. … Defendant's decision to copy Plaintiff's

formulation and process 'is an indicium of nonobviousness.'") (citation omitted), *aff'd on other

grounds*, 874 F.3d 724 (Fed. Cir. 2017); *Bayer Pharma AG v. Watson Labs., Inc.*, 183

F. Supp. 3d 538, 550 (D. Del. 2016) ("The court agrees with Bayer that Watson's copying is

evidence of non-obviousness in this case."), *rev'd on other grounds*, 874 F.3d 1316, 1328 (Fed.

Cir. 2017) ("Bayer's evidence of copying…weigh in favor of the nonobviousness of the claimed

combination."); *Merck Sharp & Dohme Pharm., SRL v. Teva Pharms. USA, Inc.*, No. CIV 07-

1596, 2009 WL 3153316, at *53 (D.N.J. Aug. 19, 2009) (relying on proposed package insert as

evidence of copying).

### g.    Teaching Away

57.    Whether the prior art teaches away from the claimed invention may also serve as

objective evidence of nonobviousness. *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361,

1379-80 (Fed. Cir. 2000) (district court erred in holding that the prior art did not teach away

from the claimed invention), *cert. denied*, 532 U.S. 974 (2001); *In re Sullivan*, 498 F.3d 1345,

1351 (Fed. Cir. 2007) (evidence that the prior art teaches away for the claimed invention may

rebut a prima facie case of obviousness); *see also Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678

F.3d 1280, 1293-1296 (Fed. Cir. 2012) (prior art taught away from asserted lead compounds

because of known side effects or poor antipsychotic activity); *Daiichi Sankyo Co., Ltd. v. Matrix

Labs., Ltd.*, 619 F.3d 1346, 1353 (Fed. Cir. 2010) (prior art taught away from asserted lead

compounds because other prior art compounds "demonstrated greater potency and all had been

more thoroughly studied"); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 541-42

(D. Del. 2016) (prior art taught away from asserted lead compound because "literature at the time relating to AED [antiepileptic drug] development does not even acknowledge FAAs [functionalized amino acids]"), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

### h.   Praise/Industry Recognition

58.   "Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made." *Genzyme Corp. v. Dr. Reddy's Labs., Ltd.*, No. 13-1506-GMS, 2016 WL 2757689, at *15 (D. Del. May 11, 2016) (citation omitted), *aff'd by*, 716 F. App'x 1006 (Fed. Cir. 2017); *see id.*, at *15 ("the Plaintiffs have established that Mozobil® received widespread praise in the US and Europe and this weighs in favor of nonobviousness"); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 539, 543 (D. Del. 2016) ("While other AEDs have also received praise this does not undermine the fact that lacosamide has received a considerable amount of praise— something that would have been considerably less likely to have occurred had lacosamide been obvious."), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018).

59.   Defendants cannot prove that any of the asserted claims of the Patents-in-Suit are *prima facie* obvious.

60.   Objective indicia of nonobviousness support the validity of the asserted claims of the Patents-In-Suit.

61.   Defendants cannot prove by clear and convincing evidence that any of the asserted claims of the Patents-in-Suit are invalid as obvious.

62.   The asserted claims of the Patents-in-Suit are not invalid under 35 U.S.C. § 103.

### C.      Written Description

63.      Whether Defendants have proven by clear and convincing evidence that one or more of the asserted claims of the Patents-in-Suit are invalid under 35 U.S.C. § 112 for lack of written description.  The applicable law is set forth as follows:

64.      Pursuant to 35 U.S.C. § 112, ¶ 1, "[t]he specification shall contain a written description of the invention ...."  *See also Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1307 (Fed. Cir. 2015).

65.      Whether a claim is supported by sufficient written description is a question of fact.  *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1308 (Fed. Cir. 2015); *Alcon Research Ltd. v. Barr Labs., Inc*., 745 F.3d 1180, 1190 (Fed. Cir. 2014).  And, because a patent is presumed valid, the challenger bears the burden of proving lack of adequate written description by clear and convincing evidence.  *Alcon Research Ltd. v. Barr Labs., Inc*., 745 F.3d 1180, 1188 (Fed. Cir. 2014).

66.      For adequate written description there must be sufficient disclosure in the specification to show that the inventor possessed the invention at the time of the original filing. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003).  The written description requirement is assessed from the viewpoint of a POSA.  *Id.*  The patent disclosure must "allow one skilled in the art to visualize or recognize the identity of the subject matter purportedly described."  *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1308 (Fed. Cir. 2015); *Alcon Research Ltd. v. Barr Labs., Inc*., 745 F.3d 1180, 1190 (Fed. Cir. 2014) (same).

67.      A patent "need not provide *in haec verba* support for the claimed subject matter at issue" to satisfy the written description requirement.  *Lampi Corp. v. Am. Power Prods, Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) (citation omitted); *Cordis Corp. v. Medtronic AVE, Inc.,* 339 F.3d 1352, 1365 (Fed. Cir. 2003) (same).  Rather, the written description requirement is satisfied

if the disclosure in the application relied upon reasonably conveys to those skilled in the art that

the inventor had possession of the claimed subject matter as of the filing date. *Allergan, Inc. v.*

*Sandoz Inc.*, 796 F.3d 1293, 1308 (Fed. Cir. 2015); *Alcon Research Ltd. v. Barr Labs., Inc.*, 745

F.3d 1180, 1190-91 (Fed. Cir. 2014).

68.     The written description requirement does not demand "either examples or an

actual reduction to practice"; a constructive reduction to practice that in a definite way identifies

the claimed invention can satisfy the written description requirement. *Allergan, Inc. v. Sandoz*

*Inc.*, 796 F.3d 1293, 1308 (Fed. Cir. 2015) (citation omitted); *Alcon Research Ltd. v. Barr Labs.,*

*Inc.*, 745 F.3d 1180, 1190-92 (Fed. Cir. 2014); *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357,

1366-67 (Fed. Cir. 2006).

69.     The level of detail required to satisfy the written description requirement depends,

in large part, on the nature of the claims and the complexity of the technology. *Capon v. Eshhar*,

418 F.3d 1349, 1357 (Fed. Cir. 2005) ("The descriptive text needed to meet these requirements

varies with the nature and scope of the invention at issue, and with the scientific and technologic

knowledge already in existence.").  To evaluate the adequacy of the written disclosure, courts

look to "a variety of factors, such as the existing knowledge in the particular field, the extent and

content of the prior art, the maturity of the science or technology, the predictability of the aspect

at issue, and other considerations appropriate to the subject matter." *Capon v. Eshhar*, 418 F.3d

1349, 1359 (Fed. Cir. 2005).

70.     "A patent claim is not necessarily invalid for lack of written description just

because it is broader than the specific examples disclosed." *Lochner Techs., LLC v. Vizio, Inc.,*

567 F. App'x 931, 939 (Fed. Cir. 2014) (citation omitted); *Capon v. Eshhar*, 418 F.3d 1349, 1359

(Fed. Cir. 2005) ("It is not necessary that every permutation within a generally operable

invention be effective in order for an inventor to obtain a generic claim, provided that the effect is sufficiently demonstrated to characterize a generic invention."); *Cordis Corp. v. Medtronic AVE, Inc.,* 339 F.3d 1352, 1365 (Fed. Cir. 2003) (patentee cannot be required to disclose every possible embodiment).

71.     Defendants cannot prove by clear and convincing evidence that the asserted claims of the Patents-in-Suit are invalid for lack of written description.

72.     The asserted claims of the Patents-in-Suit have adequate written description.

73.     The asserted claims of the Patents-in-Suit are not invalid under 35 U.S.C. § 112 for lack of written description.

### D.     Enablement

74.     Whether Defendants have proven by clear and convincing evidence that one or more of the asserted claims of the Patents-in-Suit are invalid under 35 U.S.C. § 112 for lack of enablement.  The applicable law is set forth as follows:

75.     Whether a claim satisfies the enablement requirement is a question of law based on underlying questions of fact.  *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1309 (Fed. Cir. 2015); *Alcon Research Ltd. v. Barr Labs., Inc*., 745 F.3d 1180, 1188 (Fed. Cir. 2014).

76.     Because a patent is presumed to be enabled, the challenger bears the burden of proving lack of enablement by clear and convincing evidence.  *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013); *Alcon Research Ltd. v. Barr Labs., Inc*., 745 F.3d 1180, 1188 (Fed. Cir. 2014).

77.     To be enabling, the patent specification must teach those skilled in the art how to make and use the full scope of the claimed invention without "undue experimentation." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013).  The specification need not "explain every detail" because the patent "is speaking to those skilled in the art."

*DeGeorge v. Bernier*, 768 F.2d 1318, 1323 (Fed. Cir. 1985) (citation omitted), *abrogation on other grounds* recognized by *Kubota v. Shibuya*, 999 F.2d 517 (Fed. Cir. 1993).  Thus, "[a] patent need not teach, and preferably omits, what is well known in the art."  *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2006) (citation omitted).  Otherwise, "patent specifications would turn into production specifications, which they were never intended to be."  *DeGeorge v. Bernier*, 768 F.2d 1318, 1323 (Fed. Cir. 1985) (citation omitted).

78.     In assessing whether "undue experimentation" is required, "[t]he key word is 'undue', not [']experimentation.'"  *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1336-37 (Fed. Cir. 2005) (quoting *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988)).  "[A] reasonable amount of routine experimentation required to practice a claimed invention does not violate the enablement requirement."  *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013).  That experimentation may have been difficult or time consuming does not require a conclusion that such experimentation is "undue."  *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2006) (affirming enablement where "great expenditures of time and money were ordinary in the field"); *Cephalon*, 707 F.3d at 1338 ("[E]xtensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques.")

79.     Factors that may be considered when determining whether the required experimentation is undue include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

80.     However, "a patent does not need to guarantee that the invention works for a claim to be enabled." *Alcon Research Ltd. v. Barr Labs., Inc*., 745 F.3d 1180, 1189 (Fed. Cir. 2014); *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1310 (Fed. Cir. 2015) (same).  "Nor is it 'a requirement of patentability that an inventor correctly set forth, or even know, how or why the invention works.'"  *Alcon Research Ltd. v. Barr Labs., Inc*., 745 F.3d 1180, 1190 (Fed. Cir. 2014) (citation omitted).  Even if some claimed embodiments may be inoperable, the claims are not necessarily invalid for lack of enablement.  *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576-77 (Fed. Cir. 1984) (claims were enabled even though they encompassed inoperable embodiments).

81.     Defendants cannot prove by clear and convincing evidence that the asserted claims of the Patents-in-Suit are invalid for lack of enablement.

82.     The asserted claims of the Patents-in-Suit are enabled.

83.     The asserted claims of the Patents-in-Suit are not invalid under 35 U.S.C. § 112 for lack of enablement.

## III.     REMEDIES

84.     Pursuant to 35 U.S.C. § 271(e)(4) "[f]or an act of infringement described in paragraph (2) — (A) the court shall order the effective date of any approval of the drug … involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed."  35 U.S.C. § 271(e)(4)(A).

85.     Pursuant to § 271(e)(4) "[f]or an act of infringement described in paragraph (2) — … (B) injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug …."  35 U.S.C. § 271(e)(4)(B).

## IV.   **EXCEPTIONAL CASE**

86.    Whether Plaintiffs have proven by a preponderance of the evidence that this is an exceptional case and that Plaintiffs are entitled to attorneys' fees, and whether Defendants have proven by a preponderance of the evidence that this is an exceptional case and that Defendants are entitled to attorneys' fees.  The applicable law is set forth as follows:

87.    35 U.S.C. § 271(e)(4) provides that "a court may award attorney fees under section 285."  35 U.S.C. § 285 authorizes a district court to award attorneys' fees to the prevailing party in patent litigation in "exceptional cases."

88.    Patent litigants bear the burden of establishing exceptional case claims by a preponderance of the evidence, not clear and convincing evidence.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557 (2014).

89.    As the Supreme Court has explained, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  The Court instructed district courts to determine whether a case is "exceptional" in "the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Id*. at 554.  A party's unreasonable conduct need not be independently sanctionable to justify an award of fees, it need only be "exceptional."  *Id.* at 555.  A case may sufficiently set itself apart to warrant a fee award by presenting either subjective bad faith or exceptionally meritless defenses.  *Id*. at 555.

90.    "[T]he Hatch-Waxman Act authorizes an award of attorney fees to a prevailing party in exceptional cases on the basis of an ANDA filing."  *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346 (Fed. Cir. 2000); *see also* 35 U.S.C. § 271(e)(4).  "The

31

Act also permits an award of attorney fees for infringement by an ANDA filing" … and "does

not limit an award for attorney fees … to cases involving infringing commercial sales."

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346 (Fed. Cir. 2000)

(citing 35 U.S.C. § 271(e)(4)).  The Federal Circuit has also recognized "many varieties of

misconduct that make a case exceptional for a fee award" including willful infringement,

offensive litigation tactics, vexatious or unjustified litigation, or frivolous filings.  *Yamanouchi*

*Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346-47 (Fed. Cir. 2000) (citations

omitted).

      91.     The Hatch-Waxman Act "imposes a duty of care on an ANDA certifier."  *Takeda*

*Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1387-88 (Fed. Cir. 2008) (quoting

Y*amanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1347 (Fed. Cir. 2000)).

Thus, "cases that arise from the filing of an ANDA may become exceptional for the purposes of

Section 285 'if the ANDA filer makes baseless certifications.'"  *Takeda Chem. Indus., Ltd. v.*

*Mylan Labs., Inc.*, 459 F. Supp. 2d 227, 232 (S.D.N.Y. 2006) (quoting *Yamanouchi Pharm. Co.*

*v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1347 (Fed. Cir. 2000)), *subsequent determination*,

Nos. 03 CIV. 8253, 04 CIV. 1966, 2007 WL 840368 (S.D.N.Y. Mar. 21, 2007) ("*Takeda II*"),

*aff'd*, 549 F.3d 1381 (Fed. Cir. 2008) ("*Takeda III*").  "A baseless certification includes the

failure 'to present even a *prima facie* case of invalidity in filing [the] paragraph IV certification.'"

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 459 F. Supp. 2d 227, 232 (S.D.N.Y. 2006)

(citation omitted).  An exceptional case finding is warranted when the alleged infringer has

pursued meritless and fruitless arguments in its Paragraph IV certification with the FDA and in

litigation.  *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1347-48 (Fed.

Cir. 2000) ("Danbury's case for obviousness presented at trial contained glaring weaknesses …

When Danbury proceeded in the face of these weaknesses, its certification amounted to baseless and unjustified misconduct."); *Takeda III*, 549 F.3d 1381, 1387-89 (Fed. Cir. 2008) (upholding exceptional case finding in light of defendant's "'utter failure' to account for the identification of compound b as the lead compound as required under structural obviousness law"); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 459 F. Supp. 2d 227, 232 (S.D.N.Y. 2006) ("Filing a baseless Paragraph IV certification and proceeding to challenge a patent's validity despite glaring weaknesses in the theory of invalidity constitute litigation misconduct.")

92.     Plaintiffs have proven by a preponderance of the evidence that this is an exceptional case and, therefore, Plaintiffs should be awarded attorney fees.

93.     Defendants have failed to prove by a preponderance of the evidence that this is an exceptional case, and Defendants should not be awarded attorney fees.

# EXHIBIT 5

**EXHIBIT 5 TO THE JOINT PRETRIAL ORDER**

**DEFENDANTS' STATEMENT OF ISSUES OF LAW REMAINING TO BE LITIGATED**

The main issues and points of law Defendants intend to prove at trial are set forth below.

By setting forth specific information herein, Defendants do not intend to waive their right to prove

information not specifically set forth herein. This statement is not intended to be exhaustive and,

in addition to what is set out herein, Defendants may prove any matters identified in their

pleadings, in their interrogatory responses, or in the opening reports, rebuttal reports, reply reports,

or depositions of their expert witnesses.

To the extent that Defendants' statement of issues of fact set forth in Exhibit 3 contain

issues of law, those issues are incorporated herein by reference. Should the Court determine that

any issue identified in this Exhibit as an issue of law is more appropriately considered an issue of

fact, it should be treated as an issue of fact as if listed by Defendants in Exhibit 3.

Defendants' identification of the issues of law that remain to be litigated is based, in part,

on their understanding of the arguments that Plaintiffs Allergan Sales LLC and Allergan USA, Inc.

(collectively, "Allergan"), Forest Laboratories Holdings, LTD. ("Forest"), and Ironwood

Pharmaceuticals, Inc. ("Ironwood") (collectively, "Plaintiffs") are likely to make in attempting to

respond to Defendants' invalidity case and to establish infringement, based upon the pleadings and

discovery in the action to date. To the extent that Plaintiffs intend or attempt to introduce different

or additional legal arguments, Defendants reserve their right to contest those legal arguments, and

to present any and all rebuttal evidence in response to those arguments, and will not be bound by

this summary of issues of law to be litigated. Defendants further reserve the right to amend or

revise these issues in view of any amendments or revisions of Plaintiffs' statements of issues of

fact and/or law remaining to be litigated.

I.      **INVALIDITY**

A.      **Issues**

1.      Whether claims 3 and 6 of the '727 patent; claims 2, 9, 33, 37, 39, 43, and 44 of the '036 patent; claims 2, 4, and 14 of the '947 patent; claims 1 and 2 of the '526 patent; claims 1, 16, 17, 20, and 21 of the '628 patent; and claims 1, 2, 7, and 8 of the '573 patent are invalid under 35 U.S.C. § 103.

2.      Whether claims 3 and 6 of the '727 patent, claims 2, 9, 33, 37, 39, 43, and 44 of the '036 patent, and claims 2, 4, and 14 of the '947 patent are invalid under 35 U.S.C. § 112 for lack of a written description.

3.      Whether claims 33, 37, 39, 43, and 44 of the '036 patent are invalid under 35 U.S.C. § 112 for lack of enablement.

B.      **Applicable Law**

4.      Every issued patent claim is presumed valid. 35 U.S.C. § 282. A patent challenger bears the burden of proving its invalidity contentions by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

1.      **Obviousness**

a.      **Standard**

5.      The determination of obviousness under § 103(a) is a question of law based on underlying facts. *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1346 (Fed. Cir. 2009).

b.      **General Principles**

6.      "Section 103(a) forbids issuance of a patent 'when the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in

2

the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

7.      The obviousness analysis requires that "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *KSR*, 550 U.S. at 406 (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

8.      Secondary considerations, or objective indicia, such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *KSR*, 550 U.S. at 406 (quoting *Graham*, 383 U.S. at 17-18).

9.      To determine whether a claimed invention would have been obvious, "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *KSR*, 550 U.S. at 417.

10.     A determination that a claimed invention would have been obvious "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418.

11.     An obvious combination is no more than the "predictable use of prior art elements according to their established functions." *KSR*, 550 U.S. at 417.

12.     Where there are "a finite number of identified, predictable solutions" and "a person of ordinary skill has good reason to pursue the known options within his or her technical grasp," those solutions would have been obvious. *KSR*, 550 U.S. at 421.

### c.      Person of Ordinary Skill in the Art

13.     "The person of ordinary skill in the art is a hypothetical person who is presumed to

3

be aware of all the pertinent prior art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986). The person of ordinary skill in the art ("POSA") "is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

14.     "While it may be easier to prove obviousness if each limitation of the claimed invention is found in the prior art, the level of skill of one of ordinary skill in the art can, at times, fill in the gap when limitations of the claimed invention are not specifically found in the prior art." *Belden Techs., Inc. v. Superior Essex Commc'ns LP*, 802 F. Supp. 2d 555, 563 (D. Del. 2011).

### d.     Motivation to Combine Prior Art

15.     The Supreme Court has held that the Federal Circuit's requirement for some teaching, suggestion, or motivation in the art to combine references forming the basis for an obviousness contention was too rigid and propounded an "expansive and flexible approach" based on the principles laid down in *Graham. KSR*, 550 U.S. at 415; s*ee also Senju Pharm. Co. Ltd. v. Apotex Inc.*, 836 F. Supp. 2d 196, 208 (D. Del. 2011) ("The Supreme Court has emphasized the need for courts to value 'common sense' over 'rigid preventative rules.'").

16.     "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416.

17.     As long as a person of ordinary skill in the art would have been motivated to combine references by the prior art taken as a whole, it is not necessary that the references be combined for the same reasons contemplated by the inventor. *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006). The obviousness analysis is not limited to the problem that the patentee was trying to solve but "[u]nder the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420.

18.     Rather than focus on the "particular motivation" or the "avowed purpose" of the

patentee, what matters to a proper obviousness analysis is "the objective reach of the claim." *KSR*, 550 U.S. at 419. Simply put, "[i]f the claim extends to what is obvious, it is invalid under § 103." *Id.*

19.     "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claim." *KSR*, 550 U.S. at 419-20; *see also Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1324-26 (Fed. Cir. 2012) (affirming invalidity of claims under § 103 where the claimed invention solved known problems by the use of an obvious solution). Even more, the discovery of a problem does not always result in a patentable invention. *Norgren*, 699 F.3d at 1327. For instance, an alleged invention would have been obvious in view of "evidence of known problems and an obvious solution." *Id.*

20.     "When the prior art provides the means of making the invention and predicts the results, and the patentee merely verifies the expectation through 'routine testing,' the claims are obvious." *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 642 F. Supp. 2d 329, 368 (D. Del. 2009) (citing *Pfizer*, 480 F.3d at 1367).

21.     The fact that a reference was previously considered by the PTO merely goes to the weight of that reference's evidence and does not increase the burden of proof or preclude a finding of invalidity. *See Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259-60 (Fed. Cir. 2012); *Surface Tech., Inc. v. U.S.I.T.C.*, 801 F.2d 1336, 1340-41 (Fed. Cir. 1986). A finding of invalidity may be appropriate where the reference was considered by the PTO, but the Examiner failed to give proper consideration to the teachings of that reference. *See Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1366 (Fed. Cir. 2007).

22.     In fact, "[w]hether a reference was previously considered by the PTO, the burden

of proof is the same: clear and convincing evidence." *Sciele Pharma*, 684 F.3d at 1260 (citing *Microsoft.*, 131 S. Ct. at 2245-46). "The burden does not suddenly change to something higher— 'extremely clear and convincing evidence' or 'crystal clear and convincing evidence'—simply because the prior art references were considered by the PTO." *Id.* at 1260. "In short, there is no heightened or added burden that applies to invalidity defenses that are based upon references that were before the Patent Office." *Id.* Further, inherency may supply a missing claim limitation in an obviousness analysis. *Par Pharm., Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014), *vacated and remanded*, 120 F. Supp. 3d 468, 475 (D. Md. 2015) (finding that defendant proved by clear and convincing evidence that particular limitations were inherent in the prior art, and thus the asserted claims were invalid as obvious).

### e.       Reasonable Expectation of Success

23.      In general, a claim is invalid for obviousness if "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention," and "would have had a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).

24.      "While the definition of 'reasonable expectation' is somewhat vague, [Federal Circuit] case law makes clear that it does not require a certainty of success." *Medichem, SA v. Rolabo, SL*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). "Obviousness does not require absolute predictability of success," but rather, "[a]ll that is required is a reasonable expectation of success" in making the invention. *Id.*; *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Obviousness does not require absolute predictability. Only a reasonable expectation that the beneficial result will be achieved is necessary to show obviousness."). Thus, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364.

### f.      Lead Compound Analysis

25.      Whether a new chemical compound would have been prima facie obvious over prior art involves two steps evaluating: 1) whether a chemist of ordinary skill would have selected the prior art compound as a lead compound for development, and 2) whether the prior art would have provided a motivation to modify the lead compound to make the claimed compound with a reasonable expectation of success. *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1291-92 (Fed. Cir. 2012).

26.      The lead compound is the "compound in the prior art that would be most promising to modify in order to improve upon its . . . activity and obtain a compound with better activity." *Otsuka*, 678 F.3d at 1291.  Further, "[a]s such, a lead compound is 'a natural choice for further development efforts.'" *Id.*; *see also Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1008 (Fed. Cir. 2009).

27.      Determining whether a chemist would have selected a compound as the lead compound "is guided by evidence of the compound's pertinent properties," including activity and potency, toxicity, and other relevant characteristics. *Otsuka*, 678 F.3d at 1292. The party contesting the validity of the patent must do more than establish the existence of a lead compound in the prior art; it must establish with "clear and convincing evidence" that the compound in question would have been selected by a POSA for experimentation. *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1377 (Fed. Cir. 2006); *see also Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) ("[A] prima facie case of obviousness for a chemical compound still, in general, begins with the reasoned identification of a lead compound."); *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) ("[I]n cases involving new chemical compounds, it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new

7

claimed compound.").

28.     "While the lead compound analysis must, in keeping with *KSR*, not rigidly focus on the selection of a single, best lead compound . . . the analysis still requires the challenger to demonstrate by clear and convincing evidence that one of ordinary skill in the art would have had a reason to select a proposed lead compound or compounds over other compounds in the prior art." *Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1354 (Fed. Cir. 2010),

29.     The motivation to modify the lead compound "may come from any number of sources and need not necessarily be explicit in the prior art." *Otsuka*, 678 F.3d at 1292. The "pertinent properties guide the analysis" in this step as well. *Id.*; *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007) ("The 'reason or motivation' need not be an explicit teaching that the claimed compound will have a particular utility; it is sufficient to show that the claimed and prior art compounds possess a 'sufficiently close relationship . . . to create an expectation,' in light of the totality of the prior art, that the new compound will have 'similar properties' to the old.") (quoting *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990)); *see also KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

### g.     Claimed Ranges

30.     "[W]here there is a range disclosed in the prior art, and the claimed invention falls within that range, there is a presumption of obviousness." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004).

31.     "Where a variable is known to affect a particular desirable result, i.e., is what has been called a 'result-effective' variable, the 'overlap itself provides sufficient motivation to optimize the ranges,' and 'it is not inventive to discover the optimum or workable ranges by routine

experimentation,' because the desire to improve results would motivate skilled artisans to experiment with, and improve upon, known conditions in the prior art." *In re Haase*, 542 F. App'x 962, 967 (Fed. Cir. 2013) (citing *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012)). "[R]anges that are not especially broad invite routine experimentation to discover optimum values, rather than require nonobvious invention." *In re Peterson*, 315 F.3d 1325, 1330 n.1 (Fed. Cir. 2003).

### h.    The Inventor's Path Is Not Relevant

32.    None of "the length, expense, [or] difficulty of the techniques used are dispositive since many techniques that require extensive time, money, and effort to carry out may nevertheless be arguably 'routine' to one of ordinary skill in the art." *Pfizer*, 480 F.3d at 1367.

33.    A "claim to a product does not become nonobvious simply because the patent specification provides a more comprehensive explication of the known relationships between the variables and the affected properties." *In re Applied Materials*, 692 F.3d at 1297.

34.    "[T]he path that leads an inventor to the invention is expressly made irrelevant to patentability by statute." *Life Techs., Inc. v. Clontech Lab., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000); *see also Std. Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) ("[O]ne should not go about determining obviousness under § 103 by inquiring into what patentees . . . would have known or would likely have done"). The inquiry into whether prior art teachings would have rendered the claimed invention obvious to one of ordinary skill in the art, is, as a matter of law, "independent of the motivations that led the inventors to the claimed invention." *Life Techs.*, 224 F.3d at 1325.

###### i.       Secondary Considerations[1]

35.       The Court also considers in its obviousness analysis secondary considerations of non-obviousness that may bear on the issue of whether the claimed invention would have been obvious. *KSR*, 550 U.S. at 406.

36.       For secondary considerations to be relevant, there must be a nexus between the secondary considerations and the claimed invention. *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006) ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success."). The patentee bears the burden of demonstrating "a legally and factually sufficient connection." *In re Paulson*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).  If such a connection is not shown, the evidence is not entitled to weight. *Id.*

37.       Secondary considerations cannot override a strong prima facie showing of nonobviousness. *See, e.g., Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1334 (Fed. Cir. 2013) ("Where a claimed invention represents no more than the predictable use of prior art elements according to established functions . . . , evidence of secondary indicia are frequently deemed inadequate to establish non–obviousness."); S*tone Strong, LLC v. Del Zotto Prods. of Fla.*, 455 F. App'x 964, 971 (Fed. Cir. 2011) ("Where the inventions represent no more than the predictable use of prior art elements according to their established functions, the secondary considerations are inadequate to establish nonobviousness as a matter of law." (internal quotation

---

[1] Defendants do not concede that evidence of secondary considerations is appropriate, relevant, and/or admissible in view of Plaintiffs' failure to disclose their purported evidence of "objective indicia" of nonobviousness during fact and expert discovery, and as set forth in but not limited to Defendants' Motion *In Limine* to Limit Plaintiffs' Assertion of Secondary Considerations of Nonobviousness and in Defendants' objections to Plaintiffs' list of exhibits they intend to offer at trial.

marks omitted)); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("[O]bjective evidence of nonobviousness simply cannot overcome . . . a strong prima facie case of obviousness.").

### i.     Skepticism

38.     Where the record "does not express any direct skepticism concerning the feasibility" of the invention, the "assertion that there was secondary indicia of skepticism that rendered the invention of the asserted claims nonobvious is supported only by evidence that is irrelevant and not supportive." *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1352 (Fed. Cir. 2010); *see also Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1274–75 (Fed. Cir. 2004) (where the record actually "does not show that [the industry] doubted that [the claimed invention] would work," the evidence of "skepticism of experts [i]s weak").

39.     Substantiating a claim of skepticism of experts often requires a showing of technical infeasibility or manufacturing uncertainty—not economic considerations or other companies' preferences. *See Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013 (Fed. Cir. 1983) ("[T]hat the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevented their combination."): *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008) ("[M]arket-force skepticism also lacks the requisite nexus to the claimed invention."); *AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 980 (Fed. Cir. 2013) ("evidence of corporate prudence" is not "industry skepticism.").

### ii.     Unexpected Results

40.     To be considered as evidence of nonobviousness, "unexpected results must be established by factual evidence." *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984). "Mere

11

argument or conclusory statements" by the patentee "do[] not suffice." *Id.*

41.     "To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill at the time of the invention." *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014) (citations omitted); *see also Koa Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006) ("[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art."); *accord In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991) (same). Moreover, "in order to properly evaluate whether a superior property was unexpected, the court should . . . consider[] what properties were expected." *Pfizer*, 480 F.3d at 1371.

42.     When a patentee attempts to rely on the unexpected benefits of a claimed invention, the patentee must "show that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected." *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997). "The outcome of optimizing a result-effective variable may still be patentable if the claimed ranges are 'critical' and 'produce a new and unexpected result which is different in kind and not merely in degree from the results of the prior art.'" *In re Applied Materials*, 692 F.3d at 1297 (citing *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955); *see also Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 13623 (Fed. Cir. 2012) (holding synergies created by combination of agents known to the prior art must be "beyond the degree that was already predictable based on the prior art.").

43.     As with other secondary considerations, even where a claimed invention "exhibits unexpectedly superior results," "this secondary consideration does not overcome [a] strong

showing of obviousness." *Pfizer*, 480 F.3d at 1372. Where "the record establishes such a strong case of obviousness," any "alleged unexpectedly superior results are ultimately insufficient." *Id.* In particular, "evidence of superior [results] does nothing to undercut the showing that there was a reasonable expectation of success . . ., even if the level of success may have turned out to be somewhat greater than would have been expected." *Hoffmann-La Roche, Inc. v. Apotex, Inc.*, 748 F.3d 1326, 1334 (Fed. Cir. 2014).

### iii.      Failure of Others

44.     When asserted as a secondary consideration of nonobviousness, "[t]he purpose of evidence of failure of others is to show 'indirectly the presence of a significant defect in the prior art, while serving as simulated laboratory test of the obviousness of the solution to a skilled artisan.'" *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012) (quoting *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578–79 (Fed. Cir. 1991)). Failure of others is "inherently limited to events pre-dating issuance of the patent." *Eisai Co., Ltd. v. Teva Pharm. USA, Inc.*, 247 F.R.D. 440, 444 (D.N.J. 2007).

45.     "[A]n unsolved problem is not evidence of non-obviousness unless skilled workers in the art have tried and failed to solve the problem." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000). Actual evidence of failure of others must be shown, as "the mere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

46.     Additionally, failure of others requires that the prior attempts failed because they lacked the claimed features. *See Ormco*, 463 F.3d at 1313 ("[T]he evidence does not suggest that these prior attempts failed because [they] lacked the claimed features.").

### iv.      Long-Felt but Unmet Need

47.     To show the existence of a long-felt but unmet need, the patent owner must show

recognition of a problem in the relevant field for a considerable time, that the claimed invention solved the problem, and that the solution was not dependent on unrelated advances in the field. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009).

48.     When asserted as a secondary consideration of nonobviousness, analysis of a long-felt but unmet need begins at the time that an identified problem is articulated and ends at the time of filing of the claimed invention. *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993) ("Long-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem."); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009) ("[W]e look to the filing date of the challenged invention to assess the presence of a long-felt and unmet need."). It is not enough for a patentee to identify drawbacks; the patentee must "show that these drawbacks constituted a long-felt unmet need alleviated by the patent." *Perfect Web*, 587 F.3d at 1332; *In re Gardner*, 449 F. App'x 914, 918 (Fed. Cir. 2011) ("[O]nce a long-felt need is established, evidence must show that the claimed invention satisfied that need." (citing *In re Cavanagh*, 436 F.2d 491, 496 (C.C.P.A. 1971))). Bare assertions that a claimed invention made improvements without supporting data are not sufficient to show that the claimed invention met any long-felt need. *Perfect Web*, 587 F.3d at 1333. Thus, an assertion of long-felt need must be rejected where the patentee "provided no evidence to explain how long [any relevant] need was felt . . . when the problem first arose," or how the "need [was] alleviated by the patent." *Id.* at 1332.

49.     Even if there is evidence that the "claimed [invention] may have been beneficial," that evidence is not probative if "others had previously solved the long-felt need." *In re PepperBall Techs., Inc.*, 469 F. App'x 878, 882 (Fed. Cir. 2012); *see also Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988) ("once another supplied the key element, there was no long-

14

felt need").

50. Furthermore, evidence of long-felt need may be discounted in certain circumstances: where there is no actual and present need, but rather a need that has yet to be realized; where the long-felt need is part of a niche market; or where the differences between the prior art and the claimed invention are minimal. *Tokyo Keiso Co. v. SMC Corp.*, 307 F. App'x 446, 453 (Fed. Cir. 2009) (Evidence of "long-felt need" is not probative in "a niche market," where "it is not surprising that it took a few years for a company to expand on the prior art."); *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010) ("Where the differences between the prior art and the claimed invention are . . . minimal," "it cannot be said that any long-felt need was unsolved.").

### v.     Copying

51. When a patentee relies on evidence of copying as evidence of non-obviousness, "just as with the commercial success analysis, a nexus between the copying and the novel aspects of the claimed invention must exist for evidence of copying to be given significant weight in an obviousness analysis." *Wm. Wrigley Jr. Co.*, 683 F.3d at 1364 (citing *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (quotation marks omitted)).

52. "[E]vidence of copying [the reference listed drug preparations] in the ANDA context is not probative of nonobviousness because a showing of bioequivalence is required for FDA approval." *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013). In the ANDA context, courts have held that even if copying is established, this is not compelling evidence of nonobviousness. *See, e.g., Allergan, Inc. v. Watson Labs., Inc.-Florida*, 869 F. Supp. 2d 456, 485 (D. Del.), *aff'd*, 470 F. App'x 903 (Fed. Cir. 2012) ("as several courts have recognized, demonstration that a defendant has copied a patent invention is not compelling evidence of non-obviousness in the Hatch-Waxman context due to the unique nature of the ANDA

process."); *Santarus, Inc. v. Par Pharm., Inc.*, 720 F. Supp. 2d 427, 458 (D. Del. 2010) ("[a]s several courts have noted, however, a showing of copying is not compelling evidence of non-obviousness in Hatch-Waxman cases due to the nature of the ANDA process . . .. Thus, even assuming Par's conduct in reverse engineering Zegerid amounted to 'copying' of the patents-in-suit, such conduct is not persuasive objective evidence of nonobviousness."); *Purdue Pharma Prods. L.P.*, 642 F. Supp. 2d at 373 ("a showing of copying, which Plaintiffs have provided here [], is not compelling evidence of non-obviousness in the Hatch-Waxman context.").

### vi.      Praise

53.     To support a finding of nonobviousness, "[i]ndustry praise must . . . be linked to the patented invention." *Geo. M. Martin*, 618 F.3d at 1305; *see also Paulsen*, 30 F.3d at 1482 (evidence of praise, while impressive, was not relevant to the claims and was thus entitled to no weight); *Gardner*, 449 F. App'x at 918 (evidence of praise was "properly rejected" where patentee did not establish[] the requisite nexus"). A patentee must show that any industry praise is "attributable to . . . material difference[s] between [the prior art] and the patented invention." *Asyst*, 544 F.3d at 1316.

54.     "[S]elf-referential commendation fall[s] well short of demonstrating true industry praise." *Bayer*, 713 F.3d at 1377.

55.     Furthermore, industry praise of what was clearly rendered obvious by published references is not a persuasive secondary consideration." *Id.*

56.     A statement intended to generate interest in a product also is not evidence of industry praise. *Richardson-Vicks*, 122 F.3d at 1484 n.3 ("This advertisement, according to RVI, represents 'industry acclaim' of the patented invention that constituted 'strong objective evidence of nonobviousness.' We fail to appreciate the significance of this statement which is intended to generate interest in the product, not prove its superiority.").

16

### vii.      Teaching Away

57.      A reference may be said to teach away "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Gator Tail, LLC v. Mud Buddy, LLC.*, 618 F. App'x 992, 998-99 (Fed. Cir. 2015) (quoting *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)).  Absent evidence that the prior art "invariably" led to a different path, the prior art does not teach away.  *See Par Pharm.*, 773 F.3d at 1199.

58.      "A reference does not teach away . . . if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed."  *Gator Tail*, 618 F. App'x at 999 (quoting *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009).  Similarly, "[a] teaching that a composition may be optimal or standard does not criticize, discredit, or otherwise discourage investigation into other compositions." *Galderma Labs*., 737 F.3d at 739.  Absent evidence that the prior art "invariably" led to a different path, the prior art does not teach away. *See Par Pharm.*, 773 F.3d at 1199.

59.      A statement that a particular combination or use is not a preferred embodiment does not teach away absent clear discouragement of that combination or use. *Galderma Labs.*, 737 F.3d at 739; *Syntex*, 407 F.3d at 1380 ("A statement that a particular combination is not a preferred embodiment does not teach away absent clear discouragement of that combination." (citation omitted)).

60.      A reference that is silent as to whether an embodiment will work cannot be said to teach away from that embodiment. *See, e.g., Syntex*, 407 F.3d at 1383 (finding district court erred "because a prior art reference that does not specifically refer to one element of a combination does not, per se, teach away. If it did, only references that anticipate could be used to support an

obviousness analysis [but that is not the law].").

### viii.        Licensing

61.      If a patentee attempts to rely on licensing to show the nonobviousness of the inventions, such licensing agreements "must be carefully appraised as to [their] evidentiary value." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 908 (Fed. Cir. 1985).  This is because there are many legitimate reasons to take a license which are completely unrelated to the nonobviousness of the patented subject matter, i.e., a license may simply be mutually beneficial to the parties involved, it may be cheaper to take a license than to defend infringement suits, or any number of other business reasons.  *Id.* at 907–08.

62.      The patentee bears the burden of proving that a nexus exists between the claimed features of the invention and the license taken out by the patentee's competitors, which, for reasons noted above, courts frequently find have not been met. *See, e.g., Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983); *In re GPAC*, 57 F.3d at 1580; *EWP Corp.*, 755 F.2d at 908.

### j.        Obviousness of the Asserted Claims

63.      The asserted claims of the '727 patent are invalid pursuant to 35 U.S.C. § 103 because they would have been obvious to a person of ordinary skill in the art as of January 28, 2003, in view of the prior art.

64.      The asserted claims of the '036 patent are invalid pursuant to 35 U.S.C. § 103 because they would have been obvious to a person of ordinary skill in the art as of January 28, 2003, in view of the prior art.

65.      The asserted claims of the '947 patent are invalid pursuant to 35 U.S.C. § 103 because they would have been obvious to a person of ordinary skill in the art as of January 28, 2003, in view of the prior art.

66.      The asserted claims of the '526 patent are invalid pursuant to 35 U.S.C. § 103

because they would have been obvious to a person of ordinary skill in the art as of January 28, 2003, in view of the prior art.

67.     The asserted claims of the '628 patent are invalid pursuant to 35 U.S.C. § 103 because they would have been obvious to a person of ordinary skill in the art as of August 15, 2008, in view of the prior art.

68.     The asserted claims of the '573 patent are invalid pursuant to 35 U.S.C. § 103 because they would have been obvious to a person of ordinary skill in the art as of August 6, 2009, in view of the prior art.

### 2.     Written Description and Enablement

69.     A patent's specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112, ¶ 1. The first paragraph of § 112 contains two separate requirements: a "written description" and "enablement" requirement. *See Ariad Pharm., Inc., v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

### a.     Written Description

70.     Whether a specification satisfies the written description requirement is a question of fact. *Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019).

71.     "To fulfill the written description requirement, a patent owner must convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrate that by disclosure in the specification of the patent." *Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1162-63 (Fed. Cir. 2019) (quotation marks and citations omitted).The "purpose of the written description requirement is to

ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Ariad*, 598 F.3d at 1354; *see also Nuvo*, 923 F.3d at 1382 ("The essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe his or her invention so that the public will know what it is that he or she has truly made the claimed invention."). Thus, "[t]he policy behind the written description requirement is to prevent overreaching and post hoc claims that were not part of the original invention." *Purdue Pharma L.P. v. F.H. Faulding & Co.*, 48 F. Supp. 2d 420, 427 (Fed. Cir. 1999); *see also Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed. Cir. 2009) ("[T]he purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not . . . .").

72.     The written description requirement only rewards actual inventions—not "a mere wish or plan for obtaining the claimed invention." *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1381 (Fed. Cir. 1997). Indeed, a "patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion." *Univ. of Rochester*, 358 F.3d at 929-30 & n.10 (affirming summary judgment of invalidity for lack of written description where the specification did "not provide any guidance that would steer the skilled practitioner toward compounds that can be used to carry out the claimed methods."). Even if a POSA may have known how to test all the possible variants disclosed in a specification to find the claimed invention, this is not enough: the question is not "whether one of ordinary skill in the art presented with [the application] would have been enabled to take those final steps, but whether [the application] discloses the variants to him, specifically, as something [the inventor] actually invented." *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1350 (Fed. Cir. 2013).

73.     "[T]he hallmark of written description is disclosure," and "the test requires an objective inquiry into the four corners of the specification" to determine whether it "show[s] that the inventor actually invented the invention claimed." *Ariad*, 598 F.3d at 1351; *Idenix*, 941 F.3d at 1162-63. Whether the specification of the patent-in-suit adequately describes the claimed invention for purposes of § 112, is "determined by the text and examples of the specification and their meaning to those skilled in the art." *Purdue Pharma*, 48 F. Supp. 2d at 432. The written description requirement is satisfied only if the inventor "convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrate[s] that by disclosure in the specification of the patent." *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011). In other words, the patent specification must show "that the inventor actually invented the invention claimed." *Id.* For "claims added during prosecution," they too "must find support sufficient to satisfy § 112 in the written description of the original priority application." *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1344 (2013).

74.     The Federal Circuit has expressly rejected the argument that the written description requirement is "necessarily met as a matter of law because the claim language appears *ipsis verbis* in the specification." *Nuvo*, 923 F.3d at 1380 (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 960 (Fed. Cir. 2002)). Indeed, "mere indistinct words" in a specification do not necessarily satisfy § 112 where their disclosure does not put others on notice of the scope of the claimed invention and demonstrate possession of the invention. *Nuvo*, 923 F.3d at 1380. Instead, the disclosure in the specification of the patent-in-suit must show "that the inventor actually invented the invention claimed." *Ariad*, 598 F.3d at 1351. This requires some description establishing that the inventor was in possession of the . . . claimed invention, including all of the

21

elements and limitations. *Nuvo*, 923 F.3d at 1380-81.

75.     A written description supported by "[w]orking backward from a knowledge of [the claims] . . . hindsight" is impermissible. *Novozymes*, 723 F.3d at 1349. A patent claim must be assessed "as an integrated whole rather than as a collection of independent limitations." *Id.* Such a claim is invalid for inadequate written description when the specification fails to disclose any "species that falls within the claims or . . . any 'blaze marks' that would lead an ordinarily skilled investigator toward such a species among a slew of competing possibilities." *Id.*; *Idenix*, 941 F.3d at 1162-63. Indeed, if an inventor possessed the claimed invention at the time of filing, one would expect the specifically claimed invention to be disclosed. *See Novozymes*, 723 F.3d at 1344 ("[I]f [patentee] had possessed a working variant substituent at position 239 [as claimed], it surely would have disclosed that substitution instead of, or at least along with, the nonfunctional S239W substitution in the several pages of [the applications] devoted to listing exemplary substitutions.").

76.     The written description requirement is not met where a specification provides broad disclosures, with no guidance to the specific claimed invention. *Purdue Pharma*, 48 F. Supp. 2d at 1326-27 ("[O]ne cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention. In order to satisfy the written description requirement, the blaze marks directing the skilled artisan to that tree must be in the originally filed disclosure."). "[A] 'laundry list' disclosure of every possible moiety for every possible position [does not] constitute a written description of every species in the genus . . . because such a disclosure would not reasonably lead those skilled in the art to any particular species." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1571 (Fed. Cir. 1996); *see also Biogen MA Inc. v. Forward Pharma A/S*, Interference No. 106,023 at 24 (P.T.A.B. Mar. 31, 2017) ("The picking and choosing necessary for one skilled in the art from [inventor's] generically described subject matter to arrive

22

at the invention would, at best, render the claimed subject matter obvious. It does not show possession of the specific treatment claimed.").

77. "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351. "While the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997). "It is not sufficient for purposes of the written description requirement of § 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose." *Id.*; *Idenix*, 941 F.3d at 1165. Ultimately, "the specification itself . . . must demonstrate possession." *Novozymes*, 723 F.3d at 1352.

78. The Federal Circuit has "repeatedly stated that actual 'possession' or reduction to practice outside of the specification is not enough." *Ariad*, 598 F.3d at 1352; *see also Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1309 (Fed. Cir. 2015) (holding it was error to rely on clinical protocol not disclosed in the specification to show possession "even if it shows that the inventors had invented the claimed invention before the time of filing" because the "written description requirement requires possession *as shown in the specification*, not as shown by prior experimental work." (emphasis in original)).

79. Descriptions "which render[] obvious a claimed invention [are] not sufficient to satisfy the written description requirement of that invention." *Regents of Univ. of Cal.*, 119 F.3d at 1567 (citations omitted); *Ariad*, 598 F.3d at 1352 ("[A] description that merely renders the invention obvious does not satisfy the requirement."). The written description requirement is not

met for "subject matter which is not disclosed, but would be obvious over what is expressly disclosed." *Lockwood*, 107 F.3d at 1571-72. "One shows that one is 'in possession' of the invention by describing the invention, with all its claimed limitations, not that which makes it obvious." *Id.* at 1572.

80.    "A written description of an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula, [or] chemical name' of the claimed subject matter sufficient to distinguish it from other materials." *Idenix*, 941 F.3d at 1164 (quoting *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1363 (Fed. Cir. 2011) (quoting *Regents of the Univ. of Cal.*, 119 F.3d at 1568 (Fed. Cir. 1997))). Lists or examples of supposedly effective compounds must explain what "makes them effective," otherwise "a POSA is deprived of any meaningful guidance into what compounds beyond the examples and formulas, if any, would provide the same result." *Id.*  "In the absence of that guidance, the listed examples and formulas cannot provide adequate written description support." *Id.* "The written description requirement specifically defends against such attempts to cover any compound later actually invented and determined to fall within the claim's functional boundaries." *Id.* (quotation marks omitted). If a specification does not identify the specific compound in dispute, "a POSA would not visualize or recognize the members of the genus as including [the specified compound], and the specification could not demonstrate to a POSA that the inventor had possession of that embodiment at the time of filing." *Id.* at 1165.

81.    The asserted claims of the '036 patent, the asserted claims of the '727 patent, and the asserted claims of the '947 patent are invalid pursuant to 35 U.S.C. § 112 because the patents' specifications do not demonstrate or convey with reasonable clarity to those skilled in the art that, as of the filing date sought, the inventors were in possession of the invention.  For example, the

24

claims do not specify the disulfide bonds that provide the peptide with its molecular formation. Indeed, a person of ordinary skill in the art would understand that the asserted claims encompass peptides having three disulfide bonds, two disulfide bonds, one disulfide bond, no disulfide bonds, and variations having alternative covalent cross-links, without identifying the disulfide bonds that provide the peptide with its molecular formation.  However, the specifications do not demonstrate or convey that the inventors were in possession of the full scope of the invention as claimed.

### b.     Enablement

82.     "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (2010) (quoting *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)); *see also Idenix*, 941 F.3d at 1160 ("An enabling disclosure 'must be commensurate in scope with the claim.'"); *Id.* at 1162 (enablement "considers the scope of the claim as written, not just the subset of the claim that a POSA might practice.") This is "determined as of the effective filing date of the patent's application." *ALZA Corp.*, 603 F.3d at 940; *see also Idenix*, 941 F.3d at 1154; *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1323 (2009). Whether undue experimentation would have been required to make and use the invention, and thus whether a disclosure is enabling under § 112 is a question of law based on underlying factual inquiries. *ALZA*, 603 F.3d at 940. Courts "analyze the presence of working examples and the amount of guidance presented in the specification together." *Idenix*, 941 F.3d at 1161 ("Where . . . working examples are present but are 'very narrow, despite the wide breadth of the claims at issue,' this factor weighs against enablement.").

83.     "[P]atent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable . . . . Tossing out the mere germ of an idea does not constitute enabling disclosure." *In re '318 Patent*, 583 F.3d at 1324,

1327 (citations omitted) (affirming patent insufficiently enabled where "the specification, even read in the light of the knowledge of those skilled in the art, does no more than state a hypothesis and propose testing to determine the accuracy of that hypothesis."); *see also Idenix*, 941 F.3d at 1161. "Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable." *Genentech*, 108 F.3d at 1366 (holding patent claiming method of expressing a DNA encoding a conjugate protein through cleavable fusion expression invalid for lack of enablement where "specification [did] not describe a specific material to be cleaved or any reaction conditions under which cleavable fusion expression would work"). "If mere plausibility were the test for enablement under section 112, applicants could obtain patent rights to 'inventions' consisting of little more than respectable guesses as to the likelihood of their success. When one of the guesses later proved true, the 'inventor' would be rewarded the spoils instead of the party who demonstrated that the method actually worked. That scenario is not consistent with the statutory requirement that the inventor enable an invention rather than merely proposing an unproved hypothesis." *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1325 (Fed. Cir. 2005).

84.    In *In re Wands*, the Federal Circuit set forth the following factors that a court may consider when determining if a disclosure requires undue experimentation:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

858 F.2d 731, 737 (Fed. Cir. 1988).

85.    "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *In re*

26

*Wands*, 858 F.2d at 737.

86.     "[W]hen there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out, undue experimentation is required; there is a failure to meet the enablement requirement that cannot be rectified by asserting that all the disclosure related to the process is within the skill of the art. It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Genentech*, 108 F.3d at 1336; *see also Idenix*, 941 F.3d at 1159-60 (quoting *id.*). In such instances, "the "specification provides only a starting point, a direction for further research." *Genentech.*, 108 F.3d at 1336.

87.     The Federal Circuit has "repeatedly stated[] the rule that a specification need not disclose what is well known in the art is merely a rule of supplementation, not a substitute for basic enabling disclosure." *ALZA*, 603 F.3d at 940-41 (internal quotations omitted) (stating patentee "cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification."); *Idenix*, 941 F.3d at 1161  ("A patent owner is 'required to provide an enabling disclosure in the specification; it cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification.'"). Furthermore, "where there is no indication that one skilled in the art would accept without question statements as to the effects of the claimed drug products and no evidence has been presented to demonstrate that the claimed products do have those effects, an applicant has failed to demonstrate sufficient utility and therefore cannot establish enablement." *Rasmusson*, 413 F.3d at 1323 (affirming PTAB's finding applications insufficiently enabled method of treatment claims where a POSA had no basis to believe a compound treated prostate cancer as of filing date and specification failed to provide any data to demonstrate the effects of the compound for such

treatment).

88.    Where a POSA "would have been required to engage in an iterative, trial-and-error process to practice the claimed invention even with the help of the . . . specification," the invention is not sufficiently enabled. *Wyeth & Cordis Corp. v. Abbott Labs*, 720 F.3d 1380, 1386 (Fed. Cir. 2013) (affirming summary judgment of invalidity for non-enablement where evaluating claimed candidate compounds would "take technicians weeks to complete" and where "specification offer[ed] no guidance or predictions about particular substitutions that might preserve" claimed method of treatment); *see also Idenix*, 941 F.3d at 1156-61 (holding that where a patent specification disclosed a compound for the treatment of the hepatitis c virus and "many thousands" of configurations as principal embodiments, the testing of embodiments for the proverbial "needle in a  haystack" alone required enough experimentation to "weigh in favor of non-enablement."). This is the case even if the experimentation required is considered "routine." *Idenix*, 941 F.3d at 1162-63 (holding the where the specification discloses thousands of embodiments "many of which would require synthesis and each of which would require screening . . . [it] constitutes undue experimentation.").

89.    Claims 33, 27, 39, 43, and 44 of the '036 patent are invalid pursuant to 35 U.S.C. § 112 because they do not teach a person of ordinary skill how to make and use the full scope of the claimed inventions without undue experimentation.

## II.    EQUITABLE RELIEF

### A.    Issue

90.    Whether Plaintiffs are entitled to a permanent injunction.

### B.    Applicable Law

91.    A patent holder seeking entitlement to a permanent injunction must satisfy four factors before the Court may grant such equitable relief. *eBay Inc. v. MercExchange, L.L.C.*, 547

U.S. 388, 391 (2006). The patent holder must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id*.

92.     Because the Patents-in-Suit are invalid, Plaintiffs are not entitled to an injunction.

# EXHIBIT 6

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Joint Trial Exhibit List**

Confidential

| Joint Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. |
|---|---|---|---|---|---|
| JTX-001 | Certified U.S. Patent No. 7,304,036 (Currie et al.) | 12/4/2007 | LINZ_0000001 | LINZ_0000078 | Barnett Exhibit 3<br>Chang Exhibit 9<br>Chien Exhibit 6<br>Currie Exhibit 4<br>Kent Exhibit 5<br>Mahajan-Miklos Exhibit 2 |
| JTX-002 | Certified U.S. Patent No. 8,080,526 (Currie et al.) | 12/20/2011 | LINZ_0005222 | LINZ_0005285 | Barnett Exhibit 7<br>Chang Exhibit 12<br>Chien Exhibit 10<br>Currie Exhibit 8<br>Kent Exhibit 8<br>Mahajan-Miklos Exhibit 4 |
| JTX-003 | Certified U.S. Patent No. 7,371,727 (Currie et al.) | 5/13/2008 | LINZ_0001847 | LINZ_0001953 | Barnett Exhibit 5<br>Chang Exhibit 10<br>Chien Exhibit 7<br>Currie Exhibit 5<br>Fretzen Exhibit 26<br>Kent Exhibit 6<br>Mahajan-Miklos Exhibit 6 |
| JTX-004 | Certified U.S. Patent No. 7,704,947 (Currie et al.) | 4/27/2010 | LINZ_0003475 | LINZ_0003541 | Barnett Exhibit 6<br>Chang Exhibit 11<br>Chien Exhibit 8<br>Currie Exhibit 6<br>Giannella Exhibit 3<br>Kent Exhibit 7<br>Mahajan-Miklos Exhibit 7 |
| JTX-005 | Certified U.S. Patent No. 8,748,573 (Fretzen et al.) | 6/10/2014 | LINZ_0007300 | LINZ_0007359 | Block Exhibit 4<br>Chien Exhibit 12<br>Fretzen Exhibit 4<br>Gupta Exhibit 9<br>Klibanov Exhibit 11<br>Zhao Exhibit 3 |
| JTX-006 | Certified U.S. Patent No. 8,802,628 (Fretzen et al.) | 8/12/2014 | LINZ_0169794 | LINZ_0169819 | Block Exhibit 5<br>Gupta Exhibit 10 |
| JTX-007 | U.S. Patent No. 5,130,298 (Cini et al.) | 7/14/1992 | DEFS-LINA-00000932 | DEFS-LINA-00000937 | Block Exhibit 11<br>Gupta Exhibit 29 |
| JTX-008 | U.S. Patent No. 5,489,670 (Currie et al.) | 2/6/1996 | DEFS-LINA-00000035 | DEFS-LINA-00000043 | Barnett Exhibit 23<br>Barrett Exhibit 15<br>Currie Exhibit 25<br>DeGrado Exhibit 10<br>Giannella Exhibit 7 |
| JTX-009 | U.S. Patent No. 5,654,278 (Sørensen) | 8/5/1997 | DEFS-LINA-00000808 | DEFS-LINA-00000812 | Block Exhibit 12 |
| JTX-010 | U.S. Patent No. 6,022,858 (Sørensen et al.) | 2/8/2000 | DEFS-LINA-00001036 | DEFS-LINA-00001040 | Gupta Exhibit 28 |
| JTX-011 | U.S. Patent Application Publication No. 2008/0124326 A1 (Rehder et al.) | 5/29/2008 | DEFS-LINA-00000994 | DEFS-LINA-00001035 | Gupta Exhibit 30 |
| JTX-012 | International Publication No. WO 2002/26248 A1 (Marra) | 4/4/2002 | DEFS-LINA-00000938 | DEFS-LINA-00000993 | Gupta Exhibit 32 |
| JTX-013 | European Patent 0943336 A1 (Yanagawa) | 9/22/1999 | DEFS-LINA-00000813 | DEFS-LINA-00000829 | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Joint Trial Exhibit List**

Confidential

| Joint Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. |
|---|---|---|---|---|---|
| JTX-014 | Camilleri, M., "Review article: tegaserod," *Ailment Pharmacol. Ther.* , Vol. 15, pp. 277-289 | 1/1/2001 | DEFS-LINA-00002684 | DEFS-LINA-00002696 | DeGrado Exhibit 5 |
| JTX-015 | Capelle, M., et al., "High Throughput Screening of Protein Formulation Stability: Practical Considerations," *Eur. J. Pharm. Biopharm* ., Vol. 65, pp. 131-148 (2007) | 9/29/2006 | DEFS-LINA-00002383 | DEFS-LINA-00002400 | Block Exhibit 16<br>Gupta Exhibit 15 |
| JTX-016 | Chen, B., et al., "Influence of Calcium Ions on the Structure and Stability of Recombinant Human Deoxyribonuclease I in the Aqueous Lyophilized States," *Journal of Pharmaceutical Sciences* , Vol. 88, No. 4, pp. 477-482 (1999) | 4/1/1999 | DEFS-LINA-00001059 | DEFS-LINA-00001064 | Gupta Exhibit 31 |
| JTX-017 | Gliński, J., et al., "Surface properties of aqueous solutions of L-leucine," *Biophysical Chemistry* , Vol. 84, pp. 99-103 | 1/1/2000 | DEFS-LINA-00004939 | DEFS-LINA-00004943 | Gupta Exhibit 24 |
| JTX-018 | Hirayama, T., "Heat-Stable Enterotoxin of *Escherichia coli,* " *Bacterial Toxins and Virulence Factors in Disease [Handbook of Natural Toxins]* , Vol. 8, pp. 281-296 | 1/1/1995 | DEFS-LINA-00000421 | DEFS-LINA-00000438 | Block Exhibit 9<br>Currie Exhibit 20<br>Gupta Exhibit 21<br>Kent Exhibit 30 |
| JTX-019 | Sato, T., et al., "Structural Characteristics for Biological Activity of Heat-Stable Enterotoxin Produced by Enterotoxigenic *Escherichia coli* : X-ray Crystallography of Weakly Toxic and Nontoxic Analogs," *Biochemistry* , Vol. 33, No. 29, pp. 8641-8650 (1994) | 1/1/1994 | DEFS-LINA-00000669 | DEFS-LINA-00000679 | DeGrado Exhibit 17<br>Gupta Exhibit 23<br>Kent Exhibit 31<br>Klibanov Exhibit 17 |
| JTX-020 | Wolfe, H., Waldman, S., "A Comparative Molecular Field Analysis (COMFA) of the Structural Determinants of Heat-Stable Enterotoxins Mediating Activation of Guanylyl Cyclase C," *Journal of Medicinal Chemistry* , Vol. 45, No. 8 | 1/1/2002 | DEFS-LINA-00000781 | DEFS-LINA-00000784 | Currie Exhibit 22<br>Giannella Exhibit 4<br>Kent Exhibit 27<br>Wolfe Exhibit 6 |

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN SALES, LLC, FOREST              )
LABORATORIES HOLDINGS, LTD.,             )
ALLERGAN USA, INC., and IRONWOOD         )
PHARMACEUTICALS, INC.                    )
                                         )
                 Plaintiffs,             )     C.A. No. 16-1114 (RGA)
                                         )     Consolidated
         v.                              )
                                         )
TEVA PHARMACEUTICALS USA, INC.           )
and SANDOZ INC.                          )
                                         )
                 Defendants.             )
                                         )

**PRETRIAL ORDER EXHIBIT 7: PLAINTIFFS' EXHIBIT LIST**

Pursuant to D. Del. LR 16.3(c)(6), Plaintiffs Allergan Sales, LLC, Forest Laboratories Holdings, Ltd., Allergan USA, Inc., (collectively, "Allergan") and Ironwood Pharmaceuticals, Inc. ("Ironwood") (Allergan and Ironwood, collectively, "Plaintiffs") identify exhibits that Plaintiffs may use at trial.  This exhibit list is not a commitment that Plaintiffs will use any particular exhibit at trial.

The listing of a document on a Plaintiffs' exhibit list, including any alleged prior art references relied upon by Defendants, is not an admission that such document is relevant or otherwise admissible when offered by Defendants.  Nothing herein shall be construed as a stipulation or admission that any document is entitled to any weight in deciding the merits of this case.  Plaintiffs' description of a document on its exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the listed document or any other listed document.

Plaintiffs reserve the right to use any exhibit that is listed on Defendants' exhibit list, to the same effect as though it were listed on its own exhibit list, subject to all evidentiary objections.  Plaintiffs reserve the right to use as an exhibit any alleged prior art reference relied upon by Defendants or cited within the expert reports of Plaintiffs' expert witnesses.  Plaintiffs reserve the right to amend this list to add or remove exhibits in response to any issues or conflicts that arise, for example, during the exchange of information for submitting the Pretrial Order or at trial.

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0001 | MOVED TO JOINT EXHIBIT LIST AS JTX-001 | | | | | |
| 0002 | MOVED TO JOINT EXHIBIT LIST AS JTX-002 | | | | | |
| 0003 | MOVED TO JOINT EXHIBIT LIST AS JTX-003 | | | | | |
| 0004 | MOVED TO JOINT EXHIBIT LIST AS JTX-004 | | | | | |
| 0005 | MOVED TO JOINT EXHIBIT LIST AS JTX-005 | | | | | |
| 0006 | Certified U.S. Patent No. 8,802,628 (Fretzen et al.) | 8/12/2014 | LINZ_0010297 | LINZ_0010319 | Chien Exhibit 13 Fretzen Exhibit 5 Klibanov Exhibit 12 Zhao Exhibit 5 | |
| 0007 | MOVED TO JOINT EXHIBIT LIST AS JTX-006 | | | | | |
| 0008 | Certified File History for U.S. Patent No. 7,304,036 | 2/8/2017 | LINZ_0000079 | LINZ_0001846 | | R, CU, H, U |
| 0009 | Certified File History for U.S. Patent No. 8,080,526 | 2/2/2017 | LINZ_0005286 | LINZ_0006927 | | R, CU, H, U |
| 0010 | Certified File History for U.S. Patent No. 7,371,727 | 1/31/2017 | LINZ_0001954 | LINZ_0003474 | | R, CU, H, U |
| 0011 | Certified File History for U.S. Patent No. 7,704,947 | 1/31/2017 | LINZ_0003542 | LINZ_0004446 | | R, CU, H, U |
| 0012 | File History for U.S. Patent No. 7,704,947 Reexamination | 10/31/2007 | LINZ_0017345 | LINZ_0021015 | Chien Exhibit 16A & 16B | R, CU, H, U |
| 0013 | Certified File History for U.S. Patent No. 8,748,573 | 2/3/2017 | LINZ_0007360 | LINZ_0010296 | | R, CU, H, U |
| 0014 | Certified File History for U.S. Patent No. 8,802,628 | 2/3/2017 | LINZ_0010320 | LINZ_0013218 | | R, CU, H, U |
| 0015 | Certified File History for U.S. Patent No. 8,802,628 | 2/25/2019 | LINZ_0169820 | LINZ_0172735 | | R, CU, H, U |
| 0016 | Provisional Application No. 60/443,098 | 1/28/2003 | LINZ_0021016 | LINZ_0021027 | Currie Exhibit 10 | R, CU, H, U |
| 0017 | Provisional Application No. 60/471,288 | 5/16/2003 | LINZ_0021028 | LINZ_0021057 | | R, CU, H, U |
| 0018 | Certified Provisional Application No. 60/471,288 | 4/22/2004 | LINZ_0106041 | LINZ_0107079 | | R, CU, H, U |
| 0019 | Provisional Application No. 60/519,460 | 11/12/2003 | LINZ_0021058 | LINZ_0021108 | | H, R, CU, U |
| 0020 | Provisional Application No. 61/089,422 | 8/15/2008 | LINZ_0021109 | LINZ_0021191 | | H, R, CU, U |
| 0021 | Provisional Application No. 61/231,725 | 8/6/2009 | LINZ_0021192 | LINZ_0021392 | | H, R, CU, U |
| 0022 | Provisional Application No. 61/273,332 | 8/3/2009 | LINZ_0021393 | LINZ_0021488 | | H, R, CU, U |
| 0023 | Patent Assignment Abstract of Title results for Patent No. 7,304,036 | 5/15/2017 | LINZ_0017194 | LINZ_0017194 | | A, R, BE, U, CU, LC, H |
| 0024 | Patent Assignment Abstract of Title results for Patent No. 7,373,727 | 5/15/2017 | LINZ_0017195 | LINZ_0017195 | | A, R, BE, U, CU, LC, H |
| 0025 | Patent Assignment Abstract of Title results for Patent No. 7,704,947 | 5/15/2017 | LINZ_0017196 | LINZ_0017196 | | A, R, BE, U, CU, LC, H |
| 0026 | Patent Assignment Abstract of Title results for Patent No. 8,802,628 | 5/15/2017 | LINZ_0017198 | LINZ_0017199 | | A, R, BE, U, CU, LC, H |
| 0027 | Patent Assignment Abstract of Title results for Patent No. 8,748,573 | 5/15/2017 | LINZ_0017200 | LINZ_0017201 | | A, R, BE, U, CU, LC, H |
| 0028 | Patent Assignment Abstract of Title results for Patent No. 8,080,526 | 5/15/2017 | LINZ_0017202 | LINZ_0017202 | | A, BE, R, CU, H, U, LC, |
| 0029 | Certified Recordation of patent assignment for patent application 10/796,719, dated 9/16/2004 | 5/11/2017 | LINZ_0017205 | LINZ_0017208 | | CU, R |
| 0030 | Certified Recordation of patent assignment for patent application 10/899,806, dated 12/12/2004 | 5/11/2017 | LINZ_0017209 | LINZ_0017215 | | CU, R |
| 0031 | Certified Recordation of patent assignment for patent application 10/899,806, dated 11/7/2005 | 5/11/2017 | LINZ_0017216 | LINZ_0017220 | | CU, R |
| 0032 | Certified Recordation of patent assignment for patent application 10/796,719, dated 11/7/2005 | 5/11/2017 | LINZ_0017221 | LINZ_0017225 | | CU, R |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0033 | Certified Recordation of patent assignment for patent application 11/930,696, dated 4/3/2008 | 5/11/2017 | LINZ_0017226 | LINZ_0017229 | | CU, R |
| 0034 | Certified Recordation of patent assignment for patent application 11/930,696, dated 4/3/2008 | 5/11/2017 | LINZ_0017230 | LINZ_0017235 | | CU, R |
| 0035 | Certified Recordation of patent assignment for patent application 60/940,269, et al, dated 4/17/2008 | 5/11/2017 | LINZ_0017236 | LINZ_0017242 | | CU, R |
| 0036 | Certified Recordation of patent assignment for patent application 11/949,340, dated 7/10/2009 | 5/11/2017 | LINZ_0017243 | LINZ_0017253 | | CU, R |
| 0037 | Certified Recordation of patent assignment for patent application 12/541,410, dated 11/2/2009 | 5/11/2017 | LINZ_0017254 | LINZ_0017262 | | CU, R |
| 0038 | Certified Recordation of patent assignment for patent application 12/541,410, dated 11/2/2009 | 5/11/2017 | LINZ_0017263 | LINZ_0017269 | | CU, R |
| 0039 | Certified Recordation of patent assignment for patent application 12/541,410, dated 11/15/2010 | 5/11/2017 | LINZ_0017270 | LINZ_0017275 | | CU, R |
| 0040 | Certified Recordation of patent assignment for patent application 12/851,330, dated 10/26/2010 | 5/11/2017 | LINZ_0017276 | LINZ_0017288 | | CU, R |
| 0041 | Certified Recordation of patent assignment for patent application 12/851,330, dated 10/29/2010 | 5/11/2017 | LINZ_0017289 | LINZ_0017303 | | CU, R |
| 0042 | Certified Recordation of patent assignment for patent application 12/851,330, dated 11/16/2010 | 5/11/2017 | LINZ_0017304 | LINZ_0017310 | | CU, R |
| 0043 | Certified Recordation of patent assignment for patent application 12/754,138, dated 7/15/2011 | 5/11/2017 | LINZ_0017311 | LINZ_0017314 | | CU, R |
| 0044 | Certified Recordation of patent assignment for patent application 12/754,138, dated 7/15/2011 | 5/11/2017 | LINZ_0017315 | LINZ_0017319 | | CU, R |
| 0045 | Certified Recordation of patent assignment for patent application 12/788,979, dated 7/15/2011 | 5/11/2017 | LINZ_0017320 | LINZ_0017323 | | CU, R |
| 0046 | Certified Recordation of patent assignment for patent application 12/788,979, dated 7/15/2011 | 5/11/2017 | LINZ_0017324 | LINZ_0017328 | | CU, R |
| 0047 | Certified Recordation of patent assignment for patent application 12/788,979, dated 7/15/2011 | 5/11/2017 | LINZ_0017329 | LINZ_0017332 | | CU, R |
| 0048 | Certified Recordation of patent assignment for patent application 12/754,138, dated 7/15/2011 | 5/11/2017 | LINZ_0017334 | LINZ_0017338 | | CU, R |
| 0049 | Certified Recordation of patent assignment for patent application 13/579,685, dated 3/22/2013 | 5/11/2017 | LINZ_0017339 | LINZ_0017344 | | CU, R |
| 0050 | Certified Recordation of patent assignment for patent application 14/239,178, dated 11/20/2014 | 10/31/2017 | LINZ_0023578 | LINZ_0023585 | | CU, R |
| 0051 | Certified Recordation of patent assignment for patent application US2012/051289, dated 2/4/2014 | 10/31/2017 | LINZ_0023586 | LINZ_0023593 | | CU, R |
| 0052 | 290 μg Orange Book Listing | 3/8/2019 | LINZ_0172739 | LINZ_0172741 | | CU, R, U, H, F, BE |
| 0053 | 145 μg Orange Book Listing | 3/8/2019 | LINZ_0172736 | LINZ_0172738 | | CU, R, U, H, F, BE |
| 0054 | 72 μg Orange Book Listing | 3/8/2019 | LINZ_0172742 | LINZ_0172744 | | CU, R, U, H, F, BE |
| 0055 | NDA 202-811 FDA Approval Materials - Medical Review(s) | 10/4/2011 | LINZ_0022020 | LINZ_0022508 | Barnett Exhibit 37 McDuff Exhibit 6 | A, F, H, R, U, CU |
| 0056 | NDA 202-811 FDA Approval Materials - Clinical Pharmacology and Biopharmaceutics Review(s) | 10/7/2011 | LINZ_0021887 | LINZ_0021961 | | A, F, H, R, U, CU |
| 0057 | NDA 202-811 FDA Approval Materials - Officer/Employee List | 1/1/2012 | LINZ_0022548 | LINZ_0022549 | | A, F, H, R, U, CU |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0058 | NDA 202-811 FDA Approval Materials - Chemistry Review(s) | 4/2/2012 | LINZ_0021842 | LINZ_0021886 | | A, F, H, R, U, CU |
| 0059 | NDA 202-811 FDA Approval Materials - Pharmacology Review(s) | 8/1/2012 | LINZ_0022678 | LINZ_0022964 | | A, F, H, R, U, CU |
| 0060 | NDA 202-811 FDA Approval Materials - Risk Assessment and Risk Mitigation Review(s) | 8/7/2012 | LINZ_0022965 | LINZ_0022970 | Barnett Exhibit 35 McDuff Exhibit 4 | A, F, H, R, U, CU |
| 0061 | NDA 202-811 FDA Approval Materials - Propriety Name Review(s) | 8/10/2012 | LINZ_0022509 | LINZ_0022547 | | A, F, H, R, U, CU |
| 0062 | NDA 202-811 FDA Approval Materials - Administrative and Correspondence Documents | 8/14/2012 | LINZ_0021563 | LINZ_0021830 | Kurtz Exhibit 12 | A, F, H, R, U, CU |
| 0063 | NDA 202-811 FDA Approval Materials - Cross Discipline Team Leader Review | 8/15/2012 | LINZ_0021962 | LINZ_0022000 | Barnett Exhibit 36 McDuff Exhibit 5 | A, F, H, R, U, CU |
| 0064 | NDA 202-811 FDA Approval Materials - Statistical Review(s) | 8/16/2012 | LINZ_0022971 | LINZ_0023203 | | A, F, H, R, U, CU |
| 0065 | NDA 202-811 FDA Approval Materials - Other Review(s) | 8/29/2012 | LINZ_0022550 | LINZ_0022677 | | A, F, H, R, U, CU |
| 0066 | NDA 202-811 FDA Approval Materials - Summary Review | 8/29/2012 | LINZ_0023204 | LINZ_0023260 | Kurtz Exhibit 11 | A, F, H, R, U, CU |
| 0067 | NDA 202-811 FDA Approval Materials - Approval Package | 8/30/2012 | LINZ_0021831 | LINZ_0021841 | Kurtz Exhibit 2 McDuff Exhibit 2 | A, F, H, R, U, CU |
| 0068 | NDA 202-811 FDA Approval Materials - Labeling | 8/30/2012 | LINZ_0022001 | LINZ_0022019 | | A, F, H, R, U, CU |
| 0069 | NDA 202-811 Approval Letter | 8/30/2012 | IW_LINZ_00073084 | IW_LINZ_00073091 | | A, F, H, R, U, CU |
| 0070 | NDA 202-811/S-003 - Package insert for Linzess capsules 145 mcg and 290 mcg | 8/1/2013 | LINZ_0023261 | LINZ_0023277 | Kunka Exhibit 1a | A, F, H, R, U, CU |
| 0071 | NDA 202-811/S-003 - FDA Supplemental Approval Letter | 8/8/2013 | LINZ_0023278 | LINZ_0023280 | | A, F, H, R, U, CU |
| 0072 | NDA 202-811-S004 - Package insert for Linzess capsules 145 mcg and 290 mcg | 7/1/2014 | LINZ_0023281 | LINZ_0023297 | Kunka Exhibit 1a | A, F, H, R, U, CU |
| 0073 | NDA 202-811-S004 - FDA Supplemental Approval Letter | 7/9/2014 | LINZ_0023298 | LINZ_0023300 | | A, F, H, R, U, CU |
| 0074 | NDA 202-811-S009 - Package insert for Linzess capsules 145 mcg and 290 mcg | 11/1/2015 | LINZ_0023323 | LINZ_0023341 | Kunka Exhibit 1a | A, F, H, R, U, CU |
| 0075 | NDA 202-811-S009 - FDA Supplemental Approval Letter | 11/23/2015 | LINZ_0023342 | LINZ_0023344 | | A, F, H, R, U, CU |
| 0076 | NDA 202-811-S007 - Package insert for Linzess capsules 145 mcg and 290 mcg | 4/1/2016 | LINZ_0023301 | LINZ_0023319 | Kunka Exhibit 1a | A, F, H, R, U, CU |
| 0077 | NDA 202-811-S007 - FDA Supplemental Approval Letter | 4/6/2016 | LINZ_0023320 | LINZ_0023322 | | A, F, H, R, U, CU |
| 0078 | NDA 202-811-S011 - Package insert for Linzess capsules 145 mcg and 290 mcg | 8/1/2016 | LINZ_0023371 | LINZ_0023389 | Kunka Exhibit 1a | A, F, H, R, U, CU |
| 0079 | NDA 202-811-S011 - FDA Supplemental Approval Letter | 8/31/2016 | LINZ_0023390 | LINZ_0023392 | | A, F, H, R, U, CU |
| 0080 | NDA 202-811-S010 - Package insert for Linzess capsules 72 mcg, 145 mcg and 290 mcg | 1/1/2017 | LINZ_0023345 | LINZ_0023365 | | A, F, H, R, U, CU |
| 0081 | NDA 202-811-S013 - Package insert for Linzess capsules 72 mcg, 145 mcg and 290 mcg | 1/1/2017 | LINZ_0023393 | LINZ_0023413 | | A, F, H, R, U, CU |
| 0082 | NDA 202-811-S010 - FDA Supplemental Approval Letter | 1/25/2017 | LINZ_0023366 | LINZ_0023370 | | A, F, H, R, U, CU |
| 0083 | NDA 202-811-S013 - FDA Supplemental Approval Letter | 3/8/2017 | LINZ_0023414 | LINZ_0023417 | | A, F, H, R, U, CU |
| 0084 | Rebuttal Expert Report of Kim E. Barrett, Ph.D., including documents cited within | 1/17/2019 | N/A | N/A | Barrett Exhibit 1 DeGrado Exhibit 8 | F, H, CU |
| 0085 | Exhibit 2 to Barrett Rebuttal Expert Report - Materials Considered as of January 17, 2019 | 1/17/2019 | N/A | N/A | Barrett Exhibit 2 | F, H, CU |
| 0086 | Curriculum Vitae of Kim E. Barrett, Ph.D. | 11/1/2019 | LINZ_0173238 | LINZ_0173282 | | F, H, CU |
| 0087 | Rebuttal Expert Report of Lin Chang, M.D., including documents cited within | 1/17/2019 | N/A | N/A | Chang Exhibit 5 | F, H, CU, LC |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0088 | Curriculum Vitae of Lin Chang, M.D. | 11/1/2019 | LINZ_0173142 | LINZ_0173237 | | F, H, CU |
| 0089 | Exhibit 2 to Chang Rebuttal Expert Report - Materials Considered as of January 18, 2019 | 1/17/2019 | N/A | N/A | Chang Exhibit 7 | F, H, CU, LC |
| 0090 | Rebuttal Expert Report of Professor Alexander M. Klibanov, including documents cited within | 1/17/2019 | N/A | N/A | Block Exhibit 8 Klibanov Exhibit 2 | F, H, CU, LC |
| 0091 | Exhibit 2 to Klibanov Rebuttal Expert Report - Materials Considered as of January 17, 2019 | 1/17/2019 | N/A | N/A | Klibanov Exhibit 3 | F, H, LC, CU |
| 0092 | Second Rebuttal Expert Report of Professor Alexander M. Klibanov, including documents cited within | 9/20/2019 | N/A | N/A | Klibanov Exhibit 10 | F, H, CU, LC |
| 0093 | Exhibit A to Klibanov Second Rebuttal Expert Report - Materials Considered as of September 20, 2019 | 9/20/2019 | N/A | N/A | Klibanov Exhibit 10 | F, H, CU, LC |
| 0094 | Curriculum Vitae of Alexander M. Klibanov | 11/1/2019 | LINZ_0173099 | LINZ_0173141 | | F, H, CU |
| 0095 | Rebuttal Expert Report of William DeGrado, Ph.D., including documents cited within | 1/18/2019 | N/A | N/A | | F, H, CU, LC |
| 0096 | Exhibit 2 to DeGrado Rebuttal Expert Report - Materials Considered as of January 18, 2019 | 1/18/2019 | N/A | N/A | | F, H, CU, LC |
| 0097 | Curriculum Vitae of William DeGrado | 11/1/2019 | LINZ_0173283 | LINZ_0173313 | | F, H, CU |
| 0098 | Curriculum Vitae of Mark G. Currie | 00/00/0000 | IW_LIZ_00000010 | IW_LIZ_00000027 | Currie Exhibit 2 | F, H, CU |
| 0099 | Curriculum Vitae of Ralph A. Giannella, M.D. | 00/00/0000 | RG_LINZ_00000404 | RG_LINZ_00000404 | Giannella Exhibit 1 | F, H, CU |
| 0100 | Curriculum Vitae of Henry R. Wolfe, Ph.D. | 00/00/0000 | IW_LINZ_00000316 | IW_LINZ_00000325 | Wolfe Exhibit 5 | F, H, CU |
| 0101 | IND 63,290 | 00/00/0000 | IW_LINZ_IND00000001 | IW_LINZ_IND00117962 | | A, F, H, R |
| 0102 | Microbia IND Study 10008, *In Vitro* Proteolytic Stability of MD-1100 Acetate | 9/20/2004 | IW_LINZ_IND00000373 | IW_LINZ_IND00000420 | | A, R, CU, H, U, F |
| 0103 | Microbia Study No. 10014 - Effect of MD-1100 Acetate on Inflammation and Stress-Induced Colorectal Hyperalgesia to Distention in Rats | 9/20/2004 | IW_LINZ_IND00000694 | IW_LINZ_IND00000713 | | A, R, CU, H, U, F |
| 0104 | Excerpt to Final Clinical Study Report No. MCP-103-001 | 6/7/2005 | IW_LINZ_IND0005136 | IW_LINZ_IND0005141 | | I, CU, F, H, U, R, A |
| 0105 | Type-C Meeting Minutes between the Division of Gasteroenterology Products and Microbia, Inc. | 6/20/2006 | IW_LINZ_IND00009257 | IW_LINZ_IND00009258 | | H, R, F, A, CU, U |
| 0106 | Microbia Meeting Minutes for Type-C Meeting with FDA | 10/27/2005 | IW_LINZ_IND00009259 | IW_LINZ_IND00009265 | | H, R, F, A, CU, U |
| 0107 | Microbia/FDA Meeting Minutes: Type-C Meeting (9/25/2006) | 10/4/2006 | IW_LINZ_IND00010110 | IW_LINZ_IND00010120 | | H, R, F, A, CU, U |
| 0108 | Type-C Meeting Briefing Document - Section 6 Synopsis | 11/20/2006 | IW_LINZ_IND00010365 | IW_LINZ_IND00010370 | | I, H, R, F, A, CU, U |
| 0109 | Type-C Meeting Briefing Document - Section 7 NC Studies | 11/20/2006 | IW_LINZ_IND00010371 | IW_LINZ_IND00010399 | | I, H, R, F, A, CU, U |
| 0110 | Letter from R. Justice (FDA) to W. Begley (Microbia) re: Pre-IND Question 3 | 6/24/2004 | IW_LINZ_IND00018793 | IW_LINZ_IND00018798 | | R, U, F, H, CU |
| 0111 | Microbia/FDA Meeting Minutes: Type-C Meeting (1/11/2007) | 1/22/2007 | IW_LINZ_IND00018799 | IW_LINZ_IND00018826 | | R, U, F, H, CU |
| 0112 | Microbia/FDA Meeting Minutes: Type-C Meeting (4/19/2007) | 5/2/2007 | IW_LINZ_IND00024010 | IW_LINZ_IND00024027 | | R, U, F, H, CU |
| 0113 | Ironwood/FDA Meeting Minutes: Type-B EOP2 Meeting (5/15/2008) | 6/9/2008 | IW_LINZ_IND00029461 | IW_LINZ_IND00029487 | | R, U, F, H, CU |
| 0114 | Letter from S. Lieber (Ironwood) to D. Griebel (FDA) re: IND 63,290 linaclotide/MD-1100, Serial No. 0234, General Correspondence: Sponsor Meeting Minutes for Pediatric Type C Meeting | 5/19/2010 | IW_LINZ_IND00049821 | IW_LINZ_IND00049839 | Kunka Exhibit 7 | R, CU, U, H, A, F |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0115 | Ironwood Pharmaceuticals, Inc. Nonclinical Study Report No. MDP-103-056-IAR-01 | 12/15/2009 | IW_LINZ_IND00050909 | IW_LINZ_IND00050930 | | R, CU, U, H, A, F |
| 0116 | Ironwood Pharmaceuticals, Inc. Final Study Report No. MCP-103-005 CSR Synopsis | 2/18/2011 | IW_LINZ_IND00064157 | IW_LINZ_IND00064161 | | R, CU, U, H, A, F |
| 0117 | Ironwood/FDA Meeting Minutes: Type-B EOP2 Meeting (8/7/2008) | 8/7/2008 | IW_LINZ_IND00065083 | IW_LINZ_IND00065094 | | R, CU, U, H, A, F |
| 0118 | Meeting minutes, FDA Type A Meeting: linaclotide IBS-C | 10/15/2008 | IW_LINZ_IND00065095 | IW_LINZ_IND00065105 | Kunka Exhibit 11 | R, CU, U, H, A, F |
| 0119 | Meeting Minutes - Linaclotide EOP2 CMC meeting (FDA) | 11/6/2008 | IW_LINZ_IND00065106 | IW_LINZ_IND00065115 | | R, CU, U, H, A, F |
| 0120 | Meeting Minutes for FDA Type C Meeting (1/20/2011) | 1/20/2011 | IW_LINZ_IND00065127 | IW_LINZ_IND00065132 | | R, CU, U, H, A, F |
| 0121 | Meeting Minutes for FDA Type B Meeting; linaclotide Pre-NDA (3/22/2011) | 3/22/2011 | IW_LINZ_IND00065133 | IW_LINZ_IND00065144 | | R, CU, U, H, A, F |
| 0122 | Final Clinical Study Report - Protocol No. MCP-103-001, Volume 1 | 6/7/2005 | IW_LINZ_IND00005135 | IW_LINZ_IND00005509 | | R, CU, U, H, A, F |
| 0123 | Final Clinical Study Report - Protocol No. MCP-103-001, Volume 2 | 6/7/2005 | IW_LINZ_IND00005512 | IW_LINZ_IND00005869 | | R, CU, U, H, A, F |
| 0124 | Ironwood Pharmaceuticals, Inc. Final Study Report No. MCP-103-002-CSR-02 -Amendment No. 1 | 9/16/2005 | IW_LINZ_IND00007837 | IW_LINZ_IND00007840 | | R, CU, U, H, A, F |
| 0125 | Microbia, Inc. Final Clinical Study Report No. MDP-103-041 | 10/11/2006 | IW_LINZ_IND00018689 | IW_LINZ_IND00018719 | | R, CU, U, H, A, F |
| 0126 | Forest Research Institute Study Report No. PRD-RPT-EXP-00031 | 00/00/0000 | IW_LINZ_IND00028590 | IW_LINZ_IND00028607 | | R, CU, U, H, A, F |
| 0127 | Ironwood Pharmaceuticals, Inc. Study Report No. MNP-103-066-IAR-01 | 7/1/2009 | IW_LINZ_IND00050396 | IW_LINZ_IND00050429 | | R, CU, U, H, A, F |
| 0128 | Ironwood Pharmaceuticals, Inc. Final Validation Report No. MNP-103-004-MVR-01 | 8/9/2005 | IW_LINZ_IND00051841 | IW_LINZ_IND00051928 | | R, CU, U, H, A, F |
| 0129 | Ironwood Pharmaceuticals, Inc. Nonclinical Study Report No. MDP-103-056-IAR-02 | 9/16/2010 | IW_LINZ_IND00063151 | IW_LINZ_IND00063171 | | R, CU, U, H, A, F |
| 0130 | Ironwood Pharmaceuticals, Inc. Final Study Report No. MCP-103-002-CSR-02 - Synopsis | 10/7/2005 | IW_LINZ_IND00064138 | IW_LINZ_IND00064143 | | R, CU, U, H, A, F |
| 0131 | Ironwood Pharmaceuticals, Inc. Clinical Study Report No. MCP-103-103 - Synopsis | 11/2/2009 | IW_LINZ_IND00064144 | IW_LINZ_IND00064150 | | R, CU, U, H, A, F |
| 0132 | Ironwood Pharmaceuticals, Inc. Clinical Study Report No. MCP-103-201-CSR-01 - Synopsis | 8/7/2009 | IW_LINZ_IND00064162 | IW_LINZ_IND00064169 | | R, CU, U, H, A, F |
| 0133 | Ironwood Pharmaceuticals, Inc. Clinical Study Report No. MCP-103-202-CSR-01 - Synopsis | 9/22/2009 | IW_LINZ_IND00064170 | IW_LINZ_IND00064177 | | R, CU, U, H, A, F |
| 0134 | Ironwood Pharmaceuticals, Inc. Study Report No. MCP-103-303-CSR-01 - Synopsis | 2/18/2011 | IW_LINZ_IND00064201 | IW_LINZ_IND00064209 | | R, CU, U, H, A, F |
| 0135 | Ironwood Pharmaceuticals, Inc. Study Report No. LIN-MD-01 - Synopsis | 2/18/2011 | IW_LINZ_IND00064210 | IW_LINZ_IND00064218 | | R, CU, U, H, A, F |
| 0136 | Microbia, Inc. Final Report No. BAS-103-005-MRQ-02 | 2/28/2008 | IW_LINZ_IND00068503 | IW_LINZ_IND00068539 | | R, CU, U, H, A, F |
| 0137 | Ironwood Pharmaceuticals, Inc. Revised Method Validation Report No. MNP-103-043-MVR-03 | 2/2/2011 | IW_LINZ_IND00068540 | IW_LINZ_IND00068639 | | R, CU, U, H, A, F |
| 0138 | Forest Research Institute Report No. MDP-103-057-IAR-01 | 11/8/2009 | IW_LINZ_IND00068640 | IW_LINZ_IND00068655 | | R, CU, U, H, A, F |
| 0139 | Ironwood Pharmaceuticals, Inc. Final Report No. MDP-103-088-IAR-01 | 10/1/2010 | IW_LINZ_IND00068656 | IW_LINZ_IND00068704 | | R, CU, U, H, A, F |
| 0140 | Solvo Biotechnology Contract Research Report Protocol No. SOLVO-Almirall-03-30Sep2010 | 3/15/2011 | IW_LINZ_IND00068705 | IW_LINZ_IND00068760 | | R, CU, U, H, A, F |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0141 | Quotient Bioresearch Study No. AML/21 | 3/21/2011 | IW_LINZ_IND00068761 | IW_LINZ_IND00068840 | | R, CU, U, H, A, F |
| 0142 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-103 with addendum dated 5/17/2011 | 11/2/2009 | LINZ_NDA0036025 | LINZ_NDA0037677 | | R, CU, U, H, A, F |
| 0143 | Final Clinical Study Report - Protocol No. MCP-103-001 with addendum dated 5/17/2011 | 6/7/2005 | LINZ_NDA0038211 | LINZ_NDA0038944 | | R, CU, U, H, A, F |
| 0144 | Ironwood Pharmaceuticals, Inc. Final Study Report No. MCP-103-002 with addendum dated 5/17/2011 | 10/7/2005 | LINZ_NDA0038946 | LINZ_NDA0040609 | | R, CU, U, H, A, F |
| 0145 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report MCP-103-004 with addendum dated 5/17/2011 | 12/9/2008 | LINZ_NDA0083835 | LINZ_NDA0085729 | | R, CU, U, H, A, F |
| 0146 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-201, with Addendum dated, 5/17/2011, Vol. 1 | 8/7/2009 | LINZ_NDA0085732 | LINZ_NDA0088500 | | R, CU, U, H, A, F |
| 0147 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-201, with Addendum dated, 5/17/2011, Vol. 2 | 8/7/2009 | LINZ_NDA0088501 | LINZ_NDA0095271 | | R, CU, U, H, A, F |
| 0148 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-303 with Addendum dated 5/23/2011, Vol. 1 | 5/7/2010 | LINZ_NDA0095938 | LINZ_NDA0099969 | | R, CU, U, H, A, F |
| 0149 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-303 with Addendum dated 5/23/2011, Vol. 2 | 5/7/2010 | LINZ_NDA0099970 | LINZ_NDA0115230 | | R, CU, U, H, A, F |
| 0150 | Forest Research Institute, Inc. Study No. LIN-MD-31 with Addendum dated 6/1/2011, Vol. 1 | 5/10/2011 | LINZ_NDA0144444 | LINZ_NDA0148655 | | R, CU, U, H, A, F |
| 0151 | Forest Research Institute, Inc. Study No. LIN-MD-31 with Addendum dated 6/1/2011, Vol. 2 | 5/10/2011 | LINZ_NDA0148656 | LINZ_NDA0153114 | | R, CU, U, H, A, F |
| 0152 | Forest Research Institute, Inc. Study No. LIN-MD-31 with Addendum dated 6/1/2011, Vol. 3 | 5/10/2011 | LINZ_NDA0153115 | LINZ_NDA0174939 | | R, CU, U, H, A, F |
| 0153 | Ironwood Pharmaceuticals, Inc. Clinical Study Report No. MCP-103-005 Addendum | 6/22/2011 | LINZ_NDA0191751 | LINZ_NDA0192783 | | R, CU, U, H, A, F |
| 0154 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-202 with Addendum dated 5/17/2011, Vol. 1 | 9/22/2009 | LINZ_NDA0192786 | LINZ_NDA0196660 | | R, CU, U, H, A, F |
| 0155 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-202 with Addendum dated 5/17/2011, Vol. 2 | 9/22/2009 | LINZ_NDA0196661 | LINZ_NDA0210673 | | R, CU, U, H, A, F |
| 0156 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-302 with Addendum dated 6/24/2011, Vol. 1 | 6/24/2011 | LINZ_NDA0212468 | LINZ_NDA0216545 | | R, CU, U, H, A, F |
| 0157 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-302 with Addendum dated 6/24/2011, Vol. 2 | 6/24/2011 | LINZ_NDA0216546 | LINZ_NDA0230013 | | R, CU, U, H, A, F |
| 0158 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-302 with Addendum dated 6/24/2011, Vol. 3 | 6/24/2011 | LINZ_NDA0230014 | LINZ_NDA0241342 | | R, CU, U, H, A, F |
| 0159 | Forest Research Institute, Inc. Study No. LIN-MD-02, Vol. 1 | 11/5/2012 | LINZ_NDA0515719 | LINZ_NDA0522996 | | R, CU, U, H, A, F |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0160 | Forest Research Institute, Inc. Study No. LIN-MD-02, Vol. 2 | 11/5/2012 | LINZ_NDA0522997 | LINZ_NDA0548211 | | R, CU, U, H, A, F |
| 0161 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-305, Vol. 1 | 10/18/2012 | LINZ_NDA0548213 | LINZ_NDA0554566 | | R, CU, U, H, A, F |
| 0162 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-305, Vol. 2 | 10/18/2012 | LINZ_NDA0554567 | LINZ_NDA0562290 | | R, CU, U, H, A, F |
| 0163 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-305, Vol. 3 | 10/18/2012 | LINZ_NDA0562291 | LINZ_NDA0574932 | | R, CU, U, H, A, F |
| 0164 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-309, Vol. 1 | 2/10/2016 | LINZ_NDA0671162 | LINZ_NDA0674761 | | R, CU, U, H, A, F |
| 0165 | Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-309, Vol. 2 | 2/10/2016 | LINZ_NDA0674762 | LINZ_NDA0691701 | | R, CU, U, H, A, F |
| 0166 | NDA 202811 | 00/00/0000 | LINZ_NDA0000001 | LINZ_NDA0713580 | | R, CU, U, H, A, F |
| 0167 | Letter from C. Tran-Zwanetz (FDA) to S. Lieber (Ironwood) re: Meeting Preliminary Comments (IND 63,290) | 5/4/2011 | LINZ_NDA0000200 | LINZ_NDA0000203 | | R, CU, U, H, A, F |
| 0168 | Letter from S. Lieber to D. Griebel re: Original New Drug Application No. 202811, Sequence 0000 | 8/9/2011 | LINZ_NDA0000204 | LINZ_NDA0000206 | | R, CU, U, H, A, F |
| 0169 | Letter from A. Pariser (FDA) to C. Pierce (Ironwood) re: IND 63,290 | 9/3/2008 | LINZ_NDA0000301 | LINZ_NDA0000303 | | R, CU, U, H, A, F |
| 0170 | FDA Facsimile attaching 4/17/2007 Executive CAC Meeting Minutes | 4/23/2007 | LINZ_NDA0000306 | LINZ_NDA0000309 | | R, CU, U, H, A, F |
| 0171 | Letter from D. Griebel (FDA) to S. Lieber (Ironwood) re: Advice/Information Request | 5/20/2010 | LINZ_NDA0000452 | LINZ_NDA0000454 | | R, CU, U, H, A, F |
| 0172 | Letter from J. Grewal (FDA) to S. Lieber (Ironwood) re: Meeting Preliminary Comments | 5/14/2010 | LINZ_NDA0000490 | LINZ_NDA0000494 | | R, CU, U, H, A, F |
| 0173 | Ironwood Pharmaceuticals, Inc. 1.6.3 Regulatory History 145-290 mcg | 00/00/0000 | LINZ_NDA0000495 | LINZ_NDA0000499 | | R, CU, U, H, A, F |
| 0174 | Letter from S. Lieber (Ironwood) to D. Griebel (FDA) re: IND 63,290 linaclotide/MD-1100, Serial No. 0248 General Correspondence: Sponsor Response to the FDA Advice Regarding IBS-C Trials | 7/2/2010 | LINZ_NDA0000508 | LINZ_NDA0000516 | | R, CU, U, H, A, F |
| 0175 | Ironwood Pharmaceuticals, Inc. 1.3.1.4 Transfer of Clinical Obligations to CRO | 00/00/0000 | LINZ_NDA0000521 | LINZ_NDA0000522 | | R, CU, U, H, A, F |
| 0176 | Letter from FDA to Ironwood attaching Memorandum of Meeting Minutes re: Linaclotide (MD-1100 Acetate) | 11/20/2008 | LINZ_NDA0000523 | LINZ_NDA0000531 | Kurtz Exhibit 3 | R, CU, U, H, A, F |
| 0177 | Memorandum of FDA Meeting Minutes (Type C, 1/20/2011) | 2/7/2011 | LINZ_NDA0000532 | LINZ_NDA0000541 | | R, CU, U, H, A, F |
| 0178 | Memorandum of FDA Meeting Minutes (Type C, 1/26/2010) | 2/22/2010 | LINZ_NDA0000542 | LINZ_NDA0000554 | | R, CU, U, H, A, F |
| 0179 | 2.3.P Description and Composition of the Drug product (Linaclotide Capsules, 145 ug and 290 ug) | 00/00/0000 | LINZ_NDA0000597 | LINZ_NDA0000642 | Fretzen Exhibit 30 | R, CU, U, H, A, F |
| 0180 | Ironwood Pharmaceuticals, Inc. 2.3.S Quality Overall Summary | 00/00/0000 | LINZ_NDA0000643 | LINZ_NDA0000675 | | R, CU, U, H, A, F |
| 0181 | Ironwood Pharmaceuticals, Inc. 2.4 Non-Clinical Overview | 00/00/0000 | LINZ_NDA0000676 | LINZ_NDA0000709 | | R, CU, U, H, A, F |
| 0182 | Ironwood Pharmaceuticals, Inc. 2.5 Clinical Overview | 00/00/0000 | LINZ_NDA0000710 | LINZ_NDA0000768 | Kunka Exhibit 1b | R, CU, U, H, A, F |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0183 | Ironwood Pharmaceuticals, Inc. 2.6.3 Non-Clinical Pharmacology Tabulated Summary 145-290 mcg | 00/00/0000 | LINZ_NDA0000777 | LINZ_NDA0000788 | | R, CU, U, H, A, F |
| 0184 | Ironwood Pharmaceuticals, Inc. 2.6.5 Non-Clinical Pharmacokinetic Tabulated Summary 145-290 mcg | 00/00/0000 | LINZ_NDA0000867 | LINZ_NDA0000888 | | R, CU, U, H, A, F |
| 0185 | Ironwood Pharmaceuticals, Inc. 2.6.7 Non-Clinical Toxicology Tabulated Summary 145-290 mcg | 00/00/0000 | LINZ_NDA0000981 | LINZ_NDA0001085 | | R, CU, U, H, A, F |
| 0186 | Ironwood Pharmaceuticals, Inc. 2.7.1 Summary of Biopharmaceutic Studies and Associated Analytical Methods 145-290 mcg | 00/00/0000 | LINZ_NDA0001366 | LINZ_NDA0001396 | | R, CU, U, H, A, F |
| 0187 | Ironwood Pharmaceuticals, Inc. 2.7.3 Summary Clinical Efficacy, Integrated Summary of Efficacy (Module 5.3.5.3) for Irritable Bowel Syndrome with Constipation | 6/30/2011 | LINZ_NDA0001397 | LINZ_NDA0001533 | | R, CU, U, H, A, F |
| 0188 | Ironwood Pharmaceuticals, Inc. 2.7.3 Summary of Clinical Efficacy, Integrated Summary of Effectiveness for Chronic Constipation | 6/30/2011 | LINZ_NDA0001534 | LINZ_NDA0001652 | | R, CU, U, H, A, F |
| 0189 | Ironwood Pharmaceuticals, Inc. 2.7.2 Summary Clinical Pharmacology Studies 145-290 mcg | 00/00/0000 | LINZ_NDA0001653 | LINZ_NDA0001695 | | R, CU, U, H, A, F |
| 0190 | Ironwood Pharmaceuticals, Inc. 2.7.6 Synopses of Individual Clinical Studies 145-290 mcg | 5/10/2011 | LINZ_NDA0001696 | LINZ_NDA0001771 | Kunka Exhibit 1b | R, CU, U, H, A, F |
| 0191 | Ironwood Pharmaceuticals, Inc., 3.2.P.1 Description and Composition of the Drug Product (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0001772 | LINZ_NDA0001774 | | R, CU, U, H, A, F |
| 0192 | 3.2.P.2.1 Components of the Drug Product (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0001823 | LINZ_NDA0001832 | Fretzen Exhibit 20 | R, CU, U, H, A, F |
| 0193 | 3.2.P.2.2 Drug Product (Linaclotidc Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0001835 | LINZ_NDA0001880 | Fretzen Exhibit 21 | R, CU, U, H, A, F |
| 0194 | Ironwood Pharmaceuticals, Inc. Description of Manufacturing Process and Controls (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0002072 | LINZ_NDA0002080 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0195 | Ironwood Pharmaceuticals, Inc. 3.2.P.3.1 Manufacturers (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0002081 | LINZ_NDA0002083 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0196 | Certificate of Analysis for Customer No. 42138 | 11/1/2010 | LINZ_NDA0002125 | LINZ_NDA0002125 | | R, CU, U, H, A, F |
| 0197 | Ironwood Pharmaceuticals, Inc. 3.2.P.5.1 Specifications (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0002168 | LINZ_NDA0002169 | | R, CU, U, H, A, F |
| 0198 | Forest Research Institute Stability Summary Report: Linaclotide Capsules ICH Registration Stability Batches | 7/7/2011 | LINZ_NDA0002356 | LINZ_NDA0002515 | | R, CU, U, H, A, F |
| 0199 | Ironwood Pharmaceuticals, Inc. 3.2.P.8.1 Stability Summary and Conclusion (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0002516 | LINZ_NDA0002534 | | R, CU, U, H, A, F |
| 0200 | Ironwood Pharmaceuticals, Inc. 3.2.P.8.3 Stability Data (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0002535 | LINZ_NDA0002536 | | R, CU, U, H, A, F |
| 0201 | Ironwood Pharmaceuticals, Inc., 3.2.P.1 Description And Composition Of The Drug Product (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002537 | LINZ_NDA0002538 | | R, CU, U, H, A, F, I |
| 0202 | Drug Product (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002539 | LINZ_NDA0002539 | | R, CU, U, H, A, F, I |
| 0203 | Ironwood Pharmaceuticals, Inc. 3.2.P.3.2 Batch Formula (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002543 | LINZ_NDA0002543 | | R, CU, U, H, A, F |
| 0204 | Ironwood Pharmaceuticals, Inc. 3.2.P.3.3 Description of Manufacturing and Process Controls (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002545 | LINZ_NDA0002547 | Kunka Exhibit 1c | R, CU, U, H, A, F |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0205 | Ironwood Pharmaceuticals, Inc. 3.2.P.3.1 Manufacture (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002548 | LINZ_NDA0002548 | Kunka Exhibit 1c | R, CU, U, H, A, F, I |
| 0206 | Ironwood Pharmaceuticals, Inc. 3.2.P.5.1 Specifications (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002560 | LINZ_NDA0002561 | | R, CU, U, H, A, F |
| 0207 | Ironwood Pharmaceuticals, Inc. 3.2.P.8.3 Stability Data (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002578 | LINZ_NDA0002579 | | R, CU, U, H, A, F |
| 0208 | Forest Research Institute, Inc. 3.2.P.8.1 Stability Summary and Conclusion (Linaclotide Capsules, 290 ug) | 00/00/0000 | LINZ_NDA0002580 | LINZ_NDA0002596 | | R, CU, U, H, A, F |
| 0209 | Ironwood Pharmaceuticals, Inc. 3.2.S.1.3 General Properties (Linaclotide, All Manufacturers) | 00/00/0000 | LINZ_NDA0004294 | LINZ_NDA0004296 | | R, CU, U, H, A, F |
| 0210 | Ironwood Pharmaceuticals, Inc. 3.2.S.1.2 Structure (Linaclotidc, All Manufacturers) | 00/00/0000 | LINZ_NDA0004298 | LINZ_NDA0004298 | | R, CU, U, H, A, F |
| 0211 | Ironwood Pharmaceuticals, Inc. 3.2.S.2.2 Description of Manufacturing and Process Controls (Linaclotide, All Manufacturers) | 00/00/0000 | LINZ_NDA0004302 | LINZ_NDA0004304 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0212 | Ironwood Pharmaceuticals, Inc. 3.2.S.2.6 Manufacturing Process Development (Linaclotide, All Manufacturers) | 00/00/0000 | LINZ_NDA0004305 | LINZ_NDA0004326 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0213 | Ironwood Pharmaceuticals, Inc. 3.2.S.4.1 Control of Drug Substance (Linaclotide, All Manufacturers) | 00/00/0000 | LINZ_NDA0004532 | LINZ_NDA0004536 | | R, CU, U, H, A, F |
| 0214 | Ironwood Nonclinical Study Report: MDP-103-067-PHR-01 titled "The Effect of pH on the Relative Binding Affinities of Linaclotide and Other Related Peptides to the Guanylate Cyclase-C Receptor on T84 Cells" (Study number MDP-103-067) | 2/16/2011 | LINZ_NDA0006850 | LINZ_NDA0006874 | Kurtz Exhibit 6 | R, CU, U, H, A, F |
| 0215 | Ironwood Nonclinical Study Report: MDP-103-083-PHR-03 titled "The Effect ofMM-431343 (cGMP) on Stress-induced Visceral Pain in Rats" (Study number MDP-103-083) | 3/14/2011 | LINZ_NDA0006980 | LINZ_NDA0007000 | Kurtz Exhibit 7 | R, CU, U, H, A, F |
| 0216 | Ironwood Pharmaceuticals, Inc. 5.2 Tabular Listing of All Clinical Studies | 00/00/0000 | LINZ_NDA0036016 | LINZ_NDA0036024 | Kunka Exhibit 1b | R, CU, U, H, A, F |
| 0217 | Excerpt of Forest Research Institute, Inc. Study No. LIN-MD-01 | 6/2/2010 | LINZ_NDA0040611 | LINZ_NDA0040623 | | R, CU, U, H, A, F, I |
| 0218 | Addendum to Ironwood Pharmaceuticals, Inc. Final Clinical Study Report MCP-103-004 | 5/17/2011 | LINZ_NDA0083835 | LINZ_NDA0083843 | | R, CU, U, H, A, F, I |
| 0219 | Addendum to Ironwood Pharmaceuticals, Inc. Clinical Study Report No. MCP-103-201 | 5/17/2011 | LINZ_NDA0085732 | LINZ_NDA0085742 | | R, CU, U, H, A, F, I |
| 0220 | Addendum to Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-303 | 5/17/2011 | LINZ_NDA0095938 | LINZ_NDA0095952 | | R, CU, U, H, A, F, I |
| 0221 | Clinical Study Report: MC11-103-303-CSR-01, Clinical Laboratory Results - Randomized Population | 5/7/2010 | LINZ_NDA0112297 | LINZ_NDA0112297 | | R, CU, U, H, A, F, NL |
| 0222 | Addendum to PRO Evidence Dossier to Support Labeling for Linaclotide for the Treatment of Chronic Constipation | 5/19/2011 | LINZ_NDA0129328 | LINZ_NDA0129387 | | R, CU, U, H, A, F, I |
| 0223 | Excerpt of Forest Research Institute, Inc. Study No. LIN-MD-31 | 5/10/2011 | LINZ_NDA0144444 | LINZ_NDA0144463 | | R, CU, U, H, A, F, I |
| 0224 | Addendum to Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-202 | 5/17/2011 | LINZ_NDA0192786 | LINZ_NDA0192796 | | R, CU, U, H, A, F, I |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0225 | Addendum to Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-202 | 6/24/2011 | LINZ_NDA0212468 | LINZ_NDA0212482 | | R, CU, U, H, A, F, I, MD |
| 0226 | Addendum to PRO Evidence Dossier to Support Labeling for Linaclotide for the Treatment of Irritable Bowel Syndrome with Constipation | 6/1/2011 | LINZ_NDA0267313 | LINZ_NDA0267401 | | R, CU, U, H, A, F |
| 0227 | Forest Research Institute Stability Summary Report: Linaclotide Capsules ICH Registration Stability Batches | 11/15/2011 | LINZ_NDA0346645 | LINZ_NDA0346804 | | R, CU, U, H, A, F |
| 0228 | Seq. 0039 - 3.2.P.2.2 Pharmaceutical Development 145 mcg | 00/00/0000 | LINZ_NDA0512750 | LINZ_NDA0512794 | | R, CU, U, H, A, F, I |
| 0229 | Letter from L. Kunka to D. Griebel re: Response to Clinical Information Request NDA No. 202811, Sequence 0046 | 5/7/2012 | LINZ_NDA0513494 | LINZ_NDA0513494 | | R, CU, U, H, A, F |
| 0230 | Letter from L. Kunka to D. Griebel re: Response to FDA Labeling Comments dated May 18, 2012 - NDA No. 202811, Sequence 0048 | 5/23/2012 | LINZ_NDA0513584 | LINZ_NDA0513585 | | R, CU, U, H, A, F |
| 0231 | Letter from L. Kunka to D. Griebel re: Response to FDA Labeling Comments received June 11, 2012 - NDA No. 202811, Sequence 0050 | 6/25/2012 | LINZ_NDA0513771 | LINZ_NDA0513772 | | R, CU, U, H, A, F |
| 0232 | Letter from L. Kunka to D. Griebel re: Response to Information Request - NDA No. 202811, Sequence 0052 | 7/30/2012 | LINZ_NDA0514279 | LINZ_NDA0514280 | | R, CU, U, H, A, F |
| 0233 | Letter from L. Kunka to D. Griebel re: Response to Information Request - Agreement to Post Marketing Requirements - NDA No. 202811, Sequence 0053 | 8/14/2012 | LINZ_NDA0514291 | LINZ_NDA0514292 | | R, CU, U, H, A, F |
| 0234 | Letter from L. Kunka to D. Griebel re: Response to Carton and Container Labeling Comments - NDA No. 202811, Sequence 0055 | 8/21/2012 | LINZ_NDA0514338 | LINZ_NDA0514339 | | R, CU, U, H, A, F |
| 0235 | Letter from L. Kunka to D. Griebel re: Response to FDA Labeling Comments received August 24, 2012 - NDA No. 202811, Sequence 0056 | 8/27/2012 | LINZ_NDA0514373 | LINZ_NDA0514374 | | R, CU, U, H, A, F |
| 0236 | Letter from L. Kunka to D. Griebel re: Response to FDA Labeling Comments Received August 28, 2012 - NDA No. 202811, Sequence 0057 | 8/28/2012 | LINZ_NDA0514443 | LINZ_NDA0514444 | | R, CU, U, H, A, F |
| 0237 | Letter from L. Kunka to D. Griebel re: Response to Information Request - Agreement to Immunogenicity Testing Post Marketing Requirements - NDA No. 202811, Sequence 0058 | 8/28/2012 | LINZ_NDA0514513 | LINZ_NDA0514515 | | R, CU, U, H, A, F |
| 0238 | Letter from L. Kunka to D. Griebel re: Response to Information Request - Statistical Programming - NDA No. 202811, Sequence 0059 | 8/28/2012 | LINZ_NDA0514550 | LINZ_NDA0514551 | | R, CU, U, H, A, F |
| 0239 | Letter from L. Kunka to D. Griebel re: Time Sensitive Patent Information - NDA No. 202811, Sequence 0060 | 9/18/2012 | LINZ_NDA0514563 | LINZ_NDA0514564 | | R, CU, U, H, A, F |
| 0240 | Letter from L. Kunka to D. Griebel re: Notification of Enrollment in MedWatch-to-Manufacturer Program (MMP) NDA No. 202-811, Sequence 0061 | 9/19/2012 | LINZ_NDA0514772 | LINZ_NDA0514774 | | R, CU, U, H, A, F |
| 0241 | Excerpt of Forest Research Institute, Inc. Study No. LIN-MD-02 | 11/5/2012 | LINZ_NDA0515719 | LINZ_NDA0515722 | | R, CU, U, H, A, F, I |
| 0242 | Excerpt of Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-305 | 10/18/2012 | LINZ_NDA0548213 | LINZ_NDA0548216 | | R, CU, U, H, A, F, I |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0243 | Email from L. Kunka to B. Strongin re: Linzess 202-811 Action Items from August 9th Teleconference | 8/10/2012 | LINZ_NDA0661857 | LINZ_NDA0661858 | | R, CU, U, H, A, F |
| 0244 | Meeting Minutes from July 16, 2012 Teleconference linaclotide Labeling Negotiations | 7/16/2012 | LINZ_NDA0661859 | LINZ_NDA0661865 | | R, CU, U, H, A, F |
| 0245 | Meeting Minutes from August 6, 2012 Teleconference linaclotide Labeling Negotiations | 8/6/2012 | LINZ_NDA0661866 | LINZ_NDA0661872 | | R, CU, U, H, A, F |
| 0246 | Meeting Minutes from August 9, 2012 Teleconference Linaclotide Labeling Negotiations | 8/9/2012 | LINZ_NDA0661873 | LINZ_NDA0661880 | | R, CU, U, H, A, F |
| 0247 | Memorandum of FDA Meeting Minutes (4/19/2007) | 5/17/2007 | LINZ_NDA0661890 | LINZ_NDA0661897 | | R, CU, U, H, A, F |
| 0248 | Memorandum of FDA Meeting Minutes (Type C, 4/16/2013) | 4/23/2013 | LINZ_NDA0661898 | LINZ_NDA0661905 | | R, CU, U, H, A, F |
| 0249 | Meeting Minutes from April 16, 2013 Type C Meeting LINZESS Secondary Endpoints | 4/16/2013 | LINZ_NDA0661906 | LINZ_NDA0661918 | | R, CU, U, H, A, F |
| 0250 | Meeting Minutes from December 17, 2013 Face-to-Face Meeting with the GI Division to discuss Secondary Endpoints inclusion in the label | 12/17/2013 | LINZ_NDA0661919 | LINZ_NDA0661928 | | R, CU, U, H, A, F |
| 0251 | Letter from J. Shay to D. Griebel re: NDA: 202811 Linzess (linaclotide) Capsules, 145 mcg and 290 mcg RE: CMC Supplement: Changes Being Effected in 30 days - to Provide for an Alternate Drug Substance Manufacturing Site | 10/21/2014 | LINZ_NDA0664644 | LINZ_NDA0664646 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0252 | Forest Research Institute, Inc. 3.2.S.2.2 Description of Manufacturing and Process Controls (Linaclotide, All Manufacturers) | 00/00/0000 | LINZ_NDA0664694 | LINZ_NDA0664695 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0253 | Ironwood Pharmaceuticals, Inc. 3.2.S.2.1 Manufacturers | 00/00/0000 | LINZ_NDA0664696 | LINZ_NDA0664697 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0254 | Ironwood Pharmaceuticals, Inc. 3.2.S.2.6 Manufacturing Process Development (Bachem) | 00/00/0000 | LINZ_NDA0664834 | LINZ_NDA0664834 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0255 | Letter from W. Ishihara (FDA) to C. Pierce (Ironwood) re: Meeting Request Granted (IND 063290) | 8/15/2014 | LINZ_NDA0667119 | LINZ_NDA0667121 | | R, CU, U, H, A, F |
| 0256 | Letter from D. Griebel (FDA) to C. Pierce (Ironwood) re: Advice/Information Request | 11/17/2014 | LINZ_NDA0667122 | LINZ_NDA0667125 | | R, CU, U, H, A, F |
| 0257 | Letter from W. Ishihara (FDA) to C. Pierce (Ironwood) re: Meeting Request - Written Responses (IND 063290) | 10/10/2014 | LINZ_NDA0667126 | LINZ_NDA0667129 | | R, CU, U, H, A, F |
| 0258 | Letter from L. Kunka to D. Griebel re: Efficacy Supplemental New Drug Application for Chronic Idiopathic Constipation, New Dosing Regimen (72 ug) | 3/25/2016 | LINZ_NDA0670127 | LINZ_NDA0670129 | | R, CU, U, H, A, F |
| 0259 | 2.3.P Drug Product (Linaclotide Capsules, 72 ug) | 00/00/0000 | LINZ_NDA0670363 | LINZ_NDA0670414 | | R, CU, U, H, A, F, I |
| 0260 | Forest Research Institute, Inc. 2.5 Clinical Overview 72 mcg | 00/00/0000 | LINZ_NDA0670415 | LINZ_NDA0670447 | Kunka Exhibit 1b | R, CU, U, H, A, F, I |
| 0261 | 3.2.P.3.1 Manufacturers (Linaclotide Capsules, 145 ug) | 00/00/0000 | LINZ_NDA0671013 | LINZ_NDA0671013 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0262 | Seq. 0161 - 3.2.P.2.2 Pharmaceutical Development 72 mcg | 00/00/0000 | LINZ_NDA0671038 | LINZ_NDA0671054 | | R, CU, U, H, A, F, I |
| 0263 | 3.2.P.3.2 Batch Formula (Linaclotide Capsules, 72 ug) | 00/00/0000 | LINZ_NDA0671067 | LINZ_NDA0671067 | | R, CU, U, H, A, F |
| 0264 | 3.2.P.3.3 Description of Manufacturing Process and Process Controls (Linaclotide Capsules, 72 ug) | 00/00/0000 | LINZ_NDA0671069 | LINZ_NDA0671077 | Kunka Exhibit 1c | R, CU, U, H, A, F |
| 0265 | 3.2.P.5.1 Specifications (Linaclotide Capsules, 72 ug) | 00/00/0000 | LINZ_NDA0671088 | LINZ_NDA0671088 | | R, CU, U, H, A, F |
| 0266 | 3.2.P.8.3 Stability Data, 72 mcg | 00/00/0000 | LINZ_NDA0671129 | LINZ_NDA0671134 | | R, CU, U, H, A, F |
| 0267 | 3.2.P.8.3 Stability Data, 72 mcg | 00/00/0000 | LINZ_NDA0671135 | LINZ_NDA0671142 | | R, CU, U, H, A, F |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0268 | 3.2.P.8.3 Stability Data (Linaclotide Capsules, 72 ug) | 00/00/0000 | LINZ_NDA0671143 | LINZ_NDA0671145 | | R, CU, U, H, A, F |
| 0269 | 3.2.P.8.1 Stability Summary and Conclusion (Linaclotide Capsules, 72 ug) | 00/00/0000 | LINZ_NDA0671146 | LINZ_NDA0671158 | | R, CU, U, H, A, F |
| 0270 | Forest Research Institute, Inc. 5.2 Tabular Listing of Clinical Studies 72 mcg | 00/00/0000 | LINZ_NDA0671159 | LINZ_NDA0671161 | Kunka Exhibit 1b | R, CU, U, H, A, F |
| 0271 | Excerpt to Ironwood Pharmaceuticals, Inc. Final Clinical Study Report No. MCP-103-309 | 2/10/2016 | LINZ_NDA0671162 | LINZ_NDA0671173 | Kunka Exhibit 1b | R, CU, U, H, A, F |
| 0272 | 3.2.P.1 Description and Composition of the Drug Product [Linaclotide Capsules, 72 ug] | 00/00/0000 | LINZ_NDA0713481 | LINZ_NDA0713481 | | R, CU, U, H, A, F |
| 0273 | Declaration of Angelika Fretzen for U.S. Patent Application No. 12/851,330 | 3/15/2013 | LINZ_0007765 | LINZ_0007773 | Block Exhibit 7 Fretzen Exhibit 25 Gupta Exhibit 12 | R, CU, U, H, A, F |
| 0274 | Patent Assignment Abstract of Title and other documents | Various | LINZ_0017194 | LINZ_0017338 | Chien Exhibit 17 | R, CU, U, H, A, F, BE, LC |
| 0275 | Patent Owner's Response to Office Action submitted by A. Tridico | 10/5/2012 | LINZ_0020742 | LINZ_0020840 | Wolfe Exhibit 4 | R, CU, U, H, A, F |
| 0276 | Declaration of S. Falkow Under 37 C.F.R. §1.132 ('947 Reexamination) | 10/4/2012 | LINZ_0020793 | LINZ_0020808 | | R, CU, U, H, A, F |
| 0277 | Declaration of Ralph Giannella Under 37 C.F.R. 1.132 for U.S. Patent No. 7,704,947 | 10/8/2012 | LINZ_0020809 | LINZ_0020830 | Giannella Exhibit 2 | R, CU, U, H, A, F |
| 0278 | Declaration of H. Wolfe Under 37 C.F.R. §1.132 ('947 Reexamination) | 10/3/2012 | LINZ_0020831 | LINZ_0020840 | | R, CU, U, H, A, F |
| 0279 | Package insert for Linzess capsules (145 mcg and 290 mcg) | 8/1/2012 | LINZ_0023418 | LINZ_0023434 | Kunka Exhibit 4 | R, CU, U, H, A, F |
| 0280 | Documents presented at Kunka deposition - Topic No. 4: Labeling - Package Inserts (Aug. 2012, Aug. 2013, July 2014, Nov. 2015, Apr. 2016, Aug. 2016 and Jan. 2017) | Various | LINZ_0023418 | LINZ_0023547 | Kunka Exhibit 1a | R, CU, U, H, A, F |
| 0281 | Memoranda attaching Amendment No. 1 (dated Nov. 3, 2009) and Amendment No. 2 (dated Jan. 8, 2013) to Master Collaboration Agreement by and between Microbia, Inc. and Forest Laboratories, Inc., dated September 12, 2007 | 4/30/2010 | LINZ_0093872 | LINZ_0093878 | Chien Exhibit 4 | R, CU, U, H, A, F, NL |
| 0282 | Memorandum from D. Solomon attaching Collaboration Agreement by and between Microbia, Inc. and Forest Laboratories, Inc., dated September 12, 2007 | 9/25/2007 | LINZ_0093879 | LINZ_0094081 | Chien Exhibit 3 | R, CU, U, H, A, F, NL |
| 0283 | Summary Review for Regulatory Action re: 21-908/S005 | 4/29/2008 | LINZ_0103681 | LINZ_0103694 | | R, CU, U, H, A, F |
| 0284 | Declaration of S. Falkow (EPO Opposition) with curriculum vitae | 1/10/2014 | LINZ_0106627 | LINZ_0106664 | | R, CU, U, H, A, F |
| 0285 | Declaration of R. Giannella (EPO Opposition) with curriculum vitae | 1/9/2014 | LINZ_0106665 | LINZ_0106718 | | R, CU, U, H, A, F |
| 0286 | Ironwood presentation, "Linaclotide Pediatric Program" | 00/00/0000 | LINZ_0115570 | LINZ_0115579 | | A, F, H, CU, R, U |
| 0287 | Excipient Compatibility Report No. 060106A1 for MD-1100 Acetate to Support Tablet Formulation Development for Microbia, Inc. | 12/14/2007 | LINZ_0123903 | LINZ_0123980 | | A, F, H, CU, R, U |
| 0288 | PR&D Meeting: Linaclotide Agenda | 10/28/2009 | LINZ_0129600 | LINZ_0129600 | | A, F, H, CU, R, U |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0289 | Presentation, "Clinical Development Program" | 10/28/2009 | LINZ_0129693 | LINZ_0129698 | | A, F, H, CU, R, U |
| 0290 | Ironwood Pharmaceuticals, Inc. presentation, "Linaclotide NDA - Pediatrics" | 10/28/2009 | LINZ_0130034 | LINZ_0130040 | | A, F, H, CU, R, U |
| 0291 | Sec 6.1 FDA Supporting Information | 00/00/0000 | LINZ_0138726 | LINZ_0138728 | | A, F, H, CU, R, U, I |
| 0292 | Sec 5.2 FDA Questions and Positions | 00/00/0000 | LINZ_0138729 | LINZ_0138730 | | A, F, H, CU, R, U, I |
| 0293 | Ironwood Pharmaceuticals, Inc. Type-C Meeting Package | 1/12/2010 | LINZ_0161186 | LINZ_0161204 | | A, F, H, CU, R, U |
| 0294 | Evaluate press release, "Forest Laboratories Announces Agreement With Rotta Research For License Of Dexloxiglumide" | 8/7/2000 | LINZ_0168296 | LINZ_0168297 | | A, F, H, CU, R, U |
| 0295 | Archived press release, "Forest Laboratories Announces Agreement with Rotta Research for License of Dexloxiglumide" | 8/7/2000 | LINZ_0168298 | LINZ_0168299 | | A, F, H, CU, R, U |
| 0296 | Archived press release, "Forest to Discontinue Development in U.S. of Dexloxiglumide for Irritable Bowel Syndrome (IBS)" | 10/1/2003 | LINZ_0168300 | LINZ_0168301 | | A, F, H, CU, R, U |
| 0297 | Prohealth press release, "Forest to Discontinue Development in U.S. of Dexloxiglumide for Irritable Bowel Syndrome (IBS)" | 10/2/2003 | LINZ_0168302 | LINZ_0168303 | | A, F, H, CU, R, U |
| 0298 | Pharmabiz press release, "Forest to discontinue development in U.S. of dexloxiglumide for irritable bowel syndrome" | 10/4/2003 | LINZ_0168304 | LINZ_0168305 | | A, F, H, CU, R, U |
| 0299 | DARWIN Study: A Randomization/Withdraw a Efficacy Study of Dexloxiglumide in Constipation-Predominant Irritable Bowel Syndrome (C-IBS)(Study description) | 5/14/2008 | LINZ_0168390 | LINZ_0168394 | | A, F, H, CU, R, U |
| 0300 | DARWIN Study: A Randomization/Withdraw a Efficacy Study of Dexloxiglumide in Constipation-Predominant Irritable Bowel Syndrome (C-IBS)(Tracking information) | 5/14/2018 | LINZ_0168395 | LINZ_0168399 | | A, F, H, CU, R, U |
| 0301 | U.S. Patent Application Publication No. 2004/0266989 A1 (Currie et al.) | 12/30/2004 | LINZ_0168485 | LINZ_0168554 | | A, F, H, CU, R, U |
| 0302 | Documents presented at Kunka deposition - Topic No. 9: Clinical Studies | Various | Various | Various | Kunka Exhibit 1b | A, F, H, CU, R, U |
| 0303 | Documents presented at Kunka deposition - Topic No. 12: Manufacturing | Various | Various | Various | Kunka Exhibit 1c | A, F, H, CU, R, U |
| 0304 | Email from A. Fretzen to M. Currie re: The big MD-1100 Formulation Brainstorm | 6/21/2005 | IW_LINZ_00015592 | IW_LINZ_00015592 | | A, F, H, CU, R, U |
| 0305 | Fretzen Meeting Request to Internal Team re: The big MD-1100 Formulation Brainstorm | 6/27/2005 | IW_LINZ_00015613 | IW_LINZ_00015613 | | A, F, H, CU, R, U |
| 0306 | Email from A. Fretzen to S. Hill, et al., re: analytical method development MD-1100 | 8/22/2005 | IW_LINZ_00015661 | IW_LINZ_00015661 | Fretzen Exhibit 7 | A, F, H, CU, R, U |
| 0307 | Email from M. Currie to R. Busby, C. Kurtz re: Need input - linaclotide degradant qualification question for Type C meeting | 10/6/2010 | IW_LINZ_00025489 | IW_LINZ_00025491 | | A, F, H, CU, R, U |
| 0308 | C1 Consulting presentation, "Microbia MDS 1100 C-IBS/CC/GERD Forecast Model" | 3/24/2004 | IW_LINZ_00027181 | IW_LINZ_00027192 | | A, F, H, CU, R, U |
| 0309 | Email from A. Fretzen to S. Mahajan-Miklos, M. Currie re: formulation proposal revised with attachment | 3/30/2004 | IW_LINZ_00027255 | IW_LINZ_00027260 | | A, F, H, CU, R, U |
| 0310 | Email from A. Fretzen to  S. Mahajan-Miklos, M. Currie re: full update on formulation | 6/16/2004 | IW_LINZ_00028566 | IW_LINZ_00028567 | | A, F, H, CU, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0311 | Email from A. Fretzen to C. Kurtz, et al., re: KMS - Article: Moisture-induced aggregation of lyophilized insulin | 7/1/2005 | IW_LINZ_00040723 | IW_LINZ_00040724 | | A, F, H, CU, R, U |
| 0312 | Email from A. Fretzen to S. Hill, et al., re: proposed experiments for MD-1100 with attachment | 7/5/2005 | IW_LINZ_00040868 | IW_LINZ_00040870 | | A, F, H, CU, R, U |
| 0313 | Email from A. Fretzen to C. Kurtz, et al., attaching PowerPoint re: current status for stable, solid formulation being a capsule or tablet | 8/15/2005 | IW_LINZ_00041305 | IW_LINZ_00041308 | | A, F, H, CU, R, U, I |
| 0314 | Feasibility Batch Form from UPM Pharmaceuticals indicating current formulation being manufactured | 5/3/2005 | IW_LINZ_00044808 | IW_LINZ00044811 | | A, F, H, CU, R, U |
| 0315 | Email from A. Fretzen to E. Scholtz, et al., re: Minutes from today's conference call | 10/11/2005 | IW_LINZ_00045464 | IW_LINZ_00045464 | | A, F, H, CU, R, U |
| 0316 | Memorandum of FDA Meeting Minutes (10/20/2005) | 10/27/2005 | IW_LINZ_00046438 | IW_LINZ_00046448 | | A, F, H, CU, R, U |
| 0317 | Consulting Meeting Minutes | 12/20/2005 | IW_LINZ_00047287 | IW_LINZ_00047291 | | A, F, H, CU, R, U |
| 0318 | Email from A. Fretzen to C. Kurtz, et al., re: Meeting Minutes with attachments | 12/19/2005 | IW_LINZ_00047239 | IW_LINZ_00047265 | | A, F, H, CU, R, U |
| 0319 | Email from S. Mahajan-Miklos to GCCA Strategy re: Peptisyntha | 7/2/2003 | IW_LINZ_00047318 | IW_LINZ_00047319 | | A, F, H, CU, R, U |
| 0320 | Email from T. Norman to GCCA Strategy re: drug discovery presentation | 7/17/2003 | IW_LINZ_00047322 | IW_LINZ_00047337 | | A, F, H, CU, R, U |
| 0321 | Email from P. Hecht to J. O'Hara, et al., re: Fw: GCCA resource requests | 10/14/2003 | IW_LINZ_00047376 | IW_LINZ_00047377 | | A, F, H, CU, R, U |
| 0322 | Email from S. Mahajan-Miklos to GCCA Strategy re: Meetiing Minutes from 11.06.03 | 11/6/2003 | IW_LINZ_00047428 | IW_LINZ_00047431 | | A, F, H, CU, R, U |
| 0323 | Email from M. Currie to A. Mahajan-Miklos re: GCCA resources | 10/10/2003 | IW_LINZ_00047445 | IW_LINZ_00047446 | | A, F, H, CU, R, U |
| 0324 | Microbia - American Peptide Company Meeting Minutes | 11/27/2007 | IW_LINZ_00048781 | IW_LINZ_00048781 | Fretzen Exhibit 28 | A, F, H, CU, R, U |
| 0325 | Email from Fretzen re: presentation for Forest | 12/18/2007 | IW_LINZ_00049005 | IW_LINZ_00049027 | | A, F, H, CU, R, U, I |
| 0326 | Email from M. Currie to A. Fretzen re: just in case you are cruising around on your blackberry | 1/3/2005 | IW_LINZ_00049648 | IW_LINZ_00049649 | | A, F, H, CU, R, U |
| 0327 | Email from M. Currie to A. Fretzen re: quick update | 5/3/2005 | IW_LINZ_00049817 | IW_LINZ_00049818 | | A, F, H, CU, R, U |
| 0328 | Email from M. Currie to A. Fretzen re: KMS - Article: Moisture-induced aggregation of lyophilized insulin | 6/30/2005 | IW_LINZ_00049962 | IW_LINZ_00049963 | | A, F, H, CU, R, U |
| 0329 | Email from M. Currie to A. Fretzen re: MD1100 | 6/15/2007 | IW_LINZ_00051397 | IW_LINZ_00051398 | | A, F, H, CU, R, U |
| 0330 | Email from M. Currie to A. Fretzen re: Phase III, Set 3, Additives Group 1 & 2 | 7/23/2007 | IW_LINZ_00051417 | IW_LINZ_00051418 | | A, F, H, CU, R, U |
| 0331 | Email from M. Currie to S. Miklos re: Fw: Microbia Press Release | 9/17/2007 | IW_LINZ_00051597 | IW_LINZ_00051597 | Chien Exhibit 14 Mahajan-Miklos Exhibit 12 | A, F, H, CU, R, U |
| 0332 | End of Phase II Meeting Minutes | 8/7/2008 | IW_LINZ_00055318 | IW_LINZ_00055326 | | A, F, H, CU, R, U |
| 0333 | Letter from FDA to Ironwood attaching Memorandum of Meeting Minutes re: linaclotide/MD-1100 Acetate | 12/3/2008 | IW_LINZ_00055410 | IW_LINZ_00055420 | Kunka Exhibit 21 | A, F, H, CU, R, U |
| 0334 | Email from M. Taglietti to M. Currie, et al., re: Support for cmc issue | 10/14/2009 | IW_LINZ_00060098 | IW_LINZ_00060098 | | A, F, H, CU, R, U |
| 0335 | Email from J. Wescott to L. Kunka, et al., re: NORS (Notice of Regulatory Submission) - Linzess - US - 72 mcg sNDA for CIC | 3/25/2016 | IW_LINZ_00063525 | IW_LINZ_00063526 | Chien Exhibit 18 | A, F, H, CU, R, U |
| 0336 | Email from A. Grossi to M. Lovell, et al., re: 3 Month Data for Additive Study | 9/7/2007 | IW_LINZ_00068548 | IW_LINZ_00068549 | Fretzen Exhibit 15 | A, F, H, CU, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0337 | UPM Visit for MD-100 Meeting Minutes | 7/28/2007 | IW_LINZ_00068577 | IW_LINZ_00068582 | Fretzen Exhibit 16 | A, F, H, CU, R, U |
| 0338 | Presentation titled "Major Observations II" with handwritten notes | 4/20/2007 | IW_LINZ_00068751 | IW_LINZ_00068756 | Fretzen Exhibit 11 | A, F, H, CU, R, U |
| 0339 | Draft Phase 3 Linaclotide Capsule Formulation Development Using a Design of Experiment Approach, Development Report: CMC-1 03-DP-DTR-003 | 00/00/0000 | IW_LINZ_00070196 | IW_LINZ_00070250 | Fretzen Exhibit 24 | A, F, H, CU, R, U |
| 0340 | Formulations for 100 Lot No. Key spreadsheet and handwritten notes | 1/26/2007 | IW_LINZ_00071048 | IW_LINZ_00071050 | Fretzen Exhibit 8 Zhao Exhibit 40 | A, F, H, CU, R, U, NL |
| 0341 | MD-1100 Formulation Development Meeting Minutes | 2/5/2007 | IW_LINZ_00071052 | IW_LINZ_00071060 | Fretzen Exhibit 12 | A, F, H, CU, R, U |
| 0342 | Microbia Formulation Development Review meeting agenda | 1/30/2007 | IW_LINZ_00071061 | IW_LINZ_00071063 | Fretzen Exhibit 18 | A, F, H, CU, R, U |
| 0343 | Slide titled "Selection of development candidates" | 00/00/0000 | IW_LINZ_00081256 | IW_LINZ_00081256 | Currie Exhibit 15 | A, F, H, CU, R, U |
| 0344 | FDA memorandum from T. Moreno to C. Pierce re: Meeting for Linaclotide (IND 63,290) - August 7, 2008 | 8/5/2008 | IW_LINZ_00115258 | IW_LINZ_00115267 | Kunka Exhibit 9 | A, F, H, CU, R, U |
| 0345 | Memorandum of FDA Meeting Minutes (5/15/2008) | 7/14/2008 | IW_LINZ_00115268 | IW_LINZ_00115278 | | A, F, H, CU, R, U |
| 0346 | Microbia, Inc. Regulatory and Clinical Strategic Plan (GCCA peptide for treatment of general constipation) | 9/5/2003 | IW_LINZ_00115866 | IW_LINZ_00115891 | Kurtz Exhibit 4 | A, F, H, CU, R, U |
| 0347 | Microbia Report Summary for study titled, "Recombinant Production of St Peptide and Selected Derivatives" | 2/17/2004 | IW_LINZ_00117964 | IW_LINZ_00117989 | Currie Exhibit 13 Mahajan-Miklos Exhibit 9 | A, F, H, CU, R, U |
| 0348 | Briefing Book to Support Type-C Meeting for IND No. 63,290 | 11/20/2006 | IW_LINZ_00120345 | IW_LINZ_00120427 | Currie Exhibit 21 Kent Exhibit 25 Kurtz Exhibit 8 | A, F, H, CU, R, U |
| 0349 | Microbia Pre-IND Meeting on MD-1100 acetate Briefing Document (Pre-IND Number 63,290) | 7/1/2004 | IW_LINZ_00120428 | IW_LINZ_00120516 | | A, F, H, CU, R, U |
| 0350 | Linaclotide Pain MOA Advisory Board Meeting presentation materials | 9/4/2012 | IW_LINZ_00123750 | IW_LINZ_00123904 | Kurtz Exhibit 9 | A, F, H, CU, R, U |
| 0351 | Selection of Endpoints for Linaclotide Trials | 00/00/0000 | IW_LINZ_00126596 | IW_LINZ_00126598 | | A, F, H, CU, R, U |
| 0352 | Guidance for Industry, Irritable Bowel Syndrome - Clinical Evaluation of Products for Treatment, *Draft Guidance* | 3/1/2010 | IW_LINZ_00134983 | IW_LINZ_00134999 | | A, F, H, CU, R, U |
| 0353 | Memorandum of FDA Meeting Minutes (Type B, 3/22/2011) | 4/21/2011 | IW_LINZ_00155675 | IW_LINZ_00155697 | | A, F, H, CU, R, U |
| 0354 | Meeting invitation from C. Kurtz re: Strategy for Ph3 initiation with current formulation | 3/6/2008 | IW_LINZ_00230943 | IW_LINZ_00230943 | | A, F, H, CU, R, U |
| 0355 | Linaclotide Phase 3 CTM Development Options | 3/6/2008 | IW_LINZ_00230944 | IW_LINZ_00230945 | | A, F, H, CU, R, U |
| 0356 | Microbia presentation, "GI Program Updates" | 10/9/2007 | IW_LINZ_00232568 | IW_LINZ_00232610 | Fretzen Exhibit 13 | A, F, H, CU, R, U |
| 0357 | Email from C. Kurtz to A. Fretzen, M. Currie re: Solubility summary report | 8/14/2006 | IW_LINZ_00237199 | IW_LINZ_00237200 | | A, F, H, CU, R, U |
| 0358 | Microbia Project Weekly Update | 2/11/2015 | IW_LINZ_00248210 | IW_LINZ_00248210 | | A, F, H, CU, R, U |
| 0359 | Email from A. Fretzen to E. Scholtz, et al., re: MD1100 2 Week Stability Results | 11/19/2005 | IW_LINZ_00278534 | IW_LINZ00278535 | | A, F, H, CU, R, U |
| 0360 | Email from A. Fretzen to C. Kurtz re: MD-100's solution behavior | 12/1/2004 | IW_LINZ_00311316 | IW_LINZ_00311317 | | A, F, H, CU, R, U |
| 0361 | Email from A. Fretzen to M. Currie, et al., re: Formulation with attachment | 12/16/2004 | IW_LINZ_00311964 | IW_LINZ_00311966 | | A, F, H, CU, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0362 | Memorandum of FDA Meeting Minutes (9/25/2006) | 10/19/2006 | IW_LINZ_00334656 | IW_LINZ_00334672 | | A, F, H, CU, R, U |
| 0363 | Email from A. Fretzen to C. Kurtz re: Pharmatek stability data | 6/1/2006 | IW_LINZ_00339140 | IW_LINZ00339141 | | A, F, H, CU, R, U |
| 0364 | Memorandum of FDA Meeting Minutes (6/5/2006) | 6/26/2006 | IW_LINZ_00340951 | IW_LINZ_00340957 | | A, F, H, CU, R, U |
| 0365 | Microbia presentation, "Quick Formulation Development Update" | 1/17/2006 | IW_LINZ_00347257 | IW_LINZ_00347261 | | A, F, H, CU, R, U |
| 0366 | Microbia Meeting Minutes/Action Items - Consulting Meeting with Michael Lowell (Formulation Development) | 2/28/2006 | IW_LINZ_00348284 | IW_LINZ_00348286 | | A, F, H, CU, R, U |
| 0367 | Forest memorandum from A. Patel/S. Keene to Linaclotide Joint Operational Project Team re: Team Meeting Minutes | 1/4/2008 | IW_LINZ_00355465 | IW_LINZ_00355467 | | A, F, H, CU, R, U |
| 0368 | Draft Development Report: Formulation Development, Solid Oral Dosage Form Development: Combination of Additives Study | 00/00/0000 | IW_LINZ_00388251 | IW_LINZ_00388270 | Fretzen Exhibit 23 | A, F, H, CU, R, U |
| 0369 | Email from C. Kurtz to J. Johnston re: Limitless possibilities | 11/1/2012 | IW_LINZ_00390403 | IW_LINZ_00390407 | | A, F, H, CU, R, U |
| 0370 | Email from M. Lovell to A. Fretzen, et al., re: Phase III, Additives Group 2, T=1M stability | 7/13/2007 | IW_LINZ_00401412 | IW_LINZ_00401413 | | A, F, H, CU, R, U |
| 0371 | Memorandum of FDA Meeting Minutes (1/11/2007) | 2/8/2007 | IW_LINZ_00405497 | IW_LINZ_00405508 | | A, F, H, CU, R, U |
| 0372 | Email from A. Fretzen to M. Currie, et al., re: strategic off-site: Linaclotide | 2/28/2007 | IW_LINZ_00413785 | IW_LINZ_00413785 | | A, F, H, CU, R, U |
| 0373 | Email from J. Johnson to C. Kurtz re: Gastroenterology - GASTRO-D-07-01104 | 8/31/2007 | IW_LINZ_00416062 | IW_LINZ_00416065 | | A, F, H, CU, R, U |
| 0374 | Memorandum of FDA Meeting Minutes (Type C, 11/6/2008) | 6/1/2009 | IW_LINZ_00448821 | IW_LINZ_00448831 | | A, F, H, CU, R, U |
| 0375 | JDC Face to Face Meeting minutes | 11/16/2010 | IW_LINZ_00478689 | IW_LINZ_00478697 | | A, F, H, CU, R, U |
| 0376 | Email from G. Reis to A. Bryant, et al. | 12/21/2010 | IW_LINZ_00481083 | IW_LINZ_00481085 | | A, F, H, CU, R, U |
| 0377 | Presentation, "Results from the Rome Endpoints/Outcomes in IBS Working Team - Brennan Spiegel, MD, MSHS" | 00/00/0000 | IW_LINZ_00486764 | IW_LINZ_00486803 | | A, F, H, CU, R, U |
| 0378 | Ironwood Pharmaceuticals, Inc., Summary of Rome conference | 00/00/0000 | IW_LINZ_00487540 | IW_LINZ_00487541 | | A, F, H, CU, R, U |
| 0379 | Choice of Parameters for Linaclotide IBS-C Trials | 00/00/0000 | IW_LINZ_00578021 | IW_LINZ_00578023 | | A, F, H, CU, R, U |
| 0380 | Linaclotide Executive Advisory Board Meeting minutes (Top-line Take-away Messages) | 6/6/2011 | IW_LINZ_00605814 | IW_LINZ_00605820 | Kunka Exhibit 15 | A, F, H, CU, R, U |
| 0381 | Letter from FDA to Forest Laboratories, Inc. re: Information Request | 5/3/2012 | IW_LINZ_00633788 | IW_LINZ_00633792 | | A, F, H, CU, R, U |
| 0382 | Letter from L. Kunka to D. Griebel re: Response to Statistical Information Request NDA No. 202811, Sequence 0049 | 6/6/2012 | IW_LINZ_00635860 | IW_LINZ_00635860 | | A, F, H, CU, R, U |
| 0383 | Letter from L. Iacono-Connors to M. Taglietti re: 483 Inspection | 6/19/2012 | IW_LINZ_00638259 | IW_LINZ_00638294 | | A, F, H, CU, R, U |
| 0384 | Meeting Minutes from August 14, 2012 Teleconference | 8/14/2012 | IW_LINZ_00640401 | IW_LINZ_00640407 | | A, F, H, CU, R, U |
| 0385 | Meeting Minutes from August 20, 2012 Teleconference | 8/20/2012 | IW_LINZ_00641960 | IW_LINZ_00641964 | | A, F, H, CU, R, U |
| 0386 | Presentation, "Linaclotide - JDC/JCC Meeting" | 7/13/2010 | IW_LINZ_00678458 | IW_LINZ_00678469 | | A, F, H, CU, R, U |
| 0387 | Ironwood Pharmaceuticals, Inc. Strategic Leadership Team Meeting Minutes | 8/18/2010 | IW_LINZ_00679715 | IW_LINZ_00679720 | | A, F, H, CU, R, U |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0388 | Email from C. Kurtz to M. Currie re: materials for conversation with Marco | 12/11/2010 | IW_LINZ_00681979 | IW_LINZ_00681980 | | A, F, H, CU, R, U |
| 0389 | Rationale for RT Formulation | 00/00/0000 | IW_LINZ_00681981 | IW_LINZ_00681997 | | A, F, H, CU, R, U |
| 0390 | FDA Question 3c | 00/00/0000 | IW_LINZ_00681998 | IW_LINZ_00682016 | | A, F, H, CU, R, U |
| 0391 | Introduction to Question 2: To be drafted by Ravi H. | 00/00/0000 | IW_LINZ_00682017 | IW_LINZ_00682035 | | A, F, H, CU, R, U |
| 0392 | Microbia presentation, "Testing Microbia Peptides - Drug Discovery 071703 JVT, CG, EAC" | 7/17/2003 | IW_LINZ_00704942 | IW_LINZ_00704951 | Mahajan-Miklos Exhibit 10 | A, F, H, CU, R, U |
| 0393 | Microbia Presentation, "Drug Discovery 09/18/03 - GCCA Chymotryspin Sensitivity" | 9/18/2003 | IW_LINZ_00705001 | IW_LINZ_00705009 | Currie Exhibit 17 | A, F, H, CU, R, U |
| 0394 | Microbia presentation, "Experiment Summaries" | 12/31/2003 | IW_LINZ_00707339 | IW_LINZ_00707351 | | A, F, H, CU, R, U |
| 0395 | Microbia Presentation, "Purified Peptides in GCCA Animal Models" | 9/18/2003 | IW_LINZ_00709120 | IW_LINZ_00709138 | Currie Exhibit 18 | A, F, H, CU, R, U |
| 0396 | Microbia presentatuin, "Wild Type vs. Chy 3 ST Timecourse" | 8/21/2003 | IW_LINZ_00709199 | IW_LINZ_00709209 | | A, F, H, CU, R, U |
| 0397 | CMC Analytical Reports Update | 5/2/2011 | IW_LINZ_00716858 | IW_LINZ_00716859 | Zhao Exhibit 24 | A, F, H, CU, R, U |
| 0398 | MD-1100 Formulation Development Meeting Minutes (January 30, 2007) | 2/5/2007 | IW_LINZ_00717281 | IW_LINZ_00717288 | Zhao Exhibit 14 | A, F, H, CU, R, U |
| 0399 | Linaclotide NDA DS Glossary, "For Your Information" | 3/4/2011 | IW_LINZ_00717639 | IW_LINZ_00717652 | Fretzen Exhibit 29 | A, F, H, CU, R, U |
| 0400 | Ironwood Development Report: CMC-103-DP-DTR-007, Linaclotide Solid Oral Dosage Form Development: Combination Additive Study | 6/23/2011 | IW_LINZ_00726113 | IW_LINZ_00726154 | Zhao Exhibit 34 | A, F, H, CU, R, U |
| 0401 | Ironwood Impurity Characterization Report: CMC-103-DS-CZR-019, Final Version 01, "Identification of Linaclotide Impurity $Cys^5$-D-Isomer" | 7/22/2011 | IW_LINZ_00727540 | IW_LINZ_00727585 | Zhao Exhibit 25 | A, F, H, CU, R, U |
| 0402 | Ironwood Characterization Report: CMC-103-DS-CZR-058, Final Version 00, "Identification of Linaclotide Impurity $Asp^{7'}$ | 7/21/2011 | IW_LINZ_00729214 | IW_LINZ_00729254 | Zhao Exhibit 27 | A, F, H, CU, R, U |
| 0403 | Ironwood Characterization Report: CMC-103-DS-CZR-059, Final Version 00, "Identification of Linaclotide Impurity Des-$Tyr^{14'}$ | 7/28/2011 | IW_LINZ_00729539 | IW_LINZ_00729584 | Zhao Exhibit 28 | A, F, H, CU, R, U |
| 0404 | Ironwood Characterization Report: CMC-103-DS-CZR-057, Final Version 00, "Identification of Linaclotide Impurity $Cys^1$-N-Acetyl" | 7/28/2011 | IW_LINZ_00730587 | IW_LINZ_00730628 | Zhao Exhibit 26 | A, F, H, CU, R, U |
| 0405 | Ironwood Development Report: CMC-103-DS-DTR-0003, Final Version, "Procecure for Generation of Multimer-Enriched Linaclotide Solution" | 4/13/2010 | IW_LINZ_00730780 | IW_LINZ_00730816 | Zhao Exhibit 30 | A, F, H, CU, R, U |
| 0406 | Ironwood Development Report: CMC-103-DS-CZR-056, Final Version, "Characterization of Linaclotide Disulfide-Bonded Multimers By Mass Spectrometry, SEC, and HPLC" | 4/1/2010 | IW_LINZ_00738360 | IW_LINZ_00738402 | Zhao Exhibit 29 | A, F, H, CU, R, U |
| 0407 | Ironwood Characterization Report: CMC-103-DP-CZR-004, Final Version 00, "Characterization and Separation of the Cys-Ketone Degradation Peak in Linaclotide Drug Product" | 8/2/2011 | IW_LINZ_00741176 | IW_LINZ_00741239 | Zhao Exhibit 35 | A, F, H, CU, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0408 | Ironwood Development Report: CMC-103-DS-DTR-004, Final Version 00, "Evaluation of Ion Exchange Chromatography for the Analysis of Disulfide-Bonded Multimers in Linaclotide" | 7/5/2011 | IW_LINZ_00760080 | IW_LINZ_00760125 | Zhao Exhibit 31 | A, F, H, CU, R, U |
| 0409 | Email from H. Zhao to A. Fretzen re: solution stability for MD-1100 | 1/25/2007 | IW_LINZ_00760846 | IW_LINZ_00760847 | Zhao Exhibit 8 | A, F, H, CU, R, U |
| 0410 | Email Meeting Invite from S. Hui to A. Fretzen, et al., re: CMC Offsite SOP/Development Report meeting | 6/15/2007 | IW_LINZ_00772595 | IW_LINZ_00772595 | Zhao Exhibit 22 | A, F, H, CU, R, U |
| 0411 | CMC Development Reports (MD-1100, MD-0727 and MD-3124) | 00/00/0000 | IW_LINZ_00772596 | IW_LINZ_00772596 | Zhao Exhibit 23 | A, F, H, CU, R, U |
| 0412 | Email from A. Fretzen to S. Witkowski, H. Zhao re: solution stability for MD-1100 | 1/25/2007 | IW_LINZ_00773242 | IW_LINZ_00773242 | Zhao Exhibit 6 | A, F, H, CU, R, U |
| 0413 | Email from A. Fretzen to K. Stith, et al., re: data and desired outcome for Tuesday (two additional literature files) | 1/25/2007 | IW_LINZ_00773251 | IW_LINZ_00773252 | Zhao Exhibit 10 | A, F, H, CU, R, U |
| 0414 | Email from M. Kessler to H. Zhao re: Slide presentations | 10/25/2010 | IW_LINZ_00785809 | IW_LINZ_00785809 | Zhao Exhibit 17 | A, F, H, CU, R, U |
| 0415 | Ironwood Presentation, "Structure Characterization of linaclotide drug product impurity Cys[1]-imidazolidinone" | 9/28/2010 | IW_LINZ_00785810 | IW_LINZ_00785841 | Zhao Exhibit 18 | A, F, H, CU, R, U |
| 0416 | Ironwood Presentation, "Structure Characterization of linaclotide drug product impurity MM-448623-α-ketone/diol" | 10/13/2010 | IW_LINZ_00785843 | IW_LINZ_00785868 | Zhao Exhibit 20 | A, F, H, CU, R, U |
| 0417 | MD-1100 Formulation Development Meeting Action Items and Timeline | 10/25/2006 | IW_LINZ_00805608 | IW_LINZ_0080610 | | A, F, H, CU, R, U |
| 0418 | Email from A. Fretzen to S. Witkowski et al., re: Agenda for Tuesday | 1/26/2007 | IW_LINZ_00805681 | IW_LINZ_00805681 | Zhao Exhibit 12 | A, F, H, CU, R, U |
| 0419 | Microbia Formulation Development Review Meeting Agenda | 1/30/2007 | IW_LINZ_00805682 | IW_LINZ_00805682 | Zhao Exhibit 13 | A, F, H, CU, R, U |
| 0420 | Email from A. Fretzen to K. Stith, et al., re: FW: Microbia MD-1100: Post Meeting Notes | 2/7/2007 | IW_LINZ_00805694 | IW_LINZ_00805696 | | A, F, H, CU, R, U |
| 0421 | MD-1100 Formulation Data Review | 7/19/2007 | IW_LINZ_00805957 | IW_LINZ_0080959 | | A, F, H, CU, R, U |
| 0422 | Email from H. Zhao to T. Chancellor, et al., re: Last Report for Multimer Characterization, CMC-103-DS-DTR-006 | 4/1/2011 | IW_LINZ_00814187 | IW_LINZ_00814188 | Zhao Exhibit 32 | A, F, H, CU, R, U |
| 0423 | Ironwood Nonclinical Study Report: CMC-103-DS-DTR-006 regarding the Evaluation of Alternative SEC Columns and Detectors for the Analysis of Disulfide-Bonded Multimers in Linaclotide | 00/00/0000 | IW_LINZ_00814189 | IW_LINZ_00814230 | Zhao Exhibit 33 | A, F, H, CU, R, U |
| 0424 | Linaclotide Solid Oral Dosage Form Development: Single Additive Study Development Report: CMC-103-DP-DTR-006 | 7/7/2011 | IW_LINZ_00819338 | IW_LINZ_00819396 | Fretzen Exhibit 22 Gupta Exhibit 11 | A, F, H, CU, R, U |
| 0425 | GI Program Tactics Meeting Minutes | 3/1/2004 | IW_LINZ_00821145 | IW_LINZ_00821148 | | A, F, H, CU, R, U |
| 0426 | Microbia presentation, "GCCA Program" | 12/9/2003 | IW_LINZ_00848194 | IW_LINZ_00848231 | | A, F, H, CU, R, U |
| 0427 | Email from M. Kessler to J. Rennekamp re: LINZESS GDM Story with draft brochure | 6/22/2017 | IW_LINZ_00848901 | IW_LINZ_00848910 | | A, F, H, CU, R, U |
| 0428 | Appendix 1: Guanylate Cyclase Subtype-C Agonist Project (from Board of Directors Meeting) | 4/22/2003 | IW_LINZ_00900106 | IW_LINZ_00900116 | | A, F, H, CU, R, U, I |
| 0429 | Microbia presentation, "GCCA Program Board Presentation" | 3/1/2003 | IW_LINZ_00900317 | IW_LINZ_00900340 | Barnett Exhibit 15 Kent Exhibit 11 | A, F, H, CU, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0430 | Microbia presentation, "GCCA Program Board Presentation" | 4/22/2003 | IW_LINZ_00900341 | IW_LINZ_00900377 | | A, F, H, CU, R, U |
| 0431 | Board of Directors Meeting Gastrointestinal Program Update | 12/16/2003 | IW_LINZ_00900437 | IW_LINZ_00900453 | Currie Exhibit 19 | A, F, H, CU, R, U |
| 0432 | Ironwood presentation, "R&D Review 2008" | 4/30/2008 | IW_LINZ_00900646 | IW_LINZ_00900773 | Fretzen Exhibit 6 | A, F, H, CU, R, U |
| 0433 | Microbia presentation, "Gastrointestinal Program - Confidential Overview" | 4/1/2004 | IW_LINZ_00902164 | IW_LINZ_00902216 | | A, F, H, CU, R, U |
| 0434 | Microbia presentation, "Microbia R&D Review - Pharmaceutical Advisory Committee" | 10/14/2005 | IW_LINZ_00913207 | IW_LINZ_0091274 | | A, F, H, CU, R, U |
| 0435 | Email from M. Currie to J. O'Hara re: IBS backgrounder with attachment | 9/30/2003 | IW_LINZ_00913509 | IW_LINZ_00913512 | | A, F, H, CU, R, U |
| 0436 | Email from M. Currie to M. Joyal re: Therapeutics program history | 7/21/2008 | IW_LINZ_00917227 | IW_LINZ_00917227 | Currie Exhibit 11 | A, F, H, CU, R, U |
| 0437 | Microbia informational, "Guanylate Cyclase Subtype-C (GC-C) Super-Agonist Project" | 00/00/0000 | IW_LINZ_00917228 | IW_LINZ_00917236 | Currie Exhibit 12 | A, F, H, CU, R, U |
| 0438 | Microbia Board of Directors Meeting materials | 2/24/2004 | IW_LINZ_00929622 | IW_LINZ_00929754 | | A, F, H, CU, R, U |
| 0439 | Email from M. Lovell to D. Chapin, et al., re: Follow Up from Yesterday's Call with handwritten notes | 4/5/2007 | IW_LINZ_00930474 | IW_LINZ_00930487 | Fretzen Exhibit 9 | A, F, H, CU, R, U |
| 0440 | Ironwood presentation, "Linaclotide : A Novel Peptide in Clinical Development for the Treatment of IBS-C and CC" | 4/10/2011 | IW_LINZ_00931841 | IW_LINZ_00931874 | | A, F, H, CU, R, U |
| 0441 | FDA Meeting Minutes (Type B, 8/7/2008) | 8/25/2008 | IW_LINZ_00960987 | IW_LINZ_00960999 | | A, F, H, CU, R, U |
| 0442 | Ironwood presentation, "60-Day Plan, Round 1" | 5/4/2010 | IW_LINZ_01008533 | IW_LINZ_01008588 | | A, F, H, CU, R, U |
| 0443 | Presentation, "Linaclotide - Joint Steering Committee Meeting" | 7/13/2010 | IW_LINZ_01009662 | IW_LINZ_010096689 | | A, F, H, CU, R, U |
| 0444 | Microbia presentation, "Gastrointestinal Program - Confidential Overview" | 6/1/2004 | IW_LINZ_01042384 | IW_LINZ_01042451 | | A, F, H, CU, R, U |
| 0445 | Microbia presentation, "GCCA Molecule Selection" | 9/15/2003 | IW_LINZ_01044903 | IW_LINZ_01044912 | | A, F, H, CU, R, U |
| 0446 | Microbia presentation, "GCCA Project PAC Meeting" | 6/26/2003 | IW_LINZ_01044939 | IW_LINZ_01044964 | Barnett Exhibit 14 Kent Exhibit 10 | A, F, H, CU, R, U |
| 0447 | MD-1100 Formulation Development Meeting Minutes | 11/1/2006 | IW_LINZ_01052264 | IW_LINZ_01052269 | | A, F, H, CU, R, U |
| 0448 | Email from A. Fretzen to E. Scholtz, et al., re: Experimental Design for Next Set of Experiments | 2/12/2007 | IW_LINZ_01052270 | IW_LINZ_01052270 | Zhao Exhibit 15 | A, F, H, CU, R, U |
| 0449 | Peptide Chart with Scale, Methocel, Additive, Quantity, and Comments | 00/00/0000 | IW_LINZ_01052271 | IW_LINZ_01052271 | Zhao Exhibit 16 | A, F, H, CU, R, U |
| 0450 | Vancocin® HCl (vancomycin hydrochloride capsules) [package insert], Indianapolis, IN: Eli Lilly and Co., 2003 | 3/5/2003 | IW_LINZ_01054641 | IW_LINZ_01054646 | | A, F, H, CU, R, U |
| 0451 | Vancomycin Hydrochloride Capsules [product monograph], Toronto, ON: Fresenius Kabi Canada Ltd., 2017 | 11/22/2017 | IW_LINZ_01054647 | IW_LINZ_01054670 | | A, F, H, CU, R, U |
| 0452 | Neoral® (cyclosporine) [package insert], East Hanover, NJ: Novartis Pharmaceuticals Corp., 2005 | 8/1/2005 | IW_LINZ_01054581 | IW_LINZ_01054611 | | A, F, H, CU, R, U |
| 0453 | Sandimmune® (cyclosporine) [package insert], East Hanover, NJ: Novartis Pharmaceuticals Corp., 2006 | 3/6/2006 | IW_LINZ_01054612 | IW_LINZ_01054631 | | A, F, H, CU, R, U |
| 0454 | Teva Paragraph IV Notice Letter | 10/21/2016 | N/A | N/A | | A, F, H, CU, R, U |
| 0455 | Teva Paragraph IV Notice Letter re: 72c mcg Linaclotide Capsules | 12/21/2017 | N/A | N/A | | A, F, H, CU, R, U |

Confidential

Allergan SAles, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0456 | Plaintiffs' Notice of Deposition of Teva Pursuant to Fed.R.Civ.P.30(b)(6) | 6/22/2018 | N/A | N/A | Domnic Exhibit 2 Shah Exhibit 2 | A, F, H, CU, R, U |
| 0457 | 1.12.15 Request for Waiver of In Vitro Bioavailability Studies [Linoclotide Capsules] | 00/00/0000 | TEVA-LINAC0000263 | TEVA-LINAC0000263 | Domnic Exhibit 8 | A, F, H, CU, R, U |
| 0458 | 2.3.P Drug Product [Linaclotide Capsules, 145 mcg and 290 mcg] | 00/00/0000 | TEVA-LINAC0000340 | TEVA-LINAC0000415 | Domnic Exhibit 9 Gawad Exhibit 7 Shah Exhibit 17 | A, F, H, CU, R, U |
| 0459 | 3.2.P.2 Pharmaceutical Development [Linaclotide Capsules, 145 mcg and 290 mcg] | 8/29/2016 | TEVA-LINAC0000832 | TEVA-LINAC0000984 | Domnic Exhibit 11 Shah Exhibit 16 | A, F, H, CU, R, U, I |
| 0460 | Prescribing Information for Linaclotide Capsules (145 mcg and 290 mcg) | 5/1/2017 | TEVA-LINAC0006599 | TEVA-LINAC0006617 | | A, F, H, CU, R, U |
| 0461 | Email from M. Giangiulio to D. Merrill, et al., re: Monthly R&D Project Review 02-20-14 Notes | 3/13/2014 | TEVA-LINAC0027057 | TEVA-LINAC0027062 | Shah Exhibit 10 | A, F, H, CU, R, U |
| 0462 | Email from T. Jiao to R. Phull, M. Feng re: Kickoff meeting - ARD with attached presentation | 9/21/2013 | TEVA-LINAC0027383 | TEVA-LINAC0027435 | Shah Exhibit 7 | A, F, H, CU, R, U |
| 0463 | Email from N. Kumaraperumal to A. Tovi, et al., re: Linaclotide - For today's mtg (with attachment) | 9/16/2013 | TEVA-LINAC0027719 | TEVA-LINAC0027722 | Shah Exhibit 5 | A, F, H, CU, R, U |
| 0464 | Email from J. Derstine to J. Clark re: FW: Pre-ANDA Meeting Request/Background Materials - Linaclotide Capsules with attachment | 6/8/2015 | TEVA-LINAC0029225 | TEVA-LINAC0029315 | Domnic Exhibit 3 Shah Exhibit 8 | A, F, H, CU, R, U |
| 0465 | Email from E. Gray to V. Kumar re: FW: Monthly Pomona R&D Project Review: Sept 2014 Notes | 10/20/2014 | TEVA-LINAC0046507 | TEVA-LINAC0046511 | Shah Exhibit 12 | A, F, H, CU, R, U |
| 0466 | Email from X. Qi to M. Lopez, et al.,  re: Linaclotide SLC - Material details request | 3/26/2015 | TEVA-LINAC0055970 | TEVA-LINAC0055972 | Shah Exhibit 14 | A, F, H, CU, R, U |
| 0467 | Email from D. Merrill to Y. Joshi, et al., re: Monthly Pomona R&D Project Review: Face-to-Face Meeting with attached Presentation | 6/24/2014 | TEVA-LINAC0058595 | TEVA-LINAC0058630 | Shah Exhibit 11 | A, F, H, CU, R, U |
| 0468 | Email from X. Qi to W. Zarycranski, et al., re: FW: weekly project review meeting with attached Linaclotide Formulator Forum | 11/7/2014 | TEVA-LINAC0059420 | TEVA-LINAC0059434 | Shah Exhibit 13 | A, F, H, CU, R, U |
| 0469 | Email from X. Qi to T. Jiao re: Fw: background of Linaclotide and trial batches | 6/18/2013 | TEVA-LINAC0059608 | TEVA-LINAC0059620 | Gawad Exhibit 16 Shah Exhibit 4 | A, F, H, CU, R, U |
| 0470 | Email from T. Jiao to X. Qi re: Linaclotide Trial Formulation with attached sample formulation trial capsule | 11/9/2013 | TEVA-LINAC0076146 | TEVA-LINAC0076148 | Shah Exhibit 9 | A, F, H, CU, R, U |
| 0471 | U.S. Pharmacopeial Convention Material Safety Data Sheet for L-Leucine | 7/1/2007 | TEVA-LINAC0088350 | TEVA-LINAC0088354 | | A, F, H, CU, R, U |
| 0472 | Email from X. Qi to M. Taleb re: formulation development section with attached Formaulation Development | 6/22/2016 | TEVA-LINAC0093365 | TEVA-LINAC0093378 | | A, F, H, CU, R, U |
| 0473 | 1.12.12 Comparison Between Generic Drug and Reference Listed Drug [Linaclotide Capsules, 72 mcg] | 00/00/0000 | TEVA-LINAC0136942 | TEVA-LINAC0136943 | Domnic Exhibit 19 | A, F, H, CU, R, U |
| 0474 | 1.12.15 Request for Waiver of In Vivo Bioavailability Studies [Linaclotide Capsules, 72 mcg] | 00/00/0000 | TEVA-LINAC0137115 | TEVA-LINAC0137116 | Domnic Exhibit 22 | A, F, H, CU, R, U |
| 0475 | 2.3.P Drug Product [Linaclotide Capsules, 72 mcg] | 00/00/0000 | TEVA-LINAC0137185 | TEVA-LINAC0137252 | | A, F, H, CU, R, U |
| 0476 | 2.3.P Drug Product [Linaclotide Capsules, 72 mcg] | 00/00/0000 | TEVA-LINAC0137253 | TEVA-LINAC0137275 | Domnic Exhibit 24 Shah Exhibit 26 | A, F, H, CU, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0477 | Actavis Product Development Report ANDA #211255, Linaclotide capsules, 72mcg | 00/00/0000 | TEVA-LINAC0137655 | TEVA-LINAC0137781 | Domnic Exhibit 26 Shah Exhibit 27 | A, F, H, CU, R, U |
| 0478 | Application to Market a New or Abbreviated New Drug or Biologic for Human Use for Linaclotide Capsules, 72mcg (Seq. #0007 - Labeling Amendment) | 3/9/2018 | TEVA-LINAC0141233 | TEVA-LINAC0141311 | Domnic Exhibit 25 | A, F, H, CU, R, U |
| 0479 | Sandoz Paragraph IV Notice Letter | 11/1/2016 | N/A | N/A | | A, F, H, CU, R, U, UP |
| 0480 | Plaintiffs' Notice of Deposition of Sandoz Pursuant to Fed.R.Civ.P. 30(b)(6) | 6/22/2018 | N/A | N/A | Henry Exhibit 1 Suchak Exhibit 1 | A, F, H, CU, R, U |
| 0481 | Sandoz - 2.3 Quality Overall Summary - combined (Linaclotide 145 mcg Capsule, hard) | 9/30/2016 | SDZ.LIN 0026234 | SDZ.LIN 0026441 | Henry Exhibit 8 Suchak Exhibit 21 | A, F, H, CU, R, U |
| 0482 | Sandoz - 1.12.12 Comparison of Generic Drug and RLD | 00/00/0000 | SDZ.LIN 0020542 | SDZ.LIN 0020544 | Henry Exhibit 12 | A, F, H, CU, R, U |
| 0483 | BCS Class 3 Biowaiver for Linaclotide hard gelatin capsules (HGC) 145 ug and 290 ug - Justification document | 8/24/2016 | SDZ.LIN 0021629 | SDZ.LIN 0021664 | Henry Exhibit 13 | A, F, H, CU, R, U |
| 0484 | Sandoz - 3.2.P.1 Description and Composition of the Drug Product | 8/24/2016 | SDZ.LIN 0021790 | SDZ.LIN 0021800 | Henry Exhibit 15 | A, F, H, CU, R, U |
| 0485 | Sandoz - 3.2.P.2. Pharmaceutical Development for Linaclotide 145 mcg, 290 mcg capsule, Hard | 8/29/2016 | SDZ.LIN 0021801 | SDZ.LIN 0022041 | Henry Exhibit 17 Suchak Exhibit 24 | A, F, H, CU, R, U |
| 0486 | Sandoz - 2.3.P Quality Overall Summary - Drug Product [Linaclotide] | 9/30/2016 | SDZ.LIN 0026442 | SDZ.LIN 0026600 | | A, F, H, CU, R, U |
| 0487 | Package Insert for Linaclotide Capsules (145 mcg and 290 mcg) | 5/1/2017 | SDZ.LIN 0027635 | SDZ.LIN 0027738 | Henry Exhibit 4 Suchak Exhibit 29 | A, F, H, CU, R, U |
| 0488 | Draft Prescribing Information for Linzess capsules (145 mcg and 290 mcg) | 5/1/2017 | SDZ.LIN 0027683 | SDZ.LIN 0027708 | | A, F, H, CU, R, U |
| 0489 | Email from R. Suchak to I. Nandi re: FW: PDB Agenda 05/2013 with attached Sandoz Product Selection for Pre-Development Presentation | 5/22/2013 | SDZ.LIN 0039804 | SDZ.LIN 0039808 | Suchak Exhibit 9 | A, F, H, CU, R, U |
| 0490 | Email from M. Verbit to R. Suchak re: Project Order Example with attachment | 10/2/2013 | SDZ.LIN 0040187 | SDZ.LIN 0040190 | Suchak Exhibit 5 | A, F, H, CU, R, U |
| 0491 | Project Order for Linaclotide, 145mcg, 290mcg | 9/1/2013 | SDZ.LIN 0040188 | SDZ.LIN 0040190 | Henry Exhibit 5 | A, F, H, CU, R, U |
| 0492 | Email from R. Weiss to I. Pochic, et al., re: Summary, MS3 Stage Gate Meeting Linaclotide HGC with attachment | 12/23/2015 | SDZ.LIN 0042602 | SDZ.LIN 0042621 | Suchak Exhibit 14 | A, F, H, CU, R, U |
| 0493 | Email from M. Seip to M. Henry, et al., re: Project strategy Linaclotide US (with attachment) | 11/11/2014 | SDZ.LIN 0049761 | SDZ.LIN 0049764 | Henry Exhibit 23 | A, F, H, CU, R, U |
| 0494 | Email from G. Perera to M. Henry re: CC to FDA for Linaclotide q1/q2 check with attached formulation | 12/21/2015 | SDZ.LIN 0051074 | SDZ.LIN 0051081 | | A, F, H, CU, R, U |
| 0495 | Sandoz presentation, "PJ-305514 Linaclotide HGC 145 ug, 290 ug US, EU" | 4/28/2015 | SDZ.LIN 0062899 | SDZ.LIN 0062907 | Henry Exhibit 25 | A, F, H, CU, R, U |
| 0496 | Hexal Pharmaceutical Development Test Report GIS 301796 - Stabilisation of Linaclotide coated on pellets (part II) | 6/16/2015 | SDZ.LIN 0087132 | SDZ.LIN 0087163 | Suchak Exhibit 25 | A, F, H, CU, R, U |
| 0497 | Hexal Pharmaceutical Development Test Report GIS 301796 - Stabilisation of Linaclotide coated on pellets (part II)(Excerpted) | 6/16/2015 | SDZ.LIN 0087132 | SDZ.LIN 0087157 | Henry Exhibit 24 | A, F, H, CU, R, U |
| 0498 | HEXAL AG - SDC Holzkirchen - Test report Analytics - Draft Summary of Development Stability for Linaclotide HGC 290 ug - non-q1/q2 Formulation | 6/1/2015 | SDZ.LIN 0105660 | SDZ.LIN 0105670 | Henry Exhibit 7 | A, F, H, CU, R, U |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0499 | Sandoz - 2.3.P Quality Overall Summary - Drug product [Linaclotide] | 8/20/2018 | SDZ.LIN 0142619 | SDZ.LIN 0142791 | | A, F, H, CU, R, U |
| 0500 | Resubmission Letter from M. Henry (Sandoz) to FDA re: ANDA # 209630 Linaclotide Capsules, 145 mcg and 290 mcg | 11/26/2018 | SDZ.LIN 0143265 | SDZ.LIN 0143332 | | A, CU, F, H, R, U |
| 0501 | Prescribing Information for Linzess capsules (145 mcg and 290 mcg) | 10/1/2018 | SDZ.LIN 0143979 | SDZ.LIN 0143999 | | A, CU, F, H, R, U |
| 0502 | Sandoz - 3.2.P.1 Description and Composition of the Drug Product | 5/17/2018 | SDZ.LIN 0145066 | SDZ.LIN 0145076 | | A, CU, F, H, R, U |
| 0503 | Sandoz - 3.2.P.2. Pharmaceutical Development | 5/17/2018 | SDZ.LIN 0145483 | SDZ.LIN 0145728 | | A, CU, F, H, R, U |
| 0504 | Letter from M. Parks (FDA) to J. Crimmins (Sanofi-Aventis U.S. LLC) enclosing Package Inserts and Patient Instruction Guide for DDA VP Intranasal, Package Inserts for DDA VP Injection and DDA VP Tablets | 10/26/2007 | N/A | N/A | Gupta Exhibit 2 | A, CU, F, H, R, U |
| 0505 | Letter from R. Albrecht (FDA) to I. Kissen (Novartis) enclosing Sandimmune® package insert | 3/6/2006 | N/A | N/A | Gupta Exhibit 3 | A, CU, F, H, R, U |
| 0506 | Letter from R. Albrecht (FDA) to R. Van Halen (Novartis) enclosing Neoral® package insert | 8/1/2007 | N/A | N/A | Gupta Exhibit 4 | A, CU, F, H, R, U |
| 0507 | Rome Foundation - Endpoints and Outcomes Conference 2009: Optimizing Clinical Trials in FGID | 4/15/2009 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0508 | Draft Program of Endpoints and Outcomes Conference 2009: Optimizing Clinical Trials in FGID | 4/15/2009 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0509 | Guidance for Industry - Patient-Reported Outcome Measures: Use in Medical Product Development to Support Labeling Claims | 12/1/2009 | N/A | N/A | Kunka Exhibit 8 | A, CU, F, H, R, U |
| 0510 | Figure 1 from 2010 Lin paper with header "Bacterial STs" | 1/1/2010 | N/A | N/A | Kent Exhibit 24 | A, CU, F, H, R, U, I |
| 0511 | Guidance for Industry - Irritable Bowel Syndrome - Clinical Evaluation of Drugs for Treatment | 5/1/2012 | N/A | N/A | Kunka Exhibit 10 | A, CU, F, H, R, U |
| 0512 | U.S. Pharmacopeial Convention Safety Data Sheet for Calcium Chloride | 7/9/2015 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0513 | U.S. Pharmacopeial Convention Safety Data Sheet for L-Leucine | 9/8/2016 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0514 | ANDA Submissions - Refuse-to-Receive Standards Guidance for Industry, Revision 2 | 12/1/2016 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0515 | Package insert for Linzess capsules (72 mcg, 145 mcg and 290 mcg) | 1/1/2017 | N/A | N/A | Kunka Exhibit 5 | A, CU, F, H, R, U |
| 0516 | Angelika Fretzen LinkedIn Profile | 8/2/2018 | N/A | N/A | Fretzen Exhibit 1 | A, CU, F, H, R, U |
| 0517 | Prescribing Information for Trulance | 2/1/2018 | N/A | N/A | Currie Exhibit 28 | A, CU, F, H, R, U |
| 0518 | Prescribing Information for Trulance | 5/1/2019 | N/A | N/A | Gupta Exhibit 5 | A, CU, F, H, R, U |
| 0519 | "How LINZESS Works" (https://www.linzess.com/ibsc-and-cic-symptoms/how-linzess-works - last accessed 9/6/18) | 9/6/2018 | N/A | N/A | Kurtz Exhibit 10 | A, CU, F, H, R, U |
| 0520 | Stipulated Order, *Allergan Sales LLC, et al. v. Teva Pharmaceuticals USA, et al.*, CA. No. 16-1114 (RGA) | 5/1/2019 | N/A | N/A | Gupta Exhibit 33 | CU, F, H, R, U |
| 0521 | Slide deck, "Irritable Bowel Syndrome, Part 2" | 00/00/0000 | N/A | N/A | Barnett Exhibit 16 Chang Exhibit 25 | A, CU, F, H, R, U |
| 0522 | List of depositions and trials in which Dr. Klibanov has testified | 00/00/0000 | N/A | N/A | Klibanov Exhibit 1 | A, CU, F, H, R, U |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0523 | Presentation, "Linzess (linaclotide) capsules, 72 mcg, 145 mcg, 290 mcg" | 00/00/0000 | N/A | N/A | Kunka Exhibit 14 | A, CU, F, H, R, U |
| 0524 | MOVED TO JOINT EXHIBIT LIST AS JTX-007 | | | | | |
| 0525 | U.S. Patent No. 5,140,102 (Currie) | 8/18/1992 | N/A | N/A | Currie Exhibit 24 | A, CU, F, H, R, U |
| 0526 | U.S. Patent No. 5,204,096 (Neurath et al.) | 4/20/1993 | N/A | N/A | Kent Exhibit 35 | A, CU, F, H, R, U |
| 0527 | MOVED TO JOINT EXHIBIT LIST AS JTX-008 | | | | | |
| 0528 | U.S. Patent No. 5,618,539 (Dorval et al.) | 4/8/1997 | N/A | N/A | Klibanov Exhibit 7 | A, CU, F, H, R, U |
| 0529 | MOVED TO JOINT EXHIBIT LIST AS JTX-009 | | | | | |
| 0530 | U.S. Patent No. 5,705,537 (Hartman, Jr. et al.) | 1/6/1998 | DEFS-LINA-00001041 | DEFS-LINA-00001044 | Fretzen Exhibit 14 | |
| 0531 | U.S. Patent No. 5,874,106 (Adesunloye et al.) | 2/23/1999 | DEFS-LINA-00002537 | DEFS-LINA-00002542 | Block Exhibit 20 | |
| 0532 | U.S. Patent No. 5,969,097 (Wiegand et al.) | 10/19/1999 | DEFS-LINA-00001618 | DEFS-LINA-00001631 | Barnett Exhibit 22 Barrett Exhibit 14 Currie Exhibit 26 DeGrado Exhibit 11 Giannella Exhibit 8 | |
| 0533 | MOVED TO JOINT EXHIBIT LIST AS JTX-010 | | | | | |
| 0534 | U.S. Patent No. 6,383,788 (Chan et al.) | 5/7/2002 | DEFS-LINA-00000913 | DEFS-LINA-00000931 | | |
| 0535 | U.S. Patent No. 7,118,737 (Kochendoerfer et al.) | 10/10/2006 | N/A | N/A | Kent Exhibit 36 | A, CU, F, H, R, U |
| 0536 | U.S. Patent No. 8,618,049 (Kent et al.) | 12/31/2013 | N/A | N/A | Kent Exhibit 37 | A, CU, F, H, R, U |
| 0537 | U.S. Patent No. 10,383,919 (Gupta et al.) | 8/20/2019 | N/A | N/A | Gupta Exhibit 6 | A, CU, F, H, R, U |
| 0538 | U.S. Patent Application Publication No. 2003/0073628 (Shailubhai et al.) | 4/17/2003 | DEFS-LINA-00000138 | DEFS-LINA-00000159 | Chang Exhibit 21 | |
| 0539 | U.S. Patent Application Publication No. 2005/0020811 A1 (Currie et al.) | 1/27/2005 | DEFS-LINA-00000830 | DEFS-LINA-00000912 | Klibanov Exhibit 13 | |
| 0540 | MOVED TO JOINT EXHIBIT LIST AS JTX-011 | | | | | |
| 0541 | U.S. Patent Application Publication No. 2017/0157200 (Mo et al.) | 6/8/2017 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0542 | International Publication No. WO 2001/25266 A1 | 4/12/2001 | DEFS-LINA-00000083 | DEFS-LINA-00000137 | Barnett Exhibit 24 Barrett Exhibit 16 Currie Exhibit 27 | |
| 0543 | MOVED TO JOINT EXHIBIT LIST AS JTX-012 | | | | | |
| 0544 | International Publication No. WO 2004/039392 A2 (Bentz) | 5/13/2004 | IW_LINZ_00773253 | IW_LINZ_00773293 | Fretzen Exhibit 19 Zhao Exhibit 11 | A, CU, F, H, R, U |
| 0545 | International Publication No. WO 2006/088418 A1 (Wahren) | 8/24/2006 | DEFS-LINA-00002717 | DEFS-LINA-00002739 | Klibanov Exhibit 8 | |
| 0546 | MOVED TO JOINT EXHIBIT LIST AS JTX-013 | | | | | |
| 0547 | European Patent 1559433 A1 (Iwata) | 8/3/2005 | DEFS-LINA-00002331 | DEFS-LINA-00002365 | Block Exhibit 21 | |
| 0548 | Aimoto, et al., "Chemical Synthesis of a Highly Potent and Heat-stable Analog of an Enterotoxin Produced by a Human Strain of Enterotoxigenic *Escherichia coli*," *Biochemical and Biophysical Research Communications*, Vol. 112, No. 1 | 4/15/1983 | DEFS-LINA-00000172 | DEFS-LINA-00000178 | DeGrado Exhibit 13 Giannella Exhibit 12 Kent Exhibit 8 Wolfe Exhibit 15 | |
| 0549 | Albano, F., et al., "Structural and Functional Features of Modified Heat-Stable Toxins Produced by Enteropathogenic *Klebsiella* Cells," *Pediatric Research*, Vol. 48, No. 5, pp. 685-689 (2000) | 1/1/2000 | DEFS-LINA-00000160 | DEFS-LINA-00000165 | | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0550 | Andresen, V., et al., "Effect of 5 Days Linaclotide on Transit and Bowel Function in Females with Constipation Predominant Irritable Bowel Syndrome," *Gastroenterology* , Vol. 133, No. 3, pp. 761-768 (2007) | 1/1/2007 | LINZ_0156019 | LINZ_0156026 | | A, CU, F, H, R, U |
| 0551 | Andresen, V., et al., "Linaclotide Acetate," *Drugs of the Future* , Vol. 33, No. 7, pp. 570-576 (2008) | 7/1/2008 | DEFS-LINA-00001046 | DEFS-LINA-00001053 | Klibanov Exhibit 14 | |
| 0552 | Appel, W., "Chymotrypsin: Molecular and Catalytic Properties," *Clinical Biochemistry,* Vol. 19, pp. 317-322 | 12/1/1986 | IW_LINZ_00000109 | IW_LINZ_00000114 | Wolfe Exhibit 17 | A, CU, F, H, R, U |
| 0553 | Arita, M., et al, "Purification and characterization of a heat-stable enterotoxin of *Vibrio mimicus* ," *FEMS Microbiology Letter* , Vol. 79, pp. 105-110 | 1/1/1991 | LINZ_0105724 | LINZ_0105729 | | A, CU, F, H, R, U |
| 0554 | Atwe, S., Gupta, P., "Development of Albumin-coated Nanoparticle Carrier systems for Human Growth Hormone" | 00/00/0000 | DEFS-LINA-00005379 | DEFS-LINA-00005380 | Gupta Exhibit 14 | |
| 0555 | Barnes, M. and Gray, I., "Amino Acid Properties and Consequences of Substitutions," Chap. 14 in *Bioinformation for Geneticists* (2003) | 1/1/2003 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0556 | Barnett, J., "Taking Care of Constipation," *Diabetes Forecast* , pp. 25-27 | 5/1/1992 | N/A | N/A | Barnett Exhibit 9 | A, CU, F, H, R, U |
| 0557 | Barnett, J., Snape, W., "Motor Disorders of the Gastrointestinal Tract," *Textbook of Internal Medicine* , Vol. 1, Chapter 78 | 1/1/1989 | N/A | N/A | Barnett Exhibit 28 | A, CU, F, H, R, U |
| 0558 | Barnett, J., Snape, W., "Approach to the Patient with Constipation," *Textbook of Internal Medicine* , Vol. 1, Chapter 99 | 1/1/1989 | N/A | N/A | Barnett Exhibit 29 | A, CU, F, H, R, U |
| 0559 | Barnett, J., "Approach to the Patient with Constipation," *Textbook of Internal Medicine* , Second Edition, Chapter 99 | 1/1/1992 | N/A | N/A | Barnett Exhibit 30 | A, CU, F, H, R, U |
| 0560 | Barnett, J., "Approach to the Patient with Constipation and Fecal Incontinence," *Textbook of Internal Medicine* , Third Edition, Chapter 106 | 1/1/1997 | N/A | N/A | Barnett Exhibit 31 | A, CU, F, H, R, U, NL |
| 0561 | Barnett, J., "Approach to the Patient with Constipation, Fecal Incontinence, and Gas," *Textbook of Internal Medicine* , 4th ed., Chapter 100 | 1/1/2000 | N/A | N/A | Barnett Exhibit 32 | A, CU, F, H, R, U, I |
| 0562 | Barrett, K., Keely, S., "Chloride Secretion by the Intestinal Epithelium: Molecular Basis and Regulatory Aspects," *Annu. Rev. Physiol.* , Vol. 62, pp. 535-572 (2000) | 1/1/2000 | LINZ_0168781 | LINZ_0168820 | Barrett Exhibit 8 | A, CU, F, H, R, U, BE |
| 0563 | Barrett, K., "Endogenous and exogenous control of gastrointestinal epithelial function: building on the legacy of Bayliss and Starling," *J. Physiol.* , Vol. 595, pp. 423–432 (2017) | 1/1/2017 | LINZ_0168998 | LINZ_0169007 | | A, CU, F, H, R, U |
| 0564 | Barrett, K., "New frontiers in gastrointestinal physiology and pathophysiology," *J. Physiol.* , Vol. 596, pp. 3859-3860 (2018) | 1/1/2018 | LINZ_0169350 | LINZ_0169351 | | A, CU, F, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0565 | Bauer, C.A., "Active Centers Of *Streptomyces griseus* Protease 1, *Streptomyces griseus* Protease 3, and α-Chymotrypsin: Enzyme-Substrate Interactions, *Biochemistry - Am. Chem. Soc.*, Vol. 17, No. 2, pp. 375-380 (1978) | 1/1/1978 | LINZ_0169569 | LINZ_0169574 | | A, CU, F, H, R, U |
| 0566 | Beckmann, J., et al., "Preparation Of Chemically 'Mutated' Aprotinin Homologues By Semisynthesis P1 - Substitutions Change Inhibitory Specificity," *Eur. J. Biochem.*, Vol. 176, pp. 675-682 (1988) | 1/1/1988 | LINZ_0169617 | LINZ_0169624 | | A, CU, F, H, R, U |
| 0567 | Beckmann, J., et al., "Semisynthesis of Arg15, Glu15, Met15, and Nle15-Aprotinin Involving Enzymatic Peptide Bond Resynthesis," *Journal of Protein Chemistry*, Vol. 8, No. 1, pp. 101-113 (1989) | 1/1/1989 | LINZ_0169583 | LINZ_0169595 | | A, CU, F, H, R, U |
| 0568 | Beltowski, J., "Guanylin and Related Peptides," *J. of Physiology and Pharmacology*, Vol. 52, pp. 351–375 (2001) | 1/1/2001 | DEFS-LINA-00001871 | DEFS-LINA-00001895 | | |
| 0569 | Berezin, I.V., et al., "On the Relationship Between Structure and Reactivity of Chymptrysin Substrates," *FEBS Letters*, Vol. 15, No. 2, pp. 125-128 | 6/1/1971 | LINZ_0105730 | LINZ_0105733 | | A, CU, F, H, R, U |
| 0570 | Bergmann, M., Fruton, J., "On Proteolytic Enzymes: XIII. Synthetic Substrates For Chymotrypsin," J. Biol. Chem., Vol. 118, pp. 405-415 (1937) | 1/1/1937 | LINZ_0169377 | LINZ_0169388 | | A, CU, F, H, R, U |
| 0571 | Brennan, T., Clarke, S., "Effect of adjacent histidine and cysteine residues on the spontaneous degradation of asparaginyl- and aspartyl-containing peptides," *Int. J. Pepride Protein Res.*, Vol. 45, pp. 547-553 | 7/1/1995 | N/A | N/A | Gupta Exhibit 18 | A, CU, F, H, R, U |
| 0572 | Bryant, A., et al., "Linaclotide is a potent and selective guanylate cyclase C agonist that elicits pharmacological effects locally in the gastrointestinal tract," *Life Science*, 86 (2010) 760-765 | 3/11/2010 | LINZ_NDA0035664 | LINZ_NDA0035669 | Kurtz Exhibit 5 | A, CU, F, H, R, U |
| 0573 | Burks, T., "Gastrointestinal Drugs," *Human Pharmacology: Molecular to Clinical*, Chap. 60, pp. 801-814, (2nd ed. 1994) | 1/1/1994 | DEFS-LINA-00002543 | DEFS-LINA-00002561 | Barrett Exhibit 4 | |
| 0574 | Busby, R., et al., "Linaclotide, through activation of guanylate cyclase C. acts locally in the gastrointestinal tract to elicit enhanced intestinal secretion and transit," *European Journal of Pharmacology*, 649 (2010) 328-335 | 9/7/2010 | LINZ_0038075 | LINZ_0038082 | Mahajan-Miklos Exhibit 11 | A, CU, F, H, R, U |
| 0575 | Busby, R., et al., "Pharmacologic Properties, Metabolism, and Disposition of Linaclotide, a Novel Therapeutic Peptide Approved for the Treatment of Irritable Bowel Syndrome with Constipation and Chronic Idiopathic Constipations," *The Journal of Pharmacology and Experimental Therapeutics*, Vol. 334, pp. 196-206 | 1/1/2013 | LINZ_0105758 | LINZ_0105767 | | A, CU, F, H, R, U |
| 0576 | Caballero-Plasencia, A., et al., "Altered Gastric Emptying in Patients with Irritable Bowel Syndrome," *Eur. J. Nucl. Med.*, Vol. 26, No. 4, pp. 404-409 (1999) | 4/1/1999 | N/A | N/A | | A, CU, F, H, R, U, UP |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0577 | MOVED TO JOINT EXHIBIT LIST AS JTX-014 | | | | | |
| 0578 | Camilleri, M., "Management of the Irritable Bowel Syndrome," *Gastroenterology* , Vol. 120, No. 3, pp. 652-668 | 2/1/2001 | LINZ_0001165 | LINZ_0001181 | Barnett Exhibit 19 | A, CU, F, H, R, U |
| 0579 | Camilleri, M., "Treating irritable bowel syndrome: overview, perspective and future therapies," *British Journal of Pharmacology* , Vol. 141, pp. 1237-1248 | 1/1/2004 | LINZ_0105779 | LINZ_0105790 | | A, CU, F, H, R, U |
| 0580 | Camilleri, M., Chang, L., "Challenges to the Therapeutic Pipeline for Irritable Bowel Syndrome: End Points and Regulatory Hurdles," *Gastroenterology* , Vol. 135, No. 8, pp. 1877-1891 | 12/1/2008 | IW_LINZ_00141686 | IW_LINZ_00141700 | Chang Exhibit 20 | A, CU, F, H, R, U |
| 0581 | MOVED TO JOINT EXHIBIT LIST AS JTX-015 | | | | | |
| 0582 | *Rational Design of Stable Protein Formulations: Theory and Practice* (John F. Carpenter & Mark C. Manning, eds., 2002) | 1/1/2002 | IW_LINZ_01054243 | IW_LINZ_01054464 | Gupta Exhibit 16 | A, CU, F, H, R, U |
| 0583 | Carpick, B., Gariepy, J., "Structural Characterization of Functionally Important Regions of the *Escherichia coli* Heat-Stable Enterotoxin STIb," *Biochemistry* , Vol. 30, No. 19, pp. 4803-4809 (1991) | 1/1/1991 | DEFS-LINA-00000192 | DEFS-LINA-00000198 | | |
| 0584 | Carpick, B., Gariepy, J., "The *Escherichia coli* Heat-Stable Enterotoxin Is a Long-Lived Superagonist of Guanylin," *Infection and Immunity* , Vol. 61, No. 11, pp. 4710-4715 (1993) | 11/1/1993 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0585 | Cash, B., Lacy, B., "Systematic Review: FDA-Approved Prescription Medications for Adults With Constipation," *Gastroenterology & Hepatology* , Vol. 2, Issue 10, pp. 736-749 | 10/1/2006 | LINZ_0105791 | LINZ_0105804 | | A, CU, F, H, R, U, NL |
| 0586 | Cash, B., et al., "Update on the Management of Adults with Chronic Idiopathic Constipation," *J. of Family Practice* , Suppl. Vol. 56, No. 6, S13-S20 (2007) | 6/1/2007 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0587 | Castro, J., et al., "Linaclotide Inhibits Colonic Nociceptors and Relieves Abdominal Pain via Guanylate Cyclase-C and Extracellular Cyclic Guanosine 3',5'-Monophosphate," *Gastroenterology* , Vol. 145, pp. 1334-1346 (2013) | 12/1/2013 | N/A | N/A | Barnett Exhibit 38 - (Color Version) Barrett Exhibit 18 Kent Exhibit 26 | A, CU, F, H, R, U |
| 0588 | Catalan, M., et al., "ClC-2 in guinea pig colon: mRNA, immunolabeling, and functional evidence for surface epithelium localization," *Am. J. Physiol. Gastrointestinal Liver Physiol* ., Vol. 283, G1004-G1013 (2002) | 1/1/2002 | LINZ_0168821 | LINZ_0168830 | | A, CU, F, H, R, U |
| 0589 | Chang, L., Drossman, D., "Rome Foundation Endpoints and Outcomes Conference 2009: Optimizing Clinical Trials in FGID," *Am J Gastroenterol.* , Vol. 105 | 4/1/2010 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0590 | Chang, L., et al., "The impact of abdominal pain on global measures in patients with chronic idiopathic constipation, before and after treatment with linaclotide: a pooled analysis of two randomised, double-blind, placebo controlled, phase 3 trials," *Alimentary Pharmacology and Therapeutics* , pp. 1-11 | 1/1/2014 | LINZ_0169762 | LINZ_0169772 | Barrett Exhibit 22 Chang Exhibit 3 | A, CU, F, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0591 | Chang, L., et al., "Functional Bowel Disorders: A Roadmap to Guide the Next Generation of Research," *Gastroenterology*, Vol. 154, No. 3, pp. 723-735 | 2/1/2018 | N/A | N/A | Chang Exhibit 23 | A, CU, F, H, R, U |
| 0592 | Charney, A., et al., "Effect of E. coli heat-stable enterotoxin on colonic transport in guanylyl cyclase C receptor-deficient mice," *Am J Physiol. Gastrointest. Liver Physiol.*, Vol. 280, pp. G216-221 | 1/1/2001 | LINZ_0105805 | LINZ_0105810 | | A, CU, F, H, R, U |
| 0593 | MOVED TO JOINT EXHIBIT LIST AS JTX-016 | | | | | |
| 0594 | Chen, T., "Formulation Concerns of Protein Drugs," *Drug Dev. Ind. Pharm*., Vol. 18, pp. 1311-1354 (1992) | 1/1/1992 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0595 | Chey, W., et al., "Utility of the Rome I and Rome II Criteria for Irritable Bowel Syndrome in U.S. Women," *The American Journal of Gastroenterology*, Vol. 97, No. 11, pp. 2803-2811 (2002) | 11/1/2002 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0596 | Clark-Lewis, I., et al., "Structure-Function Studies of Human Granulocyte-Macrophage Colony-Stimulatiing Factor - Identification of Residues Required for Activity," *The Journal of Immunology*, Vol. 141, No. 3, pp. 881-889 | 8/1/1988 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0597 | Clark-Lewis, I., et al., "Role of disulfide bridges in determining the biological activity of interleukin 3," *Proc. Natl. Acad. Sci. USA*, Vol. 85, pp. 7897-7901 | 11/1/1988 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0598 | Cleland, J., et al., "The Development of Stable Protein Formulations: A Close Look at Protein Aggregation, Deamidation, and Oxidation," *Crit. Rev. Ther. Drug Carrier Syst.*, Vol. 10, Issue 4, pp. 307-377 (1993) | 1/1/1993 | DEFS-LINA-00000251 | DEFS-LINA-00000323 | Block Exhibit 13 | |
| 0599 | Cohen, M., et al., "Age-Related Differences in Receptors for Escherichia coli Heat-Stable Enterotoxin in the Small and Large Intestine of Children," *Gastroenterology*, Vol. 94, No. 2, pp. 367-373 (1988) | 1/1/1988 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0600 | Cohen, M., et al., "Differences in jejunal and ileal response to *E. coli* enterotoxin: possible mechanisms," *Am. J. Physiol.*, Vol. 257, pp. G118-G123 | 1/1/1989 | RG_LINZ_00000182 | RG_LINZ_00000187 | Giannella Exhibit 11 | A, CU, F, H, R, U |
| 0601 | Cohen, M., et al., "*E. Coli* Heat-Stable Enterotoxin (STa) Induced Secretion: Differences Between Adult Rat Jejunum and Ileum Correlate with Differences in Metabolic Fate of STa," *Adv. in Res. On Cholera and Related Diarrheas* (7th. Ed.), pp. 99-104 (1990) | 1/1/1990 | RG_LINZ_00000176 | RG_LINZ_00000181 | | A, CU, F, H, R, U |
| 0602 | Cohen, M., Giannella, R., "Jejunal Toxin Inactivation Regulates Susceptibility of the Immature Rat to STa," *Gastroenterology*, Vol. 102, pp. 1988–1996 (1992) | 6/1/1992 | RG_LINZ_00000244 | RG_LINZ_00000252 | DeGrado Exhibit 14 | A, CU, F, H, R, U |
| 0603 | Cohen, M., et al., "Randomized, Controlled Human Challenge Study of the Safety, Immunogenicity, and Protective Efficacy of a Single Dose of Peru-15, a Live Attenuated Oral Cholera Vaccine," *Infection and Immunity*, Vol. 70, No. 4, pp. 1965-1970 | 1/1/2002 | N/A | N/A | Barnett Exhibit 39 Giannella Exhibit 9 | A, CU, F, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0604 | Cornette, J., et al., "Hydrophobicity Scales and Computational Techniques for Detecting Amphipathic Structures in Proteins," *J Mol. Biol* ., Vol. 195, pp. 659-685 (1987) | 7/1/1987 | LINZ_0169040 | LINZ_0169068 | | A, CU, F, H, R, U |
| 0605 | Costantino, H., et al., "Moisture-Induced Aggregation of Lyophilized Insulin," *Pharmaceutical Research* , Vol. 11, No. 1, pp. 21-29 (1994) | 1/1/1994 | IW_LINZ_01054538 | IW_LINZ_01054546 | | A, CU, F, H, R, U |
| 0606 | Costantino, H., et al., "Solid-Phase Aggregation of Proteins under Pharmaceutically Relevant Conditions," *Journal of Pharmaceutical Sciences* , Vol. 83, No. 12, pp. 1662-1669 | 12/1/1994 | IW_LINZ_01054547 | IW_LINZ_01054554 | Fretzen Exhibit 17 | A, CU, F, H, R, U |
| 0607 | Costantino, H.R., et al., "Deterioration of Lyophilized Pharmaceutical Proteins," *Biochemistry (Moscow)* , Vol. 63, No. 3, pp. 357-363 | 1/1/1998 | IW_LINZ_00103188 | IW_LINZ_00103200 | Klibanov Exhibit 9 | A, CU, F, H, R, U, MD |
| 0608 | Creighton, T., "Disulfide Bonds as Probes of Protein Folding Pathways," *Methods in Enzymology* , Vol. 131, pp. 83-106 (1986) | 1/1/1986 | LINZ_0169319 | LINZ_0169342 | | A, CU, F, H, R, U |
| 0609 | Creighton, T., "Disulphide bonds and protein stability," *BioEssays* , Vol. 8, No. 2, pp. 57-63 (1988) | 2/1/1988 | LINZ_0169343 | LINZ_0169349 | | A, CU, F, H, R, U |
| 0610 | Creighton, T., "The disulfide folding pathway of BPTI," *Science* , Vol. 256, pp. 111-114 (1992) | 4/3/1992 | LINZ_0169069 | LINZ_0169071 | | A, CU, F, H, R, U |
| 0611 | Crowley, P., "Excipients as Stabilizers," *Pharm. Sci. Technol. Today* , Vol. 2, No. 6, pp. 237-243 (1999) | 6/1/1999 | DEFS-LINA-00001065 | DEFS-LINA-00001071 | | |
| 0612 | Cuppoletti, J., et al., "Recombinant and Native Intestinal Cell ClC-2 Cl-Channels Are Activated by RU-0211," *Gastroenterology* , Suppl. Vol. 122, No . 4 , A-538 (2002) | 4/1/2002 | LINZ_0105811 | LINZ_0105814 | | A, CU, F, H, R, U, NL |
| 0613 | Cuppoletti, J., et al., "Recombinant and Native Intestinal Cell ClC-2 Cl-Channels Are Activated by RU-0211," *Gastroenterology* , Suppl. Vol. 122, No. 4 , A-538 (2002)**(Color version)** | 4/1/2002 | N/A | N/A | Barnett Exhibit 10 | A, CU, F, H, R, U |
| 0614 | Cuppoletti, J., et al., "SPI-0211 activates T84 cell chloride transport and recombinant human ClC-2 chloride currents," *Am. J. Physiol Cell Physiol* , Vol. 287, C1173-C1183 (2004) | 11/1/2004 | N/A | N/A | Barnett Exhibit 11 | A, CU, F, H, R, U |
| 0615 | Currie, M., et al., "Guanylin: An endogenous activator of intestinal guanylate cyclase," *Proc. Natl. Acad. Sci. USA* , Vol. 89, pp. 947-951 (1992) | 2/1/1992 | LINZ_0105826 | LINZ_0105830 | Kent Exhibit 16 | A, CU, F, H, R, U |
| 0616 | Dahm, L., Jones, D., "Rat Jejunum Controls Luminal Thiol-Disulfide Redox," *J. Nutr* ., Vol. 130 , pp. 2739-2745 (2000) | 1/1/2000 | DEFS-LINA-00001632 | DEFS-LINA-00001638 | | |
| 0617 | Daugherty, A., R. Mrsny, "Formulation and Delivery Issues for Monoclonal Antibody Therapeutics," *Adv. Drug Deliv. Rev* ., Vol. 58, pp. 686-706 (2006) | 5/22/2006 | IW_LINZ_01054465 | IW_LINZ_01054485 | | A, CU, F, H, R, U |
| 0618 | Davis, L., "Botulism Toxin, From Poison to Medicine," *West J. Med.* , Vol. 158, No. 1, pp. 25-29 (1993) | 1/1/1993 | LINZ_0169072 | LINZ_0169076 | | A, CU, F, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0619 | Dayhoff, M., et al., "A Model of Evolutionary Change in Proteins," *Atlas of Protein Sequence and Structure* , 5 Supp. 3, pp. 345-352 (1978) | 1/1/1978 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0620 | del Barrio, M., et al., "Simultaneous Determination of Formic Acid and Formaldehyde in Pharmaceutical Excipients Using Headspace GC/MS," *J. Pharm. Biomed. Analysis* ., Vol. 41, pp. 738-743 (2006) | 2/7/2006 | DEFS-LINA-00001520 | DEFS-LINA-00001525 | Block Exhibit 18 | |
| 0621 | DiFeo, T., "Drug Product Development: A Technical Review of Chemistry, Manufacturing, and Controls Information for the Support of Pharmaceutical Compound Licensing Activities," *Drug Development and Industrial Pharmacy* , Vol. 29, No. 9, pp. 939-958 | 1/1/2003 | DEFS-LINA-00002697 | DEFS-LINA-00002716 | | |
| 0622 | Dorovska, V.N., et al., "The Influence Of The Geometric Properties Of The Active Centre On The Specificity Of α-Chymotrypsin Catalysis," *FEBS Letters* , Vol. 23, No. 1, pp. 122-124 (1972) | 6/1/1972 | LINZ_0169517 | LINZ_0169519 | | A, CU, F, H, R, U |
| 0623 | Dreyfus, L., Robertson, D., "Solublization and Partial Characterization of the Intestinal Receptor for *Escherichia coli* Heat-Stable Enterotoxin," *Infection and Immunity* , Vol. 46, No. 2, pp. 537-543 | 11/1/1984 | DEFS-LINA-00000324 | DEFS-LINA-00000330 | | |
| 0624 | Drossman, D., "The functional gastrointestinal disorders and the Rome II process," *Gut* , Vol. 45, pp. II1 II5 | 1/1/1999 | DEFS-LINA-00002059 | DEFS-LINA-00002063 | | |
| 0625 | Eberle, D., et al., "Rapid Oxidation *in Vitro* of Endogenous and Exogenous Glutathione in Bile of Rats," *J. Biol. Chem* ., Vol. 256, No. 5, pp. 2115-2117 (1981) | 3/10/1981 | DEFS-LINA-00001639 | DEFS-LINA-00001641 | | |
| 0626 | Eisenberg, D., et al., "Analysis of Membrane and Surface Protein Sequences with the Hydrophobic Moment Plot," *J. Mol. Biol* ., Vol. 179, pp. 125-142 (1984) | 1/1/1984 | LINZ_0169292 | LINZ_0169309 | | A, CU, F, H, R, U |
| 0627 | Eisenberg, S., et al., "Location Of Protease-Inhibitory Region Of Secretory Leukocyte Protease Inhibitor," *The Journal of Biological Chemistry* , Vol. 265, No. 4, pp. 7976-7981 (1990) | 5/15/1990 | LINZ_0169596 | LINZ_0169602 | | A, CU, F, H, R, U |
| 0628 | El-Salhy, M., "Chronic idiopathic slow transit constipation: pathophysiology and management," *Colorectal Disease* , Vol. 5, pp. 288-296 | 1/1/2003 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0629 | Engelman, D.M., et al., "Identifying Nonpolar Transbilayer Helices in Amino Acid Sequences of Membrane Proteins," *Annual Review of Biophysics and Biophysical Chemistry* , Vol. 15, pp. 321-352 (1986) | 1/1/1986 | LINZ_0169079 | LINZ_0169113 | | A, CU, F, H, R, U |
| 0630 | Eutamene, H., et al., "Guanylate cyclase C-mediated antinociceptive effects of linaclotide in rodent models of visceral pain," *Neurogastroenterology & Motility,* pp. 1-11 | 1/1/2009 | IW_LINZ_00711153 | IW_LINZ_00711163 | | A, CU, F, H, R, U |
| 0631 | Ewe, K., "Intestinal Transport in Constipation and Diarrhoea," *Pharmacology* , 36 Suppl. 1, pp. 73-84 (1988) | 1/1/1988 | DEFS-LINA-00000331 | DEFS-LINA-00000345 | Barnett Exhibit 20 Barrett Exhibit 3 | |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0632 | Fan, X., et al., "Structure and activity of uroguanylin and guanylin from the intestine and urine of rats," pp. E957-E964 | 1/1/1997 | IW_LINZ_00118353 | IW_LINZ_00118360 | | A, CU, F, H, R, U |
| 0633 | Fleckenstein, P., et al., "Minute Rhythm of Electrical Spike Bursts of the Small Intestine in Different Species," *Am. J. Physiol.* , Vol. 242. No. 6, pp. G654-549 (1982) | 6/1/1982 | DEFS-LINA-00000346 | DEFS-LINA-00000353 | | |
| 0634 | Fonteles, M.C., et al., "The lysine-1 analog of guanylin induces intestinal secretion and natriuresis in the isolated perfused kidney," *Brazilian Journal of Medical and Biological Research* , Vol. 29, pp. 267-271 | 1/1/1996 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0635 | The Food and Drug Administration's "Guidance for Industry for the Submission of Chemistry, Manufacturing, and Controls Information for Synthetic Peptide Substances" (1994) | 11/1/1994 | DEFS-LINA-00001072 | DEFS-LINA-00001087 | | |
| 0636 | Forte, L., "Guanylin Stimulation of CI Secretion in Human Intestinal T84 Cells via Cyclic Guanosine Monophosphate," *The Journal of Clinical Investigation* , Vol. 91, No. 6, pp. 2423-2428 | 6/1/1993 | IW_LINZ_00123949 | IW_LINZ_00123963 | | A, CU, F, H, R, U |
| 0637 | Forte, L., "Guanylin regulatory peptides: structures, biological activities mediated by cyclic GMP and pathbiology," *Regulatory Peptide* , Vol. 81, pp. 25-39 | 1/1/1999 | DEFS-LINA-00001642 | DEFS-LINA-00001656 | Barnett Exhibit 26 Barrett Exhibit 13 Chang Exhibit 19 Currie Exhibit 14 Kent Exhibit 19 | |
| 0638 | Frantz, J., et al., "Binding of *Escherichia coli* Heat-Stable Enterotoxin to Rat Intestinal Cells and Brush Border Membranes," *Infection and Immunity* , Vol. 43, No. 2, pp. 622-630 (1984) | 2/1/1984 | DEFS-LINA-00000370 | DEFS-LINA-00000378 | | |
| 0639 | Gabriel, S.E., et al., "A novel plant-derived inhibitor of cAMP-mediated fluid and chloride secretion," *The American Physiological Society* , pp. G58-G63 | 1/1/1999 | LINZ_0105831 | LINZ_0105836 | | A, CU, F, H, R, U |
| 0640 | Ganapathy, V., et al., "Protein Digestion and Assimilation," *Textbook of Gastroenterology* , Chap. 19, pp. 438-448, (4th ed. 2003) | 1/1/2003 | LINZ_0169226 | LINZ_0169243 | | A, CU, F, H, R, U |
| 0641 | Gariepy, J., et al., "Structure of the Toxic Domain of the Escherichia coli Heat-Stable Enterotoxin ST I", *Biochemistry* , Vol. 25, No. 24, pp. 7854-7866 (1986) | 1/1/1986 | DEFS-LINA-00000379 | DEFS-LINA-00000391 | | |
| 0642 | Gariepy, J., et al., "Design of a Photoreactive Analogue of the *Escherichia coli* Heat-Stable Enterotoxin STIb: Use in Identifying Its Receptor on Rat Brush Border Membranes," *Proc. Natl. Acad. Sci. USA* , Vol. 83, pp. 483-487 (1986) | 1/1/1986 | DEFS-LINA-00000397 | DEFS-LINA-00000401 | | |
| 0643 | Gariepy, J.,  et al., "Importance of disulfide bridges in the structure and activity of *Escherichia coli* enterotoxin ST1b," *Proc. Natl. Acad. Sci. USA* , Vol. 84, pp. 8907-8911 (1987) | 12/1/1987 | DEFS-LINA-00000392 | DEFS-LINA-00000396 | DeGrado Exhibit 12 | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0644 | Gascon, J., et al., "Diarrhea in Children under 5 Years of Age from Ifakara, Tanzania: a Case-Control Study," *Journal of Clinical Microbiology*, Vol. 38, No. 12, pp. 4459-4462 | 12/1/2000 | LINZ_0105842 | LINZ_0105845 | | A, CU, F, H, R, U |
| 0645 | Gershon, M., "Serotonin and Its Implication for the Management of Irritable Bowel Syndrome," *Reviews in Gastroenterological Disorders*, Vol. 3, Suppl. 2, pp. S25-S34 | 1/1/2003 | LINZ_0105846 | LINZ_0105855 | | A, CU, F, H, R, U |
| 0646 | Giannella, R., "*Escherichia coli* heat-stable enterotoxins, guanylins, and their receptors: What are they and what do they do?," *J. Lab. Clinical Medicine*, Vol. 125, No. 2 | 2/1/1995 | DEFS-LINA-00000402 | DEFS-LINA-00000410 | Chang Exhibit 22 Giannella Exhibit 5 Wolfe Exhibit 11 | |
| 0647 | Article presented at the 66th Annual Meeting of the Central Society for Clinical Research written by R. Giannella titled, "E. coli Heat-Stable Enterotoxins, Guanylins, and Their Receptors: What are They and what Are They Doing?" | 11/4/1993 | RG_LINZ_00000820 | RG_LINZ_00000848 | Giannella Exhibit 10 | A, CU, F, H, R, U |
| 0648 | MOVED TO JOINT EXHIBIT LIST AS JTX-017 | | | | | |
| 0649 | Goldenberg, D., et al., "Probing the Determinants of Disulfide Stability in Native Pancreatic Trypsin Inhibitor," *Biochemistry*, Vol. 32, No. 11, pp. 2835-2844 (1993) | 1/1/1993 | LINZ_0169642 | LINZ_0169651 | | A, CU, F, H, R, U, NL |
| 0650 | Greenberg, R., et al., "Reduction of the Secretory Response to *Escherichia coli* Heat-Stable Enterotoxin by Thiol and Disulfide Compounds," *Infection and Immunity*, Vol. 41, No. 1 pp. 174-180 (1983) | 7/1/1983 | DEFS-LINA-00001657 | DEFS-LINA-00001663 | | |
| 0651 | Greenberg, R., et al., "Comparison of Effects of Uroguanylin, Guanylin, and *Escherichia coli* Heat-Stable Enterotoxin STa in Mouse Intestine and Kidney: Evidence that Uroguanylin is an Intestinal Natriuretic Hormone," *J. of Investigative Medicine*, Vol. 45, No. 5, pp. 276-283 (1997) | 6/1/1997 | DEFS-LINA-00000411 | DEFS-LINA-00000420 | Barnett Exhibit 25 Kent Exhibit 20 | |
| 0652 | Griebenow, K., Klibanov, A., "Lyophilization-induced reversible changes in the secondary structure of proteins," *Proc. Natl. Acad. Sci. USA*, Vol. 92, No. 24, pp. 10969-10976 | 11/21/1995 | LINZ_0169785 | LINZ_0169793 | Klibanov Exhibit 4 | A, CU, F, H, R, U |
| 0653 | Gron, H., et al., "Extensive Comparison Of The Substrate Preferences Of Two Subtilisins As Determined With Peptide Substrates Which Are Based On The Principle Of Intramolecular Quenching," *Biochemistry*, Vol. 31, No. 26, pp. 6011-6018 (1992) | 1/1/1992 | LINZ_0169609 | LINZ_0169616 | | A, CU, F, H, R, U |
| 0654 | Gutierrez-Cazarez, Z., et al., "Identification of Enterotoxigenie *Escherichia coli* Harboring Longus Type IV Pilus Gene by DNA Amplification," *Journal of Clinical Microbiology*, Vol. 38, No. 5, pp. 1767-1771 | 5/1/2000 | LINZ_0105866 | LINZ_0105870 | | A, CU, F, H, R, U |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0655 | Gyomorey, K., et al., "Expression of the chloride channel ClC-2 in the murine small intestine epithelium," *Am. J. Physiol. Cell Physiol* ., Vol. 279, pp. C1787-C1794 (2000) | 1/1/2000 | LINZ_0168836 | LINZ_0168843 | | A, CU, F, H, R, U |
| 0656 | Hamra, F.K., et al., "Uroguanylin: Structure and activity of a second endogenous peptide that stimulates intestinal guanylate cyclase," *Proc. Natl. Acad. Sci. USA* , Vol. 90, pp. 10464-10468 (1993) | 11/1/1993 | LINZ_0168844 | LINZ_0168848 | DeGrado Exhibit 15 Kent Exhibit 18 | A, CU, F, H, R, U |
| 0657 | Hamra, F.K., et al., "Prouroguanylin and Proguanylin: Purification from Colon, Structure, and Modulation of Bioactivity by Proteases," *Endocrinology* , Vol. 137, No. 1, pp. 257-265 (1996) | 1/1/1996 | IW_LINZ_00841110 | IW_LINZ_00841118 | | A, CU, F, H, R, U |
| 0658 | Hamra, F.K., et al., "Regulation of intestinal uroguanylin/guanylin receptor-mediated responses by mucosal acidity," *Proc. Natl. Acad. Sci. USA* , Vol. 94,  pp. 2705-2710 (1997) | 3/1/1997 | LINZ_0168849 | LINZ_0168854 | Barnett Exhibit 27 Kent Exhibit 21 | A, CU, F, H, R, U |
| 0659 | *Handbook of Pharmaceutical Excipients*  - Hypromellose (R.C. Rowe et al., eds., 2006) | 1/1/2006 | DEFS-LINA-00001088 | DEFS-LINA-00001091 | | |
| 0660 | Hannig, G., et al., "Guanylate cyclase-C/cGMP: an emerging pathway in the regulation of visceral pain," *Frontiers in Molecular Neuroscience* , Vol. 7, Article 31 | 4/16/2014 | LINZ_0034282 | LINZ_0034287 | | A, CU, F, H, R, U |
| 0661 | Hansch, C., Coats, E., "α-Chymotrypsin: A Case Study Of Substituent Constants And Regression Analysis In Enzymic Structure-Activity Relationships," *J. Pharm. Sciences* , Vol. 59, No. 6, pp. 731-743 (1970) | 6/1/1970 | LINZ_0169504 | LINZ_0169516 | | A, CU, F, H, R, U, BE |
| 0662 | Harper, J.W., et al., "Active Site Mapping of the Serine Proteases Human Leukocyte Elastase, Cathepsin G, Porcine Pancreatic Elastase, Rat Mast Cell Proteases I and II, Bovine Chymotrypsin Aa, and *Staphylococcus aureus*  Protease V-8 Using Tripeptide Thiobenzyl Ester Substrates," *Biochemistry* , Vol. 23, No. 13, pp. 2995-3002 (1984) | 1/1/1984 | LINZ_0169575 | LINZ_0169582 | | A, CU, F, H, R, U |
| 0663 | Harris, L., "Chronic Constipation: Mechanisms of Action and Effective Treatment," *Advance Srudies in Medicine* , Vol. 5, pp. S965-S976 | 11/1/2005 | LINZ_0105876 | LINZ_0105887 | | A, CU, F, H, R, U |
| 0664 | Harris, L., Crowell, M., "Drug Evaluation: Linaclotide, a New Direction in the Treatment of Irritable Bowel Syndrome and Chronic Constipation," *Curr. Opin. Mol. Ther* ., Vol. 9, No. 4, pp. 403-410 (2007) | 1/1/2007 | DEFS-LINA-00001092 | DEFS-LINA-00001099 | | |
| 0665 | Hasegawa, M., et al., "Identification of a binding region on *Escherichia coli*  heat-stable enterotoxin to intestinal guanylyl cyclase C," *Letters in Peptide Science* , Vol. 4 (1997) | 1/1/1997 | IW_LINZ_00000098 | IW_LINZ_00000108 | DeGrado Exhibit 16 Kent Exhibit 33 Wolfe Exhibit 16 | A, CU, F, H, R, U |
| 0666 | Hasegawa, M., et al., "Determination of the Binding Site on the Extracellular Domain of Guanylyl Cyclase C to Heat-stable Enterotoxin," *The Journal of Biological Chemistry* , Vol. 274, No. 44, pp. 31713-31718 | 10/29/1999 | LINZ_0105899 | LINZ_0105905 | | A, CU, F, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0667 | Hein, G., Niemann, C., "An Interpretation of the Kinetic Behavior of Model Substrates of Chymotrypsin," *Biochemistry*, Vol. 47, pp. 1341-1355 | 7/24/1961 | LINZ_0105906 | LINZ_0105920 | | A, CU, F, H, R, U |
| 0668 | Hein, G., Niemann, C.,  "Steric Course and Specificity of α-Chymotrypsin-Catalyzed Reactions," *J. Am. Chem. Soc*., Vol. 84,  pp. 4487-4494 (1962) | 12/5/1962 | LINZ_0169488 | LINZ_0169495 | | A, CU, F, H, R, U |
| 0669 | Hepner, F., et al., "Mass Spectrometrical Analysis of Recombinant Human Growth Hormone (Genotropin®) Reveals Amino Acid Substitutions in 2% of the Expressed Protein," *Proteome Science*, Vol. 3 (2005) | 2/11/2005 | DEFS-LINA-00001100 | DEFS-LINA-00001111 | | |
| 0670 | MOVED TO JOINT EXHIBIT LIST AS JTX-018 | | | | | |
| 0671 | Hofmann, A., et al., "Undergraduate teaching project of the American Gastroenterological Association: a pathophysiology resource," *Am. J. Physiol*., 260, S1-S5 (1991) | 1/1/1999 | LINZ_0168855 | LINZ_0168859 | | A, CU, F, H, R, U |
| 0672 | Holzer, P., et al., "Surveillance of the Gastrointestinal Mucosa by Sensory Neuros," *J. Physiol. and Pharmacol*., Vol. 52, pp. 505-521 (2001) | 1/1/2001 | LINZ_0168860 | LINZ_0168876 | | A, CU, F, H, R, U |
| 0673 | Hopp, T., Woods, K., "A Computer Program For Predicting Protein Antigenic Determinants," *Molecular Immunology*, Vol. 20, No. 4, pp. 483-489 (1983) | 1/1/1983 | LINZ_0169123 | LINZ_0169129 | | A, CU, F, H, R, U |
| 0674 | Hruby, V., "Designing Peptide Receptor Agonists and Antagonists," *Nature Reviews*, Vol. 1, pp. 847-858 (2002) | 11/1/2002 | DEFS-LINA-00001749 | DEFS-LINA-00001760 | Barnett Exhibit 21 Kent Exhibit 34 | |
| 0675 | Hu, H., et al., "B-Sheet Structure Formation of Proteins in Solid State as Revealed by Circular Dichroism Spectroscopy," *Shangai Institute of Biochemistry*," pp. 15-21 | 1/1/2000 | DEFS-LINA-00004932 | DEFS-LINA-00004938 | Block Exhibit 22 | |
| 0676 | Huang, X., et al., "Nucleotide sequence of a gene encoding the novel Yersinia enterocolitica heat-stable enterotoxin that includes a pro-region-like sequence in its mature toxin molecule," *Microbial Pathogenesis*, Vol. 22, pp. 89-97 | 1/1/1997 | LINZ_0105940 | LINZ_0105948 | | A, CU, F, H, R, U |
| 0677 | Hubbard, S.J., et al, "Modeling studies of the change in conformation required for cleavage of limited proteolytic sites," *Protein Science*, Vol. 3, pp. 757-768 (1994) | 1/1/1994 | LINZ_0169130 | LINZ_0169141 | | A, CU, F, H, R, U |
| 0678 | Hussar, D., "New Drugs: Lubiprostone, Ranolazine, and Anidulafungin," *Journal of the American Pharmacists Association*, Vol. 46, No. 3, pp. 411-415 | 5/1/2006 | LINZ_0105949 | LINZ_0105953 | | A, CU, F, H, R, U |
| 0679 | Ikemura, H., et al., "Heat-stable Enterotoxin (STh) of Human Enterotoxigenic *Escherichia coli* (Strain SK-1). Structure-activity Relationship," *Bull. Chem. Soc. Jpn*., Vol. 57, No. 9, pp. 2550-2556 (1984) | 9/1/1984 | DEFS-LINA-00000469 | DEFS-LINA-00000475 | | |
| 0680 | Ingles, D.W., Knowles, J.R., "Specificity and Stereospecificity of a-Chymotrypsin," *Biochem. J.*, Vol. 104, pp. 369-376 | 1/1/1967 | LINZ_0105954 | LINZ_0105962 | | A, CU, F, H, R, U |
| 0681 | Janin, J., "Surface and inside volumes in globular proteins," *Nature*, Vol. 277, pp. 491-492 (1979) | 2/8/1979 | LINZ_0169289 | LINZ_0169291 | | A, CU, F, H, R, U |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0682 | Johanson, J., et al., "Efficacy and Safety of a Novel Compound, RU-0211, for the Treatment of Constipation," *Gastroenterology*, Suppl., Vol. 122, No. 4, A-315 (2002) | 4/1/2002 | LINZ_0105963 | LINZ_0105966 | Barrett Exhibit 10 DeGrado Exhibit 7 Kent Exhibit 13 | A, CU, F, H, R, U, NL |
| 0683 | Johanson, J., et al., "Efficacy and Safety of a Novel Compound, RU-0211, for the Treatment of Constipation," *Gastroenterology*, Suppl., Vol. 122, No. 4, A-315 (2002)**(Color version)** | 4/1/2002 | N/A | N/A | Barnett Exhibit 8 | A, CU, F, H, R, U |
| 0684 | Johanson, J., et al., "Phase III Efficacy and Safety of RU-0211, a Novel Chloride Channel Activator for the Treatment of Constipation," *Gastroenterology*, Vol. 124, No. 7, Abstract no. 372 | 6/1/2003 | LINZ_0105967 | LINZ_0105969 | | A, CU, F, H, R, U, NL |
| 0685 | Johnston, J., et al., "Linaclotide Improves Abdominal Pain and Bowel Habits in a Phase IIb Study of Patients With Irritable Bowel Syndrome With Constipation," *Gastroenterology*, Vol. 139, No. 6, pp. 1877-1886 | 12/1/2010 | LINZ_0169773 | LINZ_0169784 | Barrett Exhibit 21 Chang Exhibit 4 | A, CU, F, H, R, U |
| 0686 | Kojima, S., "Inhibition Of Subtilisin BPN' By Reaction Site P1 Mutants Of *Streptomyces* Subtilisin Inhibitor," *J. Biochem*., Vol. 109, No. 3, pp. 377-382 (1991) | 1/1/1991 | LINZ_0169603 | LINZ_0169608 | | A, CU, F, H, R, U |
| 0687 | Kyaw, A., et al., "Intracellular Distribution of Radiolabelled Enterotoxigenic *Escherichia coli* Heat-Stable Toxin (STa) in the Intestine of Suckling Rat," *J. Diarrhoel Dis. Res*., Vol. 13, pp. 232-234 (1995) | 12/1/1995 | DEFS-LINA-00001701 | DEFS-LINA-00001706 | | |
| 0688 | Kyte, J., Doolittle, R., "A Simple Method for Displaying the Hydropathic Character of a Protein," *J. Mol. Biol*., Vol. 157, pp. 105-132 (1982) | 1/1/1982 | LINZ_0169142 | LINZ_0169169 | | A, CU, F, H, R, U |
| 0689 | Lacy, B., "ACG 2006 – Evaluation and Treatment of IBS and Chronic Constipation," *Medscape Gastroenterology*, available at www.medscape.com (2006) | 1/1/2006 | DEFS-LINA-00001116 | DEFS-LINA-00001123 | | |
| 0690 | Lacy, B., et al., "Bowel Disorders," *Gastroenterology*, Vol. 150, No. 6, pp. 1393-1407 (2016) | 5/1/2016 | LINZ_0168877 | LINZ_0168896 | | A, CU, F, H, R, U |
| 0691 | Lacy, B., et al., "Bowel Disorders," *Gastroenterology*, Vol. 150, No. 6, pp. 1393-1407 (2016)**(Color Version)** | 5/1/2016 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0692 | Ladunga, I., Smith, R., "Amino acid substitutions preserve protein folding by conserving steric and hydrophobicity properties," *Protein Engineering*, Vol. 10, No. 3, pp. 187-196 (1997) | 1/1/1997 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0693 | Learoyd, T., et al., "Chitosan-based Spray-dried Respirable Powders for Sustained Delivery of Terbutaline Sulfate," *European Journal of Pharmaceutics and Biopharmaceutics*, Vol. 68, pp. 224-234 | 5/5/2007 | DEFS-LINA-00004944 | DEFS-LINA-00004954 | | |
| 0694 | Lembo, A., Camilleri, M., "Chronic Constipation," *The New England Journal of Medicine*, Vol. 349, pp. 1360-1368 | 10/2/2003 | N/A | N/A | | A, CU, F, H, R, U, UP |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0695 | Lembo, A., "The Clinical and Economic Burden of Irritable Bowel Syndrome," *Practical Gastroenterology* , Vol. 31, pp. 3-9 | 9/1/2007 | LINZ_0168620 | LINZ_0168626 | | A, CU, F, H, R, U |
| 0696 | Lembo, A., et al., "Two Randomized Trials of Linaclotide for Chronic Constipation," *The New England Journal of Medicine* , Vol. 365, No. 6 | 8/11/2011 | N/A | N/A | Kunka Exhibit 13 | A, CU, F, H, R, U |
| 0697 | Lembo, T., et al., "Sigmoid Afferent Mechanisms in Patients with Irritable Bowel Syndrome," *Digestive Diseases and Sciences,* Vol. 42, No. 6, pp. 1112-1120 | 6/1/1997 | N/A | N/A | | A, CU, F, H, R, U, UP |
| 0698 | Lencer, W. et al., "Induction of epithelial chloride secretion by channel-forming cryptdins 2 and 3," *Proc. Natl. Acad. Sci. USA* , Vol. 94, pp. 8585-8589 (1997) | 8/1/1997 | N/A | N/A | Kent Exhibit 15 | A, CU, F, H, R, U |
| 0699 | Levitt, M., "A Simplified Representation Of Protein Conformations For Rapid Simulation Of Protein Folding," *J. Mol.. Biol.* , Vol. 104, pp. 59-107 (1976) | 1/1/1976 | LINZ_0169520 | LINZ_0169568 | | A, CU, F, H, R, U |
| 0700 | Lewis, A., Richard, J., "Challenges in the Delivery of Peptide Drugs: An Industry Perspective," *Therapeutic Delivery* , Vol. 6, pp. 149-163 (2015) | 1/1/2015 | IW_LINZ_01054566 | IW_LINZ_01054580 | | A, F, CU, H, R, U |
| 0701 | Li, Z., et al., "Detection and Quantification of Low-Molecular-Weight Aldehydes in Pharmaceutical Excipients by Headspace Gas Chromatography," *Journal of Chromatopgraphy A* , Vol. 1104 (2006) | 1/1/2006 | DEFS-LINA-00001125 | DEFS-LINA-00001134 | Block Exhibit 19 | |
| 0702 | Lin, J., et al., "Bacterial Heat-Stable Enterotoxins: Translation of Pathogenic Peptides into Novel Targeted Diagnostics and Therapeutics," *Toxins* , Vol. 2, pp. 2028-2054 (2010) | 8/5/2010 | LINZ_0105970 | LINZ_0105996 | | A, F, CU, H, R, U |
| 0703 | Lipecka, J., et al., "Distribution of ClC-2 chloride channel in rat and human epithelial tissues," *Am. J. Physiol. Cell Physiol* ., Vol. 282, C805-C816 (2002) | 4/1/2002 | LINZ_0168897 | LINZ_0168908 | | A, F, CU, H, R, U |
| 0704 | Lloyd-Williams, P. et al., *Chemical Approaches to the Synthesis of Peptides and Proteins* (Chaps. 2 and 5)(1997) | 1/1/1997 | DEFS-LINA-00000476 | DEFS-LINA-00000580 | | |
| 0705 | Locke, G.R., et al., "AGA Technical Review on Constipation," *American Gastroenterological Association* , Vol. 119, No. 6, pp. 1766-1778 | 1/1/2000 | N/A | N/A | Gupta Exhibit 26 | A, F, CU, H, R, U |
| 0706 | Longstreth, G., et al., "Functional Bowel Disorders," *Gastroenterology* , Vol. 130, pp. 1480-1491 (2006) | 4/1/2006 | LINZ_0169630 | LINZ_0169641 | Chang Exhibit 16 | A, F, CU, H, R, U |
| 0707 | Lovell, R., "Global Prevalence of and Risk Factors for Irritable Bowel Syndrome: A Meta-analysis," *Clinical Gastroenterology and Hepatology* , Vol. 10, No. 7, pp. 712-721 | 7/1/2012 | DEFS-LINA-00004822 | DEFS-LINA-00004835 | Chang Exhibit 24 | |
| 0708 | Lu, W., et al., "Binding of Amino Acid Side-chains to S Cavities of Serine Proteinases," *J. Mol. Biol* ., Vol. 266, pp. 441-461 (1997) | 1/1/1997 | DEFS-LINA-00001776 | DEFS-LINA-00001796 | | |
| 0709 | Lu, X., et al., "Deamidation and isomerization liability analysis of 131 clinical-stage antibodies," *MABS* , Vol. 11, No. 1, pp. 45-57 | 12/10/2018 | N/A | N/A | Gupta Exhibit 20 | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0710 | Madara, J., Anderson, J., "Epithelia: Biological Principles of Organization," *Textbook of Gastroenterology* (4th ed. 2003), Chap. 8, pp. 151-165 | 1/1/2003 | LINZ_0169204 | LINZ_0169225 | | A, F, CU, H, R, U |
| 0711 | Manning, M., et al., "Stability of Protein Pharmaceuticals," *Pharm. Res* ., Vol. 6, No. 11, pp. 903-918 (1989) | 1/1/1989 | DEFS-LINA-00000581 | DEFS-LINA-00000599 | Block Exhibit 15 | |
| 0712 | Marx, U.C., et al., "One Peptide, Two Topologies: Structure and Interconversion Dynamics of Human Uroguanylin Isomers," *J. Peptide. Res* ., Vol. 52, pp. 229-240 (1998) | 1/1/1998 | LINZ_0168986 | LINZ_0168997 | | F, CU, H, R, U |
| 0713 | Matubayasi, N., et al., "Thermodynamic Quantities of Surface Formation of Aqueous Electrolyte Solutions," *Journal of Colloid and Interface Science* , Vol. 250, pp. 431-437 | 5/15/2002 | DEFS-LINA-00004955 | DEFS-LINA-00004961 | | |
| 0714 | Mayer, E., et al., "Evolving Pathophysiological Model of Functional Gastrointestinal Disorders: Implications for Treatment," *Eur. J. Surg* ., Suppl. 587, pp. 3-9 (2002) | 1/1/2002 | LINZ_0105997 | LINZ_0106004 | Barnett Exhibit 13 Barrett Exhibit 11 Kent Exhibit 9 | A, F, CU, H, R, U |
| 0715 | McCole, D., et al., "Transactivation of the Epidermal Growth Factor Receptor in Colonic Epithelial Cells by Carbachol Requires Extracellular Release of Transforming Growth Factor-α," *J. Biol. Chem* ., Vol. 277, No. 45, pp. 42603-42612 (2002) | 8/28/2002 | LINZ_0168909 | LINZ_0168919 | Barrett Exhibit 7 | A, F, CU, H, R, U |
| 0716 | Menard, L.P., Dubreuil, J.D., "Enteroaggregative *Escherichia coli* Heat-Stable Enterotoxin 1 (EAST1): A New Toxin with an Old Twist," *Critical Reviews in Microbiology* , Vol. 28, pp. 43- 60 (2002) | 1/1/2002 | N/A | N/A | Kent Exhibit 29 | A, F, CU, H, R, U |
| 0717 | Metz, B., et al., "Identification of Formaldehyde-Induced Modifications in Proteins: Reactions with Model Peptides," *J. Biol. Chem* ., Vol. 279, No. 8, pp. 6235-6243 (2004) | 2/20/2004 | DEFS-LINA-00001555 | DEFS-LINA-00001564 | Block Exhibit 17 | |
| 0718 | Mezoff, A., et al., "*Escherichia coli* Enterotoxin (STa) Binds to Receptors, Stimulates Guanyl Cyclase, and Impairs Absorption in Rat Colon," *Gastroenterology* , Vol. 102, pp. 816-822 (1992) | 3/1/1992 | N/A | N/A | | F, CU, H, R, U, UP |
| 0719 | Microbia Press Release, "Linaclotide Shown to Improve Symptoms of Chronic Constipation in Phase 2A Study" | 10/24/2006 | DEFS-LINA-00001135 | DEFS-LINA-00001136 | | |
| 0720 | Microbia Press Release, "Microbia Announces Positive Phase 2 Results for its Investigational Compound Linaclotide" | 5/21/2007 | DEFS-LINA-00001137 | DEFS-LINA-00001138 | | |
| 0721 | Motheram, R., "Behavior of Recombinant Human Growth Hormone at Solid / Liquid Interfaces," University of the Sciences in Philadelphia (Mar. 2007) (Ph.D. Dissertation) | 3/1/2007 | DEFS-LINA-00004980 | DEFS-LINA-00005159 | | |

Case 1:16-cv-01114-RGA   Document 313-1   Filed 12/27/19   Page 621 of 669 PageID #: 6059

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0722 | Muller-Lissner, S.A., et al., "Tegaserod, a 5-HT4 receptor partial agonist, relieves symptoms in irritable bowel syndrome patients with abdominal pain, bloating and constipation," *Aliment Pharmacol Thcr.* , Vol. 15, pp. 1655-1666 | 1/1/2001 | LINZ_0106024 | LINZ_0106035 | | A, F, CU, H, R, U |
| 0723 | Nakazato, M., "Guanylin Family: New Intestinal Peptides Regulating Electrolyteand Water Homeostasis," *J. Gastroenterology* , Vol. 36, pp. 219–225 (2001) | 1/1/2001 | DEFS-LINA-00000600 | DEFS-LINA-00000606 | Barrett Exhibit 17 Chang Exhibit 18 DeGrado Exhibit 9 | |
| 0724 | Nataro, J., et al., "Heterogeneity of Enteroaggregative *Escherichia coli* Virulence Demonstrated in Volunteers," *The Journal of Infectious Diseases* , Vol. 171, pp. 465-468 (1995) | 1/1/1995 | LINZ_0106036 | LINZ_0106039 | | A, F, CU, H, R, U |
| 0725 | Neurath, H., Schwert, G., "The Mode Of Action Of The Crystalline Pancreatic Proteolytic Enzymes," pp. 69-153 (1949) | 1/1/1949 | LINZ_0169389 | LINZ_0169473 | | A, F, CU, H, R, U |
| 0726 | Neurath, H.,  "Some Considerations Of The Multiple Specificity Of Proteolytic Enzymes," *Annals New York  Academy of Science* , pp. 11-24 (1957) | 1/1/1957 | LINZ_0169474 | LINZ_0169487 | | A, F, CU, H, R, U |
| 0727 | Nicolaou, K.C., et al., "Taxoids: New Weapons Against Cancer," *Scientific American,*  Vol. 6, pp. 94-98 (1996) | 6/1/1996 | DEFS-LINA-00000607 | DEFS-LINA-00000611 | | |
| 0728 | Nielsen, K., et al., "An H NMR determination of the three-dimensional structures of mirror-image forms of a Leu-5 variant of the trypsin inhibitor from *Ecballium elaterium* (EETI-11), *Protein Science* , Vol. 3, pp. 291-302 | 1/1/1994 | N/A | N/A | | F, CU, H, R, U, UP |
| 0729 | Letter to the Editor titled "An Outbreak of Gastroenteritis in Japan due to *Escherichia coli* 0166," by Y. Nishikawa, et al., *Emerging Infectious Diseases* , Vol. 5, No. 2 | 3/1/1999 | LINZ_0106040 | LINZ_0106040 | | A, F, CU, H, R, U |
| 0730 | Niu, C., et al., "FDA Perspective on Peptide Formulation and Stability Issues," *J. Pharm. Sciences* , Vol. 87, No. 11, pp. 1331-1334 (1998) | 11/1/1998 | DEFS-LINA-00000612 | DEFS-LINA-00000615 | | |
| 0731 | Norimatsu, Y., et al., "Lubiprostone Activates CFTR, but not CIC-2, via the Prostaglandin Receptor (EP4)," *Biochem Biophys Res. Commun* ., Vol. 426, No. 3, pp. 374–379 (2012) | 9/28/2012 | LINZ_0169352 | LINZ_0169363 | | A, F, CU, H, R, U |
| 0732 | Nostrant, T., Barnett, J., "Management of irritable bowel syndrome," *Modern Medicine,*  Vol. 57, No. 5, pp. 100-113 | 5/1/1989 | N/A | N/A | Barnett Exhibit 17 | A, F, CU, H, R, U |
| 0733 | Nozaki,  Y., Tanford,C., "The Solubility of Amino Acids and Two Glycine Peptides in Aqueous Ethanol and Dioxane Solutions. Establishment of the Hydrophobicity Scale," *The Journal of Biological Chemistry* , Vol. 246, No. 7, pp. 2211-2217 | 4/10/1971 | LINZ_0173074 | LINZ_0173081 | | A, F, CU, H, R, U |

Confidential

*Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.*
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0734 | O'Donnell, E., et al., "Inhibition of enterotoxin-induced porcine colonic secretion by diarylsulfonylureas in vitro," *Am. J. Physical Gastrointest Liver Physiol.*, Vol. 279, pp. G1104-G1112 | 1/1/2000 | N/A | N/A | Kent Exhibit 17 | A, F, CU, H, R, U |
| 0735 | O'Donnell, P., Bokser, A., "Stability of Pharmaceutical Products," *Remington: The Science and Practice of Pharmacy*, Chap. 52 (D.B. Troy et al., eds., 2006) | 1/1/2006 | DEFS-LINA-00001143 | DEFS-LINA-00001153 | | |
| 0736 | Ozaki, H., et al., "Molecular Structure of the Toxic Domain of Heat-stable Enterotoxin Produced by a Pathogenic Strain of *Escherichia coli* ," *The Journal of Biological Chemistry* , Vol. 266, No. 9, pp. 5934-5941 | 3/1/1991 | LINZ_0107080 | LINZ_0107087 | Kent Exhibit 32 | A, F, CU, H, R, U |
| 0737 | Payne, R., Manning, M., "Peptide Formualation: Challenges and Strategies," *Innovations in Pharmaceutical Technology* , pp. 64-68 | 00/00/0000 | N/A | N/A | Gupta Exhibit 19 | F, CU, H, R, U, ID |
| 0738 | Pearlman, R., Nguyen, T.H., "Formulation Strategies for Recombinant Proteins: Human Growth Hormone and Tissue Plasminogen Activator," *Therapeutic Peptides and Proteins: Formulations, Delivery, and Targeting* | 1/1/1989 | LINZ_0173082 | LINZ_0173093 | | A, F, CU, H, R, U |
| 0739 | Pennington, M., et al., "Peptide therapeutics from venom: Current status and potential," *Bioorganic & Medicinal Chemistry* , Vol. 26, pp. 2738-2758 | 1/1/2018 | DEFS-LINA-00002027 | DEFS-LINA-00002047 | | |
| 0740 | Prather, C., et al., "Tegaserod Accelerates Orocecal Transit in Patients With Constipation-Predominant Irritable Bowel Syndrome," *Gastroenterology* , Vol. 118, No. 3, pp. 463-468 (2000) | 3/1/2000 | LINZ_0168929 | LINZ_0168934 | | A, F, CU, H, R, U |
| 0741 | Qadri, F., et al., "Prevalence of Toxin Types and Colonization Factors in Enterotoxigenic *Escherichia coli*  Isolated during a 2-Year Period from Diarrheal Patients in Bangladesh," *Journal of Clinical Microbiology* , Vol. 38, No. 1, pp. 27-31 | 1/1/2000 | LINZ_0107090 | LINZ_0107094 | | A, F, CU, H, R, U |
| 0742 | Qian, X., et al., "Expression of GC-C, a Receptor-Guanylate Cyclase, and Its Endogenous Ligands Uroguanylin and Guanylin along the Rostrocaudal Axis of the Intestine," *Endocrinology* , Vol. 141, No. 9, pp.  3210-3224 (2000) | 1/1/2000 | DEFS-LINA-00001896 | DEFS-LINA-00001910 | | |
| 0743 | Ratnaike, R., Jones, T., "Mechanisms of Drug-Induced Diarrhoea in the Elderly," *Drugs & Aging* , Vol. 13, pp. 245-253 (1998) | 9/1/1998 | DEFS-LINA-00002073 | DEFS-LINA-00002081 | Barrett Exhibit 5 | |
| 0744 | Raula, J., et al., "Study of the Dispersion Behaviour of L-Leucine Containing Microparticles Synthesized with an Aerosol Flow Reactor Method," *Powder Technology* , Vol. 177, pp. 125-132 | 3/16/2007 | DEFS-LINA-00004962 | DEFS-LINA-00004969 | | |
| 0745 | *Remington: The Science and Practice of Pharmacy*  20th ed. (Gennaro A. Ed., Lippincott Williams & Wilkins, 2000) | 1/1/2000 | DEFS-LINA-00000616 | DEFS-LINA-00000662 | | |
| 0746 | Resta-Lenert, S., Barrett, K., "Enteroinvasive Bacteria Alter Barrier and Transport Properties of Human Intestinal Epithelium: Role of iNOS and COX-2," *Gastroenterology* , Vol. 122, No. 4, pp. 1070-1087 (2002) | 4/1/2002 | LINZ_0168935 | LINZ_0168952 | Barrett Exhibit 9 | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0747 | Rich, C., et al., "Characterization of enteroaggregative *Escherichia coli* isolates," *FEMS Microbiology Letters* , Vol. 173, pp. 55-61 | 1/1/1999 | LINZ_0107095 | LINZ_0107101 | | A, F, CU, H, R, U |
| 0748 | Ringel, Y., et al., "Irritable Bowel Syndrome," *Annu. Rev. Med.* , Vol. 52, pp. 319-338 | 1/1/2001 | LINZ_0001209 | LINZ_0001228 | Barnett Exhibit 18 | A, F, CU, H, R, U |
| 0749 | Ritchie, J., "Pain from distension of the pelvic colon by inflating a balloon in the irritable colon syndrome," *Gut* , Vol. 14, pp. 125-132 | 1/1/1973 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0750 | *Rome II: The Functional Gastrointestinal Disorders* | 1/1/2000 | DEFS-LINA-00002082 | DEFS-LINA-00002305 | Barnett Exhibit 34 | |
| 0751 | *Rome II: The Functional Gastrointestinal Disorders* (excerpt) - Table of Contents | 1/1/2000 | DEFS-LINA-00002082 DEFS-LINA-00002299 | DEFS-LINA-00002087 DEFS-LINA-00002300 | Chang Exhibit 15 | |
| 0752 | Roussel, A.J., et al., "Myoelectric Activity of the Small Intestine in Enterotoxin-induced Diarrhea of Calves," *Am. J. Vet. Res* ., Vol. 53, No. 7, pp. 1145-1148 (1992) | 7/1/1992 | DEFS-LINA-00000663 | DEFS-LINA-00000668 | | |
| 0753 | Sack, G., et al., "Gastric acidity in cholera and noncholera diarrhoea," *Bull. Wld. Health Org* , Vol. 47, pp. 31-36 (1972) | 1/1/1972 | DEFS-LINA-00002306 | DEFS-LINA-00002311 | | |
| 0754 | Sack, R.B., "Enterotoxigenic *Escherichia coli* : Identification and Characterization," *J. Infect. Dis* ., Vol. 142, No. 2, pp. 279-286 (1980) | 8/1/1980 | DEFS-LINA-00001707 | DEFS-LINA-00001714 | | |
| 0755 | Sandler, R., et al., "The Burden of Selected Digestive Diseases in the United States," *Gastroenterology* , Vol. 122, pp. 1500-1511 (2002) | 5/1/2002 | LINZ_0168953 | LINZ_0168964 | | A, F, CU, H, R, U |
| 0756 | Santos-Neto, M.S., et al., "Comparison of the Actions of Guanylin and Its Lysine-Containing Analog in Perfused Rat Kidney.  Interaction with Chymostatin-A Chymotrypsin Inhibitor," *Hypertension* , Vol. 33, Abstract 246 | 4/1/1999 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0757 | Santos-Neto, M.S., et al., "Guanylin and its Lysine-Containing Analogue in the Isolated Perfused Rat Kidney: Interaction with Chymotrypsin Inhibitor," *Pharmacology & Toxicology* , Vol. 92, pp. 114-120 | 1/1/2003 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0758 | MOVED TO JOINT EXHIBIT LIST AS JTX-019 | | | | | |
| 0759 | Sato, T. and Shimonishi. Y., et al., "Structural features of *Escherichia coli* heat-stable enterotoxin that activates membrane-associated guanylyl cyclase," *J. Peptide Res.* , 2004, 63, 200-206 | 1/1/2004 | IW_LINZ_00773243 | IW_LINZ_00773249 | Zhao Exhibit 7 | F, CU, H, R, U |
| 0760 | Savarino, S., et al., "Enteroaggregative *Escherichia coli* heat stable enterotoxin 1 represents another subfamily of *E. coli* heat-stable toxin," *Proc. Natl. Acad. Sci. USA* , Vol. 90, pp. 3093-3097 (1993) | 4/1/1993 | LINZ_0107112 | LINZ_0107116 | Kent Exhibit 28 | A, F, CU, H, R, U |
| 0761 | Savarino, S., et al., "Enteroaggregative *Escherichia coli* Heat-Stable Enterotoxin Is Not Restricted to Enteroaggregative *E. coli* ," *The Journal of Infectious Diseases* , Vol. 173, pp. 1019-1022 | 4/1/1996 | LINZ_0107117 | LINZ_0107120 | | A, F, CU, H, R, U |
| 0762 | Saxena, P., "Serotonin Receptors: Subtypes, Functional Responses and Therapeutic Relevance," *Pharm. Ther* ., Vol. 66, pp. 339-368 (1995) | 1/1/1995 | LINZ_0169174 | LINZ_0169203 | | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0763 | Schellenberger, V., et al., "The specificity of chymotrypsin - A statistical analysis of hydrolysis data," *Eur. J. Biochem* ., Vol. 199, pp. 623-636 (1991) | 1/1/1991 | DEFS-LINA-00001843 | DEFS-LINA-00001856 | | |
| 0764 | Schiller, L.R., "Review Article: The Therapy of Constipation," *Aliment Pharmacol. Ther* ., Vol. 15, pp. 749–763 (2001) | 1/9/2001 | DEFS-LINA-00000686 | DEFS-LINA-00000700 | Barrett Exhibit 6 Giannella Exhibit 6 | |
| 0765 | Schmidt, R., "Dose-Finding Studies in Clinical Drug Development," *Eur. J Clin. Pharmacol* , Vol. 34, pp. 15-19 (1988) | 1/1/1988 | DEFS-LINA-00002048 | DEFS-LINA-00002052 | | |
| 0766 | Schulz, A., et al., "Carboxy-terminal extension stabilizes the topological stereoisomers of guanylin," *J. Peptide Res.* , Vol. 52, pp. 518-525 | 1/1/1998 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0767 | Senderoff, R., et al., "Aqueous Stability of Human Epidermal Growth Factor 1-48," *Pharmaceutical Research* , Vol. 11, No. 12, pp. 1712-1720 (1994) | 1/1/1994 | DEFS-LINA-00001154 | DEFS-LINA-00001162 | Block Exhibit 6 | |
| 0768 | Serra, J., Caballero, N., "Dexloxiglumide for the treatment of constipation predominant irritable bowel syndrome," *Expert Opinion on Pharmacology* , Vol. 17, No. 14, pp. 1969-1974 | 9/8/2016 | LINZ_0168460 | LINZ_0168466 | | A, F, CU, H, R, U |
| 0769 | Shaheen, N., "Best of DDW 2007, Highlights from Digestive Disease Week and the 108th Annual Meeting of the American Gastroenterological Association Institute, *Gastroenterology & Hepatology* , Vol. 3, Issue 8, pp. 620-633 (2007) | 8/1/2007 | DEFS-LINA-00001163 | DEFS-LINA-00001176 | | |
| 0770 | Shailubhai, K., "Therapeutic Applications of Guanylate Cyclase-C Receptor Agonists," *Current Opinion Drug Discovery Dev* ., Vol. 5, No. 2, pp. 261-268 (2002) | 1/1/2002 | DEFS-LINA-00000701 | DEFS-LINA-00000708 | Barrett Exhibit 12 Chang Exhibit 17 | |
| 0771 | Shekhar, C., Whorwell, P., "Emerging drugs for irritable bowel syndrome," *Expert Opin. Emerging Drugs* , Vol. 14, pp. 673-685 | 1/1/2009 | LINZ_0168599 | LINZ_0168611 | | A, F, CU, H, R, U |
| 0772 | Shimonishi, Y., et al., "Mode of disulfide bond formation of a heat-stable enterotoxin (STh) produced by a human strain of enterotoxigenic *Escherichia coli* ," *FEBS Letters* , Vol. 215, No. 1 | 5/1/1987 | IW_LINZ_00000065 | IW_LINZ_00000070 | Wolfe Exhibit 10 | F, CU, H, R, U |
| 0773 | Shiraki, K., et al., "Biophysical Effect of Amino Acids on the Prevention of Protein Aggregation," *J. Biochem.* , Vol. 132, No. 4, pp. 591-595 | 1/1/2002 | LINZ_0173094 | LINZ_0173098 | Gupta Exhibit 25 | A, F, CU, H, R, U |
| 0774 | Silberstein S.. et al., "Botulinum Toxin Type A as a Migraine Preventive Treatment," *Headache* , Vol. 40, pp. 445-450 (2000) | 6/1/2000 | DEFS-LINA-00000680 | DEFS-LINA-00000685 | | |
| 0775 | Simon, B., Kather, H., "Interaction of laxatives with enzymes of cyclic AMP metabolism from human colonic mucosa," *European Journal of Clinical Investigation* , Vol. 10, pp. 231-234 | 1/1/1980 | DEFS-LINA-00002768 | DEFS-LINA-00002771 | Barrett Exhibit 20 | |
| 0776 | Sjolund, K., et al., "Motilin in Chronic Idiopathic Constipation," *Scandinavian J. Gastroenterology* , Vol. 21, pp. 914-918 (1986) | 1/1/1986 | LINZ_0168965 | LINZ_0168970 | | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0777 | So, M., "Nucleotide sequence of the bacterial transposon Tn1681 encoding a heat-stable (ST) toxin and its identification in enterotoxigenic *Escherichia coli* strains," *Proc. Natl. Acad. Sci. USA*, Vol. 77, No. 7, pp. 4011-4015 | 7/1/1980 | LINZ_0107150 | LINZ_0107154 | | A, F, CU, H, R, U |
| 0778 | Sobel, J., "Botulism," *Clinical Infectious Diseases*, Vol. 41, pp. 1167-73 (2005) | 10/15/2005 | LINZ_0169652 | LINZ_0169658 | | A, F, CU, H, R, U |
| 0779 | Sohma, Y., et al., "Contribution of Residue B5 to the Folding and Function of Insulin and IGF-I," *The Journal of Biological Chemistry*, Vol. 285, No. 7, pp. 5040-5055 | 2/12/2010 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0780 | Stahl, P.H., et al., "Monographs on Acids and Bases," *Handbook of Pharmaceutical Salts* (P. Stahl and C. Wermuth eds., 2002), Chap. 12, pp. 265-327 | 1/1/2002 | DEFS-LINA-00000715 | DEFS-LINA-00000779 | | |
| 0781 | *Biochemistry* (L. Stryer, et al., 3ed 1988) | 1/1/1988 | DEFS-LINA-00002401 | DEFS-LINA-00002531 | | |
| 0782 | Szenczi, A., et al., "The Effect of Solvent Environment on the Conformation and Stability of Human Polyclonal IgG in Solution," *Biologicals*, Vol. 34, pp. 5-14 | 1/1/2006 | DEFS-LINA-00004970 | DEFS-LINA-00004979 | | |
| 0783 | Tabb, J.S., et al., "Characterization of p-Azidophenylalanine as a System L Substrate and a Photoaffinity Probe," *Federation Proc.*, Vol. 45, p. 1940 (1986) | 1/1/1986 | DEFS-LINA-00000780 | DEFS-LINA-00000780 | | |
| 0784 | Tajima, M., et al., "Role of Calcium Ions in the Thermostability of Thermolysin and *Bacillus subtilis* var. *amylosacchariticus* Neutral Protease, *Eur. J. Biochem*., Vol. 64, pp. 243-247 (1976) | 1/1/1976 | DEFS-LINA-00002532 | DEFS-LINA-00002536 | | |
| 0785 | Takao, T., et al., "Isolation, primary structure and synthesis of heat-stable enterotoxin produced by Yersinia *enterocolitica*," *Eur. J. Biochem.*, Vol. 152, pp. 199-206 | 1/1/1985 | LINZ_0107159 | LINZ_0107166 | | A, F, CU, H, R, U |
| 0786 | Takao, T., et al., "Amino acid sequence of heat-stable enterotoxin produced by *Vibrio cholerae* non-01," *FEBS Letters*, Vol. 193, No. 2, pp. 250-254 | 12/1/1985 | LINZ_0107167 | LINZ_0107171 | | A, F, CU, H, R, U |
| 0787 | Takeda, T., et al., "Epitope Mapping and Characterization of Antigenic Determinants of Heat-Stable Enterotoxin (STh) of Enterotoxigenic *Escherichia coli* by Using Monoclonal Antibodies," *Infection and Immunity*, Vol. 61, No. 1, pp. 289-294 | 1/1/1993 | LINZ_0107172 | LINZ_0107177 | | A, F, CU, H, R, U |
| 0788 | Talley, N., "Serotoninergic neuroenteric modulators," *The Lancet*, Vol. 358, No. 929B, pp. 2061-2068 | 12/15/2001 | N/A | N/A | DeGrado Exhibit 6 | A, F, CU, H, R, U |
| 0789 | Tanford, C., "Contribution Of Hydrophobic Interactions To The Stability Of The Globular Conformation Of Proteins," *J. Am. Chem. Soc*., Vol. 84, pp. 4240-4247 (1962) | 11/20/1962 | LINZ_0169496 | LINZ_0169503 | | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0790 | Tchernychev, B., et al., "MRP4 Modulation of the Guanylate Cyclase-C/cGMP Pathway: Effects on Linaclotide-Induced Electrolyte Secretion and cGMP Efflux," *J. Pharmacol. Exp. Ther.*, Vol. 355, pp. 48-56 | 10/1/2015 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0791 | Tian, X., "STa Peptide Analogs For Probing Guanylyl Cyclase C," *Biopolymers*, Vol. 90, No. 5, pp. 713-723 | 00/00/0000 | LINZ_0168467 | LINZ_0168484 | | A, F, CU, H, R, U |
| 0792 | Tillisch, K., Chang, L., "Diagnosis and Treatment of Irritable Bowel Syndrome: State of the Art," *Current Gastroenterology Reports*, Vol. 7, pp. 249-256 (2005) | 1/1/2005 | LINZ_0168971 | LINZ_0168978 | | A, F, CU, H, R, U |
| 0793 | "The United States Pharmacopeia (USP 23): The National Formulary (NF18)" pp. 1942-1943 (1995) | 1/1/1995 | DEFS-LINA-00001181 | DEFS-LINA-00001184 | | |
| 0794 | Uzzau, S., Fasano, A., "Cross-talk between enteric pathogens and the intestine," *Cellular Microbiology*, Vol. 2, pp. 83-89 (2000) | 1/1/2000 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0795 | Videlock, E., Chang, L., "Irritable bowel syndrome," *Yamada's Textbook of Gastroenterology* (6th ed. 2015), Chap. 75, pp. 1495-1521 | 1/1/2016 | LINZ_0169244 | LINZ_0169270 | | A, F, CU, H, R, U |
| 0796 | Volkin, D., et al., "Degradative Covalent Reactions Important to Protein Stability," *Molecular Biotech*., Vol. 8, pp. 105-122 (1997) | 1/1/1997 | DEFS-LINA-00001194 | DEFS-LINA-00001211 | Block Exhibit 14 | |
| 0797 | Wald, "Constipation, Advances in Diagnosis and Treatment," *JAMA*, Vol. 315, No. 2, pp. 185-191 (2016) | 1/12/2016 | LINZ_0168979 | LINZ_0168985 | | A, F, CU, H, R, U |
| 0798 | Wang, W., et al., "Antibody Structure, Instability, and Formulation," *J. Pharm. Sci.*, Vol. 96, No. 1 (2007) | 1/1/2007 | IW_LINZ_01054486 | IW_LINZ_01054511 | | A, F, CU, H, R, U |
| 0799 | Weinberg, D., et al., "American Gastroenterological Association Institute Guideline on the Pharmacological Management of Irritable Bowel Syndrome," *Gastroenterology*, Vol. 147, No. 5, pp. 1146-1148 | 11/1/2014 | LINZ_0034905 | LINZ_0034907 | Barnett Exhibit 40 | A, F, CU, H, R, U |
| 0800 | Weissman, J., Kim, P., "Reexamination of the Folding of BPTI: Predominance of Native Intermediates," *Science*, Vol. 253, pp. 1386-93 (1991) | 9/20/1991 | LINZ_0169310 | LINZ_0169318 | | A, F, CU, H, R, U |
| 0801 | White, W.C., Chan, P.D., Chaps. 2-4 - "Basic principles, Basic procedures, and Preparation and handling of peptides containing methionine and cysteine," pp. 9-40, Fmoc solid phase peptide synthesis - *A Pratical Approach* (2000) | 1/1/2000 | DEFS-LINA-00001911 | DEFS-LINA-00002026 | | |
| 0802 | Williams, M., "Drug Design and Development: A Perspective", *Foye's Principles of Medicinal Chemistry*, (Williams and Lemke eds., 5th Ed. 2002) | 1/1/2002 | LINZ_0169729 | LINZ_0169761 | | A, F, CU, H, R, U |
| 0803 | MOVED TO JOINT EXHIBIT LIST AS JTX-020 | | | | | |
| 0804 | Wolfe, H., Waldman, S., "A Comparative Molecular Field Analysis (COMFA) of the Structural Determinants of Heat-Stable Enterotoxins Mediating Activation of Guanylyl Cyclase C," Journal of Medicinal Chemistry, Vol. 45, No. 8 (Color version) | 1/1/2002 | N/A | N/A | Currie Exhibit 23 Wolfe Exhibit 7 | F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0805 | Woodworth, T., Nicols, J. "Recombinant Fusion Toxins - A New Class of Targeted Biological Therapeutics," *Immunoconjugate Therapy of Hematologic Malignancies* , (1993) | 1/1/1993 | DEFS-LINA-00000785 | DEFS-LINA-00000802 | | |
| 0806 | Wu, S. et al., "The formation and mechanism of multimerization in a freeze-dried peptide," *International Journal of Pharmaceutics* , 200 (2000) 1-16 | 1/1/2000 | IW_LINZ_00760848 | IW_LINZ_00760863 | Zhao Exhibit 9 | A, F, CU, H, R, U |
| 0807 | Wu, Y., et al., "Reactive Impurities in Excipients: Profiling, Identification and Mitigation of Drug-Excipient Incompatibility," *AAPS PharmSciTech* , Vol. 12, No. 4 | 12/1/2011 | IW_LINZ_00723097 | IW_LINZ_00723112 | Zhao Exhibit 21 | A, F, CU, H, R, U, LP |
| 0808 | Wu, Y., et al., "Reactive Impurities in Excipients: Profiling, Identification and Mitigation of Drug-Excipient Incompatibility," *AAPS PharmSciTech* , Vol. 12, No. 4 (Highlighted version of Zhao Exhibit 21) | 4/11/2011 | N/A | N/A | Zhao Exhibit 21a | A, F, CU, H, R, U, LP |
| 0809 | Yamamoto, T., et al., "Comparison of the nucleotide sequence of enteroaggregative *Escherichia coli* heat-stable enterotoxin 1 genes among diarrhea-associated *Escherichia coli* ," FEMS Microbiology Letters, Vol. 147, pp. 89-95 | 1/1/1997 | LINZ_0107185 | LINZ_0107191 | | A, F, CU, H, R, U |
| 0810 | Yamamoto, T., Taneike, I., "The sequences of enterohemorrhagic *Escherichia coli* and *Yersinia pestis* that are homologous to the enteroaggregative E. coli heat stable enterotoxin gene: cross-species transfer in evolution," *FEBS Letters,* Vol. 472, pp. 22-26 | 1/1/2000 | LINZ_0107192 | LINZ_0107196 | | A, F, CU, H, R, U |
| 0811 | Yamanaka, H., et al., "Involvement of glutamic acid residue at position 7 in the formation of the intramolecular disulfide bond of *Escherichia coli* heat-stable enterotoxin Ip *in vivo,*" *Microbial Pathogenesis* , Vol. 24, pp. 145-154 | 1/1/1998 | N/A | N/A | Gupta Exhibit 22 | A, F, CU, H, R, U |
| 0812 | Yamasaki, S., et al., "Structural Requirements for the Spatial Structure and Toxicity of Heat-Stable Enterotoxin (STh) of Enterotoxigenic *Escherichia coli* ," *Bull. Chem. Soc. Jpn* , Vol. 61, No. 5, pp. 1701-1706 (1988) | 5/1/1988 | LINZ_0169278 | LINZ_0169283 | | A, F, CU, H, R, U |
| 0813 | Yang, H., Ma, T., "Luminally Acting Agents For Constipation Treatment: A Review Based On Literatures and Patents," *Frontiers in Pharmacology* , Vol. 8, Article 418, pp. 1-13 | 6/30/2017 | LINZ_0169364 | LINZ_0169376 | | A, F, CU, H, R, U |
| 0814 | Yoshimura, S., et al., "Essential structure for full enterotoxigenic activity of heat-stable enterotoxin produced by enterotoxigenic *Escherichia coli* ," *FEBS Letters,* Vol. 181, No. 1 | 2/1/1985 | IW_LINZ_00000060 | IW_LINZ_00000064 | Wolfe Exhibit 9 | F, CU, H, R, U |
| 0815 | Zalewski, "Cisapride Withdrawal Requires Alternative Therapy," *Cleveland Clinic Pharmacotherapy Update* , Vol. III, No. 2 | 6/1/2000 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0816 | Amitiza Prescribing Information | 1/31/2006 | LINZ_0104744 | LINZ_0104757 | Barnett Exhibit 12 Chang Exhibit 14 Kent Exhibit 14 | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.

No. 16-cv-01114-RGA

**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0817 | Prescribing Information for Amitiza (8 mcg and 24 mcg) | 11/1/2012 | LINZ_0104758 | LINZ_0104774 | | A, F, CU, H, R, U |
| 0818 | NDA 21-908 Adminstrative Documents/Correspondence | 2/1/2006 | LINZ_0102101 | LINZ_0102223 | | A, F, CU, H, R, U, MD |
| 0819 | NDA 21-908 Approval Letter | 1/31/2006 | LINZ_0102096 | LINZ_0102099 | | A, F, CU, H, R, U |
| 0820 | NDA 21-908 FDA Approval Letter | 00/00/0000 | LINZ_0102224 | LINZ_0102227 | | A, F, CU, H, R, U |
| 0821 | NDA 21-908 FDA Approved Labeling | 1/31/2006 | LINZ_0102745 | LINZ_0102759 | | A, F, CU, H, R, U |
| 0822 | NDA 21-908 FDA Chemistry Review | 1/25/2006 | LINZ_0104242 | LINZ_0104265 | | A, F, CU, H, R, U |
| 0823 | NDA 21-908 FDA Clinical Pharmacology and Biopharmaceutics Review(s) | 1/5/2006 | LINZ_0102228 | LINZ_0102261 | | A, F, CU, H, R, U |
| 0824 | NDA 21-908 FDA Medical Review(s) | 1/30/2006 | LINZ_0102262 | LINZ_0102484 | | A, F, CU, H, R, U |
| 0825 | NDA 21-908 FDA Microbiology Review(s) | 10/3/2005 | LINZ_0102485 | LINZ_0102490 | | A, F, CU, H, R, U |
| 0826 | NDA 21-908 FDA Pharmacology Review(s) | 1/13/2006 | LINZ_0102491 | LINZ_0102744 | | A, F, CU, H, R, U |
| 0827 | NDA 21-908 FDA Statistical Review(s) | 12/16/2005 | LINZ_0102760 | LINZ_0102864 | | A, F, CU, H, R, U |
| 0828 | NDA 21-908/S-004 Amitiza Label | 5/1/2007 | LINZ_0104775 | LINZ_0104787 | | A, F, CU, H, R, U |
| 0829 | NDA 21-908/S-004 Approval Letter | 5/16/2007 | LINZ_0103658 | LINZ_0103660 | | A, F, CU, H, R, U |
| 0830 | NDA 21-908/S-005 Amitiza Package Insert (8 mcg and 24 mcg) | 4/1/2008 | LINZ_0103661 | LINZ_0103676 | | A, F, CU, H, R, U |
| 0831 | NDA 21-908/S-005 Approval Letter | 4/29/2008 | LINZ_0103765 | LINZ_0103769 | | A, F, CU, H, R, U |
| 0832 | NDA 21-908/S-005 FDA Administrative and Correspondence Documents | 4/29/2008 | LINZ_0103695 | LINZ_0103764 | | A, F, CU, H, R, U, MD |
| 0833 | NDA 21-908/S-005 FDA Chemistry Review(s) | 4/22/2008 | LINZ_0103770 | LINZ_0103772 | | A, F, CU, H, R, U |
| 0834 | NDA 21-908/S-005 FDA Cross Discipline Team Leader Review | 4/25/2008 | LINZ_0103773 | LINZ_0103782 | | A, F, CU, H, R, U |
| 0835 | NDA 21-908/S-005 FDA Labeling | 4/29/2008 | LINZ_0104014 | LINZ_0104036 | | A, F, CU, H, R, U |
| 0836 | NDA 21-908/S-005 FDA Medical Review(s) | 4/11/2008 | LINZ_0103783 | LINZ_0103992 | | A, F, CU, H, R, U |
| 0837 | NDA 21-908/S-005 FDA Officer/Employee List | 4/29/2008 | LINZ_0103993 | LINZ_0103994 | | A, F, CU, H, R, U |
| 0838 | NDA 21-908/S-005 FDA Other Review(s) | 4/8/2008 | LINZ_0103995 | LINZ_0104007 | | A, F, CU, H, R, U |
| 0839 | NDA 21-908/S-005 FDA Pharmacology Review(s) | 4/18/2008 | LINZ_0104008 | LINZ_0104013 | | A, F, CU, H, R, U |
| 0840 | NDA 21-908/S-005 FDA Statistical Review(s) | 4/25/2008 | LINZ_0104037 | LINZ_0104110 | | A, F, CU, H, R, U |
| 0841 | NDA 21-908/S-005 FDA Summary Review | 4/29/2008 | LINZ_0104111 | LINZ_0104125 | | A, F, CU, H, R, U |
| 0842 | NDA 21-908/S-008 Amitiza Package Insert (8 mcg and 24 mcg) | 2/1/2011 | LINZ_0104126 | LINZ_0104142 | | A, F, CU, H, R, U |
| 0843 | NDA 21-908/S-008 Approval Letter | 2/24/2011 | LINZ_0104143 | LINZ_0104146 | | A, F, CU, H, R, U |
| 0844 | NDA 21-908/S-008 FDA Approval Package | 2/24/2011 | LINZ_0104147 | LINZ_0104241 | | A, F, CU, H, R, U |
| 0845 | NDA 21-908/S-010 Approval Letter | 11/26/2012 | LINZ_0102866 | LINZ_0102868 | | A, F, CU, H, R, U |
| 0846 | NDA 21-908/S-010 FDA Approval Package | 11/26/2012 | LINZ_0102869 | LINZ_0102902 | | A, F, CU, H, R, U |
| 0847 | NDA 21-908/S-011 Amitiza Package Insert (8 mcg and 24 mcg) | 4/1/2013 | LINZ_0102903 | LINZ_0102921 | | A, F, CU, H, R, U |
| 0848 | NDA 21-908/S-011 Approval Letter | 4/19/2013 | LINZ_0102922 | LINZ_0102925 | | A, F, CU, H, R, U |
| 0849 | NDA 21-908/S-011 Approval Package | 4/19/2013 | LINZ_0102926 | LINZ_0103613 | | A, F, CU, H, R, U |
| 0850 | NDA 21-908/S-013 Amitiza Package Insert | 9/1/2016 | LINZ_0103614 | LINZ_0103632 | | A, F, CU, H, R, U |
| 0851 | NDA 21-908/S-013 Approval Letter | 10/11/2016 | LINZ_0103633 | LINZ_0103635 | | A, F, CU, H, R, U |
| 0852 | NDA 21-908/S-015 Amitiza Package Insert | 8/1/2017 | LINZ_0103636 | LINZ_0103654 | | A, F, CU, H, R, U |
| 0853 | NDA 21-908/S-015 Approval Letter | 8/1/2017 | LINZ_0103655 | LINZ_0103657 | | A, F, CU, H, R, U |
| 0854 | NDA 21-200 FDA Approval Letter | 7/24/2002 | LINZ_0104789 | LINZ_0104798 | | A, F, CU, H, R, U |
| 0855 | Zelnorm Label | 7/24/2002 | LINZ_0105608 | LINZ_0105623 | DeGrado Exhibit 4 Kent Exhibit 12 | A, F, CU, H, R, U |
| 0856 | NDA 21-200 Administrative Documents | 7/24/2002 | LINZ_0104816 | LINZ_0104914 | | A, F, CU, H, R, U, MD |

Confidential

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0857 | NDA 21-200 Approved Zelnorm Label | 7/24/2002 | LINZ_0104799 | LINZ_0104815 | Barnett Exhibit 4 Chang Exhibit 13 | A, F, CU, H, R, U |
| 0858 | NDA 21-200 FDA Chemistry Review | 6/27/2002 | LINZ_0104915 | LINZ_0104943 | | A, F, CU, H, R, U |
| 0859 | NDA 21-200 FDA Clinical Pharmacology and Biopharmaceutics Review(s) | 2/11/2000 | LINZ_0104944 | LINZ_0104996 | | A, F, CU, H, R, U |
| 0860 | NDA 21-200 FDA Correspondence | 7/10/2002 | LINZ_0104997 | LINZ_0105135 | | A, F, CU, H, R, U |
| 0861 | NDA 21-200 FDA Medical Review(s) | 6/17/2002 | LINZ_0105136 | LINZ_0105353 | | A, F, CU, H, R, U |
| 0862 | NDA 21-200 FDA Pharmacology Review(s) | 5/23/2001 | LINZ_0105354 | LINZ_0105566 | | A, F, CU, H, R, U |
| 0863 | NDA 21-200 FDA Statistical Review(s) | 4/27/2001 | LINZ_0105567 | LINZ_0105607 | | A, F, CU, H, R, U |
| 0864 | Zelnorm Label | 12/1/2003 | LINZ_0105624 | LINZ_0105634 | | A, F, CU, H, R, U |
| 0865 | Zelnorm Label | 4/1/2004 | LINZ_0105655 | LINZ_0105669 | Henry Exhibit 3 | A, F, CU, H, R, U |
| 0866 | NDA 21-200/S-005 Zelnorm Package Insert | 8/1/2004 | LINZ_0105670 | LINZ_0105687 | | A, F, CU, H, R, U |
| 0867 | NDA 21-200/S-014 Zelnorm Package Insert | 7/1/2006 | LINZ_0105688 | LINZ_0105704 | | A, F, CU, H, R, U |
| 0868 | Zelnorm Label and sample cartons | 00/00/0000 | LINZ_0105635 | LINZ_0105654 | | A, F, CU, H, R, U |
| 0869 | FDA Public Health Advisory: Tegaserod maleate (marketed as Zelnorm) | 3/30/2007 | LINZ_0107088 | LINZ_0107089 | | A, F, CU, H, R, U |
| 0870 | Press release, "FDA Permits Restricted Use of Zelnorm for Qualifying Patients" | 7/27/2007 | LINZ_0107207 | LINZ_0107208 | | A, F, CU, H, R, U |
| 0871 | Zelnorm® Single Patient IND Packet | 2/1/2018 | LINZ_0107209 | LINZ_0107215 | | A, F, CU, H, R, U |
| 0872 | Alosetron - withdrawn: severe adverse reactions, Essential Drugs in Brief No. 003-2001: Regulatory Matters, http://apps.who.int/medicinedocs/en/p/printable.html (last visited 1/5/2019) | 11/28/2000 | N/A | N/A | | A, F, CU, H, R, U, UP |
| 0873 | Drugs@FDA Entry for NDA 019955 (DDAVP® tablets), DRUGS@FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=019955 (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054557 | IW_LINZ_01054559 | | A, F, CU, H, R, U |
| 0874 | Drugs@FDA Entry for NDA 050108 (Coly-Mycin M® for injection), DRUGS@FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=050108 (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054536 | IW_LINZ_01054536 | | A, F, CU, H, R, U |
| 0875 | Drugs@FDA Entry for NDA 050355 (Coly-Mycin S® oral suspension), DRUGS@FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=050355 (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054537 | IW_LINZ_01054537 | | A, F, CU, H, R, U |
| 0876 | Product Names Beginning with "C," DRUGS@FDA, page 7, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=C (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054555 | IW_LINZ_01054556 | | A, F, CU, H, R, U |
| 0877 | Product Names Beginning with "C," Drugs@FDA, page 1, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=C (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054518 | IW_LINZ_01054523 | | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
**Plaintiffs' Trial Exhibit List**

Confidential

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0878 | Product Names Beginning with "C," DRUGS@FDA, pages 2, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=C (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054524 | IW_LINZ_01054529 | | A, F, CU, H, R, U |
| 0879 | Product Names Beginning with "C," DRUGS@FDA, pages 3, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=C (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054530 | IW_LINZ_01054535 | | A, F, CU, H, R, U |
| 0880 | Product Names Beginning with "A," DRUGS@FDA, page 5, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=A (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054512 | IW_LINZ_01054517 | | A, F, CU, H, R, U |
| 0881 | Product Names Beginning with "G," DRUGS@FDA, page 1, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=G (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054560 | IW_LINZ_01054565 | | A, F, CU, H, R, U |
| 0882 | Product Names Beginning with "T," DRUGS@FDA, page 1, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=T (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054632 | IW_LINZ_01054637 | | A, F, CU, H, R, U |
| 0883 | Product Names Beginning with "T," DRUGS@FDA, page 6, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=T (last visited January 14, 2019) | 1/14/2019 | IW_LINZ_01054638 | IW_LINZ_01054640 | | A, F, CU, H, R, U |
| 0884 | Microbia Lab Notebook No. 189 assigned to Steve Lai | 9/5/2002 - 9/19/2003 | IW_LINZ_00000345 | IW_LINZ_00000571 | | A, F, CU, H, R, U |
| 0885 | Microbia Lab Notebook No. 436 assigned to Angelika Fretzen | 11/20/2006 - 8/25/2009 | IW_LINZ_00000244 | IW_LINZ_00000344 | Fretzen Exhibit 10 | A, F, CU, H, R, U, LP |
| 0886 | Microbia Lab Notebook No. 227 assigned to Thea Norman | 5/7/2003 - 3/9/2004 | IW_LINZ_00001049 | IW_LINZ_00001276 | | A, F, CU, H, R, U |
| 0887 | Microbia Lab Notebook No. 242 assigned to Etchell Cordero | 6/18/2003- 10/27/2003 | IW_LINZ_00001499 | IW_LINZ_00001723 | | A, F, CU, H, R, U |
| 0888 | Microbia Lab Notebook No. 249 assigned to Thea Norman | 9/8/2003 - 3/9/2004 | IW_LINZ_00001941 | IW_LINZ_00002002 | | A, F, CU, H, R, U |
| 0889 | Microbia Lab Notebook No. 300 assigned to Peter Germano | 7/20/2004 - 7/29/2009 | IW_LINZ_00004477 | IW_LINZ_00004552 | | A, F, CU, H, R, U |
| 0890 | Microbia Lab Notebook No. 348 assigned to Wakefield | 8/31/2005 - 3/15/2007 | IW_LINZ_00006444 | IW_LINZ_00006658 | | A, F, CU, H, R, U |
| 0891 | Microbia Lab Notebook No. 350 assigned to Marco Kessler | 9/2/2005 - 11/4/2005 | IW_LINZ_00006659 | IW_LINZ_00006876 | | A, F, CU, H, R, U |
| 0892 | Microbia Lab Notebook No. 491 assigned to Elizabeth Powers | 6/18/2007 - 6/15/2015 | IW_LINZ_00012432 | IW_LINZ_00012650 | | A, F, CU, H, R, U |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals USA, Inc., et al.
No. 16-cv-01114-RGA
Plaintiffs' Trial Exhibit List

| Plaintiffs' Trial Ex. No. | Description | Date | Beg Bates | End Bates | Deposition Ex. No. | Defendants' Objections |
|---|---|---|---|---|---|---|
| 0893 | Microbia Lab Notebook No. 449 assigned to H. Zhao | 1/10/2007 - 8/22/2007 | IW_LINZ_00013852 | IW_LINZ_00014075 | Zhao Exhibit 36 | A, F, CU, H, R, U, LP |
| 0894 | Microbia Lab Notebook No. 509 assigned to H. Zhao on 9/10/2007 | 9/10/2007 - 6/3/2008 | IW_LINZ_00014076 | IW_LINZ_00014293 | Zhao Exhibit 37 | A, F, CU, H, R, U, LP |
| 0895 | Microbia Lab Notebook No. 574 assigned to H. Zhao on 6/13/2008 | 6/13/2008 - 12/3/2008 | IW_LINZ_00014294 | IW_LINZ_00014513 | Zhao Exhibit 38 | A, F, CU, H, R, U, LP |
| 0896 | Ironwood Pharmaceuticals Lab Notebook No. 677 | 1/4/2010 - 7/25/2010 | IW_LINZ_00014514 | IW_LINZ_00014623 | Zhao Exhibit 39 | A, F, CU, H, R, U, LP |
| 0897 | Microbia Lab Notebook No. 188 assigned to Mark Currie | 9/4/2002 - 9/13/2007 | IW_LINZ_00066870 | IW_LINZ_00066916 | | A, F, CU, H, R, U |
| 0898 | Microbia Lab Notebook No. 141 assigned to Thea C. Norman | 2/13/2002 - 3/9/2004 | IW_LINZ_00709766 | IW_LINZ_00710019 | Mahajan-Miklos Exhibit 8 | A, F, CU, H, R, U, LP |
| 0899 | Kita, T., et al., "Characterization of human uroguanylin: a member of the guanylin peptide family," *The American Psychological Society* , pp. F342-48 | 1/1/1994 | IW_LINZ_00117934 | IW_LINZ_00117940 | | A, F, CU, H, R, U |
| 0900 | Hungin, A.P.S., et al., "Irritable bowel syndrome in the United States: prevalence, symptom patterns and impact," *Aliment. Pharmacol Ther.* , Vol. 21, pp. 1365-1375 | 1/1/2005 | N/A | N/A | | A, F, CU, H, R, U, UP |

**Exhibits**

| Obj. | Description |
|------|-------------|
| A | Authenticity; Fed. R. Evid. 901 |
| BE | Best Evidence Rule; Fed. R. Evid. 1002 |
| CU | Misleading, Confusing and/or Cumulative/Waste of time; Fed. R. Evid. 403 |
| F | No foundation or assumes facts not in evidence; Fed. R. Evid. 104, 602, 703, 901 |
| FL | Foreign Language |
| H | Hearsay if offered for the truth of the matter asserted; Fed. R. Evid. 801,  802, 803, 805 |
| I | Incomplete designation; Fed. R. Evid. 106, 403 |
| ID | Incorrect Description |
| LC | Incomplete designation; Fed. R. Evid. 701 |
| LP | Admissible for Limited Purpose; Fed. R. Evid. 105 |
| MD | Multiple Documents |
| NL | Not Legible |
| R | Not relevant; Fed. R. Evid. 401, 402 |
| SRM | Subsequent Remedial Measure; Fed. R. Evid. 407 |
| SO | Settlement Offer; Fed. R. Evid. 408 |
| U | Unfairly prejudicial; Fed. R. Evid. 403 |
| UP | Untimely Production |
| UT | Untimely Translated |
| F.R.C.P.26 | Outside the scope of the expert report |
| Unelected | Unelected references |

# EXHIBIT 8

Allergan Sales, LLC, et al.  v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-001 | LINZ_0000001 | LINZ_0000078 | 12/4/2007 | U.S. Patent No. 7,304,036 (Currie, et al.) | Chien 6; Chang 9; Currie 4; Mahajan-Miklos 2; Kent 5; Barnett 3 | |
| DTX-002 | LINZ_0000079 | LINZ_0001846 | 3/9/2004 | Certified File History for U.S. Patent 7,304,036 (Currie, et al.) | | |
| DTX-003 | LINZ_0001847 | LINZ_0001953 | 5/13/2008 | Certified U.S. Patent 7,371,727 (Currie, et al.) | Chien 7; Fretzen 26; Mahajan-Miklos 6; Chang 10; Currie 5; Kent 6; Barnett 5 | |
| DTX-004 | LINZ_0001954 | LINZ_0003474 | 7/27/2004 | Certified File History for U.S. Patent 7,371,727 (Currie, et al.) | | |
| DTX-005 | LINZ_0003475 | LINZ_0003541 | 4/27/2010 | Certified U.S. Patent 7,704,947 (Currie, et al.) | Chien 8; Giannella 3; Chang 11; Currie 6; Mahajan-Miklos 7; Kent 7; Barnett 6 | |
| DTX-006 | LINZ_0003542 | LINZ_0004446 | 10/31/2007 | Certified File History for U.S. Patent 7,704,947 (Currie, et al.) | | |
| DTX-007 | LINZ_0004447 | LINZ_0004522 | 6/29/2010 | Certified U.S. Patent 7,745,409 (Currie, et al.) | Chien 9; Currie 7; Mahajan-Miklos 3 | R, P |
| DTX-008 | LINZ_0004523 | LINZ_0005221 | 12/3/2007 | Certified File History for U.S. Patent 7,745,409 (Currie, et al.) | | R, P |
| DTX-009 | LINZ_0005222 | LINZ_0005285 | 12/20/2011 | Certified U.S. Patent 8,080,526 (Currie, et al.) | Chien 10; Chang 12; Currie 8; Mahajan-Miklos 4; Kent 8, Barnett 7 | |
| DTX-010 | LINZ_0005286 | LINZ_0006927 | 4/5/2010 | Certified File History for U.S. Patent 8,080,526 (Currie, et al.) | | |
| DTX-011 | LINZ_0006928 | LINZ_0007002 | 2/7/2012 | Certified U.S. Patent 8,110,553 (Currie, et al.) | Chien 11; Currie 9; Mahajan-Miklos 5 | R, P |
| DTX-012 | LINZ_0007003 | LINZ_0007299 | 5/27/2010 | Certified File History for U.S. Patent 8,110,553 (Currie, et al.) | | R, P |
| DTX-013 | LINZ_0007300 | LINZ_0007359 | 6/10/2014 | Certified U.S. Patent 8,748,573 (Fretzen, et al.) | Chien 12; Fretzen 4; Zhao 3; Block 4; Gupta 9; Klibanov 11 | |
| DTX-014 | LINZ_0007360 | LINZ_0010296 | 8/5/2010 | Certified File History for U.S. Patent 8,748,573 (Fretzen, et al.) | | |
| DTX-015 | LINZ_0010297 | LINZ_0010319 | 8/12/2014 | Certified U.S. Patent 8,802,628 (Fretzen, et al.) | Chien 13; Fretzen 5; Zhao 5; Klibanov 12 | I |
| DTX-016 | LINZ_0010320 | LINZ_0013218 | 8/14/2009 | Certified File History for U.S. Patent 8,802,628 (Fretzen, et al.) | | |
| DTX-017 | LINZ_0013219 | LINZ_0013249 | 1/13/2015 | Certified U.S. Patent 8,933,030 (Fretzen, et al.) | | R, P |
| DTX-018 | LINZ_0013250 | LINZ_0017193 | 3/29/2013 | Certified File History for  U.S. Patent 8,933,030 (Fretzen, et al.) | | R, P |
| DTX-019 | LINZ_0023418 | LINZ_0023434 | 8/1/2012 | Linzess August 2012 Prescribing Information | Kunka 4 | |
| DTX-020 | LINZ_0023393 | LINZ_0023413 | 1/1/2017 | Linzess January 2017 Prescribing Information | Kunka 5 | |
| DTX-021 | DEFS-LINA-00000001 | DEFS-LINA-00000034 | 10/8/1985 | U.S. Patent 4,545,931 (Houghten) | | R, P |
| DTX-022 | DEFS-LINA-00000035 | DEFS-LINA-00000043 | 2/6/1996 | U.S. Patent 5,489,670 (Currie, et al.) | Currie 25; Giannella 7; Barrett 15; DeGrado 10; Barnett 23 | |
| DTX-023 | DEFS-LINA-00000044 | DEFS-LINA-00000081 | 5/21/1996 | U.S. Patent 5,518,888 (Waldman) | | R, P |

CONFIDENTIAL

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-024 | DEFS-LINA-00000083 | DEFS-LINA-00000137 | 4/12/2001 | International Publication WO 01/25266 A1 (Shailubhai & Currie) | Currie 27; Barrett 16; Barnett 24 | R, P |
| DTX-025 | DEFS-LINA-00000138 | DEFS-LINA-00000159 | 4/17/2003 | U.S. Patent Application Publication 2003/0073628 A1 (Shailubhai, et al.) | Chang 21 | R, P |
| DTX-026 | DEFS-LINA-00000160 | DEFS-LINA-00000165 | 6/21/2000 | Albano, et al. Structural and Functional Features of Modified Heat-Stable Toxins Produced by Enteropathogenic Klebsiella Cells. Pediatric Research 48(5):685-689 (2000) ("Albano") | | R, P |
| DTX-027 | DEFS-LINA-00000166 | DEFS-LINA-00000171 | 12/1/1986 | Appel, A. Chymotrypsin: Molecular and Catalytic Properties. Clinical Biochemistry 19:317-322 (1986) ("Appel") | Wolfe - 17 | R, P |
| DTX-028 | DEFS-LINA-00000172 | DEFS-LINA-00000178 | 4/15/1983 | Aimoto, et al. Chemical Synthesis of a Highly Potent and Heat-stable Analog of an Enterotoxin Produced by a Human Strain of Enterotoxigenic Escherichia coli. Biochem. Biophy. Res. Commun. 112(1):320-326 (1983) ("Aimoto") | Giannella 12; DeGrado 13; Wolfe - 15; Kent 22 | R, P |
| DTX-029 | DEFS-LINA-00000179 | DEFS-LINA-00000184 | 4/1/1999 | Caballero-Plasencia, et al. Altered Gastric Emptying in Patients with Irritable Bowel Syndrome. Eur. J. Nucl. Med. 26:404-409 (1999) ("Caballero-Plasencia") | | R, P |
| DTX-030 | DEFS-LINA-00000185 | DEFS-LINA-00000191 | 3/25/2000 | Camilleri, M. Efficacy and Safety of Alosetron in Women with Irritable Bowel Syndrome: a Randomized, Placebo-controlled Trial. Gastroenterology 120:652-668 (2000) ("Camilleri") | | R, P |
| DTX-031 | DEFS-LINA-00000192 | DEFS-LINA-00000198 | 1/22/1991 | Carpick, et al. Structural Characterization of Functionally Important Regions of the Escherichia coli Heat-Stable Enterotoxin STIb. Biochemistry 30:4803-4809 (1991) ("Carpick 1991") | | R, P |
| DTX-032 | DEFS-LINA-00000199 | DEFS-LINA-00000204 | 11/1/1993 | Carpick & Gariepy, The Escherichia coli Heat-Stable Enterotoxin is a Long- Lived Superagonist of Guanylin. Infection & Immunity 61(11):4710-4715 (1993) ("Carpick 1993") | | R, P |
| DTX-033 | DEFS-LINA-00000205 | DEFS-LINA-00000250 | 1/1/1992 | Chen, T. Formulation Concerns of Protein Drugs. Drug Dev. Ind. Pharm. 18 (11 & 12):1311-1354 (1992) ("Chen"). | | R, P |
| DTX-034 | DEFS-LINA-00000251 | DEFS-LINA-00000323 | 1/1/1993 | Cleland, et al. The Development of Stable Protein Formulations: A Close Look at Protein Aggregation, Deamidation, and Oxidation. Crit. Rev. Ther. Drug Carrier Syst. 10(4):307-377 (1993) ("Cleland") | Block 13 | R, P |
| DTX-035 | DEFS-LINA-00000324 | DEFS-LINA-00000330 | 11/1/1984 | Dreyfus & Robertson, Solubilization and Partial Characterization of the Intestinal Receptor for Escherichia coli Heat- Stable Enterotoxin. Infection and Immunity 46(2):537-543 (1984) ("Dreyfus") | | R, P |
| DTX-036 | DEFS-LINA-00000331 | DEFS-LINA-00000345 | 1/1/1988 | Ewe K., Intestinal Transport in Constipation and Diarrhoea. Pharmacology 36 (Suppl. 1):73-84 (1988) ("Ewe") | Barrett 3; Barnett 20 | R, P |
| DTX-037 | DEFS-LINA-00000346 | DEFS-LINA-00000353 | 6/1/1982 | Fleckenstein, et al. Minute Rhythm of Electrical Spike Bursts of the Small Intestine in Different Species. Am. J. Physiol. 242(6):G654-659 (1982) ("Fleckenstein") | | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-038 | DEFS-LINA-00000370 | DEFS-LINA-00000378 | 2/1/1984 | Frantz, et al. Binding of Escherichia coli Heat-Stable Enterotoxin to Rat Intestinal Cells and Brush Border Membranes. Infection and Immunity 43(2):622-630 (1984) ("Frantz") | | R, P |
| DTX-039 | DEFS-LINA-00000379 | DEFS-LINA-00000391 | 7/21/1986 | Gariepy, et al. Structure of the Toxic Domain of the Escherichia coli Heat- Stable Enterotoxin ST I. Biochemistry 25:7854-7866 (1986) ("Gariepy I") | | R, P |
| DTX-040 | DEFS-LINA-00000392 | DEFS-LINA-00000396 | 12/1/1987 | Gariepy, et al. Importance of Disulfide Bridges in the Structure and Activity of Escherichia coli Enterotoxin ST1b. Proc. Natl. Acad. Sci. USA 84:8907-8911 (1987) ("Gariepy II") | DeGrado 12 | R, P |
| DTX-041 | DEFS-LINA-00000397 | DEFS-LINA-00000401 | 1/1/1986 | Gariepy & Schoolnik, Design of a Photoreactive Analogue of the Escherichia coli Heat-Stable Enterotoxin STIb: Use in Identifying Its Receptor on Rat Brush Border Membranes. Proc. Natl. Acad. Sci. USA 83:483-487 (1986) ("Gariepy & Schoolnik") | | R, P |
| DTX-042 | DEFS-LINA-00000402 | DEFS-LINA-00000410 | 2/1/1995 | Giannella, Escherichia coli Heatstable Enterotoxins, Guanylins, and Their Receptors: What Are They and What Do They Do? J. Lab. Clin. Med.125(2):173-181 (1995) ("Giannella") | Giannella 5; Chang 22; Wolfe - 11 | R, P |
| DTX-043 | DEFS-LINA-00000411 | DEFS-LINA-00000420 | 6/1/1997 | Greenberg, et al. Comparison of Effects of Uroguanylin, Guanylin and Escherichia coli Heat-Enterotoxin STa in Mouse Intestine and Kidney: Evidence that Uroguanylin Is an Intestinal Natriuretic Hormone. J. Inv. Medicine 45(5): 276-283 (1997) ("Greenberg") | Kent 20; Barnett 25 | R, P |
| DTX-044 | DEFS-LINA-00000421 | DEFS-LINA-00000438 | 1/1/1995 | Hirayama. Heat-Stable Enterotoxin of Escherichia coli. Handbook of Natural Toxins: Bacterial Toxins and Virulence Factors in Disease Vol. 8 (Moss, et al. eds. 1995) Ch. 12, pp. 281-296 ("Handbook of Natural Toxins") | Currie 20; Block 9; Kent 30; Gupta 21 | |
| DTX-045 | DEFS-LINA-00000439 | DEFS-LINA-00000449 | 1/28/1997 | Hasegawa, et al. Identification of a Binding Region on Escherichia coli Heatstable Enterotoxin to Intestinal Guanylyl Cyclase C. Letters in Peptide Science 4(1):1-11 (1997) ("Hasegawa") | DeGrado 16; Wolfe - 16; Kent 33 | R, P |
| DTX-046 | DEFS-LINA-00000469 | DEFS-LINA-00000475 | 9/1/1984 | Ikemura, et al. Heat-stable Enterotoxin (STh) of Human Enterotoxigenic Escherichia coli (Strain SK-1). Structure-activity Relationship. Bull. Chem. Soc. Jpn. 57:2550-2556 (1984) ("Ikemura") | | R, P |
| DTX-047 | DEFS-LINA-00000476 | DEFS-LINA-00000580 | 1/1/1997 | Lloyd-Williams, et al. Chemical Approaches to the Synthesis of Peptides and Proteins (Chapters 2 and 5). CRC Press LLC (1997) ("Lloyd-Williams") | | R, P |
| DTX-048 | DEFS-LINA-00000581 | DEFS-LINA-00000599 | 7/1/1989 | Manning, et al. Stability of Protein Pharmaceuticals. Pharm. Res. 6 (11):903-918 (1989) ("Manning") | Block 15 | R, P |
| DTX-049 | DEFS-LINA-00000600 | DEFS-LINA-00000606 | 1/1/2001 | Nakazato, M. Guanylin Family: New Intestinal Peptides Regulating Electrolyte and Water Homeostasis. J. Gastroenterology 36: 219-225 (2001) ("Nakazato") | Barrett 17; DeGrado 9; Chang 18 | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-050 | DEFS-LINA-00000607 | DEFS-LINA-00000611 | 6/1/1996 | Nicolaou, at al. Taxoids: New Weapons Against Cancer. Sci. Am. 274(6):94-98 (1996) ("Nicolaou") | | R, P |
| DTX-051 | DEFS-LINA-00000612 | DEFS-LINA-00000615 | 9/16/1998 | Niu, et al. FDA Perspective on Peptide Formulation and Stability Issues. J. Pharm. Sciences 87(11):1331-34 (1998) ("Niu") | | R, P |
| DTX-052 | DEFS-LINA-00000616 | DEFS-LINA-00000662 | 1/1/2000 | Remington: The Science and Practice of Pharmacy. 20th ed. (Gennaro A. Ed., Lippincott Williams & Wilkins, 2000) ("Remington 2000") | | R, P |
| DTX-053 | DEFS-LINA-00000663 | DEFS-LINA-00000668 | 7/1/1992 | Roussel, et al. Myoelectric Activity of the Small Intestine in Enterotoxin-induced Diarrhea of Calves. Am. J. Vet. Res. 53(7):1145-1148 (1992) ("Roussel") | | R, P |
| DTX-054 | DEFS-LINA-00000669 | DEFS-LINA-00000679 | 7/26/1994 | Sato, et al. Structural Characteristics for Biological Activity of Heat-Stable Enterotoxin Produced by Enterotoxigenic Escherichia coli: X-ray Crystallography of Weakly Toxic and Nontoxic Analogs. Biochemistry 33:8641-8650 (1994) ("Sato") | DeGrado 17; Kent 31; Gupta 23; Klibanov 17 | |
| DTX-055 | DEFS-LINA-00000680 | DEFS-LINA-00000685 | 6/1/2000 | Silberstein, et al. Botulinum Toxin Type A as a Migraine Preventive Treatment. Headache 40(6):445-450 (2000). ("Silberstein") | | R, P |
| DTX-056 | DEFS-LINA-00000686 | DEFS-LINA-00000700 | 1/9/2001 | Schiller, L.R.The Therapy of Constipation. Aliment. Pharmacol. Ther. 15:749-763 (2001) ("Schiller") | Giannella 6; Barrett 6 | R, P |
| DTX-057 | DEFS-LINA-00000701 | DEFS-LINA-00000708 | 1/1/2002 | Shailubhai, K. Therapeutic Applications of Guanylate Cyclase-C Receptor Agonists. Current Opinion Drug Discovery Dev. 5(2):261 (2002) ("Shailubhai") | Barrett 12; Chang 17 | R, P |
| DTX-058 | DEFS-LINA-00000709 | DEFS-LINA-00000714 | 5/1/1987 | Shimonishi, et al. Mode of Disulfide Bond Formation of a Heat-Stable Enterotoxin (STh) Produced by a Human Strain of Enterotoxigenic Escherichia coli. FEBS Letters 215(1):165-170 (1987) ("Shimonishi") | Wolfe - 10 | R, P |
| DTX-059 | DEFS-LINA-00000715 | DEFS-LINA-00000779 | 1/1/2003 | Stahl, et al. Monographs on Acids and Bases. Handbook of Pharmaceutical Salts pp. 265-327 (P. Heinrich Stahl & Camille G. Wermuth eds., 2002) ("Stahl & Wermuth") | | R, P |
| DTX-060 | DEFS-LINA-00000780 | DEFS-LINA-00000780 | 1/1/1986 | Tabb, et al. Characterization of p-Azidophenylalanine as a System L Substrate and a Photoaffinity Probe. Federation Proc. 45:1940 (1986) ("Tabb") | | R, P |
| DTX-061 | DEFS-LINA-00000781 | DEFS-LINA-00000784 | 3/13/2002 | Wolfe, et al. A Comparative Molecular Field Analysis (COMFA) of the Structural Determinants of Heat-Stable Enterotoxins Mediating Activation of Guanylyl Cyclase C. J. Medicinal Chemistry 45: 1731-1734 (2002) ("Wolfe") | Wolfe - 6; Wolfe - 7; Giannella 4; Currie 22; Currie 23; Kent 27 | |
| DTX-062 | DEFS-LINA-00000785 | DEFS-LINA-00000802 | 1/1/1993 | Woodworth, et al. Recombinant Fusion Toxins - A New Class of Targeted Biological Therapeutics. Immunoconjugate Therapy of Hematologic Malignancies. (Rosen, et. al. eds. 1993) ("Woodworth") | | R, P |
| DTX-063 | DEFS-LINA-00000803 | DEFS-LINA-00000807 | 2/1/1985 | Yoshimura, et al. Essential Structure for Full Enterotoxigenic Activity of Heat-stable Enterotoxin Produced by Enterotoxigenic Escherichia coli. FEBS 181(1): 138- 142 (1985) ("Yoshimura") | Wolfe - 9 | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-064 | DEFS-LINA-00000808 | DEFS-LINA-00000812 | 8/5/1997 | U.S. Patent 5,654,278 (Sorensen) | Block 12; Gupta 27 | |
| DTX-065 | DEFS-LINA-00000813 | DEFS-LINA-00000829 | 9/22/1999 | European Patent Application EP 0 943 336 A1 (Yanagawa) | | |
| DTX-066 | DEFS-LINA-00000830 | DEFS-LINA-00000912 | 1/27/2005 | U.S. Patent Application Publication US 2005/0020811 A1 (Currie, et al.) ("The '811 Publication") | Klibanov 13 | R, P |
| DTX-067 | DEFS-LINA-00000913 | DEFS-LINA-00000931 | 5/7/2002 | U.S. Patent 6,383,788 (Chan) | | R, P |
| DTX-068 | DEFS-LINA-00000932 | DEFS-LINA-00000937 | 7/14/1992 | U.S. Patent 5,130,298 (Cini) | Block 11; Gupta 29 | |
| DTX-069 | DEFS-LINA-00000938 | DEFS-LINA-00000993 | 4/4/2002 | International Application WO 02/26248 A1 (Marra, et al.) | Gupta 32 | |
| DTX-070 | DEFS-LINA-00000994 | DEFS-LINA-00001035 | 5/29/2008 | U.S. Patent Application Publication US 2008/0124326 A1 (Rehder, et al.) | Gupta 30 | |
| DTX-071 | DEFS-LINA-00001036 | DEFS-LINA-00001040 | 2/8/2000 | U.S. Patent 6,022,858 (Sorenson, et al.) | Gupta 28 | |
| DTX-072 | DEFS-LINA-00001041 | DEFS-LINA-00001044 | 1/6/1998 | U.S. Patent 5,705,537 (Hartman, et al.) ("The '537 patent") | Fretzen 14 | R, P |
| DTX-073 | DEFS-LINA-00001046 | DEFS-LINA-00001053 | 7/1/2008 | Andresen, et al. Linaclotide Acetate. Drugs of the Future 33(7):570-576 (July 2008) ("Andresen 2008") | Klibanov 14 | R, P |
| DTX-074 | DEFS-LINA-00001054 | DEFS-LINA-00001058 | 11/1/1989 | Bodmeier, et al. Spherical Agglomerates of Water-Insoluble Drugs. J Pharm Sci. 78(11):964-67 (1989) ("Bodmeier") | | R, P |
| DTX-075 | DEFS-LINA-00001059 | DEFS-LINA-00001064 | 4/1/1999 | Chen, et al. Influence of Calcium Ions on the Structure and Stability of Recombinant Human Deoxyribonuclease I in the Aqueous Lyophilized States. J. Pharmac. Sci. 88(4):477-482 (1999) ("Chen 1999") | Gupta 31 | |
| DTX-076 | DEFS-LINA-00001065 | DEFS-LINA-00001071 | 6/1/1999 | Crowley, P.J. Excipients as Stabilizers. PSTT 2(6): 237-243 (June 1999) ("Crowley") | | R, P |
| DTX-077 | DEFS-LINA-00001072 | DEFS-LINA-00001087 | 11/1/1994 | Guidance for Industry for the Submission of Chemistry, Manufacturing, and Controls Information for Synthetic Peptide Substances. The Food and Drug Administration (1994) ("FDA Guidance") | | R, P |
| DTX-078 | DEFS-LINA-00001088 | DEFS-LINA-00001091 | 1/1/2006 | Handbook of Pharmaceutical Excipients, 5th ed. (Rowe, R.C. et al., eds., Pharmaceutical Press 2006) ("HPE") | | R, P |
| DTX-079 | DEFS-LINA-00001092 | DEFS-LINA-00001099 | | Harris, et al. Drug Evaluation: Linaclotide, a New Direction in the Treatment of Irritable Bowel Syndrome and Chronic Constipation. Current Opinion Molecular Therapeutics 9(4):403-410 (2007) ("Harris") | | R, P |
| DTX-080 | DEFS-LINA-00001100 | DEFS-LINA-00001111 | 2/11/2005 | Hepner, et al. Mass Spectrometrical Analysis of Recombinant Human Growth Hormone (Genotropin®) Reveals Amino Acid Substitutions in 2% of the Expressed Protein. Proteome Science 3(1):1-12 (2005) ("Hepner") | | R, P |
| DTX-081 | DEFS-LINA-00001112 | DEFS-LINA-00001115 | 6/29/2004 | Jacob, et al. The Sulfinic Acid Switch in Proteins. Org. Biomol. Chem. 2: 1953-1556 (2004) ("Jacob") | | R, P |
| DTX-082 | DEFS-LINA-00001116 | DEFS-LINA-00001123 | | Lacy, Brian E. ACG 2006 – Evaluation and Treatment of IBS and Chronic Constipation. Medscape Gastroenterology, available at www.medscape.com (2006) ("Lacy") | | R, P |
| DTX-083 | DEFS-LINA-00001124 | DEFS-LINA-00001124 | 6/1/2008 | Lembo, et al. Linaclotide Significantly Improved Bowel Habits and Relieved Abdominal Symptoms in Adults with Chronic Constipation: Data from a Large 4-Week, Randomized, Double-Blind, Placebo Controlled Study. Gastroenterology, 135(1):295 (2008) ("Lembo") | | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-084 | DEFS-LINA-00001125 | DEFS-LINA-00001134 | 1/1/2006 | Li, et al. Detection and Quantification of Low- Molecular-Weight Aldehydes in Pharmaceutical Excipients by Headspace Gas Chromatography. J. Chromatography A 1104:1-10 (2006) ("Li") | Block 19 | R, P |
| DTX-085 | DEFS-LINA-00001135 | DEFS-LINA-00001136 | 10/24/2006 | Press Release, Microbia: Linaclotide Shown to Improve Symptoms of Chronic Constipation in Phase 2A Study (Oct. 24, 2006), available at https://www.ironwoodpharma.com/newsPDF/2006_10.24.Microbia.LinaclotidePh2aResults.pdf ("Microbia Press Release 2006") | | R, P |
| DTX-086 | DEFS-LINA-00001137 | DEFS-LINA-00001138 | 5/21/2007 | Press Release, Microbia: Microbia Announces Positive Phase 2 Results for its Investigational Compound Linaclotide (May 21, 2007), available at https://www.ironwoodpharma.com/newsPDF/2007_05.21.Microbia.LinaclotidePh2.Results.pdf ("Microbia Press Release 2007") | | R, P |
| DTX-087 | DEFS-LINA-00001139 | DEFS-LINA-00001142 | 3/4/2008 | Press Release, Microbia: Microbia and Forest Laboratories Announce Preliminary Results of Linaclotide Phase 2B Studies (March 4, 2008), available at https://www.ironwoodpharma.com/newsPDF/Linaclotide.Phase.2b.03.04.08.FINAL.pdf ("Microbia Press Release 2008") | | R, P |
| DTX-088 | DEFS-LINA-00001143 | DEFS-LINA-00001153 | 1/1/2006 | Remington: The Science and Practice of Pharmacy, 21st ed. (Troy, D.B., et al., eds., Lippincott Williams & Wilkins 2006) ("Remington 2006") | | R, P |
| DTX-089 | DEFS-LINA-00001154 | DEFS-LINA-00001162 | 6/8/1994 | Senderoff, et al. Aqueous Stability of Human Epidermal Growth Factor 1-48. Pharm. Res. 11(12):1712-1720 (1994) ("Senderoff") | Block 6 | R, P |
| DTX-090 | DEFS-LINA-00001163 | DEFS-LINA-00001176 | 8/1/2007 | Shaheen, Nicholas J. Best of DDW 2007, Highlights from Digestive Disease Week and the 108th Annual Meeting of the American Gastroenterological Association Institute, May 19-24, 2007, Washington D.C. Gastroenterology & Hepatology 3(8):620-633 (2007) ("Shaheen") | | R, P |
| DTX-091 | DEFS-LINA-00001177 | DEFS-LINA-00001180 | 1/1/1995 | Son, et al. Stabilization of Human Epidermal Growth Factor (hEGF) in Aqueous Formulation. Pharm. Res. 12(3):451-454 (1995) ("Son") | | R, P |
| DTX-092 | DEFS-LINA-00001181 | DEFS-LINA-00001184 | 1/1/1995 | The United States Pharmacopeia (USP 23): The National Formulary (NF18). United States Pharmacopeia (1995) ("USP 23") | | R, P |
| DTX-093 | DEFS-LINA-00001185 | DEFS-LINA-00001193 | 5/3/2006 | van den Eijnden, et al. Disulfide bonds determine growth hormone receptor folding, dimerisation and ligand binding. J. of Cell Science 119: 3078-86 (2006) ("van den Eijnden") | | R, P |
| DTX-094 | DEFS-LINA-00001194 | DEFS-LINA-00001211 | 1/1/1997 | Volkin, Degradative Covalent Reactions Important to Protein Stability. Molecular Biotech. 8:105-122 (1997) ("Volkin") | Block 14 | R, P |
| DTX-095 | DEFS-LINA-00001289 | DEFS-LINA-00001293 | 11/9/1999 | U.S. Patent 5,980,945 (Ruiz) | | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-096 | DEFS-LINA-00001294 | DEFS-LINA-00001306 | 9/30/1997 | U.S. Patent 5,672,359 (Digenis, et al.) | | R, P |
| DTX-097 | DEFS-LINA-00001307 | DEFS-LINA-00001388 | 2/18/2010 | International Application Publication WO 2010/019266 | | R, P |
| DTX-098 | DEFS-LINA-00001389 | DEFS-LINA-00001508 | 12/11/2008 | International Application Publication WO 2008/151257 | | R, P |
| DTX-099 | IW_LINZ_00098579 | IW_LINZ_00098588 | 4/22/1991 | Rasmussen & Bundgaard, Prodrugs of Peptides. 15. 4-Imidazolidinone Prodrug Derivatives of Enkephalins to Prevent Aminopeptidase- Catalyzed Metabolism in Plasma and Absorptive Mucosae. Int'l J. of Pharmaceutics 76:113-122 (1991) ("Bundgaard") | | R, P |
| DTX-100 | DEFS-LINA-00001520 | DEFS-LINA-00001525 | 2/7/2006 | del Barrio, et al. Simultaneous Determination of Formic Acid and Formaldehyde in Pharmaceutical Excipients Using Headspace GC/MS. J. Pharm. Biomed. Analysis 41:738-743 (2006) ("del Barrio") | Block 18 | R, P |
| DTX-101 | DEFS-LINA-00001526 | DEFS-LINA-00001533 | 9/1/2006 | Fyfe, et al. An ~140-kb Deletion Associated with Feline Spinal Muscular Atrophy Implies an Essential LIX1 Function for Motor Neuron Survival. Genome Research 16(9):1084-1090 (Sept. 2006) ("Fyfe") | | R, P |
| DTX-102 | DEFS-LINA-00001534 | DEFS-LINA-00001537 | 10/1/2009 | Fujita, et al. Generation of Formaldehyde by Pharmaceutical Excipients and Its Absorption by Meglumine. Chem. Pharm. Bull. 57:1096-1099 (2009) ("Fujita") | | R, P |
| DTX-103 | DEFS-LINA-00001538 | DEFS-LINA-00001546 | 2/16/2001 | Heck, et al. Modification and Inhibition of Vancomycin Group Antibiotics by Formaldehyde and Acetaldehyde. Chem. Eur. J., 7(4):910-916 (2001) ("Heck") | | R, P |
| DTX-104 | DEFS-LINA-00001547 | DEFS-LINA-00001554 | 6/1/2013 | Mandake, et al. Kinetic Study of Catalyzed and Uncatalyzed Esterification Reaction of Acetic Acid with Methanol. American International Journal of Research in Formal, Applied & Natural Sciences 3:1114-1121 (2013) ("Mandake") | | R, P |
| DTX-105 | DEFS-LINA-00001555 | DEFS-LINA-00001564 | 2/20/2004 | Metz, et al. Identification of Formaldehyde-Induced Modifications in Proteins: Reactions with Model Peptides. J. Biol. Chem. 279:6235-6243 (2004) ("Metz") | Block 17 | R, P |
| DTX-106 | DEFS-LINA-00001565 | DEFS-LINA-00001590 | 1/1/1993 | Oliyai & Stella, Prodrugs of Peptides and Proteins for Improved Formulation and Delivery. Ann. Rev. Pharmacol. Toxicol. 32:521-544 (1993) ("Oliyai") | | R, P |
| DTX-107 | DEFS-LINA-00001591 | DEFS-LINA-00001601 | 4/22/1991 | Rasmussen, et al. Prodrugs of Peptides. 10. Protection of Di- and Tripeptides Against Aminopeptidase by Formation of Bioreversible 4- Imidazolidinone Derivatives. Int'l J. of Pharmaceutics 71:45-53 (1991) ("Rasmussen") | | R, P |
| DTX-108 | DEFS-LINA-00001602 | DEFS-LINA-00001617 | 12/1/2011 | Wu, et al. Reactive Impurities in Excipients: Profiling, Identification and Mitigation of Drug–Excipient Incompatibility. AAPS PharmSciTech 12(4):1248-1263 (2011) ("Wu") | Zhao 21 | R, P |
| DTX-109 | DEFS-LINA-00001618 | DEFS-LINA-00001631 | 10/19/1999 | U.S. Patent 5,969,097 (Weigand, et al.) | Currie 26; Giannella 8; Barrett 14; DeGrado 11; Barnett 22 | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-110 | DEFS-LINA-00001632 | DEFS-LINA-00001638 | 7/12/2000 | Dahm and Jones, Rat Jejunum Controls Luminal Thiol-Disulfide Redox, American Society for Nutritional Sciences (2000) 2739-2745 ("Dahm & Jones") | | R, P |
| DTX-111 | DEFS-LINA-00001639 | DEFS-LINA-00001641 | 3/10/1981 | Eberle et al., Rapid Oxidation in Vitro of Endogenous and Exogenous Glutathione in Bile of Rats, The Journal of Biological Chemistry 256(5):2115-2117 (1981) ("Eberle") | | R, P |
| DTX-112 | DEFS-LINA-00001642 | DEFS-LINA-00001656 | 2/16/1999 | Forte, L.R. Guanylin Regulatory Peptides: Structures, Biological Activities Mediated by Cyclic GMP and Pathobiology. Regulatory Peptides 81:25–39 (1999) ("Forte 1999") | Barrett 13; Chang 19; Currie 14; Barnett 26; Kent 19 | R, P |
| DTX-113 | DEFS-LINA-00001657 | DEFS-LINA-00001663 | 7/1/1983 | Greenberg, et al., Reduction of the Secretory Response to Escherichia coli Heat-Stable Enterotoxin by Thiol and Disulfide Compounds. Infection and Immunity 41(1): 174-180 (July 1983) ("Greenberg 1983") | Kent 30 | R, P |
| DTX-114 | DEFS-LINA-00001682 | DEFS-LINA-00001700 | 1/1/2000 | Hirayama, et al. Heat-Stable Enterotoxin of Escherichia coli. Handbook of Experimental Pharmacology, Bacterial Protein Toxins 145:577-593 (K. Aktories & I. Just eds., 2000) ("Hirayama") | | R, P |
| DTX-115 | DEFS-LINA-00001701 | DEFS-LINA-00001706 | 12/1/1995 | Aye-Kyaw et al., Intracellular Distribution of Radio-labelled Enterotoxigenic Escherichia coli Heat-Stable Toxin (STa) in the Intestine of Suckling Rat. J. Diarrhoeal Dis. Res.13(4):232–234 (Dec. 1995) ("Aye-Kyaw 1995") | | R, P |
| DTX-116 | DEFS-LINA-00001707 | DEFS-LINA-00001714 | 8/1/1980 | Sack, Enterotoxigenic Escherichia coli: Identification and Characterization, The Journal of Infectious Diseases 42(2): 279-286 (August 1980) ("Sack") | | R, P |
| DTX-117 | DEFS-LINA-00001715 | DEFS-LINA-00001723 | 5/22/2001 | Jain et al., Sildenafil-induced peripheral analgesia and activation of the nitric oxide-cyclic GMP pathway, Brain Research 909:170-178 (2001) | | R, P |
| DTX-118 | DEFS-LINA-00001724 | DEFS-LINA-00001726 | 1/22/1996 | Nzegwu and Levin, Luminal Capsaicin Inhibits Fluid Secretion Induced by Enterotoxin E. coli STa, but not by Carbachol, in Vivo in Rat Small and Large Intestine, Experimental Physiology 81: 313-315 (1996) | | R, P |
| DTX-119 | DEFS-LINA-00001727 | DEFS-LINA-00001731 | 1/1/1999 | Rolfe and Levin, Vagotomy inhibits the jejunal fluid secretion activated by the luminal ideal Escherichia coli STa in the rat in vivo, Gut 44: 615-619 (1999) | | R, P |
| DTX-120 | DEFS-LINA-00001732 | DEFS-LINA-00001738 | 1/1/1994 | Rolfe and Levin, Enterotoxin Escherichia coli STa activates a nitric oxidedependent myentreric plexus secretory reflex in the rat ileum, Journal of Physiology 475.3: 531-537 (1994) | | R, P |
| DTX-121 | DEFS-LINA-00001739 | DEFS-LINA-00001743 | 6/12/2001 | Soares and Duarte, Dibutyryl-cyclic GMP induces peripheral antinociception via activation of ATP-sensitive K+ channels in the rag PGE2-induced hyperalgesic paw, British Journal of Pharmacology 134: 127-131 (2001) | | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-122 | DEFS-LINA-00001744 | DEFS-LINA-00001748 | 8/13/2002 | Amarante and Duarte, The K-opiod agonist (±)-bremazocine elicits peripheral antinociception by activation of the Largine/nitric oxide/cyclic GMP pathway, European Journal of Pharmacology 454: 19-23 (2002) | | R, P |
| DTX-123 | DEFS-LINA-00001749 | DEFS-LINA-00001760 | 11/1/2002 | Hruby, Designing peptide receptor agonists and antagonists, Nature Reviews Drug Discovery 1(11): 847-858 (Nov 2002) ("Hruby") | Kent 34; Barnett 21 | R, P |
| DTX-124 | DEFS-LINA-00001761 | DEFS-LINA-00001764 | 9/1/1981 | Boudier, et al., Importance of Secondary Enzyme-Substrate Interactions in Human Cathepsin G and Chymotrypsin II Catalysis, Archives of Biochemistry and Biophysics 210(2): 790-793 (September 1981) | | R, P |
| DTX-125 | DEFS-LINA-00001765 | DEFS-LINA-00001775 | 3/9/2000 | Krondahl, et al., Investigations of the In-vitro Metabolism of Three Opiod Tetrapeptides by Pancreatic and Intestinal Enzymes, J. Pharm. Pharmacol. 52: 785-795 (2000) | | R, P |
| DTX-126 | DEFS-LINA-00001776 | DEFS-LINA-00001776 | 1/1/1997 | Lu, et al., Binding of Amino Acid Side-chains to S1 Cavities of Serine Proteinases, J. Mol. Biol. 266:441-461 (1997) | | R, P |
| DTX-127 | DEFS-LINA-00001797 | DEFS-LINA-00001802 | 3/21/1997 | Reseland et al., A Novel Human Chymotrypsin-like Digestive Enzyme, The Journal of Biological Chemistry 272(12): 8099–8104 (March 21, 1997) | | R, P |
| DTX-128 | DEFS-LINA-00001803 | DEFS-LINA-00001811 | 3/25/1997 | Terada, et al., Expression of pancreatic digestive enzymes in normal and pathologic epithelial cells of the human gastrointestinal system. Virchows Arch. 431:195–203 (1997) | | R, P |
| DTX-129 | DEFS-LINA-00001812 | DEFS-LINA-00001820 | 3/23/2001 | Walker, G. Activity of pancreatic endopeptidases towards luteinizing hormone-releasing hormones, International Journal of Pharmaceutics 216(1-2): 77-82 (2001) | | R, P |
| DTX-130 | DEFS-LINA-00001821 | DEFS-LINA-00001842 | 11/1/2011 | Circu and Aw, Redox biology of the intestine, Free Radical Research 45(11-12): 1245-1266 (Nov.-Dec. 2011) | | R, P |
| DTX-131 | DEFS-LINA-00001843 | DEFS-LINA-00001856 | 4/10/1991 | Schellenberger, et al. The specificity of chymotrypsin, A statistical analysis of hydrolysis data. Eur. J. Biochem. 199: 623-636 (1991) | | R, P |
| DTX-132 | DEFS-LINA-00001857 | DEFS-LINA-00001870 | 11/19/1985 | U.S. Patent 4,554,101 (Hopp) | | R, P |
| DTX-133 | DEFS-LINA-00001871 | DEFS-LINA-00001895 | 7/18/2001 | Beltowski, J. Guanylin and Related Peptides. 52(3) J. of Physiology and Pharmacology 351–375 (2001) ("Beltowski 2001") | | R, P |
| DTX-134 | DEFS-LINA-00001896 | DEFS-LINA-00001910 | 1/21/2000 | Qian et al., Expression of GC-C, a Receptor-Guanylate Cyclase, and Its Endogenous Ligands Uroguanylin and Guanylin along the Rostrocaudal Axis of the Intestine. Endocrinology 141(9): 3210–3224 (2000) ("Qian 2000") | | R, P |
| DTX-135 | DEFS-LINA-00001911 | DEFS-LINA-00002026 | 1/1/2000 | Fmoc Solid Phase Peptide Synthesis: A Practical Approach. 9-114 (Chan and White, eds., 2000) | | R, P |
| DTX-136 | DEFS-LINA-00002027 | DEFS-LINA-00002047 | 1/1/2018 | Pennington, et al. Peptide therapeutics from venom: Current status and potential. Bioorganic & Medicinal Chemistry 26: 2738–2758 (2018) | | R, P |

CONFIDENTIAL

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-137 | DEFS-LINA-00002048 | DEFS-LINA-00002052 | 1/1/1988 | Schmidt, R. Dose-finding studies in clinical drug development, Eur J Clin Pharmacol. 34:15-19 (1988) ("Schmidt 1988") | | R, P |
| DTX-138 | DEFS-LINA-00002053 | DEFS-LINA-00002058 | 10/7/2004 | Amadesi and Bunnett, Protease-Activated Receptors: Protease Signaling in the Gastrointestinal Tract. Current Opinion in Pharmacology 4:551–556 (2004) ("Amadesi") | | R, P |
| DTX-139 | DEFS-LINA-00002059 | DEFS-LINA-00002063 | 9/1/1999 | Drossman, The Functional Gastrointestinal Disorders and the Rome II Process. Gut 45 (Suppl II):II1–II5 (1999) ("Drossman 1999") | | R, P |
| DTX-140 | DEFS-LINA-00002064 | DEFS-LINA-00002070 | 2/19/1988 | Evans, et al. Measurement of Gastrointestinal pH Profiles in Normal Ambulant Human Subjects. Gut 29:1035–1041 (1988) ("Evans 1988") | | R, P |
| DTX-141 | DEFS-LINA-00002071 | DEFS-LINA-00002072 | 10/1/2017 | Ruiz, A., Overview of the Digestive System. Merck Manual Consumer Version. (Last full review/revision October 2017) | | R, P |
| DTX-142 | DEFS-LINA-00002073 | DEFS-LINA-00002081 | 9/1/1998 | Ratnaike and Jones, Mechanisms of Drug-Induced Diarrhea in the Elderly. Drug Aging 13:245–253 (1998) ("Ratnaike 1998") | Barrett 5 | R, P |
| DTX-143 | DEFS-LINA-00002082 | DEFS-LINA-00002305 | 1/1/2000 | Drossman, D., ed. Rome II: The Functional Gastrointestinal Disorders: Diagnosis, Pathophysiology and Treatment: A Multinational Consensus (2nd ed. 2000) ("Rome II") | Chang 15; Barnett 34 | R, P |
| DTX-144 | DEFS-LINA-00002306 | DEFS-LINA-00002311 | 1/1/1972 | Sack, et al., Gastric acidity in cholera and noncholera diarrhoea. Bull. Wld. Hlth. Org. 47:31–36 (1972) ("Sack 1972") | | R, P |
| DTX-145 | DEFS-LINA-00002312 | DEFS-LINA-00002330 | 1/1/2000 | Bretz, et al. Practical considerations for optimal designs in clinical dose finding studies. Statist. Med. 00:1–6 (2000) ("Bretz 2000") | | R, P |
| DTX-146 | DEFS-LINA-00002331 | DEFS-LINA-00002365 | 8/3/2005 | European Patent Application EP 1 559 433 A1 (Iwata, et al.) | Block 21 | R, P |
| DTX-147 | DEFS-LINA-00002366 | DEFS-LINA-00002382 | 11/1/1994 | International Council on Harmonization of Technical Requirements for the Registration of Pharmaceuticals for Human Use ("ICH-E4"), "Guidelines for industry: Dose-response information to support drug registration" (1994) ("Industry Guidelines 1994") | | R, P |
| DTX-148 | DEFS-LINA-00002383 | DEFS-LINA-00002400 | 1/1/2007 | Capelle, et al. High throughput screening of protein formulation stability: Practical considerations. European Journal of Pharmaceutics and Biopharmaceutics 65: 131–148 (2006) ("Martinus 2006") | Block 16; Gupta 15 | |
| DTX-149 | DEFS-LINA-00002401 | DEFS-LINA-00002531 | 1/1/1988 | Stryer, L. Biochemistry, 3d. Ed. W. H. Freeman and Company, New York (1988) ("Stryer 1988") | | R, P |
| DTX-150 | DEFS-LINA-00002532 | DEFS-LINA-00002536 | 1/23/1976 | Tajima, et al. Role of Calcium Ions in the Thermostability of Thermolysin and Bacillus subtilis var. amylosacchariticus Neutral Protease. Eur. J. Biochecm. 64: 243-247 (1976) ("Tajima 1976") | | R, P |
| DTX-151 | DEFS-LINA-00002537 | DEFS-LINA-00002542 | 2/23/1999 | U.S. Patent 5,874,106 (Adesunloye, et al.) | Block 20 | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-152 | DEFS-LINA-00002543 | DEFS-LINA-00002561 | 1/1/1994 | Burks, T. Gastrointestinal Drugs (Chapter 60, pp. 801–814) in Human Pharmacology: Molecular to Clinical (2nd ed. 1994) | Barrett 4 | R, P |
| DTX-153 | DEFS-LINA-00002562 | DEFS-LINA-00002568 | | National Institutes of Health, "Digestive Diseases Statistics for the United States – Glossary," available at https://www.niddk.nih.gov/health-information/healthstatistics/digestive-diseases | | R, P |
| DTX-154 | DEFS-LINA-00002569 | DEFS-LINA-00002576 | 1/1/1978 | Dürr et al., Fecal Chymotrypsin: Study on Some Characteristics of the Enzyme, Digestion 17:396–403 (1978) | | R, P |
| DTX-155 | DEFS-LINA-00002577 | DEFS-LINA-00002583 | 2/1/1996 | Hayden et al., Role of prostaglandins and enteric nerves in Escherichia coli heat-stable enterotoxin (STa)-induced intestinal secretion in pigs, American Journal of Veterinaty Research 57(2): 211-215 (February 1996) | | R, P |
| DTX-156 | DEFS-LINA-00002584 | DEFS-LINA-00002590 | 8/11/1992 | Hitotsubashi, et al. Some Properties of Purified Escherichia coli Heat-Stable Enterotoxin II. INfection and Immunity 60(11): 4468-4474 (1992) | | R, P |
| DTX-157 | DEFS-LINA-00002591 | DEFS-LINA-00002598 | 7/1/2017 | Lau and Dunn, Therapeutic peptides: Historical perspectives, current development trends, and future directions, Bioorganic & Medicinal Chemistry 26: 2700-2707 (2018) | | R, P |
| DTX-158 | DEFS-LINA-00002599 | DEFS-LINA-00002637 | 1/1/2000 | Lucas, et al. Guanylyl Cyclases and Signaling by Cyclic GMP, Pharmacological Reviews 52(3): 375-413 (2000) | | R, P |
| DTX-159 | DEFS-LINA-00002638 | DEFS-LINA-00002648 | 3/31/1998 | Poulopoulou and Nowak, Extracellular 3',5' Cyclic Guanosine Monophosphate Inhibits Kainate-Activated Responses in Cultured Mouse Cerebellar Neurons, The Journal of Pharmacology and Experimental Therapeutics 286(1): 99-109 (1998) | | R, P |
| DTX-160 | DEFS-LINA-00002650 | DEFS-LINA-00002656 | 7/29/1994 | Rabenstein and Yeo, Kinetics and Equilibria of the Formation and Reduction of the Disulfide Bonds in the Arginine-Vasopressin and Oxytocin by Thiol/Disulfide Interchange with Glutathione and Cysteine, J. Org. Chem. 59(15): 4223-4229 (1994) | | R, P |
| DTX-161 | DEFS-LINA-00002657 | DEFS-LINA-00002663 | 2/4/1994 | Schellenberger, et al. Role of the S' Substitutes in Serine Protease Catalysis. Active-Site Mapping of Rat Chymotrypsin, Rat Trypsin, ?-Lytic Protease, and Cercarial Protease from Schistosoma mansoni. Biochemistry 33(14): 4251-4257 (1994) | | R, P |
| DTX-162 | DEFS-LINA-00002664 | DEFS-LINA-00002674 | 5/29/2013 | Silos-Santiago, et al. Gastrointestinal pain: Unraveling a novel endogenous pathway through uroguanylin/guanylate cyclase-C/cGMP activation. Pain 154: 1820-1830 (2013) | | R, P |
| DTX-163 | DEFS-LINA-00002675 | DEFS-LINA-00002683 | 4/17/2002 | Baillie, et al. Contemporary issues in Toxicology: Drug Metabolites in Safety Testing. Toxicology and Applied Pharmacology 182: 188-196 (2002) | | R, P |
| DTX-164 | DEFS-LINA-00002684 | DEFS-LINA-00002696 | 1/1/2001 | Camilleri, M. Review article: tegaserod. Aliment Pharmacol Ther 15: 277-289 (2001) | DeGrado 5 | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-165 | DEFS-LINA-00002697 | DEFS-LINA-00002716 | 1/1/2003 | DiFeo, T. Drug Product Development: A Technical Review of Chemistry, Manufacturing, and Controls Information for the Support of Pharmaceutical Compound Licensing Activities, 29(9) Drug Dev. & Indus. Pharmacy 29(9): 939-958 (2003) ("DiFeo 2003") | | R, P |
| DTX-166 | DEFS-LINA-00002717 | DEFS-LINA-00002739 | 8/24/2006 | International Publication WO 2006/088418 A1 (Wahren, et al.) | Klibanov 8 | R, P |
| DTX-167 | DEFS-LINA-00002740 | DEFS-LINA-00002758 | 10/1/2018 | Amitiza October 2018 Prescribing Information | | |
| DTX-168 | DEFS-LINA-00002759 | DEFS-LINA-00002763 | | Imodium FAQs about Diarrhea Symptoms & Treatment, https://www.imodium.com/faq (last accessed February 14, 2019) | | R, P |
| DTX-169 | DEFS-LINA-00002764 | DEFS-LINA-00002767 | 1/1/2002 | Physicians' Desk Reference 56th Ed., pp. 1007–1008 (2002) | | R, P |
| DTX-170 | DEFS-LINA-00002768 | DEFS-LINA-00002771 | 1/8/1980 | Simon & Kather, Interactions of laxatives with enzymes of cyclic AMP metabolism from human colonic mucosa. European Journal of Clinical Investigation 10:231-234 (1980) | Barrett 20 | R, P |
| DTX-171 | DEFS-LINA-00002772 | DEFS-LINA-00002798 | 3/1/2014 | Lotronex March 2014 Prescribing Information | | |
| DTX-172 | DEFS-LINA-00002799 | DEFS-LINA-00002799 | 11/28/2000 | WebMD Health News, IBS Drug Withdrawn After Less Than a Year on the Market. https://www.webmd.com/ibs/news/20001128/ibs-drugwithdrawn-after-less-than-year-on-market#1 (November 28, 2000) | | R, P |
| DTX-173 | DEFS-LINA-00002802 | DEFS-LINA-00002839 | 1/1/2014 | Bharucha, et al., American Gastroenterological Association Technical Review on Constipation. Gastroenterology 144(1): 218-238 (2013) | | R, P |
| DTX-174 | DEFS-LINA-00002840 | DEFS-LINA-00002843 | | 35 U.S.C. § 271, Infringement of patent | | R, P, LA, NE |
| DTX-175 | DEFS-LINA-00002844 | DEFS-LINA-00002852 | 11/27/2017 | Credit Suisse, "Ironwood Pharmaceuticals, Inc." 11/27/2017. | | R, P |
| DTX-176 | DEFS-LINA-00002853 | DEFS-LINA-00002932 | 9/10/2018 | Acorda Therapeutics, Inc. v. Roxane Laboratories Inc., 903 F.3d 1310 (Fed. Cir. 2018) | | R, P, LA, NE |
| DTX-177 | DEFS-LINA-00002933 | DEFS-LINA-00002939 | 4/16/2013 | Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc., 713 F.3d 1369 (Fed. Cir. 2013) | | R, P, LA, NE |
| DTX-178 | DEFS-LINA-00002940 | DEFS-LINA-00002940 | | Native spreadsheet, ClinicalTrials.gov, Search for "linaclotide," https://clinicaltrials.gov/ct2/results?cond=&term=linaclotide&cntry=&state=&city=&dist=, accessed 2/11/2019 (Excel output of the search results) | | R, P |
| DTX-179 | DEFS-LINA-00002941 | DEFS-LINA-00002952 | | ClinicalTrials.gov, Search for "linaclotide," https://clinicaltrials.gov/ct2/results?cond=&term=linaclotide&cntry=&state=&city=&dist=, accessed 2/11/2019 | | R,P |
| DTX-180 | DEFS-LINA-00002953 | DEFS-LINA-00004451 | 1/1/2018 | FDA Orange Book, 2018. | | R, P |
| DTX-181 | DEFS-LINA-00004452 | DEFS-LINA-00004454 | | FDA Website, Abbreviated New Drug Application (ANDA), http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/AbbreviatedNewDrugApplicationANDAGenerics/, accessed February 15, 2019 | | R, P, LA, NE |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-182 | DEFS-LINA-00004455 | DEFS-LINA-00004456 | | FDA Drug Details Website, Search Results for "Linaclotide," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process, accessed 2/14/2019. | | R, P |
| DTX-183 | DEFS-LINA-00004457 | DEFS-LINA-00004459 | | FDA Website, Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), https://www.fda.gov/drugs/informationondrugs/ucm129662.htm, accessed 2/11/2019. | | R, P |
| DTX-184 | DEFS-LINA-00004462 | DEFS-LINA-00004462 | | FDA Orange Book Website, Search Results for "Linaclotide," https://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm, accessed 2/14/2019. | | IC, R, P |
| DTX-185 | DEFS-LINA-00004463 | DEFS-LINA-00004464 | | FDA Orange Book Websites, Patent and Exclusivity for: N202811, Product 001, https://www.accessdata.fda.gov, accessed 2/11/2019. | | |
| DTX-186 | DEFS-LINA-00004465 | DEFS-LINA-00004466 | | FDA Orange Book Websites, Patent and Exclusivity for: N202811, Product 002, https://www.accessdata.fda.gov, accessed 2/11/2019. | | |
| DTX-187 | DEFS-LINA-00004467 | DEFS-LINA-00004468 | | FDA Orange Book Websites, Patent and Exclusivity for: N202811, Product 003, https://www.accessdata.fda.gov, accessed 2/11/2019. | | |
| DTX-188 | DEFS-LINA-00004469 | DEFS-LINA-00004592 | 3/31/2014 | Forest Laboratories, 10-K, 2014 | | R, P |
| DTX-189 | DEFS-LINA-00004593 | DEFS-LINA-00004605 | 12/11/2013 | Galderma Laboratories, L. P. v. Tolmar, Inc., 737 F.3d 731 (Fed. Cir. 2013) | | R, P, LA, NE |
| DTX-190 | DEFS-LINA-00004606 | DEFS-LINA-00004617 | 3/13/2017 | HealthLine, IBS-C: New Treatments Deliver Promising Management, 3/13/2017. https://www.healthline.com/health/ibs?c/new?treatments#1. | | R, P |
| DTX-191 | DEFS-LINA-00004618 | DEFS-LINA-00004787 | 12/31/2009 | Ironwood, Form 10-K, 2009 | | R, P |
| DTX-192 | DEFS-LINA-00004788 | DEFS-LINA-00004794 | 8/5/2010 | Ironwood Earnings Call Transcript, 2010-Q2, 8/5/2010 | | R, P |
| DTX-193 | DEFS-LINA-00004795 | DEFS-LINA-00004797 | | Linzess Website, What is CIC?, https://www.linzess.com/ibsc?and?cic?information/cic?symptoms (accessed 1/8/2019) | | R, P, I |
| DTX-194 | DEFS-LINA-00004798 | DEFS-LINA-00004800 | | Linzess Website, What is IBS?C?, https://www.linzess.com/ibsc?and?cic?information/ibscsymptoms (accessed 1/7/2019). | | R, P, I |
| DTX-195 | DEFS-LINA-00004822 | DEFS-LINA-00004835 | 7/1/2012 | Lovell and Ford, Global Prevalence of and Risk Factors for Irritable Bowel Syndrome: A Meta-analysis. Clinical Gastroenterology and Hepatology 10(7): 712-721 (2012). | Chang 24 | R, P |
| DTX-196 | DEFS-LINA-00004836 | DEFS-LINA-00004845 | | Mayo Clinic Website, Irritable Bowel Syndrome, Diagnosis, https://www.mayoclinic.org/diseases?conditions/irritable?bowel?syndrome/diagnosis-treatment/drc?20360064, accessed 2/14/2019. | | R, P, H |
| DTX-197 | DEFS-LINA-00004846 | DEFS-LINA-00004848 | | Memorial Hermann Website, Irritable Bowel Syndrome (IBS), http://www.memorialhermann.org/digestive/irritable?bowel?syndrome/, accessed 2/14/2019 | | R, P, H |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-198 | DEFS-LINA-00004849 | DEFS-LINA-00004849 | 4/7/2008 | Microbia Press Release, "Microbia Announces Name Change to Ironwood Pharmaceuticals," 4/7/2008, https://www.ironwoodpharma.com/newsPDF/microbia.name.change.pdf. | | R, P |
| DTX-199 | DEFS-LINA-00004850 | DEFS-LINA-00004862 | 2/1/2005 | Reiffen and Ward, Generic Drug Industry Dynamics. The Review of Economics and Statistics 87(1): 37–49 (2005). | | R, P |
| DTX-200 | DEFS-LINA-00004863 | DEFS-LINA-00004874 | 5/1/2002 | Sandler, R., The Burden of Selected Digestive Diseases in the United States, Gastroenterology 122:1500-1511 (2002) | | R, P |
| DTX-201 | DEFS-LINA-00004875 | DEFS-LINA-00004881 | 3/1/2018 | Synergy Pharmaceuticals Press Release, "Synergy Pharmaceuticals Reports Fourth Quarter and Full Year 2017 Financial Results and Business Update," 3/1/2018, https://ir.synergypharma.com/press?releases/detail/1864/synergy?pharmaceuticals?reportsfourth?quarter?and?full. | | R, P |
| DTX-202 | DEFS-LINA-00004882 | DEFS-LINA-00004882 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 13/579,685, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019. | | R, P |
| DTX-203 | DEFS-LINA-00004883 | DEFS-LINA-00004884 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 10/796,719, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-204 | DEFS-LINA-00004885 | DEFS-LINA-00004885 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 14/239,178, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-205 | DEFS-LINA-00004886 | DEFS-LINA-00004886 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 11/949,340, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-206 | DEFS-LINA-00004887 | DEFS-LINA-00004888 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 12/754,138, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-207 | DEFS-LINA-00004889 | DEFS-LINA-00004889 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 12/788,979, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-208 | DEFS-LINA-00004890 | DEFS-LINA-00004890 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 12/851,330, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-209 | DEFS-LINA-00004891 | DEFS-LINA-00004892 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 12/541,410, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-210 | DEFS-LINA-00004893 | DEFS-LINA-00004893 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 10/899,806, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |
| DTX-211 | DEFS-LINA-00004894 | DEFS-LINA-00004895 | 2/11/2019 | USPTO PAIR Website, Continuity Data for 11/930,696, https://portal.uspto.gov/pair/PublicPair, accessed 2/11/2019 | | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-212 | DEFS-LINA-00004896 | DEFS-LINA-00004907 | 11/11/2018 | VeryWellHealth Website, Chronic Idiopathic Constipation Symptoms and Diagnosis, https://www.verywellhealth.com/chronic?idiopathic?constipation?1944861 (accessed 1/8/2019). | | R, P, H |
| DTX-213 | DEFS-LINA-00004908 | DEFS-LINA-00004919 | 10/30/2008 | VeryWellHealth Website, Constipation Predominant IBS (IBS?C), https://www.verywellhealth.com/constipation?predominant?1944883 (accessed 1/7/2019) | | R, P, H |
| DTX-214 | DEFS-LINA-00004920 | DEFS-LINA-00004931 | 10/30/2008 | VeryWellHealth Website, Medications for Chronic Idiopathic Constipation and IBS?C, https://www.verywellhealth.com/prescription?medicine?for?constipation?and?ibs?c?1944781 (accessed 1/7/2019) | | R, P, H |
| DTX-215 | DEFS-LINA-00004932 | DEFS-LINA-00004938 | 1/1/2001 | Hu, Hong-Yu, et al. B-Sheet Structure Formation of Protein in Solid State as Revealed by Circular Dichroism Spectroscopy, Biopolymers (Biospectroscopy) 62: 15–21 (2001) | Block - 22 | R, P |
| DTX-216 | HW_LINZ_00000127 | HW_LINZ_00000158 | 9/16/2009 | Email from H. Wolfe to M. Pennington re Combimab analogs attaching powerpoint titled Design of a novel GCC Agonist | Wolfe - 8 | R, P, H |
| DTX-217 | HW_LINZ_00000198 | HW_LINZ_00000315 | 11/10/2009 | Document titled Third Generation GCCR agonists for constipation and irritable bowel syndrom, A unique drug development opportunity (Supplemental Information for Due Diligence) | Wolfe - 14 | R, P, H |
| DTX-218 | HW_LINZ_00000316 | HW_LINZ_00000325 | | CV of Henry Wolfe, Ph.D. | Wolfe - 5 | R, P, H |
| DTX-219 | HW_LINZ_00000413 | HW_LINZ_00000420 | 12/2/2009 | Email from P. Lindell to A. Tamiz and others re MHCPDC material attaching executive summary titled "A Better Linaclotide", CombiMab's Guanylate Cyclase C Receptor Agonist Program for Chronic Idiopathic Constipation and Constipation Dominant Irritable Bowel Syndrome | Wolfe - 12 | R, P, H |
| DTX-220 | HW_LINZ_00000421 | HW_LINZ_00000449 | 12/2/2009 | Powerpoint Presentation to MHCPDC titled Third Generation GCCR agonistas for constipation and irritable bowel syndrome | Wolfe - 13 | R, P, H |
| DTX-221 | IW_LINZ_00000005 | IW_LINZ_00000009 | | CV of Hong Zhao, Ph.D. | Zhao 2 | |
| DTX-222 | IW_LINZ_00000010 | IW_LINZ_00000027 | | CV of Mark G. Currie | Currie 2 | |
| DTX-223 | IW_LINZ_00000244 | IW_LINZ_00000344 | 11/20/2006 | Microbia Lab Notebook No. 436 assigned to Angelika Fretzen | Fretzen 10 | |
| DTX-224 | IW_LINZ_00013852 | IW_LINZ_00014075 | 1/10/2007 | Microbia Lab Notebook 449 assigned to Hong Zhao | Zhao 36 | |
| DTX-225 | IW_LINZ_00014076 | IW_LINZ_00014293 | 9/10/2007 | Microbia Lab Notebook 509 assigned to Hong Zhao | Zhao 37 | |
| DTX-226 | IW_LINZ_00014294 | IW_LINZ_00014513 | 6/13/2008 | Microbia Lab Notebook 574 assigned to Hong Zhao | Zhao 38 | |
| DTX-227 | IW_LINZ_00014514 | IW_LINZ_00014623 | 8/10/2010 | Microbia Lab Notebook 677 assigned to Hong Zhao | Zhao 39 | |
| DTX-228 | IW_LINZ_00014694 | IW_LINZ_00014797 | 1/1/2012 | Linzess 2012-2013 U.S. Brand Plan | Kunka 16 | R, P |
| DTX-229 | IW_LINZ_00014922 | IW_LINZ_00014947 | 9/1/2017 | Linzess POA Workshops Document | Kunka 14 | R, P |
| DTX-230 | IW_LINZ_00015661 | IW_LINZ_00015661 | 8/22/2005 | Email from A. Fretzen to S. Hill and others re analytical method development MD-1100 | Fretzen 7 | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-231 | IW_LINZ_00017573 | IW_LINZ_00017599 | | Fretzen, et al. The Discovery of Linaclotide for the Treatment of Functional Gastrointestinal Disorders. Draft Book Chapter in Successful Drug Discoveries (Volume 1) | Fretzen 27 | R, P, H |
| DTX-232 | IW_LINZ_00048781 | IW_LINZ_00048781 | 11/27/2007 | Meeting Minutes, Microbia - American Peptide Company conference call | Fretzen 28 | R, P |
| DTX-233 | IW_LINZ_00051597 | IW_LINZ_00051597 | 9/17/2007 | Email from M. Currie to smmiklos@yahoo.com forwarding Microbia Press Release | Chien 14; Mahajan-Miklos 12 | |
| DTX-234 | IW_LINZ_00055410 | IW_LINZ_00055420 | 12/3/2008 | Memorandum of Type C Meeting Minutes | Kunka 21 | |
| DTX-235 | IW_LINZ_00063525 | IW_LINZ_00063526 | 3/25/2016 | Email from J. Wescott to L. Kunka and others re NORS (Notice of Regulatory Submission) - Linzess - US - 72mcg sNDA for CIC | Chien 18 | R, P |
| DTX-236 | IW_LINZ_00068548 | IW_LINZ_00068549 | 9/7/2007 | Email from A. Grossi to M. Lovell and others re 3 Month Data for Additive Study | Fretzen 15 | |
| DTX-237 | IW_LINZ_00068577 | IW_LINZ_00068582 | 7/25/2007 | UPM visit for MD-1100 Meeting Notes and Follow-up | Fretzen 16 | R, P, H |
| DTX-238 | IW_LINZ_00068751 | IW_LINZ_00068756 | 4/20/2007 | Email from A. Fretzen to S. Hui and others re Tablet Review and attaching powerpoint slides re stability data | Fretzen 11 | R, P, H |
| DTX-239 | IW_LINZ_00070196 | IW_LINZ_00070250 | | Phase 3 Linaclotide Capsule Formulation Development Using a Design or Experiment Approach,  Development Report: CMC-103-DP-DTR-003 | Fretzen 24 | R, P, I |
| DTX-240 | IW_LINZ_00071048 | IW_LINZ_00071050 | 1/26/2007 | Spreadsheet entitled Formulation Summary as of 1-26-07 with handwritten notes and chemical structure diagram | Fretzen 8; Zhao 40 | R, P |
| DTX-241 | IW_LINZ_00071052 | IW_LINZ_00071060 | 2/5/2007 | MD-1100 Formulation Development Meeting Minutes: January 30, 2007 | Fretzen 12 | |
| DTX-242 | IW_LINZ_00071061 | IW_LINZ_00071063 | 1/30/2007 | Microbia Formulation Development Review Minutes | Fretzen 18 | R, P |
| DTX-243 | IW_LINZ_00071220 | IW_LINZ_00071227 | 12/1/1994 | Costantino, et al. Solid-Phase Aggregation of Proteins under Pharmaceutically Relevant Conditions. Journal of Pharmaceutical Sciences Vol. 83(12): 1662-1669 (December 1994) | Fretzen 17 | R, P |
| DTX-244 | IW_LINZ_00081256 | IW_LINZ_00081256 | | Selection of development candidates | Currie 15 | R, P |
| DTX-245 | IW_LINZ_00103188 | IW_LINZ_00103200 | 1/1/1998 | Costantino et al. Deterioration of Lyophilized Pharmaceutical Proteins. Biochemistry (Moscow) 63(3): 357-363 (1998) | Klibanov 9 | R, P |
| DTX-246 | IW_LINZ_00115866 | IW_LINZ_00115891 | 10/28/2003 | Microbia, Inc. Regulatory and Clinical Strategic Plan (9/5/03, rev. 10/28/03) | Kurtz 4 | R, P, H |
| DTX-247 | IW_LINZ_00117964 | IW_LINZ_00117989 | 2/17/2004 | Report Summary: Recombinant Production of ST Peptide and Selected Derivative | Currie 13; Mahajan-Miklos 9 | R, P |
| DTX-248 | IW_LINZ_00120345 | IW_LINZ_00120427 | 10/19/2006 | Briefing Book to Support Type-C Meeting, Volume 1 of 8 | Currie 21; Kurtz 8; Kent 25 | |
| DTX-249 | IW_LINZ_00123750 | IW_LINZ_00123904 | 9/4/2012 | Linaclotide Pain MOA Advisory Board Meeting Agenda and powerpoint presentations | Kurtz 9 | R, P |
| DTX-250 | IW_LINZ_00232568 | IW_LINZ_00232610 | 10/9/2007 | Microbia GI Program Updates Presentation , PAC October 9th, 2007 | Fretzen 13 | R, P |
| DTX-251 | IW_LINZ_00388251 | IW_LINZ_00388270 | | Study Development Report: Formulation Development, Version 0.1, Linaclotide Solid Oral Dosage Form Development: Combination of Additives Study | Fretzen 23 | R, P, I |
| DTX-252 | IW_LINZ_00605814 | IW_LINZ_00605820 | 6/6/2011 | Linaclotide Executive Advisory Board Meeting: Top-line Take-away Messages Submitted June 6, 2011 | Kunka 15 | R, P, H |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-253 | IW_LINZ_00703503 | IW_LINZ_00703503 | | Native Spreadsheet | Currie 16 | R, P |
| DTX-254 | IW_LINZ_00704942 | IW_LINZ_00704951 | | Testing Microbia Peptides, Drug Discovery | Mahajan-Miklos 10 | R, P |
| DTX-255 | IW_LINZ_00705001 | IW_LINZ_00705009 | 9/18/2003 | Drug Discovery 09/18/03: GCCA Chymotrypsin Sensitivity | Currie 17 | R, P |
| DTX-256 | IW_LINZ_00709120 | IW_LINZ_00709138 | 9/18/2003 | Purified Peptides in GCCA Animal Models | Currie 18 | R, P |
| DTX-257 | IW_LINZ_00709766 | IW_LINZ_00710019 | 2/13/2002 | Microbia Lab Notebook 141 | Mahajan-Miklos 8 | |
| DTX-258 | IW_LINZ_00716858 | IW_LINZ_00716859 | 5/2/2011 | CMC Analytical Reports Update | Zhao 24 | R, P |
| DTX-259 | IW_LINZ_00717281 | IW_LINZ_00717288 | 2/5/2007 | MD-1100 Formulation Development Meeting: January 30, 2007 | Zhao 14 | |
| DTX-260 | IW_LINZ_00717639 | IW_LINZ_00717652 | 3/4/2011 | Linaclotide NDA DS Glossary - "For Your Information" | Fretzen 29 | R, P |
| DTX-261 | IW_LINZ_00726113 | IW_LINZ_00726154 | 6/23/2011 | Development Report: CMC-103-DP-DTR-007 | Zhao 34 | |
| DTX-262 | IW_LINZ_00727540 | IW_LINZ_00727585 | 7/22/2011 | Impurity Characterization Report: CMC-103-DS-CZR-019 | Zhao 25 | R, P |
| DTX-263 | IW_LINZ_00729214 | IW_LINZ_00729254 | 7/21/2011 | Characterization Report: CMC-103-DS-CZR-058 | Zhao 27 | R, P |
| DTX-264 | IW_LINZ_00729539 | IW_LINZ_00729584 | 7/28/2011 | Characterization Report: CMC-103-DS-CZR-059 (7/28/11) | Zhao 28 | R, P |
| DTX-265 | IW_LINZ_00730780 | IW_LINZ_00730816 | 4/13/2010 | Development Report: CMC-103-DS-DTR-003 | Zhao 30 | R, P |
| DTX-266 | IW_LINZ_00738360 | IW_LINZ_00738402 | 4/1/2010 | Development Report: CMC-103-DS-DTR-056 | Zhao 29 | R, P |
| DTX-267 | IW_LINZ_00741176 | IW_LINZ_00741239 | 8/2/2011 | Characterization Report: CMC-103-DP-CZR-004 | Zhao 35 | R, P |
| DTX-268 | IW_LINZ_00760080 | IW_LINZ_00760125 | 7/5/2011 | Development Report: CMC-103-DS-DTR-004 | Zhao 31 | R, P |
| DTX-269 | IW_LINZ_00760846 | IW_LINZ_00760847 | 1/25/2007 | Email from H. Zhao to A. Fretzen re solution stability for MD-1100 | Zhao 8 | R, P, H |
| DTX-270 | IW_LINZ_00760848 | IW_LINZ_00760863 | 1/1/2000 | Wu, S., The formation and mechanism of multimerization in a freeze-dried peptide. International Journal of Pharmaceutics 200:1-16 (2000) | Zhao 9 | R, P |
| DTX-271 | IW_LINZ_00772595 | IW_LINZ_00772595 | 6/15/2007 | CMC Offsite SOP/Development report meeting outlook invitation | Zhao 22 | R, P |
| DTX-272 | IW_LINZ_00772596 | IW_LINZ_00772596 | | Native Spreadsheet: CMC Development Reports | Zhao 23 | R, P |
| DTX-273 | IW_LINZ_00773242 | IW_LINZ_00773242 | 1/25/2007 | Email from A. Fretzen to S. Witkowski and H. Zhao re solution stability for MD-1100 | Zhao 6 | R, P |
| DTX-274 | IW_LINZ_00773243 | IW_LINZ_00773249 | 1/1/2004 | Sato and Shimonishi, Structural features of Escherichia coli heat –stable enterotoxin that activates membrane-associated guanylyl cyclase. J. Peptide Res. 63: 200-206 (2004) | Zhao 7 | R, P |
| DTX-275 | IW_LINZ_00773251 | IW_LINZ_00773252 | 1/25/2007 | Email A. Fretzen to K. Stith and others re data and desired outcome for Tuesday (two additional literature files) | Zhao 10 | R, P |
| DTX-276 | IW_LINZ_00773253 | IW_LINZ_00773293 | 5/13/2004 | International Publication WO 2004/039392 (Bentz, et al.) | Zhao 11; Fretzen 19 | R, P |
| DTX-277 | IW_LINZ_00785809 | IW_LINZ_00785809 | 10/25/2010 | Email from M. Kessler to H. Zhao re Slide presentations | Zhao 17 | R, P |
| DTX-278 | IW_LINZ_00785810 | IW_LINZ_00785841 | 9/28/2010 | Structure characterization of linaclotide drug product impurity Cys1-imidazolidinone | Zhao 18 | R, P |
| DTX-279 | IW_LINZ_00785842 | IW_LINZ_00785842 | 9/28/2010 | Peptide chart | Zhao 19 | R, P |
| DTX-280 | IW_LINZ_00785843 | IW_LINZ_00785868 | 10/13/2010 | Structure characterization of linaclotide drug product impurity MM-448623-α-ketone/diol | Zhao 20 | R, P |
| DTX-281 | IW_LINZ_00805681 | IW_LINZ_00805681 | 1/26/2007 | A. Fretzen to S. Witowski and others re Agenda for Tuesday | Zhao 12 | R, P |
| DTX-282 | IW_LINZ_00805682 | IW_LINZ_00805682 | 1/30/2007 | Formulation Development Review | Zhao 13 | R, P |
| DTX-283 | IW_LINZ_00814187 | IW_LINZ_00814188 | 4/1/2011 | Email from H. Zhao to T. Chancellor, A. Fretzen, and others re last report for multimer characterization (CMMC-103-DS-DTR-006) | Zhao 32 | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-284 | IW_LINZ_00814189 | IW_LINZ_00814230 | 4/1/2011 | Draft Nonclinical Study Report: CMC-103-DS-DTR-006 | Zhao 33 | R, P, I |
| DTX-285 | IW_LINZ_00819338 | IW_LINZ_00819396 | 7/7/2011 | Linaclotide Development Report CMC-103-DPDTR- 006 | Fretzen 22; Gupta 11 | |
| DTX-286 | IW_LINZ_00900437 | IW_LINZ_00900453 | 12/16/2003 | Board of Directors Meeting, December 16, 2003, Gastrointestinal Program Update | Currie 19 | R, P |
| DTX-287 | IW_LINZ_00900646 | IW_LINZ_00900773 | 4/30/2008 | Ironwood Presentation: R&D Review 2008 | Fretzen 6 | R, P |
| DTX-288 | IW_LINZ_00917227 | IW_LINZ_00917227 | 7/21/2008 | Email from M. Currie to M. Joyal re Therapeutics program history | Currie 11 | R, P |
| DTX-289 | IW_LINZ_00917228 | IW_LINZ_00917236 | | Guanylate Cyclase Subtype-C (GC-C) Super-Agonist Project | Currie 12 | R, P |
| DTX-290 | IW_LINZ_00930474 | IW_LINZ_00930487 | 4/5/2007 | Email from M. Lovell to D. Chapin, L. Hazen, A. Fretzen, and others re Follow Up from Yesterday's Call with attachment | Fretzen 9 | R, P, H |
| DTX-291 | IW_LINZ_01052270 | IW_LINZ_01052270 | 2/12/2007 | Email from A. Fretzen to E. Schultz and others re experimental design for next set of experiments | Zhao 15 | R, P |
| DTX-292 | IW_LINZ_01052271 | IW_LINZ_01052271 | 2/12/2007 | Native Spreadsheet: Design_Capsules_3_AF.xls | Zhao 16 | R, P |
| DTX-293 | IW_LINZ_01054243 | IW_LINZ_01054464 | 1/1/2002 | Rational Design of Stable Protein Formulations (John F. Carpenter et al., eds., 2002) ("Carpenter 2002") | Gupta 16 | |
| DTX-294 | IW_LINZ_01054465 | IW_LINZ_01054485 | 5/22/2006 | Daugherty, et al., Formulation and Delivery Issues for Monoclonal Antibody Therapeutics. Advanced Drug Delivery Rev. 58: 686-706 (2006) ("Daugherty 2006") | | R, P |
| DTX-295 | IW_LINZ_01054486 | IW_LINZ_01054511 | 1/1/2007 | Wang et al., Antibody Structure, Instability, and Formulation. J. Pharmaceutical Sci. 96(1): 1-26 (January 2007) ("Wang 2007") | | R, P |
| DTX-296 | IW_LINZ_IND00000373 | IW_LINZ_IND00000420 | 9/20/2004 | Linzess IND Study 10008, In Vitro Proteolytic Stability of MD-1100 Acetate, Final Version | | R, P |
| DTX-297 | IW_LINZ_IND00049821 | IW_LINZ_IND00049839 | 5/19/2010 | IND No.  63290 Sponsor Meeting Minutes for Pediatric Type C Meeting | Kunka 7 | R, P |
| DTX-298 | IW_LINZ_IND00065095 | IW_LINZ_IND00065105 | 10/15/2008 | Minutes, FDA Type A Meeting : linaclotide IBS-C | Kunka 11 | |
| DTX-299 | IW_LINZ_IND00115258 | IW_LINZ_IND00115267 | 8/5/2008 | Memo from T. Moreno to C. Pierce re Meeting for Linaclotide (IND 39290) - August 7, 2008 | Kunka 9 | |
| DTX-300 | IW-LINZ_00730587 | IW-LINZ_00730628 | 7/28/2011 | Characterization Report: CMC-103-DS-CZR-057 | Zhao 26 | R, P |
| DTX-301 | LINZ_0007579 | LINZ_0007587 | 11/12/2010 | Inventor Declaration from File History of 8,748,573 (Application No. 12/851,330) | Zhao 4 | R, P, I |
| DTX-302 | LINZ_0007765 | LINZ_0007773 | 3/15/2013 | Angelika Fretzen Declaration Under 37 C.F.R. §1.132, U.S. Patent Application No. 12/851,330 | Fretzen 25; Block 7; Gupta 12 | |
| DTX-303 | LINZ_0017194 | LINZ_0017338 | | USPTO Patent Assignment Abstract of Title and certified assignments for U.S. Patents 7,304,036, 7,373,727, 7,704,947, 7,745,409, 8,802,628, 8,748,573, 8,080,526, 8,110,553, 8,933,030 | Chien 17 | |
| DTX-304 | LINZ_0017345 | LINZ_0021015 | 5/15/2012 | Reexamination file history for U.S. Patent 7,704,947 | Chien 16 | |
| DTX-305 | LINZ_0020793 | LINZ_0020808 | 10/4/2012 | Falkow Declaration to '947 Patent Reexam ("Falkow Decl.") (Exhibit 28 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-306 | | | 10/3/2012 | Declaration of Ralph Gianella, M.D., In re Inter Parties Reexamination Application of: U.S. Patent No. 7,704,947 (Control No. 95/001,990) | Giannella 2 | |
| DTX-307 | LINZ_0021016 | LINZ_0021027 | 1/28/2003 | U.S. Provisional Application 60/443098 (Currie) | Currie 10 | |

CONFIDENTIAL

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-308 | LINZ_0021563 | LINZ_0021830 | | CDER Administrative and Correspondence Documents for NDA 202811 | Kurtz 12 | |
| DTX-309 | LINZ_0021831 | LINZ_0021841 | 8/30/2012 | CDER Approval Package for NDA 202811 | Kurtz 2; McDuff 2 | |
| DTX-310 | LINZ_0023204 | LINZ_0023260 | 8/29/2012 | CDER Summary Review for NDA 202811 | Kurtz 11 | |
| DTX-311 | LINZ_0023418 | LINZ_0023547 | | Group Exhibit - Topic No. 4: Labeling | Kunka 1a | |
| DTX-312 | LINZ_0027929LINZ_0027 | LINZ_0027930LINZ_0027938LINZ_00280 | | Group Exhibit - Topic No. 22: Marketing Materials | Kunka 1d | R, P |
| DTX-313 | LINZ_0030996 | LINZ_0030996 | 1/31/2013 | Linzess Marketing Bulletin: LINZESS Instant Savings Program | Kunka 20 | R, P |
| DTX-314 | LINZ_0034282 | LINZ_0034287 | 4/16/2014 | Hanning, et al. Guanylate cyclase-C/cGMP: and emerging pathway in the regulation of visceral pain. Frontiers in Molecular Neuroscience Volume 7, Article 31: pp. 1-6 (April 2014) | | |
| DTX-315 | LINZ_0034990 | LINZ_0035026 | | Linzess Launch Plan | Kunka 18 | R, P |
| DTX-316 | LINZ_0038075 | LINZ_0038082 | 9/20/2010 | Busby, et al. Linaclotide, through activation of guanylate cyclase C, acts locally in the gastrointestinal tract to elicit enhanced intestinal secretion and transit. European Journal of Parmacology 649: 328-335 (2010) | Mahajan-Miklos 11 | |
| DTX-317 | LINZ_0042702 | LINZ_0042719 | 9/18/2012 | Reprinted Article: Chey, et al. Linaclotide for Irritable Bowel Syndrome With Constipation: A 26-Week, Randomized, Double-blind, Placebo-Controlled Trial to Evaluate Efficacy and Safety. AM J Gastroenterol 107:1702-1712 (2012) | Kunka 12 | R, P |
| DTX-318 | LINZ_0051657 | LINZ_0051658 | | Marketing Material: When treating Irritable Bowel Syndrome with Constipation (IBS-C) and Chronic Idiopathic Constipation (CIC), Identify appropriate Medicare Part D patients | Kunka 19 | R, P |
| DTX-319 | LINZ_0093872 | LINZ_0093878 | 11/3/2009 | Amendment No. 1 to Master Collaboration Agreement | Chien 4 | |
| DTX-320 | LINZ_0094084 | LINZ_0094144 | 10/1/2015 | Linzess IBS Franchise 2016 Business Plan | Kunka 17 | R, P |
| DTX-321 | LINZ_0094236 | LINZ_0094256 | 1/1/2014 | Presentation: Linzess 2015 Business Plan | Kunka 6 | R, P |
| DTX-322 | LINZ_0095414 | LINZ_0095420 | 1/1/2016 | Allergan GI 2016 Presentation | Chien 15 | R, P |
| DTX-323 | LINZ_0104744 | LINZ_0104757 | 1/31/2006 | Amatiza (lubiprostone) Prescribing Information | Chang 14; Kent 14; Barnett 12 | |
| DTX-324 | LINZ_0104789 | LINZ_0104798 | 7/24/2002 | Zelnorm Approval Letter | | |
| DTX-325 | LINZ_0104799 | LINZ_104815 | 7/24/2002 | Zelnorm (tegaserod maleate) Prescribing Information | Chang 13; Barnett 4 | |
| DTX-326 | LINZ_0105608 | LINZ_0105623 | 7/24/2002 | Zelnorm Package Insert | DeGrado 4; Kent 12 | |
| DTX-327 | LINZ_0107088 | LINZ_0107089 | 3/30/2007 | FDA Public Health Advisory: Tegaserod maleate (marketed as Zelnorm) (March, 30, 2017) | | |
| DTX-328 | LINZ_0156019 | LINZ_0156026 | 9/1/2007 | Andresen, et al. Effect of 5 Days Linaclotide on Transit and Bowel Function in Females with Constipation-Predominant Irritable Bowel Syndrome. Gastroenterology 133(3):761-768 (2007) ("Andresen 2007") | | |
| DTX-329 | LINZ_0168781 | LINZ_0168820 | 1/1/2000 | Barrett and Keely, Chloride Secretion by the Intestinal Epithelium: Molecular Basis and Regulatory Aspects, Annu. Rev. Physiol. 62: 535-572 (2000) ("Barrett and Keely") | Barrett 8 | R, P |

CONFIDENTIAL

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-330 | LINZ_0168909 | LINZ_168919 | 11/8/2002 | McCole et al. Transactivation of the Epidermal Growth Factor Receptor in Colonic Epithelial Cells by Carbachol Requires Extracellular Release of Transforming Growth Factor-α. J. Biol. Chem. 277(45): 42603-42612 (2002) ("McCole 2002") | Barrett 7 | R, P |
| DTX-331 | LINZ_0169762 | LINZ_0169772 | 12/1/2014 | Chang et al. The impact of abdominal pain on global measures in patients with chronic idiopathic constipation, before and after treatment with linaclotide: a pooled analysis of two randomized, double-blind, placebo-controlled, phase 3 trials. Aliment Pharmacol Ther. 40(11-12):1302-12. | Barrett 22; Chang 3 | |
| DTX-332 | LINZ_0169773 | LINZ_0169784 | 12/1/2010 | Johnson et al. Linaclotide Improves Abdominal Pain and Bowel Habits in a Phase IIb Study of Patients With Irritable Bower Syndrome With Constipation. Gastroenterology 139: 1877-1886 (2010) | Barrett 21; Chang 4 | |
| DTX-333 | LINZ_NDA0000523 | LINZ_NDA0000531 | 10/15/2008 | FDA Memorandum of Type A Meeting Minutes | Kurtz 3 | |
| DTX-334 | LINZ_NDA0000597 | LINZ_NDA0000642 | | NDA, 2.3.P Description and Composition of the Drug Product (Linaclotide Capsules 145 ug and 290ug) | Fretzen 30 | R, P |
| DTX-335 | LINZ_NDA000710LINZ_ | LINZ_NDA0000768LINZ_NDA0001771LII | | Group Exhibit - Topic No. 9: Clinical Studies | Kunka 1b | |
| DTX-336 | LINZ_NDA0001823 | LINZ_NDA0001832 | | 3.2.P.2.1 Components of the Drug Product (Linaclotide Capsules, 145 µg) | Fretzen 20 | R, P |
| DTX-337 | LINZ_NDA0001835 | LINZ_NDA0001880 | | NDA, 3.2.P.2.2 Drug Product (Linaclotide Capsules 145 mg) | Fretzen 21 | R, P |
| DTX-338 | LINZ_NDA0004302LINZ_ | LINZ_NDA0004326LINZ_NDA0664646LII | | Group Exhibit - Topic No. 12: Manufacturing | Kunka 1c | |
| DTX-339 | LINZ_NDA0006850 | LINZ_NDA0006874 | 2/16/2011 | Nonclinical Study Report: MDP-103-067-PHR-01 | Kurtz 6 | R, P |
| DTX-340 | LINZ_NDA0006980 | LINZ_NDA0007000 | 3/14/2011 | Nonclinical Study Report: MDP-103-083-PHR-03 | Kurtz 7 | |
| DTX-341 | LINZ_NDA0035664 | LINZ_NDA0035669 | 3/11/2010 | Bryant, et al. Linaclotide is a potent and selective guanylate cyclase C agonist that elicits pharmacological effects locally in the gastrointestinal tract. Life Sciences 86: 760-765 (2010) | Kurtz 5 | |
| DTX-342 | LINZ_NDA0713481 | LINZ_NDA0713481 | | 3.2.P.1 Description and Composition of the Drug Product (Linaclotide Capsules, 72 µg) | | R, P |
| DTX-343 | RG_LINZ_00000143 | RG_LINZ_00000148 | 2/4/1986 | Cohen et al., The Immature Rat Small Intestine Exhibits an Increased Sensitivity and Response to Escherichia coli Heat-Stable Enterotoxin, Pediatric Research 20(6):555-560 (1986) ("Cohen 1986") | | R, P |
| DTX-344 | RG_LINZ_00000176 | RG_LINZ_00000181 | 1/1/1990 | Cohen, et al., E. Coli Heat-Stable Enterotoxin (STa) Induced Secretion: Differences Between Adult Rat Jejunum and Ileum Correlate with Differences in Metabolic Fate of STa. 7 Advances in Research on Cholera and Related Diarrheas 99–104 (1990) ("Cohen 1990") | | R, P |
| DTX-345 | RG_LINZ_00000182 | RG_LINZ_00000187 | 7/1/1989 | Cohen, et al., Differences in jejunal and ileal response to E. coli enterotoxin: possible mechanisms, American Journal of Physiology Gastrointestinal and Liver Physiology 257(1): G118-G123 (July 1989) ("Cohen 1989") | Giannella 11 | R, P |

CONFIDENTIAL

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-346 | RG_LINZ_00000210 | RG_LINZ_00000216 | 2/1/1988 | Cohen, et al., Age-Related Differences in Receptors for Escherichia coli Heat-Stable Enterotoxin in the Small and Large Intestine of Children. Gastroenterology 94:367–73 (1988) ("Cohen 1988") | | R, P |
| DTX-347 | RG_LINZ_00000237 | RG_LINZ_00000243 | 3/1/1992 | Mezoff et al., Escherichia coli Enterotoxin (STa) Binds to Receptors, Stimulates Guanyl Cyclase, and Impairs Absorption in Rat Colon. Gastroenterology 102:816–822 (1992) ("Mezoff 1992") | | R, P |
| DTX-348 | RG_LINZ_00000244 | RG_LINZ_00000252 | 6/1/1992 | Cohen and Giannella, Jejunal Toxin Inactivation Regulates Susceptibility of the Immature Rat to STa. Gastroenterology 102(6):1988–1996 (1992) ("Cohen & Giannella 1992") | DeGrado 14 | R, P |
| DTX-349 | RG_LINZ_00000289 | RG_LINZ_00000307 | 9/1/2000 | Giannella, E. Coli Heat-Stable Enterotoxins and Related Intestinal Peptides, The Regulatory Peptide Letter Vol. VIII(3):33-47 (2000) | | R, P |
| DTX-350 | RG_LINZ_00000404 | RG_LINZ_00000445 | | CV of Ralph A. Giannella, M.D. | Giannella 1 | |
| DTX-351 | RG_LINZ_00000597 | RG_LINZ_00000604 | 1/1/1978 | Dayhoff et al., A Model of Evolutionary Change in Proteins, Atlas of Protein Sequence and Structure 345-352 (1978) ("Dayhoff") | | R, P |
| DTX-352 | RG_LINZ_00000611 | RG_LINZ_00000620 | 1/1/1997 | Ladunga and Smith, Amino acid substitutions preserve protein folding by conserving steric and hydrophobicity properties, Protein Engineering 10(3):187-196 (1997) ("Ladunga") | | R, P |
| DTX-353 | RG_LINZ_00000820 | RG_LINZ_00000848 | 11/4/1993 | Giannella, R., E. coli Heat-Stable Enterotoxins, Guanylins, and Their Receptors: What are They and what Are They Doing? Presented in part as a state-of-the-art lecture at the Sixty-sixth Annual Meeting of the Central Society for Clinical Research, Nov. 4, 1993, Chicago, IL | Giannella 10 | R, P |
| DTX-354 | SDZ.LIN 0017194 | SDZ.LIN 0018476 | 1/28/2004 | Certified File History for Application No. 10/766,735 | | |
| DTX-355 | SDZ.LIN 0018477 | SDZ.LIN 0020034 | 5/14/2004 | Certified File History for Application No. 10/845,895 | | |
| DTX-356 | SDZ.LIN 0020035 | SDZ.LIN 0020054 | 1/28/2003 | Certified File History for Application No. 60/443,098 | | |
| DTX-357 | SDZ.LIN 0020055 | SDZ.LIN 0020087 | 5/15/2003 | Certified File History for Application No. 60/471,288 | | |
| DTX-358 | SDZ.LIN 0020088 | SDZ.LIN 0020139 | 11/12/2003 | Certified File History for Application No. 60/519,460 | | |
| DTX-359 | SDZ.LIN 0020140 | SDZ.LIN 0020164 | 8/12/2008 | Certified File History for Application No. 61/089,722 | | R, P |
| DTX-360 | SDZ.LIN 0020165 | SDZ.LIN 0020366 | 8/6/2009 | Certified File History for Application No. 61/231,725 | | |
| DTX-361 | SDZ.LIN 0020367 | SDZ.LIN 0020463 | 8/3/2009 | Certified File History for Application No. 61/273,332 | | |
| DTX-362 | SDZ.LIN 0020464 | SDZ.LIN 0020538 | 2/17/2010 | Certified File History for Application No. 61/305,465 | | R, P |
| DTX-363 | | | 4/1/2002 | Cohen, et al., Randomized, Controlled Human Challenge Study of the Safety, Immunogenicity, and Protective Efficacy of a Single Dose of Peru-, a Live Attenuated Oral Cholera Vaccine. Infection and Immunity 70(4):1965-1970 (Apr. 2002) | Giannella 9; Barnett 39 | R,P |
| DTX-364 | | | | Linzess.com: How LINZESS Works (https://www.linzess.com/ibsc-and-cic-symptoms/how-linzess-works) (accessed 9/6/18) | Kurtz 10 | R, P |

CONFIDENTIAL

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-365 | | | 4/1/2002 | Johanson et al., Efficacy and Safety of a Novel Compound, RU-0211, for the Treatment of Constipation, Supplement to Gastroenterology 122(4): A-315 (2002) ("Johanson 2002") | Barrett 10; DeGrado 7; Kent 13; Barnett 8 | |
| DTX-366 | | | 1/1/2002 | Mayer et al., Evolving Pathophysiological Model of Functional Gastrointestinal Disorders: Implications for Treatment, Eur. J. Surg. Supp. 587: 3-9 (2002) ("Mayer") | Barrett 11; Kent 9; Barnett 13 | |
| DTX-367 | | | 12/1/2013 | Castro et al., Linaclotide Inhibits Colonic Nociceptors and Relieves Abdominal Pain via Guanylate Cyclase-C and Extracellular Cyclic Guanosine 30,50-Monophosphate. Gastroenterology 145: 1334-1346 (2013) ("Blackshaw and Brierley") | Barrett 18; Kent 26; Barnett 38 | |
| DTX-368 | | | 4/1/2002 | Resta-Lenert and Barrett, Enteroinvasive Bacteria Alter Barrier and Transport Properties of Human Intestinal Epithelium: Role of iNOS and COX-2, Gastroenterology 122:1070-1087 (2002) ("Resta-Lenert") | Barrett 9 | R, P |
| DTX-369 | | | 4/1/2006 | Longstreth, G. Functional Bowel Disorders. Gastroenterology 130: 1480-1491 (2006) | Chang 16 | |
| DTX-370 | | | 1/1/1991 | Hofmann et al., Undergraduate teaching project of the American Gastroenterological Association: a pathophysiology resource, Am. J. Physiol. 260: S1-S5 (1991) ("Hofmann") (Exhibit 15 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-371 | | | 7/8/2009 | Sjolund et al., Motilin in Chronic Idiopathic Constipation, Scandinavian J. Gastroenterology 21(8):914-918 (1986) ("Sjolund") (Exhibit 16 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-372 | | | 4/1/2002 | Cuppoletti et al., Recombinant and Native Intestinal Cell ClC-2 Cl Channels Are Activated by RU-0211, Suppl. 122:4 GASTROENTEROLOGY A-538 (2002) ("Cuppoletti 2002") (Exhibit 18 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | Barnett 10 | |
| DTX-373 | | | 11/1/2004 | Cuppoletti et al., SPI-0211 activates T84 cell chloride transport and recombinant human ClC-2 chloride currents, 287 AM. J. PHYSIOL. C1173-C1183 (2004) ("Cuppoletti 2004") (Exhibit 19 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | Barnett 11 | |
| DTX-374 | | | 4/1/2002 | Lipecka et al., Distribution of ClC-2 chloride channel in rat and human epithelial tissues, 282 AM. J. PHYSIOL. C805-C816 (2002) ("Lipecka") (Exhibit 20 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-375 | | | 7/27/2000 | Gyomorey et al., Expression of the chloride channel ClC-2 in the murine small intestine epithelium, 270 AM. J. PHYSIOL. C1787-C1794 (2000) ("Gyomorey") (Exhibit 21 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-376 | | | 10/1/2002 | Catalan et al., ClC-2 in guinea pig colon: mRNA, immunolabeling, and functional evidence for surface epithelium localization, 283 AM. J. PHYSIOL. GASTROINTESTINAL LIVER PHYSIOL G1004-G1013 (2002) ("Catalan") (Exhibit 22 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-377 | | | 5/12/2000 | O'Donnell et al., Inhibition of enterotoxin-induced porcine colonic secretion by diarylsulfonylureas in vitro, 279 AM. J. PHYSIOL. G1104-G1112 (2000) (Exhibit 23 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | Kent 17 | |
| DTX-378 | | | 3/1/1997 | Hamra et al., Regulation of intestinal uroguanylin/guanylin receptor-mediated responses by mucosal acidity, Pharmacology 94: 2705-2710 (1997) ("Hamra 1997") | Kent 21; Barnett 27 | |
| DTX-379 | | | 1/1/2001 | Holzer et al., Surveillance of the Gastrointestinal Mucosa by Sensory Neuros, 52 J. PHYSIOL. AND PHARMACOL. 505-521 (2001) ("Holzer") (Exhibit 35 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-380 | | | 1/1/2003 | Ganapathy et al., Protein Digestion and Assimilation, Chap. 19, pp. 438-448, Textbook of Gastroenterology (4th ed. 2003) ("Ganapathy") (Exhibit 36 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-381 | | | 1/1/2003 | Madara and Anderson, Epithelia: biological principles of organization, Chap. 8, pp. 151-165, Textbook of Gastroenterology (4th ed. 2003) ("Madara") (Exhibit 37 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | | |
| DTX-382 | | | 5/1/2016 | Lacy et al., Bowel Disorder, 150 GASTROENTEROLOGY 1393-1407 (2016) ("Lacy") (Exhibit 8 to Rebuttal Expert Report of Lin Chang, M.D.) | | |
| DTX-383 | | | 1/1/2015 | Videlock and Chang, Irritable bowel syndrome, Chap. 75, pp. 1495-1521, Yamada's Textbook of Gastroenterology (6th ed. 2015) ("Videlock") (Exhibit 9 to Rebuttal Expert Report of Lin Chang, M.D.) | | |
| DTX-384 | | | 6/1/2007 | Cash et al., Update On The Management Of Adults With Chronic Idiopathic Constipation, 56(2) SUPPLEMENT TO THE JOURNAL OF FAMILY PRACTICE S13-S20 (2007) ("Cash") (Exhibit 10 to Rebuttal Expert Report of Lin Chang, M.D.) | | |
| DTX-385 | | | 1/1/2005 | Tillisch and Chang, Diagnosis And Treatment of Irritable Bowel Syndrome: State Of The Art, 7 CURRENT GASTROENTEROLOGY REPORTS 249-256 (2005) ("Tillisch") (Exhibit 13 to Rebuttal Expert Report of Lin Chang, M.D.) | | |
| DTX-386 | | | | AGA Educational Slide Set on IBS (Exhibit 17 to Rebuttal Expert Report of Lin Chang, M.D.) | | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-387 | | | 5/1/2000 | Zalewski, Cisapride Withdrawal Requires Alternative Therapy, 3:2 CLEVELAND CLINIC PHARMACOTHERAPY UPDATE (May/June 2000), http://www.clevelandclinicmeded.com/medicalpubs/pharmacy/mayjune2000/cisapride.htm (last visited 1/5/2019) (Exhibit 18 to Rebuttal Expert Report of Lin Chang, M.D.) | | |
| DTX-388 | | | 1/1/2001 | Alosetron - withdrawn: severe adverse reactions, Essential Drugs in Brief No. 003-2001: REGULATORY MATTERS (2001), http://apps.who.int/medicinedocs/en/p/printable.html (last visited 1/5/2019) (Exhibit 19 to Rebuttal Expert Report of Lin Chang, M.D.) | | |
| DTX-389 | | | 3/21/1998 | Marx et al., One Peptide, Two Topologies: Structure and Interconversion Dynamics of Human Uroguanylin Isomers, 52 J. PEPT. RES. 229-240 (1998) ("Marx") (Exhibit 17 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-390 | | | 1/1/2002 | Knittel and Zavod, Drug Design and Relationship of Functional Groups to Pharmacologic Activity, in FOYE'S PRINCIPLES OF MEDICINAL CHEMISTRY (Williams and Lemke eds., 5th Ed. 2002) ("Lemke") (Exhibit 19 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-391 | | | 1/1/1996 | Hamra et al., Prouroguanylin and Proguanylin: Purification from Colon, Structure, and Modulation of Bioactivity by Proteases, 107:1 ENDOCRINOLOGY 257-265 (1996) ("Hamra 1996") (Exhibit 23 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-392 | | | 1/1/1986 | Creighton, Disulfide bonds as probes of protein folding pathways, 131 METHODS ENZYMOL. 83-106 (1986) ("Creighton 1986") (Exhibit 24 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-393 | | | 2/1/1988 | Creighton, Disulphide bonds and protein stability, 8 BIOESSAYS 57-63 (1988) ("Creighton 1988") (Exhibit 25 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-394 | | | 4/3/1992 | Creighton, The disulfide folding pathway of BPTI, 256 SCIENCE 111-114 (1992) ("Creighton 1992") (Exhibit 26 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-395 | | | 1/1/1993 | Goldenberg, Probing the Determinants of Disuklfide Stability in Native Pancreatic Trypsin Inhibitor. Biochemistry 32:2835-2844 (1993) (Exhibit 27 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-396 | | | 2/1/1995 | Nataro et al., Heterogeneity of Enteroaggregative Escherichia coli Virulence Demonstrated in Volunteers, 171:2 THE JOURNAL OF INFECTIOUS DISEASES 465-468 (1995) ("Nataro 1995") (Exhibit 29 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-397 | | | 1/1/2002 | Menard and Dubreuil, Enteroaggregative Escherichia coli Heat-Stable Enterotoxin 1 (EAST1): A New Toxin with an Old Twist, 28:1 CRITICAL REVIEWS IN MICROBIOLOGY 43-60 (2002) ("Menard 2002") (Exhibit 30 to Rebuttal Expert Report of William DeGrado, Ph.D.) | Kent 29 | |
| DTX-398 | | | 8/5/2010 | Lin et al., Bacterial Heat-Stable Enterotoxins: Translation of Pathogenic Peptides into Novel Targeted Diagnostics and Therapeutics, 2 TOXINS 2028-2054 (2010) (Exhibit 31 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-399 | | | 5/1/1988 | Yamasaki et al., "Structural Requirements for the Spatial Structure and Toxicity of Heat-Stable Enterotoxin (STh) of Enterotoxigenic Escherichia coli," 61 BULL. CHEM. SOC. JPN. 1701-1706 (1988) (Exhibit 33 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-400 | | | 1/1/2003 | Barnes and Gray, Amino Acid Properties and Consequences of Substitutions, Chap. 14, pp. 289-316, Bioinformatics for Geneticists (2003) (Exhibit 37 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-401 | | | 1/25/1982 | Kyte and Doolittle, A simple method for displaying the hydropathic character of a protein, 157:1 J MOL BIOL 105-132 (1982) (Exhibit 39 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-402 | | | 1/1/1983 | Hopp and Woods, A computer program for predicting protein antigenic determinants, 20:4 MOL IMMUNOL 483-489 (1983) (Exhibit 40 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-403 | | | 7/1/1987 | Cornette et al., Hydrophobicity scales and computational techniques for detecting amphipathic structures in proteins, 195:3 J MOL BIOL 659-685 (1987) (Exhibit 41 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-404 | | | 6/11/1984 | Eisenberg et al., Analysis of membrane and surface protein sequences with the hydrophobic moment plot, 179:1 J MOL BIOL 125-142 (1984) (Exhibit 42 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-405 | | | 2/8/1979 | Janin, Surface and inside volumes in globular proteins, 277 NATURE 491-492 (1979) (Exhibit 43 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-406 | | | 1/1/1986 | Engelman et al., Identifying nonpolar transbilayer helices in amino acid sequences of membrane proteins, 15 ANNU REV BIOPHYS BIOPHYS CHEM 321-352 (1986) (Exhibit 44 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-407 | | | 10/15/2005 | Sobel, Botulism, 41 CLINICAL INFECTIOUS DISEASES 1167-73 (2005) ("Sobel") (Exhibit 47 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-408 | | | 3/14/1994 | Hubbard et al., Modeling studies of the change in conformation required for cleavage of limited proteolytic sites, 3 PROTEIN SCIENCE 757-768 (1994) (Exhibit 49 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-409 | | | 9/20/1991 | Weissman and Kim, Reexamination of the folding of BPTI: predominance of native intermediates, 253 SCIENCE 1386-93 (1991) ("Weissman") (Exhibit 51 to Rebuttal Expert Report of William DeGrado, Ph.D.) | | |
| DTX-410 | | | | FDA Drug Details Website, FDA Approved Drug Products, NDA 202811, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=202811 (accessed 4/18/2019). | | |
| DTX-411 | | | 1/17/2019 | Rebuttal Expert Report of Lin Chang, M.D. with Exhibits 1-20 | Chang 1 | |
| DTX-412 | | | 1/17/2019 | List of Exhibits to Rebuttal Expert Report of Lin Chang, M.D. | Chang 2 | |
| DTX-415 | | | 12/1/2008 | Camilleri and Chang. Challenges to the Therapeutic Pipeline for Irritable Bowel Syndrome: End Points and Regulatory Hurdles. Gastroenterology 135: 1877-1891 (2008) | Chang 20 | |
| DTX-416 | | | 2/1/2018 | Chang et al. Functional Bowel Disorders: A Roadmap to Guide the Next Generation of Research. Gastroenterology 154(3): 723-735 (2018) | Chang 23 | |
| DTX-417 | | | | Irritable Bowel Syndrome Part 2 (AGA Educational Slide Set on IBS) | Chang 25 | |
| DTX-413 | | | 1/18/2019 | Materials Considered by Lin Chang, M.D. as of January 18, 2019 | Chang 7 | |
| DTX-414 | | | | Dollars for Docs: Lin Chang. https://projects.propublica.org/docdollars/doctors/pid/262152 | Chang 8 | R, P, H |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-418 | | | 7/26/2018 | Plaintiff's Objections and Responses to Defendants' Notices of Rule 30(b)(6) Deposition of Allergan Sales, LLC, Forest Laboratories Holdings, Ltd., Allergan USA, Inc., and Ironwood Pharmaceuticals Inc. | Chien 1; Currie 3; Fretzen 3; Kunka 3 | NE |
| DTX-419 | | | 9/14/2018 | Defendants' Notice of Rule 30(b)(1) Deposition of Andrew Chien | Chien 2 | NE |
| DTX-420 | LINZ_0093879 | LINZ_0094081 | 9/12/2007 | Collaboration Agreement by and between Microbia, Inc. and Forest Laboratories, Inc. dated September 12, 2007 | Chien 3 | |
| DTX-421 | | | 9/17/2018 | Plaintiffs' Supplemental Objections and Responses to Defendants' First Set of Joint Interrogatories (Nos. 1-2, 5-6, and 9-10 | Chien 5 | NE |
| DTX-422 | | | 6/29/2018 | Defendants' Notice of Deposition of Mark G. Currie | Currie 1 | NE |
| DTX-423 | | | 8/18/1992 | U.S. Patent 5,140,102 (Currie) | Currie 24 | |
| DTX-424 | | | 2/1/2018 | Trulance Product Label (Rev. 02/2018) | Currie 28 (also used at Kurtz) | |
| DTX-425 | | | 1/18/2019 | Rebuttal Expert Report of William Degrado, Ph.D. (1/18/19) with Exhibits 1-51 | DeGrado 1 | |
| DTX-426 | | | 11/1/1993 | Hamra, et al. Uroguanylin: Structure and activity of a second endogenous peptide that stimulates intestinal guanylate cyclase. Proc. Natl. Acad. Sci. USA 90: 10464-10468 (November 1993) | DeGrado 15; Kent 18 | |
| DTX-427 | | | 1/18/2019 | List of Exhibits to Rebuttal Expert Report of William Degrado, Ph.D. | DeGrado 2 | |
| DTX-428 | | | 12/15/2001 | Talley, N. Serotoninergic neuroenteric modulators. The Lancet 358: 2061-2068 (2001) | DeGrado 6 | |
| DTX-429 | | | | Angelika Fretzen LinkedIn profile, accessed August 2, 2018 | Fretzen 1 | |
| DTX-430 | | | 6/29/2019 | Defendants' Notice of Deposition of Angelika Fretzen pursuant to Federal Rule of Civil Procedure 30(b)(1) | Fretzen 2 | P, NE |
| DTX-431 | | | | List of matters for which Klibanov has provided testimony | Klibanov 1 | |
| DTX-432 | | | 11/1/1995 | Griebenow and Klibanov, Lyophilization-induced reversible changes in the secondary structure of proteins. Proc. Natl. Acad. Sci. 92(24): 10969-10976 (November 1995) | Klibanov 4 | |
| DTX-433 | | | 4/8/1997 | U.S. Patent 5,618,539 (Dorval, et al.) | Klibanov 7 | R, P |
| DTX-434 | | | 5/1/2012 | Guidance for Industry, Irritable Bowel Syndrome - Clinical Evaluation of Drugs for Treatment | Kunka 10 | R, P |
| DTX-435 | | | 8/11/2011 | Lembo et al. Two Randomized Trials of Linaclotide for Chronic Constipation. N Engl J Med 365(6): 527-536 (August 11, 2011) | Kunka 13 | |
| DTX-436 | | | 9/14/2018 | Defendants' Notice of Rule 30(b)(1) Deposition of Linda Kunka | Kunka 2 | P, NE |
| DTX-437 | | | 12/1/2009 | Guidance for Industry, Patient-Reported Outcome Measures: Use in Medical Product Development to Support Labeling Claims | Kunka 8 | R, P |
| DTX-438 | | | 6/29/2018 | Defendants' Notice of Deposition of Caroline Kurtz Pursuant to Federal Rule of Civil Procedure 30(b)(1) | Kurtz 1 | P, NE |
| DTX-439 | | | 6/29/2018 | Defendants' Notice of Deposition of Shalina Mahajan-Miklos Pursuant To Federal Rule of Civil Procedure 30(b)(1) | Mahajan-Miklos 1 | P, NE |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

**Defendants' Joint Trial Exhibit List**

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-440 | | | 7/9/2018 | Defendants' Notice of Deposition Subpoena of Henry R. Wolfe | Wolfe - 1 | P, NE |
| DTX-441 | | | 7/20/2018 | Non-Party Henry Wolfe's Objections and Responses to Defendants' Document Subpoena | Wolfe - 2 | P, NE |
| DTX-442 | | | 7/20/2018 | Plaintiffs' Objections and Responses to Defendants' Document Subpoena to Henry Wolfe | Wolfe - 3 | P, NE |
| DTX-443 | | | 10/5/2012 | Patent Owners' Response to Office Action, Reexamination of U.S. Patent 7,704,947 (Control No. 95/001,990) | Wolfe - 4 | |
| DTX-444 | | | 6/29/2018 | Defendants' Notice of Deposition of Hong Zhao Pursuant to Federal Rule of Civil Procedure 30(b)(1) | Zhao 1 | P, NE |
| DTX-445 | | | 12/1/2011 | Marked up copy - Wu et al., Reactive Impurities in Excipients: Profiling, Identification and Mitigation of Drug-Excipient Incompatibility. AAPS PharmSciTech 12(4): 1248-1263 (2011) | Zhao 21a | R, P |
| DTX-446 | DEFS-LINA-00004939 | DEFS-LINA-00004943 | 1/1/2000 | Gliński, Jacek, et al., Surface Properties of Aqueous Solutions of L-Leucine, 84 Chemistry 99 (2000) ("Glinski") | Gupta 24 | |
| DTX-447 | DEFS-LINA-00004944 | DEFS-LINA-00004954 | 5/5/2007 | Learoyd, Tristan P., et al. Chitosan-Based Spray-Dried Respirable Powders for Sustained Delivery of Terbutaline Sulfate, 68 Eur. J. Pharmaceutics & Biopharmaceutics 224 (2008) ("Learoyd") | | R, P |
| DTX-448 | DEFS-LINA-00004955 | DEFS-LINA-00004961 | 5/5/2002 | Matubayasi, Norihiro, et al., Thermodynamic Quantities of Surface Formation of Aqueous Electrolyte Solutions, 250 J. Colloid & Interface Sci. 431 (2002) ("Matubayasi 2002"). | | R, P |
| DTX-449 | DEFS-LINA-00004962 | DEFS-LINA-00004969 | 3/16/2007 | Raula, Janne, et al., Study of the Dispersion Behaviour of L-Leucine Containing Microparticles Synthesized with an Aerosol Flow Reactor Metho, 177 Powder Tech. 125 (2007) ("Raula 2007"). | | R, P |
| DTX-450 | DEFS-LINA-00004970 | DEFS-LINA-00004979 | 1/1/2006 | Scenczi, Árápad, et al., The Effect of Solvent Environment on the Conformation and Stability of Human Polyclonal IgG in Solution, 34 Biologicals 5 (2006) ("Szenczi 2006"). | | R, P |
| DTX-451 | DEFS-LINA-00004980 | DEFS-LINA-00005159 | 3/1/2007 | Rajeshwar Motheram, Behavior of Recombinant Human Growth Hormone at Solid / Liquid Interfaces, University of the Sciences in Philadelphia (Mar. 2007) (Dissertation) ("Motheram 2007"). | | R, P |
| DTX-452 | LINZ_NDA0000001 | LINZ_NDA0713580 | | Original New Drug Application No. 202811, Linaclotide (LINZESS) | | |
| DTX-453 | | | 11/1/2003 | FDA Guidance for Industry, Q1A(R2) Stability Testing of New Drug Substances and Products, Revision 2 | Klibanov 16 | R, P |
| DTX-454 | | | | Chart of amino acid sequence in disulfide bonds | Klibanov 18 | R, P, NE |
| DTX-455 | | | | Small Intestine Anatomy, available at https://visualsonline.cancer.gov/details.cfm?imageid-9441 | | R, P, H |
| DTX-456 | LINZ_0169794 | LINZ_0169819 | 8/12/2014 | Certified U.S. Patent 8,802,628 (Fretzen, et al.) | Block 5; Gupta 10 | |
| DTX-457 | | | 5/9/2006 | U.S. Patent No. 7,041,786 | | R, P |
| DTX-458 | RG_LINZ_00000059 | RG_LINZ_00000065 | 4/29/1983 | Ralph A. Giannella et al., Binding of Escherichia coli heat-stable enterotoxin to receptors on rat intestinal cells, Am. J. Physiol. 245 (1983) G492-G498 | | R, P |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-459 | | | 4/1/1988 | Yuji Hidaka et al., Disulfide Linkages in a Heat-Stable Enterotoxin (ST p) Produced by a Porcine Strain of Enterotoxigenic Escherichia coli, Bull. Chern. Soc. ]pn., 61, (1988) 1265-1271 | | R, P |
| DTX-460 | LINZ_NDA0006245 | LINZ_NDA0006252 | 11/5/1999 | Binyamin Feibush & Bradley C. Snyder, Oxidation of the N-Terminal Gly-Residue of Peptides: Stress Study of Pexiganan Acetate in a Drug Formulation, Pharmaceutical Research Vol. 17, No. 2 (2000) 197-204 | | R, P |
| DTX-461 | | | 9/18/2017 | Defendants' Joint Invalidity Contentions | | P, NE |
| DTX-462 | | | 12/5/2017 | Defendants' Joint Amended Invalidity Contentions | | P, NE |
| DTX-463 | | | 10/10/2018 | Defendants' Joint Amended Invalidity Contentions | | P, NE |
| DTX-464 | | | 8/5/2019 | Defendants' Joint Amended Invalidity Contentions Pursuant to the Default Standard for Discovery | | P, NE |
| DTX-465 | | | 6/5/2017 | Plaintiffs' Initial Disclosures | | P, NE |
| DTX-466 | | | 6/5/2017 | Sandoz' Initial Disclosures | | P, NE |
| DTX-467 | | | 6/5/2017 | Teva's Initial Disclosures | | P, NE |
| DTX-468 | | | 6/19/2017 | Plaintiffs' Paragraph 4(a) Disclosures | | P, NE |
| DTX-469 | | | 6/26/2017 | Plaintiffs' Initial Disclosures Pursuant to Paragraph 3 of the default Standard For Discovery | | P, NE |
| DTX-470 | | | 6/26/2017 | Sandoz's Initial Disclosures Pursuant to Paragraph 3 of the default Standard For Discovery | | P, NE |
| DTX-471 | | | 6/26/2017 | Defendant Teva Pharmaceuticals USA, Inc.'s Initial Disclosure of Electronically Stored Information | | P, NE |
| DTX-472 | | | 10/5/2017 | Plaintiffs' Supplemental Paragraph 4(a) Disclosures | | P, NE |
| DTX-473 | | | 12/21/2017 | Plaintiffs' Second Supplemental Paragraph 4(a) Disclosures | | P, NE |
| DTX-474 | | | 1/18/2018 | Plaintiffs' Third Supplemental Paragraph 4(a) Disclosures | | P, NE |
| DTX-475 | | | 2/22/2018 | Defendant Teva Pharmaceuticals USA, Inc.'s Amended Initial Disclosure of Electronically Stored Information | | P, NE |
| DTX-476 | | | 5/14/2018 | Plaintiffs' Supplemental Initial Disclosures Pursuant to Paragraph 3 of the default Standard For Discovery | | P, NE |
| DTX-477 | | | 5/14/2018 | Plaintiffs' Fourth Supplemental Paragraph 4(a) Disclosures | | P, NE |
| DTX-478 | | | 5/14/2018 | Defendant Teva Pharmaceuticals USA, Inc.'s Initial Disclosure of Electronically Stored Information Regarding the Accused Generic Capsule Products containing 72MG of Linaclotide | | P, NE |
| DTX-479 | | | 6/21/2018 | Plaintiffs' Fifth Supplemental Paragraph 4(a) Disclosures | | P, NE |
| DTX-480 | | | 7/12/2018 | Plaintiffs' Sixth Supplemental Paragraph 4(a) Disclosures | | P, NE |
| DTX-481 | | | 7/17/2018 | Defendant Teva Pharmaceuticals USA, Inc.'s Amended Initial Disclosures | | P, NE |
| DTX-482 | | | 9/7/2018 | Plaintiffs' Seventh Supplemental Paragraph 4(a) Disclosures | | P, NE |
| DTX-483 | | | 8/29/2017 | Defendants' First Set of Joint Request for the Production of Documents and Things to Plaintiffs (Nos. 1-119) | | P, NE |
| DTX-484 | | | 9/28/2017 | Plaintiffs' Objections and Responses to Defendants' First Set of Joint Requests for the Production of Documents and Things to Plaintiffs (Nos. 1-119) | | P, NE |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|-----|-----------|-----------|------|-------------|-------------|------------------------|
| DTX-485 | | | 1/23/2018 | Defendants' Corrected First Set of Joint Request for the Production of Documents and Things to Plaintiffs (Nos. 1-119) | | P, NE |
| DTX-486 | | | 2/22/2018 | Plaintiffs' Objections and Responses to Defendants' Corrected First Set of Joint Requests for the Production of Documents and Things to Plaintiffs (Nos. 1-119) | | P, NE |
| DTX-487 | | | 6/29/2018 | Defendants' Second Set of Joint Requests For the Production of Documents and Things to Plaintiffs (Nos. 120-121) | | P, NE |
| DTX-488 | | | 7/30/2018 | Plaintiffs' Objections and Responses to Defendants' Second Set of Joint Requests for the Productions of Documents and Things to Plaintiffs (Nos. 120-121) | | P, NE |
| DTX-489 | | | 5/3/2017 | Plaintiffs First Set of Request for the Production of Documents and Things to All Defendants (Nos. 1-71) | | P, NE |
| DTX-490 | | | 6/2/2017 | Defendant Sandoz Inc.'s Responses and Objections to Plaintiffs' First Set of Requests for the Production of Documents and Things (Nos. 1-71) | | P, NE |
| DTX-491 | | | 6/2/2017 | Defendant Teva Pharmaceuticals USA, Inc.'s Response to Plaintiffs' First Set of Requests for the Production of Documents and Things to All Defendants (Nos. 1-71) | | P, NE |
| DTX-492 | | | 4/25/2018 | Defendant Teva Pharmaceuticals USA, Inc.'s Response to Plaintiffs' Second Set of Requests for the Production of Documents and Things to Teva (Nos. 72-109) | | P, NE |
| DTX-493 | | | 6/11/2018 | Plaintiffs Third Set of Requests for the Production of Documents and Things to All Defendants (Nos. 110-111) | | P, NE |
| DTX-494 | | | 7/10/2018 | Defendant Sandoz Inc.'s Responses and Objections to Plaintiffs' Third Set of Requests for the Production of Documents and Things (Nos. 110-111) | | P, NE |
| DTX-495 | | | 7/10/2018 | Defendant Teva Pharmaceuticals USA, Inc.'s Response to Plaintiffs' Third Set of Requests for the Procution of Documents and Things to All Defendants (Nos. 110-111) | | P, NE |
| DTX-496 | | | 8/29/2017 | Defendants' First Set of Joint Interrogatories to Plaintiffs (Nos. 1-11) | | P, NE |
| DTX-497 | | | 9/28/2017 | Plaintiffs Objections and Responses to Defendants First Set of Joint Interrogatories to Plaintiffs (Nos. 1-11) | | P, NE |
| DTX-498 | | | 9/17/2018 | Plaintiffs Objections and Responses to Defendants First Set of Joint Interrogatories to Plaintiffs (Nos. 1-2, 5-6, 9-10) (to Sandoz) | | P, NE |
| DTX-499 | | | 9/17/2018 | Plaintiffs' Supplemental Objections and Responses to Defendants' First Set of Joint Interrogatories (to Teva) (Nos. 1-2, 5-6, and 9-10) | | P, NE |
| DTX-500 | | | 5/3/2017 | Plaintiffs' First Set of Interrogatories to All Defendants (Nos. 1-4) | | P, NE |
| DTX-501 | | | 6/2/2017 | Sandoz's Answer and Objections to Plaintiffs' First Set of Interrogatories to All Defendants (Nos. 1-4) | | P, NE |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-502 | | | 6/2/2017 | Defendant Teva Pharmaceuticals USA, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories (Nos. 1-4) | | P, NE |
| DTX-503 | LINZ_0172745 | LINZ_0172746 | 6/15/2006 | 6/15/2006 L. Chang Agreement | | R, P |
| DTX-504 | LINZ_0172747 | LINZ_0172756 | 7/1/2006 | 7/1/2006 L. Chang Agreement | | R, P |
| DTX-505 | LINZ_0172757 | LINZ_0172757 | 4/30/2008 | 4/30/2008 L. Chang Agreement | | R, P |
| DTX-506 | LINZ_0172758 | LINZ_0172759 | 4/19/2018 | 4/19/2018 L. Chang Agreement Amendment | | R, P |
| DTX-507 | LINZ_0172760 | LINZ_0172764 | 4/20/2018 | 4/20/2018 L. Chang Certificate of Completion | | R, P |
| DTX-508 | LINZ_0172765 | LINZ_0172785 | 2/19/2015 | 2/19/2015 L. Chang Agreement | | R, P |
| DTX-509 | LINZ_0172786 | LINZ_0172791 | 2/19/2015 | 2/19/2015 Letter to L. Chang re Agreement | | R, P |
| DTX-510 | LINZ_0172792 | LINZ_0172803 | 11/25/2015 | 11/25/2015 L. Chang Agreement | | R, P |
| DTX-511 | LINZ_0172804 | LINZ_0172820 | 2/29/2016 | 2/29/2016 L. Chang Agreement | | R, P |
| DTX-512 | LINZ_0172821 | LINZ_0172829 | 12/13/2005 | 12/13/2005 L. Chang Agreement | | R, P |
| DTX-513 | LINZ_0172830 | LINZ_0172838 | 2/15/2007 | 2/15/2007 L. Chang Agreement | | R, P |
| DTX-514 | LINZ_0172839 | LINZ_0172847 | 2/15/2007 | 2/15/2007 L. Chang Agreement | | R, P |
| DTX-515 | LINZ_0172848 | LINZ_0172855 | 4/15/2010 | 4/15/2010 L. Chang Agreement | | R, P |
| DTX-516 | LINZ_0172856 | LINZ_0172861 | 9/22/2010 | 9/22/2010 L. Chang Agreement | | R, P |
| DTX-517 | LINZ_0172862 | LINZ_0172868 | 9/22/2010 | 9/22/2010 L. Chang Agreement | | R, P |
| DTX-518 | LINZ_0172869 | LINZ_0172870 | 11/4/2010 | 11/4/2010 L. Chang Agreement | | R, P |
| DTX-519 | LINZ_0172871 | LINZ_0172878 | 3/9/2011 | 3/9/2011 L. Chang Agreement | | R, P |
| DTX-520 | LINZ_0172879 | LINZ_0172883 | 4/4/2011 | 4/4/2011 L. Chang Agreement | | R, P |
| DTX-521 | LINZ_0172884 | LINZ_0172893 | 5/24/2011 | 5/24/2011 L. Chang Agreement | | R, P |
| DTX-522 | LINZ_0172894 | LINZ_0172912 | 7/19/2011 | 7/19/2011 L. Chang Agreement | | R, P |
| DTX-523 | LINZ_0172913 | LINZ_0172933 | 7/19/2011 | 7/19/2011 L. Chang Agreement | | R, P |
| DTX-524 | LINZ_0172934 | LINZ_0172955 | 12/28/2011 | 12/28/2011 L. Chang Agreement | | R, P |
| DTX-525 | LINZ_0172956 | LINZ_0172977 | 12/28/2011 | 12/28/2011 L. Chang Agreement | | R, P |
| DTX-526 | LINZ_0172978 | LINZ_0172979 | 2/3/2012 | 2/3/2012 L. Chang Agreement | | R, P |
| DTX-527 | LINZ_0172980 | LINZ_0172982 | 4/23/2012 | 4/23/2012 L. Chang Agreement | | R, P |
| DTX-528 | LINZ_0172983 | LINZ_0172986 | 6/1/2012 | 6/1/2012 L. Chang Agreement | | R, P |
| DTX-529 | LINZ_0172987 | LINZ_0172994 | 8/8/2012 | 8/8/2012 L. Chang Agreement | | R, P |
| DTX-530 | LINZ_0172995 | LINZ_0172997 | 8/27/2012 | 8/27/2012 L. Chang Agreement | | R, P |
| DTX-531 | LINZ_0172998 | LINZ_0173013 | 11/29/2012 | 11/29/2012 L. Chang Agreement | | R, P |
| DTX-532 | LINZ_0173014 | LINZ_0173015 | 5/8/2013 | 5/8/2013 L. Chang Agreement | | R, P |
| DTX-533 | LINZ_0173016 | LINZ_0173033 | 10/29/2013 | 10/29/2013 L. Chang Agreement | | R, P |
| DTX-534 | LINZ_0173034 | LINZ_0173044 | 9/24/2014 | 9/24/2014 L. Chang Agreement | | R, P |
| DTX-535 | LINZ_0173045 | LINZ_0173048 | 9/24/2014 | 9/24/2014 L. Chang Agreement | | R, P |
| DTX-536 | LINZ_0173049 | LINZ_0173057 | 4/15/2016 | 4/15/2016 L. Chang Agreement | | R, P |
| DTX-537 | LINZ_0173058 | LINZ_0173058 | 5/12/2016 | 5/12/2016 L. Chang Agreement | | R, P |
| DTX-538 | LINZ_0173059 | LINZ_0173059 | 8/8/2016 | 8/8/2016 L. Chang Agreement | | R, P |
| DTX-539 | LINZ_0173060 | LINZ_0173072 | 10/12/2018 | 10/12/2018 L. Chang Agreement | | R, P |
| DTX-540 | LINZ_0173073 | LINZ_0173073 | 1/25/2019 | 1/25/2019 L. Chang Agreement | | R, P |
| DTX-541 | | | | CV of Jeffrey L. Barnett, M.D. | | |
| DTX-542 | | | | CV of Lawrence H. Block, Ph.D. FAPRS, FAAPS | | |
| DTX-543 | | | | CV of Stephen Brian Henry Kent, Ph.D. (Acedemic) | Kent 2 | |
| DTX-544 | | | | CV of Stephen Brian Henry Kent, Ph.D. (Professional) | | |
| DTX-545 | | | | CV of DeForest McDuff, Ph.D. | | |

**Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.**
**D.N.J. C.A. No. 16-1114 (RGA)**
**Defendants' Joint Trial Exhibit List**

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-546 | | | | CV of Kim E. Barrett, Ph.D. | Barrett 19 | I |
| DTX-547 | | | | CV of Lin Chang, M.D. | Chang 6 | I |
| DTX-548 | | | | CV of William Degrado, Ph.D | | I |
| DTX-549 | | | | CV of Alexander M. Klibanov | Klibanov 6 | I |
| DTX-550 | | | | CV of Pardeep K. Gupta (Exhibit 1 to the Expert Report of Pardeep K. Gupta, Ph.D.) | | |
| DTX-551 | | | 11/9/2018 | Opening Expert Report of Jeffrey L. Barnett, M.D. in Support of Invalidity of the Patents In Suit | | ER, P, H |
| DTX-552 | | | 11/9/2018 | Materials Considered by Jeffrey L. Barnett, M.D. (Exhibit B to Opening Expert Report of Jeffrey L. Barnett, M.D. in Support of Invalidity of the Patents In Suit) | | ER, P, H |
| DTX-553 | | | 2/15/2019 | Reply Expert Report of Jeffrey L. Barnett, M.D. in Regarding Invalidity | | ER, P, H |
| DTX-554 | | | 2/15/2019 | Materials Considered by Jeffrey L. Barnett, M.D. (Attachment A to Reply Expert Report of Jeffrey L. Barnett, M.D. in Regarding Invalidity) | | ER, P, H |
| DTX-555 | | | 11/9/2018 | Opening Expert Report of Lawrence H. Block, Ph.D, FAPRS, FAAPS | Block 1 | ER, P, H |
| DTX-556 | | | 11/9/2018 | Materials Considered by Lawrence H. Block, Ph.D. (Exhibit 2 to Opening Expert Report of Lawrence H. Block, Ph.D, FAPRS, FAAPS) | | ER, P, H |
| DTX-557 | | | 2/15/2019 | Reply Expert Report of Lawrence H. Block, Ph.D, FAPRS, FAAPS | Klibanov 5; Block 2 | ER, P, H |
| DTX-558 | | | 2/15/2019 | Materials Considered by Lawrence H. Block, Ph.D. (Exhibit A to Reply Expert Report of Lawrence H. Block, Ph.D, FAPRS, FAAPS) | | ER, P, H |
| DTX-559 | | | 11/9/2018 | Opening Expert Report of Stephen Brian Henry Kent, Ph.D. | Degrado 3; Kent 1 | ER, P, H |
| DTX-560 | | | 11/9/2018 | Materials Considered by Stephen Brian Henry Kent, Ph.D.(Exhibit 2 to Opening Expert Report of Opening Expert Report of Stephen Brian Henry Kent, Ph.D.) | Kent 3 | ER, P, H |
| DTX-561 | | | 2/15/2019 | Reply Expert Report of Stephen Brian Henry Kent, Ph.D. | Kent 4 | ER, P, H |
| DTX-562 | | | 2/15/2019 | Supplemental Materials Considered by Stephen Brian Henry Kent, Ph.D.(Exhibit A to a Reply Expert Report of Opening Expert Report of Stephen Brian Henry Kent, Ph.D.) | | ER, P, H |
| DTX-563 | | | 2/15/2019 | Expert Report of DeForest McDuff, Ph.D. | | ER, P, H |
| DTX-564 | | | 2/15/2019 | Materials Considered by DeForest McDuff, Ph.D. (Attachment A-2 to Expert Report of DeForest McDuff, Ph.D.) | | ER, P, H |
| DTX-565 | | | 1/18/2018 | Rebuttal Expert Report of Kim E. Barrett, Ph.D. | Barrett 1; DeGrado 8 | |
| DTX-566 | | | 1/18/2018 | Materials Considered by Kim E. Barrett, Ph.D. (Exhibit 2 to Rebuttal Expert Report of Kim E. Barrett, Ph.D.) | Barrett 2 | |
| DTX-567 | | | 1/18/2018 | Rebuttal Expert Report of Lin Chang, M.D. | Chang 5 | |
| DTX-568 | | | 1/18/2018 | Materials Considered by Lin Chang, M.D. (Exhibit 2 to Rebuttal Expert Report of Lin Chang, M.D.) | | |
| DTX-569 | | | 1/18/2018 | Rebuttal Expert Report of William DeGrado,  Ph.D. | | |

CONFIDENTIAL

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.

D.N.J. C.A. No. 16-1114 (RGA)

Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-570 | | | 1/18/2018 | Materials Considered by William DeGrado,  Ph.D. (Exhibit 2 to Rebuttal Expert Report of William DeGrado,  Ph.D.) | | |
| DTX-571 | | | 1/18/2018 | Rebuttal Expert Report of Professor Alexander M. Klibanov | Klibanov 2; Block 8 | |
| DTX-572 | | | 1/18/2018 | Materials Considered by Professor Alexander M. Klibanov (Exhibit B to Rebuttal Expert Report of Professor Alexander M. Klibanov) | Klibanov 3 | |
| DTX-573 | | | 8/9/2019 | Expert Report of Pardeep K. Gupta | | ER, P, H |
| DTX-574 | | | 8/9/2019 | Materials Considered by Pardeep K. Gupta (Exhibit 2 to the Expert Report of Pardeep K. Gupta, Ph.D.) | | ER, P, H |
| DTX-575 | | | 9/20/2019 | Second Rebuttal Expert Report of Professor Alexander M. Klibanov | | |
| DTX-576 | | | 9/20/2019 | Second Rebuttal Expert Report of Professor Alexander M. Klibanov: List of Materials Considered | | |
| DTX-577 | | | 8/8/2018 | Mark Currie Deposition Transcript | | R, P, H |
| DTX-578 | | | 8/16/2018 | Angelika Fretzen Deposition Transcript | Klibanov 15 | R, P |
| DTX-579 | | | 8/23/2018 | Hong Zhao Deposition Transcript | | R, P |
| DTX-580 | | | 9/7/2018 | Caroline Kurtz Deposition Transcript | | R, P |
| DTX-581 | | | 9/13/2018 | Shalina Mahajan-Miklos Deposition Transcript | | R, P |
| DTX-582 | | | 9/14/2018 | Ralph Giannella Deposition Transcript | | R, P, H |
| DTX-583 | | | 9/20/2018 | Andrew Chien Deposition Transcript | | R, P |
| DTX-584 | | | 9/26/2018 | Linda Kunka Deposition Transcript | | R, P |
| DTX-585 | | | 9/27/2018 | Henry Wolfe Deposition Transcript | | R, P, H |
| DTX-586 | | | 3/8/2019 | Alexander M. Klibanov Deposition Transcript | | ER, P, H |
| DTX-587 | | | 3/14/2019 | Kim E. Barrett, Ph.D. Deposition Transcript | | ER, P, H |
| DTX-588 | | | 4/8/2019 | William DeGrado,  Ph.D. Deposition Transcript | | ER, P, H |
| DTX-589 | | | 4/10/2019 | Lin Chang, M.D. Deposition Transcript | | ER, P, H |
| DTX-590 | | | 3/20/2019 | Lawrence H. Block, Ph.D, FAPRS, FAAPS Deposition Transcript | Gupta 13 | ER, P, H |
| DTX-591 | | | 3/27/2019 | Stephen Brian Henry Kent, Ph.D. Deposition Transcript | | ER, P, H |
| DTX-592 | | | 3/29/2019 | Jeffrey L. Barnett, M.D. Deposition Transcript | | ER, P, H |
| DTX-593 | | | 4/3/2019 | DeForest McDuff, Ph.D. Deposition Transcript | | ER, P, H |
| DTX-594 | | | 10/17/2019 | Pardeep K. Gupta, Ph.D. Deposition Transcript | | ER, P, H |
| DTX-595 | | | 10/23/2019 | Alexander Klibanov, Ph.D. Deposition Transcript | | ER, P, H |
| DTX-596 | | | 3/29/2019 | Errata for deposition of Jeffrey Barnett, M.D. dated March 29, 2019 | | ER, P, H |
| DTX-597 | | | 4/17/2019 | Errata for deposition of Dr. Kim Barrett, Ph.D. dated March 14, 2019 | | ER, P, H |
| DTX-598 | | | 4/17/2019 | Errata for deposition of Dr. Lawrence Block, Ph.D. dated March 20, 2019 | | ER, P, H |
| DTX-599 | | | 10/25/2018 | Errata for deposition of Andrew Chien dated September 20, 2018 | | ER, P, H |
| DTX-600 | | | 9/25/2018 | Errata for deposition of Angelika Fretzen, Ph.D. dated August 16, 2018 | | ER, P, H |
| DTX-601 | | | 10/24/2018 | Errata for deposition of Ralph Giannella, M.D. dated September 14, 2018 | | ER, P, H |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-602 | | | 10/17/2019 | Errata for deposition of Pardeep K. Gupta, Ph.D. dated October 17, 2019 | | ER, P, H |
| DTX-603 | | | 4/30/2019 | Errata for deposition of Stephen Brian Henry Kent dated March 27, 2019 | | ER, P, H |
| DTX-604 | | | 4/6/2019 | Errata for deposition of Professor Alexander Klibanov dated March 8, 2019 | | ER, P, H |
| DTX-605 | | | 11/22/2019 | Errata for deposition of Professor Alexander Klibanov dated October 23, 2019 | | ER, P, H |
| DTX-606 | LINZ_0107080 | LINZ_0107087 | 3/25/1991 | Ozaki et al., Molecular Structure of the Toxic Domain of Heat-stable Enterotoxin Produced by a Pathogenic Strain of Excherichia Coli, 266(9) J. Biological Chem. 5934 (1991) | Kent 32 | R, P |
| DTX-607 | | | 6/14/2019 | Errata Sheet for the Deposition Transcript of Dr. Lin Chang, M.D. dated April 10, 2019 | | ER, P, H |
| DTX-608 | | | 9/19/2018 | Errata Sheet for the Deposition Transcript of Mark G. Currie, Ph.D. dated August 8, 2018 | | R, P |
| DTX-609 | | | 6/16/2019 | Errata Sheet for the Deposition Transcript of Dr. William F. Degrado, Ph.D. dated April 8, 2019 | | ER, P, H |
| DTX-610 | | | 11/12/2018 | Errata for the Deposition Transcript of Linda Kunka dated September 26, 2018 | | R, P |
| DTX-611 | | | 10/20/2018 | Errata Sheet for the Deposition Transcript of Caroline Kurtz, Ph.D. dated September 7, 2018 | | R, P |
| DTX-612 | | | 11/7/2018 | Errata Sheet for the Deposition Transcript of Henry Wolfe, Ph.D. dated September 27, 2018 | | R, P, H |
| DTX-613 | | | 10/5/2018 | Errata Sheet for the Deposition of Hong Zhao, Ph.D., dated August 23, 2018 | | R, P |
| DTX-614 | | | 11/1/2019 | Academic CV & Bibliography of Stephen Brian Henry Kent (November 2019) | | |
| DTX-615 | | | 11/1/2019 | Professional Curriculum Vitae of Stephen B. H. Kent | | |
| DTX-616 | | | 11/1/2019 | Curriculum Vitae of Jeffrey L. Barnett | | |
| DTX-617 | | | 11/1/2019 | Curriculum Vitae of DeForest McDuff, Ph.D. | | |
| DTX-618 | | | 7/18/2017 | U.S. Patent 9,708,371 | | R, P |
| DTX-619 | | | 2/1/2012 | Palsson, et al. IBS Patients Show Frequent Fluctuations between Loose/Watery and Hard/Lumpy Stools; Implications for Treatment. Am J Gastroenterol. 107(2): 286-95 (2012) | | |
| DTX-620 | | | 8/9/2019 | Expert Report of Pardeep K. Gupta, Ph.D. with Exhibits 1-2 | Gupta 1 | ER, P, H |
| DTX-621 | | | 10/26/2007 | FDA correspondence to sanofi-aventis and package inserts for DDAVP Nasal Spray, DDAVP Rhinal Tube, DDAVP Injection, and DDAVP Tablets | Gupta 2 | |
| DTX-622 | | | 3/6/2006 | FDA correspondence to Novartis Pharmaceuticals Corporation and package insert for Sandimmune | Gupta 3 | |
| DTX-623 | | | 11/9/2019 | Opening Expert Report of Lawrence H. Block, Ph.D, FAPRS, FAAPS with CV and Materials Considered | Gupta 7 | ER, P, H |
| DTX-624 | | | 2/15/2019 | Reply Expert Report of Lawrence H. Block, Ph.D, FAAPS with Exhibit A | Gupta 8 | ER, P, H |

Allergan Sales, LLC, et al. v. Teva Pharmaceuticals and Sandoz Inc.
D.N.J. C.A. No. 16-1114 (RGA)
Defendants' Joint Trial Exhibit List

| DTX | Beg Bates | End Bates | Date | Description | Dep Ex. No. | Plaintiffs' Objections |
|---|---|---|---|---|---|---|
| DTX-625 | | | 11/9/2018 | Opening Expert Report of Stephen Brian Henry Kent, Ph.D. with Exhibits 1-2 | Gupta 17 | ER, P, H |
| DTX-626 | TEVA-LINAC0029225 | TEVA-LINAC0029315 | 6/8/2015 | Email from J. Dertine to J. Clark attaching Pre-ANDA Meeting Request/Package | Shah 8 | |
| DTX-627 | TEVA-LINAC0000232 | TEVA-LINAC0000235 | 11/5/2015 | Pre-ANDA Meeting teleconference minutes | Shah 15 | |
| DTX-628 | TEVA-LINAC0137117 | TEVA-LINAC0137184 | 11/7/2017 | Teva ANDA No. 211255 Sequence 0001, 2.3.P Drug Product (23p1-23p4) [Linaclotide Capsules, 72 mcg] | Shah 25 | |
| DTX-629 | TEVA-LINAC0137253 | TEVA-LINAC0137275 | 11/7/2017 | Teva ANDA No. 211255 Sequence 0001, 2.3.P Drug Product (23p5-23p8) [Linaclotide Capsules, 72 mcg] | Shah 26 | |
| DTX-630 | TEVA-LINAC0137655 | TEVA-LINAC0137781 | 11/7/2017 | Teva ANDA No. 211255 Sequence 0001, 3.2.P.2 Product Development Report, 3.2.P.2 [Linaclotide Capsules, 72 mcg] | Shah 27 | |
| DTX-631 | TEVA-LINAC0137782 | TEVA-LINAC0137783 | 11/7/2017 | Teva ANDA No. 211255 Sequence 0001, 3.2.P.3 Manufacture [Linaclotide Capsules, 72 mcg] | Shah 28 | |

**Plaintiffs' Objection Key**

| Objection Code | Objection |
|---|---|
| AAA | Asked and answered |
| AF | Assumes facts not in evidence |
| ARG | Argumentative |
| CLC | Calls for a legal conclusion |
| CS | Calls for speculation |
| DUP of [xx] | Duplicate exhibit |
| ER | Expert report or expert opinion |
| F | Lacks Foundation |
| H | Hearsay |
| I | Incomplete / FRE 106 |
| IC | Illegible copy |
| LA | Legal argument |
| MR | Misstates record |
| MT | Misstates testimony |
| NA | Not authenticated |
| NB | No Bates range or incorrect Bates range |
| NE | Not evidence |
| NP | Exhibit not provided |
| NPK | No personal knowledge |
| NTD | Not timely disclosed |
| NTP | Not timely produced |
| P | Prejudice, confusion, waste of time, misleading |
| R | Relevance |
| SET | Seeks expert testimony |
| V | Vague |